UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| TYLER GRENIER, Individually, and JENNA GRENIER, Individually and as Next Friend of J.A.G., a minor,<br><br>                Plaintiffs<br><br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | CIV. NO. 22-00396 LEK-KJM |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE THE TESTIMONY OF EXPERT WITNESS THOMAS WISWELL M.D., [FILED 7/1/24 (DKT. NO. 112)]**

This matter arises out of a medical malpractice action filed by Plaintiffs Tyler Grenier, individually, and Jenna Grenier, individually and as next friend of J.A.G., a minor, (collectively "Plaintiffs") against Defendant United States of America ("Defendant") for alleged medical negligence at Tripler Army Medical Center ("Tripler" or "TAMC") related to the medical care by Defendant's employees for prenatal care and labor of Plaintiff Jenna Grenier ("Jenna"), and the subsequent delivery of J.A.G. See Complaint, filed 8/29/22 (dkt. no. 1). Severe physical injuries sustained by Jenna Grenier and J.A.G. are alleged as well as the negligent infliction of emotional distress to Plaintiff Tyler Grenier ("Tyler") and Jenna; Plaintiffs' loss of filial consortium; and Tyler's loss of

spousal consortium. [Id. at ¶¶ 59-73.] In the instant motion, Plaintiffs seek to strike the testimony of Defendant's expert witness, Thomas Wiswell, M.D., in its entirety because he is a neonatologist and is not qualified to render opinions regarding causation of the injuries sustained by the minor plaintiff nor the standard of care surrounding his delivery at birth. [Pls.' Motion to Strike the Testimony of Expert Witness Thomas Wiswell, M.D., filed 7/1/24 (dkt. no. 111) ("Wiswell Motion"), Mem. in Supp. at 1-2.] They do not dispute his credentials as a pediatrician and neonatologist.

      Defendants filed its opposition on August 13, 2024. [Def.'s Omnibus Opposition to Plaintiffs' Motions to Strike the Expert Testimony of Dwight Rouse, M.D., Cole Greves, M.D., Thomas Wiswell, M.D., and Thomas G. Burns, Psy.D., ABPP [ECF Nos. 108, 109, 112, 114, 115, 116], filed 8/13/24 (dkt. no. 139) ("Mem. in Opp.").] Defendant challenges Plaintiffs' assertion that, because Dr. Wiswell is a neonatologist and not an OBGYN, he is not qualified to offer opinions about Jenna's labor and delivery, and cannot meet the requirements of Rule 702, Federal Rules of Evidence. [Id. at 6-7.] Defendant contends that lack of specialization is a matter of weight and not admissibility so long as Dr. Wiswell stays in his subject area. [Id. at 7 (citations omitted).]

Plaintiffs filed their reply on August 20, 2024, and repeat their assertions that: Dr. Wiswell is not qualified to opine on the standard of care surrounding the minor plaintiff's delivery because that opinion is outside his expertise; his opinions are not helpful to the trier of fact; and his opinions duplicate standard of care opinions from Defendant's experts, Drs. Rouse and Greves. [Pls.' Reply Memorandum to Defendant United States of America's Omnibus Opposition to Plaintiffs' Motions to Strike the Expert Testimony of Dwight Rouse, M.D., Cole Greves, M.D., Thomas Wiswell, M.D., and Thomas G. Burns, Psy.D., ABPP, filed 8/20/24 (dkt. no. 145), at 10-11.]

As follows, the Wiswell Motion is granted as to Dr. Wiswell's opinions on standard of care for Jenna, and labor and delivery because he is not qualified to render opinions in these areas. The Wiswell Motion is denied in all other respects.

## STANDARDS

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles

3

and methods"; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. A trial judge is required to apply a gatekeeping role to expert witness testimony. White v. Ford Motor Co., 312 F.3d 998, 1007 (9th Cir. 2002) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003). The Rule 702 inquiry under Daubert, however, "'is a flexible one,'" and the "'factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Id. (quoting Kumho Tire, Ltd. v. Carmichael, 526 U.S. 137, 150 (1999)). To determine reliability,

> [s]cientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." Clausen v. M/V New Carissa, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993). Courts must determine whether the reasoning or methodology underlying testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. Id. at 592-93. Among the factors considered in determining whether to admit expert testimony under Rule 702 are: (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the known or potential error rate of the technique; and (4) whether the method has been

subjected to peer review and publication. Id. at 593-94.

Zucchella v. Olympusat, Inc., CV 19-7335 DSF(PLAx), 2023 WL 2628107, at *1 (C.D. Cal. Jan. 10, 2023). "[A] trial court has broad latitude in determining whether an expert's testimony is reliable," as well as in deciding how to determine the reliability of that testimony. Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004) (citation and internal quotation marks omitted). In applying Daubert to physicians' testimony,

> "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable," but it need not be conclusive because "medical knowledge is often uncertain." "The human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof." Where the foundation is sufficient, the litigant is "entitled to have the jury decide upon [the experts'] credibility, rather than the judge."

Primiano v. Cook, 598 F.3d 558, 565–66 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (alteration in Primiano) (footnotes and citations omitted).

To be admissible, evidence must be relevant. See Fed. R. Evid. 402. "'Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'" Primiano, 598 F.3d at 565 (quoting United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)). The facts

5

that the expert relies upon for his or her opinion is not an issue of admissibility:

> "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (quoting Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Children's Broad. Corp., 357 F.3d at 865. The Court agrees many of Nutten's assumptions about Dykzeul's lost earnings with Charter are rosy. But they are not entirely unfounded and Charter's concerns about the basis of the report can be raised and addressed on cross examination. See Primiano, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Dykzeul v. Charter Commc'ns, Inc., CV 18-5826 DSF(GJSx), 2021 WL 4522545, at *7 (C.D. Cal. Feb. 3, 2021) (alteration in Dykzeul).

## DISCUSSION

Dr. Wiswell reviewed the Complaint filed in the instant action, Tripler records for Jenna and the minor plaintiff, various medical records from medical facilities for the minor plaintiff, Plaintiffs' expert reports, the deposition transcripts for Jenna and Tyler as well as those for various individuals involved in Jenna's labor and the delivery of the minor plaintiff. [Wiswell Motion, Declaration of Jed Kurzban,

6

Esq., Exh. A (letter report from Dr. Wiswell to Dana Barbata, Esq., dated 5/8/24 (dkt. no. 112-3) ("Wiswell Expert Report")).] In his report, he states that he is "board certified in Pediatrics and Neonatal-Perinatal Medicine," and he is "a neonatologist . . . recently retired from clinical practice." [Id. at PageID.940.] The American Board of Medical Specialties has set the standard of professionalism and care for physicians and specialists since 1933 and has twenty-four certifying boards. See https://www.abms.org (last visited Sept. 24, 2024). The American Board of Pediatrics states that "[p]ediatricians practice the specialty of medical science concerned with the physical, emotional, and social health of children from birth to young adulthood." https://www.abms.org/board/american-board-of-pediatrics (last visited Sept. 24, 2024). Subspecialties certified by the American Board of Pediatrics include neonatal-perinatal medicine, which it describes as "act[ing] as the principal care provider for sick newborn infants." Id. In addition, "[t]his specialist's clinical expertise is used for direct patient care and for consulting with obstetrical colleagues to plan for the care of mothers who have high-risk pregnancies." Id.

     Dr. Wiswell lists 17 opinions regarding the instant matter. The following ten opinions are excluded on the basis that Dr. Wiswell does not present qualifications in the specific

medical practice areas to render opinions regarding the standard of care for obstetrics, and labor and delivery, certain opinions are generalized and overly broad, and he did not provide any methodology or principles supporting his conclusions:

1. None of the Tripler Army Medical Center providers breached the standard of care.

2. J.A.G.'s medical problems were not caused by negligence by any TAMC providers.

. . . .

5. As many as 44% or more of women are colonized with the *E. coli* bacterium during pregnancy. It would be pure speculation that Jenna Grenier's birth canal was inadequately cleansed during her labor with J.A.G. and that this was the cause of her child's infection. Additionally, there is no medical literature supporting the concept that an elective cesarean section instead of a vaginal delivery will prevent systemic bacterial infections with *E. coli* in the offspring of mothers who are colonized with the organism.

. . . .

10. The management of Jenna Grenier met the American College of Obstetrics and Gynecology (ACOG) Practice Bulletin #178 published recommendations for pregnant diabetic women for considering elective cesarean section when there is possible fetal macrosomia. The ACOG recommendations are to attempt a vaginal delivery in such patients and not consider a cesarean section unless the estimated fetal weight is ≥ 4500 gm. The two estimates of the fetal weight closest to J.A.G.'s delivery were done less than 4 days before induction of labor: a) 3 3/4 days prior to induction (a 4013 gm estimate via ultrasound) and b) on the day of induction (3500 gm estimate from clinical examination findings using the Leopold maneuvers). As such, one could **not**

"reasonably" estimate that Jenna's fetus would weigh 4500 gm or greater prior to her induction. In fact, using standard fetal growth charts to plot the serial ultrasound assessments of fetal weight in this child demonstrates a projected birth weight **hundreds** of grams less than 4500 gm on the day when induction of labor was started (redacted). The standard of care in decision-making is based on the estimate weight of the fetus, **not** on the percentiles on fetal growth charts where the estimated fetal weight plots.

11. A plaintiff obstetrician (Dr. Levy) suggested that presenting delivery options to Ms. Grenier was "both foolish and below the standard of care". He stated that the TAMC providers should have only given her the single "recommendation" for a cesarean section. However, presenting a single treatment option is an incorrect proposition and would have been considered a breach of the standard of care in 2021. Counseling a laboring mother and presenting options, as well as discussing potential risks and benefits, are the basis for a cornerstone of medical practice, informed consent counseling. Solely presenting a single recommendation is a paternalistic form of medical practice that has been considered unethical for more than 25 years. The latter approach does not include crucial ethical concepts such as true informed consent, patient autonomy, and shared decision making. True informed consent counseling involves a partnership in decision making between the patient and the physician.

12. The aforementioned plaintiff expert stated that since Ms. Grenier's diabetes was not well controlled, a "reasonable" OB/GYN provider should have advised a cesarean section without including forceps-assisted vaginal delivery as an option. However, this is an incorrect assessment of Ms. Grenier's status during the latter part of her pregnancy. At an early point in her pregnancy in early December 2020 (more than seven months before delivery),

>  Jenna was considered to have poor glucose control reflected by a hemoglobin A1c level of 9.1. Nevertheless, subsequently during her pregnancy various healthcare providers worked with this patient and adjusted her insulin dosing so that by the last trimester her diabetes was described as being both "moderately well-controlled" and "well-controlled". The drop in her hemoglobin A1c level to 6.4 on 5/11/2021 reflects this improved control.
>
> 13. ACOG supports the training in both low- and mid-forceps deliveries and does not recommend that they not be performed. Reputable OB/GYN providers continue to successfully perform the procedure when indicated. There is no indication in the medical records that Dr. Pilgrim was not qualified to perform or supervise the forceps-assisted delivery or that said delivery breached the standard of care.
>
> 14. The criteria for mid-pelvis arrest of descent is not more than 2 hours of pushing. The ACOG criteria for arrest of descent were changed ten years ago (2014) to a duration of 4 hours or more.
>
> . . . .
>
> 16. Dr. Levy refers to Ms. Grenier's comments that in post-op physician's notes in which this woman stated that she had read the medical records and did not find that she had given consent for a forceps-assisted delivery. Dr. Levy also claims that Ms. Grenier had clearly stated that she requested a cesarean delivery, This expert is is [sic] incorrect. Ms. Grenier signed a consent form on the day of induction (redacted) in which she specifically agreed to the procedure of a vaginal delivery with the possibility her doctor might need the "help" of forceps. Additionally, there is no documentation that Ms. Grenier requested a cesarean section either in the prenatal records or during the period of time between

>    her (redacted) admission for induction of labor and the subsequent delivery of J.A.G. on (redacted). In her caregiver notes made on 7/16/2021, Dr. Mada reminded Jenna that during late labor prior to J.A.G.'s birth, the two of them had discussed the possibility of a cesarean section, but that the two of them had decided to proceed with a forceps delivery.
>
> 17. Several of Dr. Levy's opinions are pure conjecture. There is no evidence in the records that Dr. Mada needed to perform this operative delivery in order to complete her ACGME requirements. There is no evidence in the records that the physicians delivering the child failed to exercise skill and thoughtfulness in their operative vaginal delivery. There is no evidence in the records that the repair of Ms. Grenier's 4th degree laceration was not skillfully done.

The remaining seven opinions expressed in the Wiswell Expert Report (found in paragraphs numbered 3, 4, 6, 7, 8, 9, and 15) are not excluded because he is qualified as a pediatrician and neonatologist to opine on the standard of care for and medical treatment of newborn infants and children.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike the Testimony of Expert Witness Thomas Wiswell, M.D., [filed 7/1/24 (dkt. no. 111),] is GRANTED IN PART AND DENIED IN PART. Specifically, it is GRANTED as to any opinions about the standard of care for obstetrics, and labor and delivery, and is DENIED in all other respects.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 25, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**TYLER GRENIER, ETC., ET AL VS. UNITED STATES OF AMERICA; CV 22-00396 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE THE TESTIMONY OF EXPERT WITNESS THOMAS WISWELL M.D., [FILED 7/1/24 (DKT. NO. 112)]**