CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

DANA A. BARBATA #9112
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: Dana.Barbata@usdoj.gov

BRIAN C. TRACY NE#25379
Major, U.S. Army
Special Assistant U.S. Attorney
U.S. Army Legal Services Agency
Litigation Division
9275 Gunston Road
Fort Belvoir, VA  22060
Telephone: (703) 693-1064
Facsimile: (703) 806-1941
E-mail: Brian.C.Tracy2.mil@army.mil

Attorneys for Defendant
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TYLER GRENIER, INDIVIDUALLY; and JENNA GRENIER, INDIVIDUALLY and as NEXT FRIEND OF J.A.G., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 22-00396 LEK-KJM<br><br>DECLARATION OF WILLIAM PARTIN; EXHIBIT EXCERPTS; CERTIFICATE OF SERVICE<br><br>Pretrial Conf.: November 18, 2024<br>Time: 10:00 A.M.<br>Judge: Hon. Leslie E. Kobayashi<br><br>TRIAL DATE:  December 2, 2024 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TYLER GRENIER, INDIVIDUALLY; and JENNA GRENIER, INDIVIDUALLY and as NEXT FRIEND OF J.A.G., a minor, | CIVIL NO. 22-00396 LEK-KJM |
| Plaintiffs, | DECLARATION OF WILLIAM PARTIN |
| vs. | |
| UNITED STATES OF AMERICA, | TRIAL DATE:   December 2, 2024 |
| Defendant. | |

DECLARATION OF WILLIAM PARTIN

I, William Partin, hereby state:

1.      I am the founder of Mueller & Partin, Inc. and have been retained by Defendants to serve as an expert witness in the above-referenced matter.  I am over the age of eighteen years and have personal knowledge of the facts set forth in this declaration.

2.      I hold a B.A. in economics from Washington State University and have completed graduate studies in economics, finance, and accounting at Seattle University.  I am a Certified Public Accountant (CPA), Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants (AICPA), a Master Analyst in Financial Forensics (MAFF) certified by the

1

National Association of Certified Valuators and Analysts, a Certified Fraud

Examiner (CFE) certified by the Association of Certified Fraud Examiners and,

through the American Society of Appraisers, have completed business valuation

levels 1-4 and am a CM in that organization.  I have continuously maintained my

professional license as a CPA in the State of Washington since first obtaining it in

1979.

3.      I have spent my whole adult life working in the fields of accounting,

forensic analysis of income loss claims and business valuation.  Between 1976 and

1984, I served as Regional Manager and Department Head of Management

Advisory Services for Laventhol & Horwath, an international public accounting

firm.  During that time, I performed accounting work, consulting services, forensic

analysis, and business valuations relating to a wide range of issues across various

industries.  In 1984, I co-founded Mueller & Partin, an accounting firm that

specializes in forensic analysis of damage claims, economics, and valuations. I

have over 40 years of experience as an expert witness analyzing business income

loss claims, personal injury claims, breach of contract claims, and a variety of

other claims in litigation.  I have worked on thousands of personal injury and

wrongful death claims over the course of my career with many involving children.

Since 1984, I have been retained as an expert in well over 7,000 matters and have

testified in over 800 cases in various jurisdictions throughout the United States.

The majority of those cases involved services generally characterized by the accounting profession as forensic analysis and valuation services. A copy of my current CV and a list of cases in which I have testified is included as Exhibit 1 to this declaration.

4.    I was retained by the United States to respond to the economic damages report provided by Plaintiffs' economist, Thomas Loudat, Ph.D., and to provide a responsive report that calculates the potential loss earnings for J.A.G. and provides a cost value to the life care plan produced by John Fountaine. I am not a doctor or medical professional nor am I a life care planner. I have no opinions on J.A.G.'s diagnosis or reasons for his status and did not review any of the underlying doctors' reports. I am not offering any independent opinions on J.A.G.'s medical condition nor the necessity, or lack thereof, of future care requirements but am simply applying objective statistical data along with the information provided in discovery to calculate J.A.G.'s loss of income and the cost of his life care plan utilizing standardized economic models for determination of losses in personal injury cases.

### Determination of Earnings for a Child When No Data Exists Regarding the Child's "But For" Intellectual Capacity

5.    An individual's income is generally correlated to educational attainment. Given J.A.G. was disabled at the time of birth, there is no objective measure of his intellectual capacity and educational interests but for his

disabilities.  In such circumstances, economists generally rely on socio-economic studies indicating probabilities of educational attainment given specific familial factors that are statistically correlated to probabilities of educational achievement in children. In this case both myself and Dr. Loudat relied upon the Spizman & Kane models for a determination of probabilities associated with various levels of educational attainment.  The Spizman & Kane models are peer reviewed and commonly utilized in circumstances where no data exists regarding an individual's intellectual capacity and educational interests.  The Spizman & Kane models calculate probabilities for attainment of the following levels of education:

- Less than high school diploma,

- GED certificate,

- High school diploma,

- Associate degree,

- Bachelor's degree,

- Master's degree,

- Doctorate degree,

- Professional degree (M.D., J.D., etc.)

The Spizman & Kane models do not calculate probabilities for some education towards a degree, only the level of education actually obtained.

6.      The Spizman & Kane models calculate coefficients (statistical factors) based upon various familial characteristics, such as parental level of education, that are statistically significant factors in determining likely educational outcomes.  The Spizman & Kane research developed two models for estimating probable levels of educational attainment:

•      Model I – identifies statistical coefficients that have some impact on the expected levels of educational attainment in circumstances where parental income is known.

•      Model II – eliminates statistical coefficients relating to parental income and is designed to be used in circumstances where parental income is unknown or not certain.

7.      My analysis utilized Model II because no information was produced regarding J.A.G.'s parental income and estimates of what that income may be are speculative.  Dr. Loudat used Model I, which presumes parental income is known. Dr. Loudat made speculative assumptions regarding parental income and then entered the result of those assumptions into the model.  I will discuss the issue in more detail later in this declaration.

8.      Familial factors statistically influencing a child's educational attainment include the following:

- Location raised (urban or rural)

- Mother's education

- Father's education

- Both biological parents in the home

- Mother's age at 1st birth

- Religion raised in

- Number of siblings

9.      Each of the above factors has a differing impact on the likely educational attainment of the child. For example, the higher the parents' level of educational attainment, the greater the probability of higher educational attainment achieved by their children.[1]

**Spizman & Kane Model II: Probabilities of J.A.G's Educational Attainment**

10.      Statistical analysis has demonstrated certain proportions of children with similar familial traits to those of J.A.G. achieve the following educational outcomes (refer to Attachment 3 of my report):

---

[1] The specific factors in Model II are listed on Attachment 3 of my report along with the statistical values derived from application of the model.

| Education Level | Individual Probability |
|---|---|
| < High School Diploma | 3.48% |
| GED Certificate | 7.68% |
| High School Diploma | 45.07% |
| Associate Degree | 10.33% |
| Bachelor's Degree | 24.63% |
| Master's Degree | 6.97% |
| Ph.D. Degree | 0.61% |
| Professional Degree (M.D., J.D., etc.) | 1.23% |

11.    The above table illustrates the educational attainment probabilities when J.A.G.'s specific familial factors are entered into the Spizman & Kane Model II. The primary familial factors that impact a child's expected educational attainment are parental level of education and then, as described above, there are a variety of other factors that are primarily culturally related including the age of the mother at the date of birth.

12.    The various probabilities for each level of educational attainment add to 100% and individually reflect the probability of a child reaching a specific level of educational attainment. For example, if we have 100 children with similar familial variables as J.A.G., approximately three children will have achieved less than a high school diploma, 45 of those children will have achieved a high school diploma, 25 a Bachelor's degree, seven a Master's degree and about two a Ph.D./Professional degree.

13.    The data tells us that we cannot predict the exact educational attainment of any individual child at birth, but the probabilities instruct us as to the range and proportions of likely outcomes within that range.

## Earnings By Level of Educational Attainment

14.    Each level of educational outcome described above has a population distribution of various incomes associated with it sorted by age and sex. The U.S. Census Bureau collects data regarding income by level of education and publishes statistics that tell us the statistical characteristics of the population, such as its "mean" (mathematical average of all data in the population) and the "median" (the mid-point income level of the population where half of the population makes less and half of the population makes more).  This data is summarized on Attachments 21-28 of my report. When the population "mean" and "median" are materially different from each other, as is frequently the case when examining statistics regarding income by level of education, it indicates that the population "mean" is skewed, meaning that a few very high income earners cause the "mean" to be higher than it otherwise would be resulting in a circumstance where more than 50% of the individuals in the population group actually earn much less than the "mean."  In these circumstances, the "median" earnings statistic more accurately measures the most probable outcome for the specific level of education because half make more and half make less.

## Calculation of J.A.G.'s Earnings Loss

15.    I calculated the present value of J.A.G.'s future earnings (wages + employer provided healthcare and paid leave benefits) for each level of educational attainment as shown on Attachments 4 – 11 of my report.  The annual wage amounts were derived from Attachments 21 – 28 of my report as discussed above. Future earnings for each specific year were derived from analysis of the U.S. Census Bureau earnings data for each level of educational attainment.

16.    The number of years of expected future labor force participation was based upon Bureau of Labor Statistics data indicating the number of labor force participation years for each level of educational attainment achieved (refer to Attachments 30-36 of my report).  Labor force participation rates measure the number of years individuals of the same sex, age, and level of educational attainment are active in the labor force.  Participation rates exclude time periods where individuals in the statistical cohort withdraw from the labor force for any variety of reasons, including: personal illness/injury, illness/injury suffered by family members, caring for children/elderly adults, death, sabbaticals, and any number of other reasons people decide to stop working for periods of time during their careers. Labor force participation data collected by the Bureau of Labor statistics includes individuals currently employed plus individuals that are unemployed but actively looking for work.  Accordingly, one must adjust the

annual earnings estimates for the probability of unemployment associated with each level of educational attainment, to arrive at an accurate estimate of an individual's earnings over the course of their lifetime (refer to probability of unemployment by level of educational attainment data shown on Attachments 37 – 40 of my report). The Bureau of Labor Statistics data does not indicate the timing or duration of the cohort population's withdrawal(s) from the labor force. Labor force participation rates do not project the specific year any individual chooses to retire, but rather measures the years the person is likely to be participating in the labor force and generating earnings without regard to age of the individual. Therefore, as economists, we typically provide the benefit of question to the Plaintiff and assume all participation years are continuous (minimizes the impact of discounting on the earnings loss calculations and serves to increase the economic loss).

17. Employer provided fringe benefits are a component of an individual's total compensation/earnings as reflected in the calculations shown on Attachments 4 – 11 of my report. Compensable monetary fringe benefits include employer contributions to healthcare insurance plus employer contributions to retirement plans. I determined the value of such benefits as a percentage of gross wages earned based upon Bureau of Labor Statistics data indicating the average employer cost of providing such benefits to all civilian workers as shown on Attachment 44

of my report (10.87% of gross wages for healthcare plus 6.16% of gross wages for retirement benefits for a total of 17.04%).

### Present Value

18.    Any loss award made by the court is a lump sum amount stated in today's purchasing power dollars such that when invested in safe government bonds will fully replace the value of earnings lost in each future year of the Plaintiff's worklife.  Future losses (as calculated on Attachments 4 – 11) are stated in present value dollars. Two economic factors impact present value:

- Expected future increases in wages

- Investment returns that can be earned on the lump sum award

(commonly referred to as the "discount rate" applied to restate future amounts to present value dollars).

19.    I determined the impact of these two factors by first calculating the "real growth rate" in wages.  The real growth rate can be determined by subtracting the overall inflation rate as measured by the consumer price index (Attachment 42 of my report) from the average growth rate in average weekly earnings as measured by the Bureau of Labor Statistics (Attachment 41 of my report).  The real growth rate in weekly earnings over the past 20 years has been .68% per year.  I increased annual earnings by .68% each year (real growth rate) for each of the levels of educational attainment.

20.    I next determined expected after-tax investment returns.  I selected U.S. government bonds known as TIPS (treasury inflation protected securities) as a benchmark for the annual return expected from investing a lump sum award.  TIPS bonds are fully guaranteed by the U.S. government and have no risk of default. TIPS are unique in that the government adds the rate of inflation each year to the coupon rate of the bond, resulting in the total rate of return.  The advantage of TIPS is that one does not have to estimate future inflation rates that impact both weekly earnings and investment returns. Future inflation, no matter how large it may be in the future, gets automatically added to the total bond rate of return. TIPS are readily available in the market with varying future maturities allowing one to match the future maturity of the bond with the year the future income would have been earned.   Current TIPS "real rate of return" by bond maturity date are shown on Attachment 46 of my report along with reduction of the TIPS yield for the impact of taxes. Application of the "real wage growth rate" and the "real rate of investment return" based on TIPS allows us to accurately determine present value without the need to speculate about future rates of inflation.   Specific discount factors applied to the calculations on Attachments 4 – 11 are calculated on Attachment 45.

## Taxes

21.    I deducted taxes (income and payroll tax) from the present value of lost earnings for each of the eight educational attainment possibilities.  My tax calculations for each level of educational attainment are stated in present value dollars utilizing the growth and discount methodology described above. The detailed calculations for each level of educational attainment are contained in Attachments 12 – 19 of my report.

## Cost of Education

22.    I deducted the cost of tuition, books and supplies relating to obtaining each level of college education from the associated loss of earnings generated by that level of education.  The costs for tuition, books and supplies were based on the average cost to attain the level of education at a public institution as published by the U.S. Department of Education, National Center for Education Statistics.  The annual costs (based on 2022 data) were increased by expected future inflation and discounted to present value as calculated on Attachment 20 of my report.

## Future Lost Earnings Loss Summary

23.    Attachment 1 of my report summarizes the present value of future earnings less taxes and cost of education resulting from each educational attainment level.  In this circumstance, we have eight educational attainment possibilities with the associated present value of lost future earnings for each (refer

to Attachment 1). Statistical science provides a method of dealing with ranges of potential educational outcomes, commonly known as "expected value" (probability weighted value).  One calculates expected value by multiplying the present value of lost earnings for each level of educational attainment by the probability of attaining that level of education. The result of the calculation is a probability-weighted earnings amount that is the most statistically accurate measure of the expected future earnings loss stated in present value dollars.  The expected value is the most statistically likely outcome and meets a "more probable than not" standard.

24.    The probability weighed present value of J.A.G.'s earnings over the course of his work life is $1,490,105 (Attachment 1).

### Differences Between Mueller & Partin and Dr. Loudat

25.    My lost earnings calculations vary from those of Dr. Loudat for the following reasons:

A.    Dr. Loudat utilized Model I of the Spizman & Kane research.  Model I presumes one has accurate information regarding parental earnings.  Dr. Loudat does not have any information regarding parental earnings and entered speculative assumptions regarding those earnings into the model.  I used Model II of the Spizman & Kane research because it was specifically designed for circumstances where no information has been produced for parental earnings and avoids the error

rates associated with speculative assumptions.  My inputs to the Spizman & Kane

model made no speculative assumptions regarding parental earnings.

B.    Dr. Loudat incorrectly assumed J.A.G.'s parents had achieved more

educational attainment than actually achieved and entered those factors into Model

I. J.A.G.'s mother does not have 17 years of formal education as assumed by Dr.

Loudat, she has 16 years.[2]  Dr. Loudat assumed J.A.G.'s father has 16 years of

formal education when he has only 12.[3],[4] The parents' level of education is the

single largest factor influencing a child's level of educational attainment.

Overstating the actual educational attainment of the parents overstates the

probabilities of higher levels of educational attainment in the Spizman & Kane

models resulting in an overstatement of the economic loss.

---

[2] I provided Mrs. Grenier with the benefit of question regarding completion of a bachelor's degree.  No information is available to me regarding her actual status of completion at this time. If she has not in fact completed the degree, my calculations should be adjusted for the lack of a college degree which will lower J.A.G.'s probabilities of higher educational attainment.

[3] I understand Mr. Grenier has military training and "top security clearance," however, there is no evidence such training translates to higher earnings in the civilian sector and the Spizman & Kane model does not provide for vocational training.  I note that many individuals with a high school diploma or less obtain specific training through labor unions and other vocational training programs.  Individuals with these characteristics are already included in the BLS data and classified into educational categories described in this report.  For example, an individual that has completed an apprenticeship as a journeyman carpenter and has a high school diploma is classified as having a high school diploma in the BLS data.  There is no evidentiary basis to increase the level of educational attainment for specialized vocational training, particularly in military occupations due to their specificity.  Any decision to do so is necessarily based upon speculation.

[4] I also understand Mr. Grenier has been accepted into a bachelor's degree "sports medicine" program.  Mr. Grenier has not yet begun the program and the statistical probability of completing a four-year bachelor's degree after the age of 26 is 8.4% within a six-year period of program enrollment *(per U.S. Dept. of Education, Persistence, Retention, and Attainment of 2011-12 First-Time Beginning Postsecondary Students as of Spring 2017, Table 3 – most current data available)*.  Any assumption Mr. Grenier will obtain a bachelor's degree fails to meet a more probable than not standard.

C.      Dr. Loudat's speculation regarding J.A.G.'s father's income with a bachelor's degree results in a $169,518 overstatement of the alleged loss when his father actually has a high school diploma.[5]  In addition, the Plaintiff has not produced tax returns that would tell us what Mr. & Mrs. Grenier's income actually is.

D.      Dr. Loudat assumed J.A.G. has siblings and entered that as a factor in the Spizman & Kane Model I.  At the date my report was prepared, J.A.G. did not have siblings.[6]

E.      Dr. Loudat rounded J.A.G.'s mother's age at the time of his birth to 22 when she was actually 21.86 at the time of birth.  Model I is sensitive to the mother's age at date of birth and overstating that age overstates the educational attainment probabilities of the child.

F.      Dr. Loudat's data input for J.A.G.'s location of residence as "urban" incorrectly utilized a positive coefficient value, when in fact the coefficient for urban is a negative number.  This error results in an overstatement of higher educational probabilities and an overstatement of the economic loss.

G.      Dr. Loudat incorrectly utilized the Spizman & Kane model statistical "thresholds" for each level of educational attainment by applying the female

---

[5] Utilizing Mueller & Partin's methodology and assumptions.

[6] I recently learned that J.A.G.'s mother has recently given birth to a second child.   Updating my calculations to include the additional sibling would actually reduce the loss by $2,282. We can provide the detailed calculations upon the Court's request.

"thresholds" rather than male "thresholds." The use of female "thresholds"
overstated the probabilities of higher levels of educational attainment resulting in
an overstatement of the economic loss.

H.      Dr. Loudat utilized the statistical "mean" earnings rather than the
"median." As discussed above, the mean is skewed upward because of a very few
number of extremely high wage earners and is therefore not characteristic of
earnings achieved by the majority of individuals within a specific level of
educational attainment. On average, the mean exceeds the median by $20,814 per
year across all levels of educational attainment, therefore materially overstating the
probable economic loss.

I.      Dr. Loudat overstated the value of employer provided fringe benefits.
The data on Attachment 44 of my report indicates that fringe benefits are 17.04%
of gross wages, not 24.97% as assumed by Dr. Loudat.

J.      Dr. Loudat failed to consider the cost of higher education. The cost of
higher education is an offset to the earnings achievement of additional education.

K.      Dr. Loudat understated the net discount rate (mathematical spread
between wage growth rates and the discount rate). His analysis ignored current
yields on TIPS securities which provide higher investment yields while at the same
time eliminating the risk of inflation in both the wage growth rate and the

17

investment rate of return.  Understatement of the net discount rate results in an overstatement of the economic loss.

### Present Value of J.A.G.'s Life Care Plan

26.    I was asked to calculate the present value of the Defendant's life care plan.  Attachment 47 is a summary of the life care plan provided by John Fountaine, with two options for adult home care, reflecting a range of $4,239,408 to $6,588,707.  The calculations show the cost per healthcare category in today's purchasing power, the total cost when real growth rates are applied to future costs, and the present value of those future costs.

27.    Attachment 48 summarizes Mr. Fountaine's life care plan recommendations including:

- A description of each care item,

- The frequency of need,

- The cost per unit of service/product,

- The category of healthcare service as defined by the Bureau of Labor Statistics for which it tracks annual cost increases over time,

- The real growth rate for the cost category.

28.    The real growth rate (calculated by healthcare category on Attachment 52) reflects the average percentage difference between historical growth rates specific to the life care plan category over/under the CPI (2.55%).  I used the

"mean" interest rate (as opposed to the "median," because it is the most appropriate statistic to apply given the characteristics of the data set and the 20-year time horizon). The real growth rate varies between the categories of service/product tracked by the Bureau of Labor Statistics depending on the actual rate of increase over time for each specific category over the general rate of inflation.

29. Attachment 49 of my report summarizes the annual cost of each care category identified in Mr. Fountaine's report over the course of J.A.G.'s life as well as the annual total for each year on the last page of Attachment 49.

30. Attachment 50 of my report utilizes the data from Attachment 49 and increases the costs each year by the real growth rate.

31. Attachment 51 of my report discounts each year of future costs from Attachment 50 (which was increased by real growth for each service category each year) to present value dollars. I utilized the same TIPS guaranteed return securities as discussed above for the earnings loss in my present value calculations for the life care plan. The TIPS securities protect the Plaintiff from any variations in future inflation that may occur and is therefore a better investment vehicle than a regular U.S. Treasury bond in this circumstance.

32. My opinions are stated on a basis of reasonable economic certainty and are more probable than not. My calculations hypothetically assume the

19

Defendant is responsible for the Plaintiff's current health status; if the court

determines the Defendant is not liable, the calculations become irrelevant.  I am

independent of the parties to this litigation.  My calculations and opinions in this

matter are consistent with professional and ethical guidelines published by the

American Institute of Certified Public Accountants.[7]

33.     My report does not factor in collateral sources, such as TriCare

benefits, disability and social security benefits, and educational benefits.  In other

words, it includes all items identified in Mr. Fountaine's report, regardless of

whether the benefit is being or will be provided by the government.

34.     Attached as Exhibit "D-8" is the expert report of John Fountaine dated

June 21, 2024, which informed, in part, my expert report.

35.     Attached as Exhibit "D-9" is a true and correct copy of my expert

report dated June 28, 2024 which describes the background and basic economic

assumptions that were utilized, and also includes all of my calculations as

attachments.   It also includes the supporting documents I produced to Plaintiffs in

response to a subpoena.

---

[7] *Calculation of Damages from Personal Injury, Wrongful Death, and Employment Discrimination: a Nonauthoritative guide; Consulting Services Practice Aid, 98-2*, published by the American Institute of Certified Public Accountants. *Measuring Damages Involving Individuals*, Association of International Certified Professional Accountants, referenced in D-9 at USA016190

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  November 19, 2024, at Honolulu, Hawaii.

_____
WILLIAM PARTIN

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date and by the method of service noted below,

a true and correct copy of the foregoing was served on the following at their last

known address:

<u>Served via CM/ECF:</u>

JED KURZBAN 10355-0                                   jed@kktplaw.com
KURZBAN KURZBAN TETZELI & PRATT, P.A.
c/o 1003 Bishop Street, Suite 1600
Honolulu, HI 96813
Telephone: (786) 401-4706
Facsimile: (305) 444-3503

LAUREN GALLAGHER                                lgallagher@kktplaw.com
KURZBAN KURZBAN TETZELI & PRATT, P.A.
131 Madeira Avenue
Coral Gables, Florida 33134
Telephone: (305) 444-0060
Facsimile: (305) 444-3503

Attorneys for Plaintiffs
TYLER GRENIER, INDIVIDUALLY; and
JENNA GRENIER, INDIVIDUALLY and as
Next Friend of J.A.G., a minor

/ /

/ /

/ /

/ /

/ /

MARK M. MURAKAMI 7342-0                    mmm@hawaiilawyer.com
DAMON KEY LEONG KUPCHAK HASTERT
1003 Bishop Street, Suite 1600
Honolulu, HI 96813
Telephone: (808) 531-8031
Facsimile: (808) 533-2242

Attorneys for Plaintiffs
TYLER GRENIER, INDIVIDUALLY; and
JENNA GRENIER, INDIVIDUALLY and as
Next Friend of J.A.G., a minor

     DATED:  November 19, 2024, at Honolulu, Hawaii.

              CLARE E. CONNORS
              United States Attorney
              District of Hawaii

               /s/ Dana A. Barbata
         By_____
              DANA A. BARBATA
              Assistant U.S. Attorney
              BRIAN C. TRACY
              Special Assistant U.S. Attorney

              Attorneys for Defendant
              UNITED STATES OF AMERICA

# EXHIBIT EXCERPTS

# Fountaine Consulting Services, LLC

15418 NE 195th Street Woodinville, WA 98072
206-909-7331
**john@expertvrc.com**
www.expertvrc.com

June 21, 2024

Dana Barbata, US Assistant Attorney
300 Ala Moana Boulevard
Room 6-100 PJKK Federal Bldg.
Honolulu, HI 96850

Re:     J███ G.
DOB:  7/7/2021

Dear Ms. Barbata:

Thank you for referring J███ G. for coordination of his Life Care Plan and Vocational Assessment. In performing my work, I have reviewed the following records: Hawai'i Department of Health Early Intervention Section, Tripler Army Medical Center, Jenkins Eye Care, Department of the Army U.S. Army Claims Services, Balboa Medical Center, Shriners Hospital for Children, Naval Medical Center San Deigo, Jeri Morris, Ph.D., ABPN, Peachtree Neuropsychological Associated, P.D., report and care plan from Gary M. Yarkony, MD, and depositions of Jenna Grenier, Corporal Tyler Grenier, Justin Pilgrim, DO, Nader Zane Rabie, MD, Karline Schmitz, RN, Captain Touria, Rose Burk, Asha Mada, DO, Gary Yarkony, MD, Jeri Morris, Ph.D., Lee Joshua Brock, MD, and Stephen Deputy, MD.

Additionally, I have consulted with Thomas Burns, Psy.D., ABPP regarding J████ prognosis and future care needs. The attached Life Care Plan is based on Dr. Burns's opinions, as well as my specialized knowledge and experience as a Life Care Planner. The records above and my consultations with Dr. Burns have formed the basis of my understanding of J███ future care needs and vocational capacities. It is not my intent to restate these records or consultations in their entirety for the purposes of this report.

I obtained a Master's Degree in Rehabilitation Counseling in 1992 and have practiced continuously in the field since. I am a Certified Rehabilitation Counselor and Certified Case Manager, who prepares Life Care Plans and Vocational Assessments. A copy of my curriculum vitae is attached, which includes a list of my experience and publications authored in the previous 10 years.  I have testified in various federal and state courts in the United States as a vocational expert and life care planner.

In performing this work, I have followed accepted methodologies and standards of practice. As a Vocational Rehabilitation Counselor, Case Manager and Life Care Planner, I have looked to the medical community to define the nature and extent of impairment. I have then translated those limitations and recommendations to the world of work, independent living, coordination of future medical and rehabilitation services and the costs associated to promote quality of life in the least restrictive environment with respect for independence and human dignity. I have received input

EXHIBIT
**D-8**

J████ G.
June 21, 2024
Page 2

for those items prescribed or deemed medically necessary and appropriate from the requisite professional(s); and then provided case management and vocational rehabilitation foundation and expertise for the identification of additional items, as well as costs and replacement rate for the various items identified.  Additionally, I have determined the impact of Jon████ impairments on his earning capacity and ability to work. My opinions are based upon my knowledge, training and experience combined with my professional and clinical judgments.

## MEDICAL:

Medical records provide a foundation for the nature and extent of medical impairment.  Diagnoses, treatment recommendations and limitations provide insight into injuries and impairments.  Medical records were reviewed and information specific to the nature and extent of injury is noted below.

Jeri Morris, Ph.D. ABPN authored a report related to evaluation of J████ on February 7 and 9, 2024. Dr. Morris's report includes the following:

> "IMPRESSIONS:
> It is clearly obvious that J████ is multi-handicapped as a result of the extensive complications surrounding his birth. He is globally intellectually impaired (intellectual developmental disorder). I considered his records, and I evaluated him when he was one year seven months of age and now again when he is two years seven months of age. He now is even farther below expected levels of cognitive and physical development as compared to his age-related. The gap between J████ and his peers has widened over the past year and can be expected to widen much further as he ages. In fact, he has made the most minimal progress over the past year in any domain except ambulation. He is able to say more words (estimated, approximately 50, though I did not hear him say more than a very few words), he does not speak in phrases, much less sentences. More serious is the fact that he uses words to label things, but he is unable to understand or communicate the meaning of more than a handful of words or signs (e.g. more).
>
> As a result, he rarely understands what is asked of him, and he rarely can follow any simple requests. This is not simply an expressive speech and language problem, it is a severe deficits to his ability to comprehend and to reason. His problem solving is impaired, and he has not grown in terms of his abilities relating to activities of daily living (e.g. dressing, washing face or hands, eating without a spoon without spilling or using other utensils). He also has made no progress in toileting and uses a diaper at all times. He is able to walk, but he tends to internally rotate his feet, and his foot placement is inconsistent. He now is able to finger-feed table food and hold a sippy-cup and spoon (though not without spilling). Given the extensive nature of his impairments and his current profile, he can be expected to have significant cognitive, social, and other deficits and require assistance and the close availability of supervision by a trained caregiver throughout his lifetime on a 24-hour basis."

J███ G.
June 21, 2024
Page 3

I received and reviewed an undated report and life care plan authored by Gary M. Yarkony, MD on March 21, 2024. It included the following:

"J███ Grenier is permanently disabled due to a brain injury. MRI of his brain on August 24, 2021 showed multifocal cystic encephalomalacia in the paramedian posterior parietal and occipital lobes. Sequela of intraparenchymal hemorrhages (blooming susceptibility) were seen involving the bilateral cerebral and cerebellar hemispheres most prominent in the occipital and posterior temporal lobes. Signs of previous subarachnoid hemorrhage was noted. The dural venous sinus thrombosis had improved.

J███ was evaluated by Brandon Cole, M.D., on November 16, 2023. He noted a history of encephalomalacia, perinatal sepsis and cerebral venous infarction and ischemia following shoulder dystonia and a traumatic birth injury. He met diagnostic criteria for autism spectrum disorder level 2 severity and recommended ABA therapy, speech therapy and continuing in the early intervention program. On October 16, 2023, he diagnosed global developmental delay.

Dr. Phillip G. Eye evaluated J███ on November 10, 2022. He noted a history of cerebral venous sinus thrombosis, encephalomalacia and cerebral ischemia resulting in developmental delay and cerebral palsy. Spasticity of his bilateral lower extremities was noted.

Physical therapy note of September 21, 2023 and November 13, 2023 noted developmental delay. His left lower extremity abnormalities are improving. His walking distance and stair climbing is improving. Follow up with physical therapy for strengthening, balance and coordination and gross motor skills was recommended. Daily activities with parents were recommended.

Speech pathology note of September 22, 2023 (age 2 years, 2 months) noted moderate to severe mixed receptive expressive language disorder. Language comprehension was in the 6-9 month range with emerging skills up to 12-15 months with scattered skills up to 18-21 months. Weekly speech therapy was recommended. J███ has received occupational therapy through the early intervention program.

Dr. Jeri Morris, PhD., a neuropsychologist, evaluated J███ at age 31 months. Impairments were noted in speech and fine and gross motor skills. 24-hour supervision is needed throughout his lifetime due to expected problems with cognition.

This plan outlines J███ minimal care needs for the future. He is at risk for substantial additional costs for the treatment of complications, hospitalizations and

J███ G.
June 21, 2024
Page 4

emergency room visits.  With proper medical care, 24-hour supervision and the provision of all necessary medical care, equipment and supplies, he will have a normal life expectancy."

In his May 25, 2024 report Thomas G. Burns, Psy.D., ABPP indicated the following:

"MENTAL STATUS EXAMINATION & BEHAVIORAL OBSERVATIONS: J███ Grenier is a two-year-old male who was accompanied to the evaluation by his mother and father. He was appropriately groomed and dressed. He appeared to be of normal build and weight. Most notable was the bald spot on the back of his head, where he received the skin graft. J███ was able to initially transition easily to the testing room for the ADOS-2 assessment. He immediately sat on the floor to explore the toys in front of him. He was able to imitate feeding the doll and imitate the examiner making a birthday cake and feeding the doll. He spontaneously cut the cake and put candles in the cake. J███ made eye contact with the examiner while establishing eye contact. J███ was able to sit and stand when requested as well as transition through the different activities. He used some single words to communicate social intention but not always coordinated with eye contact. J███ was able to direct a range of facial expressions toward the examiner and his father. He did not show objects or comment on or inquire about the examiner's thoughts and feelings as he did not engage in reciprocal conversation with the examiner due to limited language.

J███ interacted as a friendly and pleasant boy. He walked independently with an unsteady gait. He favored his left side body when walking and predominantly uses his left hand for all fine motor tasks. J███ was very energetic and friendly throughout testing. Given his young age, one of his parents was present throughout testing due to concerns of separation from his parents. J███ was able to interact with the examiner well and typically only began interacting with his parents when he became frustrated or disinterested in a task. Eye contact was somewhat limited during testing, though J███ was easily distracted by things in his environment.

J███ responded well to his name and would at times redirect to stimuli when prompted. He appeared to have some comprehension of tasks but would not indicate when he did not understand a task. He spoke using single words and typically only spoke when exposed to visual stimuli that he was familiar with and would subsequently identify. Rapport was easily established with Jacob. He required breaks but did not vocalize when he wanted a break. Instead, he would attempt to open the testing room door to leave. Throughout testing J███ would become frustrated and disinterested in certain tasks. He appeared to become easily frustrated with tasks with longer directions or those that did not have visual cue. He would often turn his back to the examiner or begin to seek out attention from his parents when he no longer wanted to engage with the testing material.

Throughout the day J███ became more easily frustrated when working on tasks leading him to bouts of crying and fussing where he would no longer interact with

J███ G.
June 21, 2024
Page 5

the testing material (Mullen Scales of Early Learning). At times he appeared motivated by praise, encouragement, and highfives but these methods were also at times unsuccessful. Based on J███ cooperation the results of the assessment are considered an accurate reflection of his current level of functioning. During the administration of the Mullens Scales of Early Learning Assessment, J███ participated in fine and gross motor skills, visual reception, and non-verbal problem solving. He walked independently throughout the assessments, was able to climb steps, and run. He was moving around more than usual and fidgeting back and forth as he became restless. It was difficult for J███ to sit still as he was more interested in active skills rather than focusing on language and communication problem solving skills. The examiner worked with J███ at the table and on the floor and followed his comfort level.

**CLINICAL SUMMARY:**
J███ is a 2-year- 10-month-old boy with documented developmental delays with some autistic features, CP, and ASD in the past. He had a traumatic birth resulting in several physical injuries and had a complicated NICU stay due to difficult to treat infections and necrosis on the scalp. Several documents reviewed noted that his birth and medical complications that subsequently occurred, are likely contributing factors to his developmental delays and CP.

While J███ has previously been given a diagnosis of ASD, during this assessment, J███ did not demonstrate behaviors consistent with ASD through formal direct testing or observationally. J███ presented himself as sociable throughout the exam and while he had somewhat limited eye contact, he did not display the restrictive and repetitive behaviors common to ASD. In review of his past records, however, he did seem to exhibit developmental delays that were global in nature, likely the result of his above complications following his birth. While it is beyond the scope of a neuropsychological evaluation to provide a causative opinion, the records support the fact that the E. Coli preceded the abnormal neuroimaging, suggesting that Jon███ struggle to recover from theE. Coli infection resulted in the injury to his brain.

Regarding Cerebral Palsy (CP), Jon███ motor functioning for both gross motor and fine motor functioning was consistent with a diagnosis of CP. J███ has continued difficulties with his gait and balance and shows an immature pencil grip. He favors his left side for movement and writing and will likely continue to require OT and PT services to help with these motor delays. Ms. Grenier reported that J███ will be seeing a neurologist to determine what specific subtype of CP J███ likely has and to continue treatment.

Finally, regarding developmental delays, J███ continues to show weakness in nonverbal abilities but has shown improvement and a relative strength in verbal processing. J███ showed significant improvement in his verbal performance during testing, particularly since his previous evaluation in February, which is

J███ G.
June 21, 2024
Page 6

consistent with his parental report of improvement in his speech. His nonverbal abilities appear to be more stable since his previous evaluation. However given his current improvement and ongoing use of PT, OT, ST, and tutoring, he will likely continue to show improvements within both domains over time.

Taken together, the current evaluation supports the previous reports that J███ has developmental delays, but he is too young to consider a global intellectual disability, as his current test scores do not support this. Given his improvements since his previous evaluation, there is evidence that J███ will continue to improve cognitively within the upcoming years, provided he is exposed to therapeutic intervention. He will likely require repeated evaluations to continue to monitor his progress over the next two to three years. He will continue to require support through his therapies, and he will benefit from the special education services as he begins this year of school in the fall.

Additional recommendations to assist J███ are provided below.

ICD-10 DIAGNOSES:
A04.2 Perinatal E. Coli Infection
P91.82 Neonatal Cerebral Venous Infarction
F88 Global Developmental Delay

RECOMMENDATIONS & THERAPEUTIC TREATMENT PLAN:
1. Academic Programming – J███ will begin schooling within a classroom designed for children with developmental delays. He will likely continue to need specialized classroom settings throughout his school years and should receive an individualized education plan (IEP) once he has finished preschool.

2. Therapies – J███ has reportedly responded well to his various therapeutic treatments related to OT, PT, and ST. It is recommended that J███ continue these treatments through his school system as they will likely continue to improve his speech, motor functioning, and cognitive abilities.

3. In addition to the above therapies and considering J███ difficulty in expressing his emotions and trouble with behavioral responses, his family may also benefit from Parent Child Interaction Therapy (PCIT), which is a family-based treatment to help parents manage children's behaviors and emotional regulation. This may assist J███ as was recommended for ABA therapy in the past by his pediatrician. This will likely employ scaffolding techniques that will focus on Jon███ behavior, particularly social reinforcement and praise. Reinforcement of time-out during behaviorally challenging episodes will likely reduce the level of fatigue, inattention, and distraction that was observed once J███ became overwhelmed.

4. Assistive Technologies – J███ may also benefit from the use of assistive technologies for his daily living. Ms. Grenier expressed concerns about Jon███

J▮▮▮ G.
June 21, 2024
Page 7

ability to communicate his wants and needs successfully. An assistive iPad that would allow J▮▮▮ to select pictures of what he wants may be a helpful bridge in further developing his communication skills. Throughout testing J▮▮▮ demonstrated an interest in interacting with test materials that were on the iPad, suggesting that his may be a platform that would be easy for J▮▮▮ to learn to use in the home and at school while also peaking his interest in the emergence of academic subject matter.

**OPINIONS REGARDING THE CASE:**

1. **Long-Term Care Options –** It is premature to recommend that J▮▮▮ will require 24-hour care for seven days per week. He has shown marked improvement in language function when compared with just months prior. He is ambulatory and is only two years of age. Early Intervention models have met with success in providing opportunities to children diagnosed with cerebral palsy. Despite the need for ongoing therapy, J▮▮▮ family would benefit from some respite care and possible assistance in the home in dealing with his developmental delays.

2. **Neuropathology –** The current test data support motor delays and low average expressive language. His developmental delays have improved but they are consistent with his neuroimaging findings (MRI from 7-26-21) implicating the cerebrovascular infarct with associated nonfocal hemorrhage in the right hemisphere. The brain parenchyma was reported to be within normal limits.

3. Stephen Deputy, MD, neurologist, opined that J▮▮▮ did not have evidence of a hypoxic ischemic brain injury. This is supported by the fact that the typical watershed regions of the brain were not implicated on neuroimaging, according to the ACOG guidelines as well as research regarding white matter changes in the brain and infectious disease such as E. Coli (Lebeaux et. al, 2021 & Mizuno et. al., 2023) which typically results in cystic encephalomalacia. This is consistent with the evidence of neurovascular infarct following the diagnosis of E. Coli that was present. J▮▮▮ did sustain an injury to this tissue on his scalp. This resulted in the surgery / skin graft, which may require plastic surgery in the future if this is deemed appropriate by his attending physicians.

4. In the postnatal period, J▮▮▮ incurred an infarct following a thrombosis to the right hemisphere of the brain, which no etiology was determined from the thrombus. J▮▮▮ was treated for shock and sepsis, with the MRI documenting intraventricular hemorrhages and the surrounding cerebral cortex leading to cystic encephalomalacia thought to be the result of the E. Coli infection, as discussed in Dr. Deputy's report. Multicystic encephalomalacia has been reported in cases involving E. Coli. Moreover, there is extensive literature discussing the impact on the gut microbiota and brain function, leading to the potential for neurodevelopmental and neurocognitive impact through neurotransmission in both animal and human research (Frerichs et. al., 2024; Madakshira & Colleagues, 2020).

J███ G.
June 21, 2024
Page 8

5. Results from neuropsychological testing support neuroimaging with neurological involvement that will impact J███ in the future. With respect to prognosis, it is important to consider the plasticity of the brain at the age of two as well as the implications for vulnerability as he ages. J██████ profile of test scores is consistent with windows of language improvement that do not support a conclusion that J███ is expected to have neurocognitive deficits that will require supervision throughout his lifetime on a 24-hour basis. His recent improvement suggests that he has not plateaued, and such a conclusion might be premature.

6. Based on the most recent intellectual test scores, J████ does not meet the necessary criteria to be diagnosed with intellectual disability but is functioning below average (borderline) range, suggesting the need for academic support in a special education preschool setting."

I have consulted with Dr. Burns regarding J██████ future care needs, including reviewing Dr. Yarkony's Life Care Plan. Dr. Burns has opined J████ will likely be potty trained by at least age 8, will require pediatrician/PM&R, neurology, neuropsychological, and dental evaluations, imaging, therapies, hair replacement, tutoring, case management, vocational/avocational assistance and home/residential care. Dr. Burns provided opinions including a best-case/ worst-case scenario for J█████ level of care. The Life Care Plan attached has been reviewed and approved by Dr. Burns.

**FAMILY BACKGROUND:**

Jenna Grenier, J█████ mother, March 28, 2023, deposition includes the following information:

Ms. Grenier graduated from Bayside High School in 2017. She attended for approximately two years at Florida Atlantic University in Boca Raton, Florida completing courses toward a Bachelor's of Studio Art Degree before switching her major to a Bachelor of Science in Elementary Education. Ms. Grenier indicated she is currently completing the requirements to obtain her Bachelor of Science Degree in Elementary Education. She estimated she will have this completed by July or August of 2024. It is her goal to work as an Elementary School Teacher.

Corporal Tyler Grenier, J█████ father, March 18, 2023, deposition includes the following information:

Corporal Grenier is a high school graduate and is currently an E-4 Corporal in the United States Marine Corps. He was working toward a Special Duty Assignment as a Recruiter and planned to attend training toward this goal in San Diego, California prior to transfer to another assignment. Corporal Grenier indicated prior to enlisting in the United States Marine Corps he worked at a grocery store, a local gym, and Einstein Bagels.

J█████ G.
June 21, 2024
Page 9

## ASSESSMENT:

A vocational assessment is a determination of an individual's ability to work and earn money. The standard methodology requires an understanding of an individual's age, education, employment experience, and earnings combined with any limitations they may have which may impede their ability to work and wage-earning capacity. Wage earning capacity can be defined as the wage that an individual is capable of earning based on a number of factors, such as education, work history, training, experience, physical capacity, the labor market and geographic area. Vocational Experts rely on a holistic mixture of quantitative (e.g., standardized tests, physical capacity evaluations) and qualitative analyses (e.g., subjective client accounts, facts from collateral sources), integrated with knowledge of the world of work, vocational education and training, combined with clinical judgment. Through the use of well researched and time-tested vocational techniques that have been relevant and reliable, Vocational Experts can provide objective information to determine an individual's ability to work and earn wages.

When assessing the employability and wage-earning capacity of a child or young adult, who experiences a permanent impairment prior to reaching adulthood, assessment of the child's educational capacity, with and without any impairment, is required. This educational capacity is compared to the earnings of individuals with similar levels of education to establish earning capacity. When an injury before adulthood, the education and employment history of family members and education levels of Americans is utilized in the assessment of educational attainment.

Based on J█████ parents' educational and the available data on educational attainment of Americans in general, it is my opinion, unimpaired, J███ would have likely obtained employment an earned wages comparable with individuals who obtain and associate's degree, on the low end, and a bachelor's degree on the high end. Jon███ ability to work in future is unknown, however, it appears unlikely that he will obtain and maintain regular full-time competitive employment. For the purposes of this report, I have assumed J███ retains no future earning capacity. Vocational and avocational assistance has been recommended in the attached Life Care Plan to assist J████ in identifying work or work-like options as an adult.

## LIFE CARE PLAN:

Life Care Planning is a longstanding tool of Case Management used to coordinate current and future medical and rehabilitation needs for people who experience a serious injury or illness. A Life Care Plan is a dynamic document based upon published standards of practice, comprehensive assessment, data analysis, and research which provides an organized, concise plan for current and future needs with associated costs, for individuals who have experienced catastrophic injury or have chronic health care needs.

Based on Dr. Burns's recommendations for current and future medical and rehabilitation needs for J████ I have researched and identified providers as well as costs and frequencies of replacement for the recommended items. The attached Life Care Plan is reflective of information obtained from the available medical records, consultations with Dr. Burns, and my specialized knowledge, training, experience and clinical judgment.

J███ G.
June 21, 2024
Page 10

Per the Life Care Planning Standards of Practice [1] and the Majority and Consensus statements derived from Life Care Planning Summits since 2000[2], the associated costs noted in the Life Care Plan are derived from a combination of costs gathered from my day costs noted in the attached Preliminary Life Care Plan are gathered from my day-to-day clinical practice, including but not limited to: Costs obtained from actual provider bills; and/or a survey of costs from geographically appropriate providers; and/or conservative estimations obtained from resources routinely relied upon within the sub-specialty practice of Life Care Planning. The cost for each item represents a base cost for geographically appropriate resources that are routinely and reliably available, now and in the future. Sales taxes, shipping, handling, and installation fees are not included, unless otherwise specified. All costs reflect the usual and ordinary charge for each item (the average cost) within a specific geographic area.

In review of Dr. Yarkony's life care plan, I found the charges in his Life Care Plan to be reasonable and appropriate and consistent with the charges I have identified for J█████ future care.

Please contact me should you have any comments or questions concerning this information. I reserve the right to revise or amend this report if new or additional information becomes available.

Very truly yours,



John Fountaine, MA, CRC, CCM
Rehabilitation Counselor/Case Manager

Attachment:    Life Care Plan – June 2024

---

[1] 4th Edition published by the Life Care Planning Section of the International Association of Rehabilitation Professionals, (2022), Journal of Life Care Planning, Vol. 20, No. 3, pp 7-23.
[2] Johnson, C., Pomeranz, J. and Stetten, 2019 Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010, 2012, 2015 and 2017 and updated via Delphi study in 2018, , Journal of Life Care Planning, 16(4), pp. 15- 19, Athens, GA: Elliott & Fitzpatrick, Inc.; Johnson, C. (2015) Consensus and Majority Statements Derived from Life Care Planning Summits Held in 2000, 2002, 2004, 2006, 2008, 2010, 2012 and 2015, Journal of Life Care Planning, Vol. 13, No. 4, 35-38. Athens, GA: Elliott & Fitzpatrick, Inc.; Johnson, C. & Preston, K., Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010 and 2012, Journal of Life Care Planning, Vol. 11, No.2, 9-14. Athens, GA: Elliott & Fitzpatrick, Inc.

**Fountaine Consulting Services, LLC**

**PRELIMINARY**

**LIFE CARE PLAN**

**FOR**

**J█ G.**

**CURRENT AGE TO LIFE EXPECTANCY**

**June 2024**

**John Fountaine, MA, CRC, CCM**
**Fountaine Consulting Services, LLC**
**15418 NE 195th Street**
**Woodinville, WA 98072**

# Fountaine Consulting Services, LLC

## TABLE OF CONTENTS

Supplies ................................................................................................................................ 1

Additional Medical Care ..................................................................................................... 2

Laboratory & Imaging ......................................................................................................... 3

Future Therapy ..................................................................................................................... 4

Augmentative Communication / Education Needs .............................................................. 5

Home Care / Residential Care ............................................................................................. 6

Case Management, Vocational / Avocational Needs ........................................................... 7

# Fountaine Consulting Services, LLC

**PRELIMINARY LIFE CARE PLAN**
**NAME: J█████ G.**
**DOB: 7/7/2021**
**DOI: 7/7/2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 38 of 432   PageID.8046

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Diapers/Pull-ups 5 per day | Personal hygiene. | Amazon.com or Local Provider | Current Age to Age 8 | Monthly | $83.65 to $111.00 each time |
| Gloves | Personal and caregiver hygiene. | Amazon.com or Local Provider | Current Age to Age 8 | 4 boxes per month | $31.92 each time |
| Wipes | Personal and caregiver hygiene. | Amazon.com or Local Provider | Current Age to Age 8 | 4 boxes per month | $63.16 each time |
| Chux Pads 2 per day | Personal hygiene. | Amazon.com or Local Provider | Current Age to Age 8 | 1 box every other month | $26.76 each time |

**SUPPLIES**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 39 of 432    PageID.8047

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Pediatrician / Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Provide coordination of Physical Therapy, Occupational Therapy, Speech Therapy for future care needs related to Perinatal E. Coli Infection, Neonatal Cerebral Venous Infarction, and Global Developmental Delay. | Carolina Pediatrics & Adolescent Care, Medical University of South Carolona, Piedmont Medical Center or Local Provider | Current Age to Life Expectancy | Annually | $285.00 to $495.00 each time |
| Neurology Evaluation, Monitoring, and Treatment | Ongoing evaluation, monitoring and treatment of neurological capacity and provision of treatment/rehabilitation recommendations. | Medical University of South Carolina, Beaufort Memorial Hospital, Piedmont Medical Center or Local Provider | Current Age to Life Expectancy | Annually | $285.00 to $495.00 each time |
| Neuropsychological / Neurodevelopmental Evaluation, Monitoring Treatment | In combination with Augmentative/Assistive technology evaluation to evaluate verbal and visual learning. | University of South Carolina, Charleston Neuropsychology, or Local Provider | Age 5 to Life Expectancy | 10 to 15 times total | $1,250.00 to $2,000.00 |
| Dental Evaluation, Monitoring and Treatment | Encourage dental hygiene above and beyond routine care. | Columbia Children's Dentistry, Kids Dental First, Capital City Dentistry or Local Provider | Current Age to Age 12 | 1 time every 3 to 5 years | $149.00 to $221.00 each time |
| **ADDITIONAL MEDICAL CARE** | | | | | |

# Fountaine Consulting Services, LLC

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| CT-Scan Head and Brain | Ongoing evaluation of Perinatal E. Coli Infection, Neonatal Cerebral Venous Infarction, and Global Developmental Delay to facilitate future treatment recommendations. | Beaufort Memorial Hospital, Prisma Health, Medical University of South Carolina or Local Provider | Current Age to Life Expectancy | 3 times total | $1,701.00 to $2,557.00 |
| MRI Brain | Ongoing evaluation of Perinatal E. Coli Infection, Neonatal Cerebral Venous Infarction, and Global Developmental Delay to facilitate future treatment recommendations. | Beaufort Memorial Hospital, Prisma Health, Medical University of South Carolina or Local Provider | Current Age to Life Expectancy | 3 times total | $2,593.00 to $3,727.00 |
| **LABORATORY AND IMAGING** | | | | | |

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 40 of 432   PageID.8048

# Fountaine Consulting Services, LLC

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 41 of 432    PageID.8049

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Physical Therapy Evaluation, Monitoring and Treatment | Periodic evaluations to identify equipment needs and the appropriate therapies. | Prisma Health Pediatrics, The Therapy Place, Inc., Moonbug Pediatric Therapy or Local Provider | Current Age to Age 21 | 50 Sessions Annually | $150.00 to $200.00 each time |
| Occupational Therapy Evaluation, Monitoring and Treatment | Periodic evaluations to identify equipment needs and the appropriate therapies. | Prisma Health Pediatrics, The Therapy Place, Inc., Moonbug Pediatric Therapy or Local Provider | Current Age to Age 21 | 50 Session Annually | $150.00 to $200.00 each session |
| Speech Therapy Evaluation Evaluation, Monitoring and Treatment | Periodic evaluations to assist with increasing communication by incorporating speech therapy. | Prisma Health Pediatrics, The Therapy Place, Inc., Moonbug Pediatric Therapy or Local Provider | Current Age to age 21 | 100 Sessions Annually | $150.00 to $200.00 each session |
| Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | Evidence-based treatment and coaching sessions for J███ and his parents to develop interactive skills and address behavioral concerns. | Creative Solutions Counseling, Palmetto State PCIT, University of South Carolina or Local Provider | Current Age to Age 3<br><br>Age 3 to Age 4<br><br>Age 4 to Age 5 | 6 sessions<br><br>12 sessions<br><br>12 sessions | $125.00 to $150.00 each session |
| Hair Replacement Evaluation, Monitoring and Treatment | Provide recommendations for age-appropriate hair replacement options. | Medical University of South Carolina, WigsForKids.org, or Local Provider | Current Age to Life Expectancy | Pending | Pending |

**FUTURE THERAPY**

# Fountaine Consulting Services, LLC

PRELIMINARY LIFE CARE PLAN
NAME: J█████ G.
DOB: 7/7/2021
DOI: 7/7/2021

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 42 of 432    PageID.8050

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Augmentative Communication Evaluation, Monitoring, and Treatment | In combination with Neuropsychological Evaluations to evaluate verbal and visual learning and provide augmentative equipment recommendations. | Prisma Health Pediatrics, The Therapy Place, Inc., Moonbug Pediatric Therapy or Local Provider | Age 5 to Life Expectancy | 10 to 15 times total | $200.00 to $25.00 each time |

**AUGMENTATIVE COMMUNICATION NEEDS**

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Tutoring | Provide additional tutorial support services above and beyond those services provided in school to assist in maximizing his educational potential. | Club Z, Sylvan Learning Center or Local Provider | Current Age to Age 21 | 1 hour per week Age 6 to Age 12<br><br>2 hours per week to Age 12 to Age 15<br><br>3 hours per week Age 15 to Age 22<br><br>(36-week school year) | $55.00 to $60.00 per hour<br><br>$59.00 to $65.00 per hour<br><br>$65.00 to $70.00 per hour |

**EDUCATION NEEDS**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 43 of 432   PageID.8051

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Option One: In-Home Care | Provide oversight, safety, and support including in-home supervision, aide for safety, and light housekeeping in the least restrictive environment. | Bayada Home Health Care, Bright Star, Caring for You Home Care, LLC, A Mother's Choice, Purpose of Hope In Home Care, LLC, or Local Provider | Current Age to Age 6 years<br><br>Age 6 years to Age 21 years<br><br><br><br>Age 22 to Life Expectancy | 4 hours daily Monday through Friday<br><br>School days 4 hours daily<br><br>Non-school days 8 hours daily<br><br>_____<br><br>Best case scenario: 12 hours per day.<br><br>Worst case scenario: 24/7 care. | $25.00 to $32.00 per hour |
| Option Two: Adult Family Home | Living in an adult family home consisting of 2 – 3 other residents of similar age with similar care needs | Lemonade House, Joanne's Community Care Home II, Brookdale or Local Provider | Age 22 to Life Expectancy | Monthly | $4,350.00 to $5,223.00 each month |

**HOME CARE / RESIDENTIAL CARE**

# Fountaine Consulting Services, LLC

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 44 of 432   PageID.8052

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Case Management | Provide assistance with coordination of ongoing treatment recommendations and future care needs. | Bright Star SC or Local Provider | Current Age to Life Expectancy | Average 2 hours each month | $100.00 to $150.00 per hour |
| Vocational / Avocational Evaluation | Identify avocational assets / volunteer activities to promote life enrichment, socialization, sense of involvement and self-esteem. | Local Certified Rehabilitation Counselor or Certified Disability Management Specialist | Age 22 to Life Expectancy | Minimum 3-5 times (10-15 hours each time) | $95.00 to $125.00 per hour |
| **CASE MANAGEMENT / VOCATIONAL / AVOCATIONAL EVALUATION** | | | | | |

# *JOHN FOUNTAINE, M.A., C.R.C., C.C.M*

Fountaine Consulting Service, LLC
15418 NE 195th Street
Woodinville, WA 98072
206-909-7331
<John@expertvrc.com>

## EDUCATION

University of Northern Colorado, Greeley, Colorado, **Master of Arts in Vocational Rehabilitation Counseling**, 1992 University of Northern Colorado, Greeley, Colorado, **Bachelor of Science in Human Rehabilitative Services**, 1991 Department of Human Resources Departmental Scholar Award recipient, 1991

## CERTIFICATIONS

**Certified Rehabilitation Counselor** (C.R.C. #20725), Commission on Rehabilitation Counselor Certification, Martingale, Illinois

**Certified Case Manager** (C.C.M. #031550), Commission for Case Manager Certification, Martingale, Illinois

**Vocational Expert for the Social Security Administration** (BPA #0230), Seattle, Washington

**Registered Vocational Rehabilitation Counselor with Washington State Department of Labor and Industries**, (VRC #8602), Olympia, Washington (1992 – 2023)

**Registered Vocational Rehabilitation Counselor with the State of Alaska Department of Labor, Workers' Compensation Division**, Anchorage, Alaska

**Certified Vocational Rehabilitation Counselor with the Oregon Workers' Compensation Division** (Certification #AJ0538)

**Registered Vocational Rehabilitation Counselor with the Department of Veterans Affairs** (Certification #346-465), Seattle, Washington

**1 |** P a g e

## <u>EMPLOYMENT HISTORY</u>

**9/2023 - Present:**  Fountaine Consulting Services, LLC, Woodinville, WA
**Owner/Manager /Rehabilitation Counselor/ Case Manager**

Providing a variety of rehabilitation services including case management, vocational rehabilitation services, Life Care Planning services, in settings including personal injury, veterans' services, social security, railroad, maritime, longshore, dissolution of marriage, among others.
Provide vocational assessments, earning capacity assessments, life care planning, medical bill review recommendations and provide expert testimony for private plaintiff and defense attorneys, USDOJ, US Attorney's Office in civil litigation cases in Washington State, California, Oregon, Alaska, and Hawaii. Vocational rehabilitation counseling/ consulting, coordination of care/case management, development of rehabilitation plans, job development and placement, psychometric testing, expert testimony, life care planning, and case management.

**4/94 – 9/2023:**  **Rehabilitation Counselor/Case Manager**
OSC Vocational Systems, Inc., Bothell, Washington

\* Case Management Services.

\* Provide vocational assessments, life care planning, medical bill review recommendations and testimony for private plaintiff and defense attorneys, USDOJ, US attorney's Office in civil litigation cases in Washington  State, California, Oregon, Alaska, and Hawaii.

\* Provide vocational rehabilitation services as a subcontractor for Washington State Department of Labor & Industries and the State of Alaska Department of Workers Compensation, including case management, vocational assessment, vocational rehabilitation plan development, implementation and monitoring.

\* Provide vocational rehabilitation services as a contract counselor for the Department of Veteran's Affairs, evaluating employment potential, independent living support, and service needs, for veterans with service-connected disabilities.

\* Provide expert opinion and testimony for the Social Security Administration Office of Hearings and Appeals in Washington State and Oregon.

\* Complete specialized vocational research, including labor market access to local, state and national labor market information and assess injury impact on wage earning capacity.

\* Administer and interpret psychometric testing materials.

\* Assist clients with job development, resume preparation and placement.

**4/94 – 4/98:**     **Rehabilitation Counselor/Case Manager/Branch Manager**
Skagit and Whatcom Counties

\* Provide vocational rehabilitation services as a subcontractor for Washington State Department of Labor & Industries and the State of Alaska Department of Workers Compensation, including case management, vocational assessment, vocational rehabilitation plan development, implementation and monitoring.

* Provide vocational rehabilitation services as a contract counselor for the Department of Veteran's Affairs, evaluating employment potential, independent living support, and service needs, for veterans with service-connected disabilities.

* Provide vocational rehabilitation services for the Office of the City Attorney, City of Bellingham, Bellingham, Washington.

* Provide vocational assessments and recommendations for private attorneys in civil litigation cases in Washington State, Alaska, and Hawaii.

* Provide vocational expert opinions in civil litigations, arbitrations, and mediations.

* Provide vocational expert opinions for the Social Security Administration's Office of Hearings and Appeals Washington and Oregon, Washington State Board of Industrial Appeals, Washington State Court, and U.S. District Court in Seattle, WA, and Honolulu, Hawaii.

* Complete specialized vocational research, including labor market access to local, state and national labor market information and assess loss of wage earning capacity.

* Advise, coordinate and direct activities of Vocational Rehabilitation Counselors and Job Developers.

* Administer and interpret psychometric testing materials.

* Assist with job development, resume preparation and client placement.

**2/93 - 4/94**:    **Vocational Rehabilitation Counselor**
Vocational Consulting, Inc., Tacoma, Washington

* Provided vocational rehabilitation services as a subcontractor for the Washington State Department of Labor & Industries.

* Evaluated qualifications for employability of injured worker and implementation of rehabilitation plans.

* Administered and interpreted psychometric testing materials.

* Assisted clients in job development, resume preparation and client placement.

* Completed specialized vocational research, including labor market access to local state and national labor market information and assessed loss of wage earning capacity.

* Assisted in the supervision of vocational rehabilitation counselor interns.

**5/92 - 8/92**:    Center for Technical Assistance in Training, Greeley, Colorado

**Research Assistant** - Master's Internship in Vocational Rehabilitation Counseling

* Designed and implemented a community-based research study on disabled clients' satisfaction with employment.

* Implemented survey design, performed client interviews, analyzed research data, and completed written reports.

**5/91 - 12/91**:    Schaffer Rehabilitation Center, Greeley, Colorado.

**3 |** P a g e

**Case Manager, Job Coach and Intern**- Scholarship for Bachelor of Science degree in Human Rehabilitation Services

* Provided vocational rehabilitation counseling and job coaching to persons with severe disabilities.

* Duties included: skill development and client placement, psychometric testing, development of vocational rehabilitation plans, systematic instruction and evaluation, as well as training and supervision of job coaches.

## PERTINENT CONTINUING EDUCATION / PUBLICATIONS

<u>Guest lecturer</u>, University of Washington Law School- Forensics class**, Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony**, William H. Gates Hall, June, 2023, Seattle, Washington

<u>Speaker</u>; International Association of Rehabilitation Professionals 2021 (IARP) Virtual Conference, **A Walk-Through from Referral to Testimony; Methodology & Admissibility**, November 11, 2021

Guest lecturer, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony**, William H. Gates Hall, April 2021, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March 2020, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March 2019, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March 2018, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March 2017, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March, 2016, Seattle, Washington.

<u>Guest lecturer</u>, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March, 2015, Seattle, Washington.

Fountaine, J. et al (2015) **Certification Standards of Professionals Coordinating Life Care Plans for Individuals Who Have Acquired Brain Injury,** Journal of NeuroRehabilitation, Sept 2015, 235 - 241. IOS Press.

Fountaine, J. et al (2015) **The Collateral Source Rule and the Affordable Care Act: Implications for Life Care Planning and Economic Damages,** Journal of Life Care Planning, Vol. 13, No. 3, 3-16. Athens, GA: Elliott & Fitzpatrick, Inc.

Guest lecturer, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March, 2014, Seattle, Washington.

Guest lecturer, University of Washington Law School- Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** William H. Gates Hall, March, 2013, Seattle, Washington.

Guest lecturer, Seattle University School of Law - Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** Sullivan Hall - Room 101, April, 2012, Seattle, Washington.

Fountaine J., et al; (Presenter) American Rehabilitation Economics Association (AREA) Conference, **Determining the Reasonableness of Past Medical Bills, and Case Manager/Life Care Plan Interactive with Economist,** Santa Barbara, CA, 9/30/11.

Fountaine, J., et al; (Presenter) American Rehabilitation Economics Association (AREA) Annual Conference 2011, **Determining the Reasonableness of Past Medical Bills,** Seattle, WA, 6/9/11.

Guest lecturer, Seattle University School of Law - Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** Sullivan Hall - Room 101, April, 2011, Seattle, Washington.

Fountaine, J., et al; **Past Medical Bill Review: Who is Best Qualified to Determine the Reasonableness of Costs?**, Trial News, September 2010.

Guest lecturer, Seattle University School of Law - Forensics class, **Vocational Rehabilitation, Case Management and Life Care Planning Expert Testimony,** Sullivan Hall - Room 101, April, 2010, Seattle, Washington.

Speaker, **Preconference Thinking Outside the Box: Anatomy of a Case and Special Considerations, Part 3 of 3,** International Association of Rehabilitation Professionals (IARP) Conference October 29, 2009, Memphis, Tennessee.

Fountaine J., et al, (2009), **Bereavement and Mortality: A Methodology for Assessing Capacity and Functioning Following the Loss of a Spouse**, Journal of Life Care Planning, Vol. 7, No. 4, 163-179. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, **"Worklife Expectancy and Life Expectancy Data, Methodology and Thinking Outside the Box – Effects on Earning Capacity Assessments and Life Care Plans,"** International Association of Rehabilitation Professionals (IARP), October 30, 2008, Weston Florida.

Fountaine, J. et al, (2008), Contributor to the **CDMS Study Guide, 5th Edition**. Athens, GA: Elliott & Fitzpatrick, Inc. Fountaine, J. et al, (2007), Contributor to the **Workers' Compensation Update**. Eau Claire, WI, Lorman Education Services.

Fountaine, J. et al, (2007), **Rules of Evidence vs. Professional Certifications: The Real Basis for Establishing Admissible Testimony by Rehabilitation Counselors and Case Managers**. The Rehabilitation Professional, Vol. 15, No. 4, 7-16. Athens, GA: Elliott & Fitzpatrick, Inc.

Speaker, **"Earning Capacity Data, Methodology and Thinking Outside the Box,"** International Association of Rehabilitation Professionals (IARP), 2007 National Conference, November 1, 2007, Las Vegas, Nevada.

Speaker, **"Applied Methodology in Vocational Rehabilitation,"** International Association of Rehabilitation Professionals (IARP), 2006 Washington Chapter Conference, September 30, 2006, Tacoma, Washington.

"**Conference for Advanced Studies in Forensic Rehabilitation**," International Association of Rehabilitation Professionals (IARP), January 23-27, 2006, Montego Bay, Jamaica.

Fountaine, J. (2006). Contributor to **Methods and Protocols, Meeting the Criteria of General Acceptance and Peer Review Under Daubert and Kumho**. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J. (2005). Contributor to **The <u>Quick Desk Reference</u> for Forensic Rehabilitation Consultants**. Athens, GA: Elliott & Fitzpatrick, Inc.

<u>Speaker</u>, "**Successful Handling Of Wrongful Death Cases in Washington,**" Lorman Educational Services, March 22, 2005, Seattle, Washington.

<u>Speaker</u>, "**Life Care Planning in Washington**," Lorman Educational Services, October 14, 2004, Seattle, Washington.

Fountaine, J. et al, (2004), **The Efficacy of Professional Clinical Judgment: Developing Expert Testimony in Cases Involving Vocational Rehabilitation and Care Planning Issues**, Journal of Life Care Planning, Vol. 3, No. 3, 131-150. Athens, GA: Elliott & Fitzpatrick, Inc.

<u>Speaker</u>, Rehabilitation Association of Montana (R.A.M.), 2004 Spring Conference, April 29-30, Missoula, Montana.

Fountaine, J. & Petgrave, C., (2004), **Book Review**, Wolfesberger, W., <u>The Future of Children with Significant Impairments: What Parents Fear and Want, and What They and Others May Be Able to Do About It</u>, Journal of Life Care Planning, Vol. 3, No. 1, 55-56. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J. (2002). Contributor to **Approaches to estimating lost earnings: Strategies for the rehabilitation consultant**. Athens, GA: Elliott & Fitzpatrick, Inc.

Fountaine, J.(2001). Contributor to **Comprehensive Study Guide for the examinations of Certification of Disability Management Specialist (CDMS), Case Manager Certification (CCM), Certified Life Care Planner (CLCP)**. Athens, GA: Elliott & Fitzpatrick, Inc.

**Issues in Forensic Rehabilitation**, Elliott & Fitzpatrick, Inc., September 28 & 29, 2000, New Orleans, LA.

**Vocational Rehabilitation and Counseling Contractor Training**, U.S. Department of Veterans Affairs, Vocational Rehabilitation Division, Seattle Washington, October, 1999.

<u>Speaker</u>, "**Understanding Brain Injury**," Washington State Convention and Trade Center, May 14, 1999, Seattle, Washington.

**Case Management By The Year 2000**, Western Regional Case Managers Meeting, May 1-3, 1998, Palm Springs, California.

<u>Speaker</u>, "**Emerging Vocational and Economic Issues in Legal Assessments**," Whatcom County Bar Association, February 5, 1997, Bellingham, Washington.

"**Getting Started as a Vocational Expert**," National Association of Rehabilitation Professionals in the Private Sector, Forensic Section Seminar, July 12-13, 1996, Snowbird Ski & Summer Resort, Salt Lake City, Utah.

"**Sailing Into the Future**," Pacific Regional Conference sponsored by National Rehabilitation Association, June 6-8, 1996, Honolulu, Hawaii.

"**Moving Outside Your Comfort Zone**," Vocational Expert Witness Seminar sponsored by National Association of Service Providers in Private Rehabilitation and National Rehabilitation Counseling Association, March 30, 1996, Tacoma, Washington.

"**Supervising in the Field of Vocational Rehabilitation**," sponsored by National Association of Rehabilitation Professionals in the Private Sector, March 22 and 23, 1996, Tukwila, Washington.

"**The Use, Questioning, and Testimony of Vocational Experts**," sponsored by Social Security Administration Office of Hearings and Appeals, October 20, 1995, Seattle, Washington.

"**Contractor Training**," sponsored by Department of Veterans Affairs, Vocational Rehabilitation & Counseling  Services,  September 26, 1995, Seattle, Washington.

"**Job Modification Technology Fair**," sponsored by Washington State Department of Labor and Industries, September 18, 1995, Olympia, Washington.

"**Contracted Provider Training**," sponsored by Washington State Department of Labor and Industries, July 28, 1995, Olympia, Washington.

## AFFILIATIONS

International Academy of Life Care Planners (IALCP)
International Association of Rehabilitation Professionals (IARP)
National Rehabilitation Association (NRA)
National Rehabilitation Counseling Association (NRCA)
Faculty Member, **Lorman Education Services**
Past Editorial Board Member, **Forensic Rehabilitation and Economics – A Journal of Debate and Discussion**  (2014 -2017)

**John Fountaine**
**Testimony List**

**Fountaine Consulting Services LLC**

Case 1:22-cv-00396-LEK-KJM  Document 285  Filed 11/19/24  Page 52 of 432  PageID.8060

| From: | To: | | | | | | |
|---|---|---|---|---|---|---|---|
| **4/2020** | **4/2024** | | | | | | |
| | | | | | | | |
| **Court case title** | **Docket#** | **Deposition / Testimony** | **Court/Location** | **Referred by** | **Requested by** | **Evaluee** | **Date** |
| Mendez Jimenez, Alfredo<br><br>v.<br><br>Square Peg Construction | 22-2-01028-2 SEA | Deposition | In the Superior Court of the State of Washington for the County of King | Maridith Ramsey<br><br>Law Office of Maridith E Ramsey PLLC | Mark Zappala<br><br>Gillaspy Rhode Faddis Benn LLC | Mendez Jimenez, Alfredo | Apr 24 |
| Steele<br><br>v.<br><br>Steele | 22-3-00294-1 SEA | Testimony | Superior Court of the State of Washington King County | Michael deMaar<br><br>deMaar Law | | Steele, Mia | Apr 24 |
| Roche, William<br><br>v.<br><br>Last Resolution, LLC; Paul Krawczyk; Everett Joseph Lindholm; in personam; and the F/V Resolution II, Primary Vessel Number WN9665RJ | 2:23-cv-00414-RAJ | Deposition | US District Court, Western District of Washington, at Seattle | Mark Choate, Choate Law Firm, LLC | Markus Oberg, Le Gros Buchanan & Paul | Roche, William | Feb 24 |
| Naiman, Nicole<br><br>v.<br><br>Swedish Health Services d/b/a Swedish Medical Center; Mt Baker Imaging; Kathryn A. Cambron MD | 22-2-04493-4 | Deposition | In the Superior Court of the State of Washington in and for the County of King | Eugene Moen; CMG Law | Neil Wagner; FAVROS Law | Naiman, Nicole | Dec 23 |
| Strong, Aideen<br><br>v.<br><br>Scroggins, Vollie D. | 21-3-00872-1 | Deposition | In the Superior Court of the State of Washington in and for the County of King | Mikel Sagoian; Wechsler Becker LLC | Monique Gilson; Gilson-Moreau & Associates P.S. | Scroggins, Vollie | Sept 23 |
| Donnelly, Paul<br><br>v.<br><br>Sharon Bitcon | 22-3-05093-8 | Testimony | In the Superior Court of the State of Washington in and for the County of King | Carena McIlwain: Anderson Fields McIlwain & Eubanks Inc. P.S. | | Donnelly, Paul | Sep 23 |
| Procopio, Lauren<br><br>v. | 21-3-04240-6 | Testimony | In the Superior Court of the State of Washington in and for the County of King | Carena McIlwain: Anderson Fields McIlwain & Eubanks Inc. P.S. | | Procopio, Lauren | Aug 23 |
| Jaymie Jones, Plaintiff,<br>v.<br>Argosy L. P., a Washington corporation,<br>Defendant. | 22-2-09020-1 SEA | Deposition | In the Superior Court of the State of Washington in and for the County of King | Melanie Nguyen: Stritmatter Kessler Koehler Moore | Thomas G. Waller: Bauer Moynihan & Johnson LLP | Jones, v. Argosy | Jul 23 |

**John Fountaine**
**Testimony List**

**Fountaine Consulting Services LLC**

| Case Caption | Case No. | Type | Court | Counsel | Counsel | Witness | Date |
|---|---|---|---|---|---|---|---|
| Chris A. Covelli, and individual; Kathi Covelli, an individual, Plaintiffs. Vs. Toyota Motor Corporation; Toyota Motor North American, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; John Doe Nos. 1-25; John Doe Companies Nos. 1- 25; and Darin Potts, Defendants. | 21CV78 | Testimony | Weld County District Court State of Colorado | Todd Ingram: Metier Law Firm LLC | Edward Stewart: Wheeler Trigg ODonnell LLP | Covelli, Chris | May 23 |
| Robyn Yates, an individual, Plaintiff, vs. Alta Crutcher, an individual, Defendant. | 18-2 00874 29 | Testimony | Superior Court of The State Of Washington For Skagit County | Tiffany Bailey: Brett McCandlis Brown & Conner PLLC | | Yates, Robyn | Mar 23 |
| Eric P. Soptich, a single person, Plaintiff, v. Howmedica Osteonics Corporation, Defendant. | 19-2-11049-0 SEA | Deposition | In the Superior Court of the State of Washington King County | Rod Nelson: Abeyta Nelson PC | Benjamin Walther: Shook Hardy & Bacon LLP | Soptich, Eric | Feb 23 |
| William Graham Smith v. Karen A. McNeill | 21-3-04029-2 SEA | Testimony | King County Superior Court | Michael de Maar: de Maar Law | | McNeill, Karen | Feb 23 |
| Fawad Mohammedi et al v. Perry Nicolopoulos | 20CV10189 | Testimony | In the Circuit Court of the State of Oregon for the County of Multnomah | Dr. Aaron DeShaw Esq.: Law Office of Dr. Aaron DeShaw Esq. PC | | Mohammadi, Fawad | Feb 23 |
| Marcias White, Plaintiff, vs. Adrian Gomez, a single person, Pascual and Tiffany Gomez, Tiffany Gomez and their marital community, Honey Pearl Ranch, Inc., a Washington State corporation, City of Ocean Shores, a Washington Municipal Corporation, and the State of Washington, Defendants. | 20-2-00742-1 SEA | Deposition | In the Superior Court of the State of Washington in and for the County of King | Robert B. Kornfeld: Kornfeld Trudell Bowen and Lindquist PLLC | Miren C. First: Keller Rohrback LLP | While, Marcias | Feb 23 |
| In Re: Randy Miller Claimant, Claim No. AK85930 | 22 11354; 22 11355 | Hearing | Board of Industrial Insurance Appeals, State of Washington | James R. Walsh: Law Office of James R. Walsh | | Miller, Randy | Jan 23 |
| Kyle A. Sharp, an individual, Plaintiff, -vs- Dari-Tech, Inc., a Washington corporation; and Jonathan Hathaway, an individual, Defendants. | 21-2-00568-37 | Deposition | In the Superior Court of the State of Washington in and for the County of Whatcom | Matthew Conner: Brett McCandlis Brown & Conner PLLC | Paul S. Smith III: Forsberg & Umlauf PS | Sharp, Kyle | Dec 22 |
| In Re: Collier vs Collier Dissolution w/ Children - Active | 21-3-05325-4 SEA | Testimony | King County Superior Court | Michael de Maar: de Maar Law | | Collier, Gabrielle | Nov 22 |
| Kristen Prentice vs Loy Clark Pipeline Co | 18CV40481 | Testimony | In the Circuit Court of the State of Oregon for the County of Multnomah | Grant Elder: Scheer.Law PLLC | | Prentice, Kristen | Oct 22 |
| Eric Rader vs Loy Clark Pipeline Co | 18CV44865 | Testimony | In the Circuit Court of the State of Oregon for the County of Multnomah | Grant Elder: Scheer.Law PLLC | | Rader, Eric | Oct 22 |
| In Re: Julie Marie Collver Claimant, Claim No. AB72669 | 21 25586; 21 25587 | Deposition | Board of Industrial Insurance Appeals, State of Washington | James R. Walsh: Law Office of James R. Walsh | | Collver, Julie | Oct 22 |

**John Fountaine**
**Testimony List**

**Fountaine Consulting Services LLC**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 54 of 432   PageID.9062

| Case | Complaint/Claim No. | Type | Court | Attorney | Opposing | Name | Date |
|---|---|---|---|---|---|---|---|
| Nathan Pinkstaff, Plaintiff v. Tidewater Barge Lines, Inc. Defendant. | Complaint(Per ORS 21.160(1)(d): 10.4 million)(Seaman's Personal Injuries) | Testimony | In the Circuit Court of the State of Oregon, For the County of Multnomah | James P. Jacobsen: Stacey & Jacobsen LLP | | Pinkstaff, Nathan | Aug-22 |
| JOHN DAVID WARREN, JR., AND 4 LAURA WARREN, Individually, and as Guardians Ad Litem and Next Friends of Their ) Minor Children, D.G.W. A.J.W., J.D.W. III, and A.A.W., Plaintiffs, vs. UNITED STATES OF AMERICA; HAWAII PACIFIC HEALTH, a Domestic Nonprofit Corporation; HAWAII PACIFIC HEALTH PARTNERS, INC. a Domestic Nonprofit Corporation; KAPIOLANI MEDICAL SPECIALISTS, a Domestic Tax Exempt Organization; DEVIN PUAPONG, M.D.; and DOE DEFENDANTS 1-10, Defendants. | 19-00232 JMS-WRP(Federal Tort Claims Act) | Testimony | In the United States District Court for the District of Hawaii | Harry Yee: U.S. Attorney's Office - Hawaii | | Warren, v US | Aug 22 |
| In Re: Fidel Reyes Lugo, Claimant. Claim No. BF-40352 | 21 15334 | Hearing | Board of Industrial Insurance Appeals, State of Washington | James R. Walsh: Law Office of James R. Walsh | | Reyes, Fidel | Aug 22 |
| In Re: Curt Richeson Claimant, Claim No. SJ15758 & SK30420 | 21 16929 & 21 20521 | Hearing | Board of Industrial Insurance Appeals, State of Washington | James R. Walsh: Law Office of James R. Walsh | | Richeson, Curt | Jul 22 |
| In Re: Fidel Reyes Lugo, Claimant. Claim No. BF-40352 | 21 15334 | Deposition | Board of Industrial Insurance Appeals, State of Washington | James R. Walsh: Law Office of James R. Walsh | Gibby Stratton: Pratt Day & Stratton PLLC | Reyes, Fidel | Jul 22 |
| In Re: Stewart Hutchens Claimant, Claim No. BA40560 | 21 25205 | Hearing | Board of Industrial Insurance Appeals | James R. Walsh: Law Office of James R. Walsh | | Hutchens, Stewart | Jun 22 |
| Bartnick vs Bartnick | 21-3-02708-3 SEA | Hearing | In the Superior Court for the State of Washington for the County of King | Nicholas Price: Archer Price Law PLLC | | Bartnick, v Bartnick | Jun 22 |
| NATALIE G. JOHNSON, Plaintiff, vs. CITY OF SEATTLE, a Washington Municipal Corporation, and TERRENCE J. BROWN and JANE DOE BROWN, individually and the marital community composed thereof; JOHN and JANE DOE DEFENDANTS 1 through 5, Defendants. | 19-2-01271-4 SEA | Deposition | Superior Court for the State of Washington for the County of King | Christopher Davis: Davis Law Group PS | | Johnson, Natalie | May 22 |
| Douglas Brenner, Plaintiff, v. Willie Taggart, an individual; National Collegiate Athletic Association, a foreign entity; Irele Oderinde, an individual; and University of Oregon, a public body of the State of Oregon, Defendants. | Complaint for Negligence | Testimony | In the Circuit Court of the State of Oregon, For the County of Multnomah | Jason Kafoury: Kafoury & McDougal | | Brenner, Douglas | Apr 22 |
| Misty Marcott, vs., Jannette Staley | 120557 | Deposition | In the Superior Court of the State of Washington in and for the County of Thurston | Maurice King (Church Rietzke Johnson PLLC) | Mark J Dynan (Dynan & Associates) | Marcott, Misty | Mar 22 |

| Case | Case Number | Type | Court | Retained By | Opposing | Witness | Date |
|---|---|---|---|---|---|---|---|
| Sean Linke, a single person, v., Washington State University, a State University of the State of Washington | 21-2-00599-0 SEA | Deposition | State of Washington King County Superior Court | Brock Stiles (Stiles Law Inc PS) | Brendan Lenihan (Attorney General of Washington) | Linke, Sean | Mar 22 |
| Edward L Walter and Jamie K Walter, husband and wife, vs., Pep Boys - Manny, More & Jack of Delaware, Inc., a froeign corporation doing business in Washington State; PB Acquisition Company Washington LLC, a froeign limited liability company d/b/a Pepboys Auto Service & Tires, doing business in Washington State; and James W Leff and Tamara Leff, husband and wife, and their marital community composed thereof; State Farm Mutual Automobil Insurance Company, a foreign insurance company doing business in the State of Washington; and State Farm Fire and Casualty Company, a foreign insurance company doing business in the State of Washington | 20-2-09642-3 SEA | Deposition | In the Superior Court for the State of Washington for the County of King | William S McGonagle (Sherrard McGonagle Tizzano & Lind) | Brittany Ward (Floyd Pflueger & Ringer) | Walter, Skip | Mar 22 |
| Albert Simon, Craig Friday, and Kelly Kehlenbach, v. Crowley Fuels, LLC, aka Crowley, and Mark Dallman | 4BE-20-206 Cl | Testimony | In the Superior Court for the State of Alaska Fourth Judicial District at Bethel | Michael Barcott (Holmes Weddle & Barcott PC) | | Simon, Albert | Feb 22 |
| Albert Simon, Craig Friday, and Kelly Kehlenbach, v. Crowley Fuels, LLC, aka Crowley, and Mark Dallman | 4BE-20-206 Cl | Testimony | In the Superior Court for the State of Alaska Fourth Judicial District at Bethel | Michael Barcott (Holmes Weddle & Barcott PC) | | Friday, Craig | Feb 22 |

| Case | Case Number | Type | Court | Retained By | Opposing | Witness | Date |
|---|---|---|---|---|---|---|---|
| Albert Simon, Craig Friday, and Kelly Kehlenbach, v. Crowley Fuels, LLC, aka Crowley, and Mark Dallman | 4BE-20-206 Cl | Testimony | In the Superior Court for the State of Alaska Fourth Judicial District at Bethel | Michael Barcott (Holmes Weddle & Barcott PC) | | Kehlenbach, Kelly | Feb 22 |
| Harry T. Watson and Marie Parker, vs. United States of America | 20-00186 HG-RT | Deposition | In the United States District Court for the District of Hawaii | Michael Cruise (Leavitt Yamane & Soldner) | | Watson, v. US | Feb 22 |
| Maxim Health Care Services Inc., v. Hozubin, Moberly | 21-2-14371-3 SEA | Deposition | The Superior Court of The State of Washington for The County of King | David H. Shoup Esq. (Tindall Bennett & Shoup) | George Kapolchok (George Kapolchuk Law Offices Inc.) | Maxim, v Hozubin et al | Feb 22 |
| In re the Marriage of: JOHNSON vs JOHNSON | 20-3-02532-5 SEA | Testimony | Superior Court of The State of Washington In and For The County of King | Carena Mcilwain | | Johnson, John F | Aug 21 |

Case 1:22-cv-00396-LEK-KJM Document 35 Filed 11/19/24 Page 55 of 432 PageID.8063

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| In re: Harry Foster<br>Claim No: AJ-55443 | 20 19524; 20 19525;<br>20 19526 | Deposition | Board of Industrial<br>Insurance<br>Appeals, State of<br>Washington | James R. Walsh | | Foster,<br>Harry | Jul 21 |
| Virginia Tom and Peter Tom,<br>individually and as Co-Guardians of L.C.S.T., a minor | 19-2-28192-8 SEA | Deposition | Superior Court of The State<br>of<br>Washington<br>In and For The County of<br>King | Tyler Goldberg-Hoss | Rando Berry Wick | Tom, L. | Jul 21 |
| Stephen Roland Lynch and Erika<br>Wolff, husband and wife, and the community property<br>comprised thereof v. City of Seattle, a municipal<br>corporation | 19-2-31460-5 SEA | Testimony | Superior Court of The State<br>of<br>Washington<br>In and For King County | Randolph I. Gordon | | Lynch,<br>Stephen | Jun 21 |
| In Re: Jerry Smith<br>Claimant, Claim No.: AJ59769 | 17 25182 | Hearing | Board of Industrial<br>Insurance<br>Appeals, State of<br>Washington | James R. Walsh | | Smith,<br>Jerry | Jun 21 |
| Darcy Monette Et Ux vs. American<br>Family Mutual Insurance Company Et Al | 17-2-01280-9 | Testimony | Superior Court of WA in and<br>for Kitsap County | William S. McGonagle | | Monette,<br>Darcy | Jun 21 |
| JESSICA MEGHINASSO v.<br>MERCEDES-BENZ USA LLC and DAIMLER AG | 3:17-cv-05930-RAJ | Deposition | UNITED STATES District<br>Court Western District<br>of Washington | Alison Gaffney | | Meghina<br>sso,<br>Jessica | May 21 |
| JESSICA MEGHINASSO v.<br>MERCEDES-BENZ USA LLC and DAIMLER AG | 3:17-cv-05930-RAJ | Deposition | UNITED STATES District<br>Court Western District<br>of Washington | Alison Gaffney | Jenna Poligo | Meghina<br>sso,<br>Jessica | Apr 21 |
| IN RE: Mark Mattschei | 20-10600, 20-10601,<br>20-10602,20-10604,<br>20-10605,20-10606,<br>20-10607, 20-10702 &<br>20-10703 | Hearing | Board of Industrial<br>Insurance<br>Appeals, State of<br>Washington | James R. Walsh | | Mark<br>Mattsch<br>ei | Mar 21 |
| Kevin Backlund and Jannette L<br>Backlund v. Darryl Allen Burgess, Jason Eric Owens, Jesse<br>Ray Owens, Chanelle Rebecca Elizabeth Mathis, JRO<br>Premier Enterprises, LLC, RCO Enterprised, Grounded<br>Logistics, DA Burgess, FE Services, Inc., Pure Diesel<br>Power, LLC, et al | 18-2-04368-4 | Deposition | Superior Court for the State<br>of<br>Washington for the County<br>of Pierce | Kyle Riley | Peter Balzarini | Kevin<br>Backlun<br>d | Feb 21 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Bisrat Tekle vs. Estate of Dula<br>Gebre; Moral Transportation, LLC,<br>Sterling Foods, LLC, So-Pak-Co,<br>Inc., dba Sopakco | 20-2-07323-7 SEA | Deposition | Superior Court of the State of<br>Washington in and for the<br>County of King | Mark Scheer | Yohannes Sium | Bisrat Tekle | Feb 21 |
| Keith Nida vs Gregory Hamby | 19-2-15933-2 KNT | Trial | Superior Court for the State of<br>Washington for the County of<br>King | Jeffrey Brook Tuttle | Mark J. Dynan | Keith Nida | Nov 20 |
| Parker Omey v. Michael Pennylegion | 2:20-cv-00242-RAJ-<br>BAT | Deposition | United States District Court<br>Western District of<br>Washington at Seattle | Joseph S. Stacey | Thomas G. Waller | Parker Omey | Oct 20 |
| Keith Nida vs Gregory Hamby | 19-2-15933-2 KNT | Deposition | Superior Court for the State of<br>Washington for the County of<br>King | Jeffrey Brook Tuttle | Mark J. Dynan | Keith Nida | Oct 20 |
| Limon vs. J&H Express Inc. et ano | 18-2-56225-2 SEA | Court | Superior Court of Washington<br>for King County | Christopher Davis | Ashley Nagrodski | Justino Limon | Sep 20 |

Case 1:22-cv-00306-LEK-KJM   Document 235   Filed 11/19/24   Page 56 of 432   PageID.8064

**John Fountaine**
**Testimony List**

**Fountaine Consulting Services LLC**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 57 of 432   PageID.8065

| Case | Number | Type | Court | | | | |
|------|--------|------|-------|--|--|--|--|
| Lynn Satre v. State of Washington, Department of Social and Health Services | 19-2-00185-35 | Deposition | State of Washington Thurston County Superior Court | Kevin M. Hastings | Amee Tilger | Satre, Lynn | Jun 20 |
| Christopher C. Rinke and Kari R. Rinke v. Radia, Inc., P.S., et al. | 19-2-07688-7 SEA | Deposition | Superior Court of Washington for King County | Carl-Erich Kruse | Jeffrey Street | Rinke, Christopher | May 20 |
| Damar Shaw v. United States of America; Ocean Shipholdings, Inc; and Ocean Duchess, Inc. | 4:18-CV-06243-PJH | Deposition | US District Court Northern District of California - Oakland Division | Nicholas Neidzwski | Eric Kaufman-Cohen | Shaw, Damar | Apr 20 |
| Justino D. Limon v. J&H Exprress, Inc.: Vladimir V. Butylev & Jane Doe Butylev | 18-2-56225-2 SEA | Deposition | Superior Court of the State of Washington in and for the County of King | Christopher Davis | Ashley Nagrodski | Limon, Justino | Apr 20 |

**From:** Suzanne Mirante ███████████████
**Sent:** Thursday, August 24, 2023 1:57 PM
**To:** Ramirez, Saundra (USAHI) ███████████████
**Subject:** [EXTERNAL] Re: Grenier v. USA


Aloha!

Sorry for the delay...here are the current CV and <mark>rate sheet for Mr. Fountaine.</mark>

Please let me know if you need anything else!

*(See attached file: JF CV 092023.pdf)(See attached file: DOJ Rate Sheet 092023.pdf)*

*Admin*
*Fountaine Consulting Services, LLC*
*15418 NE 195th Street*
*Woodinville, WA 98072*



▼ "Ramirez, Saundra (USAHI)" ---08/23/2023 10:44:11 AM---Aloha Suzanne, Pleasure speaking with you on the phone!  As I said, in order to continue retaining M

From: "Ramirez, Saundra (USAHI)" ███████████████
To: "Suzanne Mirante" ███████████████ >
Date: 08/23/2023 10:44 AM
Subject: Grenier v. USA

---

Aloha Suzanne,

Pleasure speaking with you on the phone!  As I said, in order to continue retaining Mr. Fountaine as an expert witness on *Grenier v. USA*, I would just need the following things: a fee schedule and an updated CV/Resume.

Mahalo,

Saundra Ramirez
Paralegal Specialist, Civil Division
United States Attorney's Office, District of Hawaii

## Rate Structure

| Service/Description | Rate | Mileage |
|---|---|---|
| **Professional Time** | **$275.00** | **$.655** |
| **Deposition / Testimony (per hour) 1 Hour Minimum** | **$400.00** | **$.655** |

_____

*Discovery depositions must be prepaid 72 hours in advance of the deposition or re-scheduling will be required. This prepayment is non-refundable unless notice of cancellation is received 72 hours in advance. This includes any travel time, mileage and/or parking at our customary rate if the Subpoena Duces Tecum requires travel.*

**Ramirez, Saundra (USAHI)**

---

| | |
|---|---|
| **From:** | Suzanne Mirante |
| **Sent:** | Thursday, August 24, 2023 2:32 PM |
| **To:** | Ramirez, Saundra (USAHI) |
| **Subject:** | RE: [EXTERNAL] Re: Grenier v. USA |

Preparing Testimony is Professional time

Travel time is also Professional time

Deposition/Testimony is literally for him in the "hot seat" :)

Hope that helps! Let me know if any other questions come up!

Have a lovely evening!

*Admin*
*Fountaine Consulting Services, LLC*
*15418 NE 195th Street*
*Woodinville, WA 98072*

▼ "Ramirez, Saundra (USAHI)" ---08/24/2023 05:10:02 PM---Hi Suzanne, A couple questions;

From: "Ramirez, Saundra
To: "Suzanne Mirante"
Date: 08/24/2023 05:10 PM
Subject: RE: [EXTERNAL] Re: Grenier v. USA

---

Hi Suzanne,

A couple questions;

- Would "Preparing Testimony" fall under "Professional Time" or "Deposition/Testimony"?
- I just want to confirm; Travel time falls under "Deposition/Testimony" time?
  - Further; if Mr. Fountaine were traveling to Honolulu for trial, would he be invoicing for his travel time as "Depisition/Testimony"?

Thank you- I just need to be able to justify securing the funding with explanations and I know these questions will come up!

V/R,

Saundra Ramirez
Paralegal Specialist

1

J█████.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Diapers / Pull-ups

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Amazon.com

**Address**:

**Phone**:

**Name of Person Spoken To**:

**Cost Information**:
$83.65 to $111.00 each time

**Replacement rate**:
Monthly

USA-017046

Delivering to Monroe 98272
**Update location**   All ▾   Diapers large boys                                          EN ▾   Hello, sign in   Returns   0
                                                                                          Account & Lists ▾   & Orders

All   Customer Service   Medical Care ▾   Groceries ▾   Best Sellers   Amazon Basics   Prime ▾   New Releases   Today's Deals   Music   Amazon Home   Books   Pharmacy   Registry   Gift Cards ▾   Fashion

Baby   Registry   Best Sellers   Deals   Strollers   Car Seats   Nursery   Feeding   Clothing   Activity & Gear   Toys   Diapering   Health & Safety   Gifts

NEW ON AMAZON
CYNTHIA ROWLEY    Shop now ▸

‹ Back to results



Roll over image to zoom in

## SleepOvers by Cuties, Bedwetting Underwear for Girls and Boys, Large/X-Large 60-125 lbs, 48 Count

Visit the Cuties Store

4.3        1,241 ratings  |  Search this page

700+ bought in past month

$34⁹⁹ ($0.73 / Count)

FREE Returns

Get $10 off instantly: Pay $24.99 $~~34.99~~ upon approval for the Amazon Store Card. No annual fee.

**Size: Large/X-Large (Pack of 48)**

| Large/X-Large (Pack of 48) | Small/Medium (Pack of 60) | X-Large (Pack of 88) |
|---|---|---|
| $34.99 | $36.36 | $64.99 |
| ($0.73 / Count) | ($0.61 / Count) | ($0.74 / Count) |

| | |
|---|---|
| Brand | Cuties |
| Number of Items | 1 |
| Incontinence Protector Type | Bed Wetting Underwear |
| Age Range (Description) | Kid |
| Material Type Free | Dye Free, Hypoallergenic, Latex Free, Chlorine Free |

### About this item

- ABSORBENT & COMFY: Stretchable side panels move with the body & maintain a snug fit, while a flexible, ultra-absorbent core locks in wetness & provides effective leakage protection both day & night.
- SOFT & HYPOALLERGENIC: Made from cottony soft materials free of latex, fragrance, dyes & chlorine, SleepOvers feature a hypoallergenic inner liner enriched with aloe, botanicals & vitamin E.
- COMPLETE CARE FOR SENSITIVE SKIN: Thoughtfully designed. Responsibly made. Incredibly soft. Our training pants are soft, absorbent & safe because they're going on your child's sensitive skin.
- OUR SKINSMART PROMISE TO YOU: With our products, every decision we make is designed to help protect the health of your child's sensitive skin, from preemie to newborn to toddler & beyond!
- CUTIES COMPLETE CARE: We specialize in baby care, offering comfort & protection for the sensitive skin of your newborn, infant or toddler. Try our thoughtfully designed diapers, wet wipes & training pants!

› See more product details

Report an issue with this product or seller

$34⁹⁹ ($0.73 / Count)

FREE Returns

FREE delivery **Monday, July 1.**
Details

Delivering to Monroe 98272 ·
Update location

**In Stock**

Quantity: 1

Add to Cart

Buy Now

Ships from   My Friendly Neighbor
Sold by      My Friendly Neighbor
Returns      Eligible for Return,
             Refund or Replacement
             within 90 days of receipt
Payment      Secure transaction

Add to List

Add to Baby Registry

### Other sellers on Amazon

New (3) from $26⁹⁹ + $7.49 shipping

### Add other items:

Adult Wipes with Aloe, Extra-Large Washcloth (9x12) for Incontinence and Personal Cle...

$9.99        Add to Cart

## Frequently bought together

  +    +

Total price: $91.89

Add all 3 to Cart

These items are shipped from and sold by different sellers
Show details

This item: SleepOvers by Cuties, Bedwetting Underwear for Girls and Boys, Large/X-Large 60-12...
$34⁹⁹ ($0.73/Count)

Amazon Elements Baby Wipes, Sensitive, 810 Count, Flip-Top Packs, Pack of 9
$22²⁵ ($2.75/100 Count)

Amazon Brand - Mama Bear Gentle Touch Diapers, Hypoallergenic, Size 7, 80 Coun...
$34⁶⁵ ($0.43/Count)

## Products related to this item

Sponsored ⓘ

              

Goodnites Boys' Nighttime Bedwetting Underwear, Size Extra Large (95-140+ lbs),...
1,757
$64⁹⁹ ($1.03/Count)
Save $4.00 with coupon

Goodnites Girls' Nighttime Bedwetting Underwear, Size Large (68-95 lbs), 75 Ct (3 P...
15,038
$64⁹⁹ ($0.87/Count)
Save $4.00 with coupon

Pampers Ninjamas Nighttime Bedwetting Underwear Boys - Size L (64-125 lbs), 68 Coun...
12,213
$55⁹⁹ ($0.82/Count)

Pampers Ninjamas Nighttime Bedwetting Underwear Girls - Size S/M (38-70 lbs), 88 Co...
7,200
$55⁹⁹ ($0.64/Count)

McKesson Ultra Underwear, Incontinence, Heavy Absorbency, Medium,...
209
$17⁰⁰ ($0.85/Count)

Size XL (48-62"), Incontinence Underwear for Women & Men, Maximum Absorbency...
181
$29⁴⁰ ($1.47/Count)

McKesson Ultra Underwear, Incontinence, Heavy Absorbency, XL, 56...
2,384
$44⁰⁰ ($0.79/Count)

LivDry Adult XL Incontinence Unde Extra Absorbency Diapers, Leak Prot
9,331
$67⁹⁹ ($1.21/Cou

## From the manufacturer

USA-017047

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 63 of 432
PageID.8071

**Product Description**

SleepOvers Youth Pants are designed to meet the needs of older children with nighttime incontinence episodes. Super absorbent leakage protection keeps kids and beds dry.

**Product information**

Technical Details

| | |
|---|---|
| Package Dimensions | 12.5 x 10.75 x 9 inches |
| Item model number | SLP05302 |
| Target gender | Unisex |
| Material free | Dye Free. Hypoallergenic. Latex Free, Chlorine Free |

Additional Information

| | |
|---|---|
| ASIN | B08DRTVN1J |
| Customer Reviews | 4.3          1,241 ratings |
| | 4.3 out of 5 stars |
| Best Sellers Rank | #18,972 in Health & Household (See Top 100 in Health & Household) |
| | #82 in Incontinence Protective Briefs & Underwear |

| Number Of Items | |
|---|---|
| Batteries required | No |
| Item Weight | 5.99 pounds |

Warranty & Support

Amazon.com Return Policy: **Amazon.com Voluntary 30-Day Return Guarantee:** You can return many items you have purchased within 30 days following delivery of the item to you. Our Voluntary 30-Day Return Guarantee does not affect your legal right of withdrawal in any way. You can find out more about the exceptions and conditions here.

Feedback

Would you like to tell us about a lower price?

## Inspiration from this brand



**Cuties**
Visit the Store on Amazon

+ Follow







When you make the switch to Cuties diapers and your baby sleeps thro...

Cuties diapers are team Zero Waste to Landfill. That means all waste p...

All Cuties diapers are made with a breathable outer cover to ensure u...

Thoughtfully designed. Responsibly made. Incredibly soft. Hypoallerge...

Our SkinSmart promise to you means Cuties diapers are made wit...

Booties + #Bootiesii

## Compare with similar items

| | This Item | Recommendations | | |
|---|---|---|---|---|
| |  SleepOvers by Cuties, Bedwetting Underwear for Girls and Boys, Large/X-Large 60-125 lbs, 48 Count  [Add to Cart] |  Goodnites Boys' Nighttime Bedwetting Underwear, Size Large (68-95 lbs), 75 Ct (3 Packs of 25), Packaging May Vary  [Add to Cart] |  Goodnites Nighttime Bedwetting Underwear, Boys' XS (28-43 lb.), 99 Ct (3 Packs of 33), Packaging May Vary  [Add to Cart] |  Goodnites Girls' Nighttime Bedwetting Underwear, Size S/M (43-68 lbs), 44 Ct (2 Packs of 22), Packaging May Vary  [Add to Cart] |
| Price | $34⁹⁹ | $64⁹⁹ | $64⁹⁹ | $29⁹⁷ |
| Price Per Unit | $0.73 / Count | $0.87 / Count | $0.66 / Count | $0.68 / Count |
| Delivery | — | Get it as soon as **Tuesday, Jun 25** | Get it as soon as **Tuesday, Jun 25** | Get it as soon as **Tuesday, Jun 25** |
| Customer Ratings | 4.3    1,241 | 4.8    1,522 | 4.8    320 | 4.8    15,038 |
| Absorbency | 4.0 | 4.5 | 4.0 | 4.5 |
| Leak Protection | — | 4.2 | 3.8 | 4.0 |
| Comfort | 4.1 | 4.7 | 3.7 | 4.6 |
| Value For Money | 4.0 | 4.6 | — | 4.4 |
| For Potty Training | — | — | — | 4.5 |
| Sold By | My Friendly Neighbor | Amazon.com | Amazon.com | Amazon.com |
| Size | Large/X-Large (Pack of 48) | Large | X-Small | Small/Medium |
| Unit Count | 48 | 75 | 99 | 44 |
| Material | — | Polypropylene | Polypropylene | Cotton |
| Weight Range | 60 - 125 lbs | 68-95 lb. | 28-43 lb. | 43-68 lb. |
| Target Gender | unisex | male | male | female |
| Type | bed wetting underwear | bed wetting underwear | bed wetting underwear | bed wetting underwear |

## Videos

USA-017049



| | | |
|---|---|---|
| 0:40 | 0:25 | 0:21 |
| What you need to know! ☑ Cathy Raiken ☑ | Bed wetting Underwear Diapers by SleepOvers for boys & girls Mommy's Dressing Room | SleepOvers Bed wetting Underwear for my boy that... Mommy's Dressing Room |

Upload your video

## Products related to this item

Sponsored ⓘ











| Pampers Ninjamas Nighttime Bedwetting Underwear Boys - Size S/M (38-70 lbs), 88... 12,213 $55⁹⁹ ($0.64/Count) | Medline FitRight OptiFit Ultra Adult Briefs, Incontinence Diapers with Tabs, Heavy ... 1,475 $16⁹⁹ ($0.85/Count) | Livdry XL Adult Diapers for Women, Ultimate Absorbency Incontinence Underwear, All ... 110 $77⁹⁹ ($1.77/Count) | Easy Pull-up Diaper Pants | Size (5) 3T-4T (26-37 lbs) | 88 Count (22ea*4packs) | V... 451 $60⁴⁹ ($0.69/Count) | Goodnites Girls' Nighttime Bedwetting Underwear, Size Large (68-95 lbs), 75 Ct (3 P... 15,038 $64⁹⁹ ($0.87/Count) Save $4.00 with coupon | Goodnites Boys' Nighttime Bedwetting Underwear, Size Extra Large (95-140+ lbs),... 1,757 $64⁹⁹ ($1.03/Count) Save $4.00 with coupon | Pampers Ninjamas Nighttime Bedwetting Underwear Girls - Size S/ M (38-70 lbs), 88 Co... 7,200 $55⁹⁹ ($0.64/Count) | McKesson Ultra Underwear, Incontinence, Heavy Absorbency, Medi... 209 $17⁰⁰ ($0.85/Cou... |

## Similar brands on Amazon

Sponsored



| Because Shop the Store on Amazon › | LivDry Shop the Store on Amazon › | BULL TALE Shop the Store on Amazon › | SENOY Shop the Store on Amazon › |
|---|---|---|---|
| Because Overnight Absorbency Pull Ups - Adult Disposable Incontinence Underwe... (2,459) $81.56 | LivDry Adult Diapers Large Incontinence Underwear, Overnight, Leak Protection,... (9,570) $33.99 | BULL TALE Multipurpose Wire Dishwashing Rags for Wet and Dry,Soft... (5) $7.99 | Needle T mouth s... $4.99 |

## Looking for specific info?

## Customer reviews

4.3 out of 5 ⓘ

1,241 global ratings

| | | |
|---|---|---|
| 5 star | | 70% |
| 4 star | | 12% |
| 3 star | | 7% |
| 2 star | | 4% |
| 1 star | | 7% |

⌄ Zero tolerance for fake reviews

### Customers say

Customers like the absorbency of the incontinence protector. They say it absorbs most of the urine. They appreciate the value, and versatility of the product. However, some customers have concerns about the quality, leakage, fit, and comfort.

AI-generated from the text of customer reviews

✓ Absorbency   ✓ Value   ✓ Versatility   Quality   Fit   Leakage   Comfort

⊖ Scratch resistance

### Reviews with images



See all photos ›

Top reviews

### Top reviews from the United States

**Good night time pull up**

Reviewed in the United States on August 16, 2022

Size: Small/Medium (Pack of 60)    Verified Purchase

These are way more absorbing than pampers easy ups! My daughter is using these at night time she is 4 and big for her age. She is about 44" tall and about 42lbs and the size small/medium fits ok, just a tiny bit of a gap in the waist but it's not problematic. They work fantastic for overnight! NO WET SHEETS! She drinks a lot of milk before bed and she's a heavy wetter when accidents do happen in bed. I'm shocked how absorbent these are. You can feel all the padding in the pull up when you touch them. They are good quality night pull ups. Easy up and down for going potty. They are just plain white with the size on the back. The material is soft and doesn't irritate. I would compare them to the absorbent level of a good nite pull up. They seem more padded (absorbing) than any regular day time pull up we have tried such as pampers easy up, huggies pull up, honest company training pants, etc.

41 people found this helpful

Helpful    Report

MomofMany

**A must for heavy wetters**

Reviewed in the United States on June 18, 2024

Size: Large/X-Large (Pack of 48)    Verified Purchase

If you like changing sheets and washing clothes after a bed wetting accident then don't buy these. We tried everything to find a solution to our twin boys wetting nightly. We know eventually they will outgrow this stage, but for now these are a God sent solution. A little pricier than store brands, but they work amazing! Do know the shipping is longer than normal so I always reorder when we have one pack left.

Helpful    Report

TheLainster

**They work and they're discreet!**

Reviewed in the United States on September 8, 2023

Size: Large/X-Large (Pack of 48)    Verified Purchase

Sleepovers trap the pee and save us from having to wash bedsheets every day. For an older child who needs occasional overnight protection but doesn't want a diaper, Sleepovers are plain white and appear more like undies without all the cartoons and colors. They seem to run just a little small so size up if you're on the edge of a size range.

10 people found this helpful

Helpful    Report

Areal

**Did the job.**

Reviewed in the United States on May 17, 2023

Size: Large/X-Large (Pack of 48)    Verified Purchase

These pull ups are Barely a good fit. They are too tough around my sons leg and I don't like that. The sides roll up too easily and I often have to help him out then on which doesn't really help with his independence. But the pull ups do hold up all night

8 people found this helpful

Helpful    Report

mamiof3kids

**Perfect size slim kids over 70lbs**

Reviewed in the United States on April 10, 2024

Size: Large/X-Large (Pack of 48)    Verified Purchase

Expensive but worth it for disabled kids and kids that are potty training.

6 people found this helpful

Helpful    Report

bethany ducharme

**Absolutely love these!**

Reviewed in the United States on March 13, 2024

Size: Small/Medium (Pack of 60)    Verified Purchase

No smell, very soft and comfortable for my son. Very absorbent

2 people found this helpful

Helpful    Report

Kaila Allen

**Great Reviews, Big Let Down**

Reviewed in the United States on October 5, 2023

Size: Large/X-Large (Pack of 48)    Verified Purchase

Bought these for my 7 year old son who has urinary issues. We've tried a lot of other brands and this one promised leakproof and I ordered significantly above his weight. They are so tiny and tight and the first night he used them he poured pee out as if he wasn't even wearing one. Worthless. Wish I hadn't wasted the money.

7 people found this helpful

Helpful    Report

Stacy Torres

**Product**

Reviewed in the United States on March 21, 2024

Size: Large/X-Large (Pack of 48)    Verified Purchase

I love the papers they really hold up, the only thing is the butt area I wish it covered the butt area more as well as maybe have side openings so i would be easier than having to take off the shoes and clothes just to

6/20/2024, 1:00 PM    USA-017051

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 67 of 432
PageID.8075

Helpful    Report

See more reviews ·

Back to top

**Get to Know Us**

Careers

Amazon Newsletter

About Amazon

Accessibility

Sustainability

Press Center

Investor Relations

Amazon Devices

Amazon Science

**Make Money with Us**

Sell on Amazon

Sell apps on Amazon

Supply to Amazon

Protect & Build Your Brand

Become an Affiliate

Become a Delivery Driver

Start a Package Delivery Business

Advertise Your Products

Self-Publish with Us

Become an Amazon Hub Partner

› See More Ways to Make Money

**Amazon Payment Products**

Amazon Visa

Amazon Store Card

Amazon Secured Card

Amazon Business Card

Shop with Points

Credit Card Marketplace

Reload Your Balance

Gift Cards

Amazon Currency Converter

**Let Us Help You**

Your Account

Your Orders

Shipping Rates & Policies

Amazon Prime

Returns & Replacements

Manage Your Content and Devices

Recalls and Product Safety Alerts

Help

English    United States

| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |
| IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Kindle Direct Publishing Indie Digital & Print Publishing Made Easy | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Great Deals on Quality Used Products |
| Whole Foods Market America's Healthiest Grocery Store | Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Ring Smart Home Security Systems | eero WiFi Stream 4K Video in Every Room | Blink Smart Security for Every Home | Neighbors App Real-Time Crime & Safety Alerts |
| | | Amazon Subscription Boxes Top subscription boxes – right to your door | PillPack Pharmacy Simplified | Amazon Renewed Like-new products you can trust | | |

Conditions of Use    Privacy Notice    Consumer Health Data Privacy Disclosure    Your Ads Privacy Choices
© 1996-2024, Amazon.com, Inc. or its affiliates

USA-017052

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 68 of 432 PageID.8076

Delivering to Monroe 98272 — Update location

All | Diapers large boys | Returns 0

All  Customer Service  Medical Care  Groceries  Best Sellers  Amazon Basics  Prime  New Releases  Today's Deals  Music  Amazon Home  Books  Pharmacy  Registry  Gift Cards  Fashion

Health & Personal Care  Household Supplies  Vitamins & Diet Supplements  Baby & Child Care  Health Care  Sports Nutrition  Sexual Wellness  Health & Wellness  Medical Supplies & Equipment  FSA Eligible Items

Sponsored

‹ Back to results



Roll over image to zoom in

7 VIDEOS

## Huggies Size 7 Diapers, Little Movers Baby Diapers, Size 7 (41+ lbs), 80 Count (2 packs of 40)

Visit the HUGGIES Store

4.8    35,325 ratings | Search this page

Amazon's Choice

7K+ bought in past month

-5% **$49⁹⁶** ($0.62 / Count)

One-Time Price: $52.59

FREE Returns

**Coupon:** Save an extra 10% on your first Subscribe and Save order.
Shop items | Terms

Sign in to redeem. 20% off orders $75+ promo code: BABYSTOCKUP
Shop items

Get $10 off instantly: Pay $39.96 $49.96 upon approval for the Amazon Store Card. No annual fee.

Available at a lower price from other sellers that may not offer free Prime shipping.

**Size: Size 7**

| Size 3 | Size 4 | Size 5 | Size 6 | Size 7 | Size 8 |

**Unit Count:**

80

| Brand | HUGGIES |
| --- | --- |
| Number of Items | 2 |
| Color | White |
| Incontinence Protector Type | Infant Diaper |
| Age Range (Description) | Infant |

### About this item

- Huggies Size 7 Diapers: 80 Little Movers Baby Diapers (2 packs of 40), size 7 (41+ lbs); packaging may vary
- Up to Zero Leaks, Even from Blowouts: Our toddler diapers have a curved and stretchy fit and are designed to help eliminate gaps at the legs and waist
- Our Perfect Fitting Diaper: Huggies Little Movers disposable diapers are designed for worry-free running, jumping, and playing
- The Only Leading Brand Entirely Fragrance Free**: All Huggies sensitive diapers are free of fragrance and elemental chlorine and made without parabens or natural rubber latex (**among leading national diaper brands, across all offered variants)
- Unique Waistband: Huggies Little Movers toddler diapers come with a waistband that is designed to prevent leaks and help keep your baby comfortable while on the move
- For Babies on the Move: Double Grip Strips help provide a secure, flexible fit that moves with your baby
- Fast-Absorbing Dry Touch Liner helps the disposable diaper lock away 99% of wetness to help keep skin dry

˅ Show more

Report an issue with this product or seller

### Similar item to consider

Amazon Brand – Mama Bear Plush Protection Diapers - Size 7, One Month Supply, Hypoallergenic Premium Disposable Baby Diapers, 92 Count (Pack of 4), White and Cloud Dreams (3598)
$30.99 ($0.34/Count)

prime

Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows with Prime
Try Prime and start saving today with **fast, free delivery**

One-time purchase:
**$52⁵⁹** ($0.66 / Count)
FREE delivery **Thursday, June 27**
Ships from: Amazon.com
Sold by: Amazon.com

Subscribe & Save:
5%   15%
**$49⁹⁶** ($0.62 / Count)

Save 5% now and up to 15% on repeat deliveries.
- No fees
- Cancel anytime
Learn more

FREE delivery **Thursday, June 27**

Or fastest delivery **Sunday, June 23**. Order within 7 hrs 54 mins

In Stock

Qty: 1

Deliver every:
1 month (Most common)

Set Up Now

Ships from and sold by Amazon.com

Add to List

### Other sellers on Amazon

New & Open Box (82) from
**$48⁵⁴** & FREE Shipping.

### Add an Accessory:

Huggies Natural Care Sensitive Baby Wipes, Unscented, Hypoallergenic, 99% Purified...
$28.57   Add to Cart

Sponsored



DYPER Charcoal Enhanced Diapers

Sponsored

USA-017053

## HUGGIES products customers bought together

 +

Total price: $103.58

Add both to Cart

This item: Huggies Size 7 Diapers, Little Movers Baby Diapers, Size 7 (41+ lbs), 80...
4.8    35,325
$52⁹⁹ ($0.66/Count)

Sponsored
Huggies Size 4 Overnites Baby Diapers: Overnight Diapers, Size 4 (22-37 lbs), 116 Ct (2 Packs of 58)
4.8    2,435
$50⁹⁹ ($0.44/Count)

## You might also like

     

Huggies Size 1 Diapers, Little Snugglers Diapers, Size 1 (8-14 lbs), 198 Ct (6 packs of 33)
110,840
$52.76 ($0.27/Count)
Get it as soon as Tuesday, Jun 25
FREE Shipping by Amazon

Huggies Special Delivery Hypoallergenic Baby Diapers Size 2 (12-18 lbs), 180 Ct, Fragrance Free, Safe for Sensitive Skin
13,106
3 offers from $65.83
Climate Pledge Friendly

Huggies Size 6 Diapers, Snug & Dry Baby Diapers, Size 6 (35+ lbs), 124 Count (2 packs of 62), Packaging May Vary
95,222
$50.46 ($0.41/Count)
Get it as soon as Tuesday, Jun 25
FREE Shipping by Amazon

Huggies Size 1 Diapers, Snug & Dry Newborn Diapers, Size 1 (8-14 lbs), 108 Count
95,227
$23.44 ($0.22/Count)
Get it as soon as Tuesday, Jun 25
FREE Shipping on orders over $35 shipped by Amazon

Huggies Size 6 Diapers, Little Snugglers Baby Diapers, Size 6 (35+ lbs), 96 Count (2 Packs of 48), Packaging May Vary
110,840
$52.99 ($0.55/Count)
Get it as soon as Tuesday, Jun 25
FREE Shipping by Amazon

Huggies Size 3 Diapers, Snug & Dry Baby Diapers, Size 3 (16-28 lbs), 200 Count (4 Packs of 50), Packaging May Vary
95,227
$50.98 ($0.25/Count)
Get it as soon as Tuesday, Jun 25
FREE Shipping by Amazon

## From the manufacturer

## Product Description

Huggies Little Movers Baby Diapers are designed to stay in place through active play! These disposable baby diapers are designed for worry-free running, jumping and playing without any leaks or disruptions. Each Little Movers diaper is up to 100% leak-free (even for blowouts!) and offers up to 12 hours of comfortable protection to keep your baby active and clean. Our diapers feature a curved and stretchy fit and a flexible, yet secure waistband designed to prevent leaks and help keep your baby comfortable while on the move. Double Grip Strips provide a secure, flexible fit and the diaper is designed to help eliminate gaps at the legs and waist to protect against leaks and irritation. These Huggies diapers are extra soft and contoured around the legs to help provide red-mark free, gentle protection. Little Movers are made with a fast-absorbing DryTouch Liner and our baby diaper locks away 99% of wetness to help keep skin dry. Plus, a wetness indicator easily lets you know when your baby is ready for a diaper change. Little Movers Diapers are available in size 3 (16-28 lbs), size 4 (22-37 lbs), size 5 (27+ lbs), size 6 (35+ lbs) and size 7 (41+ lbs).

## Product details

Package Dimensions : 18.93 x 9.4 x 8.02 inches; 8.04 Pounds
Item model number : 00036000534399
Department : Unisex Baby
Date First Available : January 8, 2021
Manufacturer : Kimberly-Clark Corp.
ASIN : B08SJ4KSWJ
Country of Origin : Korea, Republic of
Best Sellers Rank: #8 in Baby (See Top 100 in Baby)
   #5 in Disposable Diapers
Customer Reviews:
4.8    35,325 ratings

Inspiration from this brand

HUGGIES
Visit the Store on Amazon    + Follow

     

Adding Huggies Wipes at every diaper change is the perfect fit for...

Say goodbye to worries – Huggies ensures your baby's comfort so yo...

Huggies Natural Care Wipes for your natural baby

1 in 3 families are affected by diaper need, and you can help prevent thi...

Fragrance free and fresh scent baby wipes? Yeah, we've got both. Triple...

Welcome world, ba...

## Compare with similar items

| | This Item | Recommendations | | |
|---|---|---|---|---|
| |  |  |  |  |
| | Huggies Size 7 Diapers, Little Movers Baby Diapers, Size 7 (41+ lbs), 80 Count (2 packs of 40) | Huggies Size 6 Diapers, Little Snugglers Baby Diapers, Size 6 (35+ lbs), 96 Count (2 Packs of 48), Packaging May Vary | Huggies Size 7 Diapers, Snug & Dry Baby Diapers, Size 7 (41+ lbs), 92 Ct (2 Packs of 46), Packaging May Vary | Huggies Size 2 Diapers, Little Snugglers Baby Diapers, Size 2 (12-18 lbs), 180 Ct (3 packs of 60), Packaging May Vary |
| | Add to Cart | Add to Cart | Add to Cart | Add to Cart |
| Price | $52⁵⁹ | $52⁹⁹ | −14% $43⁶⁹ List: $50.99 | $52⁹⁸ |
| Price Per Unit | $0.66 / Count | $0.55 / Count | $0.47 / Count | $0.29 / Count |
| Delivery | Get it as soon as Thursday, Jun 27 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 |
| Customer Ratings | 4.8    35,325 | 4.8    110,840 | 4.7    95,227 | 4.8    110,840 |
| Absorbency | 4.4 | 4.6 | 3.9 | 4.6 |
| Value For Money | 4.4 | 4.5 | 3.9 | 4.5 |
| Leak Protection | 4.4 | 4.5 | 3.9 | 4.5 |
| Leak Proof | 4.3 | 4.6 | 3.8 | 4.6 |
| Softness | 4.4 | 4.7 | — | 4.7 |
| Sold By | Amazon.com | Amazon.com | Amazon.com | Amazon.com |
| Size | Size 7 | Size 6 | Size 7 | Size 2 |
| Unit Count | 80 | 96 | 92 | 180 |
| Material | Pulp, Polypropylene, Polyethylene | Pulp, Polypropylene, Polyethylene | Pulp | Pulp, Polypropylene, Polyethylene |
| Weight Range | More than 41 lbs | More than 35 lbs | 41+ lbs | 12 lbs -18 lbs |
| Target Gender | unisex | unisex | unisex | unisex |
| Type | infant diaper | infant diaper | infant diaper | infant diaper |

## Videos



0:52  Do NOT buy these diapers until you watch this!  Real Reviews with Kristin James

0:40  Which diaper brand is the best? Huggies diapers review  Amy Campbell

They really are the best.  Allie Cerda

2:11  Review- Huggies Diapers  Nichole Rowley

0:55  Best diapers  Vladislav Sum

Upload your video

## Important information

### Legal Disclaimer

Statements regarding dietary supplements have not been evaluated by the FDA and are not intended to diagnose, treat, cure, or prevent any disease or health condition.

## Related products with free delivery on eligible orders

Sponsored ⓘ | Try Prime for unlimited fast, free shipping

6/20/2024 4:05 PM    USA-017055

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/18/24    Page 71 of 432
PageID.8079

     

Huggies Size 3 Overnites Baby Diapers: Overnight Diapers, Size 3 (16-28 lbs), 132 C...
20,398
$52⁹⁸ ($0.40/Count)
Extra 10% off when you subscribe

Pampers Swaddlers 360 Pull-On Diapers, Size 5, 116 Count, One Month Supply, for up ...
112
$55⁹⁹ ($0.48/Count)
Save $3.00 with coupon

Pampers Cruisers 360 Diapers - Size 5, One Month Supply (128 Count), Pull-On Dispos...
22,906
$55⁹⁴ ($0.44/Count)
Save $3.00 with coupon

WaterWipes Plastic-Free Original-baby Wipes, 99.9% Water Based Wipes, Unscented & H...
75,202
$30²¹ ($5.59/100 Count)
Extra 15% off when you subscribe

Pampers Swaddlers Diapers - Size 7, One Month Supply (88 Count), Ultra Soft...
#1 Best Seller
120,845
$55⁹⁴ ($0.64/Count)
Save $3.00 with coupon

Huggies Size 4 Overnites Baby Diapers: Overnight Diapers, Size 4 (22-37 lbs), 116 C...
2,435
$50⁹⁹ ($0.44/Count)
Extra 10% off when you subscribe

Bambo Nature Premium Eco-friendly Baby Diapers, Size 6 (35+ Lbs), 144 Count (6 Pack...
112
$75⁵⁷ ($0.52/Count)

Hello Bello Premi... Baby Diapers Size Count (Pack of 4) ... Disposable, Extra...
456
$34⁹⁹ ($0.51/Cou...
Save 15% with coupo...



Add to cart

Sponsored

## Similar brands on Amazon

Sponsored

Pampers
Shop the Store on Amazon ›

DYPER
Shop the Store on Amazon ›

HUGGIES
Shop the Store on Amazon ›

Select Kids
Shop the Store on Amazon ›

    

Pampers Easy Ups Boys & Girls Potty Training Pants - Size 5T-6T, One Month...
(3,245)
$45.94

DYPER Charcoal Enhanced Diapers | Baby Diapers from Plant-Based* & Honest...
(294)
$99.99

Huggies Size Newborn Diapers, Skin Essentials Baby Diapers, Size Newborn...
(180)
$52.99

## Looking for specific info?

## Customer reviews

4.8 out of 5 ⓘ

35,325 global ratings

| | |
|---|---|
| 5 star | 89% |
| 4 star | 6% |
| 3 star | 2% |
| 2 star | 1% |
| 1 star | 2% |

⌄ Zero tolerance for fake reviews



Save 5% more with Subscribe & Save

Sponsored

### Customers say

Customers like the quality, comfort, and absorbency of the incontinence protector. For example, they mention it's reliable, durable, and soft. Some appreciate the fit. That said, opinions are mixed on leakage and value.

AI-generated from the text of customer reviews

✅ Quality   ✅ Fit   ✅ Absorbency   ✅ Comfort   Leakage   Value

### Reviews with images

See all photos ›

  

Top reviews

### Top reviews from the United States

Jezelle Mathis

**A good buy**
Reviewed in the United States on May 25, 2024
Size: Size 4   Unit Count: 140   Verified Purchase

I love how soft and absorbent these are. We had no problems with leaks or even rashes. Great quality and material. Great fitting diaper for my new baby girls . They perform exceptionally well and hide a bad smell

6/2... USA-017056

Helpful    Report

Michelle John

**I've tried LUVS, and PAMPERS AND THIS IS THE BEST**
Reviewed in the United States on October 23, 2023
Size: Size 4    Unit Count: 140    Verified Purchase
Product: Huggies, Little Movers Baby Diapers

I have been using Huggies Little Movers Baby Diapers for my little one, and I have to say, they are fantastic. Here's why I highly recommend them:

First and foremost, the fit of these diapers is exceptional. They have a contoured shape and stretchy sides that ensure a snug and comfortable fit for my baby. The diapers stay in place even during active play, which is a great feature for little ones who are always on the move. I haven't experienced any leaks or blowouts while using these diapers, which gives me peace of mind.

The absorbency of the Huggies Little Movers diapers is impressive. They are designed to quickly absorb wetness and lock it away, keeping my baby's skin dry and preventing any discomfort. Even after several hours of wear, the diapers remain dry on the inside, which is essential for my baby's comfort and overall

∨ Read more

11 people found this helpful

Helpful    Report

HCL

**Very comfortable**
Reviewed in the United States on June 8, 2024
Size: Size 6    Unit Count: 96    Verified Purchase

I've been using Huggies Size 6 diapers for my grandson, and I couldn't be happier with their performance. These diapers have proven to be incredibly reliable and comfortable for him. One of the standout features is how they allow him to play and move freely without any bunching up. Whether he's crawling, walking, or running around, the diapers stay in place and don't cause any discomfort. Additionally, they offer excellent absorbency, keeping him dry throughout the day and night. I highly recommend Huggies Size 6 for any active toddler.

Helpful    Report

Amazon Customer

**Huggies Size 7 are perfect for our 9 year old autistic daughter**
Reviewed in the United States on October 7, 2023
Size: Size 7    Unit Count: 36    Verified Purchase

Finally able to get my hands on Huggies Little Movers Size 7. Previously used Pampers Baby Dry and Pampers Cruisers for my 9 year old daughter that has autism.

She isn't non-verbal but Potty Training has been like war, the past 2 times we tried. So I've continued with a combination of Pampers Cruisers Size 7 and Pampers Baby Dry Size 7, until now. The Huggies size 7 don't have air channels like the Pampers do, but I've found the huggies to be bigger/taller, better fitting, far more absorbant, smell less than the pampers (when dry and when wet), be more comfortable than the pampers (based on my 9yo daughter no longer having meltdowns over diaper changes or when she goes to the toilet in her diaper.

She is able to wee/urinate in her diaper 4 to 5 times, before her Huggies will be full, and needs a change. No issues with going poo in her Huggies either, no blow-outs, no leaks, no tab breaks.

∨ Read more



21 people found this helpful

Helpful    Report

See more reviews

## Top reviews from other countries

Translate all reviews to English

Dongwoo

**Bien**
Reviewed in Mexico on February 16, 2024
Size: Size 7    Unit Count: 80    Verified Purchase
Bien

Report

Translate review to English

Alexa

**Great**
Reviewed in Canada on April 6, 2021
Size: Size 3    Unit Count: 25    Verified Purchase
Catch my baby's blowout like no other, and do not irritate.

6/2... USA-017057 ...PM

STEFFANO E.

**Muy buen producto , aunque a veces escasea .**

Reviewed in Mexico on February 16, 2020

Size: Size 4    Unit Count: 22    Verified Purchase

Me gusta mucho y es de mejor calidad y precio que el supreme que se vende en Mexico , absorbe muy bien para los niños activos no se derrama ni se manchan de popo , simplemente una excelente opción , me gustaría que estuvieran más disponibles en stock a veces no hay y tarda en haber de vuelta .

Report

Translate review to English

Christy Purvis

**Exactly as described**

Reviewed in Australia on January 27, 2024

Size: Size 5    Unit Count: 120    Verified Purchase

Very happy with price, delivery time, packaging, product was exactly as advertised.

Report

ashley martin

**Great diapers**

Reviewed in Canada on February 16, 2024

Size: Size 5    Unit Count: 104    Verified Purchase

Use huggies for my twins. They are great while they are active throughout the day and rarely leak throughout the night. Also have cute designs.

Report

See more reviews

Sponsored

**Disclaimer:** While we work to ensure that product information is correct, on occasion manufacturers may alter their ingredient lists. Actual product packaging and materials may contain more and/or different information than that shown on our Web site. We recommend that you do not solely rely on the information presented and that you always read labels, warnings, and directions before using or consuming a product. For additional information about a product, please contact the manufacturer. Content on this site is for reference purposes and is not intended to substitute for advice given by a physician, pharmacist, or other licensed health-care professional. You should not use this information as self-diagnosis or for treating a health problem or disease. Contact your health-care provider immediately if you suspect that you have a medical problem. Information and statements regarding dietary supplements have not been evaluated by the Food and Drug Administration and are not intended to diagnose, treat, cure, or prevent any disease or health condition. Amazon.com assumes no liability for inaccuracies or misstatements about products.

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| About Amazon | Supply to Amazon | Amazon Secured Card | Shipping Rates & Policies |
| Accessibility | Protect & Build Your Brand | Amazon Business Card | Amazon Prime |
| Sustainability | Become an Affiliate | Shop with Points | Returns & Replacements |
| Press Center | Become a Delivery Driver | Credit Card Marketplace | Manage Your Content and Devices |
| Investor Relations | Start a Package Delivery Business | Reload Your Balance | Recalls and Product Safety Alerts |
| Amazon Devices | Advertise Your Products | Gift Cards | Help |
| Amazon Science | Self-Publish with Us | Amazon Currency Converter | |
| | Become an Amazon Hub Partner | | |
| | › See More Ways to Make Money | | |

6/2    USA-017058 M

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 74 of 432
PageID:8082

English     United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |
| IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Kindle Direct Publishing Indie Digital & Print Publishing Made Easy | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Great Deals on Quality Used Products |
| Whole Foods Market America's Healthiest Grocery Store | Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Ring Smart Home Security Systems | eero WiFi Stream 4K Video in Every Room | Blink Smart Security for Every Home | Neighbors App Real-Time Crime & Safety Alerts |
| | | Amazon Subscription Boxes Top subscription boxes – right to your door | PillPack Pharmacy Simplified | Amazon Renewed Like-new products you can trust | | |

Conditions of Use   Privacy Notice   Consumer Health Data Privacy Disclosure   Your Ads Privacy Choices

© 1996-2024, Amazon.com, Inc. or its affiliates

6/20/2024, 4:05 PM

USA-017059

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 75 of 432
PageID.8083

Delivering to Monroe 98272
**Update location**    All    Diapers large boys    Hello, sign in    Returns    0
EN    Account & Lists    & Orders

All    Customer Service    Medical Care    Groceries    Best Sellers    Amazon Basics    Prime    New Releases    Today's Deals    Music    Amazon Home    Books    Pharmacy    Registry    Gift Cards    Fashion

Health & Personal Care    Household Supplies    Vitamins & Diet Supplements    Baby & Child Care    Health Care    Sports Nutrition    Sexual Wellness    Health & Wellness    Medical Supplies & Equipment    FSA Eligible Items

‹ Back to results

Sponsored



Roll over image to zoom in

# Pull-Ups Boys' Potty Training Pants, 5T-6T (46+ lbs), 80 Count (2 Packs of 40)

Visit the Pull-Ups Store
4.7    336 ratings | Search this page
Amazon's Choice in Toilet Training Pants by Pull-Ups

5K+ bought in past month

−5% **$46**$^{05}$ ($0.58 / Count)
One-Time Price: $48.47

FREE Returns

Coupon:    Save an extra $5 on your first Subscribe and Save order.
Terms

Sign in to redeem.    20% off orders $75+ promo code: BABYSTOCKUP
Shop items

Get $10 off instantly: Pay $36.05 $46.05 upon approval for the Amazon Store Card. No annual fee.

Available at a lower price from other sellers that may not offer free Prime shipping.

Size: 5T-6T

2T-3T    3T-4T    4T-5T    5T-6T

Unit Count: 80

14    17    20    23    48    56    60    66    74    80

84    94    99    112    124

| Brand | Pull-Ups |
| --- | --- |
| Number of Items | 2 |
| Color | Multi-colored |
| Incontinence Protector Type | Potty Training Underwear |
| Age Range (Description) | Toddler |

## About this item

- Pull-Ups Boys' Potty Training Pants: 80 toddler training pants, size 5T-6T (46+ lbs) (2 packs of 40, 80 training underwear total)
- Convenient Refastenable Sides: Perform easy changes with the refastenable sides of Pull-Ups for Boys potty training underwear, even on the go
- Up to 100% Leak-Free: Pull-Ups Training Pants provide up to 100% leak-free protection
- Targeted Absorbency: Get targeted absorbency where boys need it most with Pull-Ups for Boys underwear for potty training
- Soft and Breathable Materials: Our potty training underwear are made with soft and breathable materials for comfortable wear
- Made for Little Hands: These training pants are designed for little hands to easily pull up and down for Big Kid independence
- Teaching Graphics: Only Pull-Ups training pants have Disney graphics that fade when wet, teaching your Big Kid to stay dry

⌄ Show more

Report an issue with this product or seller

## Consider a similar item

Amazon's Choice



Bambo Nature Premium Training Pants (SIZES 4 TO 6 AVAILABLE), Size 6, 19 Count
**Size 6**
(281)
$17.32 ($0.91/Count)
♥ Climate Pledge Friendly

prime

Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows with Prime
Try Prime and start saving today with fast, free delivery

One-time purchase:
$**48**$^{47}$ ($0.61 / Count)

FREE delivery **Tuesday, June 25**

Ships from: Amazon.com
Sold by: Amazon.com

Subscribe & Save:
5%    15%

$**46**$^{05}$ ($0.58 / Count)

Save 5% now and up to 15% on repeat deliveries.
• No fees
• Cancel anytime
Learn more

FREE delivery **Tuesday, June 25**

Or fastest delivery **Saturday, June 22**. Order within 7 hrs 53 mins

In Stock

Qty: 1

Deliver every:
1 month (Most common)

Set Up Now

Ships from and sold by Amazon.com

Add to List

## Other sellers on Amazon

New & Open Box (72) from $44$^{21}$ & FREE Shipping.

## Add an Accessory:

Huggies Natural Care Sensitive Baby Wipes, Unscented, Hypoallergenic, 99% Purified...
$28.57    Add to Cart

Sponsored

Sponsored

 +

Total price: $95.95

Add both to Cart

This item: Pull-Ups Boys' Potty Training Pants, 5T-6T (46+ lbs), 80 Count (2 Packs of 40)
4.7     336
$48.47 ($0.61/Count)

Sponsored
Pull-Ups Girls' Potty Training Pants, Size 5T-6T Training Underwear (46+ lbs), 80 Count ...
4.7     313
-5% $47.48 ($0.59/Count)
Typical: $49.95

## Products related to this item

Sponsored

       

| Pampers Ninjamas Nighttime Bedwetting Underwear Boys - Size L (64-125 lbs), 68 Coun... | Pull-Ups Girls' Potty Training Pants, Size 5T-6T Training Underwear (46+ lbs),... | Pull-Ups Boys' Night-Time Potty Training Pants, Size 4T-5T Overnight Training... | Pull-Ups Boys' Skin Essentials Potty Training Pants, Training Underwear, 4T-5T (38-... | Pull-Ups Girls' Night-Time Potty Training Pants, Size 4T-5T Overnight Training... | Pampers Easy Ups Boys & Girls Potty Training Pants - Size 4T-5T, One Month Supply (... | Pull-Ups Girls' Skin Essentials Potty Training Pants, Training Underwear, 4T-5T (38... | Pampers Easy Ups Boys & Boys Potty Train... Pants - Size 4T-5T, Month Supply (... |
|---|---|---|---|---|---|---|---|
| 12,213 | 313 | 18 | #1 New Release | 36 | 12 | #1 Best Seller | 9,207 | 32 | 30,3 |
| $55.99 ($0.82/Count) | $47.48 ($0.59/Count) | $29.97 ($0.58/Count) | $58.99 ($0.60/Count) | $29.97 ($0.58/Count) | $45.94 ($0.44/Count) | $58.99 ($0.60/Count) | $45.94 ($0.44/Cou |
| | Save $5.00 with coupon | Extra 10% off when you subscribe | Extra 10% off when you subscribe | | Save $5.00 with coupon | Extra 10% off when you subscribe | Save $5.00 with coup |

## From the manufacturer



It's Go Time!     'Me Do' Attitude     Too Busy for Changes     Follows Directions

### When should he switch from diapers to PULL-UPS?

Every child is unique, but here's what parents told us about knowing when it was time to switch.

## Product Description

Start potty training with Pull-Ups Training Pants for Boys! Each training underwear delivers easy changes with refastenable sides, allowing you to keep pants and shoes on your toddler. Pull-Ups Potty Training Pants feature up to 100% leak-free protection and targeted absorbency where boys need it most. Made with soft and breathable materials, these boys' training pants are comfy and flexible, with an underwear-like fit to help make potty training easy. Not only do they provide all-around coverage, but are designed for little hands to easily pull up and down for Big Kid independence. Each pack includes two exclusive music designs featuring Disney's Mickey Mouse, with instrument graphics that fade when wet to help motivate your child to stay dry. Making music with Mickey Mouse comes to life with interactive digital tools. When your child is ready to begin his potty training journey, the Pull-Ups brand can help. Visit the Pull-Ups website for expert potty training tips and resources. We've helped train 60 million Big Kids and counting!* Pull-Ups Boys' Training Underwear are available in sizes 2T-3T (16-34 lbs), 3T-4T (32-40 lbs), 4T-5T (38-50 lbs) and 5T-6T (50+ lbs). (*US and CA)

## Product details

Package Dimensions : 15.5 x 10.2 x 10.1 inches; 7.3 Pounds
Item model number : 10036000548591
Department : Boys
Date First Available : February 23, 2023
Manufacturer : Kimberly-Clark Corp.
ASIN : B0BLD1F53H
Country of Origin : USA
Best Sellers Rank: #27 in Baby (See Top 100 in Baby)

USA-017061

#2 in Toilet Training Pants

**Customer Reviews:**
4.7          336 ratings

## Inspiration from this brand

 **Pull-Ups**
Visit the Store on Amazon          [ + Follow ]

     

Make fast changes on the go with re-fastenable sides.

Featuring refastenable sides for fast changes on-the-go or at home, Pul...

Fun music designs feature exclusive Mickey Mouse graphics that fade w...

Make quick changes in a flash with refastenable sides.

When your Big Kid is ready to take the next big step, we make potty t...

Pull-Ups® are cotton

## Compare with similar items

This Item          Recommendations

   

| | This Item | Recommendations | | |
|---|---|---|---|---|
| | Pull-Ups Boys' Potty Training Pants, 5T-6T (46+ lbs), 80 Count (2 Packs of 40) | Pampers Easy Ups Boys & Girls Potty Training Pants - Size 4T-5T, One Month Supply (104 Count), Training Underwear (Packaging May... | Pampers Easy Ups Boys & Girls Potty Training Pants - Size 5T-6T, One Month Supply (84 Count), Training Underwear (Packaging May... | Pull-Ups Boys' Potty Training Pants, 3T-4T (32-40 lbs), 112 Count (4 Packs of 28) |
| | Add to Cart | Add to Cart | Add to Cart | Add to Cart |
| Price | $48⁴⁷ | $45⁹⁴ | $45⁹⁴ | $47²⁰ |
| Price Per Unit | $0.61 / Count | $0.44 / Count | $0.55 / Count | $0.42 / Count |
| Delivery | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 |
| Customer Ratings | 4.7      336 | 4.8      9,207 | 4.8      3,245 | 4.8      4,818 |
| For Potty Training | 4.0 | 4.3 | 4.5 | 4.4 |
| Absorbency | 4.0 | 4.2 | 4.4 | 4.3 |
| Leak Protection | 3.5 | 4.1 | 4.3 | 4.5 |
| Maneuverability | 5.0 | 4.3 | — | 4.6 |
| Stretch | — | 4.4 | 4.7 | 4.4 |
| Sold By | Amazon.com | Amazon.com | Amazon.com | Amazon.com |
| Size | 5T-6T | 4T-5T | 84 Count (Pack of 1) | 3T-4T |
| Unit Count | 80 | 104 | 84 | 112 |
| Material | Polypropylene, Polyethylene | Polypropylene, Polyethylene, Spandex, Pulp | Cotton | Polypropylene, Polyethylene |
| Weight Range | 46+ lbs | More than 37 lbs | 37 | 32-40 lbs |
| Target Gender | male | unisex | unisex | male |
| Type | potty training underwear | potty training underwear | potty training underwear | potty training underwear |

## Videos

USA-017062


**Mickey 5T - 6T Pull-ups** 0:33
Royal + Reese Favorite Amazon Finds


**Reviews-Pull-Ups Boys' Potty Training Pants** 0:26
Courtney Andersen

**Pull-Ups Boys' Potty Training Pants** 0:45
Kimberly-Clark

Upload your video

## Important information

### Directions

Discard in trash. Do not flush.

### Legal Disclaimer

Statements regarding dietary supplements have not been evaluated by the FDA and are not intended to diagnose, treat, cure, or prevent any disease or health condition.

## Related products with free delivery on eligible orders

Sponsored ⓘ | Try Prime for unlimited fast, free shipping


Pull-Ups Girls' Night-Time Potty Training Pants, Size 5T-6T Overnight Training...
5
$29⁹⁷ ($0.68/Count)
Extra 10% off when you subscribe


Pull-Ups Boys' Skin Essentials Potty Training Pants, Training Underwear, 2T-3T (16-...
36
#1 New Release
$58⁹⁹ ($0.48/Count)
Extra 10% off when you subscribe


Pull-Ups Girls' Skin Essentials Potty Training Pants, Training Underwear, 4T-5T (38...
32
$58⁹⁹ ($0.60/Count)
Extra 10% off when you subscribe


Huggies Size 6 Overnites Baby Diapers: Overnight Diapers, Size 6 (35+ lbs), 84 Ct (...
20,398
$50⁷⁴ ($0.60/Count)
Extra 10% off when you subscribe


Pampers Ninjamas Nighttime Bedwetting Underwear Boys - Size L (64-125 lbs), 68 Coun...
12,215
$55⁹⁹ ($0.82/Count)




Pull-Ups Boys' Night-Time Potty Training Pants, Size 4T-5T Overnight Training...
18
$29⁹⁷ ($0.58/Count)
Extra 10% off when you subscribe

Pull-Ups Girls' Potty Training Pants, Size 5T-6T Training Underwear (46+ lbs),...
313
$47⁴⁸ ($0.59/Count)
Save $5.00 with coupon


Pampers Easy Ups & Girls Potty Train Pants - Size 4T-5T Month Supply (...
9,20?
#1 Best Seller
$45⁹⁴ ($0.44/Cou...
Save $5.00 with coup...

Sponsored

## Similar brands on Amazon

Sponsored


**Pampers**
Shop the Store on Amazon ›
Pampers Easy Ups Boys & Girls Potty Training Pants - Size 5T-6T, One Month...
(3,245)
$45.94


**The Honest Company**
Shop the Store on Amazon ›
The Honest Company Clean Conscious Training Pants | Plant-Based, Sustainabl...
$35.99


**Mrkyy**
Shop the Store on Amazon ›
Adjustable Jar Opener for Weak Hands, 2024 New Adjustable Multifunctional...
$9.99


**Select Kids**
Shop the Store on Amazon ›
$32.99

## Looking for specific info?

USA-017063

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 79 of 432
PageID.8087

## Customer reviews

### 4.7 out of 5 ⓘ

336 global ratings

| | | |
|---|---|---|
| 5 star | | 85% |
| 4 star | | 7% |
| 3 star | | 3% |
| 2 star | | 1% |
| 1 star | | 3% |

∨ Zero tolerance for fake reviews

Sponsored

Reviews with images

Top reviews

## Top reviews from the United States

**Juliabee**

**Best brand**

Reviewed in the United States on June 12, 2024

Size: 5T-6T    Unit Count: 80    Verified Purchase

I love this brand of pull ups for my kid. These are easy to pull on and off and they are very absorbent. I have never had any leaks with these.

Helpful    Report

**Nae-Nae**

**fit is great on 3yr old g grandson**

Reviewed in the United States on May 23, 2024

Size: 5T-6T    Unit Count: 80    Verified Purchase

holds pee pee real good. 😊

Helpful    Report

**ASH**

**No leaks!**

Reviewed in the United States on March 1, 2024

Size: 5T-6T    Unit Count: 80    Verified Purchase

My son uses these for nighttime and they work great. No leaks and they get the job done!

3 people found this helpful

Helpful    Report

**KC**

**Love the bigger size**

Reviewed in the United States on October 1, 2023

Size: 5T-6T    Unit Count: 80    Verified Purchase

We love the bigger size! Such a great thing for a bigger kid that is struggling to potty train. Never any leaks! We did receive the wrong color one time, we ordered the boys color and got the girls color.

One person found this helpful

Helpful    Report

**Nathalie valentin**

**Best pull ups**

Reviewed in the United States on December 2, 2023

Size: 5T-6T    Unit Count: 80    Verified Purchase

So easy to use

Helpful    Report

**Amazon Customer**

**Coloring book bonus**

Reviewed in the United States on June 7, 2023

Size: 5T-6T    Unit Count: 80    Verified Purchase

I love that pull ups come I. This larger size. My son has ASD and it is super hard to find a size that fits well and easy for him to pull up and down without tearing. Hopefully we are on the tail end of potty training. The bonus though to this purchase is the coloring book on the inside of the box.

6 people found this helpful

Helpful    Report

**Em**

**Comfort**

Reviewed in the United States on April 9, 2024

Size: 5T-6T    Unit Count: 80    Verified Purchase

Our son sometimes complains that the side is itchy and when he does we find the sides are a bit unaligned with the Velcro

One person found this helpful

Helpful    Report

**Chicka**

USA-017064

Reviewed in the United States on June 5, 2023
Size: 5T-6T   Unit Count: 80   Verified Purchase

So so happy they finally came out with a bigger size!! My son has special needs and is older and still not potty trained and these have been our go to brand his whole life. And I was so excited they finally came out with a bigger size just in time for our needs!!!! AMAZING!!!!!

5 people found this helpful

Helpful    Report

See more reviews

Sponsored

**Disclaimer**: While we work to ensure that product information is correct, on occasion manufacturers may alter their ingredient lists. Actual product packaging and materials may contain more and/or different information than that shown on our Web site. We recommend that you do not solely rely on the information presented and that you always read labels, warnings, and directions before using or consuming a product. For additional information about a product, please contact the manufacturer. Content on this site is for reference purposes and is not intended to substitute for advice given by a physician, pharmacist, or other licensed health-care professional. You should not use this information as self-diagnosis or for treating a health problem or disease. Contact your health-care provider immediately if you suspect that you have a medical problem. Information and statements regarding dietary supplements have not been evaluated by the Food and Drug Administration and are not intended to diagnose, treat, cure, or prevent any disease or health condition. Amazon.com assumes no liability for inaccuracies or misstatements about products.

Back to top

**Get to Know Us**: Careers, Amazon Newsletter, About Amazon, Accessibility, Sustainability, Press Center, Investor Relations, Amazon Devices, Amazon Science

**Make Money with Us**: Sell on Amazon, Sell apps on Amazon, Supply to Amazon, Protect & Build Your Brand, Become an Affiliate, Become a Delivery Driver, Start a Package Delivery Business, Advertise Your Products, Self-Publish with Us, Become an Amazon Hub Partner, › See More Ways to Make Money

**Amazon Payment Products**: Amazon Visa, Amazon Store Card, Amazon Secured Card, Amazon Business Card, Shop with Points, Credit Card Marketplace, Reload Your Balance, Gift Cards, Amazon Currency Converter

**Let Us Help You**: Your Account, Your Orders, Shipping Rates & Policies, Amazon Prime, Returns & Replacements, Manage Your Content and Devices, Recalls and Product Safety Alerts, Help

English    United States

Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business

Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations

IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Kindle Direct Publishing Indie Digital & Print Publishing Made Easy | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Great Deals on Quality Used Products

Whole Foods Market America's Healthiest Grocery Store | Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Ring Smart Home Security Systems | eero WiFi Stream 4K Video in Every Room | Blink Smart Security for Every Home | Neighbors App Real-Time Crime & Safety Alerts

| | | Amazon Subscription Boxes Top subscription boxes – right to your door | PillPack Pharmacy Simplified | Amazon Renewed Like-new products you can trust | |

Conditions of Use   Privacy Notice   Consumer Health Data Privacy Disclosure   Your Ads Privacy Choices
© 1996-2024, Amazon.com, Inc. or its affiliates

6/20/2024, 4:06 PM
USA-017065

J████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Gloves

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Amazon.com

**Address**:

**Phone**:

**Name of Person Spoken To**:

**Cost Information**:
$31.92 each time

**Replacement rate**:
Monthly (4 boxes)

USA-017066

Delivering to Monroe 98272    All ⌄    non-latex gloves                                    Hello, sign in    Returns    0
**Update location**                                                                      EN ⌄    Account & Lists ⌄    & Orders

All    Customer Service    Medical Care ⌄    Groceries ⌄    Best Sellers    Amazon Basics    Prime ⌄    New Releases    Today's Deals    Music    Amazon Home    Books    Pharmacy    Registry    Gift Cards ⌄    Fashion

**Amazon Fashion**    Women    Men    Kids    Luggage    Sales & Deals    New Arrivals    Amazon Brands    luxury stores

Save $5 more  with coupon        Shop now

Sponsored

‹ Back to results

Visit the Supmedic Store

Medical Nitrile Exam Gloves, Latex-Free & Powder-Free Non-Sterile Food Safe Cleaning Disposable Glove, 100 Pcs

4.6          5,563 ratings | Search this page

Amazon's Choice  ▮ Overall Pick

20K+ bought in past month

Limited time deal

−10% $7.18 ($0.07 / Count)

Typical price: $7.98 ⓘ

Get Fast, Free Shipping with Amazon Prime
FREE Returns

Color: Blue (Large)

| L 100 | $7.18 ($0.07 / Count) |
| M 100 | $7.18 ($0.07 / Count) |
| S 100 | $7.98 ($0.08 / Count) |
| XL 100 | $7.98 ($0.08 / Count) |

Size Chart

**Product details**

Fabric type          100% Nitrile
Care instructions    Hand Wash
Origin               Imported
Country of Origin    China

**About this item**

- LATEX-FREE & POWDER-FREE: Supmedic nitrile gloves contain no natural rubber latex and are manufactured without powder - a safe solution for those affected by common glove allergies and sensitivities.
- FEATURES: Blue nitrile has a smooth finish for greater tactile feedback and is the right thickness for most uses - fingers are 0. 12mm thick and palms are 0. 08mm thick.
- BULK QUANTITY: conveniently packaged to reduce storage space while ensuring a supply is always on hand - 100 disposable gloves per box, 100 pcs in total.

⌄ See more

**Customers usually keep this item**
This product has fewer returns than average compared to similar products.

Report an issue with this product or seller

Sponsored

prime
Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows with Prime
Try Prime and start saving today with fast, free delivery

$7.18 ($0.07 / Count)

Get **Fast, Free Shipping** with Amazon Prime
FREE Returns

FREE delivery **Tuesday, June 25** on orders shipped by Amazon over $35

Or fastest delivery **Saturday, June 22.** Order within 7 hrs 47 mins

Delivering to Monroe 98272 - Update location

In Stock

Quantity: 1

Add to Cart

Buy Now

Ships from    Amazon
Sold by       Supmedic
Returns       Eligible for Return, Refund or Replacement within 30 days of receipt
Packaging     Ships in product packaging

⌄ See more

☐ Add a gift receipt for easy returns

Add to List

**Other sellers on Amazon**

New (3) from $7.18  FREE Shipping on orders over $35.00 shipped by Amazon.

Sponsored

**Buy it with**

 +  +

Total price: $31.04

Add all 3 to Cart

These items are shipped from and sold by different sellers.
Show details

**This item:** Supmedic Medical Nitrile Exam Gloves, Latex-Free & Powder-Free Non-Sterile Food...
$7.18 ($0.07/Count)

Caring Nitrile Exam Gloves, Blue, Powder-Free, Disposable Gloves for Medical Care, First Aid,...
$5.99 ($0.06/Count)

MED PRIDE Disposable Underpads 23" X 36" (50-Count) Incontinence Pads, Chux, Bed...
$17.87 ($0.36/Count)

USA-017067

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 83 of 432
PageID.8091

## Products related to this item

Sponsored









| Schneider Blue Vinyl Synthetic Exam Gloves, Small, Case of 1000, 4-mil, Powder-Free... | Schneider Nitrile Exam Gloves, Blue, Large, Box of 100, 5 mil Disposable Nitrile Gl... | Schneider Clear Vinyl Exam Gloves, Latex-Free, Disposable Medical Gloves, Cleaning ... | Disposable Nitrile Gloves 6 mil Blue Heavy Duty Disposable Gloves, Cooking Mechanic... | Schneider Nitrile Exam Gloves, Black, Medium, Box of 100, Disposable Nitrile Gloves... | JMU Nitrile Gloves Medium, 200 Count Black Nitrile Exam Gloves, 3.5 Mil Nitrile... | PEIPU Nitrile Gloves,Medical Exam Gloves,Disposable Cleaning... | Powder Free Dispo Gloves X Large - 1( Pack -Clear Vinyl N Exam Gloves |
|---|---|---|---|---|---|---|---|
| 10,543 | 133 | 8,778 | 1,069 | 418 | 68 | 5,386 | 20,5 |
| $59⁹⁷ ($0.06/Count) | $9⁹⁹ ($0.10/Count) | $6⁹⁷ ($0.07/Count) | $12⁹⁹ ($0.13/Count) | $9⁹⁹ ($0.10/Count) | $13⁹⁹ ($0.07/Count) | $9⁹⁹ ($0.10/Count) | $7⁹⁸ ($0.08/Count |

Extra 20% off when you subscribe

Save 5% with coupon

## From the brand



**EXAM NITRILE GLOVE**
Visit the Store



**PREMIUM NITRIL**
Visit the Store

## Product Description

USA-017068

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 84 of 432
PageID.8092



| Q | Why should I choose Nitrile gloves over latex or vinyl gloves? | ▼ |
| Q | Are these gloves truly latex and powder-free? My hands get irritated easily. | ▼ |
| Q | Can I use these gloves for tough cleaning jobs? | ▼ |
| Q | Would these work for food preparation as well? | ▼ |
| Q | Can Supmedic gloves use for medical and lab examination? | ▼ |

**Videos**

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 85 of 432
PageID.8093

1:03
See This Before Buying Supmedic Medical Nitrile Exam Gloves,
☑ Abid Shaw Reviews It

0:58
Thin and Comfortable - Very Nice Lightweight Nitrile Glove
Chris Tatro

0:45
Good gloves for cleaning, home projects, general gloves?
Jacob Knowles

0:29
Supmedic Blue Nitrile Exam Glove Unboxing and Testing
Supmedic

Review- pow gloves
WolvertonWoi

Upload your video

## Product details

Date First Available : January 16, 2024

ASIN : B0CSF7X4P4

Best Sellers Rank: #5 in Industrial & Scientific (See Top 100 in Industrial & Scientific)
#1 in Professional Medical Surgical Gloves
#2 in Medical Exam Gloves

Customer Reviews: 4.6          5,563 ratings

## Looking for specific info?

## Related products with free delivery on eligible orders

Sponsored ⓘ | Try Prime for unlimited fast, free shipping


Schneider Blue Vinyl Synthetic Exam Gloves, XL, Case of 1000, 4-mil, Powder-Free, L...
10,543
$59⁹⁷ ($0.06/Count)

Extra 20% off when you subscribe


Schneider Nitrile Exam Gloves, Blue, Medium, Box of 100, 5 mil Disposable Nitrile G...
133
$9⁹⁹ ($0.10/Count)

Schneider Nitrile Exam Gloves, Blue, 4 mil. Powder-Free, Latex-Free, for Medical Ex...
4,948
$89⁹⁰ ($0.90/Count)


PEIPU Nitrile Gloves,Medical Exam Gloves,Disposable Cleaning...
5,386
$9⁹⁹ ($0.10/Count)


Schneider Clear Vinyl Exam Gloves, Latex-Free, Disposable Medical Gloves, Cleaning ...
9,778
$6⁹⁷ ($0.07/Count)


Disposable Nitrile Gloves 6 mil Blue Heavy Duty Disposable Gloves, Cooking Mechanic...
1,069
$12⁹⁹ ($0.13/Count)


Powder Free Disposable Gloves X Large -100 Pack -Clear Vinyl Medical Exam Gloves
20,517
$7⁹⁸ ($0.08/Count)

Schneider Nitrile E Gloves, Black, Med Box of 100, Dispos Nitrile Gloves...
418
$9⁹⁹ ($0.10/Count)

Sponsored

## Similar brands on Amazon

Sponsored



Inspire Medical Gloves Exam Gloves | Powder Free Stretch Vinyl Gloves |...
(907)
$69.99 List: $75.99

Safe Health
Shop the Store on Amazon ›


Nitrile Feature
High Flexibility
Safe Health Nitrile Exam Disposable Gloves, Latex Free, Powder Free, Blue,...
(892)
$41.95

Schneider
Shop the Store on Amazon ›



Superior puncture resistance
Schneider Blue Vinyl Synthetic Exam Gloves, Medium, Box of 100, 4-mil,...
(10,543)
$8.97 List: $11.99

UC UC Global Trade Inc
Shop the Store on Amazon ›


Large Di Thick -L
$13.99

6/2... USA-017070

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 86 of 432
PageID.8094

## Customer reviews

**4.6 out of 5** ⓘ

5,563 global ratings

| | |
|---|---|
| 5 star | 77% |
| 4 star | 14% |
| 3 star | 5% |
| 2 star | 2% |
| 1 star | 2% |

˅ Zero tolerance for fake reviews

Sponsored

### Customers say

Customers like the protection provided by the protective glove. They say it is good for cleaning and keeping hands clean of grease. They also appreciate the fit and value for money. Customers like that the gloves are easy to put on and take off. They appreciate the comfort and quality. However, some customers have mixed opinions on thickness and durability.

AI-generated from the text of customer reviews

✔ Value   ✔ Fit   ✔ Quality   ✔ Ease of use   ✔ Comfort   ✔ Grease   Durability

Thickness

### Reviews with images

See all photos ›

### Top reviews from the United States

**Barney klein**

**very nice**
Reviewed in the United States on June 8, 2024
Color: Blue (X-large)   Verified Purchase
great fitting ,durable,good value

One person found this helpful

Helpful    Report

**calalily2011**

**Great Product**
Reviewed in the United States on June 9, 2024
Color: Blue (Large)   Verified Purchase
These gloves are thin but get the job done. They are true to size in fit and offered for a great price! If you're looking for some basic gloves to get the job done, these will do the trick.

2 people found this helpful

Helpful    Report

**Vick**

**I love these gloves.**
Reviewed in the United States on June 13, 2024
Color: Blue (Large)   Verified Purchase
I use this gloves for many different task and I love the. They fit perfect and low price for them. The are very durable.

2 people found this helpful

Helpful    Report

**I am good**

**Nice gloves which serve the purpose**
Reviewed in the United States on February 24, 2024
Color: Blue (Large)   Verified Purchase
Are you in search of high-quality disposable gloves for your medical or cleaning needs? Look no further than the Supmedic Medical Nitrile Exam Gloves. These latex-free and powder-free gloves are designed to provide maximum protection and comfort for a variety of uses.

Key Features:
Latex-Free & Powder-Free: Say goodbye to potential allergic reactions with these latex-free gloves. The absence of powder also ensures a smooth and comfortable fit.
Non-Sterile & Food Safe: These gloves are suitable for a wide range of applications, making them ideal for medical examinations, food handling, cleaning tasks, and more. I use it mainly for cleaning
Snug Fit: The gloves are designed to fit snugly, providing a secure and reliable barrier against contamination.
Disposable: Convenient and hygienic, these gloves are meant for single-use to maintain cleanliness and prevent cross-contamination.

˅ Read more

8 people found this helpful

Helpful    Report

**Starr**

**Good gloves**
Reviewed in the United States on June 3, 2024
Color: Blue (Large)   Verified Purchase
The material does not break with me applying them, elasticity makes them easy to apply and thick enough to be good protection. They have no smell to them.

2 people found this helpful

USA-017071

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 87 of 432
PageID.8095



Edmund D. Cybulski

**Put them on correctly**

Reviewed in the United States on May 20, 2024

Color: Blue (Large)    Verified Purchase

There was nothing that I disliked about this product except sometimes the gloves will rip, but that is mainly my issue as I just have to put them on correctly.

One person found this helpful

Helpful    Report

A. B. Grace

**Many uses and durable**

Reviewed in the United States on May 26, 2024

Color: Blue (Medium)    Verified Purchase

I use these gloves for so many uses. I use them to put cream on my face, ointment on cuts, clean counters with cleansers, and even pick up dog pee pads. There are many other uses. These are durable, good quality, there's no pungent smell and the elasticity is perfect. I wear a size medium. They appear to be sturdy, which they are. They're also good for putting hair color on. I highly recommend these gloves.

2 people found this helpful

Helpful    Report

Renegade Rebel

**Wish I had Ordered These Previously**

Reviewed in the United States on February 21, 2024

Color: Blue (X-large)    Verified Purchase

What with the cold air in the Winter time and my having to wash my CPAP equipment regularly, my hands tend to get dry and chapped. This causes problems such as rough skin, cracks on my fingers at the edge of my nails and so on.My wife doesn't even like my having rough skin on my hands.

I use a sonic wash device for my CPAP hose and mask. The tablets for washing the stuff I believe contributes to my dry and cracked skin from having to hold the hose and stuff down when filling the water and trying to make sure the air is out of the hose.

So finally I looked online and found these gloves to use. I like the specs and what I saw from the reviews.

These gloves fit just fine. You just need to be careful putting them on as the opening is a bit snug, pulling on the skin of your hand. So after you get your hand inserted, you need to work the collar of the glove up to your wrist, being careful not to tear the gloves while putting them on.

∨ Read more

10 people found this helpful

Helpful    Report

See more reviews

Shop now

Sponsored

Back to top

| **Get to Know Us** | **Make Money with Us** | **Amazon Payment Products** | **Let Us Help You** |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| About Amazon | Supply to Amazon | Amazon Secured Card | Shipping Rates & Policies |
| Accessibility | Protect & Build Your Brand | Amazon Business Card | Amazon Prime |
| Sustainability | Become an Affiliate | Shop with Points | Returns & Replacements |
| Press Center | Become a Delivery Driver | Credit Card Marketplace | Manage Your Content and Devices |
| Investor Relations | Start a Package Delivery Business | Reload Your Balance | |
| | | Gift Cards | |

USA-017072

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 88 of 432
PageID.8096

Amazon Music
Stream
millions
of songs

Amazon Ads
Reach customers
wherever they
spend their time

6pm
Score deals
on fashion brands

AbeBooks
Books, art
& collectibles

ACX
Audiobook
Publishing
Made Easy

Sell on
Amazon
Start a Selling
Account

Amazon Business
Everything For
Your Business

Amazon Fresh
Groceries &
More
Right To Your
Door

AmazonGlobal
Ship Orders
Internationally

Home Services
Experienced Pros
Happiness Guarantee

Amazon Web
Services
Scalable Cloud
Computing
Services

Audible
Listen to Books &
Original
Audio
Performances

Box Office
Mojo
Find Movie
Box Office
Data

Goodreads
Book reviews
&
recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info
Entertainment
Professionals
Need

Kindle Direct Publishing
Indie Digital & Print
Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video Direct
Video Distribution
Made Easy

Shopbop
Designer
Fashion
Brands

Amazon
Warehouse
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security
Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart
Security
for Every
Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon Subscription
Boxes
Top subscription boxes –
right to your door

PillPack
Pharmacy
Simplified

Amazon Renewed
Like-new products
you can trust

Conditions of Use   Privacy Notice   Consumer Health Data Privacy Disclosure   Your Ads Privacy Choices
© 1996-2024, Amazon.com, Inc. or its affiliates

USA-017073

J■■G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Wipes

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Amazon.com

**Address**:

**Phone**:

**Name of Person Spoken To**:

**Cost Information**:
$63.16 each time

**Replacement rate**:
Monthly (4 boxes)

USA-017074

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 90 of 432
PageID.8098

Delivering to Monroe 98272
Update location                All ▾    disposable wipes                                              EN ▾   Account & Lists ▾   Returns & Orders   0

All   Customer Service   Medical Care ▾   Groceries ▾   Best Sellers   Amazon Basics   Prime ▾   New Releases   Today's Deals   Music   Amazon Home   Books   Pharmacy   Registry   Gift Cards ▾   Fashion

Health & Personal Care   Household Supplies   Vitamins & Diet Supplements   Baby & Child Care   Health Care   Sports Nutrition   Sexual Wellness   Health & Wellness   Medical Supplies & Equipment   FSA Eligible Items

Sponsored

‹ Back to results



7 VIDEOS

Roll over image to zoom in

## Cottonelle Fresh Feel Flushable Wet Wipes, Adult Wet Wipes, 8 Flip-Top Packs, 42 Wipes Per Pack (336 Total Wipes), Packaging May Vary

Visit the Cottonelle Store
4.7          130,784 ratings  |  Search this page
♨ 1 sustainability feature
100K+ bought in past month

$15⁷⁹ ($0.05 / Count)

Get **Fast, Free Shipping** with Amazon Prime
FREE Returns

**Coupon:**    Apply $1 coupon  Terms

Get $50 off instantly: Pay $0.00 upon approval for Amazon Visa.

Available at a lower price from other sellers that may not offer free Prime shipping.

Size: 42 Count (Pack of 8)

| 42 Count (Pack of 8) | 45 Count (Pack of 8) |
|---|---|
| $15.79 | $24.16 |
| ($0.05 / Count) | ($0.07 / Count) |

| | |
|---|---|
| **Brand** | Cottonelle |
| **Skin Type** | All |
| **Material Feature** | Disposable, Biodegradable, FSC Certified |
| **Unit Count** | 336 Count |
| **Number of Items** | 8 |

### About this item

- 8 flip-top packs of Cottonelle Fresh Feel Flushable Wet Wipes, 42 flushable wipes per pack (336 wipes total); product and packaging may vary
- A Complete Clean: Cottonelle Fresh Feel Flushable Wipes remove up to 100% of odor-causing residue
- 3x Cleaning Power: Our flushable wipes for adults remove mess, reduce odor, and protect hands
- 100% Flushable: Every wet wipe is septic-safe and breaks down like toilet paper* (*begins to break up as fast as Cottonelle Ultra Clean and has same break up after 30 minutes)
- Safe For Sensitive Skin: Cottonelle disposable wipes are hypoallergenic, alcohol free, and made with purified water
- Cottonelle wipes are FSC certified, supporting responsible forestry and only uses fibers that are 100% plant-based
- Use Cottonelle flushable wipes and Cottonelle toilet paper together for Cottonelle Ripples that clean better** (**Cottonelle dry + wet vs dry leading value brand)

▾ Show more

Report an issue with this product or seller

### Similar item to consider

Amazon's Choice ▸

Amazon Basics Flushable Adult Toilet Wipes, Fragrance Free, 336 Count (8 Packs of 42) (Previously Solimo)
**42 Count (Pack of 8)**
(43677)
$12.02 ($3.58/100 Sheets)
♺ Climate Pledge Friendly

---

**prime**

Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows with Prime
Try Prime and start saving today with **fast, free delivery**

One-time purchase:

$15⁷⁹ ($0.05 / Count)

Get **Fast, Free Shipping** with Amazon Prime
FREE Returns

FREE delivery **Tuesday, June 25** on orders shipped by Amazon over $35

Or fastest delivery **Saturday, June 22.** Order within 7 hrs 45 mins

Delivering to Monroe 98272 - Update location

In Stock

Quantity: 1

Add to Cart

Buy Now

Ships from   Amazon.com
Sold by      Amazon.com
Returns      Eligible for Return, Refund or Replacement within 30 days of receipt
Packaging    Ships in product packaging

▾ See more

☐ Add a gift receipt for easy returns

**Subscribe & Save:**
5%    15%

$15⁰⁰ ($0.04 / Count)
FREE delivery **Tuesday, June 25** on orders shipped by Amazon over $35
Ships from: Amazon.com
Sold by: Amazon.com

Add to List

### Other sellers on Amazon

New & Open Box (198) from $10⁸⁸

Sponsored

## Frequently bought together

 +  +

Total price: $52.99

Add all 3 to Cart

**This item:** Cottonelle Fresh Feel Flushable Wet Wipes, Adult Wet Wipes, 8 Flip-Top Packs, 42 Wip...
$15⁷⁹ ($0.05/Count)

Clorox Disinfecting Wipes Value Pack, Household Essentials, 75 Count, Pack of 3 (Package May...
$12⁷⁸ ($0.06/Count)

Bounty Quick Size Paper Towels, White, 8 Family Rolls = 20 Regular Rolls
$24⁴² ($2.61/100 Sheets)

## Shop by brand

Sponsored ⊙

Similar brands    Best selling brands

     

| Goodwipes Flushable Aloe Butt Wipes, Septic Safe - 360 Count Rosewater Wet Wipes | Nice 'N CLEAN Flushable Toddler Wipes 42ct (6-Pack) | 100% Plant-Based, Unscented Wet... | Goodwipes Flushable & Plant-Based Wipes with Botanicals | Dispenser for At-Home Use |... | Goodwipes Flushable & Plant-Based Wipes with Botanicals, Dispenser for At-Home Use Safe,... | Nice 'N Clean Adult Flushable Wipes (12 x 42 Count) | Personal Cleansing Wipes Made... | Goodwipes Flushable Butt Wipes Made w/ Soothing Botanicals & Aloe – Soft & Gentle... | Goodwipes Flushable Butt Wipes Made w/ Soothing Botanicals & Aloe – Soft & Gentle... | Flushable Wet Wip Lavender| Eco-Frie Paraben & Alcohol Hypoallergenic & ... |
|---|---|---|---|---|---|---|---|
| 2,590 | 343 | 1,809 | 10,424 | 26,552 | 5,572 | 2,402 | 2,22! |
| $18⁵⁷ ($0.05/Count) | $14⁹⁹ ($0.06/Count) | $23⁹⁹ ($0.10/Count) | $24⁷⁶ ($0.05/Count) | $26⁹⁹ ($0.05/Count) | $11⁴⁸ ($0.06/Count) | $22⁹⁷ ($0.03/Count) | $14⁴⁹ ($0.10/Cou |

Extra 10% off when you subscribe

## Sustainability features

This product has sustainability features recognized by trusted certifications.

**Forestry practices**

Made with materials from well-managed forests, recycled materials, and/or other controlled wood sources.

As certified by

The Forest Stewardship Council

Part of

Climate Pledge Friendly

## From the manufacturer

**3x Cleaning Power**

Cottonelle Ultra Fresh Flushable Wipes are designed to remove mess, reduce odor, and protect hands for a clean that feels complete.

**100% Flushable**

Our flushable wipes are septic safe and approved by plumbers.

**Shower-Fresh Clean**

Pair Cottonelle Flushable Wipes with Cottonelle Toilet Paper for a shower-fresh feeling.





|  | FreshCare | GentlePlus | FreshCare XL | Ultra Comfort | Ultra Clean |
|---|---|---|---|---|---|
|  | Add to Cart | Add to Cart | Add to Cart | See Details | See Details |
| Customer Reviews | 5,027 | 32,153 | 130,784 | 4,425 | 95,779 |
| Price | $6⁹⁸ | $11⁹⁹ | $24¹⁵ | — | — |
| Best for Residue Removal | ✓ |  | ✓ |  | ✓ |
| Best for Skin Comfort |  | ✓ |  | ✓ |  |

6/20/2024 USA-017076

| | | | | | |
|---|---|---|---|---|---|
| Contains Aloe & Vitamin E | | | | | |
| 40% Larger vs. Cottonelle Wipes | | | ✓ | | |
| Safe for Sensitive Skin | ✓ | ✓ | ✓ | | |
| Plant-Based Fibers | ✓ | ✓ | ✓ | ✓ | ✓ |
| FSC-Certified | ✓ | ✓ | ✓ | ✓ | ✓ |
| Clog-Free & Septic Safe | ✓ | ✓ | ✓ | ✓ | ✓ |

## Product Description

Enjoy a complete clean with the #1 septic-safe wipes brand*, Cottonelle Fresh Feel Flushable Wet Wipes. These adult wipes wash away odor-causing mess and remove up to 100% of residue, making them great for everyday use. Cottonelle Fresh Feel Flushable Wipes are designed with 3x cleaning power, designed to remove mess, reduce odor, and protect hands for a clean that feels complete. Each wet wipe is safe for sensitive skin and made with purified water. Our adult wet wipes are 100% flushable, septic-safe, and plumber-approved. Each flip-top pack has 42 flushable wet wipes per pack with pull-apart sheets for easy dispensing. Cottonelle is FSC certified, supporting responsible forestry and only uses fibers that are 100% plant-based. For more ways to feel clean, pair Cottonelle flushable wipes with Cottonelle toilet paper. Together, Cottonelle Ripples clean better**. Keep Cottonelle stocked and order online with delivery. (*among national brands) (**Cottonelle dry + wet vs dry leading value brand)

## Product details

Product Dimensions : 12.37 x 7.75 x 4.31 inches; 4.28 Pounds

Item model number : 10036000509943

Department : Household Paper

Date First Available : March 13, 2019

Manufacturer : Kimberly-Clark Corp.

ASIN : B07ND3WR64

Country of Origin : USA

Best Sellers Rank: #17 in Health & Household (See Top 100 in Health & Household)
#2 in Personal Cleansing Wipes

Customer Reviews:
4.7    130,784 ratings

## Inspiration from this brand

  Cottonelle
Visit the Store on Amazon    [+ Follow]

    

Weekend plans for beach volleyball? Don't leave the match feeling salty ...

Our softest, our thickest, our most absorbent toilet paper.

Cottonelle® Flushable Wipes are designed for toilets and tested by...

Our flushable wipes are made for your pipes. They dissolve like toilet...

Love is in the air! Check out this ahhh-mazing Cottonelle® toilet pa...

Softest. T Cottonell

## Compare with similar items

This Item    Recommendations

    

Cottonelle Fresh Feel Flushable Wet Wipes, Adult Wet Wipes, 8 Flip-Top Packs, 42 Wipes Per

Amazon Basics Flushable Adult Toilet Wipes, Fragrance Free, 126 Count (3 Packs of 42)

Cottonelle GentlePlus Flushable Wet Wipes with Aloe & Vitamin E, 6 Flip-Top Packs, 42 Wipes Per

DUDE Wipes - Flushable Wipes - 6 Pack, 288 Wipes - Shea BUTTer Smooth Extra-Large Adult

USA-017077

| | Add to Cart | Add to Cart | Add to Cart | Add to Cart |
|---|---|---|---|---|
| Price | $15⁷⁹ | $4⁷⁶ | -16% $11⁹⁹ List: $14.19 | $19⁹⁸ |
| Price Per Unit | $0.05 / Count | $3.78 / 100 Sheets | $0.05 / Count | $0.07 / Count |
| Delivery | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 | Get it as soon as Tuesday, Jun 25 |
| Customer Ratings | 4.7    130,784 | 4.5    43,677 | 4.6    32,153 | 4.7    145,106 |
| Softness | 4.4 | 4.2 | 4.4 | 4.6 |
| Scent | 4.4 | 4.1 | 4.4 | 4.6 |
| For Sensitive Skin | 4.4 | 4.3 | 4.4 | 4.6 |
| For Traveling | 4.4 | 4.1 | 4.4 | 4.5 |
| Value For Money | 4.4 | 4.0 | — | 4.5 |
| Sold By | Amazon.com | Amazon.com | Amazon.com | Amazon.com |
| Skin Type | All | Sensitive | All | Sensitive, Dry, All, Normal, Combination |
| Scent | Unscented | Fragrance Free | Unscented | Shea BUTTer Smooth |
| Unit Count | 336 | 126 | 252 | 288 |
| Active Ingredients | — | aloe barbadensis leaf juice,citric acid,disodium edta,sodium benzoate | vitamin e | Aloe |
| Specialty | hypoallergenic | Fragrance-Free | Biodegradable | Whole |
| Product Benefit | Freshening,Clean,Hypoallergenic | Biodegradable | Soothing,Freshness,Freshening,Biodegradable,N( | Soothing, Hypoallergenic, Moisturizing, flushable, biodegradable, Fragrance free, Plant based fibers |

## Videos



| 1:36 | 1:48 | 5:10 | 0:38 | |
|---|---|---|---|---|
| BIG WARNING Cottonelle Flushable WIPES LEFT ME... Sunny | Customer Review: 100% garbage now, will never purcha... Three Dog Circus | DUDE Wipes vs Cottonelle Flushable Wipes! Consumer Quest | Comparing the Cottonelle & Honest Flushable Wipes BAO WINN | Dude Wipes' VS Conttone Tech By Leon |

Upload your video

## Important information

### Safety Information

Warning: to avoid danger of suffocation, keep this bag away from babies and children

### Directions

Use the wet wipe to clean the desired area as needed.

### Legal Disclaimer

Disclaimer packaging variations Disclaimer: While we work to ensure that product information is correct, on occasion manufacturers may alter their packaging and verbiage. We recommend that you do not solely rely on the information presented and that you always read labels, warnings, and directions before using a product. For additional information about a product, please contact the manufacturer.

Statements regarding dietary supplements have not been evaluated by the FDA and are not intended to diagnose, treat, cure, or prevent any disease or health condition.

## More from frequently bought brands

Sponsored ⓘ

USA-017078








| Goodwipes Flushable Butt Wipes Made w/ Soothing Botanicals & Aloe – Soft & Gentle... | Pura Flushable Wipes 4 x 40 Toilet Wipes (160 Wipes), 100% Plastic Free Moist Toile... | Nolla Flushable Wipes - 100% Plant-Based and Biodegradable - Soft, Unscented + Soot... | Pura Flushable Toddler Wipes 3 x 60 Wipes (180 Wipes), 100% Plastic Free, 99% Water... | Cottonelle GentlePlus Flushable Wet Wipes with Aloe & Vitamin E, 6 Flip-Top Packs, ... | McKesson StayDry Disposable Wipe 6 Pack, 300 Washcloths – Large Adult Body and Inco... | McKesson StayDry Disposable Wipe 12 Pack, 600 Washcloths – Large Adult Body and... | Nice 'N Clean Adul Flushable Wipes (1 Count) | Personal Cleansing Wipes N |
|---|---|---|---|---|---|---|---|
| 1,169 | 15 | 780 | 2 | 32,153 | 1,356 | 5,799 | 26,5! |
| $21⁰⁷ ($0.06/Count) | $10⁸⁰ ($6.75/100 Count) | $19⁹⁵ ($0.11/Count) | $11⁰⁰ ($6.11/100 Count) | $11⁹⁹ ($0.05/Count) | $20⁰⁰ ($0.07/Count) | $26⁹⁹ ($0.04/Count) | $26⁹⁹ ($0.05/Cou |
| | Extra 10% off when you subscribe | Extra $1.00 off when you subscribe | Extra 10% off when you subscribe | Extra 15% off when you subscribe | | | |
| | | | ❧ Climate Pledge Friendly | ❧ Climate Pledge Friendly | | | |

Sponsored

## Similar brands on Amazon

Sponsored

Clorox
Shop the Store on Amazon ›

goodwipes
Shop the Store on Amazon ›

StayDry
Shop the Store on Amazon ›






| Clorox Disinfecting Wipes Value Pack, Household Essentials, 75 Count, Pack of ... | DUDE Wipes - Flushable Wipes - Unscented 8 Pack + Mint Travel Pack, 40... | Goodwipes Flushable & Plant-Based Wipes with Botanicals | Dispenser for At-Home ... | McKesso Pack, 60 |
|---|---|---|---|
| (99,625) | (494) | (1,809) | |
| $12.78 List: $14.99 | $31.99 | $23.99 | $26.58 |

## Looking for specific info?

## Customer reviews

### 4.7 out of 5 ⓘ

130,784 global ratings

| | |
|---|---|
| 5 star | 82% |
| 4 star | 11% |
| 3 star | 4% |
| 2 star | 1% |
| 1 star | 2% |

⌄ Zero tolerance for fake reviews

### Customers say

Customers like the ease of use, value, comfort and portability of the skin cleaning wipes. For example, they mention that it's very convenient, has a nice softness to it, smooth on the skin and appreciate the level of comfort they bring to their daily routine. That said, opinions are mixed on moisture, smell, quality, and size.
AI-generated from the text of customer reviews

✅ Value   ✅ Comfort   ✅ Portability   ✅ Ease of use   Quality   Smell   Size   Moisture

### Reviews with images

See all photos ›





Top reviews

### Top reviews from the United States

Greg

**Great wipes!**
Reviewed in the United States on May 28, 2024
Size: 42 Count (Pack of 8)   Verified Purchase
We've been using these for years, and they are fantastic! They are soft and durable and they are easy on

Sponsored

USA-017079

marketed and distributed to consumers to end up as garbage instead of our community wastewater collection. Apparently, they are not good for the system.

4 people found this helpful

Helpful    Report

MM

**Nice thick wipes. Smooth. Mild scent.**
Reviewed in the United States on May 23, 2024
Size: 42 Count (Pack of 8)    Verified Purchase

These wipes have a nice scent, are smooth on the skin, and are thick. They work well. They are smaller than the standard baby wipes which may be a problem for some people. The packets are a good size even for a small bag/purse.

3 people found this helpful

Helpful    Report

Karrie T

**Great price and quality**
Reviewed in the United States on June 4, 2024
Size: 42 Count (Pack of 8)    Verified Purchase

These wipes are thick and durable. They come in an 8 pack. The price is very fair compared to buying them at a grocery store! They have a nice flip top lid and thick packing that does not rip.

2 people found this helpful

Helpful    Report

R C Las Vegas

**Great product and easy to use and dispose them.**
Reviewed in the United States on May 14, 2024
Size: 42 Count (Pack of 8)    Verified Purchase

Used another brand and these are a lot better! Softer and more gently to use! A bit higher price but worth the extra cost! Use them often, great on trips too!

4 people found this helpful

Helpful    Report

Anthony Lawson

**They're Ok...**
Reviewed in the United States on June 8, 2024
Size: 42 Count (Pack of 8)    Verified Purchase

Had some problems grabbing wipes out of the package. Sometimes they would rip in half as I was trying to grab one out of the packaging. Smell is nice and they work well overall.

Helpful    Report

Guy and Brandy

**Experience the Ultimate Cleanliness and Comfort with Cottonelle FreshFeel Flushable Wet Wipes!**
Reviewed in the United States on December 26, 2023
Size: 42 Count (Pack of 8)    Verified Purchase

In the quest for the cleanest and most comfortable bathroom experience, Cottonelle FreshFeel Flushable Wet Wipes stand head and shoulders above the rest. This 8-pack of flushable wipes is more than just a bathroom essential; it's a game-changer in personal hygiene.

Let's dive into the details. This package includes 8 convenient flip-top packs, each containing 42 flushable wipes. That's a total of 336 flushable wipes at your disposal. No more running out of wipes when you need them the most – Cottonelle has you covered.

The true magic of these wipes lies in their ability to provide a healthy and gentle clean. They offer premium softness that's not only comfortable but also safe for sensitive skin. Whether you're using them for yourself or your family, you'll appreciate the level of comfort they bring to your daily routine.

But what sets Cottonelle apart is its commitment to safety and cleanliness. These flushable wipes are

⌄ Read more

26 people found this helpful

Helpful    Report

Tiara

**Great**
Reviewed in the United States on February 16, 2024
Size: 42 Count (Pack of 8)    Verified Purchase

Good for bathroom use, keeps things clean just don't use too many wipes at once. No more than 5 at a time. I recently had the opportunity to try out the Cottonelle FreshFeel Flushable Wet Wipes, and I must say they are a convenient and refreshing product that is perfect for personal hygiene. This pack includes 8 flip-top packs of wet wipes, with 42 wipes per pack (336 total flushable wipes), making it ideal for use at home or on the go.

These wet wipes are specifically designed for adults and provide a gentle and effective way to stay clean and fresh throughout the day. The flushable wipes offer a convenient alternative to traditional toilet paper, ensuring a thorough and comfortable cleaning experience. The packaging is compact and portable, making it easy to carry in your bag, purse, or backpack.

I found these Cottonelle Flushable Wet Wipes to be incredibly handy for various situations, such as using the restroom, freshening up after a workout, or cleaning up spills and messes. The wipes are soft, durable,

⌄ Read more

USA-017080

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 96 of 432
PageID.8104

Helpful    Report

Pat Hahn

**Good product**

Reviewed in the United States on May 25, 2024

Size: 42 Count (Pack of 8)    Verified Purchase

Soft and moist. I've tried other products but these are the best for the value

Helpful    Report

---

See more reviews

---

### Top reviews from other countries

Lyss

**Great Quality**

Reviewed in Canada on May 16, 2024

Size: 42 Count (Pack of 8)    Verified Purchase

Awesome product and cheaper than buying it in the store!

One person found this helpful

Report

Andrea Ripsher

**Cottonelle Fresh Care flushable wipes**

Reviewed in Australia on April 29, 2024

Size: 42 Count (Pack of 8)    Verified Purchase

Very nice wipes, very soft and nice scent. But the price is way too expensive especially with postage costing a bomb.

Report

alex tan

**Good quality and refresh**

Reviewed in Singapore on September 23, 2023

Size: 42 Count (Pack of 8)    Verified Purchase

Super love it cause thick quality and not easy to tear off.

Report

Amazon Customer

**These work well for potty training**

Reviewed in Canada on May 2, 2024

Size: 42 Count (Pack of 8)    Verified Purchase

They work great, instead of toilet paper for potty training. And the packages are small enough to bring in my purse for being out and about.

One person found this helpful

Report

Kay Dee

**They are FLUSHABLE!**

Reviewed in Singapore on January 27, 2023

Size: 42 Count (Pack of 8)    Verified Purchase

Trying to get hold of flushable wipes used to be impossible but when I discovered Cottonelle, the search was over forever and they are truly great!

Report

---

See more reviews

Sponsored

USA-017081

**Disclaimer:** While we work to ensure that product information is correct, on occasion manufacturers may alter their ingredient lists. Actual product packaging and materials may contain more and/or different information than that shown on our Web site. We recommend that you do not solely rely on the information presented and that you always read labels, warnings, and directions before using or consuming a product. For additional information about a product, please contact the manufacturer. Content on this site is for reference purposes and is not intended to substitute for advice given by a physician, pharmacist, or other licensed health-care professional. You should not use this information as self-diagnosis or for treating a health problem or disease. Contact your health-care provider immediately if you suspect that you have a medical problem. Information and statements regarding dietary supplements have not been evaluated by the Food and Drug Administration and are not intended to diagnose, treat, cure, or prevent any disease or health condition. Amazon.com assumes no liability for inaccuracies or misstatements about products.

Back to top

**Get to Know Us**
Careers
Amazon Newsletter
About Amazon
Accessibility
Sustainability
Press Center
Investor Relations
Amazon Devices
Amazon Science

**Make Money with Us**
Sell on Amazon
Sell apps on Amazon
Supply to Amazon
Protect & Build Your Brand
Become an Affiliate
Become a Delivery Driver
Start a Package Delivery Business
Advertise Your Products
Self-Publish with Us
Become an Amazon Hub Partner
› See More Ways to Make Money

**Amazon Payment Products**
Amazon Visa
Amazon Store Card
Amazon Secured Card
Amazon Business Card
Shop with Points
Credit Card Marketplace
Reload Your Balance
Gift Cards
Amazon Currency Converter

**Let Us Help You**
Your Account
Your Orders
Shipping Rates & Policies
Amazon Prime
Returns & Replacements
Manage Your Content and Devices
Recalls and Product Safety Alerts
Help

English        United States

| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |
| IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Kindle Direct Publishing Indie Digital & Print Publishing Made Easy | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Great Deals on Quality Used Products |
| Whole Foods Market America's Healthiest Grocery Store | Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Ring Smart Home Security Systems | eero WiFi Stream 4K Video in Every Room | Blink Smart Security for Every Home | Neighbors App Real-Time Crime & Safety Alerts |
| | | Amazon Subscription Boxes Top subscription boxes – right to your door | PillPack Pharmacy Simplified | Amazon Renewed Like-new products you can trust | | |

Conditions of Use    Privacy Notice    Consumer Health Data Privacy Disclosure    Your Ads Privacy Choices
© 1996-2024, Amazon.com, Inc. or its affiliates

USA+017082

Jonah G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Chux Pads

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Amazon.com

**Address**:

**Phone**:

**Name of Person Spoken To**:

**Cost Information**:
$26.76 each time

**Replacement rate**:
1 box every other month

USA-017083

Delivering to Monroe 98272
**Update location**    All ⌄  chux pads

Hello, sign in
EN ⌄   Account & Lists ⌄

Returns
& Orders      0

All   Customer Service   Medical Care ⌄   Groceries ⌄   Best Sellers   Amazon Basics   Prime ⌄   New Releases   Today's Deals   Music   Amazon Home   Books   Pharmacy   Registry   Gift Cards ⌄   Fashion

Industrial & Scientific   Janitorial & Facilities   Safety Supplies   Medical Supplies   Food Service   Diagnostic Equipment   Material Handling   Educational Supplies   Sealants and Lubricants   Additive Manufacturing   Laboratory Supplies

‹ Back to results



Roll over image to zoom in

# Chucks Pads Disposable [100-Pack] Underpads 17"x 24" Incontinence Chux Pads Absorbent Fluff Protective Bed Pads, Pee Pads for Babies, Kids, Adults & Elderly | Puppy Pads Large for Training Leak Proof

Visit the Stack Man Store

4.4        1,161 ratings | Search this page

Amazon's Choice ▌ in Disposable Bed Underpads by Stack Man

3K+ bought in past month

**$21⁹⁹** ($0.22 / Count)

Get **Fast, Free Shipping** with Amazon Prime
FREE Returns

**Coupon:** Save $5: Coupon available when you select **Subscribe & Save** . Shop items › | Terms

Get $10 off instantly: Pay $11.99 $21.99 upon approval for the Amazon Store Card. No annual fee.

Available at a lower price from other sellers that may not offer free Prime shipping.

**Size: 17" X 24" (100-Count)**

- ADVANCED BED PROTECTION — These absorbent chucks pads can help protect bedding and sheets from uncontrolled bladder or urinary problems in men, women, kids, or elderly to improve confidence and sleep.
- SUPER FLUFF FILL LAYERS — Stack Man bed pads are designed with premium polymer layers that help absorb liquids, urine, or accidents more quickly, locking it away to help control odor and wetness.
- MULTIPURPOSE SUPPORT — Our urinary incontinence pads are not only great for young children or elderly hospice care patients, they can be used by pet owners who want to help train young puppies or support older dogs.
- AVOID PUDDLES & IRRITATION — Under Pads are designed to absorb liquids quickly and safely, which is important for minimizing skin irritation, keeping animals from tracking urine across the floor, or avoiding puddling.
- LARGE BULK PACK COUNT — The 100-count bed covers can be used every night, while you're traveling, or anytime you need a little extra protection when you're sleeping. They're also disposable for quick clean-up!

Report an issue with this product or seller

Add to cart

Sponsored

**prime**

Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows with Prime
Try Prime and start saving today with **fast, free delivery**

One-time purchase:

**$21⁹⁹** ($0.22 / Count)

Get **Fast, Free Shipping** with Amazon Prime
FREE Returns

FREE delivery **Tuesday, June 25** on orders shipped by Amazon over $35

Or fastest delivery **Saturday, June 22**. Order within 7 hrs 43 mins

Delivering to Monroe 98272 -
Update location

In Stock

Quantity: 1

Add to Cart

Buy Now

Ships from   Amazon
Sold by      Stack Man
Returns      Eligible for Return, Refund or Replacement within 30 days of receipt
Packaging    Ships in product packaging

⌄ See more

☐ Add a gift receipt for easy returns

Subscribe & Save:

**$21⁹⁹** ($0.22 / Count)

FREE delivery **Tuesday, June 25** on orders shipped by Amazon over $35
Ships from: Amazon
Sold by: Stack Man

Add to List

Other sellers on Amazon

New (2) from $21⁹⁰  & **FREE Shipping**

Save 5% more  with Subscribe & Save

Sponsored

## Frequently bought together



Total price: $64.85

Add all 3 to Cart

These items are shipped from and sold by different sellers.
Show details

**This item:** Chucks Pads Disposable [100-Pack] Underpads 17"x 24" Incontinence Chux Pad...
$21⁹⁹ ($0.22/Count)

Chucks Pads Disposable 50x36 Underpads [50-Pack] Incontinence Chux Pads...
$34⁹⁹ ($0.70/Count)

MED PRIDE NitriPride Nitrile-Vinyl Blend Exam Gloves, Medium 100 - Powder Free, Latex Free &...
$7⁸⁷ ($0.08/Count)

## Based on your recent shopping trends

     

Chucks Pads Disposable [200-Pack] Underpads 23x36 Incontinence Chux Pads Absorbent Fluff...
13,056
Amazon's Choice ▌ in Disposable Bed Underpads
$44.99 ($0.22/Count)
Get it as soon as **Wednesday, Jul 3**
FREE Shipping by Amazon

Chucks Pads Disposable [150-Pads] Underpads 23" X 36" Incontinence Chux Pads Absorbent Fluff Protective Bed Pads, Pee Pads for Babies, Ki...
10,012
$38.99 ($0.26/Count)
FREE Shipping

Disposable Incontinence Bed Pads 23" x 36", 15 Pack - Heavy Absorbent Chux Underpads with Fluff Core - Leak Proof...
143
$14.98
Get it as soon as **Friday, Jun 28**
FREE Shipping on orders over $35 shipped by Amazon

Extra Large Disposable Incontinence Bed Pad 10 Count (Size 36 x 36 Inch) - Hospital Underpad with Incontinence Protectio...
928
$24.89
Get it as soon as **Tuesday, Jun 25**
FREE Shipping on orders over $35 shipped by Amazon

Healqu Disposable Underpads - Absorbent Incontinence Bed Pads for Adults, Kids, Elderly, and Pets - Fluid and Urine B...
1,574
$19.99
Get it as soon as **Tuesday, Jun 25**
FREE Shipping on orders over $35 shipped by Amazon

Inspire Ultra Underpads Incontinence Bed Pads | Chic Gray Modern Design | Hospital Bed Pads...
50
25% off  Limited time deal
$44.99 ($0.98/Count)
List: $59.99
Get it as soon as **Tuesday, Jun 25**
FREE Shipping by Amazon

USA-017084

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 100 of 432
PageID.8108

## Products related to this item

Sponsored

       

| Medpride Disposable Underpads 17" x 24" (100-Count) Incontinence Pads,... 29,038 | Chucks Super Soft Absorbent Pads 17x24 Underpads - Disposable Diaper Changing Pads ... 27 | Disposable Underpads 17" x 24" (100-Count) Incontinence Pads, Chux, Bed Covers, Pup... 85 | Chucks Pads Disposable [50-Pack] Underpads 23x36 Incontinence Chux Pads Absorbent F... 8,092 | Chucks MAX Hospital Bed Pads Disposable Adult 36 x 36 Breathable Incontinence Pads ... 1,215 | Chucks Pads Disposable [300-Pads] Underpads 17x24 Incontinence Chux Pads Absorbent ... 10,012 | Premium Disposable Chucks Underpads 25 Pack, 30" x 36" - Highly Absorbent Bed Pads ... 1,398 | Disposable Chucks [300 Pack - 17x24 Diaper Changing F Incontinence Bed I 13,0! |
| $16⁹⁹ | $18⁹⁹ ($0.47/Count) | $18⁹⁹ | #1 Best Seller $18⁹⁹ ($0.38/Count) Extra $5.00 off when you subscribe | #1 Best Seller $34⁹⁹ Extra $15.00 off when you subscribe | $32⁹⁹ ($0.11/Count) | Limited time deal -44% $14⁹⁸ List Price: $26.99 Save 20% with coupon | $44⁹⁹ ($0.15/Cou |

## Product details

Product Dimensions : 24 x 17 x 0.39 inches; 1.06 ounces

Date First Available : June 15, 2023

Manufacturer : AOS Brands

ASIN : B0C879PC4W

Best Sellers Rank: #6,619 in Health & Household (See Top 100 in Health & Household)
#15 in Disposable Bed Underpads

Customer Reviews:
4.4    1,161 ratings

## Product Description

## Brand in this category on Amazon



Protective Underpads with the Absorbency you Need
Shop Medline ›



| Medline Ultrasorbs 7,019 | Medline Incontinence Bed 22,661 | Medline Light Absorbency 1,351 |

Sponsored

## What's in the box

- Puppy Pads 17x24

## More from frequently bought brands

Sponsored

       

| Chucks MAX Hospital Bed Pads Disposable Adult 36 x 36 Breathable Incontinence Pads ... 1,215 | Medline Incontinence Bed Pads 36 x 36 Inches (Pack of 50), Super Absorbent Extra La... 22,661 | Chucks Pads Disposable [300-Pads] Underpads 17x24 Incontinence Chux Pads Absorbent ... 10,012 | Medline Disposable Chucks Pads, 23 x 36 inches (Pack of 150), Ultra-Light Absorbenc... 4,910 | Medpride Disposable Underpads 17" x 24" (100-Count) Incontinence Pads,... 29,038 | Chucks Super Soft Absorbent Pads 17x24 Underpads - Disposable Diaper Changing Pads ... 27 | Chucks Pads Disposable [50-Pack] Underpads 23x36 Incontinence Chux Pads Absorbent F... 8,092 | McKesson Ultra Underpads, Adult Incontinence Bed I Chux, Disposable,.. 9,28( |
| #1 Best Seller $34⁹⁹ Extra $15.00 off when you subscribe | $44⁹⁹ ($0.90/Item) Extra 15% off when you subscribe | $32⁹⁹ ($0.11/Count) | $34⁷⁴ ($0.23/Count) Extra 25% off when you subscribe | $16⁹⁹ | $18⁹⁹ ($0.47/Count) | #1 Best Seller $18⁹⁹ ($0.38/Count) Extra $5.00 off when you subscribe | $45¹³ ($0.45/Cou |

## Videos

6/20...    USA-017085



**Customer Review: Perfection**
Jvb
0:18

**Customer Review: Defective**
Ozzie The Chi
0:22

Upload your video

## Similar brands on Amazon

Sponsored




IMPROVIA
Shop the Store on Amazon ›

IMPROVIA® Washable Underpads, 34" x 36" (Pack of 4) - Heavy Absorbency...
(16,966)
$29.99



Medline
Shop the Store on Amazon ›

Medline Ultrasorbs Premium Disposable Underpads, Large Incontinence Bed Pad...
(7,019)
$39.99




RMS
Shop the Store on Amazon ›

RMS Ultra Soft 4-Layer Washable and Reusable Incontinence Bed Pad -...
(19,179)
$24.99 List: $29.99




RMS BRANDS
Shop the Store on Amazon ›

Sponsored

## Looking for specific info?

## Customer reviews

**4.4 out of 5** ⓘ

1,161 global ratings

| | |
|---|---|
| 5 star | 72% |
| 4 star | 11% |
| 3 star | 6% |
| 2 star | 4% |
| 1 star | 6% |

⌄ Zero tolerance for fake reviews

Sponsored

### Customers say

Customers like the value of the product. They say it's a good purchase for the price and works just as well as traditional puppy pads. Customers are also satisfied with the quality. However, some customers differ on water resistance, size, leakage, absorbency, and thickness.
AI-generated from the text of customer reviews

✓ Quality    ✓ Value    ✓ Cleanliness    Size    Absorbency    Thickness    Leakage

Water resistance

### Reviews with images

See all photos

Top reviews

### Top reviews from the United States

Tamar Haller

**Good value & quality**
Reviewed in the United States on May 22, 2024
Size: 17" X 24" (100-Count)    Verified Purchase
I like the variable sizes available

6/20/2024, 1:16 PM

USA-017086

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 102 of 432
PageID.8110

**MissAylaJayne**

**Potty training ferrets**

Reviewed in the United States on June 7, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

I use the pee pads to potty train my ferrets! They hold up very well to tiny claws! My babies seem to like the comfort of them. And I've had NO problems with leakage, they hold the liquid well. I even keep one under their water bowls, excellent performance.

Helpful     Report

**Mel**

**Perfect**

Reviewed in the United States on June 16, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

Absorbs well. We use it for our baby. It's not as large as others that I've seen but that didn't bother me. I would imagine it would bother someone else who needed a bigger size.

It was originally used for potential postpartum leakage from mama but we ended up using most of it for the baby during changes who was prone to blow outs and using the bathroom during a diaper change. It ended up being a life saver!!

Absorbed all messes well. I can see this being used for multiple reasons.

Helpful     Report

**Martha Bowser**

**Good value for price**

Reviewed in the United States on March 15, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

The size I ordered is perfect but only for a smaller pet 10 pound or less. Also, the backing needs to be a little thicker because I think they leak a little bit if saturated.

Helpful     Report

**Tanya C**

**Just right for my needs**

Reviewed in the United States on May 25, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

These are a very small size, but for my needs, perfect for my doggies needs.

Helpful     Report

**Art P.**

**Good quality**

Reviewed in the United States on June 11, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

Size is a little smaller than normal chuck pads. Good quality - using on baby changing table.

Helpful     Report

**Kenzie**

**Perfect for diaper changes!**

Reviewed in the United States on April 10, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

I purchased this product hoping it would be the right solution for diaper changes in public and it is 100% worth the investment! I tried using a travel changing pad that could be wiped down, but when you already have a screaming baby (potentially COATED in poop from a blowout) and you can clearly see how gross some of the changing tables are in public restrooms... you'll likely not want to have to spend a lot of time trying to wipe down and sanitize the travel changing pad after finishing a diaper change. My little one is usually somewhat calm during a diaper change and then loses his mind as soon as it's done, so the peace of mind knowing I can use one or more of these and quickly toss afterwards is well worth the buy for me.

One person found this helpful

Helpful     Report

**melissa Wescott**

**Thick, good absorbency, decent size.**

Reviewed in the United States on June 1, 2024

Size: 17" X 24" (100-Count)     Verified Purchase

Pads are decently thick compared to similar priced pads. We are using for our 12 yr old dog who's having incontinence issues. He has his favorite spot, so we cover the area with these. We do double them, and doing so has been pretty effective absorbing, as long as we notice it early enough. We just fold it up and in the dumpster.

For reference our dog is a terrier mix weighs 29lbs.

Helpful     Report

See more reviews

Add to cart

Sponsored

USA-017087

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 103 of 432
PageID.8111

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| About Amazon | Supply to Amazon | Amazon Secured Card | Shipping Rates & Policies |
| Accessibility | Protect & Build Your Brand | Amazon Business Card | Amazon Prime |
| Sustainability | Become an Affiliate | Shop with Points | Returns & Replacements |
| Press Center | Become a Delivery Driver | Credit Card Marketplace | Manage Your Content and Devices |
| Investor Relations | Start a Package Delivery Business | Reload Your Balance | Recalls and Product Safety Alerts |
| Amazon Devices | Advertise Your Products | Gift Cards | Help |
| Amazon Science | Self-Publish with Us | Amazon Currency Converter | |
| | Become an Amazon Hub Partner | | |
| | › See More Ways to Make Money | | |

English          United States

| Amazon Music Stream millions of songs | Amazon Ads Reach customers wherever they spend their time | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Sell on Amazon Start a Selling Account | Amazon Business Everything For Your Business |
|---|---|---|---|---|---|---|
| Amazon Fresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Experienced Pros Happiness Guarantee | Amazon Web Services Scalable Cloud Computing Services | Audible Listen to Books & Original Audio Performances | Box Office Mojo Find Movie Box Office Data | Goodreads Book reviews & recommendations |
| IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Kindle Direct Publishing Indie Digital & Print Publishing Made Easy | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Great Deals on Quality Used Products |
| Whole Foods Market America's Healthiest Grocery Store | Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Ring Smart Home Security Systems | eero WiFi Stream 4K Video in Every Room | Blink Smart Security for Every Home | Neighbors App Real-Time Crime & Safety Alerts |
| | | Amazon Subscription Boxes Top subscription boxes – right to your door | PillPack Pharmacy Simplified | Amazon Renewed Like-new products you can trust | | |

Conditions of Use     Privacy Notice     Consumer Health Data Privacy Disclosure     Your Ads Privacy Choices

© 1996-2024, Amazon.com, Inc. or its affiliates

USA-017088

J█████ G.
Life Care Plan Cost Sheets

## <u>**LIFE CARE COSTS**</u>

**<u>Item/Service</u>**: Pediatrician / Physical Medicine and Rehabilitation Physician Evaluation, Treatment, and Monitoring

**<u>Date Information Obtained</u>**:    June 2024

**<u>Name of Company/Provider/Facility/School</u>**:
Carolina Pediatrics & Adolescent Care

**<u>Address</u>**:
2113 Adams Grove, #101
Columbia, SC 29203

**<u>Phone</u>**: (803) 256-0531

**<u>Name of Person Spoken To</u>**:
Connie

**<u>Cost Information</u>**:
$285.00 each time

**<u>Replacement rate</u>**:
Annually

USA-017089

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Pediatrician / Physical Medicine and Rehabilitation Physician Evaluation, Treatment, and Monitoring

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Medical University of South Carolina

**Address**:
2113 Adams Grove, #101
Columbia, SC 29203

**Phone**: (803) 256-0531

**Name of Person Spoken To**:
Online Medical Cost Finder

**Cost Information**:
$285.00 to $495.00 each time

**Replacement rate**:
Annually

USA-017090

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Pediatrician / Physical Medicine and Rehabilitation Physician Evaluation, Treatment, and Monitoring

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Piedmont Medical Center

**Address**:
222 S. Herlong Ave.
Rock Hill, SC  29732

**Phone**: (803) 329-1234

**Name of Person Spoken To**:
Debbie

**Cost Information**:
$295.00 to $495.00 each time

**Replacement rate**:
Annually

USA-017091

J█████ G.
Life Care Plan Cost Sheets

# LIFE CARE COSTS

**Item/Service**: Neurology Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Medical University of South Carolina

**Address**:
2113 Adams Grove, #101
Columbia, SC 29203

**Phone**: (803) 256-0531

**Name of Person Spoken To**:
Online Medical Cost Finder

**Cost Information**:
$285.00 to $495.00 each time

**Replacement rate**:
Annually

USA-017092

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Neurology Evaluation, Monitoring, and Treatment

**Date Information Obtained**:     June 2024

**Name of Company/Provider/Facility/School**:
Beaufort Memorial Hospital

**Address**:
955 Ribaut Rd.
Beaufort, SC 29902

**Phone**: (843) 522-5200

**Name of Person Spoken To**:
Jessica, directed to online cost estimator

**Cost Information**:
$390.00 each time

**Replacement rate**:
Annually

USA-017093

J████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Neurology Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Piedmont Medical Center

**Address**:
222 S. Herlong Ave.
Rock Hill, SC  29732

**Phone**: (803) 329-1234

**Name of Person Spoken To**:
Debbie

**Cost Information**:
$295.00 to $495.00 each time

**Replacement rate**:
Annually

USA-017094

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Neuropsychological / Neurodevelopmental Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
University of South Carolina Psychology Services Center

**Address**:
1331 Elmwood Avenue, Suite 140
Columbia, SC 29201

**Phone**: (803) 777-7302

**Name of Person Spoken To**:
Jill

**Cost Information**:
$1,250.00 to $2,000.00 each time

**Replacement rate**:
10 to 15 times Age 5 to Life Expectancy

USA-017095

J▮▮▮ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Dental Evaluation, Monitoring and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Columbia Children's Dentistry

**Address**:
3731 Forest Dr., Ste. B
Columbia, SC 29204

**Phone**: (803) 782-5492

**Name of Person Spoken To**:
Jennifer

**Cost Information**:
$149.00 each time

**Replacement rate**:
1 time every 3 to 5 years

USA-017096

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Dental Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Kid's First Dental

**Address**:
2700 Broad River Rd.
Columbia, SC 29210

**Phone**: (803) 772-4949

**Name of Person Spoken To**:
April

**Cost Information**:
$149.00 each time

**Replacement rate**:
1 time every 3 to 5 years

USA-017097

J▮▮▮ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Dental Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Columbia Children's Dentistry

**Address:**
3731 Forest Dr., Ste. B
Columbia, SC 29204

**Phone**: (803) 782-5492

**Name of Person Spoken To**:
Jennifer

**Cost Information**:
$200.00 each time

**Replacement rate**:
1 time every 3 to 5 years

USA-017098

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Dental Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Capital City Dentistry

**Address**:
3410 Two Notch Rd.
Columbia, SC 29204

**Phone**: (803) 319-8633

**Name of Person Spoken To**:
Bon

**Cost Information**:
$221.00 each time

**Replacement rate**:
1 time every 3 to 5 years

USA-017099

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: CT-scan Head and Brain

**Date Information Obtained**:     June 2024

**Name of Company/Provider/Facility/School**:
Beaufort Memorial Hospital

**Address**:
955 Ribaut Rd.
Beaufort, SC 29902

**Phone**: (843) 522-5200

**Name of Person Spoken To**:
Jessica, directed to online cost estimator

**Cost Information**:
$2,557.00 each time

**Replacement Rate:**
3 times total

USA-017100

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: CT Scan Head and Brain

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Medical University of South Carolina

**Address**:
2113 Adams Grove, #101
Columbia, SC 29203

**Phone**: (803) 256-0531

**Name of Person Spoken To**:
Online Medical Cost Finder

**Cost Information**:
$1,701.00 each time

**Replacement rate**:
3 times total

USA-017101

J█████ G.
Life Care Plan Cost Sheets

# **LIFE CARE COSTS**

**Item/Service**: CT Scan Head and Brain

**Date Information Obtained**:     June 2024

**Name of Company/Provider/Facility/School**:
Prisma Health

**Address**:
Taylor at Marion St.
Columbia, SC 29220

**Phone**: (803) 296-5010

**Name of Person Spoken To**:
Online price estimator

**Cost Information**:
$2,170.00 each time

**Replacement rate**:
3 times total

USA-017102

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: MRI Brain


**Date Information Obtained**:    June 2024


**Name of Company/Provider/Facility/School**:
Beaufort Memorial Hospital

**Address**:
955 Ribaut Rd.
Beaufort, SC 29902

**Phone**: (843) 522-5200


**Name of Person Spoken To**:
Jessica, directed to online cost estimator

**Cost Information**:
$3,500.00 each time

**Replacement Rate:**
3 times total

USA-017103

J█████ G.
Life Care Plan Cost Sheets

## **LIFE CARE COSTS**

**Item/Service**: MRI Brain

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Medical University of South Carolina

**Address**:
2113 Adams Grove, #101
Columbia, SC 29203

**Phone**: (803) 256-0531

**Name of Person Spoken To**:
Online Medical Cost Finder

**Cost Information**:
$2,593.00 each time

**Replacement rate**:
3 times total

USA-017104

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: MRI Brain

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Prisma Health

**Address**:
Taylor at Marion St.
Columbia, SC 29220

**Phone**: (803) 296-5010

**Name of Person Spoken To**:
Online price estimator

**Cost Information**:
$3,400.00 each time

**Replacement rate**:
3 times total

USA-017105

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**:    Physical Therapy Evaluation, Monitoring and Treatment
Occupational Therapy Evaluation, Monitoring and
Treatment
Speech Therapy Evaluation, Monitoring and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Prisma Health Pediatrics Physical and Specialty Therapy

**Address**:
14 Richland Medical Park Dr., #100
Columbia, SC 29203

**Phone**: (803) 434-1260

**Name of Person Spoken To**:
Patrice

**Cost Information**:
$200.00 each time

**Replacement rate**:
Physical Therapy: 50 sessions annually
Occupational Therapy:  50 sessions annually
Speech Therapy: 100 sessions annually

USA-017106

J███ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**:    Physical Therapy Evaluation, Monitoring and Treatment
Occupational Therapy Evaluation, Monitoring and Treatment
Speech Therapy Evaluation, Monitoring and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
The Therapy Place

**Address**:
3620 Covenant Rd.
Columbia, SC 29204

**Phone**: (803) 787-3033

**Name of Person Spoken To**:
Erin

**Cost Information**:
$150.00 to $200.00 each time

**Replacement rate**:
Physical Therapy: 50 sessions annually
Occupational Therapy:  50 sessions annually
Speech Therapy: 100 sessions annually

USA-017107

J█████ G.
Life Care Plan Cost Sheets

# LIFE CARE COSTS

**Item/Service**:   Physical Therapy Evaluation, Monitoring and Treatment
Occupational Therapy Evaluation, Monitoring and Treatment
Speech Therapy Evaluation, Monitoring and Treatment

**Date Information Obtained**:   June 2024

**Name of Company/Provider/Facility/School**:
Moonbug Pediatric Therapy

**Address**:
3681 Leaphart Rd.
West Columbia, SC 29169

**Phone**: (803) 479-3535

**Name of Person Spoken To**:
Holly

**Cost Information**:
$175.00 to $200.00 each time

**Replacement rate**:
Physical Therapy: 50 sessions annually
Occupational Therapy:  50 sessions annually
Speech Therapy: 100 sessions annually

USA-017108

J███ G.
Life Care Plan Cost Sheets

## **LIFE CARE COSTS**

**Item/Service**: Parent Child Interactive Therapy, Evaluation, Monitoring, and Treatment

**Date Information Obtained**:      June 2024

**Name of Company/Provider/Facility/School**:
Creative Solutions Counseling

**Address**:
331 E. Main St., #200
Rock Hill, SC 29730

**Phone**: (803) 626-0545

**Name of Person Spoken To**:
Lisa Godwin, LPC

**Cost Information**:
$125.00 to $150.00 each session

**Replacement rate**:
Current Age to Age 6: 6 sessions
Age 3 to 4: 12 sessions
Age 4 to 5: 12 sessions

USA-017109

J████ G.
Life Care Plan Cost Sheets

## **LIFE CARE COSTS**

**Item/Service**:   Augmentative Communication Evaluation, Monitoring, and Treatment


**Date Information Obtained**:     June 2024


**Name of Company/Provider/Facility/School**:
Prisma Health Pediatrics Physical and Specialty Therapy

**Address**:
14 Richland Medical Park Dr., #100
Columbia, SC 29203

**Phone**: (803) 434-1260


**Name of Person Spoken To**:
Patrice

**Cost Information**:
$200.00 to $250.00 each time

**Replacement rate**:
10 to 15 times total

USA-017110

J████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**:    Augmentative Communication Evaluation, Monitoring
            and Treatment

**Date Information Obtained**:     June 2024

**Name of Company/Provider/Facility/School**:
The Therapy Place

**Address**:
3620 Covenant Rd.
Columbia, SC 29204

**Phone**: (803) 787-3033

**Name of Person Spoken To**:
Erin

**Cost Information**:
$200.00 each time

**Replacement rate**:
10 to 15 times total

USA-017111

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**:    Augmentative Communication Evaluation, Monitoring, and Treatment

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Moonbug Pediatric Therapy

**Address**:
3681 Leaphart Rd.
West Columbia, SC 29169

**Phone**: (803) 479-3535

**Name of Person Spoken To**:
Holly

**Cost Information**:
$175.00 to $200.00 each time

**Replacement rate**:
10 to 15 times total

USA-017112

J████ G.
Life Care Plan Cost Sheets

## **LIFE CARE COSTS**

**Item/Service**: Tutoring


**Date Information Obtained**:     June 2024


**Name of Company/Provider/Facility/School**:
Club Z

**Address**:
Columbia, SC

**Phone**: (801) 590-7001


**Name of Person Spoken To**:
Europa

**Cost Information**:
Age 6 to Age 12: $55.00 to $60.00 per hour
Age 12 to Age 15: $59.00 to $65.00 per hour
Age 15 to Age 22: $65.00 to $70.00 per hour

Tutoring is done in-home setting

**Replacement rate**:
Age 6 to Age 12: 1 hour per week
Age 12 to Age 15: 2 hours per week
Age 15 to Age 22: 3 hours per week

USA-017113

J▓ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Tutoring

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Sylvan Learning Center

**Address**:
130 Forum Dr., #9
Columbia, SC 29229

**Phone**: (803) 832-4935

**Ben**

**Cost Information**:
Age 6 to Age 12: $55.00 to $60.00 per hour
Age 12 to Age 15: $59.00 to $65.00 per hour
Age 15 to Age 22: $65.00 to $70.00 per hour

**Replacement rate**:
Age 6 to Age 12: 1 hour per week
Age 12 to Age 15: 2 hours per week
Age 15 to Age 22: 3 hours per week

USA-017114

J██████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: In-Home Care


**Date Information Obtained**:     June 2024


**Name of Company/Provider/Facility/School**:
Caring For You Home Care, LLC

**Address**:
2178 A Savannah Hwy., Suite A
Charleston, SC 29414

**Phone**: (843) 964-9750


**Name of Person Spoken To**:
Katrina
Confirmed provides services in Columbia/Rock Hill area

**Cost Information**:
$25.00 to $28.00 per hour

**Replacement rate**:
Current Age to Age 6: 4 hours daily Monday through Friday
Age 6 to Age 21: School days four hours daily, Non-school days 8 hours
daily

USA-017115

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: In-Home Care

**Date Information Obtained**:     June 2024

**Name of Company/Provider/Facility/School**:
Caring For You Home Care, LLC
Purpose of Hope In Home Care, LLC

**Address**:
2178 A Savannah Hwy., Suite A
Charleston, SC 29414

**Phone**: (843) 964-9750

**Name of Person Spoken To**:
Katrina
Confirmed provides services in Columbia/Rock Hill area

**Cost Information**:
$25.00 to $28.00 per hour

**Replacement rate**:
Current Age to Age 6: 4 hours daily Monday through Friday
Age 6 to Age 21: School days four hours daily, Non-school days 8 hours daily

USA-017116

J██████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: In-Home Care

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
A Mother's Choice

**Address**:
756 Cherry Rd.
Rock Hill, SC 29732

**Phone**: (803) 233-2077

**Name of Person Spoken To**:
Tisha Colbloom

**Cost Information**:
$28.00 to $32.00 per hour

**Replacement rate**:
Current Age to Age 6: 4 hours daily Monday through Friday
Age 6 to Age 21: School days four hours daily, Non-school days 8 hours
daily

USA-017117

J█████ G.
Life Care Plan Cost Sheets

## LIFE CARE COSTS

**Item/Service**: Case Mangement

**Date Information Obtained**:    June 2024

**Name of Company/Provider/Facility/School**:
Purpose in Hope in Home Care. LLC

**Address**:
2178 A Savannah Hwy., Suite A
Charleston, SC 29414

**Phone**: (843) 964-9750

**Name of Person Spoken To**:
Katrina
Confirmed provides services in Columbia/Rock Hill area

**Cost Information**:
$25.00 to $28.00 per hour

**Replacement rate**:
Current Age to Age 6: 4 hours daily Monday through Friday
Age 6 to Age 21: School days four hours daily, Non-school days 8 hours
daily

USA-017118

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 134 of 432
PageID.8142



**MUSC Health**
Medical University of South Carolina

# Estimate for OFFICE/OUTPT VISIT,EST,LEVL III

This is an estimate for the cost of services at the MUSC Health location you have selected, and is not a guarantee.
To request more information, please email: guest-estimates@musc.edu or if you would like to speak to a representative
regarding this estimate, call customer service at: 843-792-2311 or 1-800-598-0624. The below reference number will be
needed to locate your estimate. Please print a copy of this estimate for your records.
To schedule an appointment, please call 843-792-1414.

| You Pay | Reference #2280271 |
|---|---|
| **$143** | |
| Subtotal | $285 |
| Discount | -$143 |

| Details | |
|---|---|
| Total fees | $285 |
| Hospital fees | $106 |
| Physician fees | $179 |
| Discount (50%) | -$143 |
| You pay | $143 |

Coverage Information
**No insurance (self-pay)**

Service Location
**Muscp Providence Health Downtown**

6/20/2024 2:47 PM

USA-017115

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 135 of 432
PageID.8143

## Disclaimer

Disclaimer

Terms and Conditions: I acknowledge that this is just an estimate of what I would pay and does not represent a guarantee. The actual expense of my visit or procedure may be higher or lower than this estimate. The estimate may not include the fees charged by providers, which may include anesthesiologists, pathologists, radiologists, physicians, surgeons, and others.

Accepted on 6/20/24

Created 6/20/24 with MUSC Health.

Valid for 30 days.

## Questions?

If you need any help or have questions about your estimate, please contact our customer service department at 843-792-2311.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

USA-017420

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 136 of 432
PageID.8144



**MUSC Health**
Medical University of South Carolina

# Estimate for Office/Outpt Visit, Est, Level IV

This is an estimate for the cost of services at the MUSC Health location you have selected, and is not a guarantee.
To request more information, please email: guest-estimates@musc.edu or if you would like to speak to a representative
regarding this estimate, call customer service at: 843-792-2311 or 1-800-598-0624. The below reference number will be
needed to locate your estimate. Please print a copy of this estimate for your records.
To schedule an appointment, please call 843-792-1414.

| You Pay | Reference #2280273 |
|---|---|
| **$183** | |
| Subtotal | $365 |
| Discount | -$183 |

| Details | |
|---|---|
| Total fees | $365 |
| Hospital fees | $106 |
| Physician fees | $259 |
| Discount (50%) | -$183 |
| You pay | $183 |

**Coverage Information**
**No insurance (self-pay)**

**Service Location**
**Muscp Providence Health Downtown**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 137 of 432
PageID.8145

## Disclaimer

Disclaimer

Terms and Conditions: I acknowledge that this is just an estimate of what I would pay and does not represent a guarantee. The actual expense of my visit or procedure may be higher or lower than this estimate. The estimate may not include the fees charged by providers, which may include anesthesiologists, pathologists, radiologists, physicians, surgeons, and others.

Accepted on 6/20/24

Created 6/20/24 with MUSC Health.

Valid for 30 days.

## Questions?

If you need any help or have questions about your estimate, please contact our customer service department at 843-792-2311.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 138 of 432
PageID.8146



# Estimate for OFFICE/OUTPT VISIT,EST,LEVL V

This is an estimate for the cost of services at the MUSC Health location you have selected, and is not a guarantee.
To request more information, please email: guest-estimates@musc.edu or if you would like to speak to a representative
regarding this estimate, call customer service at: 843-792-2311 or 1-800-598-0624. The below reference number will be
needed to locate your estimate. Please print a copy of this estimate for your records.
To schedule an appointment, please call 843-792-1414.

## You Pay          Reference #2280272

# $248

| | |
|---|---|
| Subtotal | $495 |
| Discount | -$248 |

## Details

| | |
|---|---|
| Total fees | $495 |
| Hospital fees | $106 |
| Physician fees | $389 |
| Discount (50%) | -$248 |
| You pay | $248 |

Coverage Information
**No insurance (self-pay)**

Service Location
**Musc Health Charleston**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 139 of 432
PageID.8147

# Disclaimer

Disclaimer

Terms and Conditions: I acknowledge that this is just an estimate of what I would pay and does not represent a guarantee. The actual expense of my visit or procedure may be higher or lower than this estimate. The estimate may not include the fees charged by providers, which may include anesthesiologists, pathologists, radiologists, physicians, surgeons, and others.

Accepted on 6/20/24

Created 6/20/24 with MUSC Health.

Valid for 30 days.

# Questions?

If you need any help or have questions about your estimate, please contact our customer service department at 843-792-2311.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

USA4017824

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 140 of 432
PageID.8148

## Estimates

< Back to procedure selection

Selected Facility: **Beaufort Memorial**
Selected Services

▤    99213 – PATIENT OFFICE CONSULTATION, LEVEL 3

| Reset and Start Over | > |
| FAQs & Definitions of Terms | > |

Patient Estimates (Patient Responsibility)

See your estimated cost below.

| Hospital | ⌄ |
| Professional | ⌄ |

Combined    ⌃



$234.00

■ You Pay

| Total Charges | | $390.00 |
| Your estimated service cost | = | $390.00 |
| "Uninsured Discount – 40%" discount | – | $156.00 |
| Your cost after discount | = | $234.00 |

🖶 Print    ❶ Show discount plans

6/20... USA4017125 ...M

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 141 of 432
PageID.8149

## Insurance Information

You have selected to be uninsured.
* If you have secondary insurance coverage, your estimate could be lower.

✎ Edit Insurance Info

## Reference Number

14FX5OX2

## Disclaimer Statement

The information provided is a hospital estimate and is not a guarantee of final billed charges. Final billed charges may vary from hospital estimates for many reasons, including the patient's medical condition, unknown circumstances or complications, final diagnosis and recommended treatment ordered by the physician. Professional fees, such as physician, radiologist, anesthesiologist and pathologist fees are not included in this estimate. Insurance benefit information (where applicable) is based on information provided by your insurance company as of the date of this estimate. Benefits and eligibility are subject to change and are not a guarantee of payment.

# Estimates

< Back to procedure selection

Selected Facility: **Beaufort Memorial**
Selected Services

| 70450 CT SCAN, HEAD OR BRAIN, WITHOUT CONTRAST |
|---|

| Reset and Start Over | > |
|---|---|
| FAQs & Definitions of Terms | > |

Patient Estimates (Patient Responsibility)

See your estimated cost below.



Hospital

$1,534.00

■ You Pay

| Total Charges | | $2,557.00 |
|---|---|---|
| **Your estimated service cost** | = | $2,557.00 |
| "Uninsured Discount – 40%" discount | – | $1,022.80 |
| **Your cost after discount** | = | $1,534.00 |



🖶 Print    ℹ Show discount plans

---

Insurance Information

You have selected to be uninsured.
* If you have secondary insurance coverage, your estimate could be lower.

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 143 of 432
PageID.8151



Edit Insurance Info

---

Reference Number

PE4WQOAN

---

Disclaimer Statement

The information provided is a hospital estimate and is not a guarantee of final billed charges. Final billed charges may vary from hospital estimates for many reasons, including the patient's medical condition, unknown circumstances or complications, final diagnosis and recommended treatment ordered by the physician. Professional fees, such as physician, radiologist, anesthesiologist and pathologist fees are not included in this estimate. Insurance benefit information (where applicable) is based on information provided by your insurance company as of the date of this estimate. Benefits and eligibility are subject to change and are not a guarantee of payment.

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 144 of 432
PageID.8152



# Estimate for CT SCAN,HEAD/BRAIN,W/O CONTRAST ...

This is an estimate for the cost of services at the MUSC Health location you have selected, and is not a guarantee.
To request more information, please email: guest-estimates@musc.edu or if you would like to speak to a representative
regarding this estimate, call customer service at: 843-792-2311 or 1-800-598-0624. The below reference number will be
needed to locate your estimate. Please print a copy of this estimate for your records.
To schedule an appointment, please call 843-792-1414.

| You Pay | Reference #2278346 |
|---|---|
| **$851** | |
| Subtotal | $1,701 |
| Discount | -$851 |

| Details | |
|---|---|
| Total fees | $1,701 |
| Hospital fees | $1,345 |
| Physician fees | $356 |
| Discount (50%) | -$851 |
| You pay | $851 |

Coverage Information
**No insurance (self-pay)**

Service Location
**Muscp Providence Health Downtown**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 145 of 432
PageID.8153

# Disclaimer

Disclaimer

Terms and Conditions: I acknowledge that this is just an estimate of what I would pay and does not represent a guarantee. The actual expense of my visit or procedure may be higher or lower than this estimate. The estimate may not include the fees charged by providers, which may include anesthesiologists, pathologists, radiologists, physicians, surgeons, and others.

Accepted on 6/20/24

Created 6/20/24 with MUSC Health.

Valid for 30 days.

# Questions?

If you need any help or have questions about your estimate, please contact our customer service department at 843-792-2311.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

USA-017130



**Prisma Health**
**PO Box 100147**
**Columbia, SC 29202-3147**

**Patient Name**



2529889



Welcome to Prisma Health!

We are committed to providing the highest quality care to you and understand that trust is based on transparency. Our partnership in your care is extremely important and relies on open communication and understanding.

We want you to have a clear understanding of your financial responsibility for the services you will be receiving. To that end, this letter includes an estimate for your scheduled procedure. Please note that the estimate indicates your anticipated financial responsibility for healthcare services provided by Prisma Health on the date of your scheduled procedure.

We will also provide a consolidated statement to you for any outstanding balances.

- The consolidated statement will indicate outstanding balances for any hospital or physician practice visits.
- The consolidated statement can be viewed and paid in MyChart.

Please be advised, Prisma Health has providers that utilize a billing system for certain sub-specialties which are billed separately from Prisma Health's Epic MyChart billing system. This includes but are not limited to:

- Anesthesia Services
- Laboratory/Pathology Services
- Radiology Services

If you have any questions or concerns about your financial responsibility, please contact our customer service team at 833-425-0404.

USA-017131



**Patient Name:** ⬛⬛⬛⬛⬛⬛
**MRN: No patient ID available**
**DOB:**
**Service date: 6/19/2024**

Dear  :

To prepare for your upcoming visit at Prisma Health on **6/19/2024**, we are providing you an estimate of your scheduled services. Please note that this estimate is based on you being listed as a self-pay (uninsured or choosing not to file your insurance) patient in our system.  Based on your anticipated visit, we calculate an estimate of **$1,292.85** for this visit. However, if you have insurance coverage, please update your insurance information in your MyChart account or call the appropriate number below to provide this information.

If you have questions about your financial responsibility shown, please call customer service at 833-425-0404.

| Your estimated responsibility | |
|---|---|
| **1,292.85** | |
| Subtotal | **1,989.00** |
| Discounts | **-696.15** |

Does not include external provider fees

| Details | |
|---|---|
| Hospital fees | **1,989.00** |
| Discounts | **-696.15** |
| Your estimated responsibility | **1,292.85** |

## Patient Diagnosis/Diagnoses
—

*(handwritten: 1989.00 / 181 / 2170.00)*

USA-017132

**PRISMA**
HEALTH.

**Patient Name:** ▓▓▓▓▓▓▓
**MRN: No patient ID available**
**DOB:**
**Service date: 6/19/2024**

Prisma Health - Hospital Charge Detail
701 Grove Road, GREENVILLE SC 29605-5611                                              NPI: 1649726738

| Code | Description | Qty | Amount |
|---|---|---|---|
| 70450 | HC CT Head W/O Contrast | 1 | 1,989.00 |
| | Discounts | | -696.15 |
| | **Your responsibility for charges billed by Prisma Health** | | **1,292.85** |

External Provider Fees
Your visit includes care from providers who will send a separate bill. The fees billed by these providers are not included in the totals above. An estimate of these additional fees and the providers' contact information are included below for your convenience. The final billed charges might be different from the expected charges listed here.

Prisma Health Medical Group dba Department of Radiology -
Physician Charge Detail                                                        Phone: 800-666-1816
PO BOX 602284, CHARLOTTE NC 28260-2284                        Tax ID: 571004971    NPI: 1568799955

| Code | Description | Qty | Amount |
|---|---|---|---|
| 70450 | CT Scan,Head/Brain,W/O Contrast Matl | 1 | 181.00 |
| | Discounts/Adjustments | | -63.35 |
| | **Your responsibility for charges billed by Prisma Health Medical Group dba Department of Radiology** | | **117.65** |

Estimate ID: 2529889          Created: 6/19/2024          Page 3 of 4
                              Expires: 7/19/2024
                              Printed: 06/19/24

USA-017133

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 149 of 432
PageID.8157

# Estimates

< Back to procedure selection

---

Selected Facility: **Beaufort Memorial**
Selected Services

| 70551 BRAIN WO CONT |
|---|

| Reset and Start Over | > |
|---|---|
| FAQs & Definitions of Terms | > |

Patient Estimates (Patient Responsibility)

See your estimated cost below.



**Hospital** ⌃

$2,100.00

■ You Pay

| Total Charges | | $3,500.00 |
|---|---|---|
| Your estimated service cost | = | $3,500.00 |
| "Uninsured Discount – 40%" discount | – | $1,400.00 |
| Your cost after discount | = | $2,100.00 |



🖶 Print    ⓘ Show discount plans

---

## Insurance Information

You have selected to be uninsured.
* If you have secondary insurance coverage, your estimate could be lower.

6/20/2022, 11:34AM    USA-017134

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 150 of 432
PageID.8158

 Edit Insurance Info

Reference Number

8F10M24T

Disclaimer Statement

The information provided is a hospital estimate and is not a guarantee of final billed charges. Final billed charges may vary from hospital estimates for many reasons, including the patient's medical condition, unknown circumstances or complications, final diagnosis and recommended treatment ordered by the physician. Professional fees, such as physician, radiologist, anesthesiologist and pathologist fees are not included in this estimate. Insurance benefit information (where applicable) is based on information provided by your insurance company as of the date of this estimate. Benefits and eligibility are subject to change and are not a guarantee of payment.

USA-047135

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 151 of 432
PageID.8159



## Estimate for MRI BRAIN

This is an estimate for the cost of services at the MUSC Health location you have selected, and is not a guarantee.
To request more information, please email: guest-estimates@musc.edu or if you would like to speak to a representative
regarding this estimate, call customer service at: 843-792-2311 or 1-800-598-0624. The below reference number will be
needed to locate your estimate. Please print a copy of this estimate for your records.
To schedule an appointment, please call 843-792-1414.

| You Pay | Reference #2278354 |
|---|---|
| **$1,297** | |
| Subtotal | $2,593 |
| Discount | -$1,297 |

| Details | |
|---|---|
| Total fees | $2,593 |
| Hospital fees | $1,668 |
| Physician fees | $925 |
| Discount (50%) | -$1,297 |
| You pay | $1,297 |

Coverage Information
**No insurance (self-pay)**

Service Location
**Muscp Providence Health Downtown**

USA-017136

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 152 of 432
PageID.8160

## Disclaimer

Disclaimer

Terms and Conditions: I acknowledge that this is just an estimate of what I would pay and does not represent a guarantee. The actual expense of my visit or procedure may be higher or lower than this estimate. The estimate may not include the fees charged by providers, which may include anesthesiologists, pathologists, radiologists, physicians, surgeons, and others.

Accepted on 6/20/24

Created 6/20/24 with MUSC Health.

Valid for 30 days.

## Questions?

If you need any help or have questions about your estimate, please contact our customer service department at 843-792-2311.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

USA-013137

Case 1:22-cv-00396-LEK-KJM      Document 235      Filed 11/19/24      Page 153 of 432
PageID.8161



Your secure online health connection

# Estimate for MRI scan of brain without contrast

Estimates provided are not a contract for the actual amount that you may be required to pay. These are not quotes or guarantees of pricing, and you should not rely on these estimates to be the final amount you may owe. You will be responsible for paying the actual amount you owe based on services provided and insurance coverage as the estimate does not include any unknown or unexpected costs that may arise during treatment.

You could be charged more if complications or special circumstances occur, for example your provider's treatment choices and/or details of your insurance coverage. There is no guarantee that your insurance will provide coverage, so please check with your plan to confirm.

| You Pay | Reference #2534769 |
| --- | --- |
| **$2,262** | |
| Subtotal | $3,480 |
| Discount | -$1,218 |

| Details | |
| --- | --- |
| Total fees | $3,480 |
| Hospital fees | $3,480 |
| Discount (35%) | -$1,218 |
| You pay | $2,262 |

Your service also has an estimated $247 in fees from external providers, which are not included in the totals above.

Coverage Information
**No insurance (self-pay)**

USA-01-0138

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 154 of 432
PageID.8162

## Disclaimer

Estimates provided are not a contract for the actual amount that you may be required to pay. These are not quotes or guarantees of pricing, and you should not rely on these estimates to be the final amount you may owe. You will be responsible for paying the actual amount you owe based on services provided and insurance coverage as the estimate does not include any unknown or unexpected costs that may arise during treatment.

You could be charged more if complications or special circumstances occur, for example your provider's treatment choices and/or details of your insurance coverage. There is no guarantee that your insurance will provide coverage, so please check with your plan to confirm.

Accepted on 6/20/24

Created 6/20/24 with Prisma Health.

Retain for 30 days.

## Questions?

If you need any help or have any questions about your estimate, please review the attached letter for additional detail and contact information.

MyChart by Epic

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

USA-017139

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 155 of 432
PageID.8163

Genworth    Pay Online    Login ▾

Home / Aging & You / Finances / Cost Of Care

## Cost of Care Survey

The world's population is aging at a faster rate than ever before and people are living longer. Every day until 2030, 10,000 Baby Boomers will turn 65[a] and 7 out of 10 people will require **long term care**ⓘ in their lifetime.[b]

The cost of that care varies based on care setting, geographic location of care and level of care required, among other things. Using Genworth's Cost of Care Survey tool below, you and your family can calculate the cost of long term care across the U.S. Understanding what the median cost is today is a first step to helping you plan for it.

### Calculate the Cost of Care in your area

ENTER AND SELECT CITY, STATE OR ZIP CODE ⓘ

Columbia, SC                                    🔍

Compare Location

SELECT COST BY PERIOD ⓘ

( HOURLY )   ( DAILY )   ( MONTHLY )   ( ANNUAL )

CALCULATE FUTURE COST

○

2023    2033    2043    2053    2063    2073

Reset

## Hourly Median Costs:
### Columbia (2023)

| In-Home Careⓘ | 2023 |
| --- | --- |
| Home Maker Services[1] | $28.00 |
| Home Health Aide[1] | $30.00 |

Adult Day Health Care, Assisted Living Facility, and Nursing Home Facility categories do not use hourly rates.

📄 Print to PDF

### Next Steps: Plan for Long Term Care



**Key Cost of Care Findings**

Review the trends occurring across the long term care service landscape.

USA-017140

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 156 of 432
PageID.8164



**Find Quality Care**

The CareScout Quality Network includes high-quality home care agencies that offer special pricing to Genworth Life Insurance Company long-term care policyholders.



**Coverage Needs Estimator**

Register/Login to see how estimated future coverage may align with potential long term care needs.

*Not available for all policy forms.*



**How to Pay for Care?**

Understanding the different settings and ways to pay for care.

## About Cost of Care Survey

Since 2004, Genworth has tracked the cost of long term care services nationwide to help families understand and plan for their long term care needs. The survey results have become the foundation for long term care planning. Get answers to frequently asked questions and additional details into the research methodology used for the Genworth Cost of Care Survey.

### Frequently asked questions about the Cost of Care Survey

USA-017141

Case 1:22-cv-00396-LEK-KJM     Document 235     Filed 11/19/24     Page 157 of 432
PageID.8165

When and how was the cost of care survey conducted?

How many providers completed the survey?

How are the providers selected for the survey?

Were there any updates to this year's survey?

How many regions are included in the survey? What are Metropolitan Statistical Areas (MSAs)?

Why is 44 hours the defaulted selection for in-home care?

Who is CareScout?

What are the different types of Caregivers?

What are the different types of care settings?

a. "2020 Census Will Help Policymakers Prepare for the Incoming Wave of Aging Boomers" (census.gov), site accessed 02/22/24.

b. 2024 U.S. Department of Health and Human Services (https://acl.gov/ltc/basic-needs/how-much-care-will-you-need). Site accessed 02/22/24.

c. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Home Health Aides and Personal Care Aides, on the Internet at https://www.bls.gov/ooh/healthcare/home-health-aides-and-personal-care-aides.htm (visited 02/22/24).

d. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Nursing Assistants and Orderlies, on the Internet at https://www.bls.gov/ooh/healthcare/nursing-assistants.htm (visited 02/22/24).

e. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Licensed Practical and Licensed Vocational Nurses, on the Internet at https://www.bls.gov/ooh/healthcare/licensed-practical-and-licensed-vocational-nurses.htm (visited 02/22/24).

f. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Registered Nurses, on the Internet at https://www.bls.gov/ooh/healthcare/registered-nurses.htm (visited 02/22/24).

Genworth Cost of Care Survey, December 2023

1. As reported hourly cost

206401A3D 02/22/24

Aging & Long Term Care

Products

Our Company

For Individuals

For Business Partners

Need Help? Call Us:

Home  ·  Site Map  ·  Privacy  ·

Notice at Collection  ·  Terms of Use  ·

Fraud and Information Protection  ·  Accessibility  ·

United States

Our financial products are offered/underwritten by one or more of the following: Genworth Life and Annuity Insurance Company; Genworth Life Insurance Company; Genworth Life Insurance Company of New York (only Genworth Life Insurance Company of New York is admitted in and conducts business in New York); Genworth Mortgage Insurance Corporation; Genworth Mortgage Insurance Corporation of North Carolina; Genworth Financial Assurance Corporation.

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 158 of 432 PageID.8166

© 2024 Genworth Financial, Inc. All rights reserved.

USA-017143

Home Health Aides and Personal Care Aides, on the internet at https://www.bls.gov/ooh/healthcare/home-health-aides-and-personal-care-aides.htm (visited 02/22/24)

d. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Nursing Assistants and Orderlies, on the internet at https://www.bls.gov/ooh/healthcare/nursing-assistants.htm (visited 02/22/24).

e. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Licensed Practical and Licensed Vocational Nurses, on the internet at https://www.bls.gov/ooh/healthcare/licensed-practical-and-licensed-vocational-nurses.htm (visited 02/22/24)

f. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Registered Nurses, on the internet at https://www.bls.gov/ooh/healthcare/registered-nurses.htm (visited 02/22/24).

Genworth Cost of Care Survey, December 2023
1. Based on annual rate divided by 12 months (assumes 44 hours per week)
2. Based on annual rate divided by 12 months
3. As reported, monthly rate, private, one bedroom

206401A3D 02/22/24

Aging & Long Term Care

Products

Our Company

For Individuals

For Business Partners

Need Help? Call Us:

Home  ·  Site Map  ·  Privacy  ·

Notice at Collection  ·  Terms of Use  ·

Fraud and Information Protection  ·  Accessibility  ·

United States

Our financial products are offered/underwritten by one or more of the following: Genworth Life and Annuity Insurance Company; Genworth Life Insurance Company; Genworth Life Insurance Company of New York (only Genworth Life Insurance Company of New York is admitted in and conducts business in New York); Genworth Mortgage Insurance Corporation; Genworth Mortgage Insurance Corporation of North Carolina; Genworth Financial Assurance Corporation.

© 2024 Genworth Financial, Inc. All rights reserved.

USA-017144

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 160 of 432
PageID.8168

Genworth    Pay Online    Login

Home / Aging & You / Finances / Cost Of Care

## Cost of Care Survey

The world's population is aging at a faster rate than ever before and people are living longer. Every day until 2030, 10,000 Baby Boomers will turn 65[a] and 7 out of 10 people will require **long term care** in their lifetime.[b]

The cost of that care varies based on care setting, geographic location of care and level of care required, among other things. Using Genworth's Cost of Care Survey tool below, you and your family can calculate the cost of long term care across the U.S. Understanding what the median cost is today is a first step to helping you plan for it.

### Calculate the Cost of Care in your area

ENTER AND SELECT CITY, STATE OR ZIP CODE ⓘ

Charleston Area, SC    🔍

Compare Location

SELECT COST BY PERIOD ⓘ

( HOURLY )  ( DAILY )  ( MONTHLY )  ( ANNUAL )

CALCULATE FUTURE COST

○
2023    2033    2043    2053    2063    2073

Reset

## Monthly Median Costs:
### Charleston Area, SC (2023)

| In-Home Care ⓘ | 2023 |
|---|---|
| Home Maker Services[1] | $5,720 |
| Home Health Aide[1] | $6,578 |
| **Community and Assisted Living** ⓘ | **2023** |
| Adult Day Health Care[2] | $1,560 |
| Assisted Living Facility[3] | $4,023 |
| **Nursing Home Facility** ⓘ | **2023** |
| Semi-Private Room[2] | $8,775 |
| Private Room[2] | $9,977 |

🗎 Print to PDF

**Change weekly In-Home Care hours**
*(Only available with Daily, Monthly, or Annual Cost by Period)*

### Next Steps: Plan for Long Term Care



**Key Cost of Care Findings**

Review the trends occurring across the long term care service landscape.



USA-017145

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 161 of 432
PageID.8169



**Find Quality Care**

The CareScout Quality Network includes high-quality home care agencies that offer special pricing to Genworth Life Insurance Company long-term care policyholders.



**Coverage Needs Estimator**

Register/Login to see how estimated future coverage may align with potential long term care needs.

*Not available for all policy forms.*



**How to Pay for Care?**

Understanding the different settings and ways to pay for care.

## About Cost of Care Survey

Since 2004, Genworth has tracked the cost of long term care services nationwide to help families understand and plan for their long term care needs. The survey results have become the foundation for long term care planning. Get answers to frequently asked questions and additional details into the research methodology used for the Genworth Cost of Care Survey.

## Frequently asked questions about the Cost of Care Survey

When and how was the Cost of Care survey conducted?

How many providers completed the survey?

How are the providers selected for the survey?

Were there any updates to this year's survey?

How many regions are included in the survey? What are Metropolitan Statistical Areas (MSAs)?

Why is 44 hours the defaulted selection for in-home care?

Who is CareScout?

What are the different types of Caregivers?

What are the different types of care settings?

In Home Care Options

**Homemaker Services:** Services providing help with household tasks that cannot be managed alone. Homemaker services includes "hands-off" care such as cooking, cleaning and running errands.

USA-017146

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 162 of 432
PageID.8170

**Home Health & Community Care:** these services offer help to people who need supervision or assistance with "hands-on" personal care, but not medical care. The rate listed here is the rate charged by a non-Medicare certified, licensed agency.

### Community Option

**Adult Day Health Care (ADC):** Provides social and support services in a community-based, protective setting. Various models are designed to offer socialization, supervision and structured activities. Some programs may provide personal care, transportation, medical management and meals.

### Facility Options

**Assisted Living Facility (ALF):** Residential arrangements providing personal care and health services. The level of care may not be as extensive as that of a nursing home. Assisted living is often an alternative to a nursing home, or an intermediate level of long term care. Assisted Living Facilities are referred to as Residential Care Facilities in California.

**Nursing Home Care:** These facilities often provide a higher level of supervision and care than Assisted Living Facilities. They offer residents personal care assistance, room and board, supervision, medication, therapies and rehabilitation, and on-site nursing care 24 hours a day.

Learn more about Long Term Care and the choices in care settings

a. "2020 Census Will Help Policymakers Prepare for the Incoming Wave of Aging Boomers" (census.gov), site accessed 02/22/24.

b. 2024 U.S. Department of Health and Human Services (https://acl.gov/ltc/basic-needs/how-much-care-will-you-need). Site accessed 02/22/24.

c. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Home Health Aides and Personal Care Aides, on the Internet at https://www.bls.gov/ooh/healthcare/home-health-aides-and-personal-care-aides.htm (visited 02/22/24).

d. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Nursing Assistants and Orderlies, on the internet at https://www.bls.gov/ooh/healthcare/nursing-assistants.htm (visited 02/22/24).

e. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Licensed Practical and Licensed Vocational Nurses, on the Internet at https://www.bls.gov/ooh/healthcare/licensed-practical-and-licensed-vocational-nurses.htm (visited 02/22/24).

f. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Registered Nurses, on the Internet at https://www.bls.gov/ooh/healthcare/registered-nurses.htm (visited 02/22/24).

Genworth Cost of Care Survey, December 2023

1. Based on annual rate divided by 12 months (assumes 44 hours per week)
2. Based on annual rate divided by 12 months
3. As reported, monthly rate, private, one bedroom

206401A3D 02/22/24

**Aging & Long Term Care**

**Products**

**Our Company**

**For Individuals**

**For Business Partners**

**Need Help? Call Us:**

Home  •  Site Map  •  Privacy  •

Notice at Collection  •  Terms of Use  •

Fraud and Information Protection  •  Accessibility  •

United States

Our financial products are offered/underwritten by one or more of the following: Genworth Life and Annuity Insurance Company; Genworth Life Insurance Company; Genworth Life Insurance Company of New York (only Genworth Life Insurance Company of New York is admitted in and conducts business in New York); Genworth Mortgage Insurance Corporation; Genworth Mortgage Insurance Corporation of North Carolina; Genworth Financial Assurance Corporation.

© 2024 Genworth Financial, Inc. All rights reserved.

USA-017147

# MUELLER* & PARTIN, INC.

**Forensic Accountants and Economists**

816 EVERGREEN POINT ROAD
P.O. BOX 882
MEDINA, WASHINGTON 98039

PHONE:        (425) 455-0303
FACSIMILE:    (425) 455-5176
EMAIL: partin@muellerpartin.com

*Gary E. Mueller - Retired

June 28, 2024

Dana Barbata
United States Attorney's Office (Hawaii)
PJKK Federal Building, Room 6-100
300 Ala Moana Blvd.
Honolulu, HI 96850

Re:    *Tyler and Jenna Grenier and J.A.G. v. The United States of America*

Dear Ms. Barbata:

In accordance with the terms of our engagement, this report summarizes our evaluation of
the present value of lost future earnings and life care plan costs for J████ Grenier resulting
from alleged improper medical care during J████ birth on July 7, 2021.

## BACKGROUND

J████ Grenier is the son of Tyler and Jenna Grenier. He was born July 7, 2021 at Tripler
Army Medical Center in Honolulu, Hawaii. Plaintiffs allege J████ suffered injuries
resulting in permanent disability from medical care provided at the time of his birth.

## SCOPE

Mueller & Partin, Forensic Accountants and Economists, has been engaged by the United
States Attorney's Office to evaluate economic damages asserted by Plaintiffs resulting
from alleged medical malpractice that occurred at the time of J████ birth on July 7, 2021.
Our work on this project included analysis of the following documents:

- Complaint.

- Economic damages report by Thomas Loudat, Ph.D., dated March 12, 2024.

- Deposition of Thomas Loudat, Ph.D., taken May 23, 2024.

- Deposition of Gary Yarkony, M.D., taken May 16, 2024.

- Life Care Plan and Vocational Assessment by John Fountaine, dated June 21, 2024.



EXHIBIT

D-9

June 28, 2024
Dana Barbata
Page **2** of **11**

The analysis and opinions in this report are based on the information listed above, the education and experience of the authors in performing similar financial analyses and economic damage calculations, accepted damages methodologies and approaches, and relevant case law. Mr. Partin has been qualified as an expert and presented testimony on numerous occasions in courts throughout the United States in litigation involving the measurement of economic damages and business valuation. He is a Certified Public Accountant (CPA), Accredited in Business Valuation (ABV), certified as a Master Analyst in Financial Forensics (MAFF), and a Certified Fraud Examiner (CFE). Mr. Lesoing is a senior associate at Mueller & Partin and has consulted on hundreds of litigation matters since joining the firm in 2007. The authors' curriculum vitae, fee schedule and history of court testimony are included as Attachment 53 to this report.

Our work on this project did not constitute an audit, review or compilation of financial statements as those terms are defined by the American Institute of Certified Public Accountants. We accepted information provided to us as accurate for purposes of this report. We performed analytical procedures as considered relevant in the circumstances to evaluate economic damages claimed. This report is intended solely for your use in connection with the above-referenced matter and should not be used for any other purpose.

## ANALYSIS

We analyzed the information produced as support for the economic loss claim resulting from the alleged medical malpractice. This report includes Attachments 1 – 52, which contain our calculations and other information relied upon. Our analysis considered the following elements of economic damages:

- J████ Grenier's projected future earnings and employment benefits "but for" the alleged medical malpractice.

- Less any residual projected future earnings and employment benefits "given" the alleged medical malpractice.

- Present value of recommended future life care plan expenses.

Vocational Opinions

We analyzed the life care plan and vocational assessment by John Fountaine dated June 21, 2024. Mr. Fountaine stated the following in his report:

June 28, 2024
Dana Barbata
Page **3** of **11**

- *"I have consulted with Dr. Burns regarding Jon███ future care needs, including reviewing Dr. Yarkony's Life Care Plan. Dr. Burns has opined J███ will likely be potty trained by at least age 8, will require pediatrician/PM&R, neurology, neuropsychological, and dental evaluations, imaging, therapies, hair replacement, tutoring, case management, vocational/avocational assistance and home/residential care. Dr. Burns provided opinions including a best-case/worst-case scenario for Jon███ level of care. The Life Care Plan attached has been reviewed and approved by Dr. Burns."*

- *"Ms. Grenier graduated from Bayside High School in 2017. She attended for approximately two years at Florida Atlantic University in Boca Raton, Florida completing courses toward a Bachelor's of Studio Art Degree before switching her major to a Bachelor of Science in Elementary Education. Ms. Grenier indicated she is currently completing the requirements to obtain her Bachelor of Science Degree in Elementary Education. She estimated she will have this completed by July or August of 2024. It is her goal to work as an Elementary School Teacher."*

- *"Corporal Grenier is a high school graduate and is currently an E-4 Corporal in the United States Marine Corps. He was working toward a Special Duty Assignment at a Recruiter and planned to attend training toward this goal in San Diego, California prior to transfer to another assignment. Corporal Grenier indicated prior to enlisting in the United States Marine Corps he worked at a grocery store, a local gym, and Einstein Bagels."*

- *"Based on Jon███ parents' educational and the available data on educational attainment of Americans in general, it is my opinion, unimpaired, J███ would have likely obtained employment and earned wages comparable with individuals who obtain an associate degree, on the low end, and a bachelor's degree on the high end. Jon███ ability to work in future is unknown, however, it appears unlikely that he will obtain and maintain regular full-time competitive employment. For the purposes of this report, I have assumed J███ retains no future earning capacity. Vocational and avocational assistance has been recommended in the attached Life Care Plan to assist J███ in identifying work or work-like options as an adult."*

Distribution of Educational Attainment in the United States

An individual's likely future earnings are highly correlated with their level of educational attainment. The table below shows the proportion of the U.S. population (males, ages 25 – 29) by level of educational attainment in 2022:[1]

---

[1] U.S. Census Bureau, Current Population Survey Annual Social and Economic Supplement.

June 28, 2024
Dana Barbata
Page **4** of **11**

|                                         | % of Population |
| --------------------------------------- | --------------- |
| Less than High School                   | 6.1%            |
| High School Graduate (Incl. GED)        | 33.1%           |
| Some College, No Degree                 | 17.4%           |
| Associate Degree                        | 8.3%            |
| Bachelor's Degree                       | 27.3%           |
| Master's, Professional, Doctoral        | 7.8%            |

More than half (56.5%) of the U.S. male population between the ages of 25-29 does not hold a college degree of any type in 2022. The two most common levels of educational attainment in the United States are high school diploma and bachelor's degree. Some college, no degree is significantly more common than an associate degree. We conclude the most common level of educational attainment, absent consideration of factors specific to the individual, ranges between high school diploma and associate degree. However, numerous researchers have concluded that a child's educational attainment is correlated with the educational attainment of their parents and other household socio-economic factors, as discussed below.

Statistical Probability of Educational Attainment

The Kane-Spizman probit model (2020) assesses the probability of eight potential levels of educational attainment for a given individual based on their socio-economic characteristics.[2] We provided analysis utilizing Model II from the 2020 article to establish a probability distribution of educational attainment outcomes for Jo███ We chose Model II because it excludes coefficients regarding the parents' level of income, for which supporting information has not been produced by J█████ parents in this matter. Our analysis results in the following probability distribution for each of the eight possible educational outcomes:[3]

---

[2] Lawrence Spizman and John Kane, "Update of Educational Attainment Model for a Minor Child: Round 18 of NLSY (1997)," Journal of Forensic Economics 29(1), 2020, pp. 131-141.
[3] A summary of the model inputs utilized in the calculation is shown on Attachment 3.

June 28, 2024
Dana Barbata
Page **5** of **11**

| Education Level | Individual Probability |
|---|---|
| < High School Diploma | 3.48% |
| GED Certificate | 7.68% |
| High School Diploma | 45.07% |
| Associate Degree | 10.33% |
| Bachelor's Degree | 24.63% |
| Master's Degree | 6.97% |
| Ph.D. Degree | 0.61% |
| Professional Degree (M.D., J.D., etc.) | 1.23% |

Analysis of the above indicates 56.2% of males living in a household with the same characteristics as J█████ would obtain a high school diploma or less. This would indicate that, on a more-probable-than-not basis, J█████ would not have attained education beyond a high school diploma.

General Assumptions

Our analysis of the economic loss utilized the following general assumptions:

- Our calculations are stated in present value dollars as of December 2, 2024 (anticipated date of trial).

- We assumed a remaining life expectancy consistent with the average remaining life expectancy for males, age 3.41 (J█████ age at date of valuation), based on United States life expectancy tables (refer to Attachment 30).

- We assumed a remaining work life expectancy consistent with the average remaining work life expectancy of males with each of the assumed educational attainment levels, as shown on Attachments 30 – 36.[4]

- Work life estimates measure participation in the labor force; participation is defined as either working or unemployed but looking for work. Therefore, when work life tables are used to determine the number of years of future labor force participation, they must be adjusted for the fact that estimates, when applied to earnings loss calculations, will result in an overstatement of the number of years an individual produces earned income. The most accepted method of making the adjustment is to apply the unemployment rate for the general population to each year of the work life statistic, resulting in a consistent reduction of earnings over the course of the

---

[4] As reported by Skook, Ciecka, and Krueger, "The Markov Model of Labor Force Activity," Journal of Forensic Economics, Vol. 28, No. 1 – 2.

June 28, 2024
Dana Barbata
Page **6** of **11**

- work life estimate, eliminating the overstatement. The average unemployment rate over the last 20 years for males in the United States with each of the assumed educational attainment levels is shown on Attachments 37 – 40. We accordingly adjusted J█████ projected annual wages for the probability of employment by the average rate of unemployment in the United States and then added back estimated unemployment income received during periods of unemployment.[5]

- We assumed J██████ earnings from employment would have followed the average life cycle earnings for males with each of the assumed educational attainment levels, working full-time, year-round in the United States, as shown on Attachments 21 – 28.[6] The lifetime earnings cycle methodology incorporates the concept that an individual's earnings rate is dependent upon age. The typical wage earner will enter the labor market at a relatively low wage rate, progress rapidly in earnings in younger years, level off in mid-life, and in some instances, experience declining earnings toward the end of work life expectancy. Increases in income subsequent to entrance into the labor market occur as a result of gained experience and the attainment of higher paying jobs through promotions or movement from one employer to another. The leveling off in mid-life occurs when the employer recognizes that the employee's learning curve had peaked, and the full potential of the employee had been realized.[7]

- We assumed J████ would receive employer provided health insurance and retirement benefits valued at 17.04% of employment wages, consistent with the average cost of employer provided fringe benefits as a percent of wages for U.S. civilian workers, as shown on Attachment 44.

- In addition to increases in income attributed to age and experience as discussed above, we assumed J█████ earnings would have grown at an annual nominal rate of 3.24% (real growth rate of 0.68%), consistent with the historical compound growth rate of U.S. weekly earnings in private nonagricultural industries from 2003 – 2023 (Attachment 41).

- We assumed future education costs for higher education would have grown at the historical compound annual nominal growth rate of 3.93% (real growth rate of

---

[5] We conservatively assumed unemployment compensation provided by the State of Washington Employment Security Department. We note the State of Washington has one of the highest unemployment benefit rates in the United States.

[6] Full-Time Earnings in the United States, Expectancy Data, 2017.

[7] Everett G. Dillman, "The Age Earnings Cycle – Earnings by Education," Journal of Forensic Economics, Vol. II, No. 1, December 1988.

June 28, 2024
Dana Barbata
Page **7** of **11**

1.35%), consistent with changes in the Consumer Price Index for Education from 2003 – 2023 (Attachment 43).

- Our analysis utilized an expected real after-tax investment return / discount rate based on current Treasury Inflation-Protected Securities (TIPS) yields with maturities ranging from one to thirty years to match the years into the future the loss would have occurred. We adjusted pre-tax yields to after-tax yields by the average effective income tax rate across all scenarios. The yields utilized and resultant discount factors are shown on Attachments 45 and 46.

Projected Earnings "But For" Disability

Based on the vocational opinions of John Fountaine and statistical models of educational attainment, we prepared calculations of J█████ projected earnings "but for" disability based on a range of potential educational outcomes and the statistical probability of each potential outcome. Our calculations of the present value of future earnings under each educational outcome are shown on Attachments 4 – 11.

Projected earnings from employment are reduced by Federal payroll and income taxes applicable to those earnings.[8] Our calculations of projected reductions for taxes are shown on Attachments 12 – 19.

Projected Cost of Education

We considered the expected cost of obtaining post-secondary education as an offset to the earnings that would be achieved from attainment of those levels of education. We relied on data of the average cost of post-secondary education tuition and fees for 2-year and 4-year public institutions as provided by the U.S. Department of Education National Center for Education Statistics. We conservatively assumed J█████ would complete each level of post-secondary education consecutively following completion of high school. We note many individuals experience delays in completion of post-secondary degrees which can result in increased tuition costs and delays in joining the labor force. Our calculations of the present value of projected future education costs are shown on Attachment 20.

Calculated Net Loss of Earnings

Our calculations of the net loss of earnings for each education scenario after deductions for Federal taxes and education costs are summarized on Attachment 1. The trier of fact can

---

[8] We note state income taxes may also be applicable if J█████ were to work and live in a state with income taxes.

June 28, 2024
Dana Barbata
Page **8** of **11**

determine the net economic loss under whichever education scenario is deemed most appropriate from the summary on Attachment 1.

We weighted the net loss of earnings under each education scenario by the probability of attainment, resulting in a probability weighted net economic loss totaling $1,490,105. This is equivalent to a slightly lower projected earnings loss than the associate degree scenario, when considering the probability of all potential earnings outcomes.

Present Value of Recommended Life Care Plan Costs

We calculated the net present value of future life care plan costs recommended in the report by John Fountaine. The recommended life care plan items, according to Mr. Fountaine, their frequencies and costs are described on Attachment 48. We assumed J████ will have a normal life expectancy consistent with the average life expectancy for males age 3.41 (age at date of valuation), based on life expectancy tables published by U.S. Centers for Disease Control and Prevention, National Vital Statistics Reports.

The net present value of the life care plan was first determined by grouping the various components of the plan into categories of service delivery established by the Bureau of Labor Statistics to track inflation rates, as shown on Attachment 52. We increased each element of the life care plan by the appropriate cost inflation category and then discounted those amounts to present value by the appropriate discount factor.

Our calculations of the net present value of J████ recommended future life care plan costs are shown by item on Attachment 2 and result in a total life care plan cost between $4,239,408 (Adult Family Home Option) and $6,588,707 (Adult In-Home Care Option).

We note the projected cost for care in an adult family home likely includes the provision of housing, food, entertainment and other normal living expenses, which would be incurred regardless. Accordingly, such costs should be removed from the cost of the adult family home to arrive at the marginal cost of care and supervision provided by the adult family home. We will update our report to consider the cost offset of normal living expenses provided.

Critique of Economic Damages Report by Thomas Loudat, Ph.D.

We analyzed the economic damages report prepared by Thomas Loudat, Ph.D., dated March 12, 2024. Dr. Loudat concluded J████ incurred a loss of future earnings totaling $4.13 million and a present value of future medical costs totaling $12.42 million. We disagree with Dr. Loudat's conclusions for the following reasons:

June 28, 2024
Dana Barbata
Page **9** of **11**

- Dr. Loudat projected J███ most probable future lost earnings by level of educational attainment based on an academic study by Lawrence Spizman and John Kane[9] of correlations between children's educational attainment and other socioeconomic factors. We note the following issues with Dr. Loudat's application of the Spizman Kane study:

  o Dr. Loudat incorrectly assumed J███ mother had 17 years of formal education. As discussed above, J███ mother has not yet completed her bachelor's degree. Upon completion, she will have 16 years of formal education, not 17 years as assumed by Dr. Loudat. Dr. Loudat appears to have added an additional year of education for a teaching certificate J███ mother previously attained. We note a teaching certificate would not be considered formal education as it would be primarily duplicative of the bachelor's degree she was anticipating completing.

  o Dr. Loudat assumed J███ father had 16 years of formal education. J███ father's highest level of formal education at present is a high school diploma, which is equivalent to 12 years of formal education. He informed Dr. Loudat that he intends to pursue a bachelor's degree at some point in the future. It is speculative to assume J███ father would enroll in college courses and complete a bachelor's degree. Any assumption exceeding his current level of education is unsupported and based on speculation.

  o The parents' level of education is the single largest factor influencing their child's level of educational attainment. Dr. Loudat's speculative assumptions result in an overstatement of the projected level of educational attainment for J███.

  o Dr. Loudat rounded up the age of J███ mother to 22.0, when her age at the time of J███ birth was 21.86, resulting in an overstatement of the coefficient value for that variable.

  o Dr. Loudat assumed J███ has siblings, when in fact he does not.

  o Dr. Loudat assumed a parental level of income including hypothetical full-time earnings for both of J███ parents, when in fact J███ mother has not yet completed her education or entered the labor force. No information has been provided regarding J███ father's level of earnings.

---

[9] Lawrence Spizman and John Kane, Update of Educational Attainment Model for a Minor Child: Round 18 of NLSY (1997).  Journal of Forensic Economics 29(1), 2020, pp. 131 – 141.

June 28, 2024
Dana Barbata
Page **10** of **11**

- o Dr. Loudat appears to have a typo resulting in a positive coefficient for J████ location of residence, when the coefficient for urban location is negative according to the Spizman & Kane article.

- o Dr. Loudat incorrectly utilized the model thresholds for each education level for females instead of males. His conclusions regarding educational attainment probabilities are accordingly incorrect and speculative.

- Dr. Loudat assumed J█████ "but for" the alleged medical malpractice earnings based on the mean earnings of individuals by level of educational attainment instead of the median. Utilization of the mean is inappropriate. The median represents the midpoint level of earnings for the population. Mathematically, 50% of the population earn less than the median and 50% earn more. The mean is skewed higher by the small number of individuals who achieve earnings significantly higher than the majority of the population. The mean represents less than 50% of the population due to skewness and therefore fails to meet a more-probable-than-not standard, resulting in an overstatement of the loss.

- Dr. Loudat assumed employer provided fringe benefits would equal 24.97% of J█████ gross wages, composed of 20.2% for health and retirement, and 4.75% for Social Security tax (less Medicare tax). Dr. Loudat appears to have misinterpreted the Bureau of Labor Statistics data tables on the value of employer provided health and retirement benefits. As shown on Attachment 44, the value of employer provided fringe benefits as a percentage of gross earnings has averaged 17.04% in recent years. We additionally note Dr. Loudat's inclusion of the employer portion of Social Security taxes as a benefit is speculative. The present value of Social Security taxes paid on an employee's earnings can be significantly more than the present value of Social Security benefits an employee may eventually receive during retirement. Dr. Loudat's errors result in a material overstatement of the value of any fringe benefits J████ may have received from employment.

- Dr. Loudat does not appear to have reduced J█████ projected earnings for Federal payroll taxes, resulting in an overstatement of projected net earnings.

- Dr. Loudat provided calculations of lost earnings for three levels of educational attainment (associate, bachelor's, and master's). The selection of these three levels is misleading as the probability of obtaining a master's degree (17.59% per Loudat) is significantly less than the probability of only obtaining a high school diploma (26.9% per Loudat). Dr. Loudat failed to calculate the lost earnings under each potential educational outcome. He instead only calculated the loss of earnings for three selected levels and the interpolated midpoint estimate of 15 years of education.

June 28, 2024
Dana Barbata
Page **11** of **11**

Dr. Loudat's analysis is misleading and fails to consider all potential levels of educational attainment.

- Dr. Loudat failed to consider the cost of obtaining post-secondary education. The economic benefits derived from post-secondary education are partially offset by the costs of obtaining post-secondary education.

**CONCLUSION**

We analyzed the information provided as support for the economic loss claim asserted by Plaintiffs resulting from alleged medical malpractice associated with J▇▇ birth on July 7, 2021. We conclude J▇▇ most probable net loss of future earnings totals $1,490,105 (Attachment 1) and the present value of recommended life care plan costs totals between $4,239,408 and $6,588,707 (Attachment 2). We note it is possible J▇▇ may qualify for disability benefits and / or some of the life care plan items recommended may be provided through Tricare or his school district. The total economic loss calculated may therefore need to be reduced to the extent J▇▇ receives such benefits.

We will continue to analyze new information as it is produced and update our report should our conclusions change.

Very truly yours,

William E. Partin, CPA/ABV/MAFF/CFE                    Casey M. Lesoing, MBA

# Summary of Lost Future Earnings by Level of Educational Attainment        Attachment 1

**J█████ Grenier**

**Date of Loss:  July 7, 2021**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 174 of 432    PageID.8182

| Level of Educational Attainment | Source | Present Value of Future Earnings | Less: Less Present Value of Income & Payroll Taxes | Less: Cost of Education | Net Economic Loss | Probability of Educational Attainment |
|---|---|---|---|---|---|---|
| | | | *Attach. 12 - 19* | *Attachment 20* | | *Attachment 3* |
| Less than High School | *Attachment 4* | $ 828,240 | $ (111,610) | $ - | $ 716,630 | 3.48% |
| GED | *Attachment 5* | $ 1,089,145 | $ (158,580) | $ - | $ 930,565 | 7.68% |
| High School Diploma | *Attachment 6* | $ 1,310,571 | $ (196,796) | $ - | $ 1,113,775 | 45.07% |
| Associate Degree | *Attachment 7* | $ 1,888,496 | $ (328,298) | $ (8,455) | $ 1,551,743 | 10.33% |
| Bachelor's Degree | *Attachment 8* | $ 2,648,950 | $ (547,675) | $ (41,167) | $ 2,060,108 | 24.63% |
| Master's Degree | *Attachment 9* | $ 3,143,312 | $ (702,386) | $ (61,621) | $ 2,379,305 | 6.97% |
| Doctorate Degree | *Attachment 10* | $ 3,520,105 | $ (828,674) | $ (61,621) | $ 2,629,810 | 0.61% |
| Professional Degree | *Attachment 11* | $ 4,696,361 | $ (1,194,318) | $ (81,874) | $ 3,420,169 | 1.23% |

**Probability Weighted Net Economic Loss =        $1,490,105**

**Summary of Life Care Plan**                                    **Attachment 2**
**J███ Grenier**

*Attachment 47*

| Item | | PV Amount |
|---|---|---:|
| 1 | Diapers/Pull-ups | $ 4,917 |
| 2 | Gloves | $ 6,451 |
| 3 | Wipes | $ 12,764 |
| 4 | Chux Pads | $ 676 |
| 5 | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitori | $ 15,802 |
| 6 | Neurology Evaluation, Monitoring, and Treatment | $ 15,802 |
| 7 | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment | $ 11,197 |
| 8 | Dental Evaluation, Monitoring and Treatment | $ 544 |
| 9 | CT-Scan Head and Brain | $ 8,196 |
| 10 | MRI Brain | $ 12,166 |
| 11 | Physical Therapy Evaluation, Monitoring and Treatment | $ 128,254 |
| 12 | Occupational Therapy Evaluation, Monitoring and Treatment | $ 128,254 |
| 13 | Speech Therapy Evaluation, Monitoring and Treatment | $ 256,508 |
| 14 | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | $ 4,023 |
| 15 | Hair replacement evaluation, monitoring and treatment | $ - |
| 16 | Augmentative communication evaluation, monitoring and treatment | $ 1,464 |
| 17 | Tutoring (Age 6 - 12) | $ 11,871 |
| 18 | Tutoring (Age 12 - 15) | $ 12,344 |
| 19 | Tutoring (Age 15 - 22) | $ 45,223 |
| 20 | Case Management | $ 163,170 |
| 21 | Vocational / Avocational Evaluation | $ 3,890 |
| 22 | In Home Care (current age to Age 6) | $ 74,787 |
| 23 | In Home Care (Age 6 - 22) | $ 844,564 |
| **Sub - Total** | | **$ 1,762,868** |
| 24 | Adult Home Care (Option 1): In Home Care | $ 4,825,839 |
| 25 | Adult Home Care (Option 2): Adult Family Home | $ 2,476,540 |

**Total Life Care Plan (Adult Home Care Option 1)**          **$ 6,588,707**
**Total Life Care Plan (Adult Home Care Option 2)**          **$ 4,239,408**

**Probability of Educational Attainment**                                      **Attachment 3**

**J████ Grenier**

**Date of Loss:  July 7, 2021**

Source: Spizman & Kane, JFE, 29(1) 2020 pp. 131-141

|  | **Model II (Males)** | | | |
|---|---|---|---|---|
|  | **COEFFICIENT** | **INPUT** [1] | **RESULT** [2] | |
| **Race/Ethnicity (Ref: Black/Mixed-Race Non-Hispanic)** | | | | |
| Hispanic | 0.0271 | 0 | 0 | |
| Black | -0.1056 | 0 | 0 | |
| **Location raised in (ref: urban)** | | | | |
| Urban | -0.0601 | 1 | -0.0601 | |
| Rural | -0.0053 | 0 | 0 | |
| **Mother's education** | | | | |
| Years of Schooling | 0.0828 | 16 | 1.3248 | *Assumes Completion of Bachelor's Degree* |
| **Father's education** | | | | |
| Years of Schooling | 0.0808 | 12 | 0.9696 | *Level of Current Education, High School* |
| **Both Bio Parents** | | | | |
| Both Bio Parents | 0.3759 | 1 | 0.3759 | |
| **Mother's age at 1st birth** | | | | |
| Age (0 if unknown) | 0.0218 | 21.86 | 0.4766 | |
| **Religion raised in** | | | | |
| Baptist | 0.1948 | 0 | 0 | |
| Catholic | 0.2400 | 0 | 0 | |
| Jewish | 0.3514 | 0 | 0 | |
| Other | 0.4405 | 0 | 0 | |
| Protestant | 0.1898 | 1 | 0.1898 | *Consistent with Loudat's Assumption* |
| **Number of siblings** | | | | |
| Number of Siblings | -0.0046 | 0 | 0 | |
| **Income-to-poverty ratio** | | | | |
| Ratio | *Ignored* | *Ignored* | 0 | *No Income Information Provided* |
| **Z-Score** | | | **3.2766** [3] | |

| Education Level | | Threshold ($\Theta_x$) | Z-Score - $\Theta_x$ | Cum. Normal Distribution | Individual Probability |
|---|---|---|---|---|---|
| < HS Degree | $\Theta_1$ | 1.4619 | -1.8147 | 3.4786% | 3.48% |
| GED Certificate | $\Theta_2$ | 2.0583 | -1.2183 | 11.1558% | 7.68% |
| HS Diploma | $\Theta_3$ | 3.4333 | 0.1567 | 56.2265% | 45.07% |
| Associate Degree | $\Theta_4$ | 3.7043 | 0.4277 | 66.5570% | 10.33% |
| Bachelor's Degree | $\Theta_5$ | 4.6291 | 1.3525 | 91.1895% | 24.63% |
| Master's Degree | $\Theta_6$ | 5.3639 | 2.0873 | 98.1570% | 6.97% |
| Doctorate Degree | $\Theta_7$ | 5.5233 | 2.2467 | 98.7671% | 0.61% |
| Professional Degree | $\Theta_8$ | Remainder | | 100.0000% | 1.23% |

**Notes:**

[1] Input 1 if yes, 0 if no (except for Mother's age at 1st birth and years of education).

[2] Result calculated as: coefficient x input

[3] Z-Score calculated as the sum of each figure in the results column.

# Projected Future Earnings

J███ Grenier

**Educational Attainment:  No Diploma or GED**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends April 3, 2069 (Statistical Worklife Expectancy)*

| Item | Value | Col | Description |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B… | 30.74 | | Attachment 30 |
| Projected Date at End of Worklife Expectancy | 4/3/2069 | | Attachment 30 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 21 |
| Unemployment Rate | 8.40% | | Attachment 37 |
| Prob. Of Future Employment | 91.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 8.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr} - \text{Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 91.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2038 | 17 | 13.5 | 0.48 | $ 16,554 | $ 15,164 | $ 656 | $ 15,820 | $ 2,583 | $ 8,895 | 1.374 | $ 12,220 | 0.819 | $ 10,013 |
| 2039 | 18 | 14.5 | 1.00 | $ 17,620 | $ 16,140 | $ 687 | $ 16,827 | $ 2,750 | $ 16,827 | 1.383 | $ 23,273 | 0.807 | $ 18,792 |
| 2040 | 19 | 15.5 | 1.00 | $ 18,662 | $ 17,094 | $ 727 | $ 17,821 | $ 2,912 | $ 17,821 | 1.392 | $ 24,815 | 0.796 | $ 19,743 |
| 2041 | 20 | 16.5 | 1.00 | $ 19,679 | $ 18,026 | $ 767 | $ 18,793 | $ 3,071 | $ 18,793 | 1.402 | $ 26,345 | 0.784 | $ 20,654 |
| 2042 | 21 | 17.5 | 1.00 | $ 20,672 | $ 18,936 | $ 806 | $ 19,741 | $ 3,226 | $ 19,741 | 1.411 | $ 27,861 | 0.772 | $ 21,522 |
| 2043 | 22 | 18.5 | 1.00 | $ 21,641 | $ 19,823 | $ 844 | $ 20,667 | $ 3,377 | $ 20,667 | 1.421 | $ 29,364 | 0.761 | $ 22,351 |
| 2044 | 23 | 19.5 | 1.00 | $ 22,586 | $ 20,688 | $ 880 | $ 21,569 | $ 3,524 | $ 21,569 | 1.430 | $ 30,852 | 0.750 | $ 23,141 |
| 2045 | 24 | 20.5 | 1.00 | $ 23,506 | $ 21,531 | $ 916 | $ 22,448 | $ 3,668 | $ 22,448 | 1.440 | $ 32,326 | 0.732 | $ 23,679 |
| 2046 | 25 | 21.5 | 1.00 | $ 24,402 | $ 22,352 | $ 951 | $ 23,304 | $ 3,808 | $ 23,304 | 1.450 | $ 33,785 | 0.721 | $ 24,374 |
| 2047 | 26 | 22.5 | 1.00 | $ 25,274 | $ 23,151 | $ 985 | $ 24,136 | $ 3,944 | $ 24,136 | 1.460 | $ 35,229 | 0.711 | $ 25,033 |
| 2048 | 27 | 23.5 | 1.00 | $ 26,122 | $ 23,927 | $ 1,018 | $ 24,946 | $ 4,076 | $ 24,946 | 1.469 | $ 36,656 | 0.700 | $ 25,654 |
| 2049 | 28 | 24.5 | 1.00 | $ 26,945 | $ 24,682 | $ 1,050 | $ 25,732 | $ 4,205 | $ 25,732 | 1.479 | $ 38,067 | 0.689 | $ 26,240 |
| 2050 | 29 | 25.5 | 1.00 | $ 27,744 | $ 25,414 | $ 1,081 | $ 26,495 | $ 4,329 | $ 26,495 | 1.489 | $ 39,461 | 0.679 | $ 26,791 |
| 2051 | 30 | 26.5 | 1.00 | $ 28,519 | $ 26,123 | $ 1,112 | $ 27,235 | $ 4,450 | $ 27,235 | 1.499 | $ 40,837 | 0.669 | $ 27,307 |

# Projected Future Earnings

J████ Grenier

## Educational Attainment:  No Diploma or GED

## Date of Loss:  July 7, 2021

***Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends April 3, 2069 (Statistical Worklife Expectancy)***

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B| 30.74 | | Attachment 30 |
| Projected Date at End of Worklife Expectancy | 4/3/2069 | | Attachment 30 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 21 |
| Unemployment Rate | 8.40% | | Attachment 37 |
| Prob. Of Future Employment | 91.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 8.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 91.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2052 | 31 | 27.5 | 1.00 | $ 29,270 | $ 26,811 | $ 1,141 | $ 27,952 | $ 4,567 | $ 27,952 | 1.510 | $ 42,194 | 0.659 | $ 27,790 |
| 2053 | 32 | 28.5 | 1.00 | $ 29,996 | $ 27,476 | $ 1,169 | $ 28,645 | $ 4,681 | $ 28,645 | 1.520 | $ 43,533 | 0.649 | $ 28,239 |
| 2054 | 33 | 29.5 | 1.00 | $ 30,698 | $ 28,119 | $ 1,197 | $ 29,316 | $ 4,790 | $ 29,316 | 1.530 | $ 44,853 | 0.639 | $ 28,657 |
| 2055 | 34 | 30.5 | 1.00 | $ 31,376 | $ 28,740 | $ 1,223 | $ 29,963 | $ 4,896 | $ 29,963 | 1.540 | $ 46,153 | 0.619 | $ 28,584 |
| 2056 | 35 | 31.5 | 1.00 | $ 32,029 | $ 29,339 | $ 1,248 | $ 30,587 | $ 4,998 | $ 30,587 | 1.551 | $ 47,433 | 0.610 | $ 28,918 |
| 2057 | 36 | 32.5 | 1.00 | $ 32,659 | $ 29,915 | $ 1,273 | $ 31,188 | $ 5,096 | $ 31,188 | 1.561 | $ 48,691 | 0.600 | $ 29,223 |
| 2058 | 37 | 33.5 | 1.00 | $ 33,264 | $ 30,470 | $ 1,297 | $ 31,766 | $ 5,191 | $ 31,766 | 1.572 | $ 49,928 | 0.591 | $ 29,498 |
| 2059 | 38 | 34.5 | 1.00 | $ 33,845 | $ 31,002 | $ 1,319 | $ 32,321 | $ 5,281 | $ 32,321 | 1.582 | $ 51,143 | 0.582 | $ 29,745 |
| 2060 | 39 | 35.5 | 1.00 | $ 34,401 | $ 31,512 | $ 1,341 | $ 32,852 | $ 5,368 | $ 32,852 | 1.593 | $ 52,335 | 0.573 | $ 29,964 |
| 2061 | 40 | 36.5 | 1.00 | $ 34,934 | $ 31,999 | $ 1,362 | $ 33,361 | $ 5,451 | $ 33,361 | 1.604 | $ 53,504 | 0.564 | $ 30,156 |
| 2062 | 41 | 37.5 | 1.00 | $ 35,442 | $ 32,465 | $ 1,381 | $ 33,846 | $ 5,530 | $ 33,846 | 1.615 | $ 54,649 | 0.555 | $ 30,321 |
| 2063 | 42 | 38.5 | 1.00 | $ 35,926 | $ 32,908 | $ 1,400 | $ 34,308 | $ 5,606 | $ 34,308 | 1.626 | $ 55,769 | 0.546 | $ 30,460 |
| 2064 | 43 | 39.5 | 1.00 | $ 36,385 | $ 33,329 | $ 1,418 | $ 34,747 | $ 5,678 | $ 34,747 | 1.637 | $ 56,864 | 0.538 | $ 30,574 |
| 2065 | 44 | 40.5 | 1.00 | $ 36,820 | $ 33,727 | $ 1,435 | $ 35,163 | $ 5,746 | $ 35,163 | 1.648 | $ 57,933 | 0.529 | $ 30,663 |

# Projected Future Earnings

**J█████ Grenier**

## Educational Attainment:  No Diploma or GED

## Date of Loss:   July 7, 2021

Attachment 4

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends April 3, 2069 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 30.74 | | Attachment 30 |
| Projected Date at End of Worklife Expectancy | 4/3/2069 | | Attachment 30 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 21 |
| Unemployment Rate | 8.40% | | Attachment 37 |
| Prob. Of Future Employment | 91.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 8.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate) $^{(Valuation\ Yr - Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 91.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2066 | 45 | 41.5 | 1.00 | $ 37,231 | $ 34,104 | $ 1,451 | $ 35,555 | $ 5,810 | $ 35,555 | 1.659 | $ 58,975 | 0.521 | $ 30,728 |
| 2067 | 46 | 42.5 | 1.00 | $ 37,618 | $ 34,458 | $ 1,466 | $ 35,925 | $ 5,870 | $ 35,925 | 1.670 | $ 59,990 | 0.513 | $ 30,770 |
| 2068 | 47 | 43.5 | 1.00 | $ 37,981 | $ 34,790 | $ 1,480 | $ 36,271 | $ 5,927 | $ 36,271 | 1.681 | $ 60,977 | 0.505 | $ 30,789 |
| 2069 | 48 | 44.5 | 0.26 | $ 38,319 | $ 35,100 | $ 1,494 | $ 36,594 | $ 5,980 | $ 9,352 | 1.693 | $ 15,828 | 0.497 | $ 7,867 |

**NET PRESENT VALUE, PROJECTED FUTURE EARNINGS =  $     828,240**

**Projected Future Earnings**                                                                                   **Attachment 5**

**J███ Grenier**

**Educational Attainment: GED**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends November 4, 2072 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 34.33 | | Attachment 31 |
| Projected Date at End of Worklife Expectancy | 11/4/2072 | | Attachment 31 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 22 |
| Unemployment Rate | 6.20% | | Attachment 38 |
| Prob. Of Future Employment | 93.80% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})}$ x $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2038 | 17 | 13.5 | 0.48 | $ 16,796 | $ 15,754 | $ 470 | $ 16,224 | $ 2,684 | $ 9,139 | 1.374 | $ 12,555 | 0.819 | $ 10,288 |
| 2039 | 18 | 14.5 | 1.00 | $ 18,282 | $ 17,148 | $ 511 | $ 17,659 | $ 2,921 | $ 17,659 | 1.383 | $ 24,424 | 0.807 | $ 19,721 |
| 2040 | 19 | 15.5 | 1.00 | $ 19,728 | $ 18,505 | $ 551 | $ 19,056 | $ 3,152 | $ 19,056 | 1.392 | $ 26,534 | 0.796 | $ 21,111 |
| 2041 | 20 | 16.5 | 1.00 | $ 21,134 | $ 19,824 | $ 590 | $ 20,414 | $ 3,377 | $ 20,414 | 1.402 | $ 28,617 | 0.784 | $ 22,435 |
| 2042 | 21 | 17.5 | 1.00 | $ 22,501 | $ 21,106 | $ 628 | $ 21,734 | $ 3,595 | $ 21,734 | 1.411 | $ 30,673 | 0.772 | $ 23,695 |
| 2043 | 22 | 18.5 | 1.00 | $ 23,827 | $ 22,350 | $ 666 | $ 23,016 | $ 3,807 | $ 23,016 | 1.421 | $ 32,701 | 0.761 | $ 24,892 |
| 2044 | 23 | 19.5 | 1.00 | $ 25,114 | $ 23,557 | $ 701 | $ 24,259 | $ 4,013 | $ 24,259 | 1.430 | $ 34,700 | 0.750 | $ 26,026 |
| 2045 | 24 | 20.5 | 1.00 | $ 26,362 | $ 24,727 | $ 736 | $ 25,463 | $ 4,212 | $ 25,463 | 1.440 | $ 36,669 | 0.732 | $ 26,860 |
| 2046 | 25 | 21.5 | 1.00 | $ 27,569 | $ 25,860 | $ 770 | $ 26,630 | $ 4,405 | $ 26,630 | 1.450 | $ 38,608 | 0.721 | $ 27,853 |
| 2047 | 26 | 22.5 | 1.00 | $ 28,737 | $ 26,955 | $ 803 | $ 27,758 | $ 4,592 | $ 27,758 | 1.460 | $ 40,515 | 0.711 | $ 28,789 |
| 2048 | 27 | 23.5 | 1.00 | $ 29,865 | $ 28,013 | $ 834 | $ 28,847 | $ 4,772 | $ 28,847 | 1.469 | $ 42,389 | 0.700 | $ 29,667 |
| 2049 | 28 | 24.5 | 1.00 | $ 30,953 | $ 29,034 | $ 865 | $ 29,898 | $ 4,946 | $ 29,898 | 1.479 | $ 44,230 | 0.689 | $ 30,489 |
| 2050 | 29 | 25.5 | 1.00 | $ 32,001 | $ 30,017 | $ 894 | $ 30,911 | $ 5,114 | $ 30,911 | 1.489 | $ 46,037 | 0.679 | $ 31,256 |
| 2051 | 30 | 26.5 | 1.00 | $ 33,010 | $ 30,963 | $ 922 | $ 31,885 | $ 5,275 | $ 31,885 | 1.499 | $ 47,809 | 0.669 | $ 31,969 |

# Projected Future Earnings

**Attachment 5**

**J███ Grenier**

**Educational Attainment: GED**

**Date of Loss: July 7, 2021**

*Assumptions: Analysis starts December 2, 2024 (Date of Valuation) and ends November 4, 2072 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 34.33 | | Attachment 31 |
| Projected Date at End of Worklife Expectancy | 11/4/2072 | | Attachment 31 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 22 |
| Unemployment Rate | 6.20% | | Attachment 38 |
| Prob. Of Future Employment | 93.80% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2052 | 31 | 27.5 | 1.00 | $ 33,978 | $ 31,872 | $ 949 | $ 32,821 | $ 5,429 | $ 32,821 | 1.510 | $ 49,544 | 0.659 | $ 32,630 |
| 2053 | 32 | 28.5 | 1.00 | $ 34,907 | $ 32,743 | $ 975 | $ 33,718 | $ 5,578 | $ 33,718 | 1.520 | $ 51,242 | 0.649 | $ 33,240 |
| 2054 | 33 | 29.5 | 1.00 | $ 35,797 | $ 33,577 | $ 1,000 | $ 34,577 | $ 5,720 | $ 34,577 | 1.530 | $ 52,903 | 0.639 | $ 33,800 |
| 2055 | 34 | 30.5 | 1.00 | $ 36,646 | $ 34,374 | $ 1,024 | $ 35,397 | $ 5,856 | $ 35,397 | 1.540 | $ 54,524 | 0.619 | $ 33,768 |
| 2056 | 35 | 31.5 | 1.00 | $ 37,456 | $ 35,133 | $ 1,046 | $ 36,179 | $ 5,985 | $ 36,179 | 1.551 | $ 56,105 | 0.610 | $ 34,205 |
| 2057 | 36 | 32.5 | 1.00 | $ 38,225 | $ 35,855 | $ 1,068 | $ 36,923 | $ 6,108 | $ 36,923 | 1.561 | $ 57,644 | 0.600 | $ 34,596 |
| 2058 | 37 | 33.5 | 1.00 | $ 38,956 | $ 36,540 | $ 1,088 | $ 37,628 | $ 6,225 | $ 37,628 | 1.572 | $ 59,142 | 0.591 | $ 34,942 |
| 2059 | 38 | 34.5 | 1.00 | $ 39,646 | $ 37,188 | $ 1,107 | $ 38,295 | $ 6,335 | $ 38,295 | 1.582 | $ 60,596 | 0.582 | $ 35,243 |
| 2060 | 39 | 35.5 | 1.00 | $ 40,296 | $ 37,798 | $ 1,125 | $ 38,923 | $ 6,439 | $ 38,923 | 1.593 | $ 62,007 | 0.573 | $ 35,501 |
| 2061 | 40 | 36.5 | 1.00 | $ 40,907 | $ 38,371 | $ 1,143 | $ 39,513 | $ 6,537 | $ 39,513 | 1.604 | $ 63,371 | 0.564 | $ 35,717 |
| 2062 | 41 | 37.5 | 1.00 | $ 41,478 | $ 38,906 | $ 1,158 | $ 40,065 | $ 6,628 | $ 40,065 | 1.615 | $ 64,690 | 0.555 | $ 35,892 |
| 2063 | 42 | 38.5 | 1.00 | $ 42,009 | $ 39,405 | $ 1,173 | $ 40,578 | $ 6,713 | $ 40,578 | 1.626 | $ 65,961 | 0.546 | $ 36,027 |
| 2064 | 43 | 39.5 | 1.00 | $ 42,501 | $ 39,866 | $ 1,187 | $ 41,053 | $ 6,791 | $ 41,053 | 1.637 | $ 67,183 | 0.538 | $ 36,122 |
| 2065 | 44 | 40.5 | 1.00 | $ 42,952 | $ 40,289 | $ 1,200 | $ 41,489 | $ 6,863 | $ 41,489 | 1.648 | $ 68,355 | 0.529 | $ 36,180 |

# Projected Future Earnings

## J███ Grenier

**Educational Attainment:  GED**

**Date of Loss:  July 7, 2021**

**Attachment 5**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends November 4, 2072 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 34.33 | | Attachment 31 |
| Projected Date at End of Worklife Expectancy | 11/4/2072 | | Attachment 31 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 22 |
| Unemployment Rate | 6.20% | | Attachment 38 |
| Prob. Of Future Employment | 93.80% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2066 | 45 | 41.5 | 1.00 | $ 43,364 | $ 40,676 | $ 1,211 | $ 41,887 | $ 6,929 | $ 41,887 | 1.659 | $ 69,477 | 0.521 | $ 36,200 |
| 2067 | 46 | 42.5 | 1.00 | $ 43,736 | $ 41,025 | $ 1,222 | $ 42,246 | $ 6,989 | $ 42,246 | 1.670 | $ 70,546 | 0.513 | $ 36,184 |
| 2068 | 47 | 43.5 | 1.00 | $ 44,068 | $ 41,336 | $ 1,231 | $ 42,567 | $ 7,042 | $ 42,567 | 1.681 | $ 71,562 | 0.505 | $ 36,133 |
| 2069 | 48 | 44.5 | 1.00 | $ 44,361 | $ 41,611 | $ 1,239 | $ 42,850 | $ 7,089 | $ 42,850 | 1.693 | $ 72,523 | 0.497 | $ 36,048 |
| 2070 | 49 | 45.5 | 1.00 | $ 44,614 | $ 41,848 | $ 1,246 | $ 43,094 | $ 7,129 | $ 43,094 | 1.704 | $ 73,429 | 0.489 | $ 35,929 |
| 2071 | 50 | 46.5 | 1.00 | $ 44,827 | $ 42,047 | $ 1,252 | $ 43,299 | $ 7,163 | $ 43,299 | 1.715 | $ 74,278 | 0.482 | $ 35,778 |
| 2072 | 51 | 47.5 | 0.84 | $ 45,000 | $ 42,210 | $ 1,257 | $ 43,467 | $ 7,191 | $ 36,584 | 1.727 | $ 63,182 | 0.474 | $ 29,959 |

**NET PRESENT VALUE, PROJECTED FUTURE EARNINGS =  $  1,089,145**

**J███ Grenier**

**Educational Attainment: High School Diploma**

**Date of Loss: July 7, 2021**

*Assumptions: Analysis starts December 2, 2024 (Date of Valuation) and ends May 20, 2077 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 37.87 | | Attachment 32 |
| Projected Date at End of Worklife Expectancy | 5/20/2077 | | Attachment 32 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 23 |
| Unemployment Rate | 6.20% | | Attachment 38 |
| Prob. Of Future Employment | 93.80% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr} - \text{Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2039 | 18 | 14.5 | 0.48 | $ 19,245 | $ 18,052 | $ 538 | $ 18,589 | $ 3,075 | $ 10,471 | 1.383 | $ 14,482 | 0.807 | $ 11,694 |
| 2040 | 19 | 15.5 | 1.00 | $ 20,779 | $ 19,490 | $ 580 | $ 20,071 | $ 3,320 | $ 20,071 | 1.392 | $ 27,947 | 0.796 | $ 22,235 |
| 2041 | 20 | 16.5 | 1.00 | $ 22,272 | $ 20,891 | $ 622 | $ 21,513 | $ 3,559 | $ 21,513 | 1.402 | $ 30,157 | 0.784 | $ 23,643 |
| 2042 | 21 | 17.5 | 1.00 | $ 23,724 | $ 22,253 | $ 663 | $ 22,916 | $ 3,791 | $ 22,916 | 1.411 | $ 32,341 | 0.772 | $ 24,983 |
| 2043 | 22 | 18.5 | 1.00 | $ 25,136 | $ 23,578 | $ 702 | $ 24,280 | $ 4,017 | $ 24,280 | 1.421 | $ 34,498 | 0.761 | $ 26,259 |
| 2044 | 23 | 19.5 | 1.00 | $ 26,508 | $ 24,865 | $ 740 | $ 25,605 | $ 4,236 | $ 25,605 | 1.430 | $ 36,626 | 0.750 | $ 27,471 |
| 2045 | 24 | 20.5 | 1.00 | $ 27,839 | $ 26,113 | $ 778 | $ 26,891 | $ 4,448 | $ 26,891 | 1.440 | $ 38,725 | 0.732 | $ 28,365 |
| 2046 | 25 | 21.5 | 1.00 | $ 29,130 | $ 27,324 | $ 814 | $ 28,137 | $ 4,655 | $ 28,137 | 1.450 | $ 40,793 | 0.721 | $ 29,430 |
| 2047 | 26 | 22.5 | 1.00 | $ 30,380 | $ 28,496 | $ 849 | $ 29,345 | $ 4,854 | $ 29,345 | 1.460 | $ 42,831 | 0.711 | $ 30,435 |
| 2048 | 27 | 23.5 | 1.00 | $ 31,589 | $ 29,631 | $ 882 | $ 30,513 | $ 5,048 | $ 30,513 | 1.469 | $ 44,837 | 0.700 | $ 31,380 |
| 2049 | 28 | 24.5 | 1.00 | $ 32,758 | $ 30,727 | $ 915 | $ 31,642 | $ 5,235 | $ 31,642 | 1.479 | $ 46,811 | 0.689 | $ 32,267 |
| 2050 | 29 | 25.5 | 1.00 | $ 33,887 | $ 31,786 | $ 946 | $ 32,732 | $ 5,415 | $ 32,732 | 1.489 | $ 48,750 | 0.679 | $ 33,098 |
| 2051 | 30 | 26.5 | 1.00 | $ 34,975 | $ 32,807 | $ 977 | $ 33,783 | $ 5,589 | $ 33,783 | 1.499 | $ 50,655 | 0.669 | $ 33,873 |
| 2052 | 31 | 27.5 | 1.00 | $ 36,023 | $ 33,789 | $ 1,006 | $ 34,795 | $ 5,756 | $ 34,795 | 1.510 | $ 52,525 | 0.659 | $ 34,594 |

**Attachment 6**

**Projected Future Earnings**

J█ **Grenier**

**Educational Attainment:  High School Diploma**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 20, 2077 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 37.87 | Attachment 32 |
| Projected Date at End of Worklife Expectancy | 5/20/2077 | Attachment 32 |
| Projected Earnings, 2017 $$ | | **E** Calculated from formula on Attachment 23 |
| Unemployment Rate | 6.20% | **F** Attachment 38 |
| Prob. Of Future Employment | 93.80% | **G** Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | **I** Attachment 44 |
| Real Wage Growth Rate | 0.68% | **L** Attachment 41 |
| Cumulative Growth Factor | | **K** Calc. as (1 + Growth Rate) $^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | **L** Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2053 | 32 | 28.5 | 1.00 | 37,030 | $ 34,734 | 1,034 | $ 35,768 | $ 5,917 | $ 35,768 | 1.520 | $ 54,358 | 0.649 | $ 35,261 |
| 2054 | 33 | 29.5 | 1.00 | 37,996 | $ 35,640 | 1,061 | $ 36,702 | $ 6,072 | $ 36,702 | 1.530 | $ 56,153 | 0.639 | $ 35,877 |
| 2055 | 34 | 30.5 | 1.00 | 38,922 | $ 36,509 | 1,087 | $ 37,596 | $ 6,219 | $ 37,596 | 1.540 | $ 57,910 | 0.619 | $ 35,865 |
| 2056 | 35 | 31.5 | 1.00 | 39,808 | $ 37,340 | 1,112 | $ 38,451 | $ 6,361 | $ 38,451 | 1.551 | $ 59,628 | 0.610 | $ 36,353 |
| 2057 | 36 | 32.5 | 1.00 | 40,653 | $ 38,132 | 1,135 | $ 39,268 | $ 6,496 | $ 39,268 | 1.561 | $ 61,305 | 0.600 | $ 36,793 |
| 2058 | 37 | 33.5 | 1.00 | 41,457 | $ 38,887 | 1,158 | $ 40,045 | $ 6,625 | $ 40,045 | 1.572 | $ 62,940 | 0.591 | $ 37,186 |
| 2059 | 38 | 34.5 | 1.00 | 42,221 | $ 39,603 | 1,179 | $ 40,783 | $ 6,747 | $ 40,783 | 1.582 | $ 64,533 | 0.582 | $ 37,532 |
| 2060 | 39 | 35.5 | 1.00 | 42,945 | $ 40,282 | 1,199 | $ 41,481 | $ 6,862 | $ 41,481 | 1.593 | $ 66,081 | 0.573 | $ 37,834 |
| 2061 | 40 | 36.5 | 1.00 | 43,627 | $ 40,923 | 1,219 | $ 42,141 | $ 6,971 | $ 42,141 | 1.604 | $ 67,586 | 0.564 | $ 38,092 |
| 2062 | 41 | 37.5 | 1.00 | 44,270 | $ 41,525 | 1,236 | $ 42,762 | $ 7,074 | $ 42,762 | 1.615 | $ 69,044 | 0.555 | $ 38,308 |
| 2063 | 42 | 38.5 | 1.00 | 44,872 | $ 42,090 | 1,253 | $ 43,343 | $ 7,170 | $ 43,343 | 1.626 | $ 70,455 | 0.546 | $ 38,481 |
| 2064 | 43 | 39.5 | 1.00 | 45,433 | $ 42,616 | 1,269 | $ 43,885 | $ 7,260 | $ 43,885 | 1.637 | $ 71,819 | 0.538 | $ 38,615 |
| 2065 | 44 | 40.5 | 1.00 | 45,954 | $ 43,105 | 1,284 | $ 44,388 | $ 7,343 | $ 44,388 | 1.648 | $ 73,132 | 0.529 | $ 38,708 |
| 2066 | 45 | 41.5 | 1.00 | 46,435 | $ 43,556 | 1,297 | $ 44,852 | $ 7,420 | $ 44,852 | 1.659 | $ 74,396 | 0.521 | $ 38,763 |

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 185 of 432   PageID.8193

**Projected Future Earnings**                                                                 **Attachment 6**

**J█████ Grenier**

**Educational Attainment:  High School Diploma**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 20, 2077 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 37.87 | | Attachment 32 |
| Projected Date at End of Worklife Expectancy | 5/20/2077 | | Attachment 32 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 23 |
| Unemployment Rate | 6.20% | | Attachment 38 |
| Prob. Of Future Employment | 93.80% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 6.20% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate) $^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 93.80% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2067 | 46 | 42.5 | 1.00 | $ 46,874 | $ 43,968 | $ 1,309 | $ 45,277 | $ 7,490 | $ 45,277 | 1.670 | $ 75,608 | 0.513 | $ 38,781 |
| 2068 | 47 | 43.5 | 1.00 | $ 47,274 | $ 44,343 | $ 1,320 | $ 45,663 | $ 7,554 | $ 45,663 | 1.681 | $ 76,767 | 0.505 | $ 38,761 |
| 2069 | 48 | 44.5 | 1.00 | $ 47,633 | $ 44,679 | $ 1,330 | $ 46,010 | $ 7,611 | $ 46,010 | 1.693 | $ 77,872 | 0.497 | $ 38,707 |
| 2070 | 49 | 45.5 | 1.00 | $ 47,951 | $ 44,978 | $ 1,339 | $ 46,317 | $ 7,662 | $ 46,317 | 1.704 | $ 78,922 | 0.489 | $ 38,617 |
| 2071 | 50 | 46.5 | 1.00 | $ 48,229 | $ 45,239 | $ 1,347 | $ 46,586 | $ 7,707 | $ 46,586 | 1.715 | $ 79,915 | 0.482 | $ 38,494 |
| 2072 | 51 | 47.5 | 1.00 | $ 48,466 | $ 45,461 | $ 1,354 | $ 46,815 | $ 7,745 | $ 46,815 | 1.727 | $ 80,851 | 0.474 | $ 38,337 |
| 2073 | 52 | 48.5 | 1.00 | $ 48,663 | $ 45,646 | $ 1,359 | $ 47,005 | $ 7,776 | $ 47,005 | 1.739 | $ 81,727 | 0.467 | $ 38,149 |
| 2074 | 53 | 49.5 | 1.00 | $ 48,819 | $ 45,793 | $ 1,364 | $ 47,156 | $ 7,801 | $ 47,156 | 1.750 | $ 82,543 | 0.460 | $ 37,929 |
| 2075 | 54 | 50.5 | 1.00 | $ 48,935 | $ 45,901 | $ 1,367 | $ 47,268 | $ 7,819 | $ 47,268 | 1.762 | $ 83,298 | 0.452 | $ 37,679 |
| 2076 | 55 | 51.5 | 1.00 | $ 49,010 | $ 45,972 | $ 1,369 | $ 47,341 | $ 7,832 | $ 47,341 | 1.774 | $ 83,989 | 0.445 | $ 37,400 |
| 2077 | 56 | 52.5 | 0.39 | $ 49,045 | $ 46,004 | $ 1,370 | $ 47,374 | $ 7,837 | $ 18,292 | 1.786 | $ 32,671 | 0.438 | $ 14,322 |

NET PRESENT VALUE, PROJECTED FUTURE EARNINGS =   $   1,310,571

J███ Grenier

**Educational Attainment: Associate Degree**

**Date of Loss: July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 186 of 432   PageID.8194

*Assumptions: Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 24 |
| Unemployment Rate | 4.40% | | Attachment 39 |
| Prob. Of Future Employment | 95.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 4.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr - Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 95.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2041 | 20 | 16.5 | 0.48 | $ 25,792 | $ 24,657 | $ 487 | $ 25,144 | $ 4,200 | $ 14,183 | 1.402 | $ 19,882 | 0.784 | $ 15,587 |
| 2042 | 21 | 17.5 | 1.00 | $ 28,011 | $ 26,779 | $ 529 | $ 27,308 | $ 4,562 | $ 27,308 | 1.411 | $ 38,539 | 0.772 | $ 29,771 |
| 2043 | 22 | 18.5 | 1.00 | $ 30,164 | $ 28,837 | $ 570 | $ 29,406 | $ 4,912 | $ 29,406 | 1.421 | $ 41,781 | 0.761 | $ 31,803 |
| 2044 | 23 | 19.5 | 1.00 | $ 32,250 | $ 30,831 | $ 609 | $ 31,440 | $ 5,252 | $ 31,440 | 1.430 | $ 44,972 | 0.750 | $ 33,731 |
| 2045 | 24 | 20.5 | 1.00 | $ 34,269 | $ 32,761 | $ 647 | $ 33,408 | $ 5,581 | $ 33,408 | 1.440 | $ 48,111 | 0.732 | $ 35,240 |
| 2046 | 25 | 21.5 | 1.00 | $ 36,221 | $ 34,627 | $ 684 | $ 35,312 | $ 5,899 | $ 35,312 | 1.450 | $ 51,195 | 0.721 | $ 36,934 |
| 2047 | 26 | 22.5 | 1.00 | $ 38,107 | $ 36,430 | $ 720 | $ 37,150 | $ 6,206 | $ 37,150 | 1.460 | $ 54,224 | 0.711 | $ 38,530 |
| 2048 | 27 | 23.5 | 1.00 | $ 39,925 | $ 38,169 | $ 754 | $ 38,923 | $ 6,502 | $ 38,923 | 1.469 | $ 57,195 | 0.700 | $ 40,029 |
| 2049 | 28 | 24.5 | 1.00 | $ 41,677 | $ 39,843 | $ 787 | $ 40,631 | $ 6,788 | $ 40,631 | 1.479 | $ 60,108 | 0.689 | $ 41,433 |
| 2050 | 29 | 25.5 | 1.00 | $ 43,362 | $ 41,454 | $ 819 | $ 42,274 | $ 7,062 | $ 42,274 | 1.489 | $ 62,960 | 0.679 | $ 42,745 |
| 2051 | 30 | 26.5 | 1.00 | $ 44,981 | $ 43,001 | $ 850 | $ 43,851 | $ 7,326 | $ 43,851 | 1.499 | $ 65,751 | 0.669 | $ 43,967 |
| 2052 | 31 | 27.5 | 1.00 | $ 46,532 | $ 44,485 | $ 879 | $ 45,364 | $ 7,578 | $ 45,364 | 1.510 | $ 68,478 | 0.659 | $ 45,101 |
| 2053 | 32 | 28.5 | 1.00 | $ 48,017 | $ 45,904 | $ 907 | $ 46,811 | $ 7,820 | $ 46,811 | 1.520 | $ 71,140 | 0.649 | $ 46,148 |
| 2054 | 33 | 29.5 | 1.00 | $ 49,435 | $ 47,259 | $ 934 | $ 48,193 | $ 8,051 | $ 48,193 | 1.530 | $ 73,735 | 0.639 | $ 47,110 |

# Projected Future Earnings

**J████ Grenier**

**Educational Attainment:  Associate Degree**

**Date of Loss:  July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 187 of 432   PageID.8195

***Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)***

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 24 |
| Unemployment Rate | 4.40% | | Attachment 39 |
| Prob. Of Future Employment | 95.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 4.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 95.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2055 | 34 | 30.5 | 1.00 | $ 50,786 | $ 48,551 | $ 959 | $ 49,510 | $ 8,271 | $ 49,510 | 1.540 | $ 76,262 | 0.619 | $ 47,231 |
| 2056 | 35 | 31.5 | 1.00 | $ 52,070 | $ 49,779 | $ 984 | $ 50,762 | $ 8,480 | $ 50,762 | 1.551 | $ 78,719 | 0.610 | $ 47,992 |
| 2057 | 36 | 32.5 | 1.00 | $ 53,287 | $ 50,943 | $ 1,007 | $ 51,949 | $ 8,678 | $ 51,949 | 1.561 | $ 81,103 | 0.600 | $ 48,675 |
| 2058 | 37 | 33.5 | 1.00 | $ 54,438 | $ 52,043 | $ 1,028 | $ 53,071 | $ 8,866 | $ 53,071 | 1.572 | $ 83,414 | 0.591 | $ 49,282 |
| 2059 | 38 | 34.5 | 1.00 | $ 55,522 | $ 53,079 | $ 1,049 | $ 54,127 | $ 9,042 | $ 54,127 | 1.582 | $ 85,649 | 0.582 | $ 49,814 |
| 2060 | 39 | 35.5 | 1.00 | $ 56,539 | $ 54,051 | $ 1,068 | $ 55,119 | $ 9,208 | $ 55,119 | 1.593 | $ 87,807 | 0.573 | $ 50,273 |
| 2061 | 40 | 36.5 | 1.00 | $ 57,489 | $ 54,959 | $ 1,086 | $ 56,045 | $ 9,363 | $ 56,045 | 1.604 | $ 89,885 | 0.564 | $ 50,661 |
| 2062 | 41 | 37.5 | 1.00 | $ 58,372 | $ 55,804 | $ 1,103 | $ 56,906 | $ 9,506 | $ 56,906 | 1.615 | $ 91,883 | 0.555 | $ 50,979 |
| 2063 | 42 | 38.5 | 1.00 | $ 59,189 | $ 56,584 | $ 1,118 | $ 57,702 | $ 9,639 | $ 57,702 | 1.626 | $ 93,797 | 0.546 | $ 51,230 |
| 2064 | 43 | 39.5 | 1.00 | $ 59,938 | $ 57,301 | $ 1,132 | $ 58,433 | $ 9,762 | $ 58,433 | 1.637 | $ 95,627 | 0.538 | $ 51,415 |
| 2065 | 44 | 40.5 | 1.00 | $ 60,621 | $ 57,954 | $ 1,145 | $ 59,099 | $ 9,873 | $ 59,099 | 1.648 | $ 97,369 | 0.529 | $ 51,536 |
| 2066 | 45 | 41.5 | 1.00 | $ 61,237 | $ 58,543 | $ 1,157 | $ 59,700 | $ 9,973 | $ 59,700 | 1.659 | $ 99,023 | 0.521 | $ 51,595 |
| 2067 | 46 | 42.5 | 1.00 | $ 61,787 | $ 59,068 | $ 1,167 | $ 60,235 | $ 10,063 | $ 60,235 | 1.670 | $ 100,586 | 0.513 | $ 51,592 |
| 2068 | 47 | 43.5 | 1.00 | $ 62,269 | $ 59,529 | $ 1,176 | $ 60,706 | $ 10,141 | $ 60,706 | 1.681 | $ 102,056 | 0.505 | $ 51,530 |

# Projected Future Earnings

**Attachment 7**

**J▆▆▆ Grenier**

**Educational Attainment:  Associate Degree**

**Date of Loss:  July 7, 2021**

***Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)***

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B▆ | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 24 |
| Unemployment Rate | 4.40% | | Attachment 39 |
| Prob. Of Future Employment | 95.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 4.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 95.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2069 | 48 | 44.5 | 1.00 | $ 62,685 | $ 59,927 | $ 1,184 | $ 61,111 | $ 10,209 | $ 61,111 | 1.693 | $ 103,431 | 0.497 | $ 51,411 |
| 2070 | 49 | 45.5 | 1.00 | $ 63,034 | $ 60,260 | $ 1,191 | $ 61,451 | $ 10,266 | $ 61,451 | 1.704 | $ 104,709 | 0.489 | $ 51,235 |
| 2071 | 50 | 46.5 | 1.00 | $ 63,316 | $ 60,530 | $ 1,196 | $ 61,726 | $ 10,312 | $ 61,726 | 1.715 | $ 105,888 | 0.482 | $ 51,004 |
| 2072 | 51 | 47.5 | 1.00 | $ 63,531 | $ 60,736 | $ 1,200 | $ 61,936 | $ 10,347 | $ 61,936 | 1.727 | $ 106,965 | 0.474 | $ 50,720 |
| 2073 | 52 | 48.5 | 1.00 | $ 63,680 | $ 60,878 | $ 1,203 | $ 62,081 | $ 10,371 | $ 62,081 | 1.739 | $ 107,939 | 0.467 | $ 50,384 |
| 2074 | 53 | 49.5 | 1.00 | $ 63,762 | $ 60,956 | $ 1,204 | $ 62,160 | $ 10,384 | $ 62,160 | 1.750 | $ 108,807 | 0.460 | $ 49,998 |
| 2075 | 54 | 50.5 | 1.00 | $ 63,776 | $ 60,970 | $ 1,205 | $ 62,175 | $ 10,387 | $ 62,175 | 1.762 | $ 109,568 | 0.452 | $ 49,562 |
| 2076 | 55 | 51.5 | 1.00 | $ 63,724 | $ 60,921 | $ 1,204 | $ 62,124 | $ 10,378 | $ 62,124 | 1.774 | $ 110,218 | 0.445 | $ 49,079 |
| 2077 | 56 | 52.5 | 1.00 | $ 63,606 | $ 60,807 | $ 1,202 | $ 62,009 | $ 10,359 | $ 62,009 | 1.786 | $ 110,755 | 0.438 | $ 48,550 |
| 2078 | 57 | 53.5 | 1.00 | $ 63,420 | $ 60,630 | $ 1,198 | $ 61,828 | $ 10,329 | $ 61,828 | 1.798 | $ 111,178 | 0.432 | $ 47,976 |
| 2079 | 58 | 54.5 | 1.00 | $ 63,168 | $ 60,388 | $ 1,193 | $ 61,582 | $ 10,287 | $ 61,582 | 1.810 | $ 111,483 | 0.425 | $ 47,358 |
| 2080 | 59 | 55.5 | 1.00 | $ 62,849 | $ 60,083 | $ 1,187 | $ 61,270 | $ 10,235 | $ 61,270 | 1.823 | $ 111,669 | 0.418 | $ 46,697 |
| 2081 | 60 | 56.5 | 1.00 | $ 62,463 | $ 59,714 | $ 1,180 | $ 60,894 | $ 10,173 | $ 60,894 | 1.835 | $ 111,732 | 0.412 | $ 45,995 |

# Projected Future Earnings

**Attachment 7**

J███ **Grenier**

## Educational Attainment:  Associate Degree

## Date of Loss:   July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 24 |
| Unemployment Rate | 4.40% | | Attachment 39 |
| Prob. Of Future Employment | 95.60% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 4.40% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 95.60% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2082 | 61 | 57.5 | 0.37 | $ 62,010 | $ 59,281 | $ 1,171 | $ 60,453 | $ 10,099 | $ 22,166 | 1.847 | $ 40,946 | 0.405 | $ 16,593 |

**NET PRESENT VALUE, PROJECTED FUTURE EARNINGS = $ 1,888,496**

# Projected Future Earnings

J████ Grenier

## Educational Attainment:  Bachelor's Degree

## Date of Loss:   July 7, 2021

***Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)***

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.68 | | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | | Attachment 34 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 25 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2043 | 22 | 18.5 | 0.48 | $ 32,479 | $ 31,537 | $ 369 | $ 31,906 | $ 5,373 | $ 18,018 | 1.421 | $ 25,600 | 0.761 | $ 19,487 |
| 2044 | 23 | 19.5 | 1.00 | $ 36,267 | $ 35,216 | $ 412 | $ 35,627 | $ 5,999 | $ 35,627 | 1.430 | $ 50,962 | 0.750 | $ 38,224 |
| 2045 | 24 | 20.5 | 1.00 | $ 39,929 | $ 38,771 | $ 453 | $ 39,224 | $ 6,605 | $ 39,224 | 1.440 | $ 56,486 | 0.732 | $ 41,375 |
| 2046 | 25 | 21.5 | 1.00 | $ 43,464 | $ 42,203 | $ 494 | $ 42,697 | $ 7,190 | $ 42,697 | 1.450 | $ 61,902 | 0.721 | $ 44,659 |
| 2047 | 26 | 22.5 | 1.00 | $ 46,872 | $ 45,513 | $ 532 | $ 46,045 | $ 7,753 | $ 46,045 | 1.460 | $ 67,207 | 0.711 | $ 47,755 |
| 2048 | 27 | 23.5 | 1.00 | $ 50,154 | $ 48,699 | $ 570 | $ 49,269 | $ 8,296 | $ 49,269 | 1.469 | $ 72,398 | 0.700 | $ 50,668 |
| 2049 | 28 | 24.5 | 1.00 | $ 53,309 | $ 51,763 | $ 605 | $ 52,368 | $ 8,818 | $ 52,368 | 1.479 | $ 77,472 | 0.689 | $ 53,402 |
| 2050 | 29 | 25.5 | 1.00 | $ 56,337 | $ 54,703 | $ 640 | $ 55,343 | $ 9,319 | $ 55,343 | 1.489 | $ 82,426 | 0.679 | $ 55,961 |
| 2051 | 30 | 26.5 | 1.00 | $ 59,239 | $ 57,521 | $ 673 | $ 58,194 | $ 9,799 | $ 58,194 | 1.499 | $ 87,257 | 0.669 | $ 58,348 |
| 2052 | 31 | 27.5 | 1.00 | $ 62,014 | $ 60,216 | $ 704 | $ 60,920 | $ 10,258 | $ 60,920 | 1.510 | $ 91,961 | 0.659 | $ 60,567 |
| 2053 | 32 | 28.5 | 1.00 | $ 64,663 | $ 62,788 | $ 734 | $ 63,522 | $ 10,696 | $ 63,522 | 1.520 | $ 96,536 | 0.649 | $ 62,622 |
| 2054 | 33 | 29.5 | 1.00 | $ 67,185 | $ 65,236 | $ 763 | $ 65,999 | $ 11,113 | $ 65,999 | 1.530 | $ 100,979 | 0.639 | $ 64,516 |
| 2055 | 34 | 30.5 | 1.00 | $ 69,580 | $ 67,562 | $ 790 | $ 68,352 | $ 11,510 | $ 68,352 | 1.540 | $ 105,285 | 0.619 | $ 65,205 |
| 2056 | 35 | 31.5 | 1.00 | $ 71,849 | $ 69,765 | $ 804 | $ 70,569 | $ 11,885 | $ 70,569 | 1.551 | $ 109,433 | 0.610 | $ 66,718 |

**Attachment 8**

# Projected Future Earnings

J█ Grenier

## Educational Attainment:  Bachelor's Degree

## Date of Loss:  July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.68 | | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | | Attachment 34 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 25 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr} - \text{Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2057 | 36 | 32.5 | 1.00 | $73,991 | $71,845 | 804 | $72,649 | $12,239 | $72,649 | 1.561 | $113,419 | 0.600 | $68,070 |
| 2058 | 37 | 33.5 | 1.00 | $76,007 | $73,802 | 804 | $74,606 | $12,573 | $74,606 | 1.572 | $117,261 | 0.591 | $69,279 |
| 2059 | 38 | 34.5 | 1.00 | $77,895 | $75,636 | 804 | $76,440 | $12,885 | $76,440 | 1.582 | $120,955 | 0.582 | $70,348 |
| 2060 | 39 | 35.5 | 1.00 | $79,658 | $77,348 | 804 | $78,151 | $13,177 | $78,151 | 1.593 | $124,498 | 0.573 | $71,280 |
| 2061 | 40 | 36.5 | 1.00 | $81,293 | $78,936 | 804 | $79,739 | $13,447 | $79,739 | 1.604 | $127,886 | 0.564 | $72,078 |
| 2062 | 41 | 37.5 | 1.00 | $82,803 | $80,401 | 804 | $81,205 | $13,697 | $81,205 | 1.615 | $131,115 | 0.555 | $72,747 |
| 2063 | 42 | 38.5 | 1.00 | $84,185 | $81,744 | 804 | $82,547 | $13,925 | $82,547 | 1.626 | $134,183 | 0.546 | $73,288 |
| 2064 | 43 | 39.5 | 1.00 | $85,441 | $82,963 | 804 | $83,767 | $14,133 | $83,767 | 1.637 | $137,085 | 0.538 | $73,706 |
| 2065 | 44 | 40.5 | 1.00 | $86,570 | $84,060 | 804 | $84,863 | $14,320 | $84,863 | 1.648 | $139,817 | 0.529 | $74,004 |
| 2066 | 45 | 41.5 | 1.00 | $87,573 | $85,033 | 804 | $85,837 | $14,486 | $85,837 | 1.659 | $142,376 | 0.521 | $74,183 |
| 2067 | 46 | 42.5 | 1.00 | $88,449 | $85,884 | 804 | $86,687 | $14,631 | $86,687 | 1.670 | $144,757 | 0.513 | $74,249 |
| 2068 | 47 | 43.5 | 1.00 | $89,198 | $86,611 | 804 | $87,415 | $14,755 | $87,415 | 1.681 | $146,958 | 0.505 | $74,203 |
| 2069 | 48 | 44.5 | 1.00 | $89,821 | $87,216 | 804 | $88,020 | $14,858 | $88,020 | 1.693 | $148,974 | 0.497 | $74,048 |
| 2070 | 49 | 45.5 | 1.00 | $90,317 | $87,698 | 804 | $88,501 | $14,940 | $88,501 | 1.704 | $150,801 | 0.489 | $73,788 |

**Attachment 8**

# Projected Future Earnings

**J██ Grenier**

**Educational Attainment:  Bachelor's Degree**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.68 | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | Attachment 34 |
| Projected Earnings, 2017 $$ | | **E** Calculated from formula on Attachment 25 |
| Unemployment Rate | 2.90% | **E** Attachment 40 |
| Prob. Of Future Employment | 97.10% | **F** Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | **G** Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | **I** Attachment 44 |
| Real Wage Growth Rate | 0.68% | **L** Attachment 41 |
| Cumulative Growth Factor | | **K** Calc. as (1 + Growth Rate)$^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | **L** Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2071 | 50 | 46.5 | 1.00 | $ 90,687 | $ 88,057 | 804 | $ 88,860 | $ 15,001 | $ 88,860 | 1.715 | $ 152,435 | 0.482 | $ 73,425 |
| 2072 | 51 | 47.5 | 1.00 | $ 90,930 | $ 88,293 | 804 | $ 89,096 | $ 15,041 | $ 89,096 | 1.727 | $ 153,872 | 0.474 | $ 72,962 |
| 2073 | 52 | 48.5 | 1.00 | $ 91,046 | $ 88,406 | 804 | $ 89,209 | $ 15,060 | $ 89,209 | 1.739 | $ 155,107 | 0.467 | $ 72,401 |
| 2074 | 53 | 49.5 | 1.00 | $ 91,036 | $ 88,396 | 804 | $ 89,199 | $ 15,059 | $ 89,199 | 1.750 | $ 156,137 | 0.460 | $ 71,746 |
| 2075 | 54 | 50.5 | 1.00 | $ 90,899 | $ 88,263 | 804 | $ 89,066 | $ 15,036 | $ 89,066 | 1.762 | $ 156,957 | 0.452 | $ 70,999 |
| 2076 | 55 | 51.5 | 1.00 | $ 90,635 | $ 88,007 | 804 | $ 88,811 | $ 14,992 | $ 88,811 | 1.774 | $ 157,563 | 0.445 | $ 70,162 |
| 2077 | 56 | 52.5 | 1.00 | $ 90,245 | $ 87,628 | 804 | $ 88,432 | $ 14,928 | $ 88,432 | 1.786 | $ 157,951 | 0.438 | $ 69,238 |
| 2078 | 57 | 53.5 | 1.00 | $ 89,729 | $ 87,127 | 804 | $ 87,930 | $ 14,842 | $ 87,930 | 1.798 | $ 158,115 | 0.432 | $ 68,230 |
| 2079 | 58 | 54.5 | 1.00 | $ 89,085 | $ 86,502 | 804 | $ 87,305 | $ 14,736 | $ 87,305 | 1.810 | $ 158,052 | 0.425 | $ 67,140 |
| 2080 | 59 | 55.5 | 1.00 | $ 88,315 | $ 85,754 | 804 | $ 86,558 | $ 14,609 | $ 86,558 | 1.823 | $ 157,756 | 0.418 | $ 65,970 |
| 2081 | 60 | 56.5 | 1.00 | $ 87,419 | $ 84,884 | 804 | $ 85,687 | $ 14,460 | $ 85,687 | 1.835 | $ 157,224 | 0.412 | $ 64,722 |
| 2082 | 61 | 57.5 | 1.00 | $ 86,396 | $ 83,890 | 804 | $ 84,694 | $ 14,291 | $ 84,694 | 1.847 | $ 156,451 | 0.405 | $ 63,400 |
| 2083 | 62 | 58.5 | 1.00 | $ 85,246 | $ 82,774 | 804 | $ 83,577 | $ 14,101 | $ 83,577 | 1.860 | $ 155,431 | 0.399 | $ 62,005 |

**Projected Future Earnings**                                                              **Attachment 8**

**J███ Grenier**

**Educational Attainment:  Bachelor's Degree**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.68 | | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | | Attachment 34 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 25 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2084 | 63 | 59.5 | 0.19 | $ 83,970 | $ 81,534 | $ 804 | $ 82,338 | $ 13,890 | $ 16,010 | 1.872 | $ 29,976 | 0.393 | $ 11,772 |

NET PRESENT VALUE, PROJECTED FUTURE EARNINGS =   $ 2,648,950

**Attachment 9**

**Projected Future Earnings**

**J⬛ Grenier**

**Educational Attainment:  Master's Degree**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 39.66 | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | Attachment 35 |
| Projected Earnings, 2017 $$ | | **E** Calculated from formula on Attachment 26 |
| Unemployment Rate | 2.90% | **F** Calculated as (1 - Unemployment Rate) |
| Prob. Of Future Employment | 97.10% | **G** Assumes 2.90% of a year less 1/3 wait week |
| Unemployment Benefits, 2017 $$ | | **I** Attachment 44 |
| Fringe Benefits as % of Wages | 17.0% | **L** Attachment 41 |
| Real Wage Growth Rate | 0.68% | |
| Cumulative Growth Factor | | **K** Calc. as (1 + Growth Rate) $^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate) $^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | **L** Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2045 | 24 | 20.5 | 0.48 | $ 49,310 | $ 47,880 | 560 | $ 48,440 | $ 8,157 | $ 27,355 | 1.440 | $ 39,394 | 0.732 | $ 28,855 |
| 2046 | 25 | 21.5 | 1.00 | $ 53,407 | $ 51,858 | 607 | $ 52,465 | $ 8,834 | $ 52,465 | 1.450 | $ 76,063 | 0.721 | $ 54,875 |
| 2047 | 26 | 22.5 | 1.00 | $ 57,356 | $ 55,693 | 651 | $ 56,344 | $ 9,488 | $ 56,344 | 1.460 | $ 82,239 | 0.711 | $ 58,437 |
| 2048 | 27 | 23.5 | 1.00 | $ 61,157 | $ 59,384 | 695 | $ 60,078 | $ 10,116 | $ 60,078 | 1.469 | $ 88,282 | 0.700 | $ 61,785 |
| 2049 | 28 | 24.5 | 1.00 | $ 64,811 | $ 62,931 | 736 | $ 63,667 | $ 10,721 | $ 63,667 | 1.479 | $ 94,187 | 0.689 | $ 64,924 |
| 2050 | 29 | 25.5 | 1.00 | $ 68,317 | $ 66,335 | 776 | $ 67,111 | $ 11,301 | $ 67,111 | 1.489 | $ 99,953 | 0.679 | $ 67,860 |
| 2051 | 30 | 26.5 | 1.00 | $ 71,675 | $ 69,596 | 804 | $ 70,400 | $ 11,856 | $ 70,400 | 1.499 | $ 105,558 | 0.669 | $ 70,586 |
| 2052 | 31 | 27.5 | 1.00 | $ 74,885 | $ 72,714 | 804 | $ 73,517 | $ 12,387 | $ 73,517 | 1.510 | $ 110,977 | 0.659 | $ 73,091 |
| 2053 | 32 | 28.5 | 1.00 | $ 77,948 | $ 75,688 | 804 | $ 76,491 | $ 12,894 | $ 76,491 | 1.520 | $ 116,246 | 0.649 | $ 75,407 |
| 2054 | 33 | 29.5 | 1.00 | $ 80,863 | $ 78,518 | 804 | $ 79,322 | $ 13,376 | $ 79,322 | 1.530 | $ 121,362 | 0.639 | $ 77,539 |
| 2055 | 34 | 30.5 | 1.00 | $ 83,631 | $ 81,205 | 804 | $ 82,009 | $ 13,834 | $ 82,009 | 1.540 | $ 126,320 | 0.619 | $ 78,233 |
| 2056 | 35 | 31.5 | 1.00 | $ 86,250 | $ 83,749 | 804 | $ 84,553 | $ 14,267 | $ 84,553 | 1.551 | $ 131,118 | 0.610 | $ 79,939 |
| 2057 | 36 | 32.5 | 1.00 | $ 88,722 | $ 86,149 | 804 | $ 86,953 | $ 14,676 | $ 86,953 | 1.561 | $ 135,751 | 0.600 | $ 81,473 |
| 2058 | 37 | 33.5 | 1.00 | $ 91,047 | $ 88,406 | 804 | $ 89,210 | $ 15,060 | $ 89,210 | 1.572 | $ 140,215 | 0.591 | $ 82,841 |

# Projected Future Earnings

**Attachment 9**

**J███ Grenier**

## Educational Attainment:  Master's Degree

## Date of Loss:   July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Be | 39.66 | | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | | Attachment 35 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 26 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr} - \text{Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2059 | 38 | 34.5 | 1.00 | $ 93,223 | $ 90,520 | $ 804 | $ 91,323 | $ 15,420 | $ 91,323 | 1.582 | $ 144,506 | 0.582 | $ 84,045 |
| 2060 | 39 | 35.5 | 1.00 | $ 95,252 | $ 92,490 | $ 804 | $ 93,293 | $ 15,756 | $ 93,293 | 1.593 | $ 148,620 | 0.573 | $ 85,091 |
| 2061 | 40 | 36.5 | 1.00 | $ 97,133 | $ 94,317 | $ 804 | $ 95,120 | $ 16,067 | $ 95,120 | 1.604 | $ 152,553 | 0.564 | $ 85,981 |
| 2062 | 41 | 37.5 | 1.00 | $ 98,867 | $ 96,000 | $ 804 | $ 96,803 | $ 16,354 | $ 96,803 | 1.615 | $ 156,301 | 0.555 | $ 86,721 |
| 2063 | 42 | 38.5 | 1.00 | $ 100,453 | $ 97,540 | $ 804 | $ 98,343 | $ 16,616 | $ 98,343 | 1.626 | $ 159,860 | 0.546 | $ 87,313 |
| 2064 | 43 | 39.5 | 1.00 | $ 101,891 | $ 98,936 | $ 804 | $ 99,740 | $ 16,854 | $ 99,740 | 1.637 | $ 163,225 | 0.538 | $ 87,761 |
| 2065 | 44 | 40.5 | 1.00 | $ 103,182 | $ 100,189 | $ 804 | $ 100,993 | $ 17,068 | $ 100,993 | 1.648 | $ 166,391 | 0.529 | $ 88,069 |
| 2066 | 45 | 41.5 | 1.00 | $ 104,324 | $ 101,299 | $ 804 | $ 102,102 | $ 17,257 | $ 102,102 | 1.659 | $ 169,355 | 0.521 | $ 88,241 |
| 2067 | 46 | 42.5 | 1.00 | $ 105,319 | $ 102,265 | $ 804 | $ 103,069 | $ 17,421 | $ 103,069 | 1.670 | $ 172,113 | 0.513 | $ 88,280 |
| 2068 | 47 | 43.5 | 1.00 | $ 106,167 | $ 103,088 | $ 804 | $ 103,892 | $ 17,562 | $ 103,892 | 1.681 | $ 174,658 | 0.505 | $ 88,189 |
| 2069 | 48 | 44.5 | 1.00 | $ 106,867 | $ 103,767 | $ 804 | $ 104,571 | $ 17,677 | $ 104,571 | 1.693 | $ 176,987 | 0.497 | $ 87,972 |
| 2070 | 49 | 45.5 | 1.00 | $ 107,419 | $ 104,304 | $ 804 | $ 105,107 | $ 17,769 | $ 105,107 | 1.704 | $ 179,096 | 0.489 | $ 87,633 |
| 2071 | 50 | 46.5 | 1.00 | $ 107,823 | $ 104,696 | $ 804 | $ 105,500 | $ 17,835 | $ 105,500 | 1.715 | $ 180,979 | 0.482 | $ 87,174 |
| 2072 | 51 | 47.5 | 1.00 | $ 108,080 | $ 104,945 | $ 804 | $ 105,749 | $ 17,878 | $ 105,749 | 1.727 | $ 182,631 | 0.474 | $ 86,599 |

# Projected Future Earnings

J███ Grenier

**Educational Attainment:  Master's Degree**

**Date of Loss:   July 7, 2021**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 196 of 432    PageID.8204

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 39.66 | | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | | Attachment 35 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 26 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2073 | 52 | 48.5 | 1.00 | $ 108,189 | $ 105,051 | $ 804 | $ 105,855 | $ 17,896 | $ 105,855 | 1.739 | $ 184,048 | 0.467 | $ 85,910 |
| 2074 | 53 | 49.5 | 1.00 | $ 108,150 | $ 105,013 | $ 804 | $ 105,817 | $ 17,890 | $ 105,817 | 1.750 | $ 185,225 | 0.460 | $ 85,112 |
| 2075 | 54 | 50.5 | 1.00 | $ 107,963 | $ 104,832 | $ 804 | $ 105,636 | $ 17,859 | $ 105,636 | 1.762 | $ 186,157 | 0.452 | $ 84,207 |
| 2076 | 55 | 51.5 | 1.00 | $ 107,629 | $ 104,508 | $ 804 | $ 105,312 | $ 17,803 | $ 105,312 | 1.774 | $ 186,838 | 0.445 | $ 83,198 |
| 2077 | 56 | 52.5 | 1.00 | $ 107,147 | $ 104,040 | $ 804 | $ 104,844 | $ 17,724 | $ 104,844 | 1.786 | $ 187,264 | 0.438 | $ 82,088 |
| 2078 | 57 | 53.5 | 1.00 | $ 106,518 | $ 103,429 | $ 804 | $ 104,232 | $ 17,620 | $ 104,232 | 1.798 | $ 187,430 | 0.432 | $ 80,880 |
| 2079 | 58 | 54.5 | 1.00 | $ 105,741 | $ 102,674 | $ 804 | $ 103,478 | $ 17,491 | $ 103,478 | 1.810 | $ 187,329 | 0.425 | $ 79,577 |
| 2080 | 59 | 55.5 | 1.00 | $ 104,816 | $ 101,776 | $ 804 | $ 102,580 | $ 17,338 | $ 102,580 | 1.823 | $ 186,957 | 0.418 | $ 78,181 |
| 2081 | 60 | 56.5 | 1.00 | $ 103,743 | $ 100,735 | $ 804 | $ 101,538 | $ 17,161 | $ 101,538 | 1.835 | $ 186,309 | 0.412 | $ 76,695 |
| 2082 | 61 | 57.5 | 1.00 | $ 102,523 | $ 99,550 | $ 804 | $ 100,353 | $ 16,959 | $ 100,353 | 1.847 | $ 185,378 | 0.405 | $ 75,123 |
| 2083 | 62 | 58.5 | 1.00 | $ 101,155 | $ 98,222 | $ 804 | $ 99,025 | $ 16,733 | $ 99,025 | 1.860 | $ 184,160 | 0.399 | $ 73,466 |
| 2084 | 63 | 59.5 | 1.00 | $ 99,639 | $ 96,750 | $ 804 | $ 97,553 | $ 16,482 | $ 97,553 | 1.872 | $ 182,648 | 0.393 | $ 71,727 |
| 2085 | 64 | 60.5 | 0.18 | $ 97,976 | $ 95,135 | $ 804 | $ 95,938 | $ 16,207 | $ 16,789 | 1.885 | $ 31,646 | 0.387 | $ 12,234 |

# Projected Future Earnings

**Attachment 9**

J███ Grenier

## Educational Attainment:  Master's Degree

## Date of Loss:   July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 39.66 | | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | | Attachment 35 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 26 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |

NET PRESENT VALUE, PROJECTED FUTURE EARNINGS = $ 3,143,312

**Attachment 10**

# Projected Future Earnings

**J    Grenier**

## Educational Attainment:  Doctorate Degree

## Date of Loss:  July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B| 40.16 | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | Attachment 36 |
| Projected Earnings, 2017 $$ | | Calculated from formula on Attachment 27 | E |
| Unemployment Rate | 2.90% | Attachment 40 | E |
| Prob. Of Future Employment | 97.10% | Calculated as (1 - Unemployment Rate) | F |
| Unemployment Benefits, 2017 $$ | | Assumes 2.90% of a year less 1/3 wait week | G |
| Fringe Benefits as % of Wages | 17.0% | Attachment 44 | I |
| Real Wage Growth Rate | 0.68% | Attachment 41 | |
| Cumulative Growth Factor | | Calc. as (1 + Growth Rate) $^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ | K |
| Cumulative Discount Factor | | Attachment 45 | L |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H+I) | | J x K | | L x M |
| 2048 | | 27 | 23.5 | 0.49 | $ 61,079 | $ 59,307 | 694 | $ 60,001 | $ 10,103 | $ 34,079 | 1.469 | $ 50,077 | 0.700 | $ 35,047 |
| 2049 | | 28 | 24.5 | 1.00 | $ 65,351 | $ 63,456 | 742 | $ 64,198 | $ 10,810 | $ 64,198 | 1.479 | $ 94,973 | 0.689 | $ 65,466 |
| 2050 | | 29 | 25.5 | 1.00 | $ 69,477 | $ 67,462 | 789 | $ 68,251 | $ 11,493 | $ 68,251 | 1.489 | $ 101,651 | 0.679 | $ 69,013 |
| 2051 | | 30 | 26.5 | 1.00 | $ 73,456 | $ 71,326 | 804 | $ 72,129 | $ 12,151 | $ 72,129 | 1.499 | $ 108,152 | 0.669 | $ 72,320 |
| 2052 | | 31 | 27.5 | 1.00 | $ 77,288 | $ 75,047 | 804 | $ 75,850 | $ 12,785 | $ 75,850 | 1.510 | $ 114,499 | 0.659 | $ 75,410 |
| 2053 | | 32 | 28.5 | 1.00 | $ 80,973 | $ 78,625 | 804 | $ 79,429 | $ 13,394 | $ 79,429 | 1.520 | $ 120,710 | 0.649 | $ 78,303 |
| 2054 | | 33 | 29.5 | 1.00 | $ 84,512 | $ 82,061 | 804 | $ 82,864 | $ 13,979 | $ 82,864 | 1.530 | $ 126,782 | 0.639 | $ 81,002 |
| 2055 | | 34 | 30.5 | 1.00 | $ 87,903 | $ 85,354 | 804 | $ 86,158 | $ 14,540 | $ 86,158 | 1.540 | $ 132,711 | 0.619 | $ 82,191 |
| 2056 | | 35 | 31.5 | 1.00 | $ 91,148 | $ 88,505 | 804 | $ 89,308 | $ 15,077 | $ 89,308 | 1.551 | $ 138,493 | 0.610 | $ 84,435 |
| 2057 | | 36 | 32.5 | 1.00 | $ 94,246 | $ 91,513 | 804 | $ 92,316 | $ 15,590 | $ 92,316 | 1.561 | $ 144,124 | 0.600 | $ 86,498 |
| 2058 | | 37 | 33.5 | 1.00 | $ 97,197 | $ 94,378 | 804 | $ 95,181 | $ 16,078 | $ 95,181 | 1.572 | $ 149,600 | 0.591 | $ 88,386 |
| 2059 | | 38 | 34.5 | 1.00 | $ 100,001 | $ 97,101 | 804 | $ 97,904 | $ 16,542 | $ 97,904 | 1.582 | $ 154,919 | 0.582 | $ 90,102 |
| 2060 | | 39 | 35.5 | 1.00 | $ 102,658 | $ 99,681 | 804 | $ 100,484 | $ 16,981 | $ 100,484 | 1.593 | $ 160,075 | 0.573 | $ 91,649 |
| 2061 | | 40 | 36.5 | 1.00 | $ 105,168 | $ 102,118 | 804 | $ 102,922 | $ 17,396 | $ 102,922 | 1.604 | $ 165,066 | 0.564 | $ 93,033 |
| 2062 | | 41 | 37.5 | 1.00 | $ 107,532 | $ 104,413 | 804 | $ 105,217 | $ 17,787 | $ 105,217 | 1.615 | $ 169,886 | 0.555 | $ 94,258 |

# Projected Future Earnings

**J▮▮▮ Grenier**

## Educational Attainment:  Doctorate Degree

## Date of Loss:   July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B▮ | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 27 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})}$ x $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2063 | 42 | 38.5 | 1.00 | $ 109,748 | $ 106,566 | $ 804 | $ 107,369 | $ 18,154 | $ 107,369 | 1.626 | $ 174,532 | 0.546 | $ 95,326 |
| 2064 | 43 | 39.5 | 1.00 | $ 111,818 | $ 108,575 | $ 804 | $ 109,379 | $ 18,496 | $ 109,379 | 1.637 | $ 178,999 | 0.538 | $ 96,242 |
| 2065 | 44 | 40.5 | 1.00 | $ 113,741 | $ 110,442 | $ 804 | $ 111,246 | $ 18,814 | $ 111,246 | 1.648 | $ 183,284 | 0.529 | $ 97,010 |
| 2066 | 45 | 41.5 | 1.00 | $ 115,517 | $ 112,167 | $ 804 | $ 112,971 | $ 19,108 | $ 112,971 | 1.659 | $ 187,382 | 0.521 | $ 97,633 |
| 2067 | 46 | 42.5 | 1.00 | $ 117,146 | $ 113,749 | $ 804 | $ 114,552 | $ 19,378 | $ 114,552 | 1.670 | $ 191,289 | 0.513 | $ 98,116 |
| 2068 | 47 | 43.5 | 1.00 | $ 118,629 | $ 115,188 | $ 804 | $ 115,992 | $ 19,623 | $ 115,992 | 1.681 | $ 195,000 | 0.505 | $ 98,460 |
| 2069 | 48 | 44.5 | 1.00 | $ 119,964 | $ 116,485 | $ 804 | $ 117,289 | $ 19,844 | $ 117,289 | 1.693 | $ 198,512 | 0.497 | $ 98,671 |
| 2070 | 49 | 45.5 | 1.00 | $ 121,153 | $ 117,639 | $ 804 | $ 118,443 | $ 20,040 | $ 118,443 | 1.704 | $ 201,819 | 0.489 | $ 98,751 |
| 2071 | 50 | 46.5 | 1.00 | $ 122,194 | $ 118,651 | $ 804 | $ 119,454 | $ 20,213 | $ 119,454 | 1.715 | $ 204,917 | 0.482 | $ 98,705 |
| 2072 | 51 | 47.5 | 1.00 | $ 123,089 | $ 119,520 | $ 804 | $ 120,323 | $ 20,361 | $ 120,323 | 1.727 | $ 207,801 | 0.474 | $ 98,534 |
| 2073 | 52 | 48.5 | 1.00 | $ 123,837 | $ 120,246 | $ 804 | $ 121,050 | $ 20,485 | $ 121,050 | 1.739 | $ 210,468 | 0.467 | $ 98,242 |
| 2074 | 53 | 49.5 | 1.00 | $ 124,439 | $ 120,830 | $ 804 | $ 121,633 | $ 20,584 | $ 121,633 | 1.750 | $ 212,911 | 0.460 | $ 97,834 |
| 2075 | 54 | 50.5 | 1.00 | $ 124,893 | $ 121,271 | $ 804 | $ 122,074 | $ 20,659 | $ 122,074 | 1.762 | $ 215,126 | 0.452 | $ 97,311 |
| 2076 | 55 | 51.5 | 1.00 | $ 125,200 | $ 121,570 | $ 804 | $ 122,373 | $ 20,710 | $ 122,373 | 1.774 | $ 217,108 | 0.445 | $ 96,677 |
| 2077 | 56 | 52.5 | 1.00 | $ 125,361 | $ 121,725 | $ 804 | $ 122,529 | $ 20,737 | $ 122,529 | 1.786 | $ 218,853 | 0.438 | $ 95,935 |

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 199 of 432    PageID.8207

# Projected Future Earnings

**Attachment 10**

**J████ Grenier**

**Educational Attainment:  Doctorate Degree**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Be | 40.16 | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | Attachment 36 |
| Projected Earnings, 2017 $$ | E | Calculated from formula on Attachment 27 |
| Unemployment Rate | 2.90% | Attachment 40 |
| Prob. Of Future Employment | 97.10% F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | K | Calc. as (1 + Growth Rate)$^{(Valuation\,Yr\,-\,Base\,Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\,Ahead\,of\,Valuation\,Yr)}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2078 | 57 | 53.5 | 1.00 | $ 125,375 | $ 121,739 | $ 804 | $ 122,542 | $ 20,739 | $ 122,542 | 1.798 | $ 220,354 | 0.432 | $ 95,088 |
| 2079 | 58 | 54.5 | 1.00 | $ 125,242 | $ 121,610 | $ 804 | $ 122,413 | $ 20,717 | $ 122,413 | 1.810 | $ 221,608 | 0.425 | $ 94,138 |
| 2080 | 59 | 55.5 | 1.00 | $ 124,962 | $ 121,338 | $ 804 | $ 122,141 | $ 20,670 | $ 122,141 | 1.823 | $ 222,609 | 0.418 | $ 93,090 |
| 2081 | 60 | 56.5 | 1.00 | $ 124,535 | $ 120,923 | $ 804 | $ 121,727 | $ 20,600 | $ 121,727 | 1.835 | $ 223,352 | 0.412 | $ 91,944 |
| 2082 | 61 | 57.5 | 1.00 | $ 123,961 | $ 120,366 | $ 804 | $ 121,170 | $ 20,505 | $ 121,170 | 1.847 | $ 223,831 | 0.405 | $ 90,705 |
| 2083 | 62 | 58.5 | 1.00 | $ 123,241 | $ 119,667 | $ 804 | $ 120,470 | $ 20,386 | $ 120,470 | 1.860 | $ 224,042 | 0.399 | $ 89,376 |
| 2084 | 63 | 59.5 | 1.00 | $ 122,373 | $ 118,824 | $ 804 | $ 119,628 | $ 20,242 | $ 119,628 | 1.872 | $ 223,978 | 0.393 | $ 87,957 |
| 2085 | 64 | 60.5 | 1.00 | $ 121,359 | $ 117,840 | $ 804 | $ 118,643 | $ 20,075 | $ 118,643 | 1.885 | $ 223,634 | 0.387 | $ 86,453 |
| 2086 | 65 | 61.5 | 1.00 | $ 120,198 | $ 116,712 | $ 804 | $ 117,516 | $ 19,882 | $ 117,516 | 1.898 | $ 223,004 | 0.381 | $ 84,866 |
| 2087 | 66 | 62.5 | 0.67 | $ 118,890 | $ 115,442 | $ 804 | $ 116,246 | $ 19,666 | $ 78,143 | 1.910 | $ 149,290 | 0.375 | $ 55,928 |

**NET PRESENT VALUE, PROJECTED FUTURE EARNINGS =** $ 3,520,105

**J███ Grenier**

**Educational Attainment:  Professional Degree**

**Date of Loss:  July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 201 of 432   PageID.8209

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 28 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | K | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate)$^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2047 | 26 | 22.5 | 0.48 | $  50,545 | $  49,080 | $   574 | $  49,654 | $  8,361 | $  28,040 | 1.460 | $  40,927 | 0.711 | $  29,082 |
| 2048 | 27 | 23.5 | 1.00 | $  58,817 | $  57,112 | $   668 | $  57,779 | $  9,729 | $  57,779 | 1.469 | $  84,904 | 0.700 | $  59,421 |
| 2049 | 28 | 24.5 | 1.00 | $  66,801 | $  64,863 | $   759 | $  65,622 | $  11,050 | $  65,622 | 1.479 | $  97,079 | 0.689 | $  66,918 |
| 2050 | 29 | 25.5 | 1.00 | $  74,496 | $  72,335 | $   804 | $  73,139 | $  12,323 | $  73,139 | 1.489 | $  108,930 | 0.679 | $  73,955 |
| 2051 | 30 | 26.5 | 1.00 | $  81,903 | $  79,527 | $   804 | $  80,331 | $  13,548 | $  80,331 | 1.499 | $  120,449 | 0.669 | $  80,543 |
| 2052 | 31 | 27.5 | 1.00 | $  89,021 | $  86,439 | $   804 | $  87,243 | $  14,725 | $  87,243 | 1.510 | $  131,697 | 0.659 | $  86,737 |
| 2053 | 32 | 28.5 | 1.00 | $  95,851 | $  93,071 | $   804 | $  93,875 | $  15,855 | $  93,875 | 1.520 | $  142,665 | 0.649 | $  92,545 |
| 2054 | 33 | 29.5 | 1.00 | $  102,393 | $  99,423 | $   804 | $  100,227 | $  16,937 | $  100,227 | 1.530 | $  153,347 | 0.639 | $  97,974 |
| 2055 | 34 | 30.5 | 1.00 | $  108,646 | $  105,495 | $   804 | $  106,299 | $  17,972 | $  106,299 | 1.540 | $  163,735 | 0.619 | $  101,405 |
| 2056 | 35 | 31.5 | 1.00 | $  114,611 | $  111,287 | $   804 | $  112,091 | $  18,958 | $  112,091 | 1.551 | $  173,822 | 0.610 | $  105,974 |
| 2057 | 36 | 32.5 | 1.00 | $  120,287 | $  116,799 | $   804 | $  117,603 | $  19,897 | $  117,603 | 1.561 | $  183,601 | 0.600 | $  110,191 |
| 2058 | 37 | 33.5 | 1.00 | $  125,676 | $  122,031 | $   804 | $  122,834 | $  20,789 | $  122,834 | 1.572 | $  193,064 | 0.591 | $  114,065 |
| 2059 | 38 | 34.5 | 1.00 | $  130,775 | $  126,983 | $   804 | $  127,786 | $  21,632 | $  127,786 | 1.582 | $  202,203 | 0.582 | $  117,602 |
| 2060 | 39 | 35.5 | 1.00 | $  135,587 | $  131,655 | $   804 | $  132,458 | $  22,428 | $  132,458 | 1.593 | $  211,011 | 0.573 | $  120,812 |

# Projected Future Earnings

J███ Grenier

**Educational Attainment:  Professional Degree**

**Date of Loss:   July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 202 of 432   PageID.8210

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 28 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as $(1 + \text{Growth Rate})^{(\text{Valuation Yr - Base Yr})} \times (1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2061 | 40 | 36.5 | 1.00 | $ 140,110 | $ 136,047 | $ 804 | $ 136,850 | $ 23,176 | $ 136,850 | 1.604 | $ 219,480 | 0.564 | $ 123,702 |
| 2062 | 41 | 37.5 | 1.00 | $ 144,344 | $ 140,158 | $ 804 | $ 140,962 | $ 23,877 | $ 140,962 | 1.615 | $ 227,601 | 0.555 | $ 126,280 |
| 2063 | 42 | 38.5 | 1.00 | $ 148,291 | $ 143,990 | $ 804 | $ 144,794 | $ 24,529 | $ 144,794 | 1.626 | $ 235,367 | 0.546 | $ 128,553 |
| 2064 | 43 | 39.5 | 1.00 | $ 151,949 | $ 147,542 | $ 804 | $ 148,346 | $ 25,135 | $ 148,346 | 1.637 | $ 242,769 | 0.538 | $ 130,529 |
| 2065 | 44 | 40.5 | 1.00 | $ 155,318 | $ 150,814 | $ 804 | $ 151,618 | $ 25,692 | $ 151,618 | 1.648 | $ 249,798 | 0.529 | $ 132,216 |
| 2066 | 45 | 41.5 | 1.00 | $ 158,400 | $ 153,806 | $ 804 | $ 154,609 | $ 26,202 | $ 154,609 | 1.659 | $ 256,448 | 0.521 | $ 133,619 |
| 2067 | 46 | 42.5 | 1.00 | $ 161,192 | $ 156,518 | $ 804 | $ 157,321 | $ 26,664 | $ 157,321 | 1.670 | $ 262,708 | 0.513 | $ 134,748 |
| 2068 | 47 | 43.5 | 1.00 | $ 163,697 | $ 158,950 | $ 804 | $ 159,753 | $ 27,078 | $ 159,753 | 1.681 | $ 268,570 | 0.505 | $ 135,607 |
| 2069 | 48 | 44.5 | 1.00 | $ 165,913 | $ 161,101 | $ 804 | $ 161,905 | $ 27,444 | $ 161,905 | 1.693 | $ 274,026 | 0.497 | $ 136,206 |
| 2070 | 49 | 45.5 | 1.00 | $ 167,841 | $ 162,973 | $ 804 | $ 163,777 | $ 27,763 | $ 163,777 | 1.704 | $ 279,065 | 0.489 | $ 136,549 |
| 2071 | 50 | 46.5 | 1.00 | $ 169,480 | $ 164,565 | $ 804 | $ 165,369 | $ 28,034 | $ 165,369 | 1.715 | $ 283,681 | 0.482 | $ 136,643 |
| 2072 | 51 | 47.5 | 1.00 | $ 170,831 | $ 165,877 | $ 804 | $ 166,680 | $ 28,258 | $ 166,680 | 1.727 | $ 287,862 | 0.474 | $ 136,496 |
| 2073 | 52 | 48.5 | 1.00 | $ 171,894 | $ 166,909 | $ 804 | $ 167,712 | $ 28,434 | $ 167,712 | 1.739 | $ 291,599 | 0.467 | $ 136,113 |
| 2074 | 53 | 49.5 | 1.00 | $ 172,668 | $ 167,660 | $ 804 | $ 168,464 | $ 28,562 | $ 168,464 | 1.750 | $ 294,884 | 0.460 | $ 135,501 |

# Projected Future Earnings

## J███ Grenier

**Educational Attainment:  Professional Degree**

**Date of Loss:  July 7, 2021**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 203 of 432    PageID.8211

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 28 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | K | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate) $^{(Valuation Yr - Base Yr)}$ x (1 + Real Growth Rate) $^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| 2075 | 54 | 50.5 | 1.00 | $ 173,154 | $ 168,132 | $ 804 | $ 168,936 | $ 28,642 | $ 168,936 | 1.762 | $ 297,707 | 0.452 | $ 134,666 |
| 2076 | 55 | 51.5 | 1.00 | $ 173,351 | $ 168,324 | $ 804 | $ 169,128 | $ 28,675 | $ 169,128 | 1.774 | $ 300,057 | 0.445 | $ 133,614 |
| 2077 | 56 | 52.5 | 1.00 | $ 173,260 | $ 168,236 | $ 804 | $ 169,039 | $ 28,660 | $ 169,039 | 1.786 | $ 301,926 | 0.438 | $ 132,350 |
| 2078 | 57 | 53.5 | 1.00 | $ 172,881 | $ 167,868 | $ 804 | $ 168,671 | $ 28,597 | $ 168,671 | 1.798 | $ 303,303 | 0.432 | $ 130,882 |
| 2079 | 58 | 54.5 | 1.00 | $ 172,214 | $ 167,219 | $ 804 | $ 168,023 | $ 28,487 | $ 168,023 | 1.810 | $ 304,177 | 0.425 | $ 129,213 |
| 2080 | 59 | 55.5 | 1.00 | $ 171,258 | $ 166,291 | $ 804 | $ 167,095 | $ 28,328 | $ 167,095 | 1.823 | $ 304,539 | 0.418 | $ 127,351 |
| 2081 | 60 | 56.5 | 1.00 | $ 170,013 | $ 165,083 | $ 804 | $ 165,886 | $ 28,123 | $ 165,886 | 1.835 | $ 304,379 | 0.412 | $ 125,299 |
| 2082 | 61 | 57.5 | 1.00 | $ 168,480 | $ 163,595 | $ 804 | $ 164,398 | $ 27,869 | $ 164,398 | 1.847 | $ 303,685 | 0.405 | $ 123,065 |
| 2083 | 62 | 58.5 | 1.00 | $ 166,659 | $ 161,826 | $ 804 | $ 162,630 | $ 27,568 | $ 162,630 | 1.860 | $ 302,447 | 0.399 | $ 120,653 |
| 2084 | 63 | 59.5 | 1.00 | $ 164,550 | $ 159,778 | $ 804 | $ 160,581 | $ 27,219 | $ 160,581 | 1.872 | $ 300,654 | 0.393 | $ 118,069 |
| 2085 | 64 | 60.5 | 1.00 | $ 162,152 | $ 157,450 | $ 804 | $ 158,253 | $ 26,822 | $ 158,253 | 1.885 | $ 298,296 | 0.387 | $ 115,317 |
| 2086 | 65 | 61.5 | 1.00 | $ 159,466 | $ 154,841 | $ 804 | $ 155,645 | $ 26,378 | $ 155,645 | 1.898 | $ 295,360 | 0.381 | $ 112,402 |
| 2087 | 66 | 62.5 | 0.67 | $ 156,491 | $ 151,953 | $ 804 | $ 152,757 | $ 25,886 | $ 102,686 | 1.910 | $ 196,179 | 0.375 | $ 73,494 |

# Projected Future Earnings

**J████ Grenier**

**Educational Attainment:  Professional Degree**

**Date of Loss:   July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings B | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Projected Earnings, 2017 $$ | | E | Calculated from formula on Attachment 28 |
| Unemployment Rate | 2.90% | | Attachment 40 |
| Prob. Of Future Employment | 97.10% | F | Calculated as (1 - Unemployment Rate) |
| Unemployment Benefits, 2017 $$ | | G | Assumes 2.90% of a year less 1/3 wait week |
| Fringe Benefits as % of Wages | 17.0% | I | Attachment 44 |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | K | Calc. as (1 + Growth Rate) $^{(Valuation\ Yr\ -\ Base\ Yr)}$ x (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Proj. Annual Earnings 2017 $$ | Earnings Adj. for Unempl. | Unemp. Benefits | Total Proj. Earnings 2017 $$ | Fringe Benefits | Total Proj. Earn. Adj. Frac. of Yr | Cumul Growth Factor | Projected Earnings Current $$ | Cumul Disc. Factor | NPV Proj. Future Earnings |
| | | | | | E x 97.10% | | F + G | F x 17.04% | D x (H + I) | | J x K | | L x M |
| | | | | | | | | | | NET PRESENT VALUE, PROJECTED FUTURE EARNINGS = | | $ | 4,696,361 |

**Attachment 12**

**Projected Future Taxes**

**[ ] Grenier**

**Educational Attainment: No Diploma or GED**

**Date of Loss: July 7, 2021**

*Assumptions: Analysis starts December 2, 2024 (Date of Valuation) and ends April 3, 2069 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 30.74 | Attachment 30 |
| Projected Date at End of Worklife Expectancy | 4/3/2069 | Attachment 30 |
| Earnings Adjusted for Unemployment, 2017 $$ | E | Attachment 4, Column F |
| Unemployment Benefits | F | Attachment 4, Column G |
| Cumulative Growth Factor | G | Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 L | Attachment 29 |
| Federal Income Tax | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | N | Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | | | | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2038 | 17 | 13.5 | 0.48 | 15,164 | 656 | 7,329 | 317 | 7,646 | 1.250 | 9,560 | - | 701 | 1.099 | 770 | 0.819 | 631 |
| 2039 | 18 | 14.5 | 1.00 | 16,140 | 687 | 16,140 | 687 | 16,827 | 1.250 | 21,038 | 6,438 | 2,188 | 1.106 | 2,420 | 0.807 | 1,954 |
| 2040 | 19 | 15.5 | 1.00 | 17,094 | 727 | 17,094 | 727 | 17,821 | 1.250 | 22,282 | 7,682 | 2,403 | 1.114 | 2,676 | 0.796 | 2,129 |
| 2041 | 20 | 16.5 | 1.00 | 18,026 | 767 | 18,026 | 767 | 18,793 | 1.250 | 23,497 | 8,897 | 2,614 | 1.121 | 2,931 | 0.784 | 2,298 |
| 2042 | 21 | 17.5 | 1.00 | 18,936 | 806 | 18,936 | 806 | 19,741 | 1.250 | 24,682 | 10,082 | 2,819 | 1.129 | 3,182 | 0.772 | 2,458 |
| 2043 | 22 | 18.5 | 1.00 | 19,823 | 844 | 19,823 | 844 | 20,667 | 1.250 | 25,839 | 11,239 | 3,020 | 1.136 | 3,432 | 0.761 | 2,612 |
| 2044 | 23 | 19.5 | 1.00 | 20,688 | 880 | 20,688 | 880 | 21,569 | 1.250 | 26,967 | 12,367 | 3,231 | 1.144 | 3,696 | 0.750 | 2,772 |
| 2045 | 24 | 20.5 | 1.00 | 21,531 | 916 | 21,531 | 916 | 22,448 | 1.250 | 28,066 | 13,466 | 3,443 | 1.152 | 3,966 | 0.732 | 2,905 |
| 2046 | 25 | 21.5 | 1.00 | 22,352 | 951 | 22,352 | 951 | 23,304 | 1.250 | 29,136 | 14,536 | 3,650 | 1.160 | 4,233 | 0.721 | 3,054 |
| 2047 | 26 | 22.5 | 1.00 | 23,151 | 985 | 23,151 | 985 | 24,136 | 1.250 | 30,177 | 15,577 | 3,852 | 1.167 | 4,496 | 0.711 | 3,195 |
| 2048 | 27 | 23.5 | 1.00 | 23,927 | 1,018 | 23,927 | 1,018 | 24,946 | 1.250 | 31,189 | 16,589 | 4,047 | 1.175 | 4,757 | 0.700 | 3,329 |
| 2049 | 28 | 24.5 | 1.00 | 24,682 | 1,050 | 24,682 | 1,050 | 25,732 | 1.250 | 32,172 | 17,572 | 4,237 | 1.183 | 5,014 | 0.689 | 3,456 |
| 2050 | 29 | 25.5 | 1.00 | 25,414 | 1,081 | 25,414 | 1,081 | 26,495 | 1.250 | 33,126 | 18,526 | 4,422 | 1.191 | 5,267 | 0.679 | 3,576 |
| 2051 | 30 | 26.5 | 1.00 | 26,123 | 1,112 | 26,123 | 1,112 | 27,235 | 1.250 | 34,051 | 19,451 | 4,601 | 1.199 | 5,518 | 0.669 | 3,690 |
| 2052 | 31 | 27.5 | 1.00 | 26,811 | 1,141 | 26,811 | 1,141 | 27,952 | 1.250 | 34,948 | 20,348 | 4,774 | 1.207 | 5,764 | 0.659 | 3,796 |
| 2053 | 32 | 28.5 | 1.00 | 27,476 | 1,169 | 27,476 | 1,169 | 28,645 | 1.250 | 35,815 | 21,215 | 4,942 | 1.216 | 6,007 | 0.649 | 3,897 |
| 2054 | 33 | 29.5 | 1.00 | 28,119 | 1,197 | 28,119 | 1,197 | 29,316 | 1.250 | 36,653 | 22,053 | 5,104 | 1.224 | 6,246 | 0.639 | 3,990 |
| 2055 | 34 | 30.5 | 1.00 | 28,740 | 1,223 | 28,740 | 1,223 | 29,963 | 1.250 | 37,463 | 22,863 | 5,260 | 1.232 | 6,481 | 0.619 | 4,014 |
| 2056 | 35 | 31.5 | 1.00 | 29,339 | 1,248 | 29,339 | 1,248 | 30,587 | 1.250 | 38,243 | 23,643 | 5,411 | 1.240 | 6,712 | 0.610 | 4,092 |
| 2057 | 36 | 32.5 | 1.00 | 29,915 | 1,273 | 29,915 | 1,273 | 31,188 | 1.250 | 38,994 | 24,394 | 5,557 | 1.249 | 6,938 | 0.600 | 4,164 |
| 2058 | 37 | 33.5 | 1.00 | 30,470 | 1,297 | 30,470 | 1,297 | 31,766 | 1.250 | 39,717 | 25,117 | 5,696 | 1.257 | 7,161 | 0.591 | 4,231 |
| 2059 | 38 | 34.5 | 1.00 | 31,002 | 1,319 | 31,002 | 1,319 | 32,321 | 1.250 | 40,410 | 25,810 | 5,830 | 1.266 | 7,379 | 0.582 | 4,292 |
| 2060 | 39 | 35.5 | 1.00 | 31,512 | 1,341 | 31,512 | 1,341 | 32,852 | 1.250 | 41,075 | 26,475 | 5,959 | 1.274 | 7,593 | 0.573 | 4,347 |
| 2061 | 40 | 36.5 | 1.00 | 31,999 | 1,362 | 31,999 | 1,362 | 33,361 | 1.250 | 41,711 | 27,111 | 6,082 | 1.283 | 7,802 | 0.564 | 4,397 |

**Attachment 12**

**Projected Future Taxes**

**J█████ Grenier**

**Educational Attainment:  No Diploma or GED**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends April 3, 2069 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 30.74 | Attachment 30 |
| Projected Date at End of Worklife Expectancy | 4/3/2069 | Attachment 30 |
| Earnings Adjusted for Unemployment, 2017 $$ | | **E** Attachment 4, Column F |
| Unemployment Benefits | | **F** Attachment 4, Column G |
| Cumulative Growth Factor | | **G** Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $  14,600 | **L** Attachment 29 |
| Federal Income Tax | | **M** Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | **M** Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | **N** Attachment 41 |
| Cumulative Growth Factor | | **N** Calc. as (1 + Real Growth Rate) $^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | **L** Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | *Attachment 4* | *Attachment 4* | **D x E** | **D x F** | **G + H** | | **I x J** | **K - $14,600** | | **M x N** | | | **O x P** |
| 2062 | 41 | 37.5 | 1.00 | $  32,465 | $  1,381 | $  32,465 | $  1,381 | $  33,846 | 1.250 | $  42,317 | $  27,717 | $  6,199 | 1.291 | $  8,006 | 0.555 | $  4,442 |
| 2063 | 42 | 38.5 | 1.00 | $  32,908 | $  1,400 | $  32,908 | $  1,400 | $  34,308 | 1.250 | $  42,895 | $  28,295 | $  6,311 | 1.300 | $  8,205 | 0.546 | $  4,481 |
| 2064 | 43 | 39.5 | 1.00 | $  33,329 | $  1,418 | $  33,329 | $  1,418 | $  34,747 | 1.250 | $  43,444 | $  28,844 | $  6,417 | 1.309 | $  8,399 | 0.538 | $  4,516 |
| 2065 | 44 | 40.5 | 1.00 | $  33,727 | $  1,435 | $  33,727 | $  1,435 | $  35,163 | 1.250 | $  43,963 | $  29,363 | $  6,518 | 1.318 | $  8,588 | 0.529 | $  4,546 |
| 2066 | 45 | 41.5 | 1.00 | $  34,104 | $  1,451 | $  34,104 | $  1,451 | $  35,555 | 1.250 | $  44,454 | $  29,854 | $  6,612 | 1.327 | $  8,772 | 0.521 | $  4,571 |
| 2067 | 46 | 42.5 | 1.00 | $  34,458 | $  1,466 | $  34,458 | $  1,466 | $  35,925 | 1.250 | $  44,916 | $  30,316 | $  6,702 | 1.336 | $  8,951 | 0.513 | $  4,591 |
| 2068 | 47 | 43.5 | 1.00 | $  34,790 | $  1,480 | $  34,790 | $  1,480 | $  36,271 | 1.250 | $  45,349 | $  30,749 | $  6,785 | 1.345 | $  9,124 | 0.505 | $  4,607 |
| 2069 | 48 | 44.5 | 0.26 | $  35,100 | $  1,494 | $  8,970 | $  382 | $  9,352 | 1.250 | $  11,692 | $  - | $  858 | 1.354 | $  1,161 | 0.497 | $  577 |
| | | | | | | | | | | | | | **NET PRESENT VALUE, PROJECTED FUTURE TAXES =** | | **$** | **111,610** |

**Attachment 13**

**Projected Future Taxes**

**J███ Grenier**

**Educational Attainment:  GED**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends November 4, 2072 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 34.33 | Attachment 31 |
| Projected Date at End of Worklife Expectancy | 11/4/2072 | Attachment 31 |
| Earnings Adjusted for Unemployment, 2017 $$ | E | Attachment 5, Column F |
| Unemployment Benefits | F | Attachment 5, Column G |
| Cumulative Growth Factor | G | Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | N | Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | | *Attachment 5* | *Attachment 5* | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2038 | 17 | 13.5 | 0.48 | $ 15,754 | $ 470 | $ 7,615 | $ 227 | $ 7,842 | 1.250 | $ 9,805 | $ - | $ 728 | 1.099 | $ 800 | 0.819 | $ 656 |
| 2039 | 18 | 14.5 | 1.00 | $ 17,148 | $ 511 | $ 17,148 | $ 511 | $ 17,659 | 1.250 | $ 22,078 | $ 7,478 | $ 2,388 | 1.106 | $ 2,642 | 0.807 | $ 2,133 |
| 2040 | 19 | 15.5 | 1.00 | $ 18,505 | $ 551 | $ 18,505 | $ 551 | $ 19,056 | 1.250 | $ 23,825 | $ 9,225 | $ 2,692 | 1.114 | $ 2,998 | 0.796 | $ 2,386 |
| 2041 | 20 | 16.5 | 1.00 | $ 19,824 | $ 590 | $ 19,824 | $ 590 | $ 20,414 | 1.250 | $ 25,523 | $ 10,923 | $ 2,988 | 1.121 | $ 3,351 | 0.784 | $ 2,627 |
| 2042 | 21 | 17.5 | 1.00 | $ 21,106 | $ 628 | $ 21,106 | $ 628 | $ 21,734 | 1.250 | $ 27,174 | $ 12,574 | $ 3,296 | 1.129 | $ 3,720 | 0.772 | $ 2,874 |
| 2043 | 22 | 18.5 | 1.00 | $ 22,350 | $ 666 | $ 22,350 | $ 666 | $ 23,016 | 1.250 | $ 28,776 | $ 14,176 | $ 3,607 | 1.136 | $ 4,099 | 0.761 | $ 3,120 |
| 2044 | 23 | 19.5 | 1.00 | $ 23,557 | $ 701 | $ 23,557 | $ 701 | $ 24,259 | 1.250 | $ 30,330 | $ 15,730 | $ 3,909 | 1.144 | $ 4,472 | 0.750 | $ 3,354 |
| 2045 | 24 | 20.5 | 1.00 | $ 24,727 | $ 736 | $ 24,727 | $ 736 | $ 25,463 | 1.250 | $ 31,837 | $ 17,237 | $ 4,201 | 1.152 | $ 4,839 | 0.732 | $ 3,545 |
| 2046 | 25 | 21.5 | 1.00 | $ 25,860 | $ 770 | $ 25,860 | $ 770 | $ 26,630 | 1.250 | $ 33,295 | $ 18,695 | $ 4,485 | 1.160 | $ 5,200 | 0.721 | $ 3,752 |
| 2047 | 26 | 22.5 | 1.00 | $ 26,955 | $ 803 | $ 26,955 | $ 803 | $ 27,758 | 1.250 | $ 34,705 | $ 20,105 | $ 4,759 | 1.167 | $ 5,555 | 0.711 | $ 3,947 |
| 2048 | 27 | 23.5 | 1.00 | $ 28,013 | $ 834 | $ 28,013 | $ 834 | $ 28,847 | 1.250 | $ 36,067 | $ 21,467 | $ 5,023 | 1.175 | $ 5,904 | 0.700 | $ 4,132 |
| 2049 | 28 | 24.5 | 1.00 | $ 29,034 | $ 865 | $ 29,034 | $ 865 | $ 29,898 | 1.250 | $ 37,381 | $ 22,781 | $ 5,279 | 1.183 | $ 6,246 | 0.689 | $ 4,305 |
| 2050 | 29 | 25.5 | 1.00 | $ 30,017 | $ 894 | $ 30,017 | $ 894 | $ 30,911 | 1.250 | $ 38,647 | $ 24,047 | $ 5,525 | 1.191 | $ 6,581 | 0.679 | $ 4,468 |
| 2051 | 30 | 26.5 | 1.00 | $ 30,963 | $ 922 | $ 30,963 | $ 922 | $ 31,885 | 1.250 | $ 39,865 | $ 25,265 | $ 5,761 | 1.199 | $ 6,909 | 0.669 | $ 4,620 |
| 2052 | 31 | 27.5 | 1.00 | $ 31,872 | $ 949 | $ 31,872 | $ 949 | $ 32,821 | 1.250 | $ 41,035 | $ 26,435 | $ 5,989 | 1.207 | $ 7,230 | 0.659 | $ 4,762 |
| 2053 | 32 | 28.5 | 1.00 | $ 32,743 | $ 975 | $ 32,743 | $ 975 | $ 33,718 | 1.250 | $ 42,157 | $ 27,557 | $ 6,207 | 1.216 | $ 7,544 | 0.649 | $ 4,894 |
| 2054 | 33 | 29.5 | 1.00 | $ 33,577 | $ 1,000 | $ 33,577 | $ 1,000 | $ 34,577 | 1.250 | $ 43,231 | $ 28,631 | $ 6,415 | 1.224 | $ 7,850 | 0.639 | $ 5,016 |
| 2055 | 34 | 30.5 | 1.00 | $ 34,374 | $ 1,024 | $ 34,374 | $ 1,024 | $ 35,397 | 1.250 | $ 44,257 | $ 29,657 | $ 6,615 | 1.232 | $ 8,149 | 0.619 | $ 5,047 |
| 2056 | 35 | 31.5 | 1.00 | $ 35,133 | $ 1,046 | $ 35,133 | $ 1,046 | $ 36,179 | 1.250 | $ 45,235 | $ 30,635 | $ 6,805 | 1.240 | $ 8,440 | 0.610 | $ 5,145 |
| 2057 | 36 | 32.5 | 1.00 | $ 35,855 | $ 1,068 | $ 35,855 | $ 1,068 | $ 36,923 | 1.250 | $ 46,164 | $ 31,564 | $ 6,985 | 1.249 | $ 8,722 | 0.600 | $ 5,235 |
| 2058 | 37 | 33.5 | 1.00 | $ 36,540 | $ 1,088 | $ 36,540 | $ 1,088 | $ 37,628 | 1.250 | $ 47,046 | $ 32,446 | $ 7,156 | 1.257 | $ 8,996 | 0.591 | $ 5,315 |
| 2059 | 38 | 34.5 | 1.00 | $ 37,188 | $ 1,107 | $ 37,188 | $ 1,107 | $ 38,295 | 1.250 | $ 47,880 | $ 33,280 | $ 7,318 | 1.266 | $ 9,262 | 0.582 | $ 5,387 |
| 2060 | 39 | 35.5 | 1.00 | $ 37,798 | $ 1,125 | $ 37,798 | $ 1,125 | $ 38,923 | 1.250 | $ 48,665 | $ 34,065 | $ 7,471 | 1.274 | $ 9,519 | 0.573 | $ 5,450 |
| 2061 | 40 | 36.5 | 1.00 | $ 38,371 | $ 1,143 | $ 38,371 | $ 1,143 | $ 39,513 | 1.250 | $ 49,403 | $ 34,803 | $ 7,614 | 1.283 | $ 9,767 | 0.564 | $ 5,505 |

**Attachment 13**

**Projected Future Taxes**

J████ Grenier

**Educational Attainment:  GED**

**Date of Loss:  July 7, 2021**

***Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends November 4, 2072 (Statistical Worklife Expectancy)***

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | | 34.33 | Attachment 31 |
| Projected Date at End of Worklife Expectancy | | 11/4/2072 | Attachment 31 |
| Earnings Adjusted for Unemployment, 2017 $$ | **E** | | Attachment 5, Column F |
| Unemployment Benefits | **F** | | Attachment 5, Column G |
| Cumulative Growth Factor | **G** | | Calc. as (1 + Growth Rate) [(2024 - 2017)] |
| Standard Deduction, 2024 $$ | **L** | $ 14,600 | Attachment 29 |
| Federal Income Tax | **M** | | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | **M** | | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | **N** | 0.68% | Attachment 41 |
| Cumulative Growth Factor | **N** | | Calc. as (1 + Real Growth Rate) [(Yrs Ahead of Valuation Yr)] |
| Cumulative Discount Factor | **L** | | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| Year | | | | | | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| | | | | *Attachment 5* | *Attachment 5* | | | | | | | | | | | |
| 2062 | 41 | 37.5 | 1.00 | $ 38,906 | $ 1,158 | $ 38,906 | $ 1,158 | $ 40,065 | 1.250 | $ 50,092 | $ 35,492 | $ 7,748 | 1.291 | $ 10,006 | 0.555 | $ 5,552 |
| 2063 | 42 | 38.5 | 1.00 | $ 39,405 | $ 1,173 | $ 39,405 | $ 1,173 | $ 40,578 | 1.250 | $ 50,734 | $ 36,134 | $ 7,873 | 1.300 | $ 10,236 | 0.546 | $ 5,591 |
| 2064 | 43 | 39.5 | 1.00 | $ 39,866 | $ 1,187 | $ 39,866 | $ 1,187 | $ 41,053 | 1.250 | $ 51,327 | $ 36,727 | $ 7,988 | 1.309 | $ 10,456 | 0.538 | $ 5,622 |
| 2065 | 44 | 40.5 | 1.00 | $ 40,289 | $ 1,200 | $ 40,289 | $ 1,200 | $ 41,489 | 1.250 | $ 51,873 | $ 37,273 | $ 8,094 | 1.318 | $ 10,666 | 0.529 | $ 5,646 |
| 2066 | 45 | 41.5 | 1.00 | $ 40,676 | $ 1,211 | $ 40,676 | $ 1,211 | $ 41,887 | 1.250 | $ 52,370 | $ 37,770 | $ 8,191 | 1.327 | $ 10,866 | 0.521 | $ 5,662 |
| 2067 | 46 | 42.5 | 1.00 | $ 41,025 | $ 1,222 | $ 41,025 | $ 1,222 | $ 42,246 | 1.250 | $ 52,820 | $ 38,220 | $ 8,278 | 1.336 | $ 11,056 | 0.513 | $ 5,671 |
| 2068 | 47 | 43.5 | 1.00 | $ 41,336 | $ 1,231 | $ 41,336 | $ 1,231 | $ 42,567 | 1.250 | $ 53,221 | $ 38,621 | $ 8,356 | 1.345 | $ 11,236 | 0.505 | $ 5,673 |
| 2069 | 48 | 44.5 | 1.00 | $ 41,611 | $ 1,239 | $ 41,611 | $ 1,239 | $ 42,850 | 1.250 | $ 53,574 | $ 38,974 | $ 8,425 | 1.354 | $ 11,405 | 0.497 | $ 5,669 |
| 2070 | 49 | 45.5 | 1.00 | $ 41,848 | $ 1,246 | $ 41,848 | $ 1,246 | $ 43,094 | 1.250 | $ 53,879 | $ 39,279 | $ 8,484 | 1.363 | $ 11,562 | 0.489 | $ 5,658 |
| 2071 | 50 | 46.5 | 1.00 | $ 42,047 | $ 1,252 | $ 42,047 | $ 1,252 | $ 43,299 | 1.250 | $ 54,136 | $ 39,536 | $ 8,534 | 1.372 | $ 11,709 | 0.482 | $ 5,640 |
| 2072 | 51 | 47.5 | 0.84 | $ 42,210 | $ 1,257 | $ 35,527 | $ 1,058 | $ 36,584 | 1.250 | $ 45,741 | $ 31,141 | $ 6,903 | 1.381 | $ 9,535 | 0.474 | $ 4,521 |

**NET PRESENT VALUE, PROJECTED FUTURE TAXES =  $  158,580**

**J█████ Grenier**
**Educational Attainment:  High School Diploma**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 20, 2077 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 37.87 | Attachment 32 |
| Projected Date at End of Worklife Expectancy | 5/20/2077 | Attachment 32 |
| Earnings Adjusted for Unemployment, 2017 $$ | E | Attachment 6, Column F |
| Unemployment Benefits | F | Attachment 6, Column G |
| Cumulative Growth Factor | G | Calc. as $(1 + \text{Growth Rate})^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | N | Calc. as $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Age of Mr. | Years After | Frac. Of | Earnings Adj. for Unempl. | Unemp. Benefits | Proj. Earn. Adj. | Unemp. Benefits Adj. | Proj. Total Earn. Adj. | Cumul Growth | Total Proj. Earnings | Taxable Earnings | Income & Payroll | Cumul Growth | Projected Taxes | Cumul Disc. | NPV Proj. Future |
| Year | Grenier | 2024 | Year | 2017 $$ | | Frac. of Yr | Frac. of Yr | Frac. of Yr | Factor | 2024 $$ | | Taxes | Factor | Current $$ | Factor | Taxes |
| | | | | *Attachment 6* | *Attachment 6* | *D x E* | *D x F* | *G + H* | | *I x J* | *K - $14,600* | | | *M x N* | | *O x P* |
| 2039 | 18 | 14.5 | 0.48 | $ 18,052 | $ 538 | $ 8,725 | $ 260 | $ 8,985 | 1.250 | $ 11,234 | $ - | $ 835 | 1.106 | $ 923 | 0.807 | $ 745 |
| 2040 | 19 | 15.5 | 1.00 | $ 19,490 | $ 580 | $ 19,490 | $ 580 | $ 20,071 | 1.250 | $ 25,094 | $ 10,494 | $ 2,914 | 1.114 | $ 3,245 | 0.796 | $ 2,582 |
| 2041 | 20 | 16.5 | 1.00 | $ 20,891 | $ 622 | $ 20,891 | $ 622 | $ 21,513 | 1.250 | $ 26,897 | $ 12,297 | $ 3,242 | 1.121 | $ 3,635 | 0.784 | $ 2,850 |
| 2042 | 21 | 17.5 | 1.00 | $ 22,253 | $ 663 | $ 22,253 | $ 663 | $ 22,916 | 1.250 | $ 28,652 | $ 14,052 | $ 3,583 | 1.129 | $ 4,044 | 0.772 | $ 3,124 |
| 2043 | 22 | 18.5 | 1.00 | $ 23,578 | $ 702 | $ 23,578 | $ 702 | $ 24,280 | 1.250 | $ 30,357 | $ 15,757 | $ 3,914 | 1.136 | $ 4,448 | 0.761 | $ 3,386 |
| 2044 | 23 | 19.5 | 1.00 | $ 24,865 | $ 740 | $ 24,865 | $ 740 | $ 25,605 | 1.250 | $ 32,013 | $ 17,413 | $ 4,236 | 1.144 | $ 4,846 | 0.750 | $ 3,635 |
| 2045 | 24 | 20.5 | 1.00 | $ 26,113 | $ 778 | $ 26,113 | $ 778 | $ 26,891 | 1.250 | $ 33,621 | $ 19,021 | $ 4,548 | 1.152 | $ 5,239 | 0.732 | $ 3,837 |
| 2046 | 25 | 21.5 | 1.00 | $ 27,324 | $ 814 | $ 27,324 | $ 814 | $ 28,137 | 1.250 | $ 35,180 | $ 20,580 | $ 4,851 | 1.160 | $ 5,625 | 0.721 | $ 4,058 |
| 2047 | 26 | 22.5 | 1.00 | $ 28,496 | $ 849 | $ 28,496 | $ 849 | $ 29,345 | 1.250 | $ 36,689 | $ 22,089 | $ 5,144 | 1.167 | $ 6,005 | 0.711 | $ 4,267 |
| 2048 | 27 | 23.5 | 1.00 | $ 29,631 | $ 882 | $ 29,631 | $ 882 | $ 30,513 | 1.250 | $ 38,150 | $ 23,550 | $ 5,428 | 1.175 | $ 6,380 | 0.700 | $ 4,465 |
| 2049 | 28 | 24.5 | 1.00 | $ 30,727 | $ 915 | $ 30,727 | $ 915 | $ 31,642 | 1.250 | $ 39,562 | $ 24,962 | $ 5,702 | 1.183 | $ 6,747 | 0.689 | $ 4,651 |
| 2050 | 29 | 25.5 | 1.00 | $ 31,786 | $ 946 | $ 31,786 | $ 946 | $ 32,732 | 1.250 | $ 40,925 | $ 26,325 | $ 5,967 | 1.191 | $ 7,108 | 0.679 | $ 4,826 |
| 2051 | 30 | 26.5 | 1.00 | $ 32,807 | $ 977 | $ 32,807 | $ 977 | $ 33,783 | 1.250 | $ 42,239 | $ 27,639 | $ 6,223 | 1.199 | $ 7,462 | 0.669 | $ 4,990 |
| 2052 | 31 | 27.5 | 1.00 | $ 33,789 | $ 1,006 | $ 33,789 | $ 1,006 | $ 34,795 | 1.250 | $ 43,504 | $ 28,904 | $ 6,468 | 1.207 | $ 7,810 | 0.659 | $ 5,143 |
| 2053 | 32 | 28.5 | 1.00 | $ 34,734 | $ 1,034 | $ 34,734 | $ 1,034 | $ 35,768 | 1.250 | $ 44,720 | $ 30,120 | $ 6,705 | 1.216 | $ 8,150 | 0.649 | $ 5,286 |
| 2054 | 33 | 29.5 | 1.00 | $ 35,640 | $ 1,061 | $ 35,640 | $ 1,061 | $ 36,702 | 1.250 | $ 45,887 | $ 31,287 | $ 6,931 | 1.224 | $ 8,482 | 0.639 | $ 5,419 |
| 2055 | 34 | 30.5 | 1.00 | $ 36,509 | $ 1,087 | $ 36,509 | $ 1,087 | $ 37,596 | 1.250 | $ 47,006 | $ 32,406 | $ 7,149 | 1.232 | $ 8,807 | 0.619 | $ 5,454 |
| 2056 | 35 | 31.5 | 1.00 | $ 37,340 | $ 1,112 | $ 37,340 | $ 1,112 | $ 38,451 | 1.250 | $ 48,075 | $ 33,475 | $ 7,356 | 1.240 | $ 9,124 | 0.610 | $ 5,563 |
| 2057 | 36 | 32.5 | 1.00 | $ 38,132 | $ 1,135 | $ 38,132 | $ 1,135 | $ 39,268 | 1.250 | $ 49,096 | $ 34,496 | $ 7,555 | 1.249 | $ 9,433 | 0.600 | $ 5,662 |
| 2058 | 37 | 33.5 | 1.00 | $ 38,887 | $ 1,158 | $ 38,887 | $ 1,158 | $ 40,045 | 1.250 | $ 50,067 | $ 35,467 | $ 7,743 | 1.257 | $ 9,734 | 0.591 | $ 5,751 |
| 2059 | 38 | 34.5 | 1.00 | $ 39,603 | $ 1,179 | $ 39,603 | $ 1,179 | $ 40,783 | 1.250 | $ 50,990 | $ 36,390 | $ 7,923 | 1.266 | $ 10,027 | 0.582 | $ 5,832 |
| 2060 | 39 | 35.5 | 1.00 | $ 40,282 | $ 1,199 | $ 40,282 | $ 1,199 | $ 41,481 | 1.250 | $ 51,864 | $ 37,264 | $ 8,092 | 1.274 | $ 10,311 | 0.573 | $ 5,903 |
| 2061 | 40 | 36.5 | 1.00 | $ 40,923 | $ 1,219 | $ 40,923 | $ 1,219 | $ 42,141 | 1.250 | $ 52,688 | $ 38,088 | $ 8,253 | 1.283 | $ 10,586 | 0.564 | $ 5,966 |
| 2062 | 41 | 37.5 | 1.00 | $ 41,525 | $ 1,236 | $ 41,525 | $ 1,236 | $ 42,762 | 1.250 | $ 53,464 | $ 38,864 | $ 8,403 | 1.291 | $ 10,852 | 0.555 | $ 6,021 |

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 209 of 432   PageID.8217

**J█████ Grenier**
**Educational Attainment:  High School Diploma**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 20, 2077 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 37.87 | | Attachment 32 |
| Projected Date at End of Worklife Expectancy | 5/20/2077 | | Attachment 32 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 6, Column F |
| Unemployment Benefits | | F | Attachment 6, Column G |
| Cumulative Growth Factor | | G | Calc. as $(1 + \text{Growth Rate})^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | *Attachment 6* | *Attachment 6* | **D x E** | **D x F** | **G + H** | | **I x J** | **K - $14,600** | | | **M x N** | | **O x P** |
| 2063 | 42 | 38.5 | 1.00 | $ 42,090 | $ 1,253 | $ 42,090 | $ 1,253 | $ 43,343 | 1.250 | $ 54,191 | $ 39,591 | $ 8,545 | 1.300 | $ 11,109 | 0.546 | $ 6,068 |
| 2064 | 43 | 39.5 | 1.00 | $ 42,616 | $ 1,269 | $ 42,616 | $ 1,269 | $ 43,885 | 1.250 | $ 54,869 | $ 40,269 | $ 8,676 | 1.309 | $ 11,357 | 0.538 | $ 6,106 |
| 2065 | 44 | 40.5 | 1.00 | $ 43,105 | $ 1,284 | $ 43,105 | $ 1,284 | $ 44,388 | 1.250 | $ 55,498 | $ 40,898 | $ 8,799 | 1.318 | $ 11,594 | 0.529 | $ 6,137 |
| 2066 | 45 | 41.5 | 1.00 | $ 43,556 | $ 1,297 | $ 43,556 | $ 1,297 | $ 44,852 | 1.250 | $ 56,078 | $ 41,478 | $ 8,911 | 1.327 | $ 11,822 | 0.521 | $ 6,160 |
| 2067 | 46 | 42.5 | 1.00 | $ 43,968 | $ 1,309 | $ 43,968 | $ 1,309 | $ 45,277 | 1.250 | $ 56,610 | $ 42,010 | $ 9,015 | 1.336 | $ 12,040 | 0.513 | $ 6,175 |
| 2068 | 47 | 43.5 | 1.00 | $ 44,343 | $ 1,320 | $ 44,343 | $ 1,320 | $ 45,663 | 1.250 | $ 57,092 | $ 42,492 | $ 9,108 | 1.345 | $ 12,247 | 0.505 | $ 6,184 |
| 2069 | 48 | 44.5 | 1.00 | $ 44,679 | $ 1,330 | $ 44,679 | $ 1,330 | $ 46,010 | 1.250 | $ 57,525 | $ 42,925 | $ 9,192 | 1.354 | $ 12,444 | 0.497 | $ 6,185 |
| 2070 | 49 | 45.5 | 1.00 | $ 44,978 | $ 1,339 | $ 44,978 | $ 1,339 | $ 46,317 | 1.250 | $ 57,910 | $ 43,310 | $ 9,267 | 1.363 | $ 12,630 | 0.489 | $ 6,180 |
| 2071 | 50 | 46.5 | 1.00 | $ 45,239 | $ 1,347 | $ 45,239 | $ 1,347 | $ 46,586 | 1.250 | $ 58,245 | $ 43,645 | $ 9,332 | 1.372 | $ 12,804 | 0.482 | $ 6,168 |
| 2072 | 51 | 47.5 | 1.00 | $ 45,461 | $ 1,354 | $ 45,461 | $ 1,354 | $ 46,815 | 1.250 | $ 58,532 | $ 43,932 | $ 9,388 | 1.381 | $ 12,968 | 0.474 | $ 6,149 |
| 2073 | 52 | 48.5 | 1.00 | $ 45,646 | $ 1,359 | $ 45,646 | $ 1,359 | $ 47,005 | 1.250 | $ 58,770 | $ 44,170 | $ 9,434 | 1.391 | $ 13,120 | 0.467 | $ 6,124 |
| 2074 | 53 | 49.5 | 1.00 | $ 45,793 | $ 1,364 | $ 45,793 | $ 1,364 | $ 47,156 | 1.250 | $ 58,958 | $ 44,358 | $ 9,471 | 1.400 | $ 13,260 | 0.460 | $ 6,093 |
| 2075 | 54 | 50.5 | 1.00 | $ 45,901 | $ 1,367 | $ 45,901 | $ 1,367 | $ 47,268 | 1.250 | $ 59,098 | $ 44,498 | $ 9,498 | 1.409 | $ 13,387 | 0.452 | $ 6,056 |
| 2076 | 55 | 51.5 | 1.00 | $ 45,972 | $ 1,369 | $ 45,972 | $ 1,369 | $ 47,341 | 1.250 | $ 59,189 | $ 44,589 | $ 9,516 | 1.419 | $ 13,503 | 0.445 | $ 6,013 |
| 2077 | 56 | 52.5 | 0.39 | $ 46,004 | $ 1,370 | $ 17,763 | $ 529 | $ 18,292 | 1.250 | $ 22,870 | $ 8,270 | $ 2,526 | 1.429 | $ 3,609 | 0.438 | $ 1,582 |

**NET PRESENT VALUE, PROJECTED FUTURE TAXES = $ 196,796**

Case 1:22-cv-00396-LEK-KJM　Document 235　Filed 11/19/24　Page 210 of 432　PageID.8218

**J███ Grenier**
**Educational Attainment:  Associate Degree**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 7, Column F |
| Unemployment Benefits | | F | Attachment 7, Column G |
| Cumulative Growth Factor | | G | Calc. as $(1 + \text{Growth Rate})^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | *Attachment 7* | *Attachment 7* | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2041 | 20 | 16.5 | 0.48 | $ 24,657 | $ 487 | $ 11,917 | $ 235 | $ 12,153 | 1.250 | $ 15,195 | $ 595 | $ 1,199 | 1.121 | $ 1,345 | 0.784 | $ 1,054 |
| 2042 | 21 | 17.5 | 1.00 | $ 26,779 | $ 529 | $ 26,779 | $ 529 | $ 27,308 | 1.250 | $ 34,143 | $ 19,543 | $ 4,674 | 1.129 | $ 5,276 | 0.772 | $ 4,076 |
| 2043 | 22 | 18.5 | 1.00 | $ 28,837 | $ 570 | $ 28,837 | $ 570 | $ 29,406 | 1.250 | $ 36,766 | $ 22,166 | $ 5,186 | 1.136 | $ 5,894 | 0.761 | $ 4,486 |
| 2044 | 23 | 19.5 | 1.00 | $ 30,831 | $ 609 | $ 30,831 | $ 609 | $ 31,440 | 1.250 | $ 39,309 | $ 24,709 | $ 5,682 | 1.144 | $ 6,501 | 0.750 | $ 4,876 |
| 2045 | 24 | 20.5 | 1.00 | $ 32,761 | $ 647 | $ 32,761 | $ 647 | $ 33,408 | 1.250 | $ 41,770 | $ 27,170 | $ 6,162 | 1.152 | $ 7,097 | 0.732 | $ 5,199 |
| 2046 | 25 | 21.5 | 1.00 | $ 34,627 | $ 684 | $ 34,627 | $ 684 | $ 35,312 | 1.250 | $ 44,150 | $ 29,550 | $ 6,626 | 1.160 | $ 7,683 | 0.721 | $ 5,543 |
| 2047 | 26 | 22.5 | 1.00 | $ 36,430 | $ 720 | $ 36,430 | $ 720 | $ 37,150 | 1.250 | $ 46,448 | $ 31,848 | $ 7,074 | 1.167 | $ 8,258 | 0.711 | $ 5,868 |
| 2048 | 27 | 23.5 | 1.00 | $ 38,169 | $ 754 | $ 38,169 | $ 754 | $ 38,923 | 1.250 | $ 48,665 | $ 34,065 | $ 7,506 | 1.175 | $ 8,822 | 0.700 | $ 6,174 |
| 2049 | 28 | 24.5 | 1.00 | $ 39,843 | $ 787 | $ 39,843 | $ 787 | $ 40,631 | 1.250 | $ 50,800 | $ 36,200 | $ 7,923 | 1.183 | $ 9,375 | 0.689 | $ 6,462 |
| 2050 | 29 | 25.5 | 1.00 | $ 41,454 | $ 819 | $ 41,454 | $ 819 | $ 42,274 | 1.250 | $ 52,854 | $ 38,254 | $ 8,323 | 1.191 | $ 9,915 | 0.679 | $ 6,732 |
| 2051 | 30 | 26.5 | 1.00 | $ 43,001 | $ 850 | $ 43,001 | $ 850 | $ 43,851 | 1.250 | $ 54,826 | $ 40,226 | $ 8,708 | 1.199 | $ 10,443 | 0.669 | $ 6,983 |
| 2052 | 31 | 27.5 | 1.00 | $ 44,485 | $ 879 | $ 44,485 | $ 879 | $ 45,364 | 1.250 | $ 56,717 | $ 42,117 | $ 9,077 | 1.207 | $ 10,959 | 0.659 | $ 7,218 |
| 2053 | 32 | 28.5 | 1.00 | $ 45,904 | $ 907 | $ 45,904 | $ 907 | $ 46,811 | 1.250 | $ 58,527 | $ 43,927 | $ 9,430 | 1.216 | $ 11,462 | 0.649 | $ 7,435 |
| 2054 | 33 | 29.5 | 1.00 | $ 47,259 | $ 934 | $ 47,259 | $ 934 | $ 48,193 | 1.250 | $ 60,255 | $ 45,655 | $ 9,767 | 1.224 | $ 11,952 | 0.639 | $ 7,636 |
| 2055 | 34 | 30.5 | 1.00 | $ 48,551 | $ 959 | $ 48,551 | $ 959 | $ 49,510 | 1.250 | $ 61,902 | $ 47,302 | $ 10,103 | 1.232 | $ 12,447 | 0.619 | $ 7,709 |
| 2056 | 35 | 31.5 | 1.00 | $ 49,779 | $ 984 | $ 49,779 | $ 984 | $ 50,762 | 1.250 | $ 63,467 | $ 48,867 | $ 10,565 | 1.240 | $ 13,104 | 0.610 | $ 7,989 |
| 2057 | 36 | 32.5 | 1.00 | $ 50,943 | $ 1,007 | $ 50,943 | $ 1,007 | $ 51,949 | 1.250 | $ 64,951 | $ 50,351 | $ 11,003 | 1.249 | $ 13,739 | 0.600 | $ 8,246 |
| 2058 | 37 | 33.5 | 1.00 | $ 52,043 | $ 1,028 | $ 52,043 | $ 1,028 | $ 53,071 | 1.250 | $ 66,354 | $ 51,754 | $ 11,416 | 1.257 | $ 14,352 | 0.591 | $ 8,479 |
| 2059 | 38 | 34.5 | 1.00 | $ 53,079 | $ 1,049 | $ 53,079 | $ 1,049 | $ 54,127 | 1.250 | $ 67,675 | $ 53,075 | $ 11,806 | 1.266 | $ 14,942 | 0.582 | $ 8,690 |
| 2060 | 39 | 35.5 | 1.00 | $ 54,051 | $ 1,068 | $ 54,051 | $ 1,068 | $ 55,119 | 1.250 | $ 68,914 | $ 54,314 | $ 12,172 | 1.274 | $ 15,509 | 0.573 | $ 8,879 |
| 2061 | 40 | 36.5 | 1.00 | $ 54,959 | $ 1,086 | $ 54,959 | $ 1,086 | $ 56,045 | 1.250 | $ 70,072 | $ 55,472 | $ 12,514 | 1.283 | $ 16,052 | 0.564 | $ 9,047 |
| 2062 | 41 | 37.5 | 1.00 | $ 55,804 | $ 1,103 | $ 55,804 | $ 1,103 | $ 56,906 | 1.250 | $ 71,149 | $ 56,549 | $ 12,831 | 1.291 | $ 16,570 | 0.555 | $ 9,194 |
| 2063 | 42 | 38.5 | 1.00 | $ 56,584 | $ 1,118 | $ 56,584 | $ 1,118 | $ 57,702 | 1.250 | $ 72,144 | $ 57,544 | $ 13,125 | 1.300 | $ 17,064 | 0.546 | $ 9,320 |
| 2064 | 43 | 39.5 | 1.00 | $ 57,301 | $ 1,132 | $ 57,301 | $ 1,132 | $ 58,433 | 1.250 | $ 73,058 | $ 58,458 | $ 13,394 | 1.309 | $ 17,532 | 0.538 | $ 9,427 |

J█████ Grenier
**Educational Attainment:  Associate Degree**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends May 13, 2082 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.85 | | Attachment 33 |
| Projected Date at End of Worklife Expectancy | 5/13/2082 | | Attachment 33 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 7, Column F |
| Unemployment Benefits | | F | Attachment 7, Column G |
| Cumulative Growth Factor | | G | Calc. as (1 + Growth Rate) $^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as (1 + Real Growth Rate)$^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | *Attachment 7* | *Attachment 7* | *D x E* | *D x F* | *G + H* | | *I x J* | *K - $14,600* | | | *M x N* | | *O x P* |
| 2065 | 44 | 40.5 | 1.00 | $ 57,954 | $ 1,145 | $ 57,954 | $ 1,145 | $ 59,099 | 1.250 | $ 73,891 | $ 59,291 | $ 13,640 | 1.318 | $ 17,974 | 0.529 | $ 9,514 |
| 2066 | 45 | 41.5 | 1.00 | $ 58,543 | $ 1,157 | $ 58,543 | $ 1,157 | $ 59,700 | 1.250 | $ 74,642 | $ 60,042 | $ 13,862 | 1.327 | $ 18,389 | 0.521 | $ 9,582 |
| 2067 | 46 | 42.5 | 1.00 | $ 59,068 | $ 1,167 | $ 59,068 | $ 1,167 | $ 60,235 | 1.250 | $ 75,311 | $ 60,711 | $ 14,059 | 1.336 | $ 18,777 | 0.513 | $ 9,631 |
| 2068 | 47 | 43.5 | 1.00 | $ 59,529 | $ 1,176 | $ 59,529 | $ 1,176 | $ 60,706 | 1.250 | $ 75,899 | $ 61,299 | $ 14,233 | 1.345 | $ 19,138 | 0.505 | $ 9,663 |
| 2069 | 48 | 44.5 | 1.00 | $ 59,927 | $ 1,184 | $ 59,927 | $ 1,184 | $ 61,111 | 1.250 | $ 76,406 | $ 61,806 | $ 14,382 | 1.354 | $ 19,469 | 0.497 | $ 9,677 |
| 2070 | 49 | 45.5 | 1.00 | $ 60,260 | $ 1,191 | $ 60,260 | $ 1,191 | $ 61,451 | 1.250 | $ 76,831 | $ 62,231 | $ 14,508 | 1.363 | $ 19,772 | 0.489 | $ 9,674 |
| 2071 | 50 | 46.5 | 1.00 | $ 60,530 | $ 1,196 | $ 60,530 | $ 1,196 | $ 61,726 | 1.250 | $ 77,175 | $ 62,575 | $ 14,609 | 1.372 | $ 20,044 | 0.482 | $ 9,655 |
| 2072 | 51 | 47.5 | 1.00 | $ 60,736 | $ 1,200 | $ 60,736 | $ 1,200 | $ 61,936 | 1.250 | $ 77,438 | $ 62,838 | $ 14,686 | 1.381 | $ 20,287 | 0.474 | $ 9,619 |
| 2073 | 52 | 48.5 | 1.00 | $ 60,878 | $ 1,203 | $ 60,878 | $ 1,203 | $ 62,081 | 1.250 | $ 77,619 | $ 63,019 | $ 14,740 | 1.391 | $ 20,498 | 0.467 | $ 9,568 |
| 2074 | 53 | 49.5 | 1.00 | $ 60,956 | $ 1,204 | $ 60,956 | $ 1,204 | $ 62,160 | 1.250 | $ 77,718 | $ 63,118 | $ 14,769 | 1.400 | $ 20,677 | 0.460 | $ 9,501 |
| 2075 | 54 | 50.5 | 1.00 | $ 60,970 | $ 1,205 | $ 60,970 | $ 1,205 | $ 62,175 | 1.250 | $ 77,736 | $ 63,136 | $ 14,775 | 1.409 | $ 20,824 | 0.452 | $ 9,420 |
| 2076 | 55 | 51.5 | 1.00 | $ 60,921 | $ 1,204 | $ 60,921 | $ 1,204 | $ 62,124 | 1.250 | $ 77,673 | $ 63,073 | $ 14,756 | 1.419 | $ 20,939 | 0.445 | $ 9,324 |
| 2077 | 56 | 52.5 | 1.00 | $ 60,807 | $ 1,202 | $ 60,807 | $ 1,202 | $ 62,009 | 1.250 | $ 77,528 | $ 62,928 | $ 14,713 | 1.429 | $ 21,019 | 0.438 | $ 9,214 |
| 2078 | 57 | 53.5 | 1.00 | $ 60,630 | $ 1,198 | $ 60,630 | $ 1,198 | $ 61,828 | 1.250 | $ 77,302 | $ 62,702 | $ 14,646 | 1.438 | $ 21,065 | 0.432 | $ 9,090 |
| 2079 | 58 | 54.5 | 1.00 | $ 60,388 | $ 1,193 | $ 60,388 | $ 1,193 | $ 61,582 | 1.250 | $ 76,994 | $ 62,394 | $ 14,556 | 1.448 | $ 21,076 | 0.425 | $ 8,953 |
| 2080 | 59 | 55.5 | 1.00 | $ 60,083 | $ 1,187 | $ 60,083 | $ 1,187 | $ 61,270 | 1.250 | $ 76,605 | $ 62,005 | $ 14,441 | 1.458 | $ 21,051 | 0.418 | $ 8,803 |
| 2081 | 60 | 56.5 | 1.00 | $ 59,714 | $ 1,180 | $ 59,714 | $ 1,180 | $ 60,894 | 1.250 | $ 76,135 | $ 61,535 | $ 14,302 | 1.468 | $ 20,989 | 0.412 | $ 8,640 |
| 2082 | 61 | 57.5 | 0.37 | $ 59,281 | $ 1,171 | $ 21,737 | $ 429 | $ 22,166 | 1.250 | $ 27,714 | $ 13,114 | $ 3,421 | 1.477 | $ 5,054 | 0.405 | $ 2,048 |

NET PRESENT VALUE, PROJECTED FUTURE TAXES =    $    328,298

**Attachment 16**

**Projected Future Taxes**

J____ Grenier

**Educational Attainment:  Bachelor's Degree**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.68 | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | Attachment 34 |
| Earnings Adjusted for Unemployment, 2017 $$ | E | Attachment 8, Column F |
| Unemployment Benefits | F | Attachment 8, Column G |
| Cumulative Growth Factor | G | Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600   L | Attachment 29 |
| Federal Income Tax | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | N | Calc. as (1 + Real Growth Rate)$^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | | Attachment 8 | Attachment 8 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2043 | | 22 | 18.5 | 0.48 | 31,537 | 369 | 15,243 | 178 | 15,421 | 1.250 | 19,281 | 4,681 | 1,926 | 1.136 | 2,189 | 0.761 | 1,666 |
| 2044 | | 23 | 19.5 | 1.00 | 35,216 | 412 | 35,216 | 412 | 35,627 | 1.250 | 44,544 | 29,944 | 6,730 | 1.144 | 7,699 | 0.750 | 5,775 |
| 2045 | | 24 | 20.5 | 1.00 | 38,771 | 453 | 38,771 | 453 | 39,224 | 1.250 | 49,042 | 34,442 | 7,609 | 1.152 | 8,764 | 0.732 | 6,420 |
| 2046 | | 25 | 21.5 | 1.00 | 42,203 | 494 | 42,203 | 494 | 42,697 | 1.250 | 53,383 | 38,783 | 8,459 | 1.160 | 9,808 | 0.721 | 7,076 |
| 2047 | | 26 | 22.5 | 1.00 | 45,513 | 532 | 45,513 | 532 | 46,045 | 1.250 | 57,569 | 42,969 | 9,277 | 1.167 | 10,831 | 0.711 | 7,696 |
| 2048 | | 27 | 23.5 | 1.00 | 48,699 | 570 | 48,699 | 570 | 49,269 | 1.250 | 61,600 | 47,000 | 10,066 | 1.175 | 11,830 | 0.700 | 8,280 |
| 2049 | | 28 | 24.5 | 1.00 | 51,763 | 605 | 51,763 | 605 | 52,368 | 1.250 | 65,475 | 50,875 | 11,196 | 1.183 | 13,248 | 0.689 | 9,132 |
| 2050 | | 29 | 25.5 | 1.00 | 54,703 | 640 | 54,703 | 640 | 55,343 | 1.250 | 69,195 | 54,595 | 12,296 | 1.191 | 14,647 | 0.679 | 9,944 |
| 2051 | | 30 | 26.5 | 1.00 | 57,521 | 673 | 57,521 | 673 | 58,194 | 1.250 | 72,759 | 58,159 | 13,350 | 1.199 | 16,010 | 0.669 | 10,705 |
| 2052 | | 31 | 27.5 | 1.00 | 60,216 | 704 | 60,216 | 704 | 60,920 | 1.250 | 76,167 | 61,567 | 14,357 | 1.207 | 17,334 | 0.659 | 11,417 |
| 2053 | | 32 | 28.5 | 1.00 | 62,788 | 734 | 62,788 | 734 | 63,522 | 1.250 | 79,420 | 64,820 | 15,319 | 1.216 | 18,620 | 0.649 | 12,079 |
| 2054 | | 33 | 29.5 | 1.00 | 65,236 | 763 | 65,236 | 763 | 65,999 | 1.250 | 82,518 | 67,918 | 16,235 | 1.224 | 19,867 | 0.639 | 12,693 |
| 2055 | | 34 | 30.5 | 1.00 | 67,562 | 790 | 67,562 | 790 | 68,352 | 1.250 | 85,460 | 70,860 | 17,104 | 1.232 | 21,072 | 0.619 | 13,050 |
| 2056 | | 35 | 31.5 | 1.00 | 69,765 | 804 | 69,765 | 804 | 70,569 | 1.250 | 88,231 | 73,631 | 17,925 | 1.240 | 22,232 | 0.610 | 13,554 |
| 2057 | | 36 | 32.5 | 1.00 | 71,845 | 804 | 71,845 | 804 | 72,649 | 1.250 | 90,832 | 76,232 | 18,696 | 1.249 | 23,345 | 0.600 | 14,011 |
| 2058 | | 37 | 33.5 | 1.00 | 73,802 | 804 | 73,802 | 804 | 74,606 | 1.250 | 93,278 | 78,678 | 19,421 | 1.257 | 24,415 | 0.591 | 14,424 |
| 2059 | | 38 | 34.5 | 1.00 | 75,636 | 804 | 75,636 | 804 | 76,440 | 1.250 | 95,572 | 80,972 | 20,101 | 1.266 | 25,440 | 0.582 | 14,796 |
| 2060 | | 39 | 35.5 | 1.00 | 77,348 | 804 | 77,348 | 804 | 78,151 | 1.250 | 97,711 | 83,111 | 20,736 | 1.274 | 26,420 | 0.573 | 15,126 |
| 2061 | | 40 | 36.5 | 1.00 | 78,936 | 804 | 78,936 | 804 | 79,739 | 1.250 | 99,697 | 85,097 | 21,324 | 1.283 | 27,354 | 0.564 | 15,417 |
| 2062 | | 41 | 37.5 | 1.00 | 80,401 | 804 | 80,401 | 804 | 81,205 | 1.250 | 101,529 | 86,929 | 21,868 | 1.291 | 28,240 | 0.555 | 15,668 |
| 2063 | | 42 | 38.5 | 1.00 | 81,744 | 804 | 81,744 | 804 | 82,547 | 1.250 | 103,207 | 88,607 | 22,365 | 1.300 | 29,078 | 0.546 | 15,882 |
| 2064 | | 43 | 39.5 | 1.00 | 82,963 | 804 | 82,963 | 804 | 83,767 | 1.250 | 104,732 | 90,132 | 22,817 | 1.309 | 29,866 | 0.538 | 16,058 |
| 2065 | | 44 | 40.5 | 1.00 | 84,060 | 804 | 84,060 | 804 | 84,863 | 1.250 | 106,103 | 91,503 | 23,224 | 1.318 | 30,603 | 0.529 | 16,198 |
| 2066 | | 45 | 41.5 | 1.00 | 85,033 | 804 | 85,033 | 804 | 85,837 | 1.250 | 107,320 | 92,720 | 23,585 | 1.327 | 31,288 | 0.521 | 16,302 |

**Attachment 16**

# Projected Future Taxes

**J Grenier**

## Educational Attainment:  Bachelor's Degree

### Date of Loss:  July 7, 2021

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 11, 2084 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.68 | Attachment 34 |
| Projected Date at End of Worklife Expectancy | 3/11/2084 | Attachment 34 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E  Attachment 8, Column F |
| Unemployment Benefits | | F  Attachment 8, Column G |
| Cumulative Growth Factor | | G  Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L  Attachment 29 |
| Federal Income Tax | | M  Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M  Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | | N  Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L  Attachment 45 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | | *Attachment 8* | *Attachment 8* | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2067 | | 46 | 42.5 | 1.00 | $ 85,884 | $ 804 | $ 85,884 | $ 804 | $ 86,687 | 1.250 | $ 108,384 | $ 93,784 | $ 23,900 | 1.336 | $ 31,921 | 0.513 | $ 16,373 |
| 2068 | | 47 | 43.5 | 1.00 | $ 86,611 | $ 804 | $ 86,611 | $ 804 | $ 87,415 | 1.250 | $ 109,294 | $ 94,694 | $ 24,170 | 1.345 | $ 32,499 | 0.505 | $ 16,410 |
| 2069 | | 48 | 44.5 | 1.00 | $ 87,216 | $ 804 | $ 87,216 | $ 804 | $ 88,020 | 1.250 | $ 110,050 | $ 95,450 | $ 24,394 | 1.354 | $ 33,022 | 0.497 | $ 16,414 |
| 2070 | | 49 | 45.5 | 1.00 | $ 87,698 | $ 804 | $ 87,698 | $ 804 | $ 88,501 | 1.250 | $ 110,652 | $ 96,052 | $ 24,572 | 1.363 | $ 33,488 | 0.489 | $ 16,386 |
| 2071 | | 50 | 46.5 | 1.00 | $ 88,057 | $ 804 | $ 88,057 | $ 804 | $ 88,860 | 1.250 | $ 111,101 | $ 96,501 | $ 24,706 | 1.372 | $ 33,897 | 0.482 | $ 16,328 |
| 2072 | | 51 | 47.5 | 1.00 | $ 88,293 | $ 804 | $ 88,293 | $ 804 | $ 89,096 | 1.250 | $ 111,396 | $ 96,796 | $ 24,793 | 1.381 | $ 34,247 | 0.474 | $ 16,239 |
| 2073 | | 52 | 48.5 | 1.00 | $ 88,406 | $ 804 | $ 88,406 | $ 804 | $ 89,209 | 1.250 | $ 111,537 | $ 96,937 | $ 24,835 | 1.391 | $ 34,536 | 0.467 | $ 16,121 |
| 2074 | | 53 | 49.5 | 1.00 | $ 88,396 | $ 804 | $ 88,396 | $ 804 | $ 89,199 | 1.250 | $ 111,524 | $ 96,924 | $ 24,831 | 1.400 | $ 34,764 | 0.460 | $ 15,974 |
| 2075 | | 54 | 50.5 | 1.00 | $ 88,263 | $ 804 | $ 88,263 | $ 804 | $ 89,066 | 1.250 | $ 111,358 | $ 96,758 | $ 24,782 | 1.409 | $ 34,930 | 0.452 | $ 15,800 |
| 2076 | | 55 | 51.5 | 1.00 | $ 88,007 | $ 804 | $ 88,007 | $ 804 | $ 88,811 | 1.250 | $ 111,038 | $ 96,438 | $ 24,687 | 1.419 | $ 35,031 | 0.445 | $ 15,599 |
| 2077 | | 56 | 52.5 | 1.00 | $ 87,628 | $ 804 | $ 87,628 | $ 804 | $ 88,432 | 1.250 | $ 110,565 | $ 95,965 | $ 24,547 | 1.429 | $ 35,067 | 0.438 | $ 15,372 |
| 2078 | | 57 | 53.5 | 1.00 | $ 87,127 | $ 804 | $ 87,127 | $ 804 | $ 87,930 | 1.250 | $ 109,938 | $ 95,338 | $ 24,361 | 1.438 | $ 35,036 | 0.432 | $ 15,119 |
| 2079 | | 58 | 54.5 | 1.00 | $ 86,502 | $ 804 | $ 86,502 | $ 804 | $ 87,305 | 1.250 | $ 109,157 | $ 94,557 | $ 24,129 | 1.448 | $ 34,937 | 0.425 | $ 14,841 |
| 2080 | | 59 | 55.5 | 1.00 | $ 85,754 | $ 804 | $ 85,754 | $ 804 | $ 86,558 | 1.250 | $ 108,222 | $ 93,622 | $ 23,852 | 1.458 | $ 34,769 | 0.418 | $ 14,540 |
| 2081 | | 60 | 56.5 | 1.00 | $ 84,884 | $ 804 | $ 84,884 | $ 804 | $ 85,687 | 1.250 | $ 107,133 | $ 92,533 | $ 23,529 | 1.468 | $ 34,530 | 0.412 | $ 14,215 |
| 2082 | | 61 | 57.5 | 1.00 | $ 83,890 | $ 804 | $ 83,890 | $ 804 | $ 84,694 | 1.250 | $ 105,891 | $ 91,291 | $ 23,161 | 1.477 | $ 34,219 | 0.405 | $ 13,867 |
| 2083 | | 62 | 58.5 | 1.00 | $ 82,774 | $ 804 | $ 82,774 | $ 804 | $ 83,577 | 1.250 | $ 104,495 | $ 89,895 | $ 22,747 | 1.487 | $ 33,835 | 0.399 | $ 13,498 |
| 2084 | | 63 | 59.5 | 0.19 | $ 81,534 | $ 804 | $ 15,854 | $ 156 | $ 16,010 | 1.250 | $ 20,017 | $ 5,417 | $ 2,058 | 1.497 | $ 3,082 | 0.393 | $ 1,210 |

**NET PRESENT VALUE, PROJECTED FUTURE TAXES =  $  547,675**

**Projected Future Taxes**                                                                 **Attachment 17**

J███ Grenier
**Educational Attainment:  Master's Degree**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 39.66 | | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | | Attachment 35 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 9, Column F |
| Unemployment Benefits | | F | Attachment 9, Column G |
| Cumulative Growth Factor | | G | Calc. as (1 + Growth Rate) $^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $    14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | *Attachment 9* | *Attachment 9* | *D x E* | *D x F* | *G + H* | | *I x J* | *K - $14,600* | | | *M x N* | | *O x P* |
| 2045 | 24 | 20.5 | 0.48 | $ 47,880 | $ 560 | $ 23,142 | $ 271 | $ 23,413 | 1.250 | $ 29,273 | $ 14,673 | $ 3,742 | 1.152 | $ 4,310 | 0.732 | $ 3,157 |
| 2046 | 25 | 21.5 | 1.00 | $ 51,858 | $ 607 | $ 51,858 | $ 607 | $ 52,465 | 1.250 | $ 65,596 | $ 50,996 | $ 11,232 | 1.160 | $ 13,025 | 0.721 | $ 9,396 |
| 2047 | 26 | 22.5 | 1.00 | $ 55,693 | $ 651 | $ 55,693 | $ 651 | $ 56,344 | 1.250 | $ 70,446 | $ 55,846 | $ 12,666 | 1.167 | $ 14,786 | 0.711 | $ 10,507 |
| 2048 | 27 | 23.5 | 1.00 | $ 59,384 | $ 695 | $ 59,384 | $ 695 | $ 60,078 | 1.250 | $ 75,115 | $ 60,515 | $ 14,046 | 1.175 | $ 16,508 | 0.700 | $ 11,553 |
| 2049 | 28 | 24.5 | 1.00 | $ 62,931 | $ 736 | $ 62,931 | $ 736 | $ 63,667 | 1.250 | $ 79,602 | $ 65,002 | $ 15,373 | 1.183 | $ 18,189 | 0.689 | $ 12,538 |
| 2050 | 29 | 25.5 | 1.00 | $ 66,335 | $ 776 | $ 66,335 | $ 776 | $ 67,111 | 1.250 | $ 83,908 | $ 69,308 | $ 16,646 | 1.191 | $ 19,828 | 0.679 | $ 13,462 |
| 2051 | 30 | 26.5 | 1.00 | $ 69,596 | $ 804 | $ 69,596 | $ 804 | $ 70,400 | 1.250 | $ 88,020 | $ 73,420 | $ 17,862 | 1.199 | $ 21,421 | 0.669 | $ 14,324 |
| 2052 | 31 | 27.5 | 1.00 | $ 72,714 | $ 804 | $ 72,714 | $ 804 | $ 73,517 | 1.250 | $ 91,917 | $ 77,317 | $ 19,018 | 1.207 | $ 22,961 | 0.659 | $ 15,122 |
| 2053 | 32 | 28.5 | 1.00 | $ 75,688 | $ 804 | $ 75,688 | $ 804 | $ 76,491 | 1.250 | $ 95,636 | $ 81,036 | $ 20,120 | 1.216 | $ 24,456 | 0.649 | $ 15,864 |
| 2054 | 33 | 29.5 | 1.00 | $ 78,518 | $ 804 | $ 78,518 | $ 804 | $ 79,322 | 1.250 | $ 99,175 | $ 84,575 | $ 21,169 | 1.224 | $ 25,905 | 0.639 | $ 16,551 |
| 2055 | 34 | 30.5 | 1.00 | $ 81,205 | $ 804 | $ 81,205 | $ 804 | $ 82,009 | 1.250 | $ 102,534 | $ 87,934 | $ 22,166 | 1.232 | $ 27,308 | 0.619 | $ 16,912 |
| 2056 | 35 | 31.5 | 1.00 | $ 83,749 | $ 804 | $ 83,749 | $ 804 | $ 84,553 | 1.250 | $ 105,715 | $ 91,115 | $ 23,109 | 1.240 | $ 28,662 | 0.610 | $ 17,474 |
| 2057 | 36 | 32.5 | 1.00 | $ 86,149 | $ 804 | $ 86,149 | $ 804 | $ 86,953 | 1.250 | $ 108,716 | $ 94,116 | $ 23,998 | 1.249 | $ 29,966 | 0.600 | $ 17,985 |
| 2058 | 37 | 33.5 | 1.00 | $ 88,406 | $ 804 | $ 88,406 | $ 804 | $ 89,210 | 1.250 | $ 111,538 | $ 96,938 | $ 24,835 | 1.257 | $ 31,220 | 0.591 | $ 18,445 |
| 2059 | 38 | 34.5 | 1.00 | $ 90,520 | $ 804 | $ 90,520 | $ 804 | $ 91,323 | 1.250 | $ 114,180 | $ 99,580 | $ 25,619 | 1.266 | $ 32,423 | 0.582 | $ 18,857 |
| 2060 | 39 | 35.5 | 1.00 | $ 92,490 | $ 804 | $ 92,490 | $ 804 | $ 93,293 | 1.250 | $ 116,643 | $ 102,043 | $ 26,379 | 1.274 | $ 33,611 | 0.573 | $ 19,244 |
| 2061 | 40 | 36.5 | 1.00 | $ 94,317 | $ 804 | $ 94,317 | $ 804 | $ 95,120 | 1.250 | $ 118,927 | $ 104,327 | $ 27,102 | 1.283 | $ 34,765 | 0.564 | $ 19,594 |
| 2062 | 41 | 37.5 | 1.00 | $ 96,000 | $ 804 | $ 96,000 | $ 804 | $ 96,803 | 1.250 | $ 121,032 | $ 106,432 | $ 27,768 | 1.291 | $ 35,860 | 0.555 | $ 19,896 |
| 2063 | 42 | 38.5 | 1.00 | $ 97,540 | $ 804 | $ 97,540 | $ 804 | $ 98,343 | 1.250 | $ 122,957 | $ 108,357 | $ 28,378 | 1.300 | $ 36,894 | 0.546 | $ 20,151 |
| 2064 | 43 | 39.5 | 1.00 | $ 98,936 | $ 804 | $ 98,936 | $ 804 | $ 99,740 | 1.250 | $ 124,703 | $ 110,103 | $ 28,930 | 1.309 | $ 37,867 | 0.538 | $ 20,360 |
| 2065 | 44 | 40.5 | 1.00 | $ 100,189 | $ 804 | $ 100,189 | $ 804 | $ 100,993 | 1.250 | $ 126,270 | $ 111,670 | $ 29,426 | 1.318 | $ 38,776 | 0.529 | $ 20,524 |
| 2066 | 45 | 41.5 | 1.00 | $ 101,299 | $ 804 | $ 101,299 | $ 804 | $ 102,102 | 1.250 | $ 127,657 | $ 113,057 | $ 29,865 | 1.327 | $ 39,620 | 0.521 | $ 20,644 |
| 2067 | 46 | 42.5 | 1.00 | $ 102,265 | $ 804 | $ 102,265 | $ 804 | $ 103,069 | 1.250 | $ 128,865 | $ 114,265 | $ 30,247 | 1.336 | $ 40,399 | 0.513 | $ 20,721 |
| 2068 | 47 | 43.5 | 1.00 | $ 103,088 | $ 804 | $ 103,088 | $ 804 | $ 103,892 | 1.250 | $ 129,894 | $ 115,294 | $ 30,573 | 1.345 | $ 41,109 | 0.505 | $ 20,757 |

**Projected Future Taxes**                                                                                             **Attachment 17**

J█████ Grenier

**Educational Attainment:  Master's Degree**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends March 4, 2085 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 39.66 | | Attachment 35 |
| Projected Date at End of Worklife Expectancy | 3/4/2085 | | Attachment 35 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 9, Column F |
| Unemployment Benefits | | F | Attachment 9, Column G |
| Cumulative Growth Factor | | G | Calc. as $(1 + \text{Growth Rate})^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | Attachment 9 | Attachment 9 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2069 | 48 | 44.5 | 1.00 | $ 103,767 | $ 804 | $ 103,767 | $ 804 | $ 104,571 | 1.250 | $ 130,743 | $ 116,143 | $ 30,842 | 1.354 | $ 41,751 | 0.497 | $ 20,752 |
| 2070 | 49 | 45.5 | 1.00 | $ 104,304 | $ 804 | $ 104,304 | $ 804 | $ 105,107 | 1.250 | $ 131,414 | $ 116,814 | $ 31,054 | 1.363 | $ 42,322 | 0.489 | $ 20,708 |
| 2071 | 50 | 46.5 | 1.00 | $ 104,696 | $ 804 | $ 104,696 | $ 804 | $ 105,500 | 1.250 | $ 131,904 | $ 117,304 | $ 31,209 | 1.372 | $ 42,821 | 0.482 | $ 20,626 |
| 2072 | 51 | 47.5 | 1.00 | $ 104,945 | $ 804 | $ 104,945 | $ 804 | $ 105,749 | 1.250 | $ 132,216 | $ 117,616 | $ 31,308 | 1.381 | $ 43,246 | 0.474 | $ 20,506 |
| 2073 | 52 | 48.5 | 1.00 | $ 105,051 | $ 804 | $ 105,051 | $ 804 | $ 105,855 | 1.250 | $ 132,348 | $ 117,748 | $ 31,350 | 1.391 | $ 43,596 | 0.467 | $ 20,350 |
| 2074 | 53 | 49.5 | 1.00 | $ 105,013 | $ 804 | $ 105,013 | $ 804 | $ 105,817 | 1.250 | $ 132,301 | $ 117,701 | $ 31,335 | 1.400 | $ 43,870 | 0.460 | $ 20,158 |
| 2075 | 54 | 50.5 | 1.00 | $ 104,832 | $ 804 | $ 104,832 | $ 804 | $ 105,636 | 1.250 | $ 132,075 | $ 117,475 | $ 31,263 | 1.409 | $ 44,065 | 0.452 | $ 19,933 |
| 2076 | 55 | 51.5 | 1.00 | $ 104,508 | $ 804 | $ 104,508 | $ 804 | $ 105,312 | 1.250 | $ 131,669 | $ 117,069 | $ 31,135 | 1.419 | $ 44,180 | 0.445 | $ 19,673 |
| 2077 | 56 | 52.5 | 1.00 | $ 104,040 | $ 804 | $ 104,040 | $ 804 | $ 104,844 | 1.250 | $ 131,084 | $ 116,484 | $ 30,950 | 1.429 | $ 44,214 | 0.438 | $ 19,381 |
| 2078 | 57 | 53.5 | 1.00 | $ 103,429 | $ 804 | $ 103,429 | $ 804 | $ 104,232 | 1.250 | $ 130,320 | $ 115,720 | $ 30,708 | 1.438 | $ 44,165 | 0.432 | $ 19,058 |
| 2079 | 58 | 54.5 | 1.00 | $ 102,674 | $ 804 | $ 102,674 | $ 804 | $ 103,478 | 1.250 | $ 129,377 | $ 114,777 | $ 30,409 | 1.448 | $ 44,031 | 0.425 | $ 18,704 |
| 2080 | 59 | 55.5 | 1.00 | $ 101,776 | $ 804 | $ 101,776 | $ 804 | $ 102,580 | 1.250 | $ 128,254 | $ 113,654 | $ 30,054 | 1.458 | $ 43,810 | 0.418 | $ 18,320 |
| 2081 | 60 | 56.5 | 1.00 | $ 100,735 | $ 804 | $ 100,735 | $ 804 | $ 101,538 | 1.250 | $ 126,952 | $ 112,352 | $ 29,642 | 1.468 | $ 43,501 | 0.412 | $ 17,908 |
| 2082 | 61 | 57.5 | 1.00 | $ 99,550 | $ 804 | $ 99,550 | $ 804 | $ 100,353 | 1.250 | $ 125,470 | $ 110,870 | $ 29,173 | 1.477 | $ 43,102 | 0.405 | $ 17,467 |
| 2083 | 62 | 58.5 | 1.00 | $ 98,222 | $ 804 | $ 98,222 | $ 804 | $ 99,025 | 1.250 | $ 123,809 | $ 109,209 | $ 28,647 | 1.487 | $ 42,611 | 0.399 | $ 16,999 |
| 2084 | 63 | 59.5 | 1.00 | $ 96,750 | $ 804 | $ 96,750 | $ 804 | $ 97,553 | 1.250 | $ 121,969 | $ 107,369 | $ 28,065 | 1.497 | $ 42,027 | 0.393 | $ 16,504 |
| 2085 | 64 | 60.5 | 0.18 | $ 95,135 | $ 804 | $ 16,649 | $ 141 | $ 16,789 | 1.250 | $ 20,991 | $ 6,391 | $ 2,232 | 1.508 | $ 3,364 | 0.387 | $ 1,301 |

NET PRESENT VALUE, PROJECTED FUTURE TAXES =   $   702,386

# Projected Future Taxes

**Attachment 18**

**J▮▮▮ Grenier**
**Educational Attainment:  Doctorate Degree**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 10, Column F |
| Unemployment Benefits | | F | Attachment 10, Column G |
| Cumulative Growth Factor | | G | Calc. as (1 + Growth Rate) $^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | Attachment 10 | Attachment 10 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2048 | 27 | 23.5 | 0.49 | $ 59,307 | $ 694 | $ 28,830 | $ 337 | $ 29,167 | 1.250 | $ 36,467 | $ 21,867 | $ 5,150 | 1.175 | $ 6,052 | 0.700 | $ 4,236 |
| 2049 | 28 | 24.5 | 1.00 | $ 63,456 | $ 742 | $ 63,456 | $ 742 | $ 64,198 | 1.250 | $ 80,266 | $ 65,666 | $ 15,569 | 1.183 | $ 18,422 | 0.689 | $ 12,698 |
| 2050 | 29 | 25.5 | 1.00 | $ 67,462 | $ 789 | $ 67,462 | $ 789 | $ 68,251 | 1.250 | $ 85,334 | $ 70,734 | $ 17,067 | 1.191 | $ 20,330 | 0.679 | $ 13,803 |
| 2051 | 30 | 26.5 | 1.00 | $ 71,326 | $ 804 | $ 71,326 | $ 804 | $ 72,129 | 1.250 | $ 90,182 | $ 75,582 | $ 18,503 | 1.199 | $ 22,190 | 0.669 | $ 14,838 |
| 2052 | 31 | 27.5 | 1.00 | $ 75,047 | $ 804 | $ 75,047 | $ 804 | $ 75,850 | 1.250 | $ 94,834 | $ 80,234 | $ 19,883 | 1.207 | $ 24,005 | 0.659 | $ 15,810 |
| 2053 | 32 | 28.5 | 1.00 | $ 78,625 | $ 804 | $ 78,625 | $ 804 | $ 79,429 | 1.250 | $ 99,308 | $ 84,708 | $ 21,209 | 1.216 | $ 25,780 | 0.649 | $ 16,723 |
| 2054 | 33 | 29.5 | 1.00 | $ 82,061 | $ 804 | $ 82,061 | $ 804 | $ 82,864 | 1.250 | $ 103,604 | $ 89,004 | $ 22,483 | 1.224 | $ 27,513 | 0.639 | $ 17,578 |
| 2055 | 34 | 30.5 | 1.00 | $ 85,354 | $ 804 | $ 85,354 | $ 804 | $ 86,158 | 1.250 | $ 107,721 | $ 93,121 | $ 23,704 | 1.232 | $ 29,202 | 0.619 | $ 18,086 |
| 2056 | 35 | 31.5 | 1.00 | $ 88,505 | $ 804 | $ 88,505 | $ 804 | $ 89,308 | 1.250 | $ 111,660 | $ 97,060 | $ 24,871 | 1.240 | $ 30,848 | 0.610 | $ 18,807 |
| 2057 | 36 | 32.5 | 1.00 | $ 91,513 | $ 804 | $ 91,513 | $ 804 | $ 92,316 | 1.250 | $ 115,421 | $ 100,821 | $ 25,992 | 1.249 | $ 32,456 | 0.600 | $ 19,479 |
| 2058 | 37 | 33.5 | 1.00 | $ 94,378 | $ 804 | $ 94,378 | $ 804 | $ 95,181 | 1.250 | $ 119,004 | $ 104,404 | $ 27,126 | 1.257 | $ 34,101 | 0.591 | $ 20,147 |
| 2059 | 38 | 34.5 | 1.00 | $ 97,101 | $ 804 | $ 97,101 | $ 804 | $ 97,904 | 1.250 | $ 122,408 | $ 107,808 | $ 28,204 | 1.266 | $ 35,695 | 0.582 | $ 20,760 |
| 2060 | 39 | 35.5 | 1.00 | $ 99,681 | $ 804 | $ 99,681 | $ 804 | $ 100,484 | 1.250 | $ 125,634 | $ 111,034 | $ 29,225 | 1.274 | $ 37,236 | 0.573 | $ 21,319 |
| 2061 | 40 | 36.5 | 1.00 | $ 102,118 | $ 804 | $ 102,118 | $ 804 | $ 102,922 | 1.250 | $ 128,681 | $ 114,081 | $ 30,189 | 1.283 | $ 38,725 | 0.564 | $ 21,826 |
| 2062 | 41 | 37.5 | 1.00 | $ 104,413 | $ 804 | $ 104,413 | $ 804 | $ 105,217 | 1.250 | $ 131,551 | $ 116,951 | $ 31,097 | 1.291 | $ 40,160 | 0.555 | $ 22,282 |
| 2063 | 42 | 38.5 | 1.00 | $ 106,566 | $ 804 | $ 106,566 | $ 804 | $ 107,369 | 1.250 | $ 134,242 | $ 119,642 | $ 31,949 | 1.300 | $ 41,538 | 0.546 | $ 22,687 |
| 2064 | 43 | 39.5 | 1.00 | $ 108,575 | $ 804 | $ 108,575 | $ 804 | $ 109,379 | 1.250 | $ 136,755 | $ 122,155 | $ 32,744 | 1.309 | $ 42,859 | 0.538 | $ 23,044 |
| 2065 | 44 | 40.5 | 1.00 | $ 110,442 | $ 804 | $ 110,442 | $ 804 | $ 111,246 | 1.250 | $ 139,089 | $ 124,489 | $ 33,483 | 1.318 | $ 44,123 | 0.529 | $ 23,354 |
| 2066 | 45 | 41.5 | 1.00 | $ 112,167 | $ 804 | $ 112,167 | $ 804 | $ 112,971 | 1.250 | $ 141,245 | $ 126,645 | $ 34,166 | 1.327 | $ 45,326 | 0.521 | $ 23,617 |
| 2067 | 46 | 42.5 | 1.00 | $ 113,749 | $ 804 | $ 113,749 | $ 804 | $ 114,552 | 1.250 | $ 143,223 | $ 128,623 | $ 34,792 | 1.336 | $ 46,468 | 0.513 | $ 23,834 |
| 2068 | 47 | 43.5 | 1.00 | $ 115,188 | $ 804 | $ 115,188 | $ 804 | $ 115,992 | 1.250 | $ 145,023 | $ 130,423 | $ 35,361 | 1.345 | $ 47,548 | 0.505 | $ 24,008 |
| 2069 | 48 | 44.5 | 1.00 | $ 116,485 | $ 804 | $ 116,485 | $ 804 | $ 117,289 | 1.250 | $ 146,644 | $ 132,044 | $ 35,874 | 1.354 | $ 48,563 | 0.497 | $ 24,139 |
| 2070 | 49 | 45.5 | 1.00 | $ 117,639 | $ 804 | $ 117,639 | $ 804 | $ 118,443 | 1.250 | $ 148,087 | $ 133,487 | $ 36,331 | 1.363 | $ 49,514 | 0.489 | $ 24,227 |
| 2071 | 50 | 46.5 | 1.00 | $ 118,651 | $ 804 | $ 118,651 | $ 804 | $ 119,454 | 1.250 | $ 149,352 | $ 134,752 | $ 36,731 | 1.372 | $ 50,397 | 0.482 | $ 24,275 |

J███ Grenier
**Educational Attainment:  Doctorate Degree**
**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 10, Column F |
| Unemployment Benefits | | F | Attachment 10, Column G |
| Cumulative Growth Factor | | G | Calc. as $(1 + \text{Growth Rate})^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as $(1 + \text{Real Growth Rate})^{(\text{Yrs Ahead of Valuation Yr})}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | Attachment 10 | Attachment 10 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2072 | 51 | 47.5 | 1.00 | $ 119,520 | $ 804 | $ 119,520 | $ 804 | $ 120,323 | 1.250 | $ 150,438 | $ 135,838 | $ 37,075 | 1.381 | $ 51,212 | 0.474 | $ 24,284 |
| 2073 | 52 | 48.5 | 1.00 | $ 120,246 | $ 804 | $ 120,246 | $ 804 | $ 121,050 | 1.250 | $ 151,346 | $ 136,746 | $ 37,363 | 1.391 | $ 51,958 | 0.467 | $ 24,253 |
| 2074 | 53 | 49.5 | 1.00 | $ 120,830 | $ 804 | $ 120,830 | $ 804 | $ 121,633 | 1.250 | $ 152,076 | $ 137,476 | $ 37,594 | 1.400 | $ 52,632 | 0.460 | $ 24,185 |
| 2075 | 54 | 50.5 | 1.00 | $ 121,271 | $ 804 | $ 121,271 | $ 804 | $ 122,074 | 1.250 | $ 152,628 | $ 138,028 | $ 37,768 | 1.409 | $ 53,234 | 0.452 | $ 24,080 |
| 2076 | 55 | 51.5 | 1.00 | $ 121,570 | $ 804 | $ 121,570 | $ 804 | $ 122,373 | 1.250 | $ 153,001 | $ 138,401 | $ 37,886 | 1.419 | $ 53,761 | 0.445 | $ 23,939 |
| 2077 | 56 | 52.5 | 1.00 | $ 121,725 | $ 804 | $ 121,725 | $ 804 | $ 122,529 | 1.250 | $ 153,196 | $ 138,596 | $ 37,948 | 1.429 | $ 54,212 | 0.438 | $ 23,764 |
| 2078 | 57 | 53.5 | 1.00 | $ 121,739 | $ 804 | $ 121,739 | $ 804 | $ 122,542 | 1.250 | $ 153,213 | $ 138,613 | $ 37,953 | 1.438 | $ 54,586 | 0.432 | $ 23,555 |
| 2079 | 58 | 54.5 | 1.00 | $ 121,610 | $ 804 | $ 121,610 | $ 804 | $ 122,413 | 1.250 | $ 153,051 | $ 138,451 | $ 37,902 | 1.448 | $ 54,880 | 0.425 | $ 23,313 |
| 2080 | 59 | 55.5 | 1.00 | $ 121,338 | $ 804 | $ 121,338 | $ 804 | $ 122,141 | 1.250 | $ 152,711 | $ 138,111 | $ 37,795 | 1.458 | $ 55,094 | 0.418 | $ 23,039 |
| 2081 | 60 | 56.5 | 1.00 | $ 120,923 | $ 804 | $ 120,923 | $ 804 | $ 121,727 | 1.250 | $ 152,193 | $ 137,593 | $ 37,631 | 1.468 | $ 55,225 | 0.412 | $ 22,734 |
| 2082 | 61 | 57.5 | 1.00 | $ 120,366 | $ 804 | $ 120,366 | $ 804 | $ 121,170 | 1.250 | $ 151,497 | $ 136,897 | $ 37,410 | 1.477 | $ 55,273 | 0.405 | $ 22,399 |
| 2083 | 62 | 58.5 | 1.00 | $ 119,667 | $ 804 | $ 119,667 | $ 804 | $ 120,470 | 1.250 | $ 150,622 | $ 136,022 | $ 37,133 | 1.487 | $ 55,234 | 0.399 | $ 22,034 |
| 2084 | 63 | 59.5 | 1.00 | $ 118,824 | $ 804 | $ 118,824 | $ 804 | $ 119,628 | 1.250 | $ 149,569 | $ 134,969 | $ 36,800 | 1.497 | $ 55,108 | 0.393 | $ 21,641 |
| 2085 | 64 | 60.5 | 1.00 | $ 117,840 | $ 804 | $ 117,840 | $ 804 | $ 118,643 | 1.250 | $ 148,338 | $ 133,738 | $ 36,410 | 1.508 | $ 54,892 | 0.387 | $ 21,221 |
| 2086 | 65 | 61.5 | 1.00 | $ 116,712 | $ 804 | $ 116,712 | $ 804 | $ 117,516 | 1.250 | $ 146,928 | $ 132,328 | $ 35,964 | 1.518 | $ 54,586 | 0.381 | $ 20,773 |
| 2087 | 66 | 62.5 | 0.67 | $ 115,442 | $ 804 | $ 77,603 | $ 540 | $ 78,143 | 1.250 | $ 97,701 | $ 83,101 | $ 20,758 | 1.528 | $ 31,718 | 0.375 | $ 11,883 |

NET PRESENT VALUE, PROJECTED FUTURE TAXES =  $  828,674

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 218 of 432    PageID.8226

**Attachment 19**

**Projected Future Taxes**

**J███ Grenier**

**Educational Attainment:  Professional Degree**

**Date of Loss:  July 7, 2021**

*Assumptions:  Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | | |
|---|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.16 | | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | | Attachment 36 |
| Earnings Adjusted for Unemployment, 2017 $$ | | E | Attachment 11, Column F |
| Unemployment Benefits | | F | Attachment 11, Column G |
| Cumulative Growth Factor | | G | Calc. as (1 + Growth Rate) $^{(2024-2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 | L | Attachment 29 |
| Federal Income Tax | | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | | Attachment 41 |
| Cumulative Growth Factor | | N | Calc. as (1 + Real Growth Rate) $^{(Yrs Ahead of Valuation Yr)}$ |
| Cumulative Discount Factor | | L | Attachment 45 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | | Attachment 11 | Attachment 11 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2047 | 26 | 22.5 | 0.48 | $ 49,080 | $ 574 | $ 23,722 | $ 277 | $ 23,999 | 1.250 | $ 30,006 | $ 15,406 | $ 3,886 | 1.167 | $ 4,536 | 0.711 | $ 3,223 |
| 2048 | 27 | 23.5 | 1.00 | $ 57,112 | $ 668 | $ 57,112 | $ 668 | $ 57,779 | 1.250 | $ 72,241 | $ 57,641 | $ 13,196 | 1.175 | $ 15,510 | 0.700 | $ 10,855 |
| 2049 | 28 | 24.5 | 1.00 | $ 64,863 | $ 759 | $ 64,863 | $ 759 | $ 65,622 | 1.250 | $ 82,046 | $ 67,446 | $ 16,095 | 1.183 | $ 19,044 | 0.689 | $ 13,127 |
| 2050 | 29 | 25.5 | 1.00 | $ 72,335 | $ 804 | $ 72,335 | $ 804 | $ 73,139 | 1.250 | $ 91,444 | $ 76,844 | $ 18,877 | 1.191 | $ 22,487 | 0.679 | $ 15,267 |
| 2051 | 30 | 26.5 | 1.00 | $ 79,527 | $ 804 | $ 79,527 | $ 804 | $ 80,331 | 1.250 | $ 100,436 | $ 85,836 | $ 21,544 | 1.199 | $ 25,836 | 0.669 | $ 17,276 |
| 2052 | 31 | 27.5 | 1.00 | $ 86,439 | $ 804 | $ 86,439 | $ 804 | $ 87,243 | 1.250 | $ 109,078 | $ 94,478 | $ 24,106 | 1.207 | $ 29,104 | 0.659 | $ 19,169 |
| 2053 | 32 | 28.5 | 1.00 | $ 93,071 | $ 804 | $ 93,071 | $ 804 | $ 93,875 | 1.250 | $ 117,370 | $ 102,770 | $ 26,609 | 1.216 | $ 32,344 | 0.649 | $ 20,981 |
| 2054 | 33 | 29.5 | 1.00 | $ 99,423 | $ 804 | $ 99,423 | $ 804 | $ 100,227 | 1.250 | $ 125,312 | $ 110,712 | $ 29,123 | 1.224 | $ 35,638 | 0.639 | $ 22,770 |
| 2055 | 34 | 30.5 | 1.00 | $ 105,495 | $ 804 | $ 105,495 | $ 804 | $ 106,299 | 1.250 | $ 132,904 | $ 118,304 | $ 31,526 | 1.232 | $ 38,839 | 0.619 | $ 24,054 |
| 2056 | 35 | 31.5 | 1.00 | $ 111,287 | $ 804 | $ 111,287 | $ 804 | $ 112,091 | 1.250 | $ 140,145 | $ 125,545 | $ 33,818 | 1.240 | $ 41,944 | 0.610 | $ 25,572 |
| 2057 | 36 | 32.5 | 1.00 | $ 116,799 | $ 804 | $ 116,799 | $ 804 | $ 117,603 | 1.250 | $ 147,037 | $ 132,437 | $ 35,999 | 1.249 | $ 44,951 | 0.600 | $ 26,978 |
| 2058 | 37 | 33.5 | 1.00 | $ 122,031 | $ 804 | $ 122,031 | $ 804 | $ 122,834 | 1.250 | $ 153,578 | $ 138,978 | $ 38,069 | 1.257 | $ 47,857 | 0.591 | $ 28,274 |
| 2059 | 38 | 34.5 | 1.00 | $ 126,983 | $ 804 | $ 126,983 | $ 804 | $ 127,786 | 1.250 | $ 159,769 | $ 145,169 | $ 40,029 | 1.266 | $ 50,660 | 0.582 | $ 29,464 |
| 2060 | 39 | 35.5 | 1.00 | $ 131,655 | $ 804 | $ 131,655 | $ 804 | $ 132,458 | 1.250 | $ 165,610 | $ 151,010 | $ 41,877 | 1.274 | $ 53,358 | 0.573 | $ 30,549 |
| 2061 | 40 | 36.5 | 1.00 | $ 136,047 | $ 804 | $ 136,047 | $ 804 | $ 136,850 | 1.250 | $ 171,102 | $ 156,502 | $ 43,615 | 1.283 | $ 55,947 | 0.564 | $ 31,533 |
| 2062 | 41 | 37.5 | 1.00 | $ 140,158 | $ 804 | $ 140,158 | $ 804 | $ 140,962 | 1.250 | $ 176,243 | $ 161,643 | $ 45,242 | 1.291 | $ 58,426 | 0.555 | $ 32,417 |
| 2063 | 42 | 38.5 | 1.00 | $ 143,990 | $ 804 | $ 143,990 | $ 804 | $ 144,794 | 1.250 | $ 181,033 | $ 166,433 | $ 46,759 | 1.300 | $ 60,792 | 0.546 | $ 33,204 |
| 2064 | 43 | 39.5 | 1.00 | $ 147,542 | $ 804 | $ 147,542 | $ 804 | $ 148,346 | 1.250 | $ 185,474 | $ 170,874 | $ 48,164 | 1.309 | $ 63,043 | 0.538 | $ 33,896 |
| 2065 | 44 | 40.5 | 1.00 | $ 150,814 | $ 804 | $ 150,814 | $ 804 | $ 151,618 | 1.250 | $ 189,565 | $ 174,965 | $ 49,459 | 1.318 | $ 65,174 | 0.529 | $ 34,496 |
| 2066 | 45 | 41.5 | 1.00 | $ 153,806 | $ 804 | $ 153,806 | $ 804 | $ 154,609 | 1.250 | $ 193,306 | $ 178,706 | $ 50,643 | 1.327 | $ 67,185 | 0.521 | $ 35,006 |
| 2067 | 46 | 42.5 | 1.00 | $ 156,518 | $ 804 | $ 156,518 | $ 804 | $ 157,321 | 1.250 | $ 196,696 | $ 182,096 | $ 51,716 | 1.336 | $ 69,072 | 0.513 | $ 35,428 |
| 2068 | 47 | 43.5 | 1.00 | $ 158,950 | $ 804 | $ 158,950 | $ 804 | $ 159,753 | 1.250 | $ 199,737 | $ 185,137 | $ 52,678 | 1.345 | $ 70,832 | 0.505 | $ 35,765 |
| 2069 | 48 | 44.5 | 1.00 | $ 161,101 | $ 804 | $ 161,101 | $ 804 | $ 161,905 | 1.250 | $ 202,427 | $ 187,827 | $ 53,530 | 1.354 | $ 72,463 | 0.497 | $ 36,018 |
| 2070 | 49 | 45.5 | 1.00 | $ 162,973 | $ 804 | $ 162,973 | $ 804 | $ 163,777 | 1.250 | $ 204,767 | $ 190,167 | $ 54,271 | 1.363 | $ 73,962 | 0.489 | $ 36,190 |

**Projected Future Taxes**                                                                                    **Attachment 19**

J████ Grenier

**Educational Attainment: Professional Degree**

**Date of Loss: July 7, 2021**

*Assumptions: Analysis starts December 2, 2024 (Date of Valuation) and ends September 3, 2087 (Statistical Worklife Expectancy)*

| | | |
|---|---|---|
| Remaining Worklife Exp. at Date Lost Earnings Begin | 40.16 | Attachment 36 |
| Projected Date at End of Worklife Expectancy | 9/3/2087 | Attachment 36 |
| Earnings Adjusted for Unemployment, 2017 $$ | E | Attachment 11, Column F |
| Unemployment Benefits | F | Attachment 11, Column G |
| Cumulative Growth Factor | G | Calc. as (1 + Growth Rate) $^{(2024 - 2017)}$ |
| Standard Deduction, 2024 $$ | $ 14,600 L | Attachment 29 |
| Federal Income Tax | M | Calculated from tables on Attachment 29 |
| FICA Payroll Tax | M | Calculated as 7.65% x Col. G x Col. J |
| Real Wage Growth Rate | 0.68% | Attachment 41 |
| Cumulative Growth Factor | N | Calc. as (1 + Real Growth Rate) $^{(Yrs\ Ahead\ of\ Valuation\ Yr)}$ |
| Cumulative Discount Factor | L | Attachment 45 |

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Mr. Grenier | Years After 2024 | Frac. Of Year | Earnings Adj. for Unempl. 2017 $$ | Unemp. Benefits | Proj. Earn. Adj. Frac. of Yr | Unemp. Benefits Adj. Frac. of Yr | Proj. Total Earn. Adj. Frac. of Yr | Cumul Growth Factor | Total Proj. Earnings 2024 $$ | Taxable Earnings | Income & Payroll Taxes | Cumul Growth Factor | Projected Taxes Current $$ | Cumul Disc. Factor | NPV Proj. Future Taxes |
| | | | | Attachment 11 | Attachment 11 | D x E | D x F | G + H | | I x J | K - $14,600 | | | M x N | | O x P |
| 2071 | 50 | 46.5 | 1.00 | $ 164,565 | $ 804 | $ 164,565 | $ 804 | $ 165,369 | 1.250 | $ 206,758 | $ 192,158 | $ 54,917 | 1.372 | $ 75,349 | 0.482 | $ 36,294 |
| 2072 | 51 | 47.5 | 1.00 | $ 165,877 | $ 804 | $ 165,877 | $ 804 | $ 166,680 | 1.250 | $ 208,398 | $ 193,798 | $ 55,567 | 1.381 | $ 76,756 | 0.474 | $ 36,395 |
| 2073 | 52 | 48.5 | 1.00 | $ 166,909 | $ 804 | $ 166,909 | $ 804 | $ 167,712 | 1.250 | $ 209,688 | $ 195,088 | $ 56,079 | 1.391 | $ 77,985 | 0.467 | $ 36,402 |
| 2074 | 53 | 49.5 | 1.00 | $ 167,660 | $ 804 | $ 167,660 | $ 804 | $ 168,464 | 1.250 | $ 210,628 | $ 196,028 | $ 56,452 | 1.400 | $ 79,034 | 0.460 | $ 36,316 |
| 2075 | 54 | 50.5 | 1.00 | $ 168,132 | $ 804 | $ 168,132 | $ 804 | $ 168,936 | 1.250 | $ 211,218 | $ 196,618 | $ 56,685 | 1.409 | $ 79,897 | 0.452 | $ 36,141 |
| 2076 | 55 | 51.5 | 1.00 | $ 168,324 | $ 804 | $ 168,324 | $ 804 | $ 169,128 | 1.250 | $ 211,457 | $ 196,857 | $ 56,781 | 1.419 | $ 80,571 | 0.445 | $ 35,878 |
| 2077 | 56 | 52.5 | 1.00 | $ 168,236 | $ 804 | $ 168,236 | $ 804 | $ 169,039 | 1.250 | $ 211,347 | $ 196,747 | $ 56,737 | 1.429 | $ 81,053 | 0.438 | $ 35,530 |
| 2078 | 57 | 53.5 | 1.00 | $ 167,868 | $ 804 | $ 167,868 | $ 804 | $ 168,671 | 1.250 | $ 210,887 | $ 196,287 | $ 56,554 | 1.438 | $ 81,338 | 0.432 | $ 35,099 |
| 2079 | 58 | 54.5 | 1.00 | $ 167,219 | $ 804 | $ 167,219 | $ 804 | $ 168,023 | 1.250 | $ 210,076 | $ 195,476 | $ 56,233 | 1.448 | $ 81,422 | 0.425 | $ 34,588 |
| 2080 | 59 | 55.5 | 1.00 | $ 166,291 | $ 804 | $ 166,291 | $ 804 | $ 167,095 | 1.250 | $ 208,916 | $ 194,316 | $ 55,773 | 1.458 | $ 81,301 | 0.418 | $ 33,998 |
| 2081 | 60 | 56.5 | 1.00 | $ 165,083 | $ 804 | $ 165,083 | $ 804 | $ 165,886 | 1.250 | $ 207,405 | $ 192,805 | $ 55,174 | 1.468 | $ 80,971 | 0.412 | $ 33,332 |
| 2082 | 61 | 57.5 | 1.00 | $ 163,595 | $ 804 | $ 163,595 | $ 804 | $ 164,398 | 1.250 | $ 205,544 | $ 190,944 | $ 54,516 | 1.477 | $ 80,546 | 0.405 | $ 32,641 |
| 2083 | 62 | 58.5 | 1.00 | $ 161,826 | $ 804 | $ 161,826 | $ 804 | $ 162,630 | 1.250 | $ 203,333 | $ 188,733 | $ 53,817 | 1.487 | $ 80,049 | 0.399 | $ 31,934 |
| 2084 | 63 | 59.5 | 1.00 | $ 159,778 | $ 804 | $ 159,778 | $ 804 | $ 160,581 | 1.250 | $ 200,772 | $ 186,172 | $ 53,006 | 1.497 | $ 79,376 | 0.393 | $ 31,171 |
| 2085 | 64 | 60.5 | 1.00 | $ 157,450 | $ 804 | $ 157,450 | $ 804 | $ 158,253 | 1.250 | $ 197,861 | $ 183,261 | $ 52,085 | 1.508 | $ 78,523 | 0.387 | $ 30,356 |
| 2086 | 65 | 61.5 | 1.00 | $ 154,841 | $ 804 | $ 154,841 | $ 804 | $ 155,645 | 1.250 | $ 194,600 | $ 180,000 | $ 51,053 | 1.518 | $ 77,487 | 0.381 | $ 29,488 |
| 2087 | 66 | 62.5 | 0.67 | $ 151,953 | $ 804 | $ 102,146 | $ 540 | $ 102,686 | 1.250 | $ 128,387 | $ 113,787 | $ 30,121 | 1.528 | $ 46,026 | 0.375 | $ 17,243 |

NET PRESENT VALUE, PROJECTED FUTURE TAXES = $ 1,194,318

# Cost of Educational Attainment

**Attachment 20**

J███ Grenier

Assumptions:

Annual Cost of Education (tuition/fees) at Public Institutions

| | | | |
|---|---|---|---|
| - 2-Year Institutions | $ | 3,970 | *U.S. Departement of Education, National Center for Education Statistics* |
| - 4-Year Institutions | $ | 9,678 | *U.S. Departement of Education, National Center for Education Statistics* |

Cost for post-graduate education conservatively assumed equal to 4-year institution

Costs for Doctorate degree assumed offset by stipends/wages

| | | |
|---|---|---|
| Annual Growth Rate Education Costs (Nominal) | 3.93% | *Attachment 43* |
| Annual Growth Rate Education Costs (Real) | 1.35% | *Attachment 43* |
| Cost of Education Growth Factor | | *Calculated as (1 + .0393)^ 2024 - 2022  x (1 + .0135) Years After 2024* |

| | | Annual Cost by Attainment Scenario (2022$$) | | | | | Edu. Cost | | Present Value Cost by Attainment Scenario | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age at Year End | Associate Degree | Bachelor's Degree | Masters Degree | Professional Degree | Doctorate Degree | Growth Factor | Discount Factor | Associate Degree | Bachelor's Degree | Masters Degree | Professional Degree | Doctorate Degree |
| | | | | | | | | *Attachment 45* | *Cost x Growth Factor x Discount Factor* | | | | |
| 2024 | 3.49 | | | | | | 1.080 | 1.000 | | | | | |
| 2025 | 4.48 | | | | | | 1.095 | 0.989 | | | | | |
| 2026 | 5.48 | | | | | | 1.110 | 0.968 | | | | | |
| 2027 | 6.48 | | | | | | 1.124 | 0.955 | | | | | |
| 2028 | 7.49 | | | | | | 1.140 | 0.952 | | | | | |
| 2029 | 8.48 | | | | | | 1.155 | 0.939 | | | | | |
| 2030 | 9.48 | | | | | | 1.171 | 0.919 | | | | | |
| 2031 | 10.48 | | | | | | 1.186 | 0.905 | | | | | |
| 2032 | 11.49 | | | | | | 1.202 | 0.894 | | | | | |
| 2033 | 12.48 | | | | | | 1.219 | 0.880 | | | | | |
| 2034 | 13.48 | | | | | | 1.235 | 0.867 | | | | | |
| 2035 | 14.48 | | | | | | 1.252 | 0.857 | | | | | |
| 2036 | 15.49 | | | | | | 1.269 | 0.844 | | | | | |
| 2037 | 16.48 | | | | | | 1.286 | 0.832 | | | | | |
| 2038 | 17.48 | | | | | | 1.303 | 0.819 | | | | | |
| 2039 | 18.48 | $ 1,985 | $ 4,839 | $ 4,839 | $ 4,839 | $ 4,839 | 1.321 | 0.807 | $ 2,117 | $ 5,160 | $ 5,160 | $ 5,160 | $ 5,160 |
| 2040 | 19.49 | $ 3,970 | $ 9,678 | $ 9,678 | $ 9,678 | $ 9,678 | 1.338 | 0.796 | $ 4,227 | $ 10,306 | $ 10,306 | $ 10,306 | $ 10,306 |
| 2041 | 20.48 | $ 1,985 | $ 9,678 | $ 9,678 | $ 9,678 | $ 9,678 | 1.356 | 0.784 | $ 2,111 | $ 10,292 | $ 10,292 | $ 10,292 | $ 10,292 |
| 2042 | 21.48 | | $ 9,678 | $ 9,678 | $ 9,678 | $ 9,678 | 1.375 | 0.772 | $ - | $ 10,278 | $ 10,278 | $ 10,278 | $ 10,278 |
| 2043 | 22.48 | | $ 4,839 | $ 9,678 | $ 9,678 | $ 9,678 | 1.393 | 0.761 | $ - | $ 5,132 | $ 10,264 | $ 10,264 | $ 10,264 |
| 2044 | 23.49 | | | $ 9,678 | $ 9,678 | $ 9,678 | 1.412 | 0.750 | $ - | $ - | $ 10,250 | $ 10,250 | $ 10,250 |
| 2045 | 24.48 | | | $ 4,839 | $ 9,678 | $ 4,839 | 1.431 | 0.732 | $ - | $ - | $ 5,072 | $ 10,145 | $ 5,072 |
| 2046 | 25.48 | | | | $ 9,678 | $ - | 1.450 | 0.721 | $ - | $ - | $ - | $ 10,127 | $ - |
| 2047 | 26.48 | | | | $ 4,839 | $ - | 1.470 | 0.711 | $ - | $ - | $ - | $ 5,054 | $ - |
| 2048 | 27.49 | | | | $ - | $ - | 1.490 | 0.700 | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | $ 8,455 | $ 41,167 | $ 61,621 | $ 81,874 | $ 61,621 |

**Attachment 21**

**Life Earnings Cycle**
**Males 25 years and older, All Races**
**Education:  10th - 12th Grade, no diploma**
**Worked Full Time, Year Round**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*



$$y = -12.126x^2 + 1{,}490.289x - 5{,}276.366$$

| Age Earnings Profile Data | | | |
|---|---|---|---|
| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
| 20 - 24 | 22 | $ 21,239 | $ 21,239 |
| 25 - 29 | 27 | $ 26,130 | $ 26,130 |
| 30 - 34 | 32 | $ 30,797 | $ 30,797 |
| 35 - 39 | 37 | $ 33,369 | $ 33,369 |
| 40 - 44 | 42 | $ 36,024 | $ 36,024 |
| 45 - 49 | 47 | $ 37,169 | $ 37,169 |
| 50 - 54 | 52 | $ 39,293 | $ 39,293 |
| 55 - 59 | 57 | $ 40,355 | $ 40,355 |
| 60 - 62 | 61 | $ 40,763 | $ 40,763 |
| 63 - 67 | #N/A | #N/A | #N/A |

| Imputed Earnings (Using Formula at Right) | |
|---|---|
| Age | Earnings 2017$ |
| 23 | $ 22,586 |
| 29 | $ 27,744 |
| 36 | $ 32,659 |
| 50 | $ 38,923 |
| 60 | $ 40,487 |

# Life Earnings Cycle

**Males 25 years and older, All Races**

**Education:  GED or Alternative Credential**

**Worked Full Time, Year Round**

**Attachment 22**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
    *Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*

| Age Earnings Profile Data | | | |
|---|---|---|---|
| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
| 20 - 24 | 22 | $ 23,363 | $ 23,363 |
| 25 - 29 | 27 | $ 29,848 | $ 29,848 |
| 30 - 34 | 32 | $ 35,850 | $ 35,850 |
| 35 - 39 | 37 | $ 39,436 | $ 39,436 |
| 40 - 44 | 42 | $ 41,440 | $ 41,440 |
| 45 - 49 | 47 | $ 43,435 | $ 43,435 |
| 50 - 54 | 52 | $ 44,876 | $ 44,876 |
| 55 - 59 | 57 | $ 45,665 | $ 45,665 |
| 60 - 62 | 61 | $ 44,603 | $ 44,603 |
| 63 - 67 | #N/A | #N/A | #N/A |

| Imputed Earnings (Using Formula at Right) | | | |
|---|---|---|---|
| Age | | | Earnings 2017$ |
| 23 | | | $ 25,114 |
| 29 | | | $ 32,001 |
| 36 | | | $ 38,225 |
| 50 | | | $ 44,827 |
| 60 | | | $ 44,768 |



$$y = -19.890x^2 + 2{,}182.051x - 14{,}550.964$$

# Life Earnings Cycle
## Males 25 years and older, All Races
## Education:  HS Diploma
## Worked Full Time, Year Round

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 224 of 432   PageID.8232

### Age Earnings Profile Data

| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
|---|---|---|---|
| 20 - 24 | 22 | $ 25,280 | $ 25,280 |
| 25 - 29 | 27 | $ 31,356 | $ 31,356 |
| 30 - 34 | 32 | $ 37,296 | $ 37,296 |
| 35 - 39 | 37 | $ 41,440 | $ 41,440 |
| 40 - 44 | 42 | $ 44,464 | $ 44,464 |
| 45 - 49 | 47 | $ 47,034 | $ 47,034 |
| 50 - 54 | 52 | $ 48,851 | $ 48,851 |
| 55 - 59 | 57 | $ 50,169 | $ 50,169 |
| 60 - 62 | 61 | $ 47,789 | $ 47,789 |
| 63 - 67 | #N/A | #N/A | #N/A |

### Imputed Earnings
### (Using Formula at Right)

| Age | | | Earnings 2017$ |
|---|---|---|---|
| 23 | | | $ 26,508 |
| 29 | | | $ 33,887 |
| 36 | | | $ 40,653 |
| 50 | | | $ 48,229 |
| 60 | | | $ 48,779 |



$$y = -20.255x^2 + 2{,}283.089x - 15{,}288.114$$

**Attachment 24**

**Life Earnings Cycle**
**Males 25 years and older, All Races**
**Education:  Associate Degree**
**Worked Full Time, Year Round**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*



$$y = -33.404x^2 + 3{,}589.093x - 32{,}628.593$$

### Age Earnings Profile Data

| Age | Avg Age | Median Earnings, 2017$ | Earnings (Incl. State Adj. Factor 1.000) |
|---|---|---|---|
| 20 - 24 | 22 | $ 30,311 | $ 30,311 |
| 25 - 29 | 27 | $ 39,824 | $ 39,824 |
| 30 - 34 | 32 | $ 48,079 | $ 48,079 |
| 35 - 39 | 37 | $ 53,871 | $ 53,871 |
| 40 - 44 | 42 | $ 59,697 | $ 59,697 |
| 45 - 49 | 47 | $ 62,159 | $ 62,159 |
| 50 - 54 | 52 | $ 63,718 | $ 63,718 |
| 55 - 59 | 57 | $ 63,705 | $ 63,705 |
| 60 - 62 | 61 | $ 61,755 | $ 61,755 |
| 63 - 67 | #N/A | #N/A | #N/A |

### Imputed Earnings (Using Formula at Right)

| Age | Earnings 2017$ |
|---|---|
| 23 | $ 32,250 |
| 29 | $ 43,362 |
| 36 | $ 53,287 |
| 50 | $ 63,316 |
| 60 | $ 62,463 |

**Attachment 25**

**Life Earnings Cycle**

**Males 25 years and older, All Races**

**Education:  Bachelor's Degree**

**Worked Full Time, Year Round**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*



$$y = -63.306x^2 + 6{,}636.872x - 82{,}891.827$$

### Age Earnings Profile Data

| Age | Avg Age | Median Earnings, 2017$ | Earnings (Incl. State Adj. Factor 1.000) |
|---|---|---|---|
| 20 - 24 | #N/A | #N/A | #N/A |
| 25 - 29 | 27 | $ 50,975 | $ 50,975 |
| 30 - 34 | 32 | $ 63,718 | $ 63,718 |
| 35 - 39 | 37 | $ 75,839 | $ 75,839 |
| 40 - 44 | 42 | $ 83,616 | $ 83,616 |
| 45 - 49 | 47 | $ 88,842 | $ 88,842 |
| 50 - 54 | 52 | $ 93,239 | $ 93,239 |
| 55 - 59 | 57 | $ 90,932 | $ 90,932 |
| 60 - 62 | 61 | $ 82,917 | $ 82,917 |
| 63 - 67 | 65 | $ 82,341 | $ 82,341 |

### Imputed Earnings (Using Formula at Right)

| Age | Earnings 2017$ |
|---|---|
| 23 | $ 36,267 |
| 29 | $ 56,337 |
| 36 | $ 73,991 |
| 50 | $ 90,687 |
| 60 | $ 87,419 |

# Life Earnings Cycle
## Males 25 years and older, All Races
## Education: Master's Degree
## Worked Full Time, Year Round

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 227 of 432    PageID.8235

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*

| Age Earnings Profile Data | | | |
|---|---|---|---|
| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
| 20 - 24 | #N/A | #N/A | #N/A |
| 25 - 29 | 27 | $ 60,671 | $ 60,671 |
| 30 - 34 | 32 | $ 77,699 | $ 77,699 |
| 35 - 39 | 37 | $ 91,007 | $ 91,007 |
| 40 - 44 | 42 | $ 102,429 | $ 102,429 |
| 45 - 49 | 47 | $ 106,197 | $ 106,197 |
| 50 - 54 | 52 | $ 108,779 | $ 108,779 |
| 55 - 59 | 57 | $ 104,984 | $ 104,984 |
| 60 - 62 | 61 | $ 99,097 | $ 99,097 |
| 63 - 67 | 65 | $ 99,294 | $ 99,294 |

| Imputed Earnings (Using Formula at Right) | | | |
|---|---|---|---|
| Age | | | Earnings 2017$ |
| 23 | | | $ 45,066 |
| 29 | | | $ 68,317 |
| 36 | | | $ 88,722 |
| 50 | | | $ 107,823 |
| 60 | | | $ 103,743 |



$$y = -73.846x^2 + 7{,}715.090x - 93{,}316.512$$

**Attachment 27**

**Life Earnings Cycle**
**Males 25 years and older, All Races**
**Education:  Doctorate Degree**
**Worked Full Time, Year Round**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*



$y = -73.429x^2 + 8,311.234x - 109,794.811$

### Age Earnings Profile Data

| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
|---|---|---|---|
| 20 - 24 | #N/A | #N/A | #N/A |
| 25 - 29 | 27 | $ 62,712 | 62,712 |
| 30 - 34 | 32 | $ 78,390 | 78,390 |
| 35 - 39 | 37 | $ 98,419 | 98,419 |
| 40 - 44 | 42 | $ 106,707 | 106,707 |
| 45 - 49 | 47 | $ 121,343 | 121,343 |
| 50 - 54 | 52 | $ 125,423 | 125,423 |
| 55 - 59 | 57 | $ 125,423 | 125,423 |
| 60 - 62 | 61 | $ 121,243 | 121,243 |
| 63 - 67 | 65 | $ 121,343 | 121,343 |

### Imputed Earnings
### (Using Formula at Right)

| Age | Earnings 2017$ |
|---|---|
| 23 | $ 42,520 |
| 29 | $ 69,477 |
| 36 | $ 94,246 |
| 50 | $ 122,194 |
| 60 | $ 124,535 |

**Attachment 28**

**Life Earnings Cycle**
**Males 25 years and older, All Races**
**Education: Professional Degree**
**Worked Full Time, Year Round**

*Source: Full-Time Earnings in the United States, Expectancy Data, 2017 Edition.*
*Compiled from earnings data from American Community Survey, Public Use Microdata Samples, Bureau of the Census, Combined 2013 - 2017.*



$$y = -144.185x^2 + 15{,}913.670x - 265{,}741.011$$

### Age Earnings Profile Data

| Age | Avg Age | Median Earnings, 2017$$ | Earnings (Incl. State Adj. Factor 1.000) |
|---|---|---|---|
| 20 - 24 | #N/A | #N/A | #N/A |
| 25 - 29 | 27 | $ 60,621 | $ 60,621 |
| 30 - 34 | 32 | $ 87,796 | $ 87,796 |
| 35 - 39 | 37 | $ 128,657 | $ 128,657 |
| 40 - 44 | 42 | $ 155,398 | $ 155,398 |
| 45 - 49 | 47 | $ 169,827 | $ 169,827 |
| 50 - 54 | 52 | $ 161,790 | $ 161,790 |
| 55 - 59 | 57 | $ 169,915 | $ 169,915 |
| 60 - 62 | 61 | $ 167,231 | $ 167,231 |
| 63 - 67 | 65 | $ 163,813 | $ 163,813 |

### Imputed Earnings
(Using Formula at Right)

| Age | Earnings 2017$ |
|---|---|
| 23 | $ 24,000 |
| 29 | $ 74,496 |
| 36 | $ 120,287 |
| 50 | $ 169,480 |
| 60 | $ 170,013 |

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 230 of 432 PageID.8238

*Source:  Internal Revenue Service*

**Standard Deduction:**      $     14,600

| Single Filer, Tax Brackets | | | |
|---|---|---|---|
| Min | Max | Marginal Rate | Cumulative Tax |
| $       - | $     11,600 | 10.0% | |
| $   11,600 | $     47,150 | 12.0% | $     1,160 |
| $   47,150 | $   100,525 | 22.0% | $     5,426 |
| $ 100,525 | $   191,950 | 24.0% | $   17,169 |
| $ 191,950 | $   243,725 | 32.0% | $   39,111 |
| $ 243,725 | $   609,350 | 35.0% | $   55,679 |
| $ 609,350 | | 37.0% | $ 183,647 |

**Education:  10th - 12th Grade, no diploma**

J███ Grenier

**Date of Loss: July 7, 2021**

| Calculation Inputs: | | |
|---|---|---|
| | Date of Birth: | 7/7/2021 |
| | Date of Loss: | 7/7/2021 |
| | Date Lost Wages Begin: | 7/7/2038 |
| | Date of Valuation: | 12/2/2024 |

| Calculation Outputs: | | | |
|---|---|---|---|
| | Age at Date of Loss: | 0.00 | Years |
| | Age at Date Lost Wages Begin: | 17.00 | Years |
| | Age at Date of Valuation: | 3.41 | Years |
| | Remaining Worklife Exp. at Date of Loss: | 30.74 | Years[1] |
| | Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| | Projected Date at End of Worklife Expectancy: | 4/3/2069 | |
| | Projected Date at End of Life Expectancy: | 10/13/2098 | |
| | Projected Age at End of Worklife Expectancy: | 47.74 | Years of Age |
| | Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 17.00 |
|---|---|---|---|
| 17 Years Old | 0.00 | 30.7 | 0.00 |
| 17 Years Old | 1.00 | 30.7 | 30.74 |
| Total | 1.00 | | **30.74** |

[1] *Worklife expectancy as of age 17, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with 10th Grade to 12th Grade, No Diploma, No GED*

**Life Expectancy at Date of Valuation:**[2]

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 231 of 432 PageID.8239

**Education:  GED or Alternative Credential**

**J▇▇ Grenier**

**Date of Loss: July 7, 2021**

| **Calculation Inputs:** | | |
|---|---|---|
| Date of Birth: | 7/7/2021 | |
| Date of Loss: | 7/7/2021 | |
| Date Lost Wages Begin: | 7/7/2038 | |
| Date of Valuation: | 12/2/2024 | |

| **Calculation Outputs:** | | |
|---|---|---|
| Age at Date of Loss: | 0.00 | Years |
| Age at Date Lost Wages Begin: | 17.00 | Years |
| Age at Date of Valuation: | 3.41 | Years |
| Remaining Worklife Exp. at Date of Loss: | 34.33 | Years[1] |
| Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| Projected Date at End of Worklife Expectancy: | 11/4/2072 | |
| Projected Date at End of Life Expectancy: | 10/13/2098 | |
| Projected Age at End of Worklife Expectancy: | 51.33 | Years of Age |
| Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 17.00 |
|---|---|---|---|
| 17 Years Old | 0.00 | 34.3 | 0.00 |
| 17 Years Old | 1.00 | 34.3 | 34.33 |
| Total | 1.00 | | **34.33** |

[1] *Worklife expectancy as of age 17, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with GED, No Diploma*

**Life Expectancy at Date of Valuation:[2]**

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 232 of 432 PageID.8240

**Education:  HS Diploma**
J███ **Grenier**
**Date of Loss: July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 233 of 432   PageID.8241

| **Calculation Inputs:** | | |
|---|---|---|
| | Date of Birth: | 7/7/2021 |
| | Date of Loss: | 7/7/2021 |
| | Date Lost Wages Begin: | 7/7/2039 |
| | Date of Valuation: | 12/2/2024 |

| **Calculation Outputs:** | | | |
|---|---|---|---|
| | Age at Date of Loss: | 0.00 | Years |
| | Age at Date Lost Wages Begin: | 18.00 | Years |
| | Age at Date of Valuation: | 3.41 | Years |
| | Remaining Worklife Exp. at Date of Loss: | 37.87 | Years[1] |
| | Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| | Projected Date at End of Worklife Expectancy: | 5/20/2077 | |
| | Projected Date at End of Life Expectancy: | 10/13/2098 | |
| | Projected Age at End of Worklife Expectancy: | 55.87 | Years of Age |
| | Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 18.00 |
|---|---|---|---|
| 18 Years Old | 0.00 | 37.9 | 0.00 |
| 18 Years Old | 1.00 | 37.9 | 37.87 |
| Total | 1.00 | | **37.87** |

[1] *Worklife expectancy as of age 18, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with High School Diploma*

**Life Expectancy at Date of Valuation:[2]**

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

**Education:  Associate Degree**

J████ **Grenier**

**Date of Loss: July 7, 2021**

| Calculation Inputs: | | |
|---|---|---|
| | Date of Birth: | 7/7/2021 |
| | Date of Loss: | 7/7/2021 |
| | Date Lost Wages Begin: | 7/7/2041 |
| | Date of Valuation: | 12/2/2024 |

| Calculation Outputs: | | | |
|---|---|---|---|
| | Age at Date of Loss: | 0.00 | Years |
| | Age at Date Lost Wages Begin: | 20.00 | Years |
| | Age at Date of Valuation: | 3.41 | Years |
| | Remaining Worklife Exp. at Date of Loss: | 40.85 | Years[1] |
| | Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| | Projected Date at End of Worklife Expectancy: | 5/13/2082 | |
| | Projected Date at End of Life Expectancy: | 10/13/2098 | |
| | Projected Age at End of Worklife Expectancy: | 60.85 | Years of Age |
| | Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 20.00 |
|---|---|---|---|
| 20 Years Old | 0.00 | 40.9 | 0.00 |
| 20 Years Old | 1.00 | 40.9 | 40.85 |
| Total | 1.00 | | **40.85** |

[1] *Worklife expectancy as of age 20, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with Associate's Degree*

**Life Expectancy at Date of Valuation:[2]**

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

**Education:  Bachelor's Degree**

**J█████ Grenier**

**Date of Loss: July 7, 2021**

| **Calculation Inputs:** | Date of Birth: | 7/7/2021 |
| | Date of Loss: | 7/7/2021 |
| | Date Lost Wages Begin: | 7/7/2043 |
| | Date of Valuation: | 12/2/2024 |

| **Calculation Outputs:** | Age at Date of Loss: | 0.00 | Years |
| | Age at Date Lost Wages Begin: | 22.00 | Years |
| | Age at Date of Valuation: | 3.41 | Years |
| | Remaining Worklife Exp. at Date of Loss: | 40.68 | Years[1] |
| | Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| | Projected Date at End of Worklife Expectancy: | 3/11/2084 | |
| | Projected Date at End of Life Expectancy: | 10/13/2098 | |
| | Projected Age at End of Worklife Expectancy: | 62.68 | Years of Age |
| | Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 22.00 |
| --- | --- | --- | --- |
| 22 Years Old | 0.00 | 40.7 | 0.00 |
| 22 Years Old | 1.00 | 40.7 | 40.68 |
| Total | 1.00 | | **40.68** |

[1] *Worklife expectancy as of age 22, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with Bachelor's Degree*

**Life Expectancy at Date of Valuation:[2]**

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
| --- | --- | --- | --- |
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

**Education:  Master's Degree**

J███ Grenier

**Date of Loss: July 7, 2021**

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 236 of 432 PageID.8244

| Calculation Inputs: | | | |
|---|---|---|---|
| | Date of Birth: | 7/7/2021 | |
| | Date of Loss: | 7/7/2021 | |
| | Date Lost Wages Begin: | 7/7/2045 | |
| | Date of Valuation: | 12/2/2024 | |

| Calculation Outputs: | | | |
|---|---|---|---|
| | Age at Date of Loss: | 0.00 | Years |
| | Age at Date Lost Wages Begin: | 24.00 | Years |
| | Age at Date of Valuation: | 3.41 | Years |
| | Remaining Worklife Exp. at Date of Loss: | 39.66 | Years[1] |
| | Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| | Projected Date at End of Worklife Expectancy: | 3/4/2085 | |
| | Projected Date at End of Life Expectancy: | 10/13/2098 | |
| | Projected Age at End of Worklife Expectancy: | 63.66 | Years of Age |
| | Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**
*(Initially Active: Labor Force Activity Status)*
*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 24.00 |
|---|---|---|---|
| 24 Years Old | 0.00 | 39.7 | 0.00 |
| 24 Years Old | 1.00 | 39.7 | 39.66 |
| Total | 1.00 | | **39.66** |

[1] *Worklife expectancy as of age 24, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with Master's Degree*

**Life Expectancy at Date of Valuation:[2]**

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

**Education:  Doctorate Degree or Professional Degree**

J███ Grenier

**Date of Loss: July 7, 2021**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 237 of 432    PageID.8245

**Calculation Inputs:**

| | |
|---|---|
| Date of Birth: | 7/7/2021 |
| Date of Loss: | 7/7/2021 |
| Date Lost Wages Begin: | 7/7/2047 |
| Date of Valuation: | 12/2/2024 |

**Calculation Outputs:**

| | | |
|---|---|---|
| Age at Date of Loss: | 0.00 | Years |
| Age at Date Lost Wages Begin: | 26.00 | Years |
| Age at Date of Valuation: | 3.41 | Years |
| Remaining Worklife Exp. at Date of Loss: | 40.16 | Years[1] |
| Remaining Life Expectancy at Date of Loss: | 73.86 | Years[2] |
| Projected Date at End of Worklife Expectancy: | 9/3/2087 | |
| Projected Date at End of Life Expectancy: | 10/13/2098 | |
| Projected Age at End of Worklife Expectancy: | 66.16 | Years of Age |
| Projected Age at End of Life Expectancy | 77.27 | Years of Age |

**Worklife Expectancy at Date Lost Earnings Begin:**

*(Initially Active: Labor Force Activity Status)*

*(See Note 1)*

| Age | Calc. Weight | WLE Per Table | Weighted to Age of 26.00 |
|---|---|---|---|
| 26 Years Old | 0.00 | 40.2 | 0.00 |
| 26 Years Old | 1.00 | 40.2 | 40.16 |
| Total | 1.00 | | **40.16** |

[1] *Worklife expectancy as of age 26, from Skoog, Ciecka, and Kurt Krueger, The Markov Model of Labor Force Activity 2012-2017, Journal of Forensic Economics 28 (1-2)(2019), Worklife Expectancies for Males , of All Races, with Professional or PhD Degree*

**Life Expectancy at Date of Valuation:**[2]

| Age | Calc. Weight | LE Per Table | Weighted to Age of 3.41 |
|---|---|---|---|
| 3 Years Old | 0.59 | 74.25 | 44.11 |
| 4 Years Old | 0.41 | 73.30 | 29.75 |
| Total | 1.00 | | **73.86** |

[2] *Life expectancy was interpolated from United States Life Tables, 2018, National Vital Statistics Reports, Vol. 69, No. 12, November 17, 2020.*

# United States Historical Unemployment Rate

## Males, over age 25: Less Than a High School Diploma
## 2004 - 2023

*Source: U.S. Department of Labor - Bureau of Labor Statistics Series #LNU04027675*

| Year | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Annual Avg |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------------|
| 2004 | 10.7% | 9.9% | 8.9% | 7.2% | 6.7% | 6.9% | 6.4% | 6.4% | 6.3% | 6.6% | 7.2% | 8.6% | 7.7% |
| 2005 | 8.8% | 8.7% | 7.9% | 7.0% | 5.6% | 5.3% | 5.1% | 5.4% | 5.8% | 4.9% | 5.7% | 6.9% | 6.4% |
| 2006 | 7.4% | 7.9% | 7.3% | 5.7% | 5.4% | 5.9% | 6.4% | 5.8% | 4.7% | 4.6% | 5.5% | 7.0% | 6.1% |
| 2007 | 8.2% | 9.3% | 7.9% | 6.0% | 5.1% | 5.4% | 6.0% | 5.1% | 6.1% | 5.5% | 6.2% | 7.7% | 6.5% |
| 2008 | 8.9% | 8.6% | 10.1% | 7.5% | 6.9% | 7.4% | 7.6% | 8.4% | 9.2% | 8.6% | 10.2% | 11.8% | 8.8% |
| 2009 | 14.7% | 16.2% | 16.1% | 15.1% | 14.3% | 14.1% | 14.8% | 14.8% | 13.4% | 13.6% | 14.5% | 16.9% | 14.9% |
| 2010 | 18.9% | 19.0% | 17.2% | 14.8% | 13.9% | 12.9% | 12.8% | 12.4% | 13.7% | 12.9% | 15.3% | 16.5% | 15.0% |
| 2011 | 17.0% | 16.1% | 15.6% | 14.9% | 13.4% | 12.8% | 13.3% | 11.8% | 12.2% | 11.5% | 11.8% | 13.6% | 13.7% |
| 2012 | 14.7% | 14.1% | 13.1% | 11.4% | 11.4% | 10.9% | 10.9% | 10.1% | 9.3% | 10.2% | 11.0% | 11.7% | 11.6% |
| 2013 | 14.1% | 12.1% | 11.2% | 10.9% | 8.9% | 7.9% | 8.8% | 9.2% | 8.1% | 9.7% | 9.9% | 9.7% | 10.0% |
| 2014 | 10.4% | 10.2% | 9.0% | 7.7% | 7.9% | 7.5% | 7.7% | 7.2% | 5.9% | 5.9% | 8.2% | 8.3% | 8.0% |
| 2015 | 9.4% | 9.6% | 8.7% | 7.5% | 7.2% | 6.6% | 6.4% | 5.8% | 5.5% | 6.4% | 5.9% | 6.6% | 7.1% |
| 2016 | 8.0% | 7.9% | 7.8% | 6.6% | 5.9% | 5.8% | 5.6% | 5.4% | 6.2% | 5.5% | 6.6% | 7.7% | 6.6% |
| 2017 | 8.8% | 9.0% | 7.7% | 6.0% | 4.9% | 5.3% | 6.2% | 5.4% | 4.9% | 4.4% | 4.6% | 6.6% | 6.2% |
| 2018 | 7.5% | 7.1% | 6.0% | 5.2% | 4.3% | 4.1% | 3.9% | 4.4% | 4.4% | 4.4% | 4.5% | 6.0% | 5.2% |
| 2019 | 7.4% | 7.0% | 6.7% | 4.9% | 3.3% | 3.9% | 3.7% | 3.7% | 3.3% | 4.0% | 4.3% | 6.2% | 4.9% |
| 2020 | 7.6% | 7.4% | 8.0% | 18.5% | 16.4% | 13.4% | 13.3% | 10.6% | 8.4% | 7.7% | 7.6% | 9.7% | 10.7% |
| 2021 | 10.6% | 11.5% | 9.0% | 8.5% | 8.3% | 8.4% | 7.6% | 6.0% | 5.8% | 5.6% | 4.6% | 5.3% | 7.6% |
| 2022 | 7.6% | 5.4% | 6.1% | 5.3% | 4.3% | 4.2% | 5.7% | 5.3% | 4.5% | 5.0% | 2.9% | 5.7% | 5.2% |
| 2023 | 6.5% | 6.7% | 5.8% | 4.7% | 4.5% | 4.5% | 4.1% | 3.8% | 4.2% | 4.4% | 5.9% | 6.1% | 5.1% |

**United States Average Unemployment Rate, 2004 - 2023 =** **8.4%**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 238 of 432    PageID.8246

# United States Historical Unemployment Rate
## Males, over age 25: High School Diploma
## 2004 - 2023

*Source: U.S. Department of Labor - Bureau of Labor Statistics Series #LNU04027676*

| Year | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Annual Avg |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------------|
| 2004 | 5.9% | 6.3% | 6.3% | 5.6% | 5.0% | 4.7% | 4.6% | 4.4% | 4.1% | 4.4% | 4.8% | 5.0% | 5.1% |
| 2005 | 5.8% | 5.9% | 5.8% | 4.2% | 4.1% | 4.3% | 4.2% | 3.9% | 4.2% | 4.1% | 4.2% | 4.6% | 4.6% |
| 2006 | 5.3% | 5.4% | 4.9% | 4.3% | 4.2% | 3.8% | 4.1% | 4.1% | 3.3% | 3.5% | 4.2% | 4.7% | 4.3% |
| 2007 | 5.3% | 5.4% | 5.1% | 4.3% | 4.1% | 3.6% | 4.2% | 3.9% | 3.9% | 4.1% | 4.3% | 5.1% | 4.4% |
| 2008 | 6.1% | 6.0% | 6.0% | 5.1% | 4.7% | 4.8% | 5.4% | 5.2% | 6.0% | 6.0% | 7.1% | 9.0% | 6.0% |
| 2009 | 10.9% | 11.4% | 11.8% | 10.7% | 10.6% | 10.2% | 10.0% | 10.0% | 11.1% | 11.3% | 11.5% | 12.3% | 11.0% |
| 2010 | 13.4% | 14.1% | 13.9% | 11.9% | 11.4% | 11.0% | 10.0% | 10.1% | 9.8% | 9.7% | 10.0% | 10.8% | 11.3% |
| 2011 | 11.9% | 11.8% | 11.8% | 10.3% | 9.7% | 9.8% | 9.1% | 9.0% | 9.0% | 9.2% | 8.7% | 9.2% | 10.0% |
| 2012 | 10.0% | 9.9% | 9.7% | 8.1% | 7.7% | 7.8% | 8.3% | 8.0% | 8.2% | 7.5% | 7.8% | 8.3% | 8.4% |
| 2013 | 9.7% | 9.9% | 8.9% | 7.8% | 7.4% | 7.3% | 7.5% | 7.6% | 7.5% | 6.9% | 7.2% | 7.3% | 7.9% |
| 2014 | 8.0% | 8.0% | 7.2% | 6.4% | 6.1% | 5.5% | 5.8% | 5.8% | 4.9% | 5.2% | 5.7% | 5.7% | 6.2% |
| 2015 | 6.7% | 6.5% | 6.2% | 5.2% | 5.5% | 4.8% | 4.9% | 4.9% | 4.7% | 4.8% | 5.2% | 6.1% | 5.5% |
| 2016 | 6.1% | 6.1% | 5.9% | 5.2% | 4.8% | 4.5% | 4.9% | 4.5% | 5.1% | 5.1% | 4.7% | 5.0% | 5.2% |
| 2017 | 6.0% | 5.5% | 5.2% | 4.2% | 4.0% | 3.7% | 4.3% | 4.7% | 3.8% | 3.9% | 3.9% | 4.1% | 4.4% |
| 2018 | 5.2% | 5.0% | 4.9% | 4.3% | 3.6% | 3.7% | 3.5% | 3.5% | 3.5% | 3.7% | 3.4% | 4.0% | 4.0% |
| 2019 | 4.5% | 4.5% | 4.1% | 3.3% | 3.4% | 3.5% | 3.3% | 3.3% | 3.2% | 3.3% | 3.2% | 3.5% | 3.6% |
| 2020 | 4.6% | 4.5% | 4.9% | 15.4% | 13.2% | 11.0% | 9.8% | 8.7% | 8.2% | 7.8% | 7.6% | 8.1% | 8.7% |
| 2021 | 8.0% | 8.2% | 7.1% | 6.9% | 6.6% | 6.5% | 5.9% | 5.6% | 5.2% | 4.4% | 4.7% | 4.9% | 6.2% |
| 2022 | 5.4% | 5.1% | 4.3% | 3.5% | 3.1% | 3.2% | 3.3% | 3.8% | 3.2% | 3.3% | 3.6% | 3.4% | 3.8% |
| 2023 | 4.5% | 4.2% | 4.8% | 3.8% | 3.5% | 3.6% | 3.0% | 3.5% | 4.0% | 4.1% | 4.2% | 4.5% | 4.0% |

**United States Average Unemployment Rate, 2004 - 2023 =**    **6.2%**

# United States Historical Unemployment Rate
## Males, over age 25: Associate Degree
## 2004 - 2023

*Source: U.S. Department of Labor - Bureau of Labor Statistics Series #LNU04027687*

| Year | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Annual Avg |
|------|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|-----------|
| 2004 | 4.7% | 4.4% | 5.3% | 4.0% | 3.6% | 3.9% | 4.1% | 3.2% | 3.6% | 3.4% | 3.8% | 4.1% | 4.0% |
| 2005 | 4.6% | 4.0% | 3.8% | 3.2% | 2.7% | 3.0% | 3.3% | 2.9% | 2.5% | 2.8% | 3.2% | 3.5% | 3.3% |
| 2006 | 3.6% | 3.7% | 3.7% | 3.4% | 3.0% | 3.3% | 3.0% | 2.4% | 2.0% | 2.1% | 2.5% | 2.8% | 3.0% |
| 2007 | 3.9% | 3.8% | 3.2% | 2.7% | 3.1% | 3.2% | 2.6% | 3.2% | 2.3% | 2.3% | 2.3% | 3.5% | 3.0% |
| 2008 | 3.0% | 3.7% | 3.6% | 3.0% | 3.7% | 3.7% | 4.1% | 4.0% | 3.6% | 3.4% | 4.8% | 4.7% | 3.8% |
| 2009 | 6.2% | 7.2% | 8.1% | 7.7% | 8.1% | 8.9% | 8.0% | 8.4% | 7.6% | 8.0% | 7.9% | 8.2% | 7.9% |
| 2010 | 9.2% | 8.0% | 8.6% | 7.3% | 6.8% | 7.0% | 7.8% | 8.3% | 8.2% | 7.5% | 7.6% | 7.3% | 7.8% |
| 2011 | 7.8% | 8.2% | 6.8% | 6.2% | 6.3% | 6.5% | 6.8% | 8.1% | 6.1% | 6.7% | 5.3% | 6.6% | 6.8% |
| 2012 | 6.8% | 6.2% | 7.1% | 6.3% | 6.8% | 6.3% | 5.7% | 5.4% | 5.1% | 5.7% | 5.4% | 5.8% | 6.1% |
| 2013 | 6.1% | 5.5% | 5.0% | 4.9% | 5.4% | 4.8% | 4.3% | 5.2% | 5.2% | 5.6% | 5.0% | 5.1% | 5.2% |
| 2014 | 4.8% | 4.6% | 5.2% | 4.3% | 4.5% | 4.2% | 4.2% | 4.2% | 3.8% | 4.0% | 3.6% | 4.2% | 4.3% |
| 2015 | 4.5% | 4.4% | 4.2% | 3.7% | 3.1% | 3.1% | 3.7% | 2.9% | 3.2% | 3.9% | 3.8% | 3.2% | 3.6% |
| 2016 | 4.5% | 4.0% | 3.7% | 3.5% | 3.0% | 3.4% | 3.8% | 3.7% | 3.7% | 3.0% | 3.6% | 4.0% | 3.7% |
| 2017 | 3.4% | 4.0% | 3.2% | 2.4% | 3.1% | 3.1% | 2.6% | 3.1% | 2.8% | 3.2% | 3.3% | 3.0% | 3.1% |
| 2018 | 3.3% | 3.0% | 3.0% | 2.7% | 2.3% | 2.9% | 2.4% | 3.0% | 2.6% | 2.4% | 2.2% | 3.1% | 2.7% |
| 2019 | 3.2% | 3.1% | 3.1% | 2.1% | 2.2% | 2.6% | 2.6% | 2.6% | 2.2% | 2.0% | 2.2% | 2.3% | 2.5% |
| 2020 | 2.5% | 2.9% | 3.9% | 11.6% | 10.7% | 8.7% | 9.4% | 7.3% | 6.5% | 5.4% | 5.5% | 5.7% | 6.7% |
| 2021 | 6.7% | 6.4% | 5.8% | 5.3% | 5.1% | 4.8% | 4.2% | 4.2% | 4.4% | 3.8% | 3.3% | 2.6% | 4.7% |
| 2022 | 3.5% | 3.6% | 2.5% | 2.8% | 2.7% | 2.4% | 2.3% | 2.1% | 2.7% | 2.7% | 2.6% | 3.1% | 2.8% |
| 2023 | 3.2% | 3.6% | 3.1% | 2.9% | 2.7% | 2.9% | 2.8% | 2.6% | 2.0% | 2.8% | 3.0% | 2.8% | 2.9% |

**United States Average Unemployment Rate, 2004 - 2023 =** **4.4%**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 240 of 432    PageID.8248

# United States Historical Unemployment Rate
## Males, over age 25: College Graduates
## 2004 - 2023

*Source: U.S. Department of Labor - Bureau of Labor Statistics Series #LNU04027678*

| Year | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Annual Avg |
|------|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|------------|
| 2004 | 3.2% | 3.0% | 2.8% | 2.7% | 2.7% | 2.7% | 2.7% | 3.0% | 2.8% | 2.4% | 2.6% | 2.5% | 2.8% |
| 2005 | 2.6% | 2.4% | 2.5% | 2.4% | 2.5% | 2.1% | 2.3% | 2.1% | 2.0% | 2.1% | 2.1% | 2.0% | 2.3% |
| 2006 | 2.1% | 2.3% | 2.3% | 2.1% | 1.9% | 2.0% | 1.8% | 1.8% | 1.9% | 1.8% | 1.7% | 1.7% | 2.0% |
| 2007 | 2.3% | 2.0% | 1.8% | 1.7% | 2.0% | 2.0% | 2.0% | 2.0% | 1.9% | 1.8% | 1.9% | 2.1% | 2.0% |
| 2008 | 2.3% | 2.0% | 2.0% | 1.9% | 2.1% | 2.2% | 2.4% | 2.6% | 2.6% | 2.9% | 2.9% | 3.7% | 2.5% |
| 2009 | 4.4% | 4.5% | 4.7% | 4.5% | 4.7% | 5.0% | 5.4% | 5.0% | 5.0% | 4.5% | 4.6% | 4.7% | 4.8% |
| 2010 | 5.3% | 5.4% | 5.1% | 4.6% | 4.3% | 4.3% | 4.9% | 4.6% | 4.3% | 4.6% | 4.9% | 4.7% | 4.8% |
| 2011 | 4.8% | 4.7% | 4.4% | 4.2% | 4.3% | 4.4% | 4.3% | 4.2% | 4.0% | 4.3% | 4.2% | 4.1% | 4.3% |
| 2012 | 4.4% | 4.4% | 4.3% | 3.5% | 3.8% | 3.7% | 3.7% | 4.0% | 3.7% | 3.3% | 3.4% | 3.5% | 3.8% |
| 2013 | 3.6% | 3.8% | 3.8% | 3.6% | 3.7% | 3.8% | 3.9% | 3.5% | 3.6% | 3.4% | 3.2% | 3.2% | 3.6% |
| 2014 | 3.5% | 3.6% | 3.3% | 3.0% | 3.0% | 3.1% | 2.9% | 3.1% | 2.7% | 2.8% | 2.9% | 2.9% | 3.1% |
| 2015 | 2.8% | 2.9% | 2.6% | 2.7% | 2.5% | 2.4% | 2.3% | 2.4% | 2.4% | 2.2% | 2.3% | 2.3% | 2.5% |
| 2016 | 2.5% | 2.5% | 2.5% | 2.4% | 2.3% | 2.5% | 2.4% | 2.7% | 2.4% | 2.6% | 2.2% | 2.3% | 2.4% |
| 2017 | 2.4% | 2.3% | 2.5% | 2.2% | 2.0% | 2.3% | 2.2% | 2.4% | 2.1% | 1.8% | 2.0% | 2.1% | 2.2% |
| 2018 | 2.3% | 2.2% | 2.2% | 2.0% | 2.0% | 2.3% | 2.1% | 2.0% | 1.8% | 2.0% | 2.1% | 2.3% | 2.1% |
| 2019 | 2.6% | 2.3% | 2.1% | 2.2% | 2.0% | 1.9% | 2.1% | 2.2% | 1.9% | 2.0% | 1.9% | 1.9% | 2.1% |
| 2020 | 2.2% | 2.0% | 2.5% | 7.5% | 6.3% | 6.4% | 6.3% | 5.1% | 4.5% | 4.1% | 4.2% | 3.5% | 4.6% |
| 2021 | 4.0% | 3.8% | 3.6% | 3.4% | 3.0% | 3.4% | 3.1% | 3.1% | 2.4% | 2.3% | 2.1% | 2.0% | 3.0% |
| 2022 | 2.4% | 2.4% | 2.1% | 2.0% | 1.9% | 1.9% | 1.8% | 1.9% | 1.6% | 1.8% | 2.0% | 1.8% | 2.0% |
| 2023 | 2.3% | 2.1% | 2.0% | 1.9% | 2.0% | 2.0% | 2.2% | 2.4% | 2.2% | 1.9% | 2.0% | 2.1% | 2.1% |

**United States Average Unemployment Rate, 2004 - 2023 =**    **2.9%**

Case 1:22-cv-00396-LEK-KJM  Document 235  Filed 11/19/24  Page 241 of 432  PageID.8249

**Production and Nonsupervisory Employees in Private Industries, 2003 - 2023**

*Source:  Bureau of Labor Statistics, Current Employment Statistics Survey (CEU0500000030)*

| Year | Current $$ |
|------|-----------|
| 2003 | 517.65 |
| 2004 | 528.65 |
| 2005 | 543.91 |
| 2006 | 567.00 |
| 2007 | 589.09 |
| 2008 | 601.10 |
| 2009 | 615.82 |
| 2010 | 635.86 |
| 2011 | 652.75 |
| 2012 | 665.56 |
| 2013 | 677.62 |
| 2014 | 694.74 |
| 2015 | 708.73 |
| 2016 | 723.20 |
| 2017 | 742.42 |
| 2018 | 767.01 |
| 2019 | 790.64 |
| 2020 | 837.39 |
| 2021 | 886.54 |
| 2022 | 937.44 |
| 2023 | 979.95 |
| **Nominal Compound Growth Rate** | **3.24%** |
| Compound Growth Rate: CPI-U | 2.55% |
| **Compound Annual Real Wage Growth Rate** | **0.68%** |

*Attachment 42* (for CPI-U row)

*Calculated as ((1 + Wage Growth Rate) ÷ (1 + Inflation Rate)) -1* (for Real Wage Growth Rate row)

*Compound Growth Rate calculated as:   [(Ending Index ÷ Beginning Index) (1 ÷ Number of Growth Years) ] - 1;   Where number of growth years = 20*

**Consumer Price Index - All Items**
**All Urban Consumers, U.S. City Average**
**2003 - 2023**

*Source: U.S. Department of Labor, Bureau of Labor Statistics, CPI-U;   U.S. City average, 1982 - 84 = 100;   Series ID: CUUR0000SA0*

| Year | Annual CPI |
|------|-----------|
| 2003 | 184.0 |
| 2004 | 188.9 |
| 2005 | 195.3 |
| 2006 | 201.6 |
| 2007 | 207.3 |
| 2008 | 215.3 |
| 2009 | 214.5 |
| 2010 | 218.1 |
| 2011 | 224.9 |
| 2012 | 229.6 |
| 2013 | 233.0 |
| 2014 | 236.7 |
| 2015 | 237.0 |
| 2016 | 240.0 |
| 2017 | 245.1 |
| 2018 | 251.1 |
| 2019 | 255.7 |
| 2020 | 258.8 |
| 2021 | 271.0 |
| 2022 | 292.7 |
| 2023 | 304.7 |
| **Compound Growth Rate** | **2.55%** |

*Compound Growth Rate calculated as:   [(Ending Index ÷ Beginning Index) (1 ÷ Number of Growth Years) ] - 1;   Where number of growth years = 20*

# Historical Growth Rate - Education Costs
# 2003 - 2023

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 244 of 432    PageID.8252

*Source:*

*U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index - All Urban Consumers, U.S. City Average, Not Seasonally Adjusted:*

*Series #CUUR0000SAE1, Education*

| Year | Annual CPI |
|------|-----------|
| 2003 | 134.40 |
| 2004 | 143.70 |
| 2005 | 152.70 |
| 2006 | 162.10 |
| 2007 | 171.39 |
| 2008 | 181.28 |
| 2009 | 190.86 |
| 2010 | 199.34 |
| 2011 | 207.77 |
| 2012 | 216.33 |
| 2013 | 224.52 |
| 2014 | 231.91 |
| 2015 | 240.54 |
| 2016 | 247.53 |
| 2017 | 253.21 |
| 2018 | 258.84 |
| 2019 | 265.84 |
| 2020 | 270.73 |
| 2021 | 274.56 |
| 2022 | 282.07 |
| 2023 | 290.71 |
| **Compound Growth Rate** | **3.93%** |

| | | |
|---|---|---|
| Compound Growth Rate: CPI-U | 2.55% | *Attachment 42* |
| **nd Annual Real Wage Growth Rate** | **1.35%** | *Calculated as ((1 + Wage Growth Rate) ÷ (1 + Inflation Rate)) -1* |

*Compound Growth Rate calculated as:   [(Ending Index ÷ Beginning Index) (1 ÷ Number of Growth Years) ] - 1;   Where number of growth years = 20*

# Employer Costs for Employee Compensation - Fringe Benefits
## All Civilian Workers
## 2005 - 2023

*Source: U.S. Department of Labor, Bureau of Labor Statistics, Employer Cost of Employee Compensation*

| Year | Gross Earnings per Hour | | | | Fringe Benefits per Hour | | | |
|------|-------------------------|---|---|---|--------------------------|---|---|---|
| | Wages & Salaries | Paid Leave | Supplemental Pay | Gross Earnings | Insurance | *Insurance as % of Gross Earnings* | Retirement & Savings | *R & S as % of Gross Earnings* |
| Series ID # | CMU1020000000000D | CMU1040000000000D | CMU1090000000000D | | CMU1130000000000D | | CMU1180000000000D | |
| 2005 | 18.33 | 1.73 | 0.64 | 20.70 | 2.09 | **10.10%** | 1.12 | **5.41%** |
| 2006 | 19.00 | 1.90 | 0.68 | 21.58 | 2.21 | **10.24%** | 1.17 | **5.42%** |
| 2007 | 19.51 | 1.96 | 0.72 | 22.19 | 2.34 | **10.55%** | 1.20 | **5.41%** |
| 2008 | 20.05 | 2.02 | 0.75 | 22.82 | 2.42 | **10.60%** | 1.27 | **5.57%** |
| 2009 | 20.48 | 2.06 | 0.74 | 23.28 | 2.52 | **10.82%** | 1.30 | **5.58%** |
| 2010 | 20.66 | 2.06 | 0.71 | 23.43 | 2.62 | **11.18%** | 1.33 | **5.68%** |
| 2011 | 20.94 | 2.09 | 0.72 | 23.75 | 2.68 | **11.28%** | 1.38 | **5.81%** |
| 2012 | 21.29 | 2.14 | 0.75 | 24.18 | 2.75 | **11.37%** | 1.41 | **5.83%** |
| 2013 | 21.56 | 2.17 | 0.74 | 24.47 | 2.81 | **11.48%** | 1.49 | **6.09%** |
| 2014 | 22.17 | 2.26 | 0.84 | 25.27 | 2.89 | **11.44%** | 1.67 | **6.61%** |
| 2015 | 22.89 | 2.32 | 0.98 | 26.19 | 2.96 | **11.30%** | 1.74 | **6.64%** |
| 2016 | 23.47 | 2.38 | 1.05 | 26.90 | 3.01 | **11.19%** | 1.78 | **6.62%** |
| 2017 | 24.26 | 2.51 | 1.11 | 27.88 | 3.10 | **11.12%** | 1.93 | **6.92%** |
| 2018 | 24.86 | 2.59 | 1.16 | 28.61 | 3.16 | **11.05%** | 1.94 | **6.78%** |
| 2019 | 25.31 | 2.68 | 1.05 | 29.04 | 3.21 | **11.05%** | 1.95 | **6.71%** |
| 2020 | 26.22 | 2.81 | 1.13 | 30.16 | 3.29 | **10.91%** | 1.99 | **6.60%** |
| 2021 | 27.22 | 2.93 | 1.18 | 31.33 | 3.29 | **10.50%** | 2.03 | **6.48%** |
| 2022 | 28.67 | 3.09 | 1.30 | 33.06 | 3.43 | **10.38%** | 2.12 | **6.41%** |
| 2023 | 30.30 | 3.27 | 1.45 | 35.02 | 3.52 | **10.05%** | 2.27 | **6.48%** |

## Conclusions:

**Assumed Employer Provided Insurance Benefit as % of Gross Earnings (2005 - 2023)**      **10.87%**

**Assumed Employer Provided Retirement/Savings Benefit as % of Gross Earnings (2005 - 2023)**      6.16%

**Assumed Employer Provided Benefits (Combined) as % of Gross Earnings (2005 - 2023)**      **17.04%**

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 245 of 432    PageID.8253

# Analysis of Discount Rates and Factors          **Attachment 45**

| Treasury Security | After-Tax Investment Yield | |
|---|---|---|
| 1 Yr. Discount Rate | 2.22% | *Attachment 46* |
| 2 Yr. Discount Rate | 1.85% | *Attachment 46* |
| 3 Yr. Discount Rate | 1.40% | *Attachment 46* |
| 5 Yr. Discount Rate | 1.55% | *Attachment 46* |
| 7 Yr. Discount Rate | 1.51% | *Attachment 46* |
| 10 Yr. Discount Rate | 1.49% | *Attachment 46* |
| 20 Yr. Discount Rate | 1.53% | *Attachment 46* |
| 30 Yr. Discount Rate | 1.58% | *Attachment 46* |

| Year | Years After 2024 | PV Discount Formula | PV Discount Factor |
|---|---|---|---|
| 2024 | 0 | $= (1 + 2.22\%)^{0.0}$ | 1.000 |
| 2025 | 0.5 | $= (1 + 2.22\%)^{-0.5}$ | 0.989 |
| 2026 | 1.5 | $= (1 + 2.22\%)^{-1.5}$ | 0.968 |
| 2027 | 2.5 | $= (1 + 1.85\%)^{-2.5}$ | 0.955 |
| 2028 | 3.5 | $= (1 + 1.40\%)^{-3.5}$ | 0.952 |
| 2029 | 4.5 | $= (1 + 1.40\%)^{-4.5}$ | 0.939 |
| 2030 | 5.5 | $= (1 + 1.55\%)^{-5.5}$ | 0.919 |
| 2031 | 6.5 | $= (1 + 1.55\%)^{-6.5}$ | 0.905 |
| 2032 | 7.5 | $= (1 + 1.51\%)^{-7.5}$ | 0.894 |
| 2033 | 8.5 | $= (1 + 1.51\%)^{-8.5}$ | 0.880 |
| 2034 | 9.5 | $= (1 + 1.51\%)^{-9.5}$ | 0.867 |
| 2035 | 10.5 | $= (1 + 1.49\%)^{-10.5}$ | 0.857 |
| 2036 | 11.5 | $= (1 + 1.49\%)^{-11.5}$ | 0.844 |
| 2037 | 12.5 | $= (1 + 1.49\%)^{-12.5}$ | 0.832 |
| 2038 | 13.5 | $= (1 + 1.49\%)^{-13.5}$ | 0.819 |
| 2039 | 14.5 | $= (1 + 1.49\%)^{-14.5}$ | 0.807 |
| 2040 | 15.5 | $= (1 + 1.49\%)^{-15.5}$ | 0.796 |
| 2041 | 16.5 | $= (1 + 1.49\%)^{-16.5}$ | 0.784 |
| 2042 | 17.5 | $= (1 + 1.49\%)^{-17.5}$ | 0.772 |
| 2043 | 18.5 | $= (1 + 1.49\%)^{-18.5}$ | 0.761 |
| 2044 | 19.5 | $= (1 + 1.49\%)^{-19.5}$ | 0.750 |
| 2045 | 20.5 | $= (1 + 1.53\%)^{-20.5}$ | 0.732 |
| 2046 | 21.5 | $= (1 + 1.53\%)^{-21.5}$ | 0.721 |
| 2047 | 22.5 | $= (1 + 1.53\%)^{-22.5}$ | 0.711 |
| 2048 | 23.5 | $= (1 + 1.53\%)^{-23.5}$ | 0.700 |
| 2049 | 24.5 | $= (1 + 1.53\%)^{-24.5}$ | 0.689 |
| 2050 | 25.5 | $= (1 + 1.53\%)^{-25.5}$ | 0.679 |
| 2051 | 26.5 | $= (1 + 1.53\%)^{-26.5}$ | 0.669 |
| 2052 | 27.5 | $= (1 + 1.53\%)^{-27.5}$ | 0.659 |
| 2053 | 28.5 | $= (1 + 1.53\%)^{-28.5}$ | 0.649 |
| 2054 | 29.5 | $= (1 + 1.53\%)^{-29.5}$ | 0.639 |

## Analysis of Discount Rates and Factors                     **Attachment 45**

| Treasury Security | After-Tax Investment Yield | |
|---|---|---|
| 1 Yr. Discount Rate | 2.22% | Attachment 46 |
| 2 Yr. Discount Rate | 1.85% | Attachment 46 |
| 3 Yr. Discount Rate | 1.40% | Attachment 46 |
| 5 Yr. Discount Rate | 1.55% | Attachment 46 |
| 7 Yr. Discount Rate | 1.51% | Attachment 46 |
| 10 Yr. Discount Rate | 1.49% | Attachment 46 |
| 20 Yr. Discount Rate | 1.53% | Attachment 46 |
| 30 Yr. Discount Rate | 1.58% | Attachment 46 |

| Year | Years After 2024 | PV Discount Formula | PV Discount Factor |
|---|---|---|---|
| 2055 | 30.5 | $= (1 + 1.58\%)^{-30.5}$ | 0.619 |
| 2056 | 31.5 | $= (1 + 1.58\%)^{-31.5}$ | 0.610 |
| 2057 | 32.5 | $= (1 + 1.58\%)^{-32.5}$ | 0.600 |
| 2058 | 33.5 | $= (1 + 1.58\%)^{-33.5}$ | 0.591 |
| 2059 | 34.5 | $= (1 + 1.58\%)^{-34.5}$ | 0.582 |
| 2060 | 35.5 | $= (1 + 1.58\%)^{-35.5}$ | 0.573 |
| 2061 | 36.5 | $= (1 + 1.58\%)^{-36.5}$ | 0.564 |
| 2062 | 37.5 | $= (1 + 1.58\%)^{-37.5}$ | 0.555 |
| 2063 | 38.5 | $= (1 + 1.58\%)^{-38.5}$ | 0.546 |
| 2064 | 39.5 | $= (1 + 1.58\%)^{-39.5}$ | 0.538 |
| 2065 | 40.5 | $= (1 + 1.58\%)^{-40.5}$ | 0.529 |
| 2066 | 41.5 | $= (1 + 1.58\%)^{-41.5}$ | 0.521 |
| 2067 | 42.5 | $= (1 + 1.58\%)^{-42.5}$ | 0.513 |
| 2068 | 43.5 | $= (1 + 1.58\%)^{-43.5}$ | 0.505 |
| 2069 | 44.5 | $= (1 + 1.58\%)^{-44.5}$ | 0.497 |
| 2070 | 45.5 | $= (1 + 1.58\%)^{-45.5}$ | 0.489 |
| 2071 | 46.5 | $= (1 + 1.58\%)^{-46.5}$ | 0.482 |
| 2072 | 47.5 | $= (1 + 1.58\%)^{-47.5}$ | 0.474 |
| 2073 | 48.5 | $= (1 + 1.58\%)^{-48.5}$ | 0.467 |
| 2074 | 49.5 | $= (1 + 1.58\%)^{-49.5}$ | 0.460 |
| 2075 | 50.5 | $= (1 + 1.58\%)^{-50.5}$ | 0.452 |
| 2076 | 51.5 | $= (1 + 1.58\%)^{-51.5}$ | 0.445 |
| 2077 | 52.5 | $= (1 + 1.58\%)^{-52.5}$ | 0.438 |
| 2078 | 53.5 | $= (1 + 1.58\%)^{-53.5}$ | 0.432 |
| 2079 | 54.5 | $= (1 + 1.58\%)^{-54.5}$ | 0.425 |
| 2080 | 55.5 | $= (1 + 1.58\%)^{-55.5}$ | 0.418 |
| 2081 | 56.5 | $= (1 + 1.58\%)^{-56.5}$ | 0.412 |
| 2082 | 57.5 | $= (1 + 1.58\%)^{-57.5}$ | 0.405 |
| 2083 | 58.5 | $= (1 + 1.58\%)^{-58.5}$ | 0.399 |
| 2084 | 59.5 | $= (1 + 1.58\%)^{-59.5}$ | 0.393 |
| 2085 | 60.5 | $= (1 + 1.58\%)^{-60.5}$ | 0.387 |
| 2086 | 61.5 | $= (1 + 1.58\%)^{-61.5}$ | 0.381 |
| 2087 | 62.5 | $= (1 + 1.58\%)^{-62.5}$ | 0.375 |

# Analysis of Discount Rates and Factors                    **Attachment 45**

| Treasury Security | After-Tax Investment Yield | |
|---|---|---|
| 1 Yr. Discount Rate | 2.22% | *Attachment 46* |
| 2 Yr. Discount Rate | 1.85% | *Attachment 46* |
| 3 Yr. Discount Rate | 1.40% | *Attachment 46* |
| 5 Yr. Discount Rate | 1.55% | *Attachment 46* |
| 7 Yr. Discount Rate | 1.51% | *Attachment 46* |
| 10 Yr. Discount Rate | 1.49% | *Attachment 46* |
| 20 Yr. Discount Rate | 1.53% | *Attachment 46* |
| 30 Yr. Discount Rate | 1.58% | *Attachment 46* |

| Year | Years After 2024 | PV Discount Formula | PV Discount Factor |
|---|---|---|---|
| 2088 | 63.5 | $= (1 + 1.58\%)^{-63.5}$ | 0.369 |
| 2089 | 64.5 | $= (1 + 1.58\%)^{-64.5}$ | 0.363 |
| 2090 | 65.5 | $= (1 + 1.58\%)^{-65.5}$ | 0.357 |
| 2091 | 66.5 | $= (1 + 1.58\%)^{-66.5}$ | 0.352 |
| 2092 | 67.5 | $= (1 + 1.58\%)^{-67.5}$ | 0.346 |
| 2093 | 68.5 | $= (1 + 1.58\%)^{-68.5}$ | 0.341 |
| 2094 | 69.5 | $= (1 + 1.58\%)^{-69.5}$ | 0.336 |
| 2095 | 70.5 | $= (1 + 1.58\%)^{-70.5}$ | 0.330 |
| 2096 | 71.5 | $= (1 + 1.58\%)^{-71.5}$ | 0.325 |
| 2097 | 72.5 | $= (1 + 1.58\%)^{-72.5}$ | 0.320 |
| 2098 | 73.5 | $= (1 + 1.58\%)^{-73.5}$ | 0.315 |

Sources:  *Wall Street Journal (https://www.wsj.com/market-data/bonds/tips)*
*Federal Reserve Board of Governors (https://www.federalreserve.gov/releases/h15/)*

**Investment Yields by Maturity of Securities**

| Date | 1 Year | 2 Years | 3 Years | 5 Years | 7 years | 10 Years | 20 Years | 30 Years |
|---|---|---|---|---|---|---|---|---|
| **TIPS Yields as of 6/25/2024** | 2.84% | 2.42% | 1.92% | 2.08% | 2.04% | 2.01% | 2.06% | 2.12% |
| Tax Deduction on TIPS Interest[1] | -0.33% | -0.28% | -0.22% | -0.24% | -0.23% | -0.23% | -0.24% | -0.24% |
| Tax Deduction on Inflation[2] | -0.29% | -0.29% | -0.29% | -0.29% | -0.29% | -0.29% | -0.29% | -0.29% |
| **After Tax Investment Yield** | **2.22%** | **1.85%** | **1.40%** | **1.55%** | **1.51%** | **1.49%** | **1.53%** | **1.58%** |

*Note 1: Calculated as TIPS Yield x -11.5% Avg. Effective Income Tax Rate Across All Education Scenarios*
*Note 1: Calculated as 2.55% (Attach. 42) x -11.5% Avg. Effective Income Tax Rate Across All Education Scenarios*

**Summary of Life Care Plan**                                                    **Attachment 47**
J███ Grenier

|     |                                                                                  | *Attachment 49* | *Attachment 50* | *Attachment 51* |
| --- | -------------------------------------------------------------------------------- | --- | --- | --- |
|     | **Item**                                                                         | **Unadjusted Costs** | **Inflation Adjusted Costs** | **PV of Costs** |
| 1   | Diapers/Pull-ups                                                                 | $ 5,369 | $ 5,100 | $ 4,917 |
| 2   | Gloves                                                                            | $ 7,044 | $ 6,691 | $ 6,451 |
| 3   | Wipes                                                                             | $ 13,937 | $ 13,240 | $ 12,764 |
| 4   | Chux Pads                                                                         | $ 738 | $ 701 | $ 676 |
| 5   | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Moni | $ 29,166 | $ 25,661 | $ 15,802 |
| 6   | Neurology Evaluation, Monitoring, and Treatment                                  | $ 29,166 | $ 25,661 | $ 15,802 |
| 7   | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment        | $ 20,313 | $ 17,946 | $ 11,197 |
| 8   | Dental Evaluation, Monitoring and Treatment                                      | $ 555 | $ 574 | $ 544 |
| 9   | CT-Scan Head and Brain                                                           | $ 6,387 | $ 13,363 | $ 8,196 |
| 10  | MRI Brain                                                                         | $ 9,480 | $ 19,834 | $ 12,166 |
| 11  | Physical Therapy Evaluation, Monitoring and Treatment                            | $ 153,976 | $ 145,394 | $ 128,254 |
| 12  | Occupational Therapy Evaluation, Monitoring and Treatment                        | $ 153,976 | $ 145,394 | $ 128,254 |
| 13  | Speech Therapy Evaluation, Monitoring and Treatment                              | $ 307,951 | $ 290,788 | $ 256,508 |
| 14  | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment            | $ 4,125 | $ 4,094 | $ 4,023 |
| 15  | Hair replacement evaluation, monitoring and treatment                            | $ - | $ - | $ - |
| 16  | Augmentative communication evaluation, monitoring and treatment                  | $ 2,925 | $ 2,339 | $ 1,464 |
| 17  | Tutoring (Age 6 - 12)                                                             | $ 12,420 | $ 12,966 | $ 11,871 |
| 18  | Tutoring (Age 12 - 15)                                                            | $ 13,392 | $ 14,407 | $ 12,344 |
| 19  | Tutoring (Age 15 - 22)                                                            | $ 51,030 | $ 56,770 | $ 45,223 |
| 20  | Case Management                                                                  | $ 221,592 | $ 287,406 | $ 163,170 |
| 21  | Vocational / Avocational Evaluation                                              | $ 5,500 | $ 7,276 | $ 3,890 |
| 22  | In Home Care (current age to Age 6)                                              | $ 76,982 | $ 76,748 | $ 74,787 |
| 23  | In Home Care (Age 6 - 22)                                                         | $ 1,003,200 | $ 984,203 | $ 844,564 |
| **Sub-Total** |                                                                        | **$ 2,129,222** | **$ 2,156,558** | **$ 1,762,868** |
|     |                                                                                  |  |  |  |
| 24  | Adult Home Care (Option 1): In Home Care                                          | $ 10,355,495 | $ 9,552,576 | $ 4,825,839 |
| 25  | Adult Home Care (Option 2): Adult Family Home                                     | $ 3,174,407 | $ 5,141,735 | $ 2,476,540 |
|     |                                                                                  |  |  |  |
| **Total Life Care Plan (Adult Home Care Option 1)** |                              | **$ 12,484,717** | **$ 11,709,134** | **$ 6,588,707** |
| **Total Life Care Plan (Adult Home Care Option 2)** |                              | **$ 5,303,629** | **$ 7,298,293** | **$ 4,239,408** |

**Life Care Plan**                                                                      **Attachment 48**

J█████ Grenier

*Source: Life Care Plan Prepared by John Fountaine*

| Life Care Plan Item | Description | Frequency | Cost per treatment, session or unit | Category | Cat. No. | Real Growth Rate | Cost Data | | | Cost Per Interval |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Beg Yr | End Yr | Interval (Yrs) | $ |
| 1 | Diapers/Pull-ups | 5x daily to age 8 | $83.65 to $111.00 per month | Medical Equipment and Supplies | 8 | -1.87% | 2024 | 2029 | 1.00 | $1,168 |
| 2 | Gloves | 4x boxes per month to age 8 | $31.92 per box | Medical Equipment and Supplies | 8 | -1.87% | 2024 | 2029 | 1.00 | $1,532 |
| 3 | Wipes | 4x boxes per month to age 8 | $63.16 per box | Medical Equipment and Supplies | 8 | -1.87% | 2024 | 2029 | 1.00 | $3,032 |
| 4 | Chux Pads | 2x per day, 1 box every other month to age 8 | $26.76 per box | Medical Equipment and Supplies | 8 | -1.87% | 2024 | 2029 | 1.00 | $161 |
| 5 | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Annually, current age to life expectancy | $285 - $495 each | Physicians' Services | 1 | -0.35% | 2024 | 2098 | 1.00 | 390.00 |
| 6 | Neurology Evaluation, Monitoring, and Treatment | Annually, current age to life expectancy | $285 - $495 each | Physicians' Services | 1 | -0.35% | 2024 | 2098 | 1.00 | 390.00 |
| 7 | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment | 10-15 times total, Age 5 to Life Expectancy | $1,250 - $2,000 each | Physicians' Services | 1 | -0.35% | 2026 | 2098 | 5.76 | 1,625.00 |
| 8 | Dental Evaluation, Monitoring and Treatment | 1 time every 4 years, current age to age 12 | $149 - $221 each | Dental Services | 11 | 0.86% | 2024 | 2033 | 4.00 | 185.00 |
| 9 | CT-Scan Head and Brain | 3 times total, current age to LE | $1,701 - $2,557 each | Hospital Services | 5 | 2.49% | 2024 | 2098 | 25.00 | 2,129.00 |
| 10 | MRI Brain | 3 times total, current age to LE | $2,593 - $3,727 each | Hospital Services | 5 | 2.49% | 2024 | 2098 | 25.00 | 3,160.00 |
| 11 | Physical Therapy Evaluation, Monitoring and Treatment | 50 sessions annually to age 21 | $150 - $200 each | Other Medical Professionals' Care | 2 | -0.63% | 2024 | 2042 | 1.00 | 8,750.00 |
| 12 | Occupational Therapy Evaluation, Monitoring and Treatment | 50 sessions annually to age 21 | $150 - $200 each | Other Medical Professionals' Care | 2 | -0.63% | 2024 | 2042 | 1.00 | 8,750.00 |
| 13 | Speech Therapy Evaluation, Monitoring and Treatment | 100 sessions annually to age 21 | $150 - $200 each | Other Medical Professionals' Care | 2 | -0.63% | 2024 | 2042 | 1.00 | 17,500.00 |
| 14 | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | 6 sessions first year, 12 sessions 2nd year, 12 sessions 3rd year | $125 - $150 each | Other Medical Professionals' Care | 2 | -0.63% | 2024 | 2026 | 1.00 | |
| 15 | Hair replacement evaluation, monitoring and treatment | pending | pending | Other Medical Professionals' Care | 2 | -0.63% | 2024 | 2024 | 1.00 | |
| 16 | Augmentative communication evaluation, monitoring and treatment | 10-15 times total, Age 5 to Life Expectancy | $200 - $250 each | Other Medical Professionals' Care | 2 | -0.63% | 2026 | 2098 | 5.76 | 225.00 |
| 17 | Tutoring (Age 6 - 12) | 1 hour per week during 36-week school year | $55 - $60 per hour | Wages | 9 | 0.67% | 2027 | 2033 | 1.00 | 2,070.00 |

**Life Care Plan**                                                                                         **Attachment 48**
J███ **Grenier**

*Source: Life Care Plan Prepared by John Fountaine*

| Life Care Plan Item | Description | Frequency | Cost per treatment, session or unit | Category | Cat. No. | Real Growth Rate | Cost Data | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Beg Yr | End Yr | Interval (Yrs) | Cost Per Interval |
| | | | | | | | | | | $ |
| 18 | Tutoring (Age 12 - 15) | 2 hour per week during 36-week school year | $59 - $65 per hour | Wages | 9 | 0.67% | 2033 | 2036 | 1.00 | 4,464.00 |
| 19 | Tutoring (Age 15 - 22) | 3 hour per week during 36-week school year | $65 - $70 per hour | Wages | 9 | 0.67% | 2036 | 2043 | 1.00 | 7,290.00 |
| 20 | Case Management | 2 hours each month, current age to LE | $100 - $150 per hour | Wages | 9 | 0.67% | 2024 | 2098 | 1.00 | 3,000.00 |
| 21 | Vocational / Avocational Evaluation | 3 - 5 times (10 - 15 hours each time), age 22 - LE | $95 - $125 per hour | Wages | 9 | 0.67% | 2044 | 2098 | 14.00 | 1,375.00 |
| 22 | In Home Care (current age to Age 6) | 4 hours daily (Mon - Fri) | $25 - $32 per hour | Care of Invalids and Elderly at Home | 10 | -0.17% | 2024 | 2027 | 1.00 | 29,640 |
| 23 | In Home Care (Age 6 - 22) | 4 hours daily schooldays (180 per year), 8 hrs daily non-school days | $25 - $32 per hour | Care of Invalids and Elderly at Home | 10 | -0.17% | 2027 | 2043 | 1.00 | 62,700.00 |
| 24 | Adult Home Care (Option 1): In Home Care | 12 hours (best case) to 24 hours (worst case) per day | $25 - $32 per hour | Care of Invalids and Elderly at Home | 10 | -0.17% | 2043 | 2098 | 1.00 | 187,373.25 |
| 25 | Adult Home Care (Option 2): Adult Family Home | Age 22 to LE | $4,350 - $5,223 per month | Nursing Homes and Adult Day Services | 6 | 1.01% | 2043 | 2098 | 1.00 | 57,438.00 |

**Summary of Life Care Plan Costs (Unadjusted)** **Attachment 49**

J███ Grenier

**Assumptions:**

Date of Birth 7/7/2021

Date of Valuation 12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 1 Diapers/Pull-ups | 2 Gloves | 3 Wipes | 4 Chux Pads | 5 Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | 6 Neurology Evaluation, Monitoring, and Treatment | 7 Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment |
|---|---|---|---|---|---|---|---|---|---|
| 2024 | 3.5 | 0 | $ 94 | $ 123 | $ 244 | $ 13 | $ 390 | $ 390 | $ - |
| 2025 | 4.5 | 1 | $ 1,168 | $ 1,532 | $ 3,032 | $ 161 | $ 390 | $ 390 | $ - |
| 2026 | 5.5 | 2 | $ 1,168 | $ 1,532 | $ 3,032 | $ 161 | $ 390 | $ 390 | $ 1,625 |
| 2027 | 6.5 | 3 | $ 1,168 | $ 1,532 | $ 3,032 | $ 161 | $ 390 | $ 390 | $ - |
| 2028 | 7.5 | 4 | $ 1,168 | $ 1,532 | $ 3,032 | $ 161 | $ 390 | $ 390 | $ - |
| 2029 | 8.5 | 5 | $ 603 | $ 792 | $ 1,566 | $ 83 | $ 390 | $ 390 | $ - |
| 2030 | 9.5 | 6 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2031 | 10.5 | 7 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2032 | 11.5 | 8 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2033 | 12.5 | 9 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2034 | 13.5 | 10 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2035 | 14.5 | 11 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2036 | 15.5 | 12 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2037 | 16.5 | 13 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2038 | 17.5 | 14 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2039 | 18.5 | 15 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2040 | 19.5 | 16 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2041 | 20.5 | 17 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2042 | 21.5 | 18 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2043 | 22.5 | 19 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2044 | 23.5 | 20 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2045 | 24.5 | 21 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2046 | 25.5 | 22 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2047 | 26.5 | 23 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2048 | 27.5 | 24 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2049 | 28.5 | 25 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2050 | 29.5 | 26 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2051 | 30.5 | 27 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2052 | 31.5 | 28 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2053 | 32.5 | 29 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2054 | 33.5 | 30 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2055 | 34.5 | 31 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2056 | 35.5 | 32 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2057 | 36.5 | 33 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2058 | 37.5 | 34 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2059 | 38.5 | 35 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2060 | 39.5 | 36 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2061 | 40.5 | 37 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2062 | 41.5 | 38 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2063 | 42.5 | 39 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2064 | 43.5 | 40 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2065 | 44.5 | 41 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2066 | 45.5 | 42 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2067 | 46.5 | 43 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2068 | 47.5 | 44 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |

**Summary of Life Care Plan Costs (Unadjusted)**

**Attachment 49**

J█████ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Diapers/Pull-ups | Gloves | Wipes | Chux Pads | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Neurology Evaluation, Monitoring, and Treatment | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment |
| 2069 | 48.5 | 45 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2070 | 49.5 | 46 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2071 | 50.5 | 47 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2072 | 51.5 | 48 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2073 | 52.5 | 49 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2074 | 53.5 | 50 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2075 | 54.5 | 51 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2076 | 55.5 | 52 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2077 | 56.5 | 53 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2078 | 57.5 | 54 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2079 | 58.5 | 55 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2080 | 59.5 | 56 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2081 | 60.5 | 57 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2082 | 61.5 | 58 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2083 | 62.5 | 59 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2084 | 63.5 | 60 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2085 | 64.5 | 61 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2086 | 65.5 | 62 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2087 | 66.5 | 63 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2088 | 67.5 | 64 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2089 | 68.5 | 65 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2090 | 69.5 | 66 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 1,625 |
| 2091 | 70.5 | 67 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2092 | 71.5 | 68 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2093 | 72.5 | 69 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2094 | 73.5 | 70 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2095 | 74.5 | 71 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2096 | 75.5 | 72 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ 813 |
| 2097 | 76.5 | 73 | $ - | $ - | $ - | $ - | $ 390 | $ 390 | $ - |
| 2098 | 77.5 | 74 | $ - | $ - | $ - | $ - | $ 306 | $ 306 | $ - |
| | | | $ 5,369 | $ 7,044 | $ 13,937 | $ 738 | $ 29,166 | $ 29,166 | $ 20,313 |

**Summary of Life Care Plan Costs (Unadjusted)**    **Attachment 49**

J█████ Grenier

**Assumptions:**

Date of Birth          7/7/2021
Date of Valuation      12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 8 Dental Evaluation, Monitoring and Treatment | 9 CT-Scan Head and Brain | 10 MRI Brain | 11 Physical Therapy Evaluation, Monitoring and Treatment | 12 Occupational Therapy Evaluation, Monitoring and Treatment | 13 Speech Therapy Evaluation, Monitoring and Treatment | 14 Parent Child Interactive Therapy Evaluation, Monitoring and Treatment |
|---|---|---|---|---|---|---|---|---|---|
| 2024 | 3.5 | 0 | $ 185 | $ 2,129 | $ 3,160 | $ 705 | $ 705 | $ 1,410 | $ 825 |
| 2025 | 4.5 | 1 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ 1,650 |
| 2026 | 5.5 | 2 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ 1,650 |
| 2027 | 6.5 | 3 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2028 | 7.5 | 4 | $ 185 | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2029 | 8.5 | 5 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2030 | 9.5 | 6 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2031 | 10.5 | 7 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2032 | 11.5 | 8 | $ 185 | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2033 | 12.5 | 9 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2034 | 13.5 | 10 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2035 | 14.5 | 11 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2036 | 15.5 | 12 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2037 | 16.5 | 13 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2038 | 17.5 | 14 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2039 | 18.5 | 15 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2040 | 19.5 | 16 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2041 | 20.5 | 17 | $ - | $ - | $ - | $ 8,750 | $ 8,750 | $ 17,500 | $ - |
| 2042 | 21.5 | 18 | $ - | $ - | $ - | $ 4,521 | $ 4,521 | $ 9,042 | $ - |
| 2043 | 22.5 | 19 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2044 | 23.5 | 20 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2045 | 24.5 | 21 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2046 | 25.5 | 22 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2047 | 26.5 | 23 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2048 | 27.5 | 24 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2049 | 28.5 | 25 | $ - | $ 2,129 | $ 3,160 | $ - | $ - | $ - | $ - |
| 2050 | 29.5 | 26 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2051 | 30.5 | 27 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2052 | 31.5 | 28 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2053 | 32.5 | 29 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2054 | 33.5 | 30 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2055 | 34.5 | 31 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2056 | 35.5 | 32 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2057 | 36.5 | 33 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2058 | 37.5 | 34 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2059 | 38.5 | 35 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2060 | 39.5 | 36 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2061 | 40.5 | 37 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2062 | 41.5 | 38 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2063 | 42.5 | 39 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2064 | 43.5 | 40 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2065 | 44.5 | 41 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2066 | 45.5 | 42 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2067 | 46.5 | 43 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2068 | 47.5 | 44 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Summary of Life Care Plan Costs (Unadjusted)**                                    **Attachment 49**

J███ Grenier

**Assumptions:**

Date of Birth          7/7/2021
Date of Valuation      12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 8 Dental Evaluation, Monitoring and Treatment | 9 CT-Scan Head and Brain | 10 MRI Brain | 11 Physical Therapy Evaluation, Monitoring and Treatment | 12 Occupational Therapy Evaluation, Monitoring and Treatment | 13 Speech Therapy Evaluation, Monitoring and Treatment | 14 Parent Child Interactive Therapy Evaluation, Monitoring and Treatment |
|------|------|------|------|------|------|------|------|------|------|
| 2069 | 48.5 | 45 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2070 | 49.5 | 46 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2071 | 50.5 | 47 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2072 | 51.5 | 48 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2073 | 52.5 | 49 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2074 | 53.5 | 50 | $ - | $ 2,129 | $ 3,160 | $ - | $ - | $ - | $ - |
| 2075 | 54.5 | 51 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2076 | 55.5 | 52 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2077 | 56.5 | 53 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2078 | 57.5 | 54 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2079 | 58.5 | 55 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2080 | 59.5 | 56 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2081 | 60.5 | 57 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2082 | 61.5 | 58 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2083 | 62.5 | 59 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2084 | 63.5 | 60 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2085 | 64.5 | 61 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2086 | 65.5 | 62 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2087 | 66.5 | 63 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2088 | 67.5 | 64 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2089 | 68.5 | 65 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2090 | 69.5 | 66 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2091 | 70.5 | 67 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2092 | 71.5 | 68 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2093 | 72.5 | 69 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2094 | 73.5 | 70 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2095 | 74.5 | 71 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2096 | 75.5 | 72 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2097 | 76.5 | 73 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2098 | 77.5 | 74 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | $ 555 | $ 6,387 | $ 9,480 | $ 153,976 | $ 153,976 | $ 307,951 | $ 4,125 |

**Summary of Life Care Plan Costs (Unadjusted)**                                                    **Attachment 49**

JGrenier

**Assumptions:**

Date of Birth        7/7/2021
Date of Valuation    12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 15 Hair replacement evaluation, monitoring and treatment | 16 Augmentative communication evaluation, monitoring and treatment | 17 Tutoring (Age 6 - 12) | 18 Tutoring (Age 12 - 15) | 19 Tutoring (Age 15 - 22) | 20 Case Management | 21 Vocational / Avocational Evaluation | 22 In Home Care (current age to Age 6) |
|------|-----------------|---------------------|--------|--------|--------|--------|--------|--------|--------|--------|
| 2024 | 3.5  | 0  | $ - | $ -   | $ -     | $ -     | $ -     | $ 242   | $ -     | $ 2,388  |
| 2025 | 4.5  | 1  | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ 29,640 |
| 2026 | 5.5  | 2  | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ 29,640 |
| 2027 | 6.5  | 3  | $ - | $ -   | $ 167   | $ -     | $ -     | $ 3,000 | $ -     | $ 15,314 |
| 2028 | 7.5  | 4  | $ - | $ -   | $ 2,070 | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2029 | 8.5  | 5  | $ - | $ -   | $ 2,070 | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2030 | 9.5  | 6  | $ - | $ -   | $ 2,070 | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2031 | 10.5 | 7  | $ - | $ -   | $ 2,070 | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2032 | 11.5 | 8  | $ - | $ 225 | $ 2,070 | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2033 | 12.5 | 9  | $ - | $ -   | $ 1,903 | $ 360   | $ -     | $ 3,000 | $ -     | $ -      |
| 2034 | 13.5 | 10 | $ - | $ -   | $ -     | $ 4,464 | $ -     | $ 3,000 | $ -     | $ -      |
| 2035 | 14.5 | 11 | $ - | $ -   | $ -     | $ 4,464 | $ -     | $ 3,000 | $ -     | $ -      |
| 2036 | 15.5 | 12 | $ - | $ -   | $ -     | $ 4,104 | $ 587   | $ 3,000 | $ -     | $ -      |
| 2037 | 16.5 | 13 | $ - | $ -   | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2038 | 17.5 | 14 | $ - | $ 225 | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2039 | 18.5 | 15 | $ - | $ -   | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2040 | 19.5 | 16 | $ - | $ -   | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2041 | 20.5 | 17 | $ - | $ -   | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2042 | 21.5 | 18 | $ - | $ -   | $ -     | $ -     | $ 7,290 | $ 3,000 | $ -     | $ -      |
| 2043 | 22.5 | 19 | $ - | $ -   | $ -     | $ -     | $ 6,703 | $ 3,000 | $ -     | $ -      |
| 2044 | 23.5 | 20 | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ 1,375 | $ -      |
| 2045 | 24.5 | 21 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2046 | 25.5 | 22 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2047 | 26.5 | 23 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2048 | 27.5 | 24 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2049 | 28.5 | 25 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2050 | 29.5 | 26 | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2051 | 30.5 | 27 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2052 | 31.5 | 28 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2053 | 32.5 | 29 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2054 | 33.5 | 30 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2055 | 34.5 | 31 | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2056 | 35.5 | 32 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2057 | 36.5 | 33 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2058 | 37.5 | 34 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ 1,375 | $ -      |
| 2059 | 38.5 | 35 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2060 | 39.5 | 36 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2061 | 40.5 | 37 | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2062 | 41.5 | 38 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2063 | 42.5 | 39 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2064 | 43.5 | 40 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2065 | 44.5 | 41 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2066 | 45.5 | 42 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2067 | 46.5 | 43 | $ - | $ 225 | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |
| 2068 | 47.5 | 44 | $ - | $ -   | $ -     | $ -     | $ -     | $ 3,000 | $ -     | $ -      |

**Summary of Life Care Plan Costs (Unadjusted)**    **Attachment 49**

J█████ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Hair replacement evaluation, monitoring and treatment | Augmentative communication evaluation, monitoring and treatment | Tutoring (Age 6 - 12) | Tutoring (Age 12 - 15) | Tutoring (Age 15 - 22) | Case Management | Vocational / Avocational Evaluation | In Home Care (current age to Age 6) |
| 2069 | 48.5 | 45 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2070 | 49.5 | 46 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2071 | 50.5 | 47 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2072 | 51.5 | 48 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ 1,375 | $ - |
| 2073 | 52.5 | 49 | $ - | $ 225 | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2074 | 53.5 | 50 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2075 | 54.5 | 51 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2076 | 55.5 | 52 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2077 | 56.5 | 53 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2078 | 57.5 | 54 | $ - | $ 225 | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2079 | 58.5 | 55 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2080 | 59.5 | 56 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2081 | 60.5 | 57 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2082 | 61.5 | 58 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2083 | 62.5 | 59 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2084 | 63.5 | 60 | $ - | $ 225 | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2085 | 64.5 | 61 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2086 | 65.5 | 62 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ 1,375 | $ - |
| 2087 | 66.5 | 63 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2088 | 67.5 | 64 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2089 | 68.5 | 65 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2090 | 69.5 | 66 | $ - | $ 225 | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2091 | 70.5 | 67 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2092 | 71.5 | 68 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2093 | 72.5 | 69 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2094 | 73.5 | 70 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2095 | 74.5 | 71 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2096 | 75.5 | 72 | $ - | $ 225 | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2097 | 76.5 | 73 | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ - | $ - |
| 2098 | 77.5 | 74 | $ - | $ - | $ - | $ - | $ - | $ 2,350 | $ - | $ - |
| | | | $ - | $ 2,925 | $ 12,420 | $ 13,392 | $ 51,030 | $ 221,592 | $ 5,500 | $ 76,982 |

**Summary of Life Care Plan Costs (Unadjusted)**

J███ Grenier



**Attachment 49**

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| Year | Age of Claimant | Years Ahead of 2024 | 23 In Home Care (Age 6 - 22) | 24 Adult Home Care (Option 1): In Home Care | 25 Adult Home Care (Option 2): Adult Family Home | Total |
|---|---|---|---|---|---|---|
| 2024 | 3.5 | 0 | $ - | $ - | $ - | $ 13,002 |
| 2025 | 4.5 | 1 | $ - | $ - | $ - | $ 75,962 |
| 2026 | 5.5 | 2 | $ - | $ - | $ - | $ 77,812 |
| 2027 | 6.5 | 3 | $ 30,305 | $ - | $ - | $ 90,458 |
| 2028 | 7.5 | 4 | $ 62,700 | $ - | $ - | $ 109,627 |
| 2029 | 8.5 | 5 | $ 62,700 | $ - | $ - | $ 106,594 |
| 2030 | 9.5 | 6 | $ 62,700 | $ - | $ - | $ 103,550 |
| 2031 | 10.5 | 7 | $ 62,700 | $ - | $ - | $ 103,550 |
| 2032 | 11.5 | 8 | $ 62,700 | $ - | $ - | $ 105,585 |
| 2033 | 12.5 | 9 | $ 62,700 | $ - | $ - | $ 103,743 |
| 2034 | 13.5 | 10 | $ 62,700 | $ - | $ - | $ 105,944 |
| 2035 | 14.5 | 11 | $ 62,700 | $ - | $ - | $ 105,944 |
| 2036 | 15.5 | 12 | $ 62,700 | $ - | $ - | $ 106,172 |
| 2037 | 16.5 | 13 | $ 62,700 | $ - | $ - | $ 108,770 |
| 2038 | 17.5 | 14 | $ 62,700 | $ - | $ - | $ 110,620 |
| 2039 | 18.5 | 15 | $ 62,700 | $ - | $ - | $ 108,770 |
| 2040 | 19.5 | 16 | $ 62,700 | $ - | $ - | $ 108,770 |
| 2041 | 20.5 | 17 | $ 62,700 | $ - | $ - | $ 108,770 |
| 2042 | 21.5 | 18 | $ 62,700 | $ - | $ - | $ 91,853 |
| 2043 | 22.5 | 19 | $ 32,395 | $ 90,564 | $ 27,762 | $ 161,203 |
| 2044 | 23.5 | 20 | $ - | $ 187,373 | $ 57,438 | $ 251,816 |
| 2045 | 24.5 | 21 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2046 | 25.5 | 22 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2047 | 26.5 | 23 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2048 | 27.5 | 24 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2049 | 28.5 | 25 | $ - | $ 187,373 | $ 57,438 | $ 253,880 |
| 2050 | 29.5 | 26 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2051 | 30.5 | 27 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2052 | 31.5 | 28 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2053 | 32.5 | 29 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2054 | 33.5 | 30 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2055 | 34.5 | 31 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2056 | 35.5 | 32 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2057 | 36.5 | 33 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2058 | 37.5 | 34 | $ - | $ 187,373 | $ 57,438 | $ 249,966 |
| 2059 | 38.5 | 35 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2060 | 39.5 | 36 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2061 | 40.5 | 37 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2062 | 41.5 | 38 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2063 | 42.5 | 39 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2064 | 43.5 | 40 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2065 | 44.5 | 41 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2066 | 45.5 | 42 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2067 | 46.5 | 43 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2068 | 47.5 | 44 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |

**Summary of Life Care Plan Costs (Unadjusted)**    **Attachment 49**

█████ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| Year | Age of Claimant | Years Ahead of 2024 | 23<br>In Home Care (Age 6 - 22) | 24<br>Adult Home Care (Option 1): In Home Care | 25<br>Adult Home Care (Option 2): Adult Family Home | Total |
|---|---|---|---|---|---|---|
| 2069 | 48.5 | 45 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2070 | 49.5 | 46 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2071 | 50.5 | 47 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2072 | 51.5 | 48 | $ - | $ 187,373 | $ 57,438 | $ 249,966 |
| 2073 | 52.5 | 49 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2074 | 53.5 | 50 | $ - | $ 187,373 | $ 57,438 | $ 253,880 |
| 2075 | 54.5 | 51 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2076 | 55.5 | 52 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2077 | 56.5 | 53 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2078 | 57.5 | 54 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2079 | 58.5 | 55 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2080 | 59.5 | 56 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2081 | 60.5 | 57 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2082 | 61.5 | 58 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2083 | 62.5 | 59 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2084 | 63.5 | 60 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2085 | 64.5 | 61 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2086 | 65.5 | 62 | $ - | $ 187,373 | $ 57,438 | $ 249,966 |
| 2087 | 66.5 | 63 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2088 | 67.5 | 64 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2089 | 68.5 | 65 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2090 | 69.5 | 66 | $ - | $ 187,373 | $ 57,438 | $ 250,441 |
| 2091 | 70.5 | 67 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2092 | 71.5 | 68 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2093 | 72.5 | 69 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2094 | 73.5 | 70 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2095 | 74.5 | 71 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2096 | 75.5 | 72 | $ - | $ 187,373 | $ 57,438 | $ 249,629 |
| 2097 | 76.5 | 73 | $ - | $ 187,373 | $ 57,438 | $ 248,591 |
| 2098 | 77.5 | 74 | $ - | $ 146,776 | $ 44,993 | $ 194,730 |
| | | | ######### | ######### | ######### | ######### |

**Summary of Life Care Plan Costs (Inflation Adjusted)**    **Attachment 50**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Diapers/Pull-ups | Gloves | Wipes | Chux Pads | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Neurology Evaluation, Monitoring, and Treatment | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment |
| 2024 | 3.5 | 0 | $ 94 | $ 123 | $ 244 | $ 13 | $ 390 | $ 390 | $ - |
| 2025 | 4.5 | 1 | $ 1,146 | $ 1,504 | $ 2,975 | $ 158 | $ 389 | $ 389 | $ - |
| 2026 | 5.5 | 2 | $ 1,125 | $ 1,475 | $ 2,919 | $ 155 | $ 387 | $ 387 | $ 1,614 |
| 2027 | 6.5 | 3 | $ 1,104 | $ 1,448 | $ 2,865 | $ 152 | $ 386 | $ 386 | $ - |
| 2028 | 7.5 | 4 | $ 1,083 | $ 1,421 | $ 2,811 | $ 149 | $ 385 | $ 385 | $ - |
| 2029 | 8.5 | 5 | $ 549 | $ 720 | $ 1,425 | $ 75 | $ 383 | $ 383 | $ - |
| 2030 | 9.5 | 6 | $ - | $ - | $ - | $ - | $ 382 | $ 382 | $ - |
| 2031 | 10.5 | 7 | $ - | $ - | $ - | $ - | $ 380 | $ 380 | $ - |
| 2032 | 11.5 | 8 | $ - | $ - | $ - | $ - | $ 379 | $ 379 | $ 1,580 |
| 2033 | 12.5 | 9 | $ - | $ - | $ - | $ - | $ 378 | $ 378 | $ - |
| 2034 | 13.5 | 10 | $ - | $ - | $ - | $ - | $ 376 | $ 376 | $ - |
| 2035 | 14.5 | 11 | $ - | $ - | $ - | $ - | $ 375 | $ 375 | $ - |
| 2036 | 15.5 | 12 | $ - | $ - | $ - | $ - | $ 374 | $ 374 | $ - |
| 2037 | 16.5 | 13 | $ - | $ - | $ - | $ - | $ 372 | $ 372 | $ - |
| 2038 | 17.5 | 14 | $ - | $ - | $ - | $ - | $ 371 | $ 371 | $ 1,546 |
| 2039 | 18.5 | 15 | $ - | $ - | $ - | $ - | $ 370 | $ 370 | $ - |
| 2040 | 19.5 | 16 | $ - | $ - | $ - | $ - | $ 368 | $ 368 | $ - |
| 2041 | 20.5 | 17 | $ - | $ - | $ - | $ - | $ 367 | $ 367 | $ - |
| 2042 | 21.5 | 18 | $ - | $ - | $ - | $ - | $ 366 | $ 366 | $ - |
| 2043 | 22.5 | 19 | $ - | $ - | $ - | $ - | $ 365 | $ 365 | $ - |
| 2044 | 23.5 | 20 | $ - | $ - | $ - | $ - | $ 363 | $ 363 | $ 1,514 |
| 2045 | 24.5 | 21 | $ - | $ - | $ - | $ - | $ 362 | $ 362 | $ - |
| 2046 | 25.5 | 22 | $ - | $ - | $ - | $ - | $ 361 | $ 361 | $ - |
| 2047 | 26.5 | 23 | $ - | $ - | $ - | $ - | $ 359 | $ 359 | $ - |
| 2048 | 27.5 | 24 | $ - | $ - | $ - | $ - | $ 358 | $ 358 | $ - |
| 2049 | 28.5 | 25 | $ - | $ - | $ - | $ - | $ 357 | $ 357 | $ - |
| 2050 | 29.5 | 26 | $ - | $ - | $ - | $ - | $ 356 | $ 356 | $ 1,482 |
| 2051 | 30.5 | 27 | $ - | $ - | $ - | $ - | $ 354 | $ 354 | $ - |
| 2052 | 31.5 | 28 | $ - | $ - | $ - | $ - | $ 353 | $ 353 | $ - |
| 2053 | 32.5 | 29 | $ - | $ - | $ - | $ - | $ 352 | $ 352 | $ - |
| 2054 | 33.5 | 30 | $ - | $ - | $ - | $ - | $ 351 | $ 351 | $ - |
| 2055 | 34.5 | 31 | $ - | $ - | $ - | $ - | $ 349 | $ 349 | $ 1,456 |
| 2056 | 35.5 | 32 | $ - | $ - | $ - | $ - | $ 348 | $ 348 | $ - |
| 2057 | 36.5 | 33 | $ - | $ - | $ - | $ - | $ 347 | $ 347 | $ - |
| 2058 | 37.5 | 34 | $ - | $ - | $ - | $ - | $ 346 | $ 346 | $ - |
| 2059 | 38.5 | 35 | $ - | $ - | $ - | $ - | $ 344 | $ 344 | $ - |
| 2060 | 39.5 | 36 | $ - | $ - | $ - | $ - | $ 343 | $ 343 | $ - |
| 2061 | 40.5 | 37 | $ - | $ - | $ - | $ - | $ 342 | $ 342 | $ 1,425 |
| 2062 | 41.5 | 38 | $ - | $ - | $ - | $ - | $ 341 | $ 341 | $ - |
| 2063 | 42.5 | 39 | $ - | $ - | $ - | $ - | $ 340 | $ 340 | $ - |
| 2064 | 43.5 | 40 | $ - | $ - | $ - | $ - | $ 338 | $ 338 | $ - |
| 2065 | 44.5 | 41 | $ - | $ - | $ - | $ - | $ 337 | $ 337 | $ - |
| 2066 | 45.5 | 42 | $ - | $ - | $ - | $ - | $ 336 | $ 336 | $ - |
| 2067 | 46.5 | 43 | $ - | $ - | $ - | $ - | $ 335 | $ 335 | $ 1,395 |

**Summary of Life Care Plan Costs (Inflation Adjusted)**

**Attachment 50**

J█████ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Diapers/Pull-ups | Gloves | Wipes | Chux Pads | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Neurology Evaluation, Monitoring, and Treatment | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment |
| 2068 | 47.5 | 44 | $ - | $ - | $ - | $ - | $ 334 | $ 334 | $ - |
| 2069 | 48.5 | 45 | $ - | $ - | $ - | $ - | $ 332 | $ 332 | $ - |
| 2070 | 49.5 | 46 | $ - | $ - | $ - | $ - | $ 331 | $ 331 | $ - |
| 2071 | 50.5 | 47 | $ - | $ - | $ - | $ - | $ 330 | $ 330 | $ - |
| 2072 | 51.5 | 48 | $ - | $ - | $ - | $ - | $ 329 | $ 329 | $ - |
| 2073 | 52.5 | 49 | $ - | $ - | $ - | $ - | $ 328 | $ 328 | $ 1,366 |
| 2074 | 53.5 | 50 | $ - | $ - | $ - | $ - | $ 327 | $ 327 | $ - |
| 2075 | 54.5 | 51 | $ - | $ - | $ - | $ - | $ 325 | $ 325 | $ - |
| 2076 | 55.5 | 52 | $ - | $ - | $ - | $ - | $ 324 | $ 324 | $ - |
| 2077 | 56.5 | 53 | $ - | $ - | $ - | $ - | $ 323 | $ 323 | $ - |
| 2078 | 57.5 | 54 | $ - | $ - | $ - | $ - | $ 322 | $ 322 | $ 1,342 |
| 2079 | 58.5 | 55 | $ - | $ - | $ - | $ - | $ 321 | $ 321 | $ - |
| 2080 | 59.5 | 56 | $ - | $ - | $ - | $ - | $ 320 | $ 320 | $ - |
| 2081 | 60.5 | 57 | $ - | $ - | $ - | $ - | $ 319 | $ 319 | $ - |
| 2082 | 61.5 | 58 | $ - | $ - | $ - | $ - | $ 317 | $ 317 | $ - |
| 2083 | 62.5 | 59 | $ - | $ - | $ - | $ - | $ 316 | $ 316 | $ - |
| 2084 | 63.5 | 60 | $ - | $ - | $ - | $ - | $ 315 | $ 315 | $ 1,313 |
| 2085 | 64.5 | 61 | $ - | $ - | $ - | $ - | $ 314 | $ 314 | $ - |
| 2086 | 65.5 | 62 | $ - | $ - | $ - | $ - | $ 313 | $ 313 | $ - |
| 2087 | 66.5 | 63 | $ - | $ - | $ - | $ - | $ 312 | $ 312 | $ - |
| 2088 | 67.5 | 64 | $ - | $ - | $ - | $ - | $ 311 | $ 311 | $ - |
| 2089 | 68.5 | 65 | $ - | $ - | $ - | $ - | $ 310 | $ 310 | $ - |
| 2090 | 69.5 | 66 | $ - | $ - | $ - | $ - | $ 309 | $ 309 | $ 1,286 |
| 2091 | 70.5 | 67 | $ - | $ - | $ - | $ - | $ 307 | $ 307 | $ - |
| 2092 | 71.5 | 68 | $ - | $ - | $ - | $ - | $ 306 | $ 306 | $ - |
| 2093 | 72.5 | 69 | $ - | $ - | $ - | $ - | $ 305 | $ 305 | $ - |
| 2094 | 73.5 | 70 | $ - | $ - | $ - | $ - | $ 304 | $ 304 | $ - |
| 2095 | 74.5 | 71 | $ - | $ - | $ - | $ - | $ 303 | $ 303 | $ - |
| 2096 | 75.5 | 72 | $ - | $ - | $ - | $ - | $ 302 | $ 302 | $ 629 |
| 2097 | 76.5 | 73 | $ - | $ - | $ - | $ - | $ 301 | $ 301 | $ - |
| 2098 | 77.5 | 74 | $ - | $ - | $ - | $ - | $ 235 | $ 235 | $ - |
| | | | $ 5,100 | $ 6,691 | $ 13,240 | $ 701 | $ 25,661 | $ 25,661 | $ 17,946 |

**Summary of Life Care Plan Costs (Inflation Adjusted)**    **Attachment 50**

J████ Grenier

**Assumptions:**

Date of Birth      7/7/2021

Date of Valuation      12/2/2024

| | | | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Dental Evaluation, Monitoring and Treatment | CT-Scan Head and Brain | MRI Brain | Physical Therapy Evaluation, Monitoring and Treatment | Occupational Therapy Evaluation, Monitoring and Treatment | Speech Therapy Evaluation, Monitoring and Treatment | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | Hair replacement evaluation, monitoring and treatment |
| 2024 | 3.5 | 0 | $ 185 | $ 2,129 | $ 3,160 | $ 705 | $ 705 | $ 1,410 | $ 825 | $ - |
| 2025 | 4.5 | 1 | $ - | $ - | $ - | $ 8,695 | $ 8,695 | $ 17,391 | $ 1,640 | $ - |
| 2026 | 5.5 | 2 | $ - | $ - | $ - | $ 8,641 | $ 8,641 | $ 17,282 | $ 1,629 | $ - |
| 2027 | 6.5 | 3 | $ - | $ - | $ - | $ 8,587 | $ 8,587 | $ 17,174 | $ - | $ - |
| 2028 | 7.5 | 4 | $ 191 | $ - | $ - | $ 8,533 | $ 8,533 | $ 17,066 | $ - | $ - |
| 2029 | 8.5 | 5 | $ - | $ - | $ - | $ 8,480 | $ 8,480 | $ 16,960 | $ - | $ - |
| 2030 | 9.5 | 6 | $ - | $ - | $ - | $ 8,427 | $ 8,427 | $ 16,854 | $ - | $ - |
| 2031 | 10.5 | 7 | $ - | $ - | $ - | $ 8,374 | $ 8,374 | $ 16,748 | $ - | $ - |
| 2032 | 11.5 | 8 | $ 198 | $ - | $ - | $ 8,322 | $ 8,322 | $ 16,643 | $ - | $ - |
| 2033 | 12.5 | 9 | $ - | $ - | $ - | $ 8,270 | $ 8,270 | $ 16,539 | $ - | $ - |
| 2034 | 13.5 | 10 | $ - | $ - | $ - | $ 8,218 | $ 8,218 | $ 16,436 | $ - | $ - |
| 2035 | 14.5 | 11 | $ - | $ - | $ - | $ 8,167 | $ 8,167 | $ 16,333 | $ - | $ - |
| 2036 | 15.5 | 12 | $ - | $ - | $ - | $ 8,116 | $ 8,116 | $ 16,231 | $ - | $ - |
| 2037 | 16.5 | 13 | $ - | $ - | $ - | $ 8,065 | $ 8,065 | $ 16,130 | $ - | $ - |
| 2038 | 17.5 | 14 | $ - | $ - | $ - | $ 8,014 | $ 8,014 | $ 16,029 | $ - | $ - |
| 2039 | 18.5 | 15 | $ - | $ - | $ - | $ 7,964 | $ 7,964 | $ 15,928 | $ - | $ - |
| 2040 | 19.5 | 16 | $ - | $ - | $ - | $ 7,914 | $ 7,914 | $ 15,829 | $ - | $ - |
| 2041 | 20.5 | 17 | $ - | $ - | $ - | $ 7,865 | $ 7,865 | $ 15,730 | $ - | $ - |
| 2042 | 21.5 | 18 | $ - | $ - | $ - | $ 4,038 | $ 4,038 | $ 8,076 | $ - | $ - |
| 2043 | 22.5 | 19 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2044 | 23.5 | 20 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2045 | 24.5 | 21 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2046 | 25.5 | 22 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2047 | 26.5 | 23 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2048 | 27.5 | 24 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2049 | 28.5 | 25 | $ - | $ 3,940 | $ 5,849 | $ - | $ - | $ - | $ - | $ - |
| 2050 | 29.5 | 26 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2051 | 30.5 | 27 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2052 | 31.5 | 28 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2053 | 32.5 | 29 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2054 | 33.5 | 30 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2055 | 34.5 | 31 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2056 | 35.5 | 32 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2057 | 36.5 | 33 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2058 | 37.5 | 34 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2059 | 38.5 | 35 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2060 | 39.5 | 36 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2061 | 40.5 | 37 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2062 | 41.5 | 38 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2063 | 42.5 | 39 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2064 | 43.5 | 40 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2065 | 44.5 | 41 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2066 | 45.5 | 42 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2067 | 46.5 | 43 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Summary of Life Care Plan Costs (Inflation Adjusted)**

**Attachment 50**

J███ Grenier

**Assumptions:**

Date of Birth        7/7/2021
Date of Valuation    12/2/2024

| | | | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Dental Evaluation, Monitoring and Treatment | CT-Scan Head and Brain | MRI Brain | Physical Therapy Evaluation, Monitoring and Treatment | Occupational Therapy Evaluation, Monitoring and Treatment | Speech Therapy Evaluation, Monitoring and Treatment | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | Hair replacement evaluation, monitoring and treatment |
| 2068 | 47.5 | 44 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2069 | 48.5 | 45 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2070 | 49.5 | 46 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2071 | 50.5 | 47 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2072 | 51.5 | 48 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2073 | 52.5 | 49 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2074 | 53.5 | 50 | $ - | $ 7,293 | $ 10,825 | $ - | $ - | $ - | $ - | $ - |
| 2075 | 54.5 | 51 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2076 | 55.5 | 52 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2077 | 56.5 | 53 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2078 | 57.5 | 54 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2079 | 58.5 | 55 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2080 | 59.5 | 56 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2081 | 60.5 | 57 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2082 | 61.5 | 58 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2083 | 62.5 | 59 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2084 | 63.5 | 60 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2085 | 64.5 | 61 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2086 | 65.5 | 62 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2087 | 66.5 | 63 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2088 | 67.5 | 64 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2089 | 68.5 | 65 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2090 | 69.5 | 66 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2091 | 70.5 | 67 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2092 | 71.5 | 68 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2093 | 72.5 | 69 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2094 | 73.5 | 70 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2095 | 74.5 | 71 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2096 | 75.5 | 72 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2097 | 76.5 | 73 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2098 | 77.5 | 74 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | $ 574 | $ 13,363 | $ 19,834 | $ 145,394 | $ 145,394 | $ 290,788 | $ 4,094 | $ - |

**Summary of Life Care Plan Costs (Inflation Adjusted)**  **Attachment 50**

J███ Grenier

### Assumptions:

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Augmentative communication evaluation, monitoring and treatment | Tutoring (Age 6 - 12) | Tutoring (Age 12 - 15) | Tutoring (Age 15 - 22) | Case Management | Vocational / Avocational Evaluation | In Home Care (current age to Age 6) | In Home Care (Age 6 - 22) |
| 2024 | 3.5 | 0 | $ - | $ - | $ - | $ - | $ 242 | $ - | $ 2,388 | $ - |
| 2025 | 4.5 | 1 | $ - | $ - | $ - | $ - | $ 3,020 | $ - | $ 29,589 | $ - |
| 2026 | 5.5 | 2 | $ 222 | $ - | $ - | $ - | $ 3,040 | $ - | $ 29,537 | $ - |
| 2027 | 6.5 | 3 | $ - | $ 170 | $ - | $ - | $ 3,061 | $ - | $ 15,234 | $ 30,147 |
| 2028 | 7.5 | 4 | $ - | $ 2,126 | $ - | $ - | $ 3,081 | $ - | $ - | $ 62,266 |
| 2029 | 8.5 | 5 | $ - | $ 2,140 | $ - | $ - | $ 3,102 | $ - | $ - | $ 62,157 |
| 2030 | 9.5 | 6 | $ - | $ 2,155 | $ - | $ - | $ 3,123 | $ - | $ - | $ 62,049 |
| 2031 | 10.5 | 7 | $ - | $ 2,169 | $ - | $ - | $ 3,144 | $ - | $ - | $ 61,942 |
| 2032 | 11.5 | 8 | $ 214 | $ 2,184 | $ - | $ - | $ 3,165 | $ - | $ - | $ 61,834 |
| 2033 | 12.5 | 9 | $ - | $ 2,021 | $ 382 | $ - | $ 3,186 | $ - | $ - | $ 61,727 |
| 2034 | 13.5 | 10 | $ - | $ - | $ 4,773 | $ - | $ 3,208 | $ - | $ - | $ 61,619 |
| 2035 | 14.5 | 11 | $ - | $ - | $ 4,805 | $ - | $ 3,229 | $ - | $ - | $ 61,512 |
| 2036 | 15.5 | 12 | $ - | $ - | $ 4,448 | $ 636 | $ 3,251 | $ - | $ - | $ 61,406 |
| 2037 | 16.5 | 13 | $ - | $ - | $ - | $ 7,952 | $ 3,273 | $ - | $ - | $ 61,299 |
| 2038 | 17.5 | 14 | $ 206 | $ - | $ - | $ 8,006 | $ 3,295 | $ - | $ - | $ 61,193 |
| 2039 | 18.5 | 15 | $ - | $ - | $ - | $ 8,060 | $ 3,317 | $ - | $ - | $ 61,086 |
| 2040 | 19.5 | 16 | $ - | $ - | $ - | $ 8,114 | $ 3,339 | $ - | $ - | $ 60,980 |
| 2041 | 20.5 | 17 | $ - | $ - | $ - | $ 8,168 | $ 3,361 | $ - | $ - | $ 60,874 |
| 2042 | 21.5 | 18 | $ - | $ - | $ - | $ 8,223 | $ 3,384 | $ - | $ - | $ 60,769 |
| 2043 | 22.5 | 19 | $ - | $ - | $ - | $ 7,611 | $ 3,407 | $ - | $ - | $ 31,343 |
| 2044 | 23.5 | 20 | $ 198 | $ - | $ - | $ - | $ 3,430 | $ 1,572 | $ - | $ - |
| 2045 | 24.5 | 21 | $ - | $ - | $ - | $ - | $ 3,453 | $ - | $ - | $ - |
| 2046 | 25.5 | 22 | $ - | $ - | $ - | $ - | $ 3,476 | $ - | $ - | $ - |
| 2047 | 26.5 | 23 | $ - | $ - | $ - | $ - | $ 3,499 | $ - | $ - | $ - |
| 2048 | 27.5 | 24 | $ - | $ - | $ - | $ - | $ 3,523 | $ - | $ - | $ - |
| 2049 | 28.5 | 25 | $ - | $ - | $ - | $ - | $ 3,546 | $ - | $ - | $ - |
| 2050 | 29.5 | 26 | $ 191 | $ - | $ - | $ - | $ 3,570 | $ - | $ - | $ - |
| 2051 | 30.5 | 27 | $ - | $ - | $ - | $ - | $ 3,594 | $ - | $ - | $ - |
| 2052 | 31.5 | 28 | $ - | $ - | $ - | $ - | $ 3,618 | $ - | $ - | $ - |
| 2053 | 32.5 | 29 | $ - | $ - | $ - | $ - | $ 3,642 | $ - | $ - | $ - |
| 2054 | 33.5 | 30 | $ - | $ - | $ - | $ - | $ 3,667 | $ - | $ - | $ - |
| 2055 | 34.5 | 31 | $ 185 | $ - | $ - | $ - | $ 3,691 | $ - | $ - | $ - |
| 2056 | 35.5 | 32 | $ - | $ - | $ - | $ - | $ 3,716 | $ - | $ - | $ - |
| 2057 | 36.5 | 33 | $ - | $ - | $ - | $ - | $ 3,741 | $ - | $ - | $ - |
| 2058 | 37.5 | 34 | $ - | $ - | $ - | $ - | $ 3,766 | $ 1,726 | $ - | $ - |
| 2059 | 38.5 | 35 | $ - | $ - | $ - | $ - | $ 3,792 | $ - | $ - | $ - |
| 2060 | 39.5 | 36 | $ - | $ - | $ - | $ - | $ 3,817 | $ - | $ - | $ - |
| 2061 | 40.5 | 37 | $ 178 | $ - | $ - | $ - | $ 3,843 | $ - | $ - | $ - |
| 2062 | 41.5 | 38 | $ - | $ - | $ - | $ - | $ 3,868 | $ - | $ - | $ - |
| 2063 | 42.5 | 39 | $ - | $ - | $ - | $ - | $ 3,894 | $ - | $ - | $ - |
| 2064 | 43.5 | 40 | $ - | $ - | $ - | $ - | $ 3,921 | $ - | $ - | $ - |
| 2065 | 44.5 | 41 | $ - | $ - | $ - | $ - | $ 3,947 | $ - | $ - | $ - |
| 2066 | 45.5 | 42 | $ - | $ - | $ - | $ - | $ 3,973 | $ - | $ - | $ - |
| 2067 | 46.5 | 43 | $ 172 | $ - | $ - | $ - | $ 4,000 | $ - | $ - | $ - |

**Summary of Life Care Plan Costs (Inflation Adjusted)**  **Attachment 50**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |

| | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Augmentative communication evaluation, monitoring and treatment | Tutoring (Age 6 - 12) | Tutoring (Age 12 - 15) | Tutoring (Age 15 - 22) | Case Management | Vocational / Avocational Evaluation | In Home Care (current age to Age 6) | In Home Care (Age 6 - 22) |
| 2068 | 47.5 | 44 | $    - | $    - | $    - | $    - | $   4,027 | $    - | $    - | $    - |
| 2069 | 48.5 | 45 | $    - | $    - | $    - | $    - | $   4,054 | $    - | $    - | $    - |
| 2070 | 49.5 | 46 | $    - | $    - | $    - | $    - | $   4,081 | $    - | $    - | $    - |
| 2071 | 50.5 | 47 | $    - | $    - | $    - | $    - | $   4,109 | $    - | $    - | $    - |
| 2072 | 51.5 | 48 | $    - | $    - | $    - | $    - | $   4,136 | $   1,896 | $    - | $    - |
| 2073 | 52.5 | 49 | $   165 | $    - | $    - | $    - | $   4,164 | $    - | $    - | $    - |
| 2074 | 53.5 | 50 | $    - | $    - | $    - | $    - | $   4,192 | $    - | $    - | $    - |
| 2075 | 54.5 | 51 | $    - | $    - | $    - | $    - | $   4,220 | $    - | $    - | $    - |
| 2076 | 55.5 | 52 | $    - | $    - | $    - | $    - | $   4,248 | $    - | $    - | $    - |
| 2077 | 56.5 | 53 | $    - | $    - | $    - | $    - | $   4,277 | $    - | $    - | $    - |
| 2078 | 57.5 | 54 | $   160 | $    - | $    - | $    - | $   4,306 | $    - | $    - | $    - |
| 2079 | 58.5 | 55 | $    - | $    - | $    - | $    - | $   4,334 | $    - | $    - | $    - |
| 2080 | 59.5 | 56 | $    - | $    - | $    - | $    - | $   4,364 | $    - | $    - | $    - |
| 2081 | 60.5 | 57 | $    - | $    - | $    - | $    - | $   4,393 | $    - | $    - | $    - |
| 2082 | 61.5 | 58 | $    - | $    - | $    - | $    - | $   4,422 | $    - | $    - | $    - |
| 2083 | 62.5 | 59 | $    - | $    - | $    - | $    - | $   4,452 | $    - | $    - | $    - |
| 2084 | 63.5 | 60 | $   154 | $    - | $    - | $    - | $   4,482 | $    - | $    - | $    - |
| 2085 | 64.5 | 61 | $    - | $    - | $    - | $    - | $   4,512 | $    - | $    - | $    - |
| 2086 | 65.5 | 62 | $    - | $    - | $    - | $    - | $   4,542 | $   2,082 | $    - | $    - |
| 2087 | 66.5 | 63 | $    - | $    - | $    - | $    - | $   4,573 | $    - | $    - | $    - |
| 2088 | 67.5 | 64 | $    - | $    - | $    - | $    - | $   4,603 | $    - | $    - | $    - |
| 2089 | 68.5 | 65 | $    - | $    - | $    - | $    - | $   4,634 | $    - | $    - | $    - |
| 2090 | 69.5 | 66 | $   149 | $    - | $    - | $    - | $   4,665 | $    - | $    - | $    - |
| 2091 | 70.5 | 67 | $    - | $    - | $    - | $    - | $   4,697 | $    - | $    - | $    - |
| 2092 | 71.5 | 68 | $    - | $    - | $    - | $    - | $   4,728 | $    - | $    - | $    - |
| 2093 | 72.5 | 69 | $    - | $    - | $    - | $    - | $   4,760 | $    - | $    - | $    - |
| 2094 | 73.5 | 70 | $    - | $    - | $    - | $    - | $   4,792 | $    - | $    - | $    - |
| 2095 | 74.5 | 71 | $    - | $    - | $    - | $    - | $   4,824 | $    - | $    - | $    - |
| 2096 | 75.5 | 72 | $   143 | $    - | $    - | $    - | $   4,857 | $    - | $    - | $    - |
| 2097 | 76.5 | 73 | $    - | $    - | $    - | $    - | $   4,889 | $    - | $    - | $    - |
| 2098 | 77.5 | 74 | $    - | $    - | $    - | $    - | $   3,856 | $    - | $    - | $    - |
| | | | $   2,339 | $  12,966 | $  14,407 | $  56,770 | $ 287,406 | $   7,276 | $  76,748 | $ 984,203 |

**Summary of Life Care Plan Costs (Inflation Adjusted)**

**Attachment 50**

J█████ Grenier

**Assumptions:**

Date of Birth        7/7/2021
Date of Valuation    12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 24 Adult Home Care (Option 1): In Home Care | 25 Adult Home Care (Option 2): Adult Family Home | Total |
|---|---|---|---|---|---|
| 2024 | 3.5 | 0 | $ - | $ - | $ 13,002 |
| 2025 | 4.5 | 1 | $ - | $ - | $ 75,589 |
| 2026 | 5.5 | 2 | $ - | $ - | $ 77,055 |
| 2027 | 6.5 | 3 | $ - | $ - | $ 89,300 |
| 2028 | 7.5 | 4 | $ - | $ - | $ 108,030 |
| 2029 | 8.5 | 5 | $ - | $ - | $ 104,856 |
| 2030 | 9.5 | 6 | $ - | $ - | $ 101,798 |
| 2031 | 10.5 | 7 | $ - | $ - | $ 101,512 |
| 2032 | 11.5 | 8 | $ - | $ - | $ 103,219 |
| 2033 | 12.5 | 9 | $ - | $ - | $ 101,150 |
| 2034 | 13.5 | 10 | $ - | $ - | $ 103,225 |
| 2035 | 14.5 | 11 | $ - | $ - | $ 102,963 |
| 2036 | 15.5 | 12 | $ - | $ - | $ 102,950 |
| 2037 | 16.5 | 13 | $ - | $ - | $ 105,528 |
| 2038 | 17.5 | 14 | $ - | $ - | $ 107,045 |
| 2039 | 18.5 | 15 | $ - | $ - | $ 105,059 |
| 2040 | 19.5 | 16 | $ - | $ - | $ 104,827 |
| 2041 | 20.5 | 17 | $ - | $ - | $ 104,598 |
| 2042 | 21.5 | 18 | $ - | $ - | $ 89,260 |
| 2043 | 22.5 | 19 | $ 87,621 | $ 33,611 | $ 164,322 |
| 2044 | 23.5 | 20 | $ 180,971 | $ 70,243 | $ 258,654 |
| 2045 | 24.5 | 21 | $ 180,657 | $ 70,953 | $ 255,786 |
| 2046 | 25.5 | 22 | $ 180,343 | $ 71,671 | $ 256,211 |
| 2047 | 26.5 | 23 | $ 180,030 | $ 72,396 | $ 256,643 |
| 2048 | 27.5 | 24 | $ 179,717 | $ 73,128 | $ 257,083 |
| 2049 | 28.5 | 25 | $ 179,405 | $ 73,867 | $ 267,321 |
| 2050 | 29.5 | 26 | $ 179,093 | $ 74,614 | $ 259,662 |
| 2051 | 30.5 | 27 | $ 178,782 | $ 75,369 | $ 258,454 |
| 2052 | 31.5 | 28 | $ 178,472 | $ 76,131 | $ 258,927 |
| 2053 | 32.5 | 29 | $ 178,162 | $ 76,901 | $ 259,409 |
| 2054 | 33.5 | 30 | $ 177,852 | $ 77,679 | $ 259,899 |
| 2055 | 34.5 | 31 | $ 177,543 | $ 78,464 | $ 262,039 |
| 2056 | 35.5 | 32 | $ 177,235 | $ 79,258 | $ 260,905 |
| 2057 | 36.5 | 33 | $ 176,927 | $ 80,059 | $ 261,422 |
| 2058 | 37.5 | 34 | $ 176,620 | $ 80,869 | $ 263,673 |
| 2059 | 38.5 | 35 | $ 176,313 | $ 81,687 | $ 262,481 |
| 2060 | 39.5 | 36 | $ 176,007 | $ 82,513 | $ 263,024 |
| 2061 | 40.5 | 37 | $ 175,701 | $ 83,348 | $ 265,179 |
| 2062 | 41.5 | 38 | $ 175,396 | $ 84,191 | $ 264,137 |
| 2063 | 42.5 | 39 | $ 175,091 | $ 85,042 | $ 264,707 |
| 2064 | 43.5 | 40 | $ 174,787 | $ 85,902 | $ 265,287 |
| 2065 | 44.5 | 41 | $ 174,484 | $ 86,771 | $ 265,876 |
| 2066 | 45.5 | 42 | $ 174,181 | $ 87,648 | $ 266,474 |
| 2067 | 46.5 | 43 | $ 173,878 | $ 88,535 | $ 268,649 |

**Summary of Life Care Plan Costs (Inflation Adjusted)**  **Attachment 50**

J███ Grenier

**Assumptions:**

Date of Birth          7/7/2021
Date of Valuation   12/2/2024

| Year | Age of Claimant | Years Ahead of 2024 | 24 Adult Home Care (Option 1): In Home Care | 25 Adult Home Care (Option 2): Adult Family Home | Total |
|---|---|---|---|---|---|
| 2068 | 47.5 | 44 | $ 173,576 | $ 89,430 | $ 267,700 |
| 2069 | 48.5 | 45 | $ 173,275 | $ 90,335 | $ 268,328 |
| 2070 | 49.5 | 46 | $ 172,974 | $ 91,248 | $ 268,966 |
| 2071 | 50.5 | 47 | $ 172,673 | $ 92,171 | $ 269,613 |
| 2072 | 51.5 | 48 | $ 172,373 | $ 93,103 | $ 272,166 |
| 2073 | 52.5 | 49 | $ 172,074 | $ 94,045 | $ 272,469 |
| 2074 | 53.5 | 50 | $ 171,775 | $ 94,996 | $ 289,734 |
| 2075 | 54.5 | 51 | $ 171,477 | $ 95,957 | $ 272,304 |
| 2076 | 55.5 | 52 | $ 171,179 | $ 96,927 | $ 273,003 |
| 2077 | 56.5 | 53 | $ 170,882 | $ 97,907 | $ 273,712 |
| 2078 | 57.5 | 54 | $ 170,585 | $ 98,897 | $ 275,934 |
| 2079 | 58.5 | 55 | $ 170,289 | $ 99,898 | $ 275,162 |
| 2080 | 59.5 | 56 | $ 169,993 | $ 100,908 | $ 275,904 |
| 2081 | 60.5 | 57 | $ 169,698 | $ 101,928 | $ 276,656 |
| 2082 | 61.5 | 58 | $ 169,403 | $ 102,959 | $ 277,419 |
| 2083 | 62.5 | 59 | $ 169,109 | $ 104,001 | $ 278,194 |
| 2084 | 63.5 | 60 | $ 168,815 | $ 105,052 | $ 280,447 |
| 2085 | 64.5 | 61 | $ 168,522 | $ 106,115 | $ 279,777 |
| 2086 | 65.5 | 62 | $ 168,229 | $ 107,188 | $ 282,667 |
| 2087 | 66.5 | 63 | $ 167,937 | $ 108,272 | $ 281,405 |
| 2088 | 67.5 | 64 | $ 167,645 | $ 109,367 | $ 282,237 |
| 2089 | 68.5 | 65 | $ 167,354 | $ 110,473 | $ 283,081 |
| 2090 | 69.5 | 66 | $ 167,063 | $ 111,590 | $ 285,371 |
| 2091 | 70.5 | 67 | $ 166,773 | $ 112,719 | $ 284,804 |
| 2092 | 71.5 | 68 | $ 166,484 | $ 113,859 | $ 285,683 |
| 2093 | 72.5 | 69 | $ 166,194 | $ 115,010 | $ 286,575 |
| 2094 | 73.5 | 70 | $ 165,906 | $ 116,173 | $ 287,480 |
| 2095 | 74.5 | 71 | $ 165,618 | $ 117,348 | $ 288,396 |
| 2096 | 75.5 | 72 | $ 165,330 | $ 118,535 | $ 290,098 |
| 2097 | 76.5 | 73 | $ 165,043 | $ 119,734 | $ 290,268 |
| 2098 | 77.5 | 74 | $ 129,059 | $ 94,740 | $ 228,125 |
| | | | ######## | ######## | ######## |

**Summary of Life Care Plan Costs (Net Present Value)**

**Attachment 51**

J█████ Grenier

<u>**Assumptions:**</u>

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Diapers/Pull-ups | Gloves | Wipes | Chux Pads | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Neurology Evaluation, Monitoring, and Treatment |
| 2024 | 3.5 | 0 | 1.0000 | $ 94 | $ 123 | $ 244 | $ 13 | $ 390 | $ 390 |
| 2025 | 4.5 | 1 | 0.9891 | $ 1,134 | $ 1,487 | $ 2,943 | $ 156 | $ 384 | $ 384 |
| 2026 | 5.5 | 2 | 0.9676 | $ 1,088 | $ 1,428 | $ 2,825 | $ 150 | $ 375 | $ 375 |
| 2027 | 6.5 | 3 | 0.9553 | $ 1,054 | $ 1,383 | $ 2,737 | $ 145 | $ 369 | $ 369 |
| 2028 | 7.5 | 4 | 0.9524 | $ 1,031 | $ 1,353 | $ 2,677 | $ 142 | $ 366 | $ 366 |
| 2029 | 8.5 | 5 | 0.9392 | $ 516 | $ 677 | $ 1,339 | $ 71 | $ 360 | $ 360 |
| 2030 | 9.5 | 6 | 0.9190 | $ - | $ - | $ - | $ - | $ 351 | $ 351 |
| 2031 | 10.5 | 7 | 0.9050 | $ - | $ - | $ - | $ - | $ 344 | $ 344 |
| 2032 | 11.5 | 8 | 0.8935 | $ - | $ - | $ - | $ - | $ 339 | $ 339 |
| 2033 | 12.5 | 9 | 0.8802 | $ - | $ - | $ - | $ - | $ 332 | $ 332 |
| 2034 | 13.5 | 10 | 0.8671 | $ - | $ - | $ - | $ - | $ 326 | $ 326 |
| 2035 | 14.5 | 11 | 0.8565 | $ - | $ - | $ - | $ - | $ 321 | $ 321 |
| 2036 | 15.5 | 12 | 0.8440 | $ - | $ - | $ - | $ - | $ 315 | $ 315 |
| 2037 | 16.5 | 13 | 0.8316 | $ - | $ - | $ - | $ - | $ 310 | $ 310 |
| 2038 | 17.5 | 14 | 0.8194 | $ - | $ - | $ - | $ - | $ 304 | $ 304 |
| 2039 | 18.5 | 15 | 0.8074 | $ - | $ - | $ - | $ - | $ 299 | $ 299 |
| 2040 | 19.5 | 16 | 0.7956 | $ - | $ - | $ - | $ - | $ 293 | $ 293 |
| 2041 | 20.5 | 17 | 0.7840 | $ - | $ - | $ - | $ - | $ 288 | $ 288 |
| 2042 | 21.5 | 18 | 0.7725 | $ - | $ - | $ - | $ - | $ 283 | $ 283 |
| 2043 | 22.5 | 19 | 0.7612 | $ - | $ - | $ - | $ - | $ 278 | $ 278 |
| 2044 | 23.5 | 20 | 0.7500 | $ - | $ - | $ - | $ - | $ 272 | $ 272 |
| 2045 | 24.5 | 21 | 0.7325 | $ - | $ - | $ - | $ - | $ 265 | $ 265 |
| 2046 | 25.5 | 22 | 0.7214 | $ - | $ - | $ - | $ - | $ 260 | $ 260 |
| 2047 | 26.5 | 23 | 0.7106 | $ - | $ - | $ - | $ - | $ 255 | $ 255 |
| 2048 | 27.5 | 24 | 0.6999 | $ - | $ - | $ - | $ - | $ 251 | $ 251 |
| 2049 | 28.5 | 25 | 0.6893 | $ - | $ - | $ - | $ - | $ 246 | $ 246 |
| 2050 | 29.5 | 26 | 0.6789 | $ - | $ - | $ - | $ - | $ 241 | $ 241 |
| 2051 | 30.5 | 27 | 0.6687 | $ - | $ - | $ - | $ - | $ 237 | $ 237 |
| 2052 | 31.5 | 28 | 0.6586 | $ - | $ - | $ - | $ - | $ 233 | $ 233 |
| 2053 | 32.5 | 29 | 0.6487 | $ - | $ - | $ - | $ - | $ 228 | $ 228 |
| 2054 | 33.5 | 30 | 0.6389 | $ - | $ - | $ - | $ - | $ 224 | $ 224 |
| 2055 | 34.5 | 31 | 0.6193 | $ - | $ - | $ - | $ - | $ 216 | $ 216 |
| 2056 | 35.5 | 32 | 0.6097 | $ - | $ - | $ - | $ - | $ 212 | $ 212 |
| 2057 | 36.5 | 33 | 0.6002 | $ - | $ - | $ - | $ - | $ 208 | $ 208 |
| 2058 | 37.5 | 34 | 0.5908 | $ - | $ - | $ - | $ - | $ 204 | $ 204 |
| 2059 | 38.5 | 35 | 0.5816 | $ - | $ - | $ - | $ - | $ 200 | $ 200 |
| 2060 | 39.5 | 36 | 0.5725 | $ - | $ - | $ - | $ - | $ 197 | $ 197 |
| 2061 | 40.5 | 37 | 0.5636 | $ - | $ - | $ - | $ - | $ 193 | $ 193 |
| 2062 | 41.5 | 38 | 0.5548 | $ - | $ - | $ - | $ - | $ 189 | $ 189 |
| 2063 | 42.5 | 39 | 0.5462 | $ - | $ - | $ - | $ - | $ 185 | $ 185 |
| 2064 | 43.5 | 40 | 0.5377 | $ - | $ - | $ - | $ - | $ 182 | $ 182 |
| 2065 | 44.5 | 41 | 0.5293 | $ - | $ - | $ - | $ - | $ 178 | $ 178 |
| 2066 | 45.5 | 42 | 0.5210 | $ - | $ - | $ - | $ - | $ 175 | $ 175 |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J█████ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Diapers/Pull-ups | Gloves | Wipes | Chux Pads | Pediatrician/Physical Medicine and Rehabilitation Physician Evaluation, Treatment and Monitoring | Neurology Evaluation, Monitoring, and Treatment |
| 2067 | 46.5 | 43 | 0.5129 | $ - | $ - | $ - | $ - | $ 172 | $ 172 |
| 2068 | 47.5 | 44 | 0.5049 | $ - | $ - | $ - | $ - | $ 168 | $ 168 |
| 2069 | 48.5 | 45 | 0.4971 | $ - | $ - | $ - | $ - | $ 165 | $ 165 |
| 2070 | 49.5 | 46 | 0.4893 | $ - | $ - | $ - | $ - | $ 162 | $ 162 |
| 2071 | 50.5 | 47 | 0.4817 | $ - | $ - | $ - | $ - | $ 159 | $ 159 |
| 2072 | 51.5 | 48 | 0.4742 | $ - | $ - | $ - | $ - | $ 156 | $ 156 |
| 2073 | 52.5 | 49 | 0.4668 | $ - | $ - | $ - | $ - | $ 153 | $ 153 |
| 2074 | 53.5 | 50 | 0.4595 | $ - | $ - | $ - | $ - | $ 150 | $ 150 |
| 2075 | 54.5 | 51 | 0.4523 | $ - | $ - | $ - | $ - | $ 147 | $ 147 |
| 2076 | 55.5 | 52 | 0.4453 | $ - | $ - | $ - | $ - | $ 144 | $ 144 |
| 2077 | 56.5 | 53 | 0.4384 | $ - | $ - | $ - | $ - | $ 142 | $ 142 |
| 2078 | 57.5 | 54 | 0.4315 | $ - | $ - | $ - | $ - | $ 139 | $ 139 |
| 2079 | 58.5 | 55 | 0.4248 | $ - | $ - | $ - | $ - | $ 136 | $ 136 |
| 2080 | 59.5 | 56 | 0.4182 | $ - | $ - | $ - | $ - | $ 134 | $ 134 |
| 2081 | 60.5 | 57 | 0.4117 | $ - | $ - | $ - | $ - | $ 131 | $ 131 |
| 2082 | 61.5 | 58 | 0.4052 | $ - | $ - | $ - | $ - | $ 129 | $ 129 |
| 2083 | 62.5 | 59 | 0.3989 | $ - | $ - | $ - | $ - | $ 126 | $ 126 |
| 2084 | 63.5 | 60 | 0.3927 | $ - | $ - | $ - | $ - | $ 124 | $ 124 |
| 2085 | 64.5 | 61 | 0.3866 | $ - | $ - | $ - | $ - | $ 121 | $ 121 |
| 2086 | 65.5 | 62 | 0.3806 | $ - | $ - | $ - | $ - | $ 119 | $ 119 |
| 2087 | 66.5 | 63 | 0.3746 | $ - | $ - | $ - | $ - | $ 117 | $ 117 |
| 2088 | 67.5 | 64 | 0.3688 | $ - | $ - | $ - | $ - | $ 115 | $ 115 |
| 2089 | 68.5 | 65 | 0.3630 | $ - | $ - | $ - | $ - | $ 112 | $ 112 |
| 2090 | 69.5 | 66 | 0.3574 | $ - | $ - | $ - | $ - | $ 110 | $ 110 |
| 2091 | 70.5 | 67 | 0.3518 | $ - | $ - | $ - | $ - | $ 108 | $ 108 |
| 2092 | 71.5 | 68 | 0.3463 | $ - | $ - | $ - | $ - | $ 106 | $ 106 |
| 2093 | 72.5 | 69 | 0.3409 | $ - | $ - | $ - | $ - | $ 104 | $ 104 |
| 2094 | 73.5 | 70 | 0.3356 | $ - | $ - | $ - | $ - | $ 102 | $ 102 |
| 2095 | 74.5 | 71 | 0.3304 | $ - | $ - | $ - | $ - | $ 100 | $ 100 |
| 2096 | 75.5 | 72 | 0.3252 | $ - | $ - | $ - | $ - | $ 98 | $ 98 |
| 2097 | 76.5 | 73 | 0.3202 | $ - | $ - | $ - | $ - | $ 96 | $ 96 |
| 2098 | 77.5 | 74 | 0.3152 | $ - | $ - | $ - | $ - | $ 74 | $ 74 |
| | | | | $ 4,917 | $ 6,451 | $ 12,764 | $ 676 | $ 15,802 | $ 15,802 |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment | Dental Evaluation, Monitoring and Treatment | CT-Scan Head and Brain | MRI Brain | Physical Therapy Evaluation, Monitoring and Treatment | Occupational Therapy Evaluation, Monitoring and Treatment |
| 2024 | 3.5 | 0 | 1.0000 | $ - | $ 185 | $ 2,129 | $ 3,160 | $ 705 | $ 705 |
| 2025 | 4.5 | 1 | 0.9891 | $ - | $ - | $ - | $ - | $ 8,600 | $ 8,600 |
| 2026 | 5.5 | 2 | 0.9676 | $ 1,561 | $ - | $ - | $ - | $ 8,361 | $ 8,361 |
| 2027 | 6.5 | 3 | 0.9553 | $ - | $ - | $ - | $ - | $ 8,203 | $ 8,203 |
| 2028 | 7.5 | 4 | 0.9524 | $ - | $ 182 | $ - | $ - | $ 8,127 | $ 8,127 |
| 2029 | 8.5 | 5 | 0.9392 | $ - | $ - | $ - | $ - | $ 7,964 | $ 7,964 |
| 2030 | 9.5 | 6 | 0.9190 | $ - | $ - | $ - | $ - | $ 7,744 | $ 7,744 |
| 2031 | 10.5 | 7 | 0.9050 | $ - | $ - | $ - | $ - | $ 7,578 | $ 7,578 |
| 2032 | 11.5 | 8 | 0.8935 | $ 1,411 | $ 177 | $ - | $ - | $ 7,436 | $ 7,436 |
| 2033 | 12.5 | 9 | 0.8802 | $ - | $ - | $ - | $ - | $ 7,279 | $ 7,279 |
| 2034 | 13.5 | 10 | 0.8671 | $ - | $ - | $ - | $ - | $ 7,126 | $ 7,126 |
| 2035 | 14.5 | 11 | 0.8565 | $ - | $ - | $ - | $ - | $ 6,995 | $ 6,995 |
| 2036 | 15.5 | 12 | 0.8440 | $ - | $ - | $ - | $ - | $ 6,849 | $ 6,849 |
| 2037 | 16.5 | 13 | 0.8316 | $ - | $ - | $ - | $ - | $ 6,707 | $ 6,707 |
| 2038 | 17.5 | 14 | 0.8194 | $ 1,267 | $ - | $ - | $ - | $ 6,567 | $ 6,567 |
| 2039 | 18.5 | 15 | 0.8074 | $ - | $ - | $ - | $ - | $ 6,431 | $ 6,431 |
| 2040 | 19.5 | 16 | 0.7956 | $ - | $ - | $ - | $ - | $ 6,297 | $ 6,297 |
| 2041 | 20.5 | 17 | 0.7840 | $ - | $ - | $ - | $ - | $ 6,166 | $ 6,166 |
| 2042 | 21.5 | 18 | 0.7725 | $ - | $ - | $ - | $ - | $ 3,119 | $ 3,119 |
| 2043 | 22.5 | 19 | 0.7612 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2044 | 23.5 | 20 | 0.7500 | $ 1,135 | $ - | $ - | $ - | $ - | $ - |
| 2045 | 24.5 | 21 | 0.7325 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2046 | 25.5 | 22 | 0.7214 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2047 | 26.5 | 23 | 0.7106 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2048 | 27.5 | 24 | 0.6999 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2049 | 28.5 | 25 | 0.6893 | $ - | $ - | $ 2,716 | $ 4,032 | $ - | $ - |
| 2050 | 29.5 | 26 | 0.6789 | $ 1,006 | $ - | $ - | $ - | $ - | $ - |
| 2051 | 30.5 | 27 | 0.6687 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2052 | 31.5 | 28 | 0.6586 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2053 | 32.5 | 29 | 0.6487 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2054 | 33.5 | 30 | 0.6389 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2055 | 34.5 | 31 | 0.6193 | $ 902 | $ - | $ - | $ - | $ - | $ - |
| 2056 | 35.5 | 32 | 0.6097 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2057 | 36.5 | 33 | 0.6002 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2058 | 37.5 | 34 | 0.5908 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2059 | 38.5 | 35 | 0.5816 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2060 | 39.5 | 36 | 0.5725 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2061 | 40.5 | 37 | 0.5636 | $ 803 | $ - | $ - | $ - | $ - | $ - |
| 2062 | 41.5 | 38 | 0.5548 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2063 | 42.5 | 39 | 0.5462 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2064 | 43.5 | 40 | 0.5377 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2065 | 44.5 | 41 | 0.5293 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2066 | 45.5 | 42 | 0.5210 | $ - | $ - | $ - | $ - | $ - | $ - |

**Summary of Life Care Plan Costs (Net Present Value)**                                          **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | 7 Neuropsychological / Neurodevelopmental Evaluation, Monitoring, Treatment | 8 Dental Evaluation, Monitoring and Treatment | 9 CT-Scan Head and Brain | 10 MRI Brain | 11 Physical Therapy Evaluation, Monitoring and Treatment | 12 Occupational Therapy Evaluation, Monitoring and Treatment |
|---|---|---|---|---|---|---|---|---|---|
| 2067 | 46.5 | 43 | 0.5129 | $ 716 | $ - | $ - | $ - | $ - | $ - |
| 2068 | 47.5 | 44 | 0.5049 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2069 | 48.5 | 45 | 0.4971 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2070 | 49.5 | 46 | 0.4893 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2071 | 50.5 | 47 | 0.4817 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2072 | 51.5 | 48 | 0.4742 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2073 | 52.5 | 49 | 0.4668 | $ 637 | $ - | $ - | $ - | $ - | $ - |
| 2074 | 53.5 | 50 | 0.4595 | $ - | $ - | $ 3,351 | $ 4,974 | $ - | $ - |
| 2075 | 54.5 | 51 | 0.4523 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2076 | 55.5 | 52 | 0.4453 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2077 | 56.5 | 53 | 0.4384 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2078 | 57.5 | 54 | 0.4315 | $ 579 | $ - | $ - | $ - | $ - | $ - |
| 2079 | 58.5 | 55 | 0.4248 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2080 | 59.5 | 56 | 0.4182 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2081 | 60.5 | 57 | 0.4117 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2082 | 61.5 | 58 | 0.4052 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2083 | 62.5 | 59 | 0.3989 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2084 | 63.5 | 60 | 0.3927 | $ 516 | $ - | $ - | $ - | $ - | $ - |
| 2085 | 64.5 | 61 | 0.3866 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2086 | 65.5 | 62 | 0.3806 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2087 | 66.5 | 63 | 0.3746 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2088 | 67.5 | 64 | 0.3688 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2089 | 68.5 | 65 | 0.3630 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2090 | 69.5 | 66 | 0.3574 | $ 459 | $ - | $ - | $ - | $ - | $ - |
| 2091 | 70.5 | 67 | 0.3518 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2092 | 71.5 | 68 | 0.3463 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2093 | 72.5 | 69 | 0.3409 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2094 | 73.5 | 70 | 0.3356 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2095 | 74.5 | 71 | 0.3304 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2096 | 75.5 | 72 | 0.3252 | $ 205 | $ - | $ - | $ - | $ - | $ - |
| 2097 | 76.5 | 73 | 0.3202 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2098 | 77.5 | 74 | 0.3152 | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ 11,197 | $ 544 | $ 8,196 | $ 12,166 | $ 128,254 | $ 128,254 |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | 13 Speech Therapy Evaluation, Monitoring and Treatment | 14 Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | 15 Hair replacement evaluation, monitoring and treatment | 16 Augmentative communication evaluation, monitoring and treatment | 17 Tutoring (Age 6 - 12) | 18 Tutoring (Age 12 - 15) | 19 Tutoring (Age 15 - 22) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2024 | 3.5 | 0 | 1.0000 | $ 1,410 | $ 825 | $ - | $ - | $ - | $ - | $ - |
| 2025 | 4.5 | 1 | 0.9891 | $ 17,201 | $ 1,622 | $ - | $ - | $ - | $ - | $ - |
| 2026 | 5.5 | 2 | 0.9676 | $ 16,722 | $ 1,577 | $ - | $ 215 | $ - | $ - | $ - |
| 2027 | 6.5 | 3 | 0.9553 | $ 16,406 | $ - | $ - | $ - | $ 163 | $ - | $ - |
| 2028 | 7.5 | 4 | 0.9524 | $ 16,253 | $ - | $ - | $ - | $ 2,025 | $ - | $ - |
| 2029 | 8.5 | 5 | 0.9392 | $ 15,928 | $ - | $ - | $ - | $ 2,010 | $ - | $ - |
| 2030 | 9.5 | 6 | 0.9190 | $ 15,488 | $ - | $ - | $ - | $ 1,980 | $ - | $ - |
| 2031 | 10.5 | 7 | 0.9050 | $ 15,157 | $ - | $ - | $ - | $ 1,963 | $ - | $ - |
| 2032 | 11.5 | 8 | 0.8935 | $ 14,871 | $ - | $ - | $ 191 | $ 1,951 | $ - | $ - |
| 2033 | 12.5 | 9 | 0.8802 | $ 14,558 | $ - | $ - | $ - | $ 1,779 | $ 336 | $ - |
| 2034 | 13.5 | 10 | 0.8671 | $ 14,251 | $ - | $ - | $ - | $ - | $ 4,139 | $ - |
| 2035 | 14.5 | 11 | 0.8565 | $ 13,990 | $ - | $ - | $ - | $ - | $ 4,116 | $ - |
| 2036 | 15.5 | 12 | 0.8440 | $ 13,699 | $ - | $ - | $ - | $ - | $ 3,754 | $ 537 |
| 2037 | 16.5 | 13 | 0.8316 | $ 13,414 | $ - | $ - | $ - | $ - | $ - | $ 6,613 |
| 2038 | 17.5 | 14 | 0.8194 | $ 13,135 | $ - | $ - | $ 169 | $ - | $ - | $ 6,560 |
| 2039 | 18.5 | 15 | 0.8074 | $ 12,861 | $ - | $ - | $ - | $ - | $ - | $ 6,508 |
| 2040 | 19.5 | 16 | 0.7956 | $ 12,594 | $ - | $ - | $ - | $ - | $ - | $ 6,455 |
| 2041 | 20.5 | 17 | 0.7840 | $ 12,332 | $ - | $ - | $ - | $ - | $ - | $ 6,404 |
| 2042 | 21.5 | 18 | 0.7725 | $ 6,239 | $ - | $ - | $ - | $ - | $ - | $ 6,352 |
| 2043 | 22.5 | 19 | 0.7612 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,794 |
| 2044 | 23.5 | 20 | 0.7500 | $ - | $ - | $ - | $ 149 | $ - | $ - | $ - |
| 2045 | 24.5 | 21 | 0.7325 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2046 | 25.5 | 22 | 0.7214 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2047 | 26.5 | 23 | 0.7106 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2048 | 27.5 | 24 | 0.6999 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2049 | 28.5 | 25 | 0.6893 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2050 | 29.5 | 26 | 0.6789 | $ - | $ - | $ - | $ 130 | $ - | $ - | $ - |
| 2051 | 30.5 | 27 | 0.6687 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2052 | 31.5 | 28 | 0.6586 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2053 | 32.5 | 29 | 0.6487 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2054 | 33.5 | 30 | 0.6389 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2055 | 34.5 | 31 | 0.6193 | $ - | $ - | $ - | $ 115 | $ - | $ - | $ - |
| 2056 | 35.5 | 32 | 0.6097 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2057 | 36.5 | 33 | 0.6002 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2058 | 37.5 | 34 | 0.5908 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2059 | 38.5 | 35 | 0.5816 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2060 | 39.5 | 36 | 0.5725 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2061 | 40.5 | 37 | 0.5636 | $ - | $ - | $ - | $ 101 | $ - | $ - | $ - |
| 2062 | 41.5 | 38 | 0.5548 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2063 | 42.5 | 39 | 0.5462 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2064 | 43.5 | 40 | 0.5377 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2065 | 44.5 | 41 | 0.5293 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2066 | 45.5 | 42 | 0.5210 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Speech Therapy Evaluation, Monitoring and Treatment | Parent Child Interactive Therapy Evaluation, Monitoring and Treatment | Hair replacement evaluation, monitoring and treatment | Augmentative communication evaluation, monitoring and treatment | Tutoring (Age 6 - 12) | Tutoring (Age 12 - 15) | Tutoring (Age 15 - 22) |
| 2067 | 46.5 | 43 | 0.5129 | $ - | $ - | $ - | $ 88 | $ - | $ - | $ - |
| 2068 | 47.5 | 44 | 0.5049 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2069 | 48.5 | 45 | 0.4971 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2070 | 49.5 | 46 | 0.4893 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2071 | 50.5 | 47 | 0.4817 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2072 | 51.5 | 48 | 0.4742 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2073 | 52.5 | 49 | 0.4668 | $ - | $ - | $ - | $ 77 | $ - | $ - | $ - |
| 2074 | 53.5 | 50 | 0.4595 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2075 | 54.5 | 51 | 0.4523 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2076 | 55.5 | 52 | 0.4453 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2077 | 56.5 | 53 | 0.4384 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2078 | 57.5 | 54 | 0.4315 | $ - | $ - | $ - | $ 69 | $ - | $ - | $ - |
| 2079 | 58.5 | 55 | 0.4248 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2080 | 59.5 | 56 | 0.4182 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2081 | 60.5 | 57 | 0.4117 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2082 | 61.5 | 58 | 0.4052 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2083 | 62.5 | 59 | 0.3989 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2084 | 63.5 | 60 | 0.3927 | $ - | $ - | $ - | $ 61 | $ - | $ - | $ - |
| 2085 | 64.5 | 61 | 0.3866 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2086 | 65.5 | 62 | 0.3806 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2087 | 66.5 | 63 | 0.3746 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2088 | 67.5 | 64 | 0.3688 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2089 | 68.5 | 65 | 0.3630 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2090 | 69.5 | 66 | 0.3574 | $ - | $ - | $ - | $ 53 | $ - | $ - | $ - |
| 2091 | 70.5 | 67 | 0.3518 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2092 | 71.5 | 68 | 0.3463 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2093 | 72.5 | 69 | 0.3409 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2094 | 73.5 | 70 | 0.3356 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2095 | 74.5 | 71 | 0.3304 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2096 | 75.5 | 72 | 0.3252 | $ - | $ - | $ - | $ 47 | $ - | $ - | $ - |
| 2097 | 76.5 | 73 | 0.3202 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2098 | 77.5 | 74 | 0.3152 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ 256,508 | $ 4,023 | $ - | $ 1,464 | $ 11,871 | $ 12,344 | $ 45,223 |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 20 | 21 | 22 | 23 | 24 | 25 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Case Management | Vocational / Avocational Evaluation | In Home Care (current age to Age 6) | In Home Care (Age 6 - 22) | Adult Home Care (Option 1): In Home Care | Adult Home Care (Option 2): Adult Family Home | Total |
| 2024 | 3.5 | 0 | 1.0000 | $ 242 | $ - | $ 2,388 | $ - | $ - | $ - | $ 13,002 |
| 2025 | 4.5 | 1 | 0.9891 | $ 2,987 | $ - | $ 29,266 | $ - | $ - | $ - | $ 74,764 |
| 2026 | 5.5 | 2 | 0.9676 | $ 2,942 | $ - | $ 28,581 | $ - | $ - | $ - | $ 74,560 |
| 2027 | 6.5 | 3 | 0.9553 | $ 2,924 | $ - | $ 14,553 | $ 28,800 | $ - | $ - | $ 85,308 |
| 2028 | 7.5 | 4 | 0.9524 | $ 2,935 | $ - | $ - | $ 59,299 | $ - | $ - | $ 102,883 |
| 2029 | 8.5 | 5 | 0.9392 | $ 2,913 | $ - | $ - | $ 58,376 | $ - | $ - | $ 98,477 |
| 2030 | 9.5 | 6 | 0.9190 | $ 2,870 | $ - | $ - | $ 57,023 | $ - | $ - | $ 93,551 |
| 2031 | 10.5 | 7 | 0.9050 | $ 2,845 | $ - | $ - | $ 56,056 | $ - | $ - | $ 91,866 |
| 2032 | 11.5 | 8 | 0.8935 | $ 2,828 | $ - | $ - | $ 55,250 | $ - | $ - | $ 92,228 |
| 2033 | 12.5 | 9 | 0.8802 | $ 2,805 | $ - | $ - | $ 54,332 | $ - | $ - | $ 89,033 |
| 2034 | 13.5 | 10 | 0.8671 | $ 2,781 | $ - | $ - | $ 53,430 | $ - | $ - | $ 89,505 |
| 2035 | 14.5 | 11 | 0.8565 | $ 2,766 | $ - | $ - | $ 52,687 | $ - | $ - | $ 88,190 |
| 2036 | 15.5 | 12 | 0.8440 | $ 2,744 | $ - | $ - | $ 51,825 | $ - | $ - | $ 86,887 |
| 2037 | 16.5 | 13 | 0.8316 | $ 2,722 | $ - | $ - | $ 50,978 | $ - | $ - | $ 87,759 |
| 2038 | 17.5 | 14 | 0.8194 | $ 2,700 | $ - | $ - | $ 50,144 | $ - | $ - | $ 87,717 |
| 2039 | 18.5 | 15 | 0.8074 | $ 2,678 | $ - | $ - | $ 49,324 | $ - | $ - | $ 84,829 |
| 2040 | 19.5 | 16 | 0.7956 | $ 2,657 | $ - | $ - | $ 48,517 | $ - | $ - | $ 83,403 |
| 2041 | 20.5 | 17 | 0.7840 | $ 2,635 | $ - | $ - | $ 47,724 | $ - | $ - | $ 82,002 |
| 2042 | 21.5 | 18 | 0.7725 | $ 2,614 | $ - | $ - | $ 46,943 | $ - | $ - | $ 68,953 |
| 2043 | 22.5 | 19 | 0.7612 | $ 2,593 | $ - | $ - | $ 23,857 | $ 66,696 | $ 25,584 | $ 125,079 |
| 2044 | 23.5 | 20 | 0.7500 | $ 2,572 | $ 1,179 | $ - | $ - | $ 135,735 | $ 52,685 | $ 194,000 |
| 2045 | 24.5 | 21 | 0.7325 | $ 2,529 | $ - | $ - | $ - | $ 132,328 | $ 51,972 | $ 187,359 |
| 2046 | 25.5 | 22 | 0.7214 | $ 2,508 | $ - | $ - | $ - | $ 130,107 | $ 51,706 | $ 184,841 |
| 2047 | 26.5 | 23 | 0.7106 | $ 2,486 | $ - | $ - | $ - | $ 127,923 | $ 51,442 | $ 182,362 |
| 2048 | 27.5 | 24 | 0.6999 | $ 2,465 | $ - | $ - | $ - | $ 125,777 | $ 51,179 | $ 179,922 |
| 2049 | 28.5 | 25 | 0.6893 | $ 2,444 | $ - | $ - | $ - | $ 123,666 | $ 50,918 | $ 184,267 |
| 2050 | 29.5 | 26 | 0.6789 | $ 2,424 | $ - | $ - | $ - | $ 121,590 | $ 50,657 | $ 176,290 |
| 2051 | 30.5 | 27 | 0.6687 | $ 2,403 | $ - | $ - | $ - | $ 119,550 | $ 50,398 | $ 172,825 |
| 2052 | 31.5 | 28 | 0.6586 | $ 2,383 | $ - | $ - | $ - | $ 117,543 | $ 50,141 | $ 170,532 |
| 2053 | 32.5 | 29 | 0.6487 | $ 2,363 | $ - | $ - | $ - | $ 115,571 | $ 49,885 | $ 168,275 |
| 2054 | 33.5 | 30 | 0.6389 | $ 2,343 | $ - | $ - | $ - | $ 113,631 | $ 49,630 | $ 166,052 |
| 2055 | 34.5 | 31 | 0.6193 | $ 2,286 | $ - | $ - | $ - | $ 109,957 | $ 48,595 | $ 162,287 |
| 2056 | 35.5 | 32 | 0.6097 | $ 2,266 | $ - | $ - | $ - | $ 108,055 | $ 48,321 | $ 159,066 |
| 2057 | 36.5 | 33 | 0.6002 | $ 2,245 | $ - | $ - | $ - | $ 106,186 | $ 48,049 | $ 156,897 |
| 2058 | 37.5 | 34 | 0.5908 | $ 2,225 | $ 1,020 | $ - | $ - | $ 104,349 | $ 47,779 | $ 155,781 |
| 2059 | 38.5 | 35 | 0.5816 | $ 2,205 | $ - | $ - | $ - | $ 102,544 | $ 47,510 | $ 152,660 |
| 2060 | 39.5 | 36 | 0.5725 | $ 2,185 | $ - | $ - | $ - | $ 100,771 | $ 47,242 | $ 150,591 |
| 2061 | 40.5 | 37 | 0.5636 | $ 2,166 | $ - | $ - | $ - | $ 99,028 | $ 46,976 | $ 149,459 |
| 2062 | 41.5 | 38 | 0.5548 | $ 2,146 | $ - | $ - | $ - | $ 97,315 | $ 46,711 | $ 146,551 |
| 2063 | 42.5 | 39 | 0.5462 | $ 2,127 | $ - | $ - | $ - | $ 95,632 | $ 46,448 | $ 144,578 |
| 2064 | 43.5 | 40 | 0.5377 | $ 2,108 | $ - | $ - | $ - | $ 93,978 | $ 46,187 | $ 142,637 |
| 2065 | 44.5 | 41 | 0.5293 | $ 2,089 | $ - | $ - | $ - | $ 92,352 | $ 45,927 | $ 140,725 |
| 2066 | 45.5 | 42 | 0.5210 | $ 2,070 | $ - | $ - | $ - | $ 90,755 | $ 45,668 | $ 138,844 |

**Summary of Life Care Plan Costs (Net Present Value)**    **Attachment 51**

J███ Grenier

**Assumptions:**

| | |
|---|---|
| Date of Birth | 7/7/2021 |
| Date of Valuation | 12/2/2024 |
| Discount Factor | Attachment 45 |

| | | | | 20 | 21 | 22 | 23 | 24 | 25 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age of Claimant | Years Ahead of 2024 | Discount Factor | Case Management | Vocational / Avocational Evaluation | In Home Care (current age to Age 6) | In Home Care (Age 6 - 22) | Adult Home Care (Option 1): In Home Care | Adult Home Care (Option 2): Adult Family Home | Total |
| 2067 | 46.5 | 43 | 0.5129 | $ 2,052 | $ - | $ - | $ - | $ 89,185 | $ 45,411 | $ 137,795 |
| 2068 | 47.5 | 44 | 0.5049 | $ 2,033 | $ - | $ - | $ - | $ 87,643 | $ 45,155 | $ 135,168 |
| 2069 | 48.5 | 45 | 0.4971 | $ 2,015 | $ - | $ - | $ - | $ 86,127 | $ 44,901 | $ 133,374 |
| 2070 | 49.5 | 46 | 0.4893 | $ 1,997 | $ - | $ - | $ - | $ 84,637 | $ 44,648 | $ 131,607 |
| 2071 | 50.5 | 47 | 0.4817 | $ 1,979 | $ - | $ - | $ - | $ 83,173 | $ 44,397 | $ 129,867 |
| 2072 | 51.5 | 48 | 0.4742 | $ 1,961 | $ 899 | $ - | $ - | $ 81,735 | $ 44,147 | $ 129,054 |
| 2073 | 52.5 | 49 | 0.4668 | $ 1,944 | $ - | $ - | $ - | $ 80,321 | $ 43,898 | $ 127,184 |
| 2074 | 53.5 | 50 | 0.4595 | $ 1,926 | $ - | $ - | $ - | $ 78,932 | $ 43,651 | $ 133,135 |
| 2075 | 54.5 | 51 | 0.4523 | $ 1,909 | $ - | $ - | $ - | $ 77,567 | $ 43,405 | $ 123,175 |
| 2076 | 55.5 | 52 | 0.4453 | $ 1,892 | $ - | $ - | $ - | $ 76,225 | $ 43,161 | $ 121,567 |
| 2077 | 56.5 | 53 | 0.4384 | $ 1,875 | $ - | $ - | $ - | $ 74,907 | $ 42,918 | $ 119,983 |
| 2078 | 57.5 | 54 | 0.4315 | $ 1,858 | $ - | $ - | $ - | $ 73,611 | $ 42,676 | $ 119,071 |
| 2079 | 58.5 | 55 | 0.4248 | $ 1,841 | $ - | $ - | $ - | $ 72,338 | $ 42,436 | $ 116,888 |
| 2080 | 59.5 | 56 | 0.4182 | $ 1,825 | $ - | $ - | $ - | $ 71,087 | $ 42,197 | $ 115,376 |
| 2081 | 60.5 | 57 | 0.4117 | $ 1,808 | $ - | $ - | $ - | $ 69,857 | $ 41,959 | $ 113,887 |
| 2082 | 61.5 | 58 | 0.4052 | $ 1,792 | $ - | $ - | $ - | $ 68,649 | $ 41,723 | $ 112,422 |
| 2083 | 62.5 | 59 | 0.3989 | $ 1,776 | $ - | $ - | $ - | $ 67,462 | $ 41,488 | $ 110,978 |
| 2084 | 63.5 | 60 | 0.3927 | $ 1,760 | $ - | $ - | $ - | $ 66,295 | $ 41,255 | $ 110,133 |
| 2085 | 64.5 | 61 | 0.3866 | $ 1,744 | $ - | $ - | $ - | $ 65,148 | $ 41,022 | $ 108,158 |
| 2086 | 65.5 | 62 | 0.3806 | $ 1,729 | $ 792 | $ - | $ - | $ 64,021 | $ 40,791 | $ 107,572 |
| 2087 | 66.5 | 63 | 0.3746 | $ 1,713 | $ - | $ - | $ - | $ 62,914 | $ 40,562 | $ 105,422 |
| 2088 | 67.5 | 64 | 0.3688 | $ 1,698 | $ - | $ - | $ - | $ 61,826 | $ 40,333 | $ 104,086 |
| 2089 | 68.5 | 65 | 0.3630 | $ 1,682 | $ - | $ - | $ - | $ 60,756 | $ 40,106 | $ 102,770 |
| 2090 | 69.5 | 66 | 0.3574 | $ 1,667 | $ - | $ - | $ - | $ 59,706 | $ 39,880 | $ 101,987 |
| 2091 | 70.5 | 67 | 0.3518 | $ 1,652 | $ - | $ - | $ - | $ 58,673 | $ 39,656 | $ 100,197 |
| 2092 | 71.5 | 68 | 0.3463 | $ 1,638 | $ - | $ - | $ - | $ 57,658 | $ 39,433 | $ 98,940 |
| 2093 | 72.5 | 69 | 0.3409 | $ 1,623 | $ - | $ - | $ - | $ 56,661 | $ 39,211 | $ 97,702 |
| 2094 | 73.5 | 70 | 0.3356 | $ 1,608 | $ - | $ - | $ - | $ 55,681 | $ 38,990 | $ 96,483 |
| 2095 | 74.5 | 71 | 0.3304 | $ 1,594 | $ - | $ - | $ - | $ 54,718 | $ 38,770 | $ 95,282 |
| 2096 | 75.5 | 72 | 0.3252 | $ 1,580 | $ - | $ - | $ - | $ 53,771 | $ 38,552 | $ 94,351 |
| 2097 | 76.5 | 73 | 0.3202 | $ 1,565 | $ - | $ - | $ - | $ 52,841 | $ 38,335 | $ 92,934 |
| 2098 | 77.5 | 74 | 0.3152 | $ 1,215 | $ - | $ - | $ - | $ 40,676 | $ 29,860 | $ 71,900 |
| | | | | $ 163,170 | $ 3,890 | $ 74,787 | $ 844,564 | ######### | ######### | $ 9,065,247 |

# Historical Growth Rates by Category
## 2003 - 2023

*Source:*
*U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index - All Urban Consumers, U.S. City Average, Not Seasonally Adjusted:*
*Wage Growth: Bureau of Labor Statistics, Current Employment Statistics Survey (CEU0500000030)*

*Compound Nominal Growth Rate calculated as:   [(Ending Index ÷ Beginning Index) (1 ÷ Number of Growth Years) ] - 1*

*Real Growth Rate calculated as: ((1 + Wage Growth Rate) ÷ (1 + Inflation Rate)) -1*

| Year | All Consumer Items | Physicians' Services | Other Medical Professionals' Care | Hospital Services | Nursing Homes and Adult Day Services | Medical Equipment and Supplies | Care of Invalids and Elderly at Home | Dental Services | Wages |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | 184.0 | 267.7 | 177.1 | 144.7 | 135.2 | | | 292.5 | 517.65 |
| 2004 | 188.9 | 278.3 | 181.9 | 153.4 | 140.4 | | | 306.9 | 528.65 |
| 2005 | 195.3 | 287.5 | 186.8 | 161.6 | 145.0 | | 100.0 | 324.0 | 543.91 |
| 2006 | 201.6 | 291.9 | 192.2 | 172.1 | 151.0 | | 101.8 | 340.9 | 567.00 |
| 2007 | 207.3 | 303.2 | 197.4 | 183.6 | 159.6 | | 103.2 | 358.4 | 589.09 |
| 2008 | 215.3 | 311.3 | 205.5 | 197.2 | 165.3 | | 107.9 | 376.9 | 601.10 |
| 2009 | 214.5 | 320.8 | 209.8 | 210.7 | 171.6 | 100.0 | 109.9 | 388.1 | 615.82 |
| 2010 | 218.1 | 331.3 | 214.4 | 227.2 | 177.0 | 99.1 | 111.3 | 398.8 | 635.86 |
| 2011 | 224.9 | 340.3 | 217.4 | 241.2 | 182.2 | 99.3 | 113.1 | 408.0 | 652.75 |
| 2012 | 229.6 | 347.3 | 219.6 | 253.6 | 188.8 | 100.6 | 114.5 | 417.5 | 665.56 |
| 2013 | 233.0 | 354.2 | 223.3 | 265.4 | 194.5 | 101.0 | 115.1 | 431.8 | 677.62 |
| 2014 | 236.7 | 359.1 | 226.4 | 278.8 | 200.1 | 100.5 | 116.7 | 441.0 | 694.74 |
| 2015 | 237.0 | 366.1 | 228.2 | 290.1 | 206.4 | 99.7 | 117.9 | 452.2 | 708.73 |
| 2016 | 240.0 | 378.1 | 231.0 | 303.3 | 213.7 | 99.3 | 120.6 | 465.0 | 723.20 |
| 2017 | 245.1 | 380.1 | 236.6 | 318.2 | 220.3 | 99.6 | 119.6 | 472.6 | 742.42 |
| 2018 | 251.1 | 380.5 | 237.4 | 332.2 | 227.8 | 100.2 | 120.8 | 485.5 | 767.01 |
| 2019 | 255.7 | 383.2 | 239.2 | 338.8 | 235.3 | 102.2 | 124.2 | 496.2 | 790.64 |
| 2020 | 258.8 | 389.9 | 242.1 | 353.0 | 241.7 | 99.4 | 129.0 | 511.1 | 837.39 |
| 2021 | 271.0 | 406.5 | 247.9 | 363.5 | 249.6 | 96.2 | 138.5 | 522.5 | 886.54 |
| 2022 | 292.7 | 411.9 | 258.1 | 376.8 | 260.1 | 101.4 | 143.4 | 543.7 | 937.44 |
| 2023 | 304.7 | 412.9 | 258.7 | 392.1 | 273.8 | 109.3 | 152.6 | 574.3 | 979.95 |
| **Compound Nominal Growth** | 2.55% | 2.19% | 1.91% | 5.11% | 3.59% | 0.64% | 2.38% | 3.43% | 3.24% |
| **Real Growth Rate** | 0.00% | -0.35% | -0.63% | 2.49% | 1.01% | -1.87% | -0.17% | 0.86% | 0.67% |
| *BLS Series ID #* | CUUR0000SA0 | CUUR0000SEMC01 | CUUR0000SEMC04 | CUUR0000SEMD01 | CUUR0000SEMD02 | CUUR0000SEMG | CUUR0000SEMD03 | CUUR0000SEMC02 | CEU0500000030 |

## MUELLER* & PARTIN, INC.
### Forensic Accountants and Economists

816 EVERGREEN POINT ROAD
P.O. BOX 882
MEDINA, WASHINGTON 98039

PHONE:          (425) 455-0303
FACSIMILE:      (425) 455-5176
EMAIL: partin@muellerpartin.com

*Gary E. Mueller - Retired

## WILLIAM E. PARTIN CPA/ABV/MAFF/CFE

Certified Public Accountant
Accredited In Business Valuation
Master Analyst in Financial Forensics
Certified Fraud Examiner

## EXPERIENCE:

October 1, 1984
to Present

Mr. Partin formed the consulting and accounting firm of Mueller & Partin as a Partner on October 1, 1984. Mueller & Partin is a firm specializing in economic analysis, financial investigations and business valuations. Mr. Partin provides expert testimony as required. Mr. Partin also serves as an appraiser and umpire in insurance disputes and as an arbitrator in commercial litigation involving complex financial and economic issues. Mr. Partin has been engaged as an expert to analyze over 7,000 damage claims over the past 30 years and has extensive experience testifying in matters involving a variety of economic issues over the course of his career. Mr. Partin has testified regarding the following types of damage claims:

- Business Valuations
- Patent Infringement
- Copyright/Trademark Infringement
- Breach of Contract
- Business Income Losses
- Construction Defect Claims
- Land Use/Permit Claims
- Construction Delay and Impact Analysis
- Property Losses

William E. Partin
Page 2 of 4

- Personal Injury
- Fidelity
- Contract Surety
- Proof of Economic Motive
- RICO Investigations
- Antitrust

Mr. Partin has served as an expert witness and appraiser in a variety of situations involving tracing financial transactions, documentation of illegal income, and the valuation of businesses, property, and future earnings potential.

August 1976 to
October 1984

### Laventhol & Horwath, Certified Public Accountants

Mr. Partin was the Manager and Department Head of the firm's Northwest Division of Management Advisory Services. As a consultant with an international firm, Mr. Partin's diversified experience included:

- Accounting problems in specialized areas,

- Valuation of income producing properties,

- Valuation of business enterprises for mergers and acquisitions,

- Financial projections for businesses in various industries,

- Market supply and demand analysis,

- Feasibility studies for large scale real estate developments,

- Analysis, evaluation and interpretation of the effect of business transactions and decisions as an expert witness in litigation matters ranging from major antitrust issues to small civil matters,

- Evaluation of organization structures and implementation of recommended structural reorganization in a variety of businesses in different industries.

William E. Partin
Page 3 of 4

June 1973 to
August 1976

<u>Weyerhaeuser Company, Wood Products Division</u>

At Weyerhaeuser, Mr. Partin was a participant in its Management Development Program. He held various management positions in operations at lumber and plywood manufacturing facilities.

## GENERAL:

Mr. Partin has served as guest speaker for a variety of professional associations, addressing topics covering insurance claims, business valuation, income loss measurement and proof of damages in  a litigation setting. In addition, he has contributed to the following publications:

- Insurance Adjuster Magazine

- Seattle Claim Adjusters Newsletter

- Tacoma/Pierce County Claims Adjusters Newsletters

Mr.  Partin was appointed to a three-year term to serve on the American Institute of Certified Public Accountant's Management Advisory Services Practice Standards and Administration  Committee. The committee is responsible for the establishment of  quality standards for consulting  engagements.  Such standards  govern the practice of the accounting profession.

## EDUCATION:

Washington State University
Bachelor of Arts, Major Economics, Minor Finance

Seattle University
Graduate studies in finance, accounting and economics

## CERTIFICATION:

Certified Public Accountant

William E. Partin
Page 4 of 4

American Society of Appraisers: Business Valuation Levels 1, 2, 3 & 4

Accredited in Business Valuation by the American Institute of Certified Public Accountants

Master Analyst in Financial Forensics

Certified Fraud Examiner

## ORGANIZATIONS:

Washington Society of Certified Public Accountants

American Institute of Certified Public Accountants

National Association of Forensic Economists

American Society of Appraisers

Association of Certified Fraud Examiners

**Attachment 53**

# MUELLER* & PARTIN, INC.

**Forensic Accountants and Economists**

816 EVERGREEN POINT ROAD
P.O. BOX 882
MEDINA, WASHINGTON 98039

PHONE:          (425) 455-0303
FACSIMILE:      (425) 455-5176
EMAIL:partin@muellerpartin.com

*Gary E. Mueller - Retired

William E. Partin C.P.A. is the President of the accounting firm of Mueller & Partin Forensic Accountants and Forensic Economists where his practice is the economic analysis of damage claims in disputes involving personal injury, wrongful death, business income losses and business valuations. Mr. Partin is a member of the American Institute of Certified Public Accountants, the National Association of Forensic Economists, the Washington Society of Certified Public Accountants and the American Society of Appraisers. Mr. Partin has been qualified as an expert witness in the fields of economics, business valuation and accounting. He has testified in numerous states regarding damage measurement issues. Mr. Partin has provided seminars to the insurance industry on measurement of economic damages as well as published articles concerning the framework for the measurement of business income losses. He received his Bachelor's Degree in Business Administration. from Washington State University and has been practicing since 1976.

## MUELLER* & PARTIN, INC.

**Forensic Accountants and Economists**

816 EVERGREEN POINT ROAD
P.O. BOX 882
MEDINA, WASHINGTON 98039

*Gary E. Mueller - Retired

PHONE:        (425) 455-0303
FACSIMILE:    (425) 455-5176
EMAIL:partin@muellerpartin.com

**Publications of William E. Partin:**

As a member of the MAS Practice Standards and Administration Subcommittee of the American Society of Certified Public Accountants, Mr. Partin was co-author of the following publications:

*"Comparing Attest and Management Advisory Services: A Guide For The Practitioner"*. *A Management Advisory Services Special Report* - American Institute of Certified Public Accountants, 1988.

*"Written Communication Of Results In MAS Engagements"*. *Management Advisory Services Practice Aids (3)* - American Institute of Certified Public Accountants, 1987.

*"Starting And Developing an MAS Practice"*. *Management Advisory Services Practice Aids (4)* - American Institute of Certified Public Accountants, 1988.

*"Communicating With Clients About MAS Engagement Understandings"*. *Management Advisory Services Practice Aids (5)* - American Institute of Certified Public Accountants, 1988.

Mr. Partin authored a series of articles published in *Insurance Adjuster* magazine, 1986.  These articles dealt with measurement of business income losses.

Mr. Partin has also authored materials for numerous continuing education programs regarding business income loss and wrongful death loss measurement.

*"Wrongful Death : Consideration for the Computation of Economic Damages"*
*1996. – Mueller & Partin, LLP, CPA's*

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| 13 Coins Restaurant v. Rubenstein's Contract Carpet | FEQ2916 | | | | | |
| 70 Fahrenheit, Inc v. Pine Street Onwer LP, Pine Street owner GP, LLC and Bayley Construction LP | | 17-2-25678-1 | Superior | | King | WA |
| 1000 Virginia Ltd Partnership v. Schmidt, et al | | 02-2-24612-5 SEA | Superior | | King | WA |
| 1501 First Avenue South Limited Partnership, Home Plate Center Limited Partnership v. Eric Branfman Revocable Trust, Xiaoyu Cai, Jiaqi Chen, Hong Dai, EJB Roth LLC, EJB Traditional LLC, Yuyan Fang, Rongxiang Feng, Jaime Micahel Fink Revocable Trust et al. | | 18-2-57132-4 | Superior | | King | WA |
| Abdu, Emun v. King County Hospital District No. 2 d/b/a Evergreen Hospital Medical Center | | | | | | |
| A.H. Lundberg Assoc. v. TSI, Inc | | 14-cv-01160-JLR | Federal | Western | | WA |
| Abner, James v. Providence Health & ServiCes | | 2:13-cv-00521 | Federal | Western | Seattle | WA |
| Abney v. Seattle Freight | M27-053562 | | | | | |
| Abreu-Field v. Stevens | | 04-2-8-38094-4 SEA | Superior | | King | WA |
| Abu-Alya; et al v. DHSH | | 14-2-12046-5 | Superior | | Pierce | WA |
| Ackenhausen v. Elton, et al | | | Superior | | Jefferson | WA |
| Ackerley v. Home Insurance | | 94-919-CIV-GRAHAM | District | Southern | | FL |
| Adams, Robert v. Harrison Medical Center | | 12-2-30581-1 SEA | Superior | | King | WA |
| Afoa, Brandon v. Port of Seattle | | 09-2-06657-4 KNT | Superior | | King | WA |
| Alavekios v. The Hartford | | | | | | |
| Albaugh v. Dotson | B110660 | | | | | |
| Albertsons v. AMEX | | 06-2-344988SEA | Superior | | King | WA |
| Aldridge v. Boatwright | | 93-2-00370-9 | | | | |
| Alef, Gail M.D. v. Fujishima, et al | | 99-2-26509-2SEA | | | | |
| Alex, Charity v. State of Washington, Washington State Patrol, Justy Jean Davidson | | | Superior | | Whatcom | WA |
| Alexx, Inc. v. Charm Zone, Inc. | | | | | | |
| Aloha v. Boise Cascade | | | | | | |
| Aloha v. DaPaul (Manke) | | 94-2-03071-4 | Superior | | Thurston | WA |
| Aloha v. University of AK | | | | | | |
| Aloha v. Willis | | 92-2-450-6 | | | | |
| Alpharma NW, Inc. | | | | | | |
| Alt Foundation; et al v. Franco | | 16-2-14350-4 SEA | Superior | | King | WA |
| Aman, Feysal v. Webb, Michael and Otieno, Diana | | 14-2-23837-1 SEA | Superior | | King | WA |
| Amanda Pope and Rich Pope v. United States of America | | 3:17-cv-05868 | District | Western | Tacoma | WA |
| Amazon Fulfillment Services v. Central Freight Lines, Inc. | | | District | Central | | CA |
| American Treating Company (ATC) v. Amundson, Fred; Global Building Products; FSR Treatment; Blue Mountain Sales | | 2:12-cv-01276 | Federal | Western | Seattle | WA |
| America's Conservative Café v. Bennett, et al | | 01-2-05124-1 | Superior | | Pierce | WA |
| Amestoy, Lyndon v. Piper Aircraft, Inc., Jetprop LLC | | 16-2-04837-9 | Superior | | Spokane | WA |
| AMPCO v. City of Seattle | | | | | | |
| Amundson v. USA, US Dept. of Agriculture, Forest Service | | C03-03439-RSL | District | Western | Seattle | WA |
| Andemarian v. Morton | | | | | | |
| Andersen Construction Company v. Pryde Johnson 5711, LLC; Pryde Johnson 24th Ave, LLC; Curt A. Pryde; Fawn Johnson Pryde | | 16-2-30595-4SEA | Superior | | King | WA |
| Andersen, Scott; Lindsey Andersen; Chase Andersen; Emma Andersen; Chrisopher Posey; Parker Posey v. Boulton Insulation, Comcast Cable Communications, Cyprus Amaz Minerals Company, Cyprus Mines Corporation, Johnson & Johnson, J-M Manufacturing | | 20-2-06720-8 | Superior | | Pierce | WA |
| Anderson, Ellan & David v. Var, Harmanjit & Northwest Fr | | 09-2-11736-5SEA | Superior | | King | WA |
| Angelina, Estate of & Estate of Adam v. Augusta Aerospace Corp | | 2:10-cv-02460-RBS | District | Eastern | | PA |
| Anna Ream v. United States of America Department of the Army | | 2:17-cv-01141 | District | Western | | WA |
| Armacost v. Cunningham | | 97-2-00223-3 | Superior | | Clallam | WA |
| Arnold, Jerrol and Rebecca Arnold v. Swedish Health Services d/b/a Swedish Medical Center | | 20-2-07644-9 SEA | Superior | | King | WA |
| Arnold, Est of v. City of Shelton | | 16-2-00086-3 | Superior | | Mason | WA |
| ASF, Inc. v. City of Seattle | | CV05-0903JLR | | | | |
| Ashbaugh, David v. Foundation Bank | | None - Private Arbitration | | | | |
| Ashley, Rosario & Benny: Quigley, Pilar & David, Merckx, Duffy v. PFG Customized California | | 08-2-35879-8 KNT | Superior | | King | WA |
| Askervold v. Hattingh | | 05-2-37120-0 SEA | Superior | | King | WA |
| ATL Corporation & Davis, Bob (Principal) v.City of Seattle | | C09-1240RSL | District | Western | Seattle | WA |
| Aultman v. Blystone | | 04-2-09306-4 | Superior | | Snohomish | WA |
| Auvil-Handly, Patricia UIM | | 12-3435159 | Superior | | Pierce | WA |
| Bachman-Rhodes, Sara v. Cheney School District | | | Superior | | Spokane | WA |
| Bader's v. Hearthside Baking | | C 94-726R | District | Western | | WA |
| Baer; et al v. The Everett Clinic | | | | | | |
| Bahram Cohanim v. Aecon Group, Inc. | | 03-2-34870-8 SEA | District | Western | King | WA |
| Baker, Anneka v. The State of Washington | | 19-2-04927-34 | Superior | | Thurston | WA |
| Baker, Janet v. Washington Sports Medicine Associates, Inc, P.S., David Badger, John Does and Jane Does | | 18-2-19303-6 SEA | Superior | | King | WA |
| Baker Williams, B. a minor; Williams, Kim & Baker- Williams, Cynthia as Guardians v. Sampson, Georgian | | 10-2-13217-1 SEA | Superior | | King | WA |
| Balfour Place | | | | | | |
| Baltazar-Lorano v. Franklin Pierce S.D. | | 16-2-05466-3 | Superior | | Pierce | WA |
| Barfuss, Chris A.  Sr. v. H. Graeme French, MD, et al | | 03-2-00274-5 | Superior | | Whitman | WA |
| Barnum, Robert v. State of Washington (WSDOT) | | 08-2-00350-9 | Superior | | King | WA |
| Basra, Manminder Kaur v. State Farm; Tyndell | | 11-2-32963-1 | Superior | | King | WA |
| Basra, the Estate of Surinderpal K. v. Neudorfer Engineers; Emory Philip | | 13-2-23639-7 SEA | Superior | | King | WA |
| Bay Baby v. Logan-Zenner Seeds; et al | | 16-2-01518-5 | Superior | | Skagit | WA |

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Bayne, the Estate of Kenneth C. & McClister Bayne, Jeanette v. Hayes, John & Lisa | | 10-2-01532-1 | Superior | | Kitsap | WA |
| BDD v. MJM Construction, et al | | 02-2-12112-8 SEA | Superior | | King | WA |
| Beck, et al v. The Boeing Company | | C00-0301P | | | | |
| Behnke et al v. Ahrens et al | | 06-2-31638-0SEA | Superior | | King | WA |
| Behroub Shokri v. Boeing Company | | 2:16-cv-01132 RSM | | Western | Seattle | WA |
| Beilman-Stanley, Barbara | | 94-2-02905-9 | | | | |
| Bellevue Gardens, LLCD v. RAFN Company, et al | | 05-2-11109-7 | Superior | | King | WA |
| Benjamin, Harriet L. | 473040232 | 91-68387 | | | | |
| Bennett v. City of Lynnwood | | 16-2-02997-1 | Superior | | Snohomish | WA |
| Berg, Julia; Sandra Gollofon; Eda Lee; Phillip Haas; Susan Meyers v. Charles Schwab & Co., Inc.; Interactive Brokers LLC | | 21-02041 | | | | |
| Berg, The Estate of Brian v. Sherrod, Tyrone, Brown, T | | 11-2-10239-4 SEA | Superior | | King | WA |
| Berger v. Rognlin | | 04-2-755-7 | | | | |
| Bergrud, Cheryl; Estate of Peter Bergrud v. Mueller Co, Mueller Water Products, Bartells Asbestos Settlement Trust, Borgwarner Morse, Certainteed, Consolidated Supply, Clow Valve, Crown Cork & Seal, DBMP, General Electric, Genuine Parts, HD Fowler et al | | 19-2-16952-5 | Superior | | Pierce | WA |
| Bernier, Aaron and Bernier, Heidi v. Linda Henley, Providence Health & Services, Providence Senior & Community Services | | 18-2-04457-0 KNT | Superior | | King | WA |
| Besola v. Hinkhouse | | | | | | |
| Bethany  v. Newland | | 75-110-00079-00 | | | | |
| Bethlehem v. Scott Systems | | 08-2-00378-1 | Superior | | Chelan | WA |
| Bigler, Estate of Richard v. Virginia Mason; et al | | 15-2-05472-4 SEA | Superior | | King | WA |
| Bingham, Rodney v. City of Seattle; Yamane, Curtis | | 13-2-17191-1 SEA | Superior | | King | WA |
| Binschus, Gillum, Lange, Radcliffe, Rose Estates, et al v. Skagit County; State of Washington, et al | | 11-2-08078-0 | Superior | | Snohomish | WA |
| Bismuth v. VCI & Saytam | | 01-2-26431-1 SEA | Superior | | King | WA |
| Bjorkman, Jane v. King County | | 11-2-30693-3 SEA | Superior | | King | WA |
| Black  v.  Sound Heating | 1770640 | | | | | |
| Blackpine  v.  Woodstoves, Inc | | 99-2-07028-1 | | | | |
| Blake  v. Maxwell Aircraft; et al | | 27-CV-14-19403 | District | 4th Judicial | Hennepin | MN |
| Blayden, Robert E. v. Elbert, Michael | 248 823 6980 | 08-2-35200-5 KNT | Superior | | King | WA |
| Blaylock,Melissa v. Schwartz Brothers Restaurant; Bruce K. Greene | | 16-2-07043-4 SEA | Superior | | King | WA |
| Boguch v. Wendy Lister & Windemere Realty | | 07-2-08195-0 | Superior | | King | WA |
| Boileau, Jouhn v. Secreto, Sohng, Gregg | | 08-2-03736-3 SEA | Superior | | King | WA |
| Bolding, Kelly; Michael Manfredi v. Banner Bank | | 2:17-cv-0601-RSL | District | Western | | WA |
| Bostwick v. Ballard Marine | | 00-2-31211-3 SEA | Superior | | King | WA |
| Boton v. Cape San Lucas Fishing | | BC611978 | Superior | | Los Angeles | CA |
| Boucher, Ronald v. Ariana N. Lee | 37-697F-518 | 16-2-10763-5 | Superior | | Pierce | WA |
| Bradley, Brock; Allen, Gary v. City of Everett | | 03-2-09766-5 | Superior | | Snohomish | WA |
| Brager, Natilie v. Porcarelli | | | | | | |
| Brecher, Nancie G. v. Heffernan, Michael; Albert, Marvin H.; American State Ins Co. | | 15-2-04229-7 SEA | Superior | | King | WA |
| Brediger, Authur | 2487248078 SAW | | | | | |
| Brent Lindberg | 2486649292 | | | | | |
| Bricker v. Clark Co; et al | | 16-2-00253-0 | Superior | | Clark | WA |
| Bricker, Deanna  v. Little Rock Fire & Rescue & Thurston Co Fire Dept | | 07-2-01556-3 | Superior | | Thurston | WA |
| Brill v. Pfizer | | 01-2-17632-3 SEA | Superior | | King | WA |
| Bristol (The) at Southport v. Starline Windows, etc. | | 11-2-21741-8 | Superior | | King | WA |
| Brown v. Latitude Constructors | | 02-2-35906-0 SEA | Superior | | King | WA |
| Brown v. Reist / Simplex / Grinnell | | 04-2-02220-7 SEA | Superior | | King | WA |
| Brown, Kathleen for Estate of James Brown Jr., Stephen Brown, Kathryn Jan v. Providence Health & Services d/b/a Providence Regional Medical Center Everett, Everett Clinic, Davita Everett Physicians d/b/a The | | 18-2-18038-4 SEA | Superior | | King | WA |
| Brown, Kathy v. Marilyn Marty | | 08-2-07758-4 | Superior | | | |
| Brown's Restaurant v. Lynden Floor | 4501 2358 3015 | | | | | |
| Broyles, et al  v. Holm & Thurston County | | | Superior | | Mason | WA |
| Budget Tank & Environmental Services v. Seattle Insurance Agency | | 11-2-27448-9 SEA | Superior | | King | WA |
| Buholm, Terry v. Thomas Dunnon | | 09-2-03463-8 | | | | |
| Bundrick  v. Stewart | | | | | | |
| Burkenbine v. Cook | | 98-2-00884-6 | Superior | | Thurston | WA |
| Burkett v. Joe | | | | | | |
| Butler, Ethan v. Rutherford, Brian David; Lantz, Darryl | | 14-2-07974-1 | Superior | | Pierce | WA |
| C.B. v. Black Hills Football Club, David E. Cross, James Charrette | | 18-2-02416-34 | Superior | | Thurston | WA |
| Cadett v. Platt Electric | | 98-2-10876-2-SEA | | | | |
| Cadwallader, Stuart v. Vermulm, Jason | | 12-2-02767-2 | Superior | | Whatcom | WA |
| Calahan v. Concrete Technology | | 97-2-08307-7 | Superior | | Snohomish | WA |
| Calence v. Dimension Data Holdings | | C06-0262RSm | District | Western | Seattle | WA |
| Callahan, James | XSB80001688 | | | | | |
| Calles  v.  Stewart | 6770683230 | 97-2-02497-6 | Superior | | Snohomish | WA |
| Calnan v. Washington Mutual, et al | | 01-2-01336-1 | Superior | | Kitsap | WA |
| Campbell, Laura v. Antioch University & Manuelito- Kerkvliet | | CV09-1707-RSL | Federal | Western | | WA |
| Campeau v. JT Brown Trucking | | 95-2-0068-9 | | | | |
| Capital Savings v. Wagner | | | | | | |
| Caracoglia, Joseph v. Alpha Properties/UNITIRIN | | UIM Arbitration | | | | |
| Carpenter's Tower v. Lexington Insurance Company et al. | | 10-2-26175-3 SEA | Superior | | King | WA |
| Cascade Yarns, Inc. v. Knitting Fever, Inc. et al | | 2:10-cv-00861-RSM | Federal | Western | | WA |
| Cavanaugh v. Safeco | 21B931551672 | | | | | |
| Celes v. Lone Pine; et al | | 16-2-27532-0 SEA | Superior | | King | WA |

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| CH/Waldron-Huete v. DSHS, et al. | | 04-2-00166-1 | Superior | | Skagit | WA |
| Chagoya; et al v. State of Wa | | 12-2-20821-2 SEA | State | | King | WA |
| Chan, Christopher v. Rodgers, Heather | 27750842 | 13-2-35553-1 SEA | Superior | | King | WA |
| Chandler, Estate of Chris v. Shea Erlandsen/ Fortier/ Aries | | 09-2-07972-1 | Superior | | Snohomish | WA |
| Chen, Xiao Ping as PR for Run Sen Lie & Yu Ting Liu v. City of Seattle & Walt Brown | | 07-2-30721-4 SEA | Superior | | King | WA |
| Cheswick Lane Condo. Association v. Wellington Cheswick, LLC | | 04-2-39429-5 SEA | Superior | | King | WA |
| Chung and Boggess v. Washington Interscholastic Athletic Association (WIAA) | | 3:19-cv-05730-RBL | District | Western | Tacoma | WA |
| Cinko v. US Engines, Inc | | 02-2-04147-7 KNT | Superior | | Snohomish | WA |
| Cisneros, Jose; Mauricio Cisneros v. Jarred Bungay | | 20-2-17287-1 KNT | Superior | | King | WA |
| City of Fife v. Benskin | | 03-2-11971-2 | Superior | | Pierce | WA |
| City of Issaquah adv. BEWA Properties | A5-006824 | 97-2-03241-5 SEA | Superior | | King | WA |
| Clark, Jessie v. Icicle Seafoods | | CV6-0025 | Federal | Western | | WA |
| Clausen, Dana v. Icicle Seafoods | | 08-2-03333-3 | Superior | | King | WA |
| Clay, McKenzie v. Seattle School District | | 07-2-31322-2KNT | Superior | | King | WA |
| Clean Crawl, Inc. v. Crawl Spacce Cleaning Pros, Inc. | | 2:17-cv-01340 | District | Western | Seattle | WA |
| Clement , Curtis Andrew v. The Travelers Indemnity Company | | UIM Arbitration No. ETP 1124-002 | | | | |
| Cohen v. Issaquah | | 04-2-16433-8 | | | | |
| Colacurcio, Maria v. Brent Frei | | 18-2-14253-9 SEA | Superior | | King | WA |
| CollegeNET, Inc. v. ApplyYourself Corporation | | 02-CV-484-HU | District | | | OR |
| CollegeNET, Inc. v. XAP Corporation | | 03-1229-BR | Federal | | | OR |
| Collins, Estate of Anthony v. Ballard Marine Construction | | 14-2-01596-8 SEA | Superior | | King | WA |
| Collins, Ron S. v. JC Penney | | | | | | |
| Colyn v. Standard Parking | | 15-2-1645-9 SEA | Superior | | King | WA |
| Conant, Paula v. Lion Trucking; Finauga, Solomona | | 13-2-20183-6 | Superior | | King | WA |
| Connelly, Patrick - Estate of v. Snohomish County PUD | | 06-2-37337-5 SEA | Superior | | King | WA |
| Connor v. Valley Medical/Schlitt/Greenman | | 02-2-30678-1 SEA | Superior | | King | WA |
| Connor, William v. City of Seattle | | 62563-1 | Appeals | | | WA |
| Constable v. Craig | | | | | | |
| Contemporary Service  Corp v. Landmark Event Staffers Services & Grant Haskell | | 06-2-32584-2 SEA | Superior | | King | WA |
| Cook v. Ocean's Gold Seafoods | | C06-5562-FDB | District | Western | Pierce | WA |
| Corbitt, Estate of  v. Experimental Aircraft Assoc | | 03-2-05008-1 | Superior | | Snohomish | WA |
| Corn, Ruth v. Les Schwab | | 6-2-28808-4 | Superior | | King | WA |
| Cornhusker Casualty v. O'Neill Plumbing | | C03-0315 | | Western | King | WA |
| Counts, Carolyn v. Muth, Valerie | | 08-2-42059-1 KNT | Superior | | King | WA |
| Coyne, Sybil; Patrick Coyne v. Wendianne Rook; Jeff Rook; Society Botanicals (Kratom Divine); Chin 2 Corp (C&C Speedy Mart); JSC USA (Minit Mart Quick Shop and PDX Food Mart); Chol Pak; Blue Tree Candy (Blue Tree Wholesale); Gaia Ethnobotanical; Young's JK | | 20-2-00874-08 | Superior | | Cowlitz | WA |
| Crawford , Charles as PR for Chalyn Crawford v. Prosser Consolidated School Dist | | 09-2-01991-9 | Superior | | Benton | WA |
| Crawford v. Allstate | 6771437131 2KW | | | | | |
| Crosby v. Dept. of Corrections - WA State | | 05-2-02253-9 | Superior | | Thurston | WA |
| Crow, Amy v. Argosy Education | | 13-2-29772-8 | Superior | | King | WA |
| Cruz v. Mao; South Seattle Satellite Apts | | 04-2-28253-5 KNT | Superior | | King | WA |
| Cummings v. Lambert/Reef Trucking Ent | | 03-2-00332 5 | Superior | | Pierce | WA |
| Cunningham, Smith v. GEICO | 035933792 0101 014 | | | | | |
| Currie v. Turner: Costco | 2089230661107 | 92-2-13949-1 | Superior | | Snohomish | WA |
| Curtis Feedlot v. Animal Pharmaceuticals, Inc., et al | | 07-2-027156 | Superior | | Yakima | WA |
| Czarnecki, Mark v. United States of America, et al. | | 2:15-CV-00421-JLR | District | Western | Tacoma | WA |
| DaPaul v. Aloha | | 92-2-00450-6 | Superior | | Grays Harbor | WA |
| DaPaul v. Willis | | 94-2-674-2 | Superior | | Grays Harbor | WA |
| Darcy Monette and Trevor Monette v. American Family Mutual Insurance and Anna Jewell Agency | | 17-2-01280-9 | JAMS | | | CA |
| Davey v. Obaydan; Avis Car Rental | | 15-2-22515-4 SEA | Superior | | King | WA |
| Davies, Mari Yvonne v. Multicare Health System d/b/a Good Samaritan Hospital, Mt. Rainier emergency Physicians PLLC, Michael Hirsig MD | | 18-2-13830-2 SEA | Superior | | King | WA |
| Davis Dissolution | | | | | | |
| Dawn Phillips v. Peekay, Inc | | 04-2-29281-6 KNT | Superior | | King | WA |
| Day v. Kleinwatcher | | | | | | |
| DeBerge v. City of Seattle | | 97-2-08434-2SEA | Superior | | King | WA |
| Decan v. Matalik | | 92-2-00273-9 | | | | |
| Deem v. USAA | | | | | | |
| Degel v. City of Seattle | | 04-2-14826-0 SEA | Superior | | King | WA |
| Delauney v. Asher & Partners | | | | | | |
| Dept. of L&I v. Wal-Mart Stores, Inc. | | 01-11050 | | | | WA |
| Desch, Estate of Christopher | | CLO8004429-00 | Circuit | | | VA |
| DGHI v. Pacific Cities | | | | | | |
| Diagnos-Techs, Inc (DTI) v. Joseph Forde; Sam Eidy | | 16-2-22293-5 KNT | Superior | | King | WA |
| Dickens, Thomas and Marie v. King County, et al | | | Superior | | King | WA |
| Diemond v. State Farm | 47-4082-251 | | | | | |
| Dil v. City of Lynnwood; et al | | 12-2-04423-4 | State | | Snohomish | WA |
| Dinh; et al v. Ride the Ducks; WA; Seattle | | 15-2-28905-5 SEA consolidated | Superior | | | |
| Doherty, Shannon v. Wm. Sisson; et al | | 08-2-05073-5 | | | | |
| Donlin, John L. v. Murphy, Jerry | | 09-2-04090-5 | Superior | | Snohomish | WA |
| Dreher, Estate of Sussana v. G&I VII, et al | | 15-2-22244-9-SEA | Superior | | King | WA |
| Dungy, Charles v. Ocean Prowler | | 09-2-30333-9 SEA | Superior | | King | WA |
| Dunlop, Alex v. Safeco | 21D951830189 | 95-2-08432-8 | | | | |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Durall, Don v. Royal Ins. | | | | | | |
| Dworsky, Tina v. Crum, Betty | | 15-2-05859-8 | Superior | | Pierce | WA |
| Dwyer v. Matson Navigation | | 05-2-33157-7 SEA | | | | |
| Dye Seed, Inc. v. Farmland Insurance Company | | 2:12-cv-00218 LRS | Federal | Eastern | Spokane | WA |
| E&E Connection v. Stew | | | | | | |
| Easly, Richard v. Waterfront Shipping; Fresco Shipping S.A.; M/S Fleet Ship Management, Inc. | | 10-01167 RSL | Federal | Western | Seattle | WA |
| Edler v. Edler | | 05-3-01170-2 | | | | |
| Education Logisitcs, Inc. and Logistics Management, Inc. v. Datsopoulos, MacDonald & Lind, P.C.; Lind, Dennis and Farr, Stefan W | | DV-06-1072 | District | 4th Judicial | Missoula | MT |
| Edwards v. Santiago | | 06-2-24579-2 SEA | | | | |
| El Khoury v. Ilyia | | 15-2-08642-1 | | | King | WA |
| Elmer, Jean v. Rosman, Edward | 473119756 | 97-2-16713-2SEA | Superior | | King | WA |
| Encompass Teleservices v. Randall Scheets | | 04-cv-821-HU | District | District 9 | Multnomah | OR |
| Endicott, Justin v. Icicle seafoods | | 06-2-03016-8 | Superior | | King | WA |
| Ennen, Nicholas v. Perryman, James | 901 7601731008 | 11-2-01275-8 | Superior | | Whatcom | WA |
| Erwin v. Muller | | 98-2-182-0 | | | | |
| Escobebo, Alejandro v. Jeffrey Miller | 424726420 | | | | | |
| Eskridge v. Fletcher; Stokes Lawrence | | 17-2-05247-7 SEA | Superior | | King | WA |
| Esparza, Cipriano & Dominga v. Judity Clark | | 08-2-00612-2 | Superior | | Yakima | WA |
| Esplanade Condominium Assoc. v. AFE Spinnaker, LLC | | 08-2-41943-6 SEA | Superior | | King | WA |
| Estate of A.H. v. Federal Way Public Schools | | | | | | |
| Estate of Brandon Dahl v. Mason Co; et al | | 3:16-cv-05719-JRC | District | Western | Tacoma | WA |
| Estate of Briones v. Puget Paving; et al | | 16-2-11627-8 | Superior | | Pierce | WA |
| Estate of Butzier, Douglas; Ann Butzier v. Bendixking; Honeywell International, Wisconsin Aviation | WI - 16CV-30100 NJ - L-3695-16 OR - 16CV32452 | | Circuit and State Second Judicial | | WI - Dane, NJ - Camden, OR - Multnomah, NM - Bernalillo | WI, NJ, OR, NM |
| Estate of Earl S. King v. Estate of Roland J. Cherrier | | 3AN-96-02959 Civ. | Superior | 3rd Judicial | | AK |
| Eubanks;et al v. Klickitat Co; Brown | | 11-2-00802-2 | Superior | | Clark | WA |
| Evans, Calvin III v. Mueller Co., Mueller Water Products Inc., Bartell's Asbestos Settlement, Borgwarner Morse Tec, Certainteed Corporation, Cummins Inc., Dana Companies, Eaton Corporation, Genuine Parts Co., H.D. Fowler Co., H.D. Supply Inc., Hajoca Corp. et. al. | | 19-2-09932-7 | Superior | | Pierce | WA |
| Evans, Suzan; Estate of Bret Evans v. West Isle Air / Estate of Michael J. Laird | | 03-2-11539-3 | Superior | | Pierce | WA |
| Everett Inn (Kim) v. Center Park | | | | | | |
| Evergreen Crane Services v. Max & Una Ford | | | | | | |
| Excel Rotomold, Inc. | 57348440 QG | | | | | |
| Fabre, Steve; Point Defiance Café and Casino, LLC v. Town of Ruston | | 10-2-15634-3 | Superior | | Pierce | WA |
| Fairchild, Ivelisse v. Catering Advisors, Inc. d/b/a The Athenian Seafood Restaurant and Bar | | 18-2-26648-3 SEA | Superior | | King | WA |
| Farrow, Dennis; Advanced Technology Construction v. Sieger, Anton & Melody | | 15-2-06937-9 | Superior | | Pierce | WA |
| Fenton v. Allstate | 2712770235 WSO | | | | | |
| FHCRC v. Marine Center | | 92-2-23469-6 | | | | |
| Fife Portal; et al v. CenturyLink, et al | | 15-2-14644-6 | Superior | | Pierce | WA |
| Figgins, Cara; Thomas Harris for Estate of Marian Harris; Greg Maestretti; Partners, a Tasteful Choice Company v. Stephen Bates; George Paleologou; Premium Brands Holding Corporation; 10325660 | | 21-2-10681-8 SEA | Superior | | King | WA |
| Finchen, Michael v. F/V Lady Jessie | | C04-1285RSM | District | Western | | WA |
| Fireman v. City of Seattle | | 97-2-10026-7 | Superior | | King | WA |
| Fitzgerald, Cary v. The Markets, LLC | | 13-2-000451 | State | | Skagit | WA |
| Fitzsimmons v. Video Update | | 97-2-01865-6 | Superior | | Whatcom | WA |
| Flashpoint Ventures LLC v. Activated Matrix Partners LLC et al. | | 06-2-09476-0 SEA | Superior | | King | WA |
| Ford v. Quality Express & Stites | | 04-2-40790-8 KNT | Superior | | King | WA |
| Foster v. RGCC | | 93-2-18203-1 | Superior | | King | WA |
| Foth, Molly  v. Dr. Paul  Jones | | 08-02-04957-9 | | | | |
| Foxwood at Lakeland Condominium Association v. Foxwood LLC | | 05-2-08501-6 | | | | |
| Francis, Estate of Vanna K; Scroggins,  Estate of Scroggins, Ronald L.v. USA; Bureau of Indian Affairs; Dept. of the Interior; Clallam County, Kalama, Sela; Wells, Sandra | | C10-5056-RBL | Federal | Western | | WA |
| French, Dorothy v. Sodexho, Inc. | | 04-2272P | | | | |
| French, Hailey v. Whatcom County & State of Washington | | 08-2-00530-8 | Superior | | Skagit | WA |
| Freimanis, Edward M.D., Brian Plaskon M.D., and Eastside Surgeons, PLLC v. Swedish Health Services | | 01-17-0004-3262 | | | | |
| Frisino v. Seattle Schools | | 08-2-04839-0 | Superior | | King | WA |
| Fu v. Clyde Hill | GC000664 | C96-944JC | District | Western | | WA |
| Fualaau v. Highline School District | | 00-208282-7 KNT | Superior | | King | WA |
| Fuda, Estate of Austin and Beaupre, Estate of Hunter v. King County, et | | 11-2-19682-8 KNT | Superior | | King | WA |
| Fulton v. Lyle & Stewart | | 03-2-04233-5 | Superior | | Clark | WA |
| Funai, Dian v. Damita Faddis, Hector Tapia | | 19-2-26013-1 KNT | Superior | | King | WA |
| Gallatin Group | | | | | | |
| Gateway Outlet Center Incet al v. Kelly & Associates, P.S. | | 04-2-03846-4 SEA | Superior | | King | WA |
| Gay, Cecilia v. Argosy Education Group | | JAMS No. 160019831 | | | | |
| GDS Holding v. Humberstone, et al | | 15-2-08681-2 SEA | Superior | | King | WA |
| Gearin v. McMillan | 474212749 | 03-2-13022-1 | Superior | | Snohomish | WA |
| Gebru, Aragash v. Burstein, Paul and Burstein, Florence Katz | | 13-2-35264-7 SEA | Superior | | King | WA |
| Geil v. LME, Inc. | | C98-5409RJB | Federal | Western | Pierce | WA |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Gelt-Uhon Development Holdings LLC, et al. v. WPIC Construction, LLC et al. | | 22VECV01959 | Superior | | Los Angeles | CA |
| Gilbert v. Circuit City | | 01-2-33210-4 KNT | Superior | | King | WA |
| Gilman v. Majestic Log Homes, et al | | 04-2-01257-2 | Superior | | Kitsap | WA |
| Girard, Bethany ( a minor child); Larry & Lynn Girard  v. State of Washington; Bender, Mayme: Tina Byrd as GL for Marriah Byrd v. | | 09-2-00690-4 | Superior | | Cowlitz | WA |
| Girouard v. Copperfield Apartments | | | | | | |
| Goldberg v. Goldberg | | 98-2-85-2 / 97-4-195-5 | | | | |
| Suzanne Gonzales v. Caliber Home Loans | | 3:17-cv-01352-H-BGS | | Southern | | CA |
| Gordan Marks and Ann Marks v. Artyom Nikolin | | 17-2-28815-2 SEA | Superior | | King | WA |
| Gottlieb, Samuel:Gottlieb Colleen; Gottlieb Issaquah Highlands 93 v. Sacotte, Joseph; Sacott Midori; Sacott Higlands 93 | | JAMS No. 160018231 | | | | |
| Grace, Cynthia v. Art Institute of Seattle | | 09-2-20430-6 SEA | Superior | | King | WA |
| Gregoire v. City of Oak Harbor | | 02-2-00360-0 | | | Island | WA |
| Gregory v. AA Trucking | | 92-2-00852-4 | | | | |
| Grieve, Diane M. v. McCoy | | 08-2-01864-7 | | | Skagit | WA |
| Griffin v. Target | | | | | | |
| Gruzlewski, Lech v. Starbound, LLC | | 15-2-08749-5 SEA | | | King | WA |
| Gu v. Griswold | | 06-2-34681-5 SEA | | | King | WA |
| Guerrero, Irene & Peter; Joann & Robert Lacanfora; Brandon & Natasha Ehrlich; Gary & Martha Wyatt; Carol & Ian Hilton; Tony & Christine Eason; David & Carrie Miller; Emilie & Bryce & Nadine Dawson v. Vita Intellectus; Josh Label; Moghis (Maurice) Mohammad | | 19-2-28926-1 SEA | Superior | | King | WA |
| Guite, Jeffery v. Manhattan Plaza | | 04-2-14282-2 KNT | | | King | WA |
| Haaland, Genevieve v. Central Washington Hospital, et al | | 12-2-01380-9 | | | Grant | WA |
| Hale, R.L. v. Snoh. Co. | | 91-2-10550-2 | | | | |
| Hamlin v. State Farm | 47-4336-444 | | | | | |
| Hammond v. Cascade Fresh | | | | | | |
| Hammons, Laurie and Gary v. Mason County, State of Washington, Department of Transportation | | 16-2-00007-34 | Superior | | Thurston | WA |
| Hansen v. Kent PD | GC001160 | 92-2-16406-0 KNT | Superior | | King | WA |
| Hansen, Duane v. McKlusky & Geico | | 00-2-19522-2 SEA | Superior | | King | WA |
| Harley Marine Services, Inc. v. Harley Franco; Tug Construction, LLC | | 19-2-08826-5 SEA | Superior | | King | WA |
| Harps, Estate of Shannon  v. King County | | 11-2-06665-2 | State | | Pierce | WA |
| Harnetiaux, Isabele v. Brandon Fairbanks, Christopher Fairbanks, Tracy Fairbanks | | 20-2-15601-9 SEA | Superior | | King | WA |
| Harris v. Iseminger | | 06-2-00544-3 | Superior | | Chelan | WA |
| Harris, Brandon v. JFC International, Inc. | | 21-2-08164-5 KNT | Superior | | King | WA |
| Harrison v. Source Services / Romac | | 98-2-05985-1 SEA | Superior | | King | WA |
| Hart v. Brown | | 05-4-04788-5 SEA | Superior | | King | WA |
| Hartford Ins. v. Vinson Bros | CV02-1810 | | | | | |
| Hatch, Kenneth v. Rainier Group Invest. | | Arbitration | | | | |
| Haworth, Scott v. City of Kent, Kuzmych, Nataliya and Juri | | 08-2-24286-2 KNT | Superior | | King | WA |
| Hayden, Sylvia  v. Pemco | | | | | | |
| Hayes v. Collinson | | 03-2-28320-7 SEA | Superior | | King | WA |
| Hayes, Velma v. Washington | | 07-2-30326-2 SEA | Superior | | King | WA |
| Heddlesten, Charles J. v. Simpkins, Calvin | 47-4760-205 | 10-2-06406-6 | Superior | | Pierce | WA |
| Hedges v. McPhearson | | | | | | |
| Heldreth, David Allan (Panacea Plant Sciences) v. Franklin County, Franklin County Mosquito Control District | | | | | | |
| Hemenway v. Tukwila | | | | | | |
| Henderson v. Mack | | 01-2-34296-7 SEA | Superior | | King | WA |
| Hensley, Bradford; Cara Beth Hensley v. Multicare Health System d/b/a Tacoma General Hospital d/b/a Multicare Neuroscience & Sleep | | 17-2-13822-9 SEA | Superior | | Pierce | WA |
| Hertog, John as G.A.L. for BFJ, SRJ, & SMJ v. State of Washington, et | | 10-2-07036-1 | Superior | | Snohomish | WA |
| Hess, Estate of Donald and Hannelore (Veronica) | | 37-2010-00104069-CU-PO- | Superior | | San Diego | CA |
| Hickey v. UW; Musgrave; et al | | 12-2-08702-2 | State | | Snohomish | WA |
| Hicks v. Slattery | | | | | | |
| Hicks, Catherine v. Collaborative Construction | | 15-2-03827-3 SEA | | | | |
| Hicks, Susan and Danny v. U.S.A. | | 2:14-cv-00265 | Federal | Western | | WA |
| Hindorf  v. Scott | | 06-2-25146-6 SEA | Superior | | King | WA |
| Hingst v. Ryzex Re-Marketing | | | | | | |
| Hinson, Charles & Janice  v. ICE-AM; Art & Andrea O'Brien | 07-2-30717-6 | 07-2-30717-6 | Superior | | King | WA |
| Hodges v. Tritz | | 97-2-22084-0 SEA | | | | |
| Hofseth, Thomas v. Premier Pacific Seafood/ SS OCEAN PHOENIX | | 14-2-10808-7 SEA | Superior | | King | WA |
| Hofstetter, Katti v. City of Bellingham | | 07-2-02810-9 | Superior | | Whatcom | WA |
| Hon's v. King County | | 92-2-23360-6 | Superior | | King | WA |
| Hor, Channary v. The City of Seattle, Aaron Grant, Adam Thorp, & Omar Tamman | | 10-2-34403-9 SEA | Superior | | King | WA |
| Horner's v. AAA | 888880 | | | | | |
| Houston, Estate of Brenda; Crews, Estate of Samantha v. Avco | | 10-2-26593-7 SEA | Superior | | King | WA |
| Hoyt, Sunni v. DSHS | | 10-2-03304-5 | Superior | | Clark | WA |
| Hruska, Joseph and Seana v. Harrison Medical Center, Advanced Medical Imaging, Olympic Medical Imaging Consultants, Leen, Victor M.D.; Radia; West Sound Emergency Phys.; VMMC; Dr. Feig | | 14-2-33358-7 | Superior | | King | WA |
| Huckins, Clinton v. George Michael Diede & City of Puyallup | | 08-2-08740-4 | Superior | | Pierce | WA |
| Hunt v. McArdel, Sroufe & Continental Supply Corp. | | 02-2-16450-1 SEA | Superior | | King | WA |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Hunters Capital LLC, Northwest Liquor and Wine LLC, SRJ Enterprises d/b/a Car Tender, The Richmark Company d/b/a Richmark Label, Sage Physical Therapy PLLC, Kathleen Caples, Onyx Homeowners Association, Wade Biller, Madrona Real Estate Services LLC, Mardona Real Estate Investors IV LLC, Madrona Real Estate Investors VI LLC, 12th and Pike Associates LLC, Redside Partners LLC, Magdalena Sky, Olive St Apartments LLC, Bergman's Lock and Key Services LLC, Matthew Ploszaj, Argento LLC, Rancho Bravo Inc, Sway and Cake LLC | | 2:20-cv-00983 TSZ | District | Western | | WA |
| Hutmacher v. Brigham, et al | | 00-2-06321-1 SEA | | | King | WA |
| Hydrobee, SPC v. City of Seattle | | 20-2-12717-5 SEA | Superior | | King | WA |
| Ianuzzi v. Sears Roebuck & Company | | 02-2-00470-6 | Superior | | | |
| Icertis, Inc. v. Tom Boccella; SirionLabs, Inc.; Kimberly Riggs / SirionLabs, Inc. v. Icertis, Inc. | | 21-2-14321-7 SEA | Superior | | King | WA |
| Illinois Toolworks & Steffan Datentechnik GMBH v. Seattle Safety | | 2:07-cv-02061-JLR | District | Western | King | WA |
| Inks, Richard v. Mutual of Enumclaw | 40000017704 | | UIM Arbitration | | | |
| Inland Company v. Union Ridge Ranch LLC, Romano Properties LLC, James Donaldson and Dujann Donaldson, Freese Precase Products Inc., AA Asphalting LLC, A-Line Asphalt Maintenance Inc. / Union Ridge Ranch LLC v. Sterling Design Inc. | | 19-2-00992-06 | Superior | | Clark | WA |
| Integrative Health Institute dba Sophia Health Institute, Sophia Nutrition, Sophia Education, KS Distributors, Dietrich Klinghardt v. Christine Schaffner, Daniel Schaffner, Bella Fiore Klinik, Bella Fiore Organics, | | 2:20-cv-01471-RAJ-MLP | District | Western | Seattle | WA |
| Intellectual Ventures Property Holdings, Intellectual Ventures Management v. Fred Sharifi, Rachel Cannara, Adam Sangwin-Remesnik, Sarice Barkley, Lily Bechtel, Benjamin Jones | | JAMS No. 1160023080 | | | | |
| Interstate Concrete and Asphalt Company v. Columbia Asphalt and Gravel Inc., Columbia Ready-Mix Inc., Lawrence Sali, Steven Sali, Deleta Sali, Gayle Sali, LSL Properties LLC | | 01-20-0000-5105 | American Arbitration Association | | | |
| IntraCorp ( Western & Clay ) v. Swinerton Builders | | | | | | |
| Irving v. Thayne | 47911304283 | 98-2-05238-5 | Superior | | San Juan | WA |
| Isherwood v. W. America | | 99-0280-EFS | | | | |
| J.R.T. Nurseries Inc., et al v. Sun Gro Horticulture Distribution, Inc., et al | | 1002.02929 | Circuit | | Multnomah | OR |
| Jacobs, Mary L.W. v. Jordon Carlson, Gerald Carlson, and Nichole | 298618380.1 | 16-2-19642-0 KNT | Superior | | King | WA |
| James, Justin & Jessica v. WSDOT; King County; Kitchen, Ernie | | 11-2-36047-4 KNT | Superior | | King | WA |
| Jansen v. Clallam County | | 08-2-01362-3 | Superior | | Thurston | WA |
| Jarbo v. Schuhart Corporation | | 09-2-31112-9 SEA | Superior | | King | WA |
| Jatho, Jerry v. Home Depot U.S.A. a/k/a The Home Depot | | 3AN-09-12508 | Superior | | Anchorage | AK |
| Jensen, Craig Elva Jensen, Craig Jensen Enterprises Inc., Craig's Snow Removal LLC v. Rafeal Maxwell-Farias | 21-2-00011-37 | | Superior | | Whatcom | WA |
| Jensen / Johnson v. Aversano | | 98-2-11695-1 SEA | Superior | | King | WA |
| Jensen, Jane v. Pemco | | | | | | |
| Jerry Petersen v. Ray S. Pollari and Goldberg & Jones | | 06-2-31822-6 SEA | Superior | | King | WA |
| Johnson v. Metal Benders | | 02-2-04947-3 | Superior | | | WA |
| Johnson, Brian v. Lahlou Mohamed; A-1 Best Computers | | 11-2-27063-7 | Superior | | King | WA |
| Johnson, Bruce v. Encompass | Z9100536 NP | | | | | |
| Johnson, Bryan v. Stipe, Nathan; Cognizant Technology Solutions | | 14-2-22885-6 SEA | Superior | | King | WA |
| Johnson, Johnny v. Washington State Parks and Recreation | | 11-2-31129-5 SEA | Superior | | King | WA |
| Johnson, Kelby v. Miles, Richard | | 11-2-02185-6 | Superior | | Snohomish | WA |
| Johnson, Michael and Amity Johnson v. Jamila Jackson | | 18-2-00224-16 | Superior | | Jefferson | WA |
| Johnson, Teri v. Overlake Hospital Medical Center et al. | | 12-2-17639-6 SEA | Superior | | King | WA |
| Jones v. Simmons | | | | | | |
| Jones, Hannah v. Regency Pacific | | 10-2-21303-1 KNT | Superior | | King | WA |
| Jones, Mark v. City of Seattle / Seattle Fire Dept. | | 06-2-39861-1 SEA | | | King | WA |
| Jorgensen v. Christianson | | 93-2-04236-0 | Superior | | Snohomish | WA |
| Jungaro v. Grange | | | | | | |
| Kaden, JoEllen v. The Kroger Company and F.R. McAbee | | 18-2-56738-6 SEA | Superior | | King | WA |
| Kaiser Aluminum Washington LLC v. Team Industrial Services Inc. | | 12-2-01468-4 | Superior | | Spokane | WA |
| Kamin, Todd as PR for the Estate of Kamin, Rachael Suzanne v. City of Bothell and Strange, Joseph D | | 14-2-27762-8 SEA | Superior | | King | WA |
| Kandlik, Judith  v. Washington State Ferries; Kitsap County | | 11-2-01748-8 | | | Kitsap | WA |
| Kauri v. City of Seattle | | 91-2-10975-3 | Superior | | King | WA |
| Kelly v. Helicopter Services & Instruction | | ESX-I-7390-3 | Superior | | Essex | NJ |
| Kembel v. City of Kent | | 03-2-24712-0 KNT | Superior | | King | WA |
| Kendall v. Pediatric Specialty Care | | 00-2-09905-9 | Superior | | Pierce | WA |
| Kent v. SDM Properties | 949652106 | 94-2-12465-0 | Superior | | King | WA |
| Kersey, Sarah & Ryan v. State of Washington; Department of Social and Health Services; Children's Administration (DSHS) | | 15-2-05313-8 | Superior | | Pierce | WA |
| Kettwig v. Kreig | | | | | | |
| Kevin Cyphers v. Juliane Rose DeAsis | | 18-2-01089-31 | Superior | | Snohomish | WA |
| Kevin Locke v. City of Seattle | | 02-2-07237-2 SEA | Superior | | King | WA |
| Key Bank Nat'l Assoc. v. American Power | | 04-2-06978-1 | | | | |
| Kforce, Inc. v. Oxenhandler | | 2:14-cv-00774 MJP | Federal | Western | Seattle | WA |
| Khaleghi, Cyrus; :Baghei, Sepehr v. City of Bellevue | | 17-2-31059-0 SEA | Superior | | King | WA |
| Kielhorn, James v. Davis, Julie | | 15-2-00840-4 | | | King | WA |
| Kier, Donald v. Denise Parrish, Natalie Bumgardner | | 21-2-12683-5 KNT | Superior | | King | WA |
| Kim, Jin Young Estate v. Kim, Sung Ho; Oh, Sandra | | 13-2-33515-8 SEA | Superior | | King | WA |
| King County v. Federal, et al. | | C94-1751 | District | Western | King | WA |
| Kirking, Katherine v. Mid-Century Insurance | | 2:14-CV-01103-JLR | District | Western | Seattle | WA |
| Kirkland Plaza, et al v. Best Plumbing & Heating, Inc, et al | | 02-2-08332-2 SEA | Superior | | King | WA |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Klein Griffith Properties Group LLC v. Washington State Department of Commerce, Hanford Area Economic Investment Fund, Hanford Area Economic Investment Fund Advisory Committee, CliftonLarsonAllen LLP, JoLarr Management Consulting LLC | | 3:22-cv-05710-BJR | Superior | | Thurston | WA |
| Knapp-Shover, Emma v. Corliss Resources et al. | | 09-2-29599-9 KNT | | | King | WA |
| Knight v. SK Foods | | 09-2-04805-9 | Superior | | Pierce | WA |
| Kohfeld v. United Pacific | | 91-2-24892-3 | | | | |
| Kolasinski, Dale v. Catholic Archdiocese  / St. Joseph's | | 09-2-42850-6 SEA | Superior | | King | WA |
| Koné v. Beresford Booth; et al | | 14-2-02849-9 | State | | King | WA |
| Koontz, Jason v. Arctic Sablefish | | 3AN-19-10617 CA | Superior | | Anchorage | AK |
| Korter, Dawn; Estate of Said Joquin v. City of Lakewood d/b/a Lakewood Police Department, Michael Wiley | | 3:22-cv-05647-DGE | District | Western | Tacoma | WA |
| Krouch, Son v. Nguyen Pham | | 21-2-14359-4 SEA | Superior | | King | WA |
| Kuck v. Pruett | 89990A | | | 9th Judicial | Fremont | WY |
| Kuncl v. USA | | 2:16-cv-00337-RSM | District | Western | Tacoma | WA |
| Kuretich v. Ross | | 92-2-00872-2 | | | | |
| Kuzmick, Nicholas  v. Jed Goldberg | | 06-2-13949-1 | Superior | | King | WA |
| Ladyka, Sharon v. Group Health et al | | 08-2-14541-7 SEA | Superior | | King | WA |
| Lafferty v. Edmonds Family Medicine | | 01-2-09790-1 | Superior | | Snohomish | WA |
| Laghaeian v. Gorey | | | | | | |
| Lainhart, et al (SWAT) v. City of Louisville, Kentucky | | 16-CI-01500 | Circuit | | Jefferson | KY |
| LaHaye; Estate of Peter LaHaye | | | | | | |
| Lamb Weston v. Heat & Control | | | | | | |
| Larson Automotive Group v. A Plus LLC | | 13-2-08369-5 | State | | Pierce | WA |
| Larson v. Jacoby | | 03-2-07635-8 | Superior | | Snohomish | WA |
| Larson, Nicholas | 302492 | | | | | |
| Larson Motors, Inc. v. General Motors, LLC; Jet Chevrolet | | 2:21-cv-1367 JCC | District | Western | Seattle | WA |
| Larson, Toby for Troy Larson, Kari Costin for A.L. and C.L., Breanna Larson v. Columbia Capital Medical Center dba Capital Medical Center, Karolyn Moody, Thurston Emergency Group, Olympic Ambulance | | 21-2-00101-34 | Superior | | Thurston | WA |
| Larwick, Estate of Brent v. Emcor Facilities | | 10-2-07369-3 | Superior | | Pierce | WA |
| Laurel Park v. Cityof Tumwater | | 3:09-cv-05312-BHS | District | Western | | |
| Lavick, Estate of Gloria v. Premier Product Management, et al | | 09-2-40314-7 KNT | Superior | | King | WA |
| Laymon v. Cowlitz Fire & Rescue | | 08-2-00953-1 | Superior | | Cowlitz | WA |
| Le, Vienna v. Hoa Nguyen | | | | | | |
| Lee, Yoseb , Dachasa, Meselech, et al. v. State of Washington, et al | | 10-2-07418-0SEA | Superior | | King | WA |
| Leinbach, Daniel v. Talantuli, Ayaz | | 11-2-42700-5 SEA | Superior | | King | WA |
| Lennarson, Nels v. Cynthia Rainer, Warren Rainer | 035662230-01 | | Superior | | Kittitas | WA |
| Leornardson/Bench | | | | | | PA |
| Lewis v. Sam; Continental Ins | | 14-2-10825-7 KNT | State | | King | WA |
| Lindell v. City of Mercer Island | | Cv. 08-1827 | District | Western | | WA |
| Lindsay-Shinsato v. Herman | 233172329.1 | | | | | |
| Link; et al v. Alcoa; et al | | 16-2-16158-8 SEA | Superior | | King | WA |
| Logerwell v. Nelson | 21B912662002 | | | | | |
| Loop, Susan v. Infrastructure Systems et al | | 08-2-05256-5 | Superior | | Snohomish | WA |
| Lopez v. Union Pacific Railroad | | C00-0311 | District | Western | | WA |
| Lord v. Argentina Consolidated Mining Company et al | | A486480 | Superior | | Clark | NV |
| Lori Jacobs v. Wal-Mart stores, Inc | | 3:17-cv-05988-RJB | District | Western | Tacoma | WA |
| Lundberg, Rachel and Adam Lundberg v. Charles Cowdery | | | Superior | | King | WA |
| Lutch v. LaFluer | 251452 | | | | | |
| Lynch, Stephen Roland, Erika Wolff v. City of Seattle | | 19-2-31460-5 SEA | Superior | | King | WA |
| Lynch v. Karr Tuttle | | 08-2-11583-6 SEA | | | King | WA |
| Lynx Iron Corp.  v. Karr Tuttle Campbell | | 07-2-34288 SEA | Superior | | King | WA |
| M.I., LLC v. Redman | | 98-6239-HO | District | Oregon | | OR |
| MacMillan v. MacMillan | | | | | | |
| Macri v. Clark | | | | | | |
| Macri v. King County | | C94305Z | District | Western | | WA |
| Madison MRH-2 Lynnview LLC v. Exxel Pacific Inc, the Reserve at Lynwood Partners LLLP, and Does 1-10 | | 17-2-23896-1 | Superior | | King | WA |
| Madison Ridge Office Building v. East Madison Ridge Development | | 10-2-13940-1 SEA | Superior | | King | WA |
| Main, Jeff and Lori v. Sander, Gerhard J.: Tensar International | | 12-2-01704-4 | Superior | | Kitsap | WA |
| Maislen, Maislen v. Associated Materials | | 08-22285-3 SEA | Superior | | King | WA |
| Malbco Holdings LLC v. AMCO Insur. Co. & WAUSAU Insur. Co. | | 07-2-04878-7 | Superior | | Spokane | WA |
| Mal Icious v. Random Vaughn, Original Investments, Dank's Wonder Emporium, DWE Franchise, ATM Service Pro, Renewable Investments, Alyssa White, Robert Davenny Jr. / Random Vaughn, Mark Lavergne | | 20-2-02083-34 | Superior | | Thurston | WA |
| Mandt, Kristi  v. Safeco | 21A011073897 | | | | | |
| Manlove v. Harris | | 98-2-05180-9SEA | Superior | | King | WA |
| Mann v. Whitney | | | | | | |
| Mansfield v. Zheng | | 06-2-20434-4 SEA | Superior | | King | WA |
| Maquiraya, Rachale v. King County Department of Transportation, Road Services Division | | 18-2-23923-1 SEA | Superior | | King | WA |
| Marigold Products, Inc. d/b/a Seattle Cannabis Co. | | 20-2-16654-5 | Superior | | King | WA |
| Mark Arstein, LLC v. Animal Pharmaceuticals, Inc., et al | | 06-2-3010-8 | Superior | | Yakima | WA |
| Marshall v. Cushman | | | | | | |
| Martin, Estate of Kristopher v. Habeeb, Daniel & Polakoff, Robert | | 12-2-11109-0 SEA | Superior | | King | WA |
| Martinez, Estate of Gilberto Gonzales v. Mirikeen Homes, et al. | | 13-2-32583-7 SEA | Superior | | King | WA |
| Marvin Schlotfeldt v. Goulds Pumps et al | | 07-2-12398-9 SEA | | | | WA |
| Mason, Vincent v. Kirsten Murray, Veronica Matejski | | 21-2-06812-1 SEA | Superior | | King | WA |
| Matelich v. Branson | | | | | | |

Attachment 53

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Mather v. Sterns | | 00-2-3312-5 KNT | | | | |
| Maxwell v. Ellison | | 05-2-05569-3 SEA | Superior | | King | WA |
| Mayther v. White | | 04-2-13224-8 | Superior | | Snohomish | WA |
| Maytown Sand & Gravel, LLC v. Thurston County; Port of Tacoma. | | 11-2-00395-5 | Superior | | Lewis | WA |
| McBride v. O'Brien-William Cox; et al | | 15-2-21045-9 SEA | Superior | | King | WA |
| McCallum Envelope | | | | | | |
| McClinton, Darlene as PR for the Estate of McClinton, Keith v. USA | | 2:14-cv-00825 | Federal | Western | Seattle | WA |
| McCormick, John v. True Green; Lagerwey | | 10-2-00609-1 | Superior | | Whatcom | WA |
| McCoy v. State of WA (WSLCB) | | 00-2-20990-8 SEA | Superior | | King | WA |
| McCutcheon, Darrell Sr. and Tamicia McCutcheon, each individually and on behalf of the Estate of Darrell McCutcheon, Jr. v. Town of Steilacoom | | 23-2-04528-4 | Superior | | Pierce | WA |
| McDonald v. English | | | | | | |
| McDowell  v. Herbalife International | | C00-2011 | District | Western | | WA |
| McHugh, James v. David Shulkin MD, Secretary of Veterans Affairs | | 200P-0668-2016104418 | | | | |
| McIntyre v. State of Washington (WSP) | | 04-2-06179-8 | Superior | | Pierce | WA |
| McKibben, Phillip, et al v. Christianson, Leroy, et al. | | 10-2-27795-1 SEA | Superior | | King | WA |
| McLain v. Frantz & State of Washington | 473134052 | | | | | |
| McLean Family (Interstate Distributor Company) v. Davies Pearson & Colman, Ron | | 12-2-33964-3 SEA | | | | |
| McNabb, Darrell | | | | | | |
| McQuade v. City of Tacoma | | 16-2-12598-6 | Superior | | Pierce | WA |
| McQuigg, Gerald E. v. Swistak, Michael A, MD | | 14-2-14815-1 KNT | Superior | | King | WA |
| Meyer, Donald v. City of Seattle | | 09-2-45545-7 SEA | Superior | | King | WA |
| Michael Bennett v. Silvertree  Construction | | 07-2-20671-0 SEA | | | | |
| Mikels, Lorrel v. Northwest Commercial Improvements, Inc.: Kolln Jason | | 10-2-0297-0 | Superior | | Snohomish | WA |
| Milette, Daniel  v. MAPSCO, et al | | N/A | | | | |
| Miller / Murray v. Texaco | | 96-2-26323-3SEA | Superior | | King | WA |
| Miller v.  Mt Baker | | 08-2-01591-9 | Superior | | King | WA |
| Miller v. NW Grounds Maint. & Vasquez | | 02-2-08813-9 SEA | Superior | | King | WA |
| Miller, Todd v. American Family Insurance UIM | 331-041779 | | | | | |
| Milligan v. Jensen | 470063786 | 95-2-14619-8 | | | | |
| Mission Springs v. City of Spokane | | | | | | |
| Mitchell, Carol v. Pierce County | | 21-2-04348-0 | Superior | | Pierce | WA |
| MOD Super Fast Pizza, LLC v. Pieology Sprectrum | | | Federal | Western | Seattle | WA |
| Mohammed v. Swedish Medical Center et. al | | 12-2-23370-5 SEA | State | | King | WA |
| Molinas, Jacqueline | 21B933520060 | | | | | |
| Moll v. Cohran; Roberts | | 12-2-09881-6 SEA | State | | King | WA |
| Monk v. King County , Cities of Auburn & Kent | | 02-2-13216-2 KNT | | | | |
| Moody, Brent; Johnson, James, Salveson, Jeromy; 21st Century Tanning Inc.;SAL, Inc., KS & JS Inc., v. Desert Sun Franchising, Palm Beach Tan, Inc. Peshtaz; Rees | | 10-2-25582-6 SEA | Superior | | King | WA |
| Moore v. King County | | C 05-0442 JLR | | | | |
| Moore, Joseph; Estate of Karli Moore, Kristie Moore v. Franklin County, Franklin County Sheriff's Office, Dalynne Singleton as Personal Representative of Estate of Richard Cruz, Jack Dodson, Ramona | | | Superior | | Walla Walla | WA |
| Moore, Lisabeth as PR for Hart, Estate of Daniel  v. Raytheon Company & Raytheon Aircraft Company | | N09C-12-010 MMJ | Superior | | New Castle | DE |
| Moore, Muriel v. Sheraton | 0602NB249504T473 | | | | | |
| Moore, William R. v. Safeco - UIM Arbitration | 808913163015 | | | | Seattle | WA |
| Morehouse-Hidalgo v. Adriane Aiken | | 08-2-09870-2SEA | Superior | | King | WA |
| Morgan Scherer, Sofia Olson. v. Kimberly Lorton | | 16-2-07069-8 KNT | Superior | | King | WA |
| Morgan v. Yang | | 02-2-26432-8 SEA | Superior | | King | WA |
| Morgan, Ronald v. Discover Casualty Ins. | | | | | | |
| Morse v. State of Washington | | 03-2-00385-2 | Superior | | Mason | WA |
| Moses, Christopher v. Kirby Offshore Marine Pacific | | 19-2-13515-8 SEA | Superior | | King | WA |
| Mount v. Volume Shoe | | | | | | |
| Mountain Cold Storage | | 93-2-02400-8 | Superior | | Pierce | WA |
| Mountain View Meats | TJ 4189 | | | | | |
| Mullinax, Carolyn; Arnold Mullinax; Estate of Arnold Mullinax Jr; Estate of S.M. v. Jaguar Land Rover North America LLC; Jaguard Land Rover Limited; Joseph Rogerson; Diana Rogerson | | 18-2-01619-3 SEA | Superior | | King | WA |
| Munce, Estate of Gerald Lee, et al. v. Cline, Dennis | | 08-2-10227-6 | Superior | | Pierce | WA |
| Murphy, Martin v. Encompass Insurance Compny | Z(9 0215873NP | | | | | |
| Naini, Dr. Ali v. Evergreen Hospital | | | Federal | | | |
| Nakhlahmadi, Mojtaba v. Bittrex LLC | | JAMS Arbitration | | | | |
| National Frozen Foods v. Berkley Assurance | | 2:17-cv-00339 RSM | District | Western | | WA |
| Nelson, David P. Jr. v. Metropolitan Contracting, LLC; Ledcor et al. | | 10-2-15820-1 SEA | Superior | | King | WA |
| Nelson, Sloan & Jennifer v. Pro Caliber Motor Sports | 235.0664 | 15-2-00830-8 | Superior | | Kelso/Cowlitz | WA |
| Neppel Electrical & Controls, LLC  v. Wehash Technology Corp. | 300530-1 | | | | | |
| Neus, Craig Scott v.Crowley Maritime Corp. & Marine Services | | 1JU-13-559 | Superior | | Juneau | AL |
| New Horizon Christian Ctr v. AHR Engineer | | | | | | |
| Newby v. Lowe's Home Center; et al | | 15-01850 | District | Western | Seattle | WA |
| Newell, M.D., David W. v. Providence Health & Services dba Swedish Medical Center | Arbitration at Judicial Dispute Resolution, LLC | | | | | |
| Newman, Michele v. Costco | | 06-28574-3 SEA | Superior | | King | WA |
| Next Sentry | | | | | | |
| Ng, Jerry v. Swedish Health Services, | | 13-2-36575-8 SEA | Superior | | King | WA |
| Ni Zhou Yue v.  Que Di Di & Susan Luong | | 07-2-07117-8 | Superior | | Kitsap | WA |
| Nolana Bell v. Dr. Walter Rotkis | | 03-2-25610-2SEA | Superior | | King | WA |
| Norquest | | | | | | AK |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| North Park Dev't  v. 240 Second Ave | | 16-2-24794-6 SEA | Superior | | King | WA |
| North, James Kevin v. Fluke Biomedical, et al | | 12-2-11578-8 SEA | Superior | | King | WA |
| North, Margaret  v. Approved Turbo Components | | 6:08-cv-2020-Orl-31DAB | District | Middle | | FL |
| Nouri v. The Boeing Company | | C99-1227L | District | Western | | WA |
| NPIC v. ICW | | | | | | AK |
| NW Coinstamp | | 92-2-09596-1 | Superior | | King | WA |
| O'Neill v. Di Re | | 17-2-13600-0 SEA | Superior | | King | WA |
| O'Brien, Patrick; Surburban Air Freight, Inc. et al. v. Cessna Aircraft , Goodrich Corp. et al. | | CI 10-9381159 | Superior | | Douglas | NE |
| O'Donnell, Martin v. Bungie, Inc. and Ryan, Harold | | 14-2-19913-9 SEA | Superior | | King | WA |
| O'Farrell, Stuart v. Parker Smith & Feek | | 2:17-cv-00637 MJP | District | Western | Seattle | WA |
| Olden v. Yakima Reg Med Cntr | | 1:16-cv-03047-LRS | District | Eastern | | WA |
| Oldja, Ted v. Warm Beach Christian Camp | | 2:09-cv-00122-JCC | District | Western | | WA |
| Olney v. Les Schwab Tires | 973166363L | 95-2-25151-0 SEA | Superior | | King | WA |
| Olsen v. Merit Mechanical | | | | | | |
| OPAS v. Trend Target | | 96-2-21143-5 SEA | Superior | | King | WA |
| OrionHealth Care USA, Inc., v. Josh Cobbley, K2 Capital | | JAMS Case No. 1160023134 | | | Seattle | WA |
| Orn, Than v. City of Taoma | | 3:13-CV-05974-RBL | District | Western | | WA |
| Osborne Construction Company v. Renton Heritage LLC | | | | | | |
| Osby, Jawan v. Tacoma School District | | 3:15-cv-05079 | District | | Pierce | WA |
| Ostini v. PFM, Inc. | 4383140701 | 97-2-01796-1 | Superior | | Snohomish | WA |
| Ota, Michael and Connie Ota v. Richard Wakazuru, Kenneth Wakazuru | | 20-2-07270-2 | Superior | | King | WA |
| Otoski, Estate of Dr. Richard E., et al v. Avidyne Corporation, et al | | 3:09-cv-03041-PLK | District | Oregon | | OR |
| Otterby v. Tibbetts | | | | | | |
| Overton, Estate of Donald v. State of Washington et al. | | 10-2-01380-3 | Superior | | Thurston | WA |
| Oxford Cheese | | | | | | |
| Pacheco, Yesenia; Luis Lemus, and SLP (minor) Guardian ad Litem Brian Comfort v. United States of America | 15JA8618P00000203 | 2:15-cv-01175-RSL | District | Western | Seattle | WA |
| Pacific Coast Feathers v. Diversy Lever | 10824077 | | | | | |
| Paige v. Regan and Olberg | | 17-2-14481-9 KNT | Superior | | King | WA |
| Palekha v. Otto | | 03-2-12874-9 | | | | |
| Pang v. City of Seattle | | | | | | |
| Pate, Lynn v. Randles Sand and Gravel; et al | 379969594 | 15-2-09531-1 | | | Pierce | WA |
| Pavelich v. Wellspring Group CPAs, PLLC, et al. | | 17-2-19390-9 | Superior | | King | WA |
| Peach, Amy and Peach, Matt v. RLI Insurance Company, Triangle Charter Service LLC, Barbara Demeyer, Daniel Wilder, and William | | 17-2-16348-1 SEA | Superior | | King | WA |
| Peacock, Rachael (Estate of Scott Jernaigan)   v. Jason Frost | | 05-2-08104-0 SEA | Superior | | King | WA |
| Peckham, Estate of Dale v. USA Federa Aviation Admininstration | | 1:09-cv-0038 | District | Western | | IA |
| Pedraza, Rodrigo Rolorio v. Lakeland Evergreen LLC | | 05-2-08576-20 KNT | Superior | | King | WA |
| Peekay, Inc v. City of Lacey, et al | | C02-5261 RSM | District | Western | | WA |
| Pelletier v. Tweahaus | | 05-2-38978-8 KNT | Superior | | King | WA |
| Pemberton Creek Condominiums Association v. Bjorn  G. Olson Building | | 07-2-05228-9 | Superior | | King | WA |
| Peralta v. State of Washington; WSP | | 10-2-04894 8 | State | | Clark | WA |
| Perez-Melgos, Mercedes v. State of Washington | | 13-2-36617-7 SEA | Superior | | King | WA |
| Perkins v. Blado | | 03-2-06415-2 | Superior | | Pierce | WA |
| Peters, Brad; David Gray; Paul Staelin v. Infor (US), Inc. | | 10-cv-8102 | District | Northern | San Francisco | CA |
| Peterson v. Finazzo | | 05-2-41324-7 KNT | Superior | | King | WA |
| Peterson, Mark v. City of Yakima, Tony O'Rourke, Mark Soptich, Anthony Doan | | | Superior | | Yakima | WA |
| Phan, Vinh v. O'Hara Corporation | | 09-2-07978-1 SEA | Superior | | King | WA |
| Phillips v. New Hampshire | | A98-363 CIV | District | | | AK |
| Pineda v. Geren Ratliff, Pride Transport Inc., Howard Pels, Progressive Logistics Inc. d/b/a Giltner Inc. | | | District | Oregon | Portland Division | OR |
| Pinkstaff, Nathan v. Tidewater Barge Lines | | | Circuit | | Multnomah | OR |
| Pleasant v. Group Health | | | | | | |
| Plumlee v. Hayer;  TNS Trucking; ICBC | | 14-2-01250-3 | Superior | | Skagit | WA |
| Ponce, Estate of Jacob v. The Mountaineers | | 12-2-16394-4 SEA | Superior | | King | WA |
| Poshtkouhi v. Continental Western Group | | 06-2-0682-7 | Superior | | Pierce | WA |
| Powers v. Awad | | | | | | |
| Price, Lucas v. Price Daniel & Gravity Payments | | 15-2-10178-1 SEA | Superior | | King | WA |
| Prium Companies v. Spokane Rock I, LLC | | Arbitration | JAMS | | | WA |
| Pro Rec Sports Club Assoc. v. Baugh Const | | | | | | |
| Prosises v. Spear | | | | | | |
| Provencher, Dana; Ariana Provencher v. Pierce County d/b/a Pierce County Sheriff's Department, Shane Eppens | | 22-2-06247-4 | Superior | | Pierce | WA |
| Pryde Johnson Greenlake (Curt & Fawn Pyrde) adv. Union Bank | | 10-2-08028-7SEA | Superior | | King | WA |
| Pryde Johnson v. 4035 Stone Way; et al | | 1160021402 | | | Seattle | WA |
| Quintanilla v. City Of Seattle, et al | | 14-2-22748-5 SEA | Superior | | King | WA |
| Raju Dahlstrom v. State of Washington | | 05-2-42219-0SEA | Superior | | King | WA |
| Ramazanov, Kamil; Olga Ramazano; Olkam LLC v. Michael (Dev) Pontious; Malena Pontious; Jason Pontious | | 20-2-10491-4 SEA | Superior | | King | WA |
| Rauch, Norman v. Bechtel & ALCOA, Inc.,  et al | | 09-2-15492-4 | Superior | | Pierce | WA |
| Read, Jo Hanna as GAL for T.T. v. State of Washington | | 12-2-03999-1 | Superior | | Snohomish | WA |
| Reed, Charles v. Steven Hammond, Lara Strick, Rob Weber, Sara | | 3:16-CV-05993-BHS-DWC | District | Western | | WA |
| Reed v. IMO | | 06-2-11270-4 | | | | |
| Regency Ridge | | 97-2-25512-1 SEA | Superior | | King | WA |
| Rekhter v. State of Washington | | 10-2-01380-3 | Superior | | Thurston | WA |
| Rem Tech v. Fireman's Fund | | 05-cv-00087-LRS | District | Eastern | | WA |
| Residential Invest Partners v. SC Visions | | 03-2-04996-2 | Superior | | Snohomish | WA |

MUELLER AND PARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS INC
CASES FOR WHICH MR. PARTIN WAS DEPOSED OR TESTIFIED

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Ridge Development v. Thiel Chism | | 02-2-01314-4 | Superior | | Thurston | WA |
| Rios, Sanjuana v. Artegan LLC, Normandy Park Assisted Living LLC | 917068-GE | | Superior | | King | WA |
| Rival v. Reef | | 94-2-22243-1 | | | | |
| Roan, Natalee v. The Hartford | YHQAU27057 | 10-2-24892-6 SEA | Superior | | King | WA |
| Robinson, Josef v. City of Seattle | | 06-2-39193-4 SEA | Superior | | King | WA |
| Robinson, Rory v. Bhaika Transport, et al | | 14-2-06467-5 | Superior | | King | WA |
| Roderick v. Willis | | | | | | |
| Roland v. Miller; Rockwell | | 15-2-24997-5 KNT | | | | |
| Romanowski v. Mendyuk & James River Ins | | 175-03039 | District | Western | | WA |
| Rossi, Michael v. American Commerce Insurance Company | | Arbitration 00165841 | | | | |
| Rowe, David & Kimberly v. Seely, Daniel, MD | | 12-2-30036-4 SEA | Superior | | King | WA |
| RRW Legacy Management, et al./Campbell Investment Co. v. Campbell Walker | | 2:14-cv-326 MJP | Federal | Western | Seattle | WA |
| RSMI v. Heirloom Productions | | 03-2-08188-0 | Superior | | Pierce | WA |
| Ruelos v. Kal Kustom | | C92-6192 | | | | |
| Runyon, Richard v. Piper Aircraft, Inc., Jetprop LLC | | 17-2-00170-2 | Superior | | Spokane | WA |
| Rusin v. American States | | 99-2-00152-6 | Superior | | Kitsap | WA |
| Rutlegde v. J. Campbell & J. Gredvig (Safeco Insurance) | | 03-2-28265-1SEA | Superior | | King | WA |
| Rygaard Logging, Inc  v.  Western Power & Equipment Corp. | | 04-2-14447-7KNT | | | | |
| S & W Utility Contractors v. Thompson | | | | | | WA |
| S. Fiorito/ Race Track LLC v. J.D. & Barbara Fiorito | | 03-2-33450-2 SEA | Superior | | King | WA |
| S. Kirschoffer v. City of Seattle | | 96-2-02548-0 | | | | |
| Sage Group I, LLC.  Inc v, Kotter, John;  Kotter Assoc.; et al | | 11-2-29585-1 SEA | Superior | | King | WA |
| Salisbury, Eric v. City of Seattle | | 19-2-09999-2 KNT | Superior | | King | WA |
| Sarah E. Schmitz v. Catalina Cantu | | 03-2-17371-1 SEA | Superior | | King | WA |
| Satko, Joe v. Safeco | 386416252007 | | | | | |
| Saunders; Lowell v. Greiner | | CJ-2014-3474 | District | | Oklahoma Co | OK |
| Schauss v. Mutual of Enumclaw | 242530 | | | | | |
| Schill v. Pioneer Cable | AB066-001386-02 | 16-2-07240-8 | Superior | | Pierce | WA |
| Schmidt, Dennis; Demeter, Wendy v. American Commerce Insurance Company; MAPFRE USA | | 11-2-28529-4 KNT | Superior | | King | WA |
| Schnitzer v. Sealevel Bulkhead | | 3:16-cv-05340-RBL | District | Western | Tacoma | WA |
| Schock, Matthew C. v. Central Washington Truss, Inc. | | 10-2-00261-1 | Superior | | Kittitas | WA |
| Schuelke v. Glassybaby | | 16-2-05319-0 SEA | Superior | | King | WA |
| Scoggins, Michael; Pugh, Mary v. Rapport, Richard M.D. ; Group Health Cooperative | | 11-2-16767-4 SEA | Superior | | King | WA |
| Scot Vandervelde (Estate) v. Riyad Karmy Jones, et al | | 02-2-35005-4 SEA | Superior | | King | WA |
| Scott v. Buehler | 7319 5270 5041 | 15-2-21721-6 SEA | Superior | | King | WA |
| Scott v. Magnolia | | | | | | |
| Scott, Daniel v. Kwak-Goldman | | 07-2-11069-6 | Superior | | Pierce | WA |
| Scott; et al v. Scott, et al | | 16-4-02571-1 SEA | Superior | | King | WA |
| Seager v. Mitzie | | 00-2-29266-0 SEA | Superior | | King | WA |
| Seattle Steel | | | | | | |
| Segaline, Michael v. State of Washington | | 05-2-01554-1 | Superior | | Thurston | WA |
| Service America | | C94-1596-C | District | Western | King | WA |
| Seward; et al v. WA; et al | | 16-2-12788-1 | Superior | | Pierce | WA |
| Shane v. Gibbons | | | | | | |
| Sharkey, Christopher and Sharkey, Katherine v. State of Washington and Litvinchuk, Andrey | | 18-2-00347-4 SEA | Superior | | King | WA |
| Shaw-Sherman, Catrina; Denard Sherman v. Dalynne Singleton, Estate of Jason John Dean | | 20-2-05365-31 | Superior | | Snohomish | WA |
| Sheplar v. LPJ Excavating, et al | | 08-2-04054-2 KNT | | | | |
| Shevelenko, Yelenko and Konstantin Shevelenko v. Allstate Property and Casualty Insurance Co., Brandon Falli, Jane Doe Falli | | 20-2-05920-0 SEA | Superior | | King | WA |
| Shields v. Martinson | A0917086 | 14-2-10106-6 SEA | Superior | | King | WA |
| Shuck, Gail v. Silverdale Plaza / Safeway | | 05-2-00804-2 | Superior | | Kitsap | WA |
| Sienna  Corporation; ABv. Electronics v. Ceton Corp; Hammer, Gary & | | 1:12-CV-278-ODE | Federal | Northern | Atlanta | GA |
| Sill, Tom v. Dunn Lumber Co. Inc, Dunn Lumber Northwest Inc, John or Jane Does 1-10, Doe Corporations 1-10, Doe Partnerships 1-10 | | 18-2-25064-1 KNT | Superior | | King | WA |
| Share | | | | | | |
| Simmons v. City of Seattle | | | | | | |
| Simmons, Hayden v. Clearwater Power Company, State of Washington | | | Superior | | Asotin | WA |
| Simmons v. WA Dept of Fish & Wildlife & Clearwater Power | | 17-2-00249-02 | Superior | | Asotin | WA |
| Simpson Timber v. Girard Custom Coatings | | | | | | |
| Simon, Braeden v. Kelly Holguin | | 20-2-07549-9 | Superior | | Pierce | WA |
| Sintra v. City | | 88-2-18865-3 | | | | |
| Sires, Arnold R. v. Cho, Seong-Kyo | | 12-2-05936-3 | Superior | | Snohomish | WA |
| Six Continental v. United of Omaha | | C98-16902 | District | Western | Seattle | WA |
| Skoro, John v. State Farm | | | | | | |
| Slater, Estate of James v. King County | | 2:12-cv-01132 MJP | | Western | Seattle | WA |
| Smai, Sabrina v. Yiyuan Li, Zhongyuan Li | | 22-2-01502-1 SEA | Superior | | King | WA |
| Small v. Safeco Insurance Company | 21D970371748 | Arbitration | | | | |
| Smith, Kristi v. Clover Park School District | | 21-2-07481-4 | Superior | | Pierce | WA |
| Snoland, Steven v. Nicholas Peddy | | 21-2-07718-4 SEA | Superior | | King | WA |
| Snoqualmie Ice Cream v. Edaleen Dairy | WAMS File No: 160909003 | | | | | |
| Son, Hai dba Sam Son Remodeling Service v. Pham, et al. | | 11-2-20696-3 SEA | Superior | | King | WA |
| Song, Yong & Jin  v. JC Penny | | 01-2-01283-2 | Superior | | Benton | WA |
| Soule v. Connecticut Mutual | | 9501371 | District | Western | | WA |

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Sound Inpatient Physicians, Inc. v. Med-Data, Inc d/b/a MedData a/k/a Mednax | | | | | | |
| Spa-Go, LLC; Togamau Kalepo v. Clyde Antone Jelinek as PR of Genevieve C. Jelinek | | | Superior | | Snohomish | WA |
| St. Germaine, Rudy v. Treif USA, Inc. d/b/a Treif USA and Treif Maschinenbau GMBH | | | District | Western | | WA |
| St. Paul v. Marsh McClennan | | | | | | |
| Stanchfield v. Art Brass Plating, Inc. (Burgess Fitzer) | | Arbitration | | | | |
| Starline Windows Inc. v. Insurance Company of the State of | | | District | Southern | | California |
| State of Washington v. Careone Dental Corporation; Liem Do, DDS, PLLC; Liem Duy Do; Phuong-Oanh thuy Tran | | 15-2-002514-1 | | | | |
| State of Washington v. Johnson & Johnson; Ethicon, Inc. | | 16-2-12186-1 SEA | Federal | Western | Seattle | WA |
| State of Washington v.  National Maintenance Contractors LLC, NMC Franchising LLC, Marsden Holding LLC, Encore One LLC | | 21-2-04554-1 SEA | District | Western | Seattle | WA |
| Stearns, Rick & Dorothy v. Wilsey | 787967343020 | Arbitration | | | | |
| Steinman v. Dickson | X81204290RG | 93-2-07767-5 | Superior | | Pierce | WA |
| Sterns, Donna | | | | | | |
| Stevens, Kenneth & Bana, GAL for Stevens, Joseph & Taylor v. Valley Medical Center dba Lake Sawyer Clinic Primary Care | | | | | | |
| Stevenson, Julie Losee v. Sustainable Apparel | | 2:12-cv-01007-RAJ | Federal | Western | Seattle | WA |
| Stewart v. King County | | 03-2-18021-1 KNT | Superior | | King | WA |
| Stowe, Benjamin Bradley v. Capella Healthcare d/b/a Capital Medical | | 17-2-01042-34 | Superior | | Thurston | WA |
| Stockwell, Nita v. Hilton Seattle Airport | | 18-2-151169-4-KNT | Superior | | King | WA |
| Strickland, Enosa Sr. and Kathleen Keliikoa-Strickland as co-Personal Representatives of the Estate of Enosa Strickland Jr. v. City of Auburn, Kenneth Lyman | | 2:22-cv-00528-JHC | District | Western | | WA |
| Studer-UIM Arbitration (Safeco) | | UIM Arbitration | | | | |
| Sue Ann Corn as Pr for Estate of Ronald D. Corn v. Les Schwab | | 06-2-28808-4 KNT | Superior | | King | WA |
| Sugiyo USA, Inc v. Arden Olson Building, Inc.; Aredens Industrial Floor Coatings; Developers Surety & Indemnity Co | Y0933240 | 14-2-00462-4 | State | | Skagit | WA |
| Suldan v. Cablecom, Inc. | | | | | | |
| Sullivan, Terry | | | | | | |
| Summers, Paula | 472702345 | | | | | |
| Summerwood adv. Miles Resources | | Arbitration | | | | |
| Sun Mountain v. Pierre | | 93-2-14823-2 | | | | |
| Sundheim, Jeremy  v. United Rentals | | 15203951-7 | Federal | | Spokane | WA |
| Suzanne Gonzales v. Caliber Home Loans | | 3:17-cv-01352-H-BGS | District | Southern | | CA |
| Swan, Johnson, Kari | | 4:07-cv-01695-CDP | District | Eastern | | MO |
| Tallerday v. Delong | | | | | | |
| Tapken, Madelyn v. Spokane County and Malinak, Conrad | | 13-2-01216-7 | Superior | | Spokane | WA |
| Taylor, Reed v. Cairncross & Hempelmann; Bell | | 12-2-10803-0 SEA | Superior | | King | WA |
| T.D. as individual and natural guardian of E.M. a minor v. State of Washington, Department of Social and Health Services | | 18-2-11671-6 SEA | Superior | | King | WA |
| Tek-Line Construction Inc., Ian Edens, Ted Watson v. Scott Morrison | | 18-2-10197-2 SEA | Superior | | King | WA |
| Tenderholt, Dorothy  / Daniel Taylor v. David, Daniel & Darci Deach | | 05-2-01129-0 | Superior | | Skagit | WA |
| Tenzer, Lan Bach for Cary Scott Tenzer and Madeline Tenzer v. Chowdhary, MD and Overlake Hospital Medical Center | | 17-2-31429-3 SEA | Superior | | King | WA |
| Ternoir v. U-Haul | 1077841 | 95-2-20713-8SEA | Superior | | King | WA |
| Terry Raymond v. Pace Int'l LLC | | 96-2-29650-3 SEA | Superior | | King | WA |
| Testerman, Sherrie v. City of Union Gap | | 14-2-00563-5 | Superior | | Yakima | WA |
| Thach, Dr. Tien v. Matrix Anesthesia, PS; Dr. John Costello; Dr. Sean Kincaid | | | | | | |
| The Wattles Company v. Exide Technologies, Inc., and Exide | | 13-2-07695-6 | State | | Pierce | WA |
| Thickens, Daphne v. Culbert, Patrick; Culbert, Dennis | | 12-2-36377-3 SEA | Superior | | King | WA |
| Thompson v. Ehnez | 57331144 | | | | | |
| Thompson, Kathryn v. City of Union Gap; | | 12-2-03154-1 | Superior | | Yakima | WA |
| Thunderbird ( Red Lion) | | | | | | |
| Thykkuttathil, Rani and Wellman, Ryan v. Keese, James | | 2:12-cv-01749 | Federal | Western | Seattle | WA |
| Tiger Mountain LLC / P&L Associates v. King County | | 03-2-05287-4 | Superior | | Snohomish | WA |
| Tilzer, Adele and David Tilzer v. Robert Parker, MTR Western LLC, Seattle Hospitality Group | | 18-2-06551-8 KNT | Superior | | King | WA |
| Tokio Marine v. Kingsbury | | 01-14-0002-1826 | | | Culver City | CA |
| Tolbert, Jorden T. | | | | | | |
| Tomlinson v. Ford | | 93-2-09295-4 | Superior | | King | WA |
| Torres Mazatlan Remainder LLC v. FLRX | | 2:12-cv-00870-JCC | | | | |
| Torres v. City of Anacortes, et al | | | | | | |
| Torvik, Svein v. The Insurance Co. of  the State of Pennsylvania & American International Group, Inc. | | 2:09-cv-00886-RAJ | District | Western | | WA |
| Trans West v. WAMU | | 98-2-04031-9SEA | Superior | | King | WA |
| Trident Seafoods Corp. v. Sea 'N Air Travel | | 05-2-12974-3SEA | Superior | | King | WA |
| Unionville Ranch, et al. v. State of Washington (Taylor Bridge Fire) | | 12-2-00321-4 | Superior | | Yakima | WA |
| Uraga v. D&S Electric | | 91-2-06108-4 | | | | |
| US Engines v. Global Engines | | 00-2-30307-6 KNT | Superior | | King | WA |
| Valencia, et al v. Concrete Nor'west, et al | | 15-2-10644-4 | Superior | | Pierce | WA |
| Valiquette v. National Railroad (Amtrak) | | | | | | |
| Van De Graff Ranches, Inc, et al v. Animal Pharmaceuticals, Inc. et al | | 06-2-3010-8 | Superior | | Yakima | WA |
| Van Ess, Leona | B146936 | | | | | |
| Vanlandingham, Jason v. Sellen Brothers Construction Company | | 15-2-04045-6 SEA | Superior | | King | WA |
| Versluys, Dr. Arnaud; Institute of Classics in East Asian Medicine LLC (ICEAM) v. White Pine Circle LLC; Sharon Weizenbaum; Nadine Zaech | | 3:21-cv-1694 | District | | Portland | OR |

| Case Name | CLAIM NO. | LEGAL CAUSE NO. | COURT | DISTRICT | CITY/ COUNTY | STATE |
|---|---|---|---|---|---|---|
| Via6 Apartments (Sixth & Lenora Apartments LLC) v. Aquatherm GMBH; Aquatherm L.P.; Ridgeline Mechanical Sales, LLC; Harrington Industrial Plastics LLC | | 17-2-20015-8 SEA | Superior | | King | WA |
| Vicente, Juan v. Elenbaas Company Inc., John Does 1-10, ABC Corporations 1-10 | | 20-2-00576-37 | Superior | | Whatcom | WA |
| Vicor Founders | Arbitration # 1260000537 | | | | | CA |
| Vine Street Partnership/Smokey Pt. Prop. v. City of Marysville | | 95-2-07655-4 | Superior | | Snohomish | WA |
| Vineyard, Andrew v. Griffin, Kevin and Molly | | 14-2-17439-0 SEA | | | | |
| Vitrum Industries Ltd v. Arcadia Inc d/b/a Arcadia Northwest | | 2:20-CV-00265 | Federal | Western | Seattle | WA |
| Vizant v. Allergan | | 14-2-04198-0 | Superior | | Spokane | WA |
| Volkert, Eric v. Fairbank Construction | | 13-2-33506-6 KNT | Superior | | Seattle | WA |
| Vollstedt et al  v. Deyonne Tegman et al | | 07-2-18777-4SEA | Superior | | King | WA |
| W.O.R.K. v. Highline Hospital | | 94-2-09226-0 | Superior | | King | WA |
| Walker, Charles v. General Construction | | | | | | |
| Walters, Estate of Adell G.C. v. Bethany of the Northwest | | 06-2-13116-7 | Superior | | Snohomish | WA |
| Walters, Estate of James v. ASRC Energy | | 4FA-14-01734 CI | Superior | | Faribanks | AK |
| Ward, David, Estate of | 13309658050SD | | | | | |
| Washburn v. Stevenson & Ford of Kirkland | | | | | | WA |
| Waterman v. Lee | | 05-2-07507-0 | Superior | | Pierce | WA |
| Waterside Beach Owners v. Pryde Corp | | 99-2-22009-9SEA | | | King | WA |
| Weaver v. Vivion | | 95-2-02109-2 | | | | |
| Weber v. Progressive | | | | | | |
| Wedgewood at Renton v. Westcott Holdings, Inc.; Vercello, LLC | | 09-2-10916-8 KNT | Superior | | King | WA |
| Weedman v. Skyjack; United Rentals, et al | | 14-2-00866-6 | Superior | | Grant | WA |
| Weintraub v. Apple | 2670044380 | 97-2-30213-7SEA | Superior | | King | WA |
| Weiss, Karl & Luann Shahini v.  Torset Excavating | | 08-2-26921-3SEA | Superior | | King | WA |
| Welch,  Estate of Jerry L.&  Gosney v. Fireman's Fund Ins. Co.; Pizza Time, et al | | 09-2-32462-0 SEA | Superior | | King | WA |
| West Coast Acquisitions, Inc. v. HCI Steel Building Systems Inc., et al. | | 11-00167 JLR | Federal | Western | | WA |
| West v. West | | 07-3-03773-3 SEA | Superior | | King | WA |
| Western Homes | | | | | | |
| Westmark v. Burien; King County | | 96-2-04778-1 | Superior | | King | WA |
| Westward Hoe Construction v. Thomas Dickson et al | | 07-2-29316-7 SEA | Superior | | King | WA |
| Weyh v. Transcontinental Insurance | | | | | | |
| Wheeler v. Swedish Hospital | | | | | | |
| Whitaker v. Thyssenkrup Elevator | C05-1103 | | | | | |
| Whitby Farms; et al  v. Inland Tarp & Liner Company | LA715-0371 | | | | | |
| White v. Main | | 99-2-24382-0 SEA | Superior | | King | WA |
| Whiteluce, Randall v. Yi, Sok Hyon | | 08-2-1514-5 | Superior | | Grays Harbor | WA |
| Wilder v. Safeco | | | | | | |
| Wildseed v. Maier | | | | | | |
| Williams v. Barry Swanson Trucking | | | | | | |
| Williams, Rachel v. McLean, Edward B. & Duse | | 12-2-01979-9 SEA | Superior | | King | WA |
| Williams, Scott v. Talt, Robin | | 12-2-31426-8 SEA | Superior | | King | WA |
| Wilson v. City | | 92-2-18418-4 | Superior | | King | WA |
| Wilson v. PNE | | | | | | |
| Wily v. Mason County | | | | | | |
| W.M. (minor), Erin Olson (L.G.), James Maney v. State of Washington | | 18-2-04716-1 | Superior | | Clark | WA |
| Wolber, Andrea v. Kistap Mental Health Services | | | | | | |
| Wooding, William v. Woolworth, Ron | | JAMS 1160022464 | | | | |
| World Wrapps v. Sun Orchards | | | | | | |
| Wright, Annette v. USA; Madigan Hospital | | C12-05028 USDC | Federal | Western | Tacoma | WA |
| Wright, Patricia v. City of Gig Harbor | | 08-2-05472-7 | Superior | | Pierce | WA |
| Xu v. City of Issaquah; Sandra Hare | | 16-2-09668-9 SEA | Superior | | King | WA |
| Yin, Rong  v. Griswold | | 09-2-00538-1 | Superior | | King | WA |
| You Lucky Dog; et al v. Sloan; et al | | 16-4-25234-4SEA | Superior | | King | WA |
| Yvonne B. Tani, et al v. Healy Tibbitts Builders, Inc. et al | | 04-1-0482-03 | Circuit | | | HI |
| Zesto's LLC, 4035 Stone Way LLC, Excel Properties Commercial & Investments Inc. v. Curt Pryde, Fawn Pryde, Pryde Johnson Stone Way LLC, Pryde Johnson 15th Ave. LLC, Pryde Johnson Developer Entity LLC, Ballard 14th Ave. LLC, Stone Way 41st LLC | 1100106822 | | | | Seattle | WA |
| Ziegler v. State of Washington Sentencing Guidelines Commission | | 02-2-02190-2 | Superior | | Thurston | WA |
| Ziegler, R.W. v. Schwabe, Williamson & Wyatt, P.C. | | 10-2-28710-8SEA | Superior | | King | WA |
| Zielinski, David v. Time Bandit LLC & New Era Alaska INC | | 15-2-00747-5 SEA | Superior | | King | WA |

**Attachment 53**

# Casey M. Lesoing, MBA

Senior Associate Forensic Economist

## SUMMARY

Casey M. Lesoing, a Senior Associate at Mueller & Partin Forensic Accountants & Economists, Inc., offers clients 16 years of experience in evaluating economic loss claims.

Mr. Lesoing has a diverse range of experience in providing discovery assistance, financial investigations, causation analysis, labor market and industry research, economic analysis of claims, and preparing written reports explaining economic analyses and conclusions reached. During his tenure at the firm he has consulted on hundreds of matters involving personal injury, wrongful death, valuation of life care plans, wrongful termination, intellectual property infringement, business income loss, fraudulent transfers, real estate development delay, construction defect, inventory loss, insurance subrogation, and other complex commercial litigation matters.

Mr. Lesoing has experience analyzing claims from participants in a broad range industries including hospitality, healthcare, skilled nursing facilities, financial services, professional services, manufacturing, information technology hardware, software, education, transportation, maritime, retail, real estate, construction, food service, food production, and entertainment.

He has analyzed staffing levels, deficiency rates and financial relationships involving skilled nursing facilities in the states of Washington, California, Oklahoma, Wisconsin, Tennessee, and Kentucky. He has also analyzed financial transactions and business relationships involving hospitals, physician groups, and real estate management companies.

## PROFESSIONAL EXPERIENCE

**2007 – Present     Mueller & Partin Forensic Accountants & Economists, Inc.**
*Senior Associate Forensic Economist*

## EDUCATION

**Master's in Business Administration**
Western Washington University; *College of Business and Economics*

**B.A. in Business Administration and Finance with a Minor in Economics**
Western Washington University; *College of Business and Economics*

**Certificate in Accounting (Graduate Level)**
University of Washington

**MOGLIE & MARTIN FORENSIC ACCOUNTANTS AND ECONOMISTS, INC.**

**CASES FOR WHICH MR. MOGLIE WAS DEPOSED OR TESTIFIED**

| Case Name | Legal Cause No. | Court | District | City/County | State | Testimony Type | Date |
|---|---|---|---|---|---|---|---|
| Jeffrey R. Allen v. John W. Kim | 22-2-04585-5 | Superior | | Pierce | Washington | Trial | 9/5/2023 |
| ABV Electronics, Inc. v. Ceton Corporation | 1 : 12 - CV-2178-ODE | Federal | Northern Dist. Of Georgia | | Georgia | Deposition | |
| Allstate Insurance, et al v. Conway Construction Company, et al. (Taylor Bridge Fire Settlement Allocation) | | | | | Washington | Arbitration | |
| Sean Mesnick v. Cascade Sawing & Drilling Inc., Jason Gregoire | | Superior | | King | Washington | Deposition | 11/16/2023 |

# MUELLER* & PARTIN, INC.

**Forensic Accountants and Economists**

816 EVERGREEN POINT ROAD
P.O. BOX 882
MEDINA, WASHINGTON 98039

PHONE:          (425) 455-0303
FACSIMILE:    (425) 455-5176
EMAIL:partin@muellerpartin.com

*Gary E. Mueller - Retired

FEES
&
COST

Fees for our services are based up on our standard hourly billing rates. You will be billed for the actual time expended working on your project. Our fee is not contingent upon the outcome of possible settlement or litigation. Fees for our services are based upon the following hourly rate structure[1]:

|  | 01/01/24 thru 12/31/24 |
|---|---|
| William Partin | $ 495.00 per hour |
| Associates | $ 270.00 - 340.00 per hour |
| Staff Accountants | $ 95.00 per hour |
| Administration | $ 85.00 per hour |

Out of pocket costs for travel, telephone, delivery, supplies and other necessary project expenses will be billed to you at our costs.

Please feel free to call with any questions that you may have regarding this letter.

William E. Partin, CPA/ABV/MAFF/CFE

---

[1] Fees are adjusted at the end of every year



Worldwide leaders in public and management accounting

**Forensic & Valuation Services Practice Aid**

# Calculating Lost Profits

USA-016056

© 2020 Association of International Certified Professional Accountants. All rights reserved.

For information about the procedure for requesting permission to make copies of any part of this work, please email copy-right-permission@aicpa-cima.com with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA 220 Leigh Farm Road, Durham, NC 27707-8110

USA-016057

## *Notice to Readers*

This publication is designed to provide illustrative information about the subject matter covered. It does not establish standards or preferred practices. The material was prepared by AICPA staff and volunteers and has not been considered or acted upon by AICPA senior technical committees or the AICPA board of directors and does not represent an official opinion or position of the AICPA. It is provided with the understanding that the AICPA staff and the publisher are not engaged in rendering any legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The AICPA staff and this publisher make no representations, warranties, or guarantees about, and assume no responsibility for, the content or application of the materials contained herein and expressly disclaim all liability for any damages arising out of the use of, reference to, or reliance on such material.

The AICPA's Code of Professional Conduct (AICPA code) has updated the definition of *client* to be defined as both engaging entity (typically engaging attorney or attorney's firm) and subject entity (typically attorney's client). Effective December 31, 2017, the term *client* is defined as "any person or entity, other than the member's employer that engages a member or member's firm to perform professional services (engaging entity) and also, a person or entity with respect to which a member or member's firm performs professional services (subject entity). When the engaging entity and the subject entity are different, while there is only one engagement, they are separate clients." (ET sec. 0.400.07) [fn 1]

For purposes of this practice aid, "attorney," "litigant's attorney," and "counsel's client" are all considered *client* as defined by the AICPA code.

### Update as of January 1, 2020

The AICPA's Forensic and Valuation Services Executive Committee issued Statement on Standards for Forensic Services (SSFS) No. 1 (FS sec.100) [fn 2] to protect the public interest by preserving and enhancing the quality of practice of a member performing forensic services. Effective for engagements accepted on or after January 1, 2020, SSFS No. 1 establishes standards for a member providing services to a client as part of litigation and investigation engagements. The term litigation as used in SSFS No. 1 and throughout this practice aid is not limited to formal litigation but is inclusive of disputes and all forms of alternative dispute resolution, unless otherwise stated. [fn 3]

---

[fn 1]   All ET sections can be found in AICPA *Professional Standards*.

[fn 2]   All FS sections can be found in AICPA *Professional Standards*.

[fn 3]   See Statement on Standards for Forensic Services No. 1, paragraph 1.

© 2020 Association of International Certified Professional Accountants     3

USA-016058

## *Acknowledgments*

The authors of this practice aid are members of the AICPA Forensic and Litigation Services Damages Task Force:

Greg Regan
Jack Schwager
Holly Sharp
Christian Tregillis
Alex Walther

In addition, members of the AICPA's Forensic and Litigation Services Committee and the Forensic and Valuation Services Executive Committee also provided information and advice to the authors and AICPA staff for the update to this practice aid.

### AICPA Staff

Barbara Andrews
*Director, Forensic, Technology and Management Consulting Services*
FVS Section

Christine N. Cutti-Fox
*Senior Manager, Forensic Services*
FVS Section

© 2020 Association of International Certified Professional Accountants

USA-016059

## Contents

**Chapter 1 — Introduction**.................................................................................................. **9**

    Intent of the Practice Aid ................................................................................................ 9

    Practice Aid Overview .................................................................................................... 9

    Case Study Background Information ............................................................................. 10

**Chapter 2 — Legal Principles**........................................................................................ **11**

    Introduction.................................................................................................................... 11

    Lost Cash Flow Versus Lost Income ............................................................................ 11

    Types of Damages.......................................................................................................... 11

    Causation........................................................................................................................ 12

    Reasonable Certainty ..................................................................................................... 15

    Foreseeability................................................................................................................. 16

    Distinguishing Alleged Violative Acts From Other Acts, Including Subsequent Events ............ 16

    Identifying Multiple Harmful Acts ............................................................................... 17

**Chapter 3 — Lost Profits as a Measure of Damages**................................................... **19**

    Introduction.................................................................................................................... 19

        Figure 3.1. Summary of Lost Profits .................................................................. 20

    Causes of Action Giving Rise to Lost Profits Damages Claims..................................... 21

        Breach of Contract .............................................................................................. 21

        Torts .................................................................................................................... 22

        Other Matters Giving Rise to Lost Profits Analysis ........................................... 22

**Chapter 4 — Calculation of Lost Profits**..................................................................... **24**

**Chapter 5 — Loss Period** ............................................................................................... **26**

    Overview........................................................................................................................ 26

    Breach of Contract ........................................................................................................ 27

    Torts .............................................................................................................................. 29

© 2020 Association of International Certified Professional Accountants

USA-016060

**Chapter 6 — Estimating Lost Revenues**.............................................................................. **31**

Overview ..................................................................................................................... 31

Understand the Allegations ......................................................................................... 31

Understand the Agreements and Contracts .................................................................. 32

Request, Analyze, and Understand Relevant Documents and Information .................. 33

Assess the Reliability of Available Information .......................................................... 34

Determine the Applicable Method and Estimate But-For Revenues ........................... 35

    The "Before-and-After" Method ........................................................................... 36

    Figure 6.1. Historical Revenues for 11th Location ............................................... 37

    The "Yardstick" (or "Benchmark") Method ......................................................... 38

    Measurement Based on the Terms of the Contract ................................................ 39

    Other Methods ...................................................................................................... 40

Past and Future Lost Revenues ................................................................................... 40

    Figure 6.2. Summary of Lost Revenues ............................................................... 40

Do the Lost Revenues Make Sense and Are They Reasonable? .................................. 41

Scenarios .................................................................................................................... 42

**Chapter 7 — Costs** ............................................................................................................ **43**

Overview ..................................................................................................................... 43

Variable, Marginal, Incremental, Saved, Avoided, and Fixed Costs ........................... 43

Evaluation of Specific Cost Line Items ...................................................................... 45

    Figure 7.1. Historical Company Cost Analysis .................................................... 46

    Figure 7.2. Total Company Food Expense Compared to Total Food and Beverage Revenue ...................... 47

    Figure 7.3. Executive Compensation Expense Compared to Total Food and Beverage Revenue .............. 48

Statistical Analysis ..................................................................................................... 48

    Figure 7.4. Selected Regression Output: Exec. Comp. Expense Regressed Against Total Food and Beverage Revenue ............................................................ 49

© 2020 Association of International Certified Professional Accountants

USA-016061

Figure 7.5. Selected Regression Output: Exec Comp. Expense Regressed Against Revenue and CFO Presence ............................................................................................................................................ 50

Company-Specific Factual Investigation ........................................................................................ 50

Figure 7.6. Total Parent-Level Expenses Compared to Total Food and Beverage Revenue ......... 51

Figure 7.7. Legal Expenses, Stores Open at Year-End, and New Stores by Year ......................... 51

Figure 7.8. Possible Categorization of Costs ................................................................................. 52

Chapter 8 — Prejudgment Interest ................................................................................................ 53

Overview ......................................................................................................................................... 53

Prejudgment Interest and Lost Profits Calculations Under Federal and State Law ....................... 54

Sample Calculations of Prejudgment Interest ................................................................................. 55

Figure 8.1. Prejudgment Interest Using Simple Interest ................................................................ 55

Figure 8.2. Prejudgment Interest Using Annual Compounding .................................................... 56

Prejudgment Interest Period ........................................................................................................... 56

Prejudgment Interest Rates in Federal and State Courts ................................................................ 57

Considerations in Selecting a Prejudgment Interest Rate .............................................................. 57

Risk-Free Rate ................................................................................................................................ 58

Defendant's Cost of Unsecured Borrowing ................................................................................... 58

Plaintiff's Cost of Borrowing or Return on Investment ................................................................ 59

Plaintiff's Cost of Capital or Cost of Equity ................................................................................. 59

The Prime Rate and Other Rates .................................................................................................... 59

The Role of the Practitioner ........................................................................................................... 59

Post-Judgment Interest ................................................................................................................... 60

Ex Ante and Ex Post Calculations ................................................................................................. 60

Figure 8.3. Ex Ante Discounting and Prejudgment Interest .......................................................... 60

Chapter 9 — Discount Rates ......................................................................................................... 62

Overview ......................................................................................................................................... 62

Chapter 10 — Taxes ....................................................................................................................... 64

© 2020 Association of International Certified Professional Accountants

USA-016062

Overview..........................................................................................................................................64

"In Lieu of" and "Origin of the Claim"..........................................................................................64

*Raytheon* and the "In Lieu of" Test..............................................................................................64

Gilmore's "Origin of the Claim" Test for Damages or Settlements Paid.....................................65

Timing of Profits Lost Versus Damages Received.........................................................................65

    Figure 10.1. Example of Effect of Timing of Damages Compared to Damages Award Receipt.................66

Discount Rates and Taxes..............................................................................................................66

    Figure 10.2. Taxes on Growth During Discounting Period..............................................................67

**Chapter 11 — Mitigation** .............................................................................................................. **68**

Overview.........................................................................................................................................68

Cases With a Reduction in Lost Profit Damages for Failure to Mitigate .....................................69

Cases With Offsets in Lost Profit Damages for Mitigation...........................................................69

Cases Showing Exceptions to the Mitigation-of-Damages Doctrine ...........................................70

Cases Addressing Mitigating Revenues Versus Additional Revenues..........................................70

Application of the Mitigation-of-Damages Doctrine.....................................................................71

Limitations to the Plaintiff's Ability to Mitigate .........................................................................71

Suggestions for Practitioners in Evaluating Mitigation in Lost Profits Claims............................72

**Appendix A — Case Opinions** ....................................................................................................... **73**

© 2020 Association of International Certified Professional Accountants

USA-016063

# Chapter 1

## *Introduction*

### Intent of the Practice Aid

When a business experiences an actionable harm, one of the most commonly sought remedies is the award of damages measured as the business' lost profits. Because of their unique skills and knowledge, practitioners with expertise in the forensic accounting and valuation disciplines are frequently requested to measure lost profits in commercial disputes as both non-testifying consultants and testifying expert witnesses. [fn 1] These lost profits analyses are often subjected to intense scrutiny by attorneys, other financial practitioners, and triers-of-fact. For this reason, practitioners engaged to measure lost profits confront the need to perform sound analyses that are credible from a theoretical perspective (for example, in the fields of economics, finance, and accounting), tied to facts, and legally admissible.

The intent of this practice aid [fn 2] is to provide nonauthoritative guidance to practitioners of all levels who are engaged to measure lost profits. This practice aid is not intended to be a treatise on the topic of lost profits but, rather, is designed to assist practitioners by identifying and addressing issues of concern that may arise in the determination of lost profits. Many of the topics discussed in this practice aid are explored in greater depth in other resources, including other practice aids published by the AICPA. [fn 3]

### Practice Aid Overview

Lost profits analysis occurs at the nexus of law, economics, finance, and accounting; it may also involve other disciplines (for example, statistics and valuation) and industry-specific considerations. This practice aid discusses legal topics, including damages theories, the legal standards for recovery of lost profits, and the causes of action that commonly give rise to lost profits claims. Also included are illustrative references to case law, included to further an understanding of key legal considerations when measuring lost profits. Appendix A, "Case Opinions," lists all cases referenced within this practice aid.

---

[fn 1] Practitioners performing forensic services as defined by Statement on Standards for Forensic Services (SSFS) No. 1 (FS sec. 100), such as economic damages calculations, are subject to the requirements of SSFS No. 1. SSFS No. 1 establishes standards for a member who provides forensic services as part of both litigation and investigation engagements, which are defined therein. In addition, practitioners performing litigation or investigation engagements to measure lost profits that also involve the provision of valuation services should follow the standards set forth in VS section 100, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*. VS section 100 addresses distinctions between requirements for valuations and lost profits calculations. Both SSFS No. 1 and VS section 100 can be found in AICPA *Professional Standards*. Although VS section 100 does not apply to lost profits analyses, certain of the standards outlined in VS section 100 may be applicable to other measures of economic damages under consideration by practitioners engaged to measure damages, including the loss of business value.

[fn 2] The AICPA previously issued Practice Aid 06-4, *Calculating Lost Profits*, to provide nonauthoritative guidance to practitioners engaged to prepare an analysis of lost profits. This practice aid supersedes Practice Aid 06-4.

[fn 3] For example, see the practice aids *Attaining Reasonable Certainty in Economic Damages Calculations, Calculating Intellectual Property Infringement Damages*, and *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*.

© 2020 Association of International Certified Professional Accountants

USA-016064

Although this practice aid discusses legal concepts and requirements in connection with performing lost profits analyses, it is not intended to provide legal advice. Legal standards and requirements vary based on facts and circumstances, causes of action, the legal jurisdiction, and the continuously evolving body of legal precedent. Practitioners providing services in connection with measuring lost profits are advised to discuss legal concepts and requirements specific to their engagements with counsel.

After introducing legal concepts affecting lost profits measurements, this publication addresses methodologies for measuring lost profits and common approaches for estimating elements of a lost profits calculation. Throughout this practice aid, key considerations when performing lost profits analyses are highlighted, and practical approaches to common issues are discussed. To illustrate the practical application of the concepts introduced herein, reference is made throughout to a hypothetical business dispute between a restaurant franchisor and its franchisee. This case study is an important complement to the conceptual guidance provided herein.

## Case Study Background Information

In 2009, Franchisee LLC (Franchisee) entered into a franchise agreement with Franchisor Corp. (Franchisor), a franchisor of fast casual dining establishments under the "American Kitchen" trade name, whereby the Franchisee obtained the exclusive right to develop and operate American Kitchen restaurants in the Baltimore-Washington, DC metropolitan area (the Franchise Zone). Pursuant to the franchise agreement, Franchisee agreed to pay Franchisor a franchise fee for use of the American Kitchen trade name, trademarks, and for certain services provided by Franchisor. Franchisee additionally agreed to pay Franchisor certain fees based on a percentage of store revenues. Franchisor agreed to provide Franchisee with its franchisee operating manual and promotional materials as well as access to training, development, and operations advisory services. Franchisor also agreed to include the Franchise Zone in its national ad campaigns. Although Franchisee was responsible for the actual development and operation of each restaurant in the Franchise Zone, Franchisor maintained some control over the development and operations of restaurants developed by Franchisee, including the location, restaurant layout, signage, products, supply chain sources, and product pricing, per the franchise agreement. The franchise agreement had a 10-year term and was renewable for additional 5-year terms thereafter, at the election of Franchisor, subject to achievement of certain key financial and quality performance metrics by Franchisee.

In 2010, Franchisee opened and began operating eight American Kitchen eatery locations in the Franchise Zone. In 2011, and again in 2013, Franchisee opened one additional American Kitchen eatery location in the Franchise Zone. From 2013–2016, Franchisee operated 10 American Kitchen eateries.

In late 2016, Franchisee submitted a development plan to Franchisor to build and operate its 11th location, on a prominent college campus, as part of a new mixed-use development to be built in 2017. Franchisor rejected the development plan, citing concerns regarding the planned location and restaurant layout, and Franchisor's perception that it deviated from the American Kitchen brand's targeted consumers.

In 2017, Franchisee filed a lawsuit against Franchisor, asserting breach of contract. In particular, Franchisee asserted that Franchisor lacked contractual authority to reject the development plan. Franchisee asserted damages from the inability to open the new American Kitchen location in 2017.

10           © 2020 Association of International Certified Professional Accountants

USA-016065

# Chapter 2

## *Legal Principles*

### Introduction

A practitioner performing forensic services as a damages expert should develop an understanding of the legal principles governing the recovery of damages. At times it is helpful to discuss these legal matters with counsel, such as when the applicable state or federal law affects the calculation. As a general matter, the plaintiff will likely need to prove that (*a*) the asserted wrongful acts proximately caused the alleged harm (causation) and (*b*) the damages were calculated to a reasonable degree of certainty (reasonable certainty). When damages are the result of a breach of contract claim, the damages must also have been foreseeable.

These concepts can be illustrated in the context of the American Kitchen example summarized in chapter 1. For example, causation concerns may arise regarding the adequacy of Franchisee's financial resources to expand to an 11th location, or the opening of other competitive restaurants near the new location. Reasonable certainty challenges may arise if there are no financial projections available or there is a lack of benchmark data, or both. Further, foreseeability considerations may arise if, for example, Franchisee seeks recovery of damages beyond the 10th year of the parties' arrangement. These interrelated topics are addressed further in the next section.

### Lost Cash Flow Versus Lost Income

Practitioners engaged to measure lost profits damages may calculate either lost cash flow or lost incremental income, depending on the facts and nature of the income and cash flow stream in question, and the nature of the dispute. Although practitioners often assume the two measures to be the same, this is not always the case, and which measure is appropriate is case-specific. Using the American Kitchen example, Franchisee may have had to expend cash early on, but these costs may be capitalized. This situation may cause profits to equal cash flow in the long term, but time-period differences may affect discounting or prejudgment interest calculations. In addition, a plaintiff may need to make ongoing working capital investments, such that cash outflows exceed costs on an income statement. As a result, practitioners should be aware of these differences when developing a lost profits model.

### Types of Damages

The following table summarizes two types of compensatory damages that the plaintiff may have experienced in the context of a breach of contract:

| Type of Damages [fn 1] | Methodology |
| --- | --- |
|  |  |

---

[fn 1]  It is not the objective of this section to provide an exhaustive discussion of the types of damages measures available to the plaintiff. The practitioner should consult with counsel and sources such as *Black's Law Dictionary* for further information regarding these and other measures of damages, and particularly, which measures are appropriate for the particular causes of action and venue.

© 2020 Association of International Certified Professional Accountants                    11

USA-016066

| Type of Damages [1] | Methodology |
|---|---|
| Benefit-of-the-bargain (or "expectation") | The difference between the amount the plaintiff could be expected to have received and the amount the plaintiff received. |
| Reliance | The amount required to restore the injured party to the economic position occupied before the injured party acted in reasonable reliance on a promise. |

Lost profits is a measure used in calculating expectation damages, generally in a forward-looking manner. In contrast, reliance damages address the plaintiff's investment to obtain the benefit, typically prior to the time at which the analysis is performed, plus any out-of-pocket costs incurred by the plaintiff as a result of the harm in question, as well as consideration of what has been obtained.

The practitioner may also seek a disgorgement of the wrongdoer's profits, which is sometimes referred to as *restitution, unjust enrichment*, or *ill-gotten gains*. This measure (which is sometimes referred to as *damages* but more precisely is a monetary remedy, but not "damages") is focused on the benefit obtained by the defendant. If the practitioner measures both the harm to the plaintiff and the benefit obtained by the defendant, the practitioner should consider whether the two measurements overlap to avoid "double-counting."

The following table provides examples to illustrate how a practitioner may implement these types of damages (for purposes of the case study):

| Remedy | Example Methodology |
|---|---|
| Expectation damages | Lost profits from the expected operation of the 11th location |
| Reliance damages | Costs expended by Franchisee to evaluate the 11th location |

## Causation

To prevail in a civil lawsuit and be awarded damages, a plaintiff is generally expected to prove that

- a defendant perpetrated a wrongful act; [2]

- subsequent to the wrongful act, the plaintiff experienced some economic harm, such as lost profits as a result of lost sales; and

- the defendant's behavior was the proximate cause of the economic harm claimed as damages.

The burdens described previously rest with the plaintiff, as opposed to the plaintiff's damages expert. The requirements associated with proving causation vary between disputes and the type of analysis performed. For example, a claim for lost profits from patent infringement may require proof that the in-

---

[2] Although assertions of fraud are sometimes included within counsel's presentation of allegedly wrongful acts, the damages expert should not offer an opinion on the existence of fraud. Pursuant to Statement on Standards for Forensic Services No. 1, "[t]he ultimate decision regarding the occurrence of fraud is determined by a trier of fact;" however, the damages expert "may provide expert opinions relating to whether evidence is consistent with certain elements of fraud or other laws based on objective evaluation."

12                © 2020 Association of International Certified Professional Accountants

USA-016067

fringement caused customers to not make purchases from the plaintiff, whereas a reasonable royalty as a measure of damages for the same patent infringement would typically not require proof to avail a reasonable royalty measure of damages. [fn 3] In general, however, there are two alternative causation requirements placed on the plaintiff:

- *But-for causation.* Whether, absent the defendant's conduct, the economic harm would have occurred. [fn 4]

- *Substantial factor test.* Whether the alleged wrongful act was a substantial factor in the plaintiff's loss. [fn 5]

A plaintiff's damages expert may be asked to assume causation for the purposes of his or her work in situations in which other evidence or expert testimony may be offered on this topic. In other cases, the scope of a plaintiff's expert testimony may address or relate to causation directly or indirectly. [fn 6] In either situation, it is generally in the client's interest for the damages expert, whether working on behalf of the plaintiff or defendant, to understand the evidence about causation. In this context, it is generally useful for the expert to understand how the plaintiff claims the alleged wrongful conduct *caused* the damages. Similarly, it is useful to understand if and why the defendant claims the wrongful conduct did not cause the damages, and whether the practitioner can perform analysis or investigation that can test and support an answer to these questions. The pursuit and analysis of such data may illuminate causation considerations, including the need to introduce evidence to support (or disprove) the claims, as well as other factors that may have influenced the purported lost sales. The damages expert should take care to offer an opinion on causation only when such an opinion is within the professional expertise of the expert and adequately supported by the evidence. For example, it may be appropriate for an expert to testify about market analysis, research, sales trends, customer reviews, and internal company communications that address the question of what factors influence sales, including the alleged wrongful conduct. But it is often beyond a practitioner's expertise to opine on the summary issue of causation, with an expert opinion that the damages in question were caused by the alleged wrongful act or acts.

As a practical matter, damages experts commonly address causation indirectly by demonstrating correlation of two variables. For instance, a plaintiff may experience a loss, such as a decline in sales, that occurred immediately after an alleged wrong. However, the plaintiff must generally present evidence (through all sources, including testimony by a damages expert) sufficient enough to prove that the loss

---

[fn 3] Per the Patent Act (35 U.S. Code § 284 - Damages), "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

[fn 4] See, for example, Judicial Council of California Civil Jury Instructions (2017 edition), § 430. Causation: Substantial Factor, quoting *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 354, "We have recognized that proximate cause has two aspects." . . . "One is *cause in fact*. An act is a *cause in fact* if it is a necessary antecedent of an event." . . . "This is sometimes referred to as 'but-for' causation." (available at www.justia.com/trials-litigation/docs/caci/400/430/, accessed January 3, 2019)

[fn 5] See, for example, Judicial Council of California Civil Jury Instructions (2017 edition), § 430. Causation: Substantial Factor, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

[fn 6] In some instances, a practitioner may directly opine on causation, but this would typically be when the issue was specifically related to accounting or related issues, such as whether an accounting entry caused a breach of a loan covenant.

© 2020 Association of International Certified Professional Accountants                13

USA-016068

in sales was attributable to the alleged wrongful acts. This issue was addressed in a false advertising case in the Northern District of Alabama, *Snac Lite, LLC v. Nuts 'N More*. [fn 7] In *Snac Lite*, the plaintiff alleged the defendant had falsely advertised the protein content in its nut butter product, which had caused the plaintiff to experience lost sales and profits. As it related to damages, the court focused on two questions:

1. What evidence indicated that consumers chose the defendant's products over the plaintiff's products?

2. What evidence indicated that consumers made their choice due to the false advertising at issue?

In this matter, the opinions of the plaintiff's damages expert, a forensic practitioner, were excluded because, in the court's words, "While [the Practitioner] assumed that a causal connection existed between Defendant's alleged false statements and Plaintiff's damages, he provided no data to support such a conclusion. . . ." [fn 8] The court explained that the plaintiff did not establish that its loss of sales was the result of consumers purchasing the defendant's products. The court expected that even if the consumers had purchased the defendant's products in the past, the plaintiff had to provide evidence that purchases of the defendant's products (instead of the plaintiff's) were attributable to the defendant's false advertising. It should be noted, though, that this is a fact-specific issue, and plaintiffs are not necessarily obligated to identify each lost customer or present evidence of each customer's reason for not making a specific purchase. [fn 9] Moreover, as described previously, although it is the plaintiff's burden to present evidence of causation, it is not the responsibility of the plaintiff's damages expert to present this evidence. For example, a damages expert may refer to other experts, percipient witnesses, or documents that may address causation.

Many courts have accepted the opinions of experts who assume causation and do not cite evidence or analysis that support a causal link between the alleged wrongful acts and a damages calculation. Nonetheless, practitioners' work is strengthened by careful consideration of causation. The issue of causation is addressed in greater detail in the AICPA practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*, chapter 3, "Causation Considerations."

Another frequent causation-related issue faced by practitioners is whether the practitioner "has adequately accounted for obvious alternative explanations." [fn 10] However, it is noteworthy that Federal Rules of Evidence 702 does not explicitly obligate the expert to eliminate all other possible causes of loss. The expert may consider a broad variety of data and information sources to assess whether another obvious cause of the loss exists. The following table summarizes examples of evidence and considerations related to causation and reliability in the development of revenue projections.

---

[fn 7]  *Snac Lite, LLC v. Nuts 'N More*, LLC, 2016 WL 6778268, No. 14-cv-01695.

[fn 8]  See footnote 7.

[fn 9]  See, for example, *Syngenta Crop Protection, LLC v. Willowood, LLC, et al.*, Civ No. 1:15-cv-00274 (M.D.N.C.), "In addition, Willowood has presented no authority in support of its assertion that the identity of the purchasers or the categories of customer are relevant, let alone necessary, to a lost profits claim." *See* also, *Nebula Glass Int'l., Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006), "The lost profit damages in this case were not speculative simply because [Plaintiff] did not present evidence of every customer's reason for not buying Safety Plus 1 glass."

[fn 10]  Federal Rules of Evidence 702.

14          © 2020 Association of International Certified Professional Accountants

USA-016069

| Sources of Evidence | Possible Considerations and Questions |
|---|---|
| Pre-litigation projections | What do the projections reflect for the alleged damage period? How accurate were plaintiff's prior projections? |
| Performance summaries for the business at issue (for example, board of directors meeting materials) | Do these and other contemporaneous documents address performance of the business during the damage period? |
| Interviews or testimony of key personnel | Did a significant change in personnel occur, including, for example, the loss of a key executive or a restructuring? Did the business plan, business model, or business environment change for some unrelated reason? |
| Performance summaries for other similar businesses | Does the plaintiff have other similar business activities, including other business locations? How have those business activities performed as compared to the allegedly harmed business? |
| Industry or competitor data | How have other similar unaffected businesses performed during the damage period? Was there a new competitor or product that entered during the damage period? |
| Overall economy considerations | How did the economy perform, as a general matter, during the damage period? |

These considerations and others may be addressed through different forms of analysis and evidence. For example, individuals can either be interviewed or provide deposition testimony. The damages expert may also obtain such information in document discovery or in interrogatories, or through independent research.

Although other factors may also have some effect on the plaintiff's sales and profits, it may not be practicable to determine the exact effect of all other possible influences, given that many of these are de minimis. It is preferable, however, to show that these other factors have been considered and, when appropriate, have been taken into account in a model (for example, they are equally likely to overstate or understate the calculation).

## Reasonable Certainty

This requirement has been addressed extensively in the AICPA practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*. To summarize the analysis and discussion contained therein, there is not a one-size-fits-all definition of *reasonable certainty*. Rather, reasonable certainty is normally a case-specific assessment of whether the calculation of damages was anchored in facts, makes use of sound methodologies, and yields reasonable results. It is well established that once the fact of damages has been proven, the amount of damages need not be proven with absolute certainty.

In practice, the issue of reasonable certainty is interwoven throughout a damages analysis. For example, the damages expert should be reasonably certain of issues, including

- another obvious cause of the damages does not exist;

- the data used in the analysis, including data supplied by the client, are reliable; and

- the assumptions applied in the damages analysis are reasonable and tethered to the evidence expected to be admitted in the case.

© 2020 Association of International Certified Professional Accountants            15

USA-016070

As noted in the *Attaining Reasonable Certainty in Economic Damages Calculations* practice aid, a key objective of the reasonable certainty standard is to ensure that plaintiffs are not awarded speculative, overly optimistic, or unrealistic damages.

## Foreseeability

When the damages are being calculated for a breach of contract cause of action, the damages typically also need to have been reasonably foreseeable at the time of contracting. [fn 11] This requirement dates back to an English decision, *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854), and is still law today. In *Hadley*, the court set out that damages are recoverable only if they were reasonably foreseeable by both parties at the time of the contract. This does not, however, mean that a plaintiff needs to disclose, at the time of contracting, the amount of profit anticipated to or by the defendant. [fn 12]

A damages expert may provide testimony regarding foreseeability if such opinions are within the professional expertise of the witness and supported by the evidence. For example, an expert might analyze the circumstances surrounding the development of a projection by the parties, contemporaneous to contracting. Some cases require an analysis of the foreseeability of damages arising after the stated term of the contract. One such example was *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243 (Ind. App. 2010). In this matter, an event promoter, *Belle*, alleged that *Doorway*, a carnival operator, ceased performance of services during the first year of the parties' contract. *Belle* subsequently cancelled the event indefinitely. The court ruled losses beyond the one-year contract were not foreseeable because *Doorway* could not have anticipated that *Belle* would cancel the event indefinitely. In these situations, a practitioner may look to information such as prior renewal patterns, if available. A practitioner may also consider presenting multiple scenarios, varying whether a contract was renewed and for how long.

## Distinguishing Alleged Violative Acts From Other Acts, Including Subsequent Events

A practitioner's analysis of the data and other evidence may indicate that multiple acts, including multiple acts by the defendant, contributed to the plaintiff's loss. The practitioner should be aware, however, that not all the defendant's acts may be violative (included in the causes of action before the court) or wrongful. If the practitioner includes the impact of non-violative acts in the calculation of damages, then the reliability and relevance of the damages may be called into question. This is a concept related to causation in that the calculation of damages needs to be causally linked to the violative events.

As an example, in *Biren v. Equality Emergency Med. Grp.*, the appellate court affirmed the trial court's opinion that $2 million of lost profits were speculative because the expert did not disaggregate the effect of damages caused by undercoded billings, as distinct from a lack of collection efforts, the latter of which was determined to be non-violative. [fn 13]

---

[fn 11] Foreseeability is also a consideration in tort matters; however, the issue is often intertwined with reasonable certainty.

[fn 12] *Emerald Investments Limited Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612 (7th Cir. 2008), "A buyer is not required to disclose the profit he anticipates from dealing with the seller; such a requirement would kill the incentive to seek out profit opportunities."

[fn 13] *Biren v. Equality Emergency Med. Grp.*, 102 Cal. App. 4th 125 (2002), "[Expert] opined that PHSS's billing inefficiencies cost Equality more than $2 million in lost profits. These deficiencies included undercoding billing and lack of collection efforts. The court

16          © 2020 Association of International Certified Professional Accountants

USA-016071

Similarly, the practitioner should consider whether losses could be associated with unrelated external events or events subsequent to the wrongful act. Practitioners need to attempt to identify the non-violative facts affecting losses and ensure that the damage analysis identifies and calculates as damages only those losses that are violative within the asserted causes of action. For example, in the American Kitchen example, reduced revenues (and profits) due to subsequent events would not be recoverable: the opening of a nearby restaurant by a competitor, a salmonella outbreak, a decrease in promotions and marketing spend, or a low rating of American Kitchen locations by health services inspectors.

## Identifying Multiple Harmful Acts

In some instances, there may be multiple alleged violative acts that lead to damages. In these instances, the acts may consolidate into a single claim or multiple claims. For example, a plaintiff may claim that the defendant breached, in multiple ways, a contract to develop software (for example, alleged failures to develop five different features). In this case, the different alleged violative acts may be analyzed as one cumulative breach of contract claim, such that the practitioner does not ascribe specific losses to each individual failure (for example, each feature failed to be delivered). [fn 14]

In some situations, though, each alleged wrongful act could be modeled and evaluated as a separate claim. The practitioner may want to discuss with counsel the ability and need to quantify damages by wrongful act or claim. When it is practical and cost-efficient to do so, the damages expert may separately quantify the damage resulting from each alleged wrongful act (or a combination of them). In certain situations, if the acts are not "disaggregated," the rejection of a claim for one act may result in refutation of the entire analysis. For example, in *O2 Micro Intern. Ltd. v. Monolithic Power Systems*, the plaintiff's expert computed a single damages amount assuming the misappropriation of 11 trade secrets. The court cautioned O2 against such an approach. [fn 15] Later, when the jury found that only 1 trade secret had been misappropriated, the court concluded that the expert's testimony had not been helpful to the jury.

When damages are disaggregated, the practitioner should ensure that damages for separate acts do not have an additive effect, or, if there are issues relating to such combinations, they are disclosed. In other words, damages may be common to both acts, and it may be improper for them to simply be added together to compute total damages. In addition, a practitioner may consult with counsel to understand the current status of the claims made by the plaintiffs. It may be that legal motions have been ruled upon by the court and eliminated certain claims, or certain parties have been dismissed by the time a practitioner performs a damages analysis. Further, a practitioner may be asked to testify concerning how damages are aligned with each of the legal claims. Such a question is typically a legal issue. The practitioner,

---

questioned [expert] what portion of the $2 million loss was caused by undercoding, but [expert] was unable to allocate the portion of damage caused by PHSS's poor collection efforts. The court could reasonably infer [expert's] conclusions involved speculation, making the claimed damages uncertain."

[fn 14] For example, the court in *Braun Elevator Co. v. Thyseenkrupp Elevator Corp.* (W.D. Wis. 2005) 379 F. Supp. 2d 993 held "Neither case suggests that where multiple breaches combine to cause lost sales the jury must match particular lost sales to particular breaches, an exercise which in many instances will be impossible because intertwined breaches combine to cause lost sales."

[fn 15] *O2 Micro Intern. Ltd. v. Monolithic Power Systems*, 399 F. Supp. 2d 1064, "[I]t seems to me that if [expert] is saying the damages are X dollars if they stole all our trade secrets, he can say that. But if the jury finds that he only stole 11 of them, then his testimony would be stricken and you would have no testimony because there'd be no basis upon which a jury could decide what the damages were from the theft of 11 secrets when they've heard testimony only about what the damages are from 12 secrets unless somehow he can say that no matter how many secrets are stolen, the same damages are accrued."

USA-016072

however, may consult with counsel prior to providing testimony regarding a reasonable response to such a question. [fn 16]

Finally, a practitioner may want to consult with counsel regarding the anticipated jury instructions applicable to the claim or claims. Jury instructions frequently provide useful insight regarding the applicable recovery. These insights can often be used to assist in determining how to present damages and if the practitioner needs to allocate damages between wrongful acts or claims. Although final jury instructions are not typically filed with the court until the eve of trial or during trial, model jury instructions may be useful in validating the methodology used. [fn 17]

---

[fn 16] Experts should be aware that conferences with counsel during a deposition or while testifying at trial (including during breaks) may be prohibited and such discussions may be discoverable. For example, in *Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993), the trial court held that "conferences between witness and lawyer are prohibited both during the deposition and during recesses," 150 F.R.D. at 529. Further, the Court held that anything a lawyer tells a witness during such a conference is not protected and may be inquired into by opposing counsel to determine whether any coaching has occurred. *Id.* However, some courts flatly rejected *Hall* and held that a witness has the right to confer with counsel during normal deposition breaks and recesses. See *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 620 (D. Nev. 1998) (adhering to *Hall* could violate right to counsel); *Haskell Co. v. Georgia Pacific Corp.*, 684 So.2d 297, 298 (Fla. Ct. App. 1996) ("There is no recognized exception to the privilege for a communication between an attorney and client which occurs during a break in deposition. If a deponent changes his testimony after consulting with his attorney, the fact of the consultation may be brought out, but the substance of the communication generally is protected.").

[fn 17] See, for example, www.floridasupremecourt.org/contract-business-jury-instructions/instructions.shtml.

© 2020 Association of International Certified Professional Accountants

USA-016073

# Chapter 3

## *Lost Profits as a Measure of Damages*

### Introduction

As described previously, damages are a monetary remedy in civil law. *Black's Law Dictionary* defines *damages* as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." [1] Lost profits are a measure of compensatory damages, which are intended to compensate an aggrieved party for harm caused by the wrongful act or acts that are the subject of the dispute. [2]

As a measure of compensatory damages, damages based on lost profits redress a defendant's unlawful act or acts by compensating the plaintiff for the profits that would have been obtained "but for" (absent) the unlawful act or acts. Lost profits damages are typically measured as but-for profits less actual and mitigating profits, as illustrated in the following figure.

---

[1] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 445.

[2] Other types of damages include nominal damages and punitive damages. *Nominal damages* are typically awarded if a compensable harm has occurred, but no substantial loss or injury exists to be compensated. *Punitive damages* are those damages awarded, in addition to actual damages, if the defendant acted with recklessness, malice, or deceit. Punitive damages are intended to punish the wrongdoer and deter certain misconduct.

USA-016074

**Figure 3.1. Summary of Lost Profits**



Typically, the first step in this calculation is to estimate the profits that would have been obtained by the harmed party (simplified to "plaintiff" [fn 3]) but for the unlawful act during the damage period. This is often referred to as the *but-for scenario* or the *but-for world*. The but-for profits are measured as but-for revenues less but-for expenses (also referred to as *avoidable expenses*). Generally speaking, the but-for world is different from the "actual world" (which is often more accurately described as the "actual or mitigating world") in several ways. For example, in the but-for world, the plaintiff might have launched a new product (or done so earlier than when it was actually launched), sold more of a certain product, expanded to a new location, charged a different price, sold to different customers, saved certain costs, or earned and been paid more royalties.

Typically, the next step is to subtract the actual profits earned (or anticipated to be earned, in the event that the effects of the wrongdoing are ongoing as of the time of the damages analysis) from the but-for profits during the damage period. However, this can be complicated by the issue of *mitigation* (discussed in detail in chapter 11), which is an obligation that a plaintiff often has to maximize profits in the actual or impaired world, even if the defendant's wrongful acts have hindered the plaintiff's ability to do so. [fn 4] For example, if as a result of the wrongful acts the American Kitchen Franchisee was unable to open a restaurant in a specific location but could have opened a restaurant in another location (potentially after a delay or with lower profits), the actual or mitigating world may call for the assumption of Franchisee mitigating in a reasonable way (for example, opening an alternative restaurant). Often, the

---

[fn 3]   Although it may be possible that the injured party may also be a defendant or counterclaim plaintiff, or a claimant (as in an arbitration), the term *plaintiff* is used throughout this practice aid to refer to the injured party, and the *defendant* generally refers to the party accused of the alleged wrongful act.

[fn 4]   Mitigation may or may not be required, depending on the applicable law. See chapter 11 of this practice aid.

20             © 2020 Association of International Certified Professional Accountants

USA-016075

actual results will be known for past periods, but the damages period may extend into the future (for example, if in the actual world the plaintiff has not been able to get back to the but-for world's profits, and the effect of the wrongful acts is ongoing).

Chapter 4 introduces two alternative methods for calculating lost profits, including a simpler method, which may be appropriate in some situations.

After actual and mitigating profits have been deducted from but-for profits, the next step is normally to discount to present value the periodic lost profits to the extent that they occur in the future (or for all periods, if using the ex ante approach) because lost profits damages are typically awarded as a present value as of the time of the judgment. See chapter 8 for a discussion of the ex ante and ex post approaches. Chapter 9 includes a discussion of discount rates and discounting.

## Causes of Action Giving Rise to Lost Profits Damages Claims

As described previously, lost profits are often awarded as compensatory damages in civil commercial litigation. Causes of action that typically give rise to damages claims based on the injured party's lost profits include breach of contract and tort claims. Each of these is discussed briefly in the following text.

### Breach of Contract

In a breach of contract claim, the plaintiff alleges that the defendant has failed to fulfill its performance obligations under a contract and, thus, has breached the contract. In such matters, compensatory damages based on lost profits may be sought by the nonbreaching party to the contract.

Breach of contract claims may give rise to direct damages (also called *general damages*), [fn 5] as well as consequential damages (also called *special damages*). [fn 6] Direct damages flow directly from the breach and are reasonably expected from the breach (for example, costs of replacement goods or services that were contracted to be delivered but were not). Consequential damages also flow from the breach but are not necessarily expected consequences of the unlawful act (for example, a failure to perform by the breaching party, in turn, causes the plaintiff to incur other losses related to other business arrangements). [fn 7] In breach of contract claims, lost profits may be a measure of direct or consequential damages, depending on whether the lost profits were contracted (direct) versus an indirect consequence of the breach (consequential).

---

[fn 5] Consequential, Incidental, Direct, Actual and Compensatory Damages: What are they and who gets them? Measures of Damages in Domestic and International Transactions, 2012 American Bar Association Business Law Section Spring Meeting, by Glenn D. West, Hermann J. Knott, and James R. Waltherp. p. 8, "Basic Damage Definitions[,] Direct or General Damages[,] Damages which, in the ordinary course of human experience, can be expected to naturally and necessarily result from a breach. These damages are presumed to have been foreseen or contemplated by the parties as consequences of a breach, and as such are fairly straightforward."

[fn 6] Consequential, Incidental, Direct, Actual and Compensatory Damages: What are they and who gets them? Measures of Damages in Domestic and International Transactions, 2012 American Bar Association Business Law Section Spring Meeting, by Glenn D. West, Hermann J. Knott and James R. Waltherp. p. 8, "Consequential damages still result directly from the breach, but may not be obvious to one of the parties in advance without communication of the other party's special circumstances."

[fn 7] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 472.

© 2020 Association of International Certified Professional Accountants

21

USA-016076

*Black's Law Dictionary* defines a *tort* as "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, usually in the form of damages." [fn 8] Torts giving rise to lost profits damages include negligent torts and intentional torts, the latter of which affects the conduct of business.

*Negligent torts* are generally committed by failure to demonstrate reasonable care under the given circumstances, as a matter of law. Depending on the facts and circumstances, monetary damages based on lost profits may be available in these instances. As an example, assume that a person inaccurately says that chicken dishes at American Kitchen contain an average of five grams of trans fat per serving, which causes American Kitchen to have a dramatic decrease in its sales, whereas, in fact, the chicken dishes have an average of five grams of unsaturated fat (which is much healthier than trans fat but was confused by the individual who made the comment). In this scenario, American Kitchen may be able to claim lost profits as a result of the negligent tort, in this instance, defamation.

*Intentional torts* are torts that are made with intent by the wrongdoer. Economic damages in the form of lost profits may be awarded for intentional torts, including tortious interference with a contract (or expected economic advantage), unfair competition, and fraud.

Intellectual property infringement and misappropriation matters are also torts. *Intellectual property* refers to "a category of intangible rights protecting commercially valuable products of the human intellect." [fn 9] This category of intangible assets includes patents, copyrights, trademarks, and trade secrets. The practice aid *Calculating Intellectual Property Infringement Damages* provides an in-depth discussion of the compensatory damages remedies available to plaintiffs when patents, trademarks, or copyrights are infringed or trade secrets are misappropriated. As discussed in that practice aid, various damages remedies may be available to plaintiffs, including lost profits, depending on the intellectual property infringed or misappropriated.

Antitrust violations are also torts. Antitrust laws prohibit anticompetitive conduct, including monopolies, price fixing, and price discrimination. In antitrust litigations, plaintiffs seek to demonstrate that, absent the unlawful conduct of the defendant, the plaintiff's financial performance or condition would have been better than it actually has been and will be. Lost profits may be used as a measure of damages based on a comparison of the plaintiff's but-for performance with actual performance that was subject to the alleged unlawful anticompetitive behavior.

## Other Matters Giving Rise to Lost Profits Analysis

Practitioners are also commonly requested to measure lost profits in conjunction with business interruption and other insurance claims and assessments. Following a business interruption, practitioners may calculate lost profits after the occurrence of a covered event to assess the amount of claim allowed under an insurance policy. Unlike the measurement of lost profits as a measure of damages in a litigation or

---

[fn 8] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 1626.

[fn 9] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 881.

    © 2020 Association of International Certified Professional Accountants

USA-016077

arbitration, lost profits calculated in a business-interruption context commonly fall within the terms and parameters of the applicable insurance policy and are frequently resolved without litigation. [fn 10]

---

[fn 10] Sometimes, business interruption claims can result in breach of contract actions or similar causes of action against insurers for a failure to perform as required under the insurance policy.

© 2020 Association of International Certified Professional Accountants                    23

USA-016078

# Chapter 4

## *Calculation of Lost Profits*

On a conceptual level, lost profits damages are generally based on one of the following two models:

1. *Calculation of net incremental revenues lost, offset by net incremental costs avoided.* In this model, the net incremental revenue that would have been realized but for the unlawful act is calculated and then reduced by related net incremental costs avoided. For example, using the American Kitchen case study, suppose Franchisor was unable to meet its obligations to supply Franchisee's eateries with a key menu item for a period of one month, in violation of the franchise agreement's exclusive supplier terms. As a result, for 30 days, Franchisee was unable to sell a popular menu item. Assuming the only effect on Franchisee's stores was the inability to sell a key menu item for 30 days, lost profits, under this model, would be the incremental revenues from the sale of the popular menu item for 30 days, reduced by the incremental avoided costs of producing and selling that menu. If other items were determined to be affected (adversely or favorably) by the lack of availability of the menu item, a similar analysis of the incremental revenues lost (or gained), offset by the net incremental costs avoided (or incurred), would be necessary for each of these items, as well. [fn 1]

2. *Calculation of but-for profits, net of actual or mitigating profits realized.* In this model, the net profits that would have been achieved but for the unlawful act are calculated and then offset by the actual or mitigating profits (or increased by the actual losses) following the unlawful act. Using the same preceding example, the total but-for profits associated with the menu item for that 30-day period would be calculated and then reduced by the actual or mitigating profits realized from that menu item during the same 30-day period. This might be accomplished by examining but-for profits for the single menu item and comparing those with the actual profits for that item during the 30-day period. Alternatively, a broader assessment of the whole affected American Kitchen location and its but-for and actual or mitigating profits might be performed.

In theory, these two models should render the same calculated undiscounted lost profits damages. The models should be based on an accepted methodology for estimating the incremental revenues lost or but-for profits. [fn 2] When the two models provide differing estimates of lost profits, the practitioner should evaluate the reasonableness of the analyses under each approach. Depending on the facts and circumstances surrounding the wrongful acts, one or both preceding models could be appropriate.

For example, suppose the practitioner determined that, as a result of the aforementioned supply disruption, Franchisee failed to sell 1,500 units of the popular menu item (actual sales were 0 units, compared to but-for sales units of 1,500) during the 30-day period. The item had a sales price of $3 per unit and a cost of $1 per unit. The practitioner applied the first methodology, calculating undiscounted lost profits damages of $3,000 (that is, $4,500 of incremental revenues based on 1,500 units at $3 per unit, less

---

[fn 1]   Other complications might include running the calculation beyond 30 days, if customers or sales were lost even after the supply was resumed.

[fn 2]   See chapter 6, "Estimating Lost Revenues," in this practice aid.

       © 2020 Association of International Certified Professional Accountants

USA-016079

$1,500 incremental costs based on 1,500 units at $6 per unit). As a check, the practitioner then applied the second methodology, determining that the but-for profit anticipated for the menu item during the 30-day period was $3,000, and the actual profits related to the menu item were $0 — again concluding undiscounted lost profits damages were $3,000.

In this relatively simple example, the two models were corroborative, and both models proved easy to apply. Suppose, however, that the practitioner was concerned about potential mitigating sales of other menu items. Although the practitioner could attempt to evaluate each menu item individually under the first previously mentioned model, that model may prove burdensome when the wrongful act's effects on a plaintiff are more pervasive. Given the concerns, the practitioner also applied the second previously mentioned model to the restaurant as a whole, calculating the but-for profits during the 30-day period to be $35,500, and the actual profits during the 30-day period to be $33,500 — a difference of just $2,000, rather than the $3,000 previously calculated. This discrepancy caused the practitioner to reevaluate the completeness of the calculations of the incremental revenue and incremental costs under the initial method, which uncovered an additional (mitigating) effect in the other products. In particular, upon investigation of the discrepancy between the calculations under the two methodologies, the practitioner learned that although Franchisee indeed sold 1,500 fewer units of the popular menu item than anticipated, the actual profits during the 30-day period reflected mitigating profits from the sale of an alternative menu item in excess of those estimated in the but-for profits, but also additional damages from the loss of complementary drink sales and profits to customers who were lost as a result of the unavailable item.

It is possible that the effects on the plaintiff's business may be confined to a particular product or a specific customer or location, as in the previous examples. Returning to the American Kitchen example, suppose that Franchisee was unable to open a location in 2017. The lost profits could be confined to the location's profits that would have been earned but were not. Alternatively, suppose that Franchisee's inability to operate an additional location during 2017 also caused it to fail to qualify for certain volume-based price reductions with suppliers. Under this circumstance, Franchisee's damages would be equal to its lost profits at the new location but also the lost profits at other American Kitchen locations. In this context, a total-entity comparison of but-for profits and actual or mitigating profits would be appropriate.

USA-016080

# Chapter 5

## *Loss Period*

### Overview

One early consideration when analyzing lost profits is the applicable loss period associated with the wrongful act. Simplistically, the loss period is the time over which lost profits (or damages, more generally) have occurred or are expected to occur because of the wrongful act. Typically, the loss period

- begins on the date the wrongful act occurred and

- ends when the plaintiff is no longer earning or able to earn fewer profits than would have been earned but for the wrongful act.

As with other components of lost profits analyses, determining the appropriate loss period may not be a simple matter. Loss period start dates may be the subject of dispute between the parties, for example, due to differing views regarding when the wrongdoing or breach occurred or regarding the agreement itself. Items and information that may be relevant in determining the start of the loss period may include the following:

- The date of any breach or wrongful act

- The date that the alleged injury was sustained

- The start date of a contract

- The delivery date specified in a relevant contract

- The date of the issuance of a relevant patent or relevant patents

- Court filings, such as pleadings, answers, and rulings by the court

- Interrogatory responses, deposition testimony, or admissions

- Laches [fn 1] and statute of limitations issues

- Case law specific to the case's jurisdiction

- Discussions with the client and counsel

---

[fn 1] *Laches* is defined as "the equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed in asserting the claim, when that delay has prejudiced the party against whom relief is sought." Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 1009.

26                    © 2020 Association of International Certified Professional Accountants

USA-016081

Loss period end dates are also a common point of disagreement because the dates often occur in the future and are based on facts and circumstances on which the parties may not agree, such as forecasts of how the business will perform in the future and how long it will be until the business will "catch up" to the but-for performance. In this context, it is possible for a wrongful act to permanently impair a business. Given the nature of determining the loss period, it is often the role of the practitioner to assist the trier of fact in understanding the loss period and why the selected loss period is appropriate. Items and information that may be relevant in determining the end of the loss period may include the following:

- The date that the injured party is made whole

- The date when the wrongful act ended

- The date or period at or during which the but-for sales are equal to the forecasted actual sales

- The date of a termination provision in a contract

- The required notice period in a contract

- Any renewal provisions in a contract

- The date of trial

- The dates of any relevant injunctions or other court decisions

- Court filings such as pleadings, answers, and rulings by the court

- Interrogatory responses, deposition testimony, or admissions

- If the business survived

- If the business will be able or can be reasonably expected to fully recover

- The historical operations of the business

- Relevant industry data such as the average lifespan of the type of business at issue

- Laches and statute of limitations issues

- Case law specific to the case's jurisdiction

- Discussions with the client and counsel

Another key factor that affects the determination of the loss period is the type of case. For example, as discussed further in the following text, a loss period for breach of contract matters may differ significantly with a loss period for tort matters.

## Breach of Contract

In a breach of contract action, the loss period may be a period less than the contract's term, extend over the remaining term of the contract, or go beyond the contract term (for example, include expected re-

USA-016082

newal terms), depending on the circumstances. The loss period's determination may be further complicated if the length of the contract is one of the issues in dispute. Disputes regarding the loss period in a breach of contract matter may include the following considerations and factors:

- *Length of the contract.* Some contracts may explicitly provide the start and end dates of a contract, whereas others leave these dates unspecified. Even if a start and end date are provided, this may not be indicative of the loss period. Additionally, although the circumstances of each matter vary, some courts have been reluctant to award damages for the full length of the loss period (that is, the full term of the contract) because of uncertainty.

- *Renewal history.* If the parties have had a history of renewals or there is evidence indicating a renewal may occur (such as an extension provision in the contract, testimony, or the parties' correspondence), a loss period that considers contract renewals may be warranted.

- *Contract renegotiations.* Although damages typically do not extend beyond the term of the contract (that is, because a defendant could choose to not renew the contract), an issue could conceivably arise if an extension of the contract term was being negotiated when the breach occurred. Arguably, had the breach not occurred, it may be possible that the contract would have been extended for some additional term. Alternatively, if a contract renewal right was controlled only by the plaintiff, assumption of an extension may be appropriate.

- *Notice-of-termination provisions.* Depending on the facts and circumstances of a case, the court may, in some situations, not extend damages beyond the length of time provided for under the notice-of-termination provisions. For example, if a supplier ceased supplying a customer with a product without notice, but the supply contract required a 90-day notice, then in the but-for world it may be reasonable to expect that the supplier would cease supplying the product after the 90-day notice period elapsed. As a result, the damage period may go from the date on which the supplier actually ceased supplying to a date 90 days later. However, damages may extend beyond the 90 days if the customer would have purchased the product under contract in the 90-day period, but the customer would have used the supplied product, in a product sold to consumers or others later in time.

- *Other factors.* This may include confounding events, unrelated to the facts and circumstances of the case, such as issues in the plaintiff's industry that would have injured the business had the contract been performed.

Using the American Kitchen example, the franchise agreement provided for a 10-year term with the possibility of a 5-year renewal. The 11th location, associated with the wrongful act of not approving the development plan, was planned to open in 2017. Given these facts, the loss period could possibly begin in 2017, when the new location was projected to open per the development plan. The practitioner, however, may want to consider the length of time that was required to open the 10 original locations. If the timeline of the 11th location did not align with historical timelines of the original 10 locations, the practitioner may want to investigate to determine if the loss period start date used in the development plan is appropriate. In addition, it would likely be appropriate to consider costs to open the 11th location, including costs that would have been incurred prior to the 11th location's projected opening date.

Possible options for the end date of the loss period include the following:

- The projected actual opening date of the 11th location, assuming that the court ruled in favor of Franchisee, and Franchisee can later open at the same location

28                        © 2020 Association of International Certified Professional Accountants

USA-016083

- The date at which the 11th location can be expected to be "up to speed" and to have normal and stabilized sales

- The original 2019 end date of the franchise agreement

- The 2024 renewal end date, assuming one 5-year renewal of the franchise agreement

Also relevant is if the practitioner used a loss period assuming a renewal of the franchise agreement, the practitioner would likely need to consider the key financial and quality performance metrics set forth in the franchise agreement because these were a consideration in determining if the franchise agreement would be renewed.

Expanding on the American Kitchen example, assume that the supply chain sources required to be used per the franchise agreement were unable to fulfill their contractual obligations, and Franchisee filed suit for breach of contract. In this situation, the loss period may begin immediately upon the supplier being unable to completely fulfill the contract. The loss period may then continue through a variety of different dates, depending upon the facts and circumstances of the matter, including considerations such as the following:

- If the supplier had a notice provision, the loss period may be based on the amount of notice required per the agreement.

- The supply agreement may include provisions for determining the appropriate loss period in the event of default.

- Under the franchise agreement, if Franchisee is allowed and able to find an alternative supplier, the loss period may end once the alternative supplier fully replaces the original supplier (before considering any pricing or terms differences), and Franchisee has caught back up with the expected level of performance (for example, regained or replaced lost customers).

## Torts

As described previously, business torts relate to events, other than a breach of contract, that harm a business (for example, a fraud, intellectual property infringement, or defamation). In tort actions, the loss period usually extends from the date of the wrongful act until the date operations return to "normal." The date operations return to "normal" is the date on which the business either has been restored or can be expected to be restored to a position to make profits at the same level as would have been experienced absent the tort.

Expanding upon the American Kitchen example, a possible tort could be the actions of a key individual, such as a business partner who was responsible for managing the kitchens across all locations, joining a competitor, and wrongfully convincing a key supplier to stop supplying American Kitchen (for example, by lying about American Kitchen management or the company's financial condition), which led to an increase in costs. The loss period's start and end dates for this tort could vary greatly, depending on the specific facts and circumstances of the matter. Consider the following:

- When did the supplier in question stop supplying American Kitchen?

- When was a replacement supplier found?

© 2020 Association of International Certified Professional Accountants

29

USA-016084

- Is there a time when the replacement supplier's price would match the original supplier?

- Is there a time when the original supplier will again supply American Kitchen?

- Was it reasonable to expect the original supplier to remain in place, and for how long?

Mitigation affects tort matters in the same way as it does breach of contract matters. Specifically, the plaintiff has an obligation, in many cases, to make reasonable efforts to minimize losses of revenue and profits. Using the previous tort example, this would include consideration of whether American Kitchen took reasonable steps to find a replacement supplier. Mitigation is addressed in greater detail in chapter 11.

Although determining the loss period may seem like a straightforward task at the onset of an engagement, there are several issues that may need to be considered. Due to the specific facts and circumstances present on each case, the previous discussion regarding the loss period illustrates the types of issues one may encounter. The loss period is typically an area determined by the trier of fact, where the practitioner can often perform analysis and investigation of relevant issues to assist the trier of fact to understand information relevant to the loss period.

© 2020 Association of International Certified Professional Accountants

USA-016085

# Chapter 6

## *Estimating Lost Revenues*

## Overview

The steps in determining lost profits typically follow the order of the income statement because the overarching objective of a lost profits damages analysis is to calculate the amount of lost profits incurred due to the defendant's wrongful acts, as covered by the plaintiff's claims. [fn 1] With this in mind, one of the first elements in the calculation of lost profits is the estimation of lost revenues. *Lost revenues* are the monetary amount of sales (or other revenues) that have not and will not be earned by the plaintiff, as a result of the defendant's wrongful acts. As explained in chapter 3, this is sometimes referred to as the amount of sales the plaintiff would have achieved "but for" the defendant's wrongful acts, less the actual and mitigating revenues.

The law does not generally prescribe a specific process or methodology to measure lost revenues. Instead, credible measurements of lost revenues are commonly made when practitioners perform analyses such as the following:

- Understanding the allegations at issue and what wrongful acts are alleged to have occurred

- Understanding the agreements or contracts at issue

- Requesting, analyzing, and understanding relevant documents and information

- Assessing the reliability of available information

- Determining the applicable methods to use and prepare an estimate of lost revenues

- Reviewing the lost revenues estimate for reasonableness.

While estimations of lost revenues are enhanced by analytical steps, including those listed previously, they may also prove helpful in other parts of a lost profits analysis, a damages analysis, or a more general analysis in a dispute context. For example, identification of the loss period, avoided costs, or lost business value could follow a similar process. Each of these steps in estimating lost revenues is discussed further in the sections that follow. Although they are presented sequentially, the order or necessity of these steps may vary. For example, after preparing an estimate of lost revenues, it may be necessary to do additional research or request additional information. Or, early versions of contracts may be part of the documents requested after an initial review indicates that they are relevant.

## Understand the Allegations

---

[fn 1]   As described in previous chapters, a lost profits calculation is based on a comparison of the but-for world to the actual or mitigating world. The difference between these worlds is traceable to the wrongful acts that fall within the plaintiff's claims and causes of action.

USA-016086

Normally, a lost profits calculation will need to be performed before there has been a determination that the defendant violated the law and perpetrated the alleged wrongful acts. As such, the damages expert may need to perform alternative calculations accounting for different liability determinations and combinations. Court filings typically contain useful context and information — albeit from the perspective of an attorney acting as an advocate — for identifying the various lost profits analyses that may need to be performed. The practitioner should review filings in the litigation to obtain an initial understanding of the dispute and issues that should be addressed in the damages analysis. Potentially useful pleadings may include

- the operative complaint, as well as possibly the original complaint and any amended complaints, if applicable;

- answers filed in response to the complaint;

- counterclaims and associated answers and responses;

- interrogatories posed and related responses thereto;

- requests for admissions and related responses thereto;

- motions (for example, motions in limine and motions for summary judgment) filed and any associated responses or rulings; and

- other briefs (for example, mediation briefs).

## Understand the Agreements and Contracts

It is frequently important to read and understand any agreements or contracts at issue in the matter. These documents are typically at the core of any lost profits analyses involving alleged breaches of contract and certain torts. Potential topics of which to be aware when reading agreements and contracts include the following:

- The parties to the agreement or contract

- Definitions of key terms

- Economic terms of the agreement or contract

- The term of the agreement or contract and any renewal and termination provisions

- Representations and warranties of the parties to the agreement or contract

- Indemnification provisions

- Limitations on liabilities provisions

- Integration provisions with other contracts

- Provisions regarding how to measure damages if the agreement or contract is breached (for example, liquidated damages)

32          © 2020 Association of International Certified Professional Accountants

USA-016087

- Discussion on how specific accounting terms are defined

- Provisions for certain documents to be maintained (for example, audited financial statements will be provided six months after year-end, or books and records of the company will be made available upon request)

- Provisions regarding interest on damages

For example, in the American Kitchen dispute discussed throughout this practice aid, the practitioner would likely want to understand the relevant terms of the franchise agreement between Franchisor and Franchisee before estimating lost profits damages related to a wrongful act.

## Request, Analyze, and Understand Relevant Documents and Information

The practitioner will often make a request for documents and information to be sought from each side of the dispute, recognizing that it is normally easier to obtain information from the practitioner's attorney client and end client than from the other side. Frequently, requests for information in the form or document requests, interrogatories, requests for admission, and deposition questions call for the practitioner to use judgment in asking for information from the other side, given the likelihood of objections from the other side on the grounds of relevance, privacy, and difficulty in obtaining and producing the information (it is "burdensome"). As a result, the "wish list" often needs to be trimmed to the "acceptable list." In addition, these requests are often made in the context of discovery requests going in each direction, with counsel for each side negotiating and bargaining on what will be produced. With that in mind, practitioners may need to be creative in finding ways to obtain requested information but also careful not to leave oneself without necessary information.

For the American Kitchen example, documents to request from the parties may include the following:

- The original franchise agreement, as well as any supplements, amendments, or revised versions

- The development plan provided to Franchisor

- The commentary, if any, provided by Franchisor to Franchisee related to the development plan

- Historical financial statements, profit and loss, and sales (for example, by customer, channel, location, product type, or product number) and reports for a reasonable period preceding the onset of the harm, to the present (for example, annual, quarterly, or monthly reports)

- Tax returns, including relevant schedules

- Electronic accounting records, such as a QuickBooks back-up file, if available

- Budgets, forecasts, or projections developed for individual locations from 2009 to the present, if available

- Actual performance reports of other locations during the period in question (and before, to assist in establishing comparability)

- Meeting minutes, if any, documenting discussions related to the 11th location

© 2020 Association of International Certified Professional Accountants

33

USA-016088

- Correspondence (for example, emails or letters) related to the 11th location

- Agreements with contractors or other vendors related to the 11th location

- Any market research conducted by Franchisee when preparing the development plan (this may include data on the economic environment of the area around the proposed 11th location, a list of competitors in the area of the 11th location, and industry association data, such as survey results by the National Restaurant Association)

- Store information by location, such as date opened, address, size, and number of customers

- Depositions-of-fact witnesses and other expert witnesses

- Business valuations performed on Franchisee's collective business or individual locations

In addition, it is often important for a practitioner to perform industry analysis, looking at issues like the local economy (for example, labor costs and rent rates), performance of similar businesses, forecasts prepared by industry analysts, and the competitive environment.

This list is not meant to be all inclusive or representative of all cases. Requests for documents and information is analysis-specific and case-specific and requires judgment by the expert.

## Assess the Reliability of Available Information

Although it is normal and customary for experts to rely on information provided to them during litigation, the practitioner should consider steps to assess the relevance and reliability of the information as a basis for the practitioner's professional opinions. [fn 2] If a practitioner does not understand the information upon which the opinion relies, those opinions may be vulnerable to critique. The nature and extent of procedures necessary to assess the reliability of information will vary based on the facts and circumstances. In some cases, a conversation with members of management may suffice (for example, when the financial statements of a company have been audited). In others, the practitioner should take more substantive steps to test the accuracy and completeness of the information. If relying on the work of others, practitioners should form a sufficient understanding of how the information was developed and its characteristics (for example, how a local rent study was performed). Ultimately, the practitioner should take those steps necessary to understand the information and to be comfortable that the data are suitable to be relied on in the given circumstance.

Practitioners typically do not perform an audit, under generally accepted auditing principles, of information on which the practitioner relies in a calculation of lost profits. However, they often perform work to validate the data they receive from the client or other sources. The nature and extent of these procedures are a matter of judgment. Practitioners can reasonably anticipate that they will need to defend the basis for their opinions at deposition and trial, including the nature and extent of their procedures, to assess the reliability of the underlying data. Case law suggests that courts consider several issues when

---

[fn 2] Relatedly, Statement on Standards for Forensic Services No. 1 requires the practitioner to "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." (Emphasis added)

34          © 2020 Association of International Certified Professional Accountants

USA-016089

evaluating the admissibility and weight of an expert's testimony that relies on client-supplied data, including

- the qualifications of client personnel supplying information,

- expert acceptance of client data, with and without testing,

- the reliability of projections provided by the client,

- the reliability and reasonableness of assumptions used to develop client projections, and

- the context within which the projections were prepared and the motives of the personnel preparing the projections.

For a more complete discussion of the case law pertaining to the use of client-supplied information, see chapter 2, "Client-Supplied Information," in the practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*.

Using the American Kitchen example, if the practitioner received forecasts or projections for the 11th location, questions the practitioner may want to consider include the following:

- Who prepared the forecasts and projections? Was the preparer experienced in developing these types of materials?

- Were these projections created in the normal course or for purposes of the dispute?

- Have previous projections been met?

- Do management's projections deviate from the business's historical experience? Why?

- Do management's projections reflect a different trend or outlook for the company than is generally anticipated for the market or industry?

## Determine the Applicable Method and Estimate But-For Revenues

Establishing lost revenues is often the most challenging element of determining lost profits, in large part, because the but-for world is counterfactual (it did not occur) and, therefore, not exactly knowable. The typical methods of estimating but-for revenues include

- the "before-and-after" method,

- the "yardstick" (or "benchmark") method,

- an approach based on the terms of an underlying contract, and

- other methods, depending on the facts and circumstances of the matter.

Additional factors may need to be considered when estimating the lost profits in a newly established business or one without a history of revenues relevant to the case and business in question. A brief dis-

USA-016090

cussion of the issues specific to such businesses is also included in chapter 4, "Newly Established Businesses," in *Attaining Reasonable Certainty in Economic Damages Calculations*.

## The "Before-and-After" Method

This method compares the but-for revenue, estimated using the plaintiff's performance before the event or action alleged to have caused lost profits, with the plaintiff's actual (impaired) performance after that event or action. The underlying theory is that the same entity's performance from a prior time period either is a good proxy or otherwise provides a basis to project the but-for revenue to be estimated. In other words, but for the defendant's wrongful conduct, the plaintiff would have experienced the same or similar revenues and profits after the event or action as the plaintiff did before that event or action. In implementation, it may be appropriate to use parts of the plaintiff's operations, or extrapolate the historical results, in the but-for revenue estimation. For example, historical prices may be kept constant or adjusted. Alternatively, sales may be adjusted to account for population growth, demonstrated trends, or industry events. The before-and-after method, like all the methods discussed, does not necessarily call for strict implementation with duplication of historical results.

But-for revenues under this method typically rely on the plaintiff's historical accounting records. As such, the practitioner should consider the plaintiff's sales history and what factors affected its revenues and growth (or lack thereof) in the "before" period that is used to project lost revenues during the "after" period. The practitioner should consider whether and to what extent the historical revenues form an appropriate basis for determination of but-for revenues, including the following:

- Are the plaintiff's revenues affected by seasonality?

- Were there any one-time events or projects that affected revenues?

- How consistent has revenue growth been for the company over periods comparable to the damage period? What factors affected growth? Are these growth rates sustainable?

- Are there any non-violative economic factors that occurred in the "after" period that would have affected revenues?

- Is there available industry data that corroborate or support the growth rate?

- Are the types of activities used to generate revenues in the "before" period the same activities used to generate revenues in the "after" period?

- Are there any capacity issues that could limit or have limited growth or revenues?

- Has the business experienced a significant change in management, growth rates, or business activities?

- Does the "before" period include the same market and economic conditions, including the same competitors, as the after period?

- Can the differences between the "before" and "after" period be adequately and reliably accounted for in the analysis?

© 2020 Association of International Certified Professional Accountants

USA-016091

Expanding on the American Kitchen example, assume that the 11th location opened in late 2013 and operated for 3 full years prior to Franchisor requiring the closing of the location. Under the before-and-after method, one way to estimate revenues would be to analyze and use the revenue data for the 36-month period prior to the location shutting down. The following table summarizes the food and beverage revenue of the 11th location.

**Figure 6.1. Historical Revenues for 11th Location**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| January | $14,163 | $12,563 | $15,622 |
| February | 19,621 | 18,587 | 19,988 |
| March | 18,934 | 18,165 | 19,115 |
| April | 19,982 | 18,966 | 20,750 |
| May | 16,440 | 17,582 | 16,923 |
| June | 10,221 | 10,450 | 10,800 |
| July | 9,365 | 9,855 | 9,562 |
| August | 15,013 | 14,982 | 16,800 |
| September | 17,933 | 18,373 | 18,509 |
| October | 19,121 | 21,252 | 30,850 |
| November | 17,632 | 17,092 | 18,333 |
| December | 17,222 | 16,785 | 18,455 |
| **Total Revenue** | **$195,647** | **$194,652** | **$215,707** |

As shown in the preceding table, the location grew by $20,060 between 2014 and 2016. Possible methods to estimate lost revenues using this information may include analyzing the average monthly change in revenues, analyzing the compound annual growth rate between 2014 and 2016, or analyzing the average annual change in revenues. Although using any one of these percentages to project future revenues may be appropriate, each has different considerations.

For example, when analyzing the average monthly change in revenues, the practitioner would likely want to research any possible seasonality, such as June and July in the preceding example data, as well as any outlying months, such as October 2016.

The month of October 2016 had substantially higher revenues than other months and could be the result of a nonrecurring event, such as a large conference or other event held at the college campus where the restaurant is located. Alternatively, if a similar event were to also occur in the "after" period or can be expected to occur again, then it would likely be appropriate to include this month in the data used for the estimation, unadjusted.

© 2020 Association of International Certified Professional Accountants

USA-016092

If using a compound annual growth rate, the practitioner may want to consider researching the composition of the revenues in the two periods that are used in the compound annual growth rate calculation. Simplistically, a compound annual growth rate does not consider any actual data between the start date and end date. As such, it is possible that the compound annual growth rate may not be a good predictor of future growth.

As shown in this simplistic example, there are many factors that need to be considered when using the before-and-after method. One goal for the practitioner when applying this approach is to understand the driving factors behind the plaintiff's revenues and adjust for factors that could overstate or understate revenues.

## The "Yardstick" (or "Benchmark") Method

This method, like the market approach in business valuation, uses a comparable "yardstick" to estimate what the revenues and profits of the affected business would have been. Examples of possible yardsticks and information that might be employed in the estimation of but-for revenues include the following:

- The performance of the plaintiff's same or similar business at a different location

- The defendant's performance (especially if the defendant is accused of taking sales away from the plaintiff)

- The experience of a similar business unaffected by the defendant's actions

- Growth or decline in the industry

- General economic trends

- Trends in socioeconomic and population conditions

The "yardstick" chosen is a proxy for how the plaintiff's business would have performed but for the wrongful conduct of the defendant or defendants. An important step when using the yardstick method is to verify that the yardstick chosen is reasonably comparable to the plaintiff's business at issue in the matter. Items to consider when selecting a yardstick may include the following:

- Is the yardstick comparison normally used by market participants as a business benchmark, or was the yardstick created or used solely for litigation settings?

- Is the yardstick in a similar geographic location?

- Does the yardstick have the same or similar history as the plaintiff's business at issue?

- Would the yardstick be subject to similar economic conditions as the plaintiff's business at issue?

- Does the yardstick company sell substantially similar products or services (for example, fast food restaurant vs. a steakhouse)?

- Is the yardstick company a similar size to plaintiff's business at issue?

38          © 2020 Association of International Certified Professional Accountants

USA-016093

- Is the yardstick company part of a larger company?

- Does the yardstick company have a similar market share to plaintiff's business at issue?

- Are industry averages skewed by any large companies in the industry?

- Is the plaintiff's business large enough to skew industry averages?

- Are industry data available for the geographic region of the plaintiff?

- Does the yardstick have a similar marketing strategy to that of plaintiff's business at issue?

- Does plaintiff's business at issue have historical financial results, or is it still considered a "start-up"?

- Does the plaintiff's business or a yardstick business rely on intellectual property to create revenue or profits?

Like other before-and-after method's concerns about comparability of the "before" period with the "after" period, the practitioner should consider other factors that could cause the plaintiff's performance to differ from the yardstick selected, and how those factors have been accounted for in the damages model. In this context, it may be appropriate to adjust yardstick data to account for differences between the yardstick and the affected business or to disregard the yardstick.

Using the American Kitchen example, one potential yardstick could be the results achieved by a competing restaurant on the same college campus (if the information is available). An alternative yardstick could also be a nearby restaurant owned by the plaintiff, or another American Kitchen location, if the location was not affected by the wrongful actions of the defendant or defendants. In both scenarios, the practitioner would seek to obtain financial information reflecting the results of the yardstick.

For example, in some instances, a yardstick company can provide a growth rate that would apply to an affected company's actual sales from the "before" period to estimate but-for revenues.

## Measurement Based on the Terms of the Contract

In some instances, the lost revenues estimate is made in relation to a specific contract. In this instance, many of the elements of the lost profits measurement may be set forth in the contract document or in other communications between the parties, including

- the number of units to be sold,

- the unit prices charged,

- inflationary factors to apply to the unit price,

- the loss period,

- the minimum or maximum number of units that can be purchased,

- the minimum or maximum amount that can be billed,

© 2020 Association of International Certified Professional Accountants

39

USA-016094

- quantity discounts,

- any limitations on damages, and

- a predetermined damages formula (sometimes referred to as *liquidated damages*).

When using this method to measure lost revenues, the practitioner may develop a model to determine the revenues anticipated by the parties.

**Other Methods**

Other approaches may also be appropriate depending on the facts and circumstances involved in the matter for which lost profits are calculated. When applying other methods, the general principles underlying comparability, reasonable certainty, and the methods discussed previously should be considered in the development of a model.

One example of an alternative method is to estimate lost revenues based on market share data. Under this approach, the practitioner may analyze the market share data to estimate the percentage of its market share before and after the wrongful act. The ability to estimate lost revenues using a market share approach is dependent on the availability of relevant data on which to base the analysis, among other considerations.

Another method is to use a *multiple regression*, which is a statistical tool to estimate the impact of independent variables on a dependent variable (also discussed in chapter 7). A multiple regression can be used in the development of a revenue projection by evaluating the historical relationship between sales and independent or explanatory variables such as population, prices, competitors in the market, competitor prices, legislation, and supply costs. Once the relationship has been estimated, based on past data, it can be applied to future periods to estimate but-for sales, taking into account a wide range of potentially impactful variables to estimate sales in a world in which only one factor changed: the alleged wrongful act.

## Past and Future Lost Revenues

In many cases, the plaintiff's lost revenues may span a time period before and after the preparation of a damages calculation or before and after trial. If there are future losses (that is, the loss period extends beyond the date of trial or the preparation of the lost profits estimate), the practitioner will need to estimate both those future revenues that will be realized by the plaintiff and those revenues that the plaintiff would have realized but for the wrongful act of the defendant.

The following example highlights this issue, with the solid line representing actual amounts and the dotted lines representing projected amounts. Note that the top line is dotted for the entire loss period, given that this is the but-for revenue estimate and is projected for both past and future periods. Year 4 is when the damaging event occurred, and year 6 is when the calculation is made. The bottom dotted line represents the future projected actual revenues. The space between the top line and bottom line represents the lost revenues.

**Figure 6.2. Summary of Lost Revenues**

40                     © 2020 Association of International Certified Professional Accountants

USA-016095



Although the attestation standards for financial forecasts and projections do not apply to litigation services, practitioners may want to refer to the guidance codified in AT-C section 305, *Prospective Financial Information*.[fn 3] This guidance provides information on different factors that practitioners may consider when compiling, reviewing, or otherwise testing financial forecasts and projections. These same considerations may be relevant when estimating projected revenues in lost profits calculations.

## Do the Lost Revenues Make Sense and Are They Reasonable?

Regardless of whatever method is used to estimate lost revenues, once the practitioner has performed an initial analysis, it is important to consider the reasonableness of the lost revenues calculation. Often, simple "sanity checks" can assist in evaluating the reasonableness of a measurement of lost revenues. These may include the following questions or questions like them:

- Does the company have the capacity to fulfill the sales being projected?

- Do the projections lead to an amount of lost revenues that exceeds the overall market?

- From where will the additional sales projected come?

- How would the company's increased market share affect competitors?

- Does the company have the working capital necessary to meet the additional demand projected?

---

[fn 3]  All AT-C sections can be found in AICPA *Professional Standards*.

© 2020 Association of International Certified Professional Accountants

USA-016096

- Do slight changes in key assumptions result in large increases in lost revenues (for example, a 0.1% change in a growth rate yields 10% more lost revenues)?

- Does the company at issue have a track record of achieving the results reached by the practitioner?

The practitioner should consider such questions while developing the damages model to anticipate potential critiques of the analysis (for example, by the opposing expert). In this way, the practitioner will be more likely to develop a credible estimation of lost revenues.

## Scenarios

For some cases and analyses, the practitioner may develop a forecast range or provide alternative scenarios. These might be "high," "medium," and "low," or more or fewer scenarios. Although this approach may be appropriate in some cases, it may expose the analysis to critique regarding whether the opinion can be expressed with reasonable certainty or whether it is sufficiently helpful to the trier of fact. This critique is more likely when the practitioner offers a wide range of scenarios, with minimal insight into which of the scenarios is more or less likely. Lacking testimony on what would determine where in the range the but-for revenues would have landed, it leaves a projection with scenarios or a range subject to criticism that the testimony is not sufficiently helpful to the jury or trier of fact. [fn 4]

---

[fn 4] See, for example, *Sargon Enterprises v. University of Southern California*, 288 P.3d 1237 (Cal. 2012).

       © 2020 Association of International Certified Professional Accountants

USA-016097

# Chapter 7

## *Costs*

## Overview

As described in chapter 2 of this practice aid, lost profits are generally calculated as lost revenues less incremental costs and expenses, also called *avoidable expenses*.[fn 1] These are the expenses avoided as a result of lost revenues not having been earned. In the American Kitchen example, if Franchisee, with 10 restaurants and stores, was unable to open an 11th restaurant as a result of Franchisor's unlawful refusal, the lost revenues notably include the revenues at the location in question. See chapter 6.

In preparing the lost profits calculation, the practitioner analyzes which costs would have been incurred in the but-for world but have been avoided without these revenues. In the American Kitchen example, without additional stores, these avoided costs would likely include the cost of food and beverages that would have been served, labor (for example, servers, food preparation, and management), cleaning, maintenance, electricity and other utilities, construction costs, financing costs, and legal fees. Other costs might include sales and marketing expense, such as promotions for the new location.

In addition, a lost profits calculation may be performed in a situation in which there has been no effect on revenue, but costs have increased as a result of the unlawful acts of the defendant. For example, if a cleaning service was under contract to clean a restaurant, but the cleaning service refused to perform as called for under the contract, the restaurant may be required to obtain a replacement cleaning service at a higher price. In this scenario, the additional costs incurred for the replacement cleaning service would be a form of lost profits because the plaintiff has experienced lower profits as a result of the higher costs, even with no revenue effect.

From the examples described previously, the estimation of incremental or avoided expenses to be deducted from revenues in an estimate of but-for profits or deducted from lost revenues to arrive at lost profits is dependent on case-specific facts and circumstances. For example, adding a restaurant to a chain is going to add costs such as building construction — costs that adding 1 hour per day or 10 more customers per day at an existing restaurant will not include. As detailed more fully in the following text, practitioners are frequently tasked with performing analysis to support the estimation of incremental costs.

## Variable, Marginal, Incremental, Saved, Avoided, and Fixed Costs

In cost accounting, costs are often categorized as fixed or variable (also sometimes referred to as *marginal costs*, although hereafter, the term *variable costs* is used in this practice aid). *Fixed costs* are generally referred to as those that do not change with an increase or decrease in sales. For example, a contractually defined lease payment on office space would typically be viewed as a fixed cost because the cost will be incurred whether sales are $0 or $100,000.

---

[fn 1]  *Costs* and *expenses* are used interchangeably in this practice aid, referencing costs incurred, regardless of whether the amount is expensed in a period or is a cost incurred but not expensed until some later period. Issues pertaining to lost cash flow, as compared to lost earnings, are addressed in chapter 2 in this practice aid.

USA-016098

In contrast, variable costs increase with an increase in sales. For example, if a company pays commissions of 15% of sales, the commissions represent a variable cost. Similarly, a restaurant would typically have variable costs, such as food and beverage, given that as restaurant sales increase, food and beverage costs would also likely increase. *Variable costs* are often defined by accountants as the costs that would increase with a one-unit increase in sales, but, as can be seen in the preceding commissions example, this is not always the case. For example, commissions would increase with a price increase, even without an increase in sales volumes.

*Incremental costs* are those costs that are incurred with a change between two scenarios (for example, what actually occurred versus what would have occurred "but for" the unlawful act).[fn 2] What the "increment" is depends on the purpose of the calculation. In some situations, incremental costs may be the same as variable costs (for example, if the increment is to add one more unit of sales). However, incremental costs can also be evaluated using other measures, such as one or more additional products offered for sale, one or more additional stores opened, or one or more additional lines of business operated.

Although fixed costs do not change with a change in volume (for example, unit volume), that is not to say that fixed costs necessarily remain constant across all time periods. For example, rent expense may increase due to lease escalations, but the rent expense (in a given month) that does not change based on changes in sales volume would be considered a fixed cost. However, if there were a need to increase rent space to accommodate additional sales, then rent could become an incremental cost.

In a lost profits calculation, costs are typically categorized as incremental, saved, or avoided (hereafter simplified to incremental), or fixed, in which fixed costs in a lost profits calculation are those that do not change with the increment of the change between the but-for and actual scenario. As a result, because the increment in a lost profits calculation may be different from a one-unit change (the increment used in cost accounting for "variable costs"), fixed costs in a lost profits calculation may differ from those seen in a cost accounting exercise to estimate fixed versus variable costs.

In this context, experts are normally tasked with the estimation of which costs were saved (avoided) as a result of a disputed event or events: incremental costs not incurred because the lost revenues in question were not earned. As can be deduced from the preceding discussion, this is typically not a simple analysis and varies from case to case. The analysis of costs frequently calls for some combination of tools and analyses used by the practitioner, including

- evaluation of specific cost line items using accounting records,

- statistical analysis (for example, regression), and

---

[fn 2]    There is not a unanimous and clear definition of *incremental costs*. For example, some define incremental costs to be synonymous with variable costs, whereas others use the definition discussed in this chapter, which is consistent with the GAAP definition. The AICPA's *Working Draft: Time-share Revenue Recognition Implementation Issue* (AICPA Audit and Accounting Guide: Revenue Recognition,§ 3.7.03, January 2019.) explains that the FASB *Accounting Standards Codification*® defines incremental costs to be those that are incurred with an additional event (not just an additional unit sold): "Paragraphs 1-3 of FASB ASC 340-40-25 explain that the costs of obtaining a contract should be recognized as an asset if the costs are incremental and are expected to be recovered. Incremental costs of obtaining a specific contract are those costs that the entity would not have incurred if the contract had not been obtained."

44                    © 2020 Association of International Certified Professional Accountants

USA-016099

- company-specific factual investigation.

## Evaluation of Specific Cost Line Items

As part of the analysis of the costs to be included in the determination of lost profits, the practitioner should consider the facts and circumstances related to specific cost line items. For example, it may be appropriate to adjust the analysis for one-time events, nonrecurring items, or other case-specific factors. The basis for such adjustments is a sufficient understanding of the historical cost evidence.

Using the American Kitchen example, an expert might look at the historical costs of Franchisee's other operations and locations. [fn 3] This analysis may be performed on a line-item basis, as seen in the following table.

---

[fn 3] Courts have also considered whether margin information provided by management is appropriate to use to calculate lost profits as applied to the particular lost sales at issue in a case. *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620 (Tex. App. 2010) (Finding the use of a management-supplied, company-wide margin was not appropriate to apply to the customer and lost sales at issue where no additional evidence was presented to support the profit margin and its particular use by the expert).

© 2020 Association of International Certified Professional Accountants                45

USA-016100

**Figure 7.1. Historical Company Cost Analysis**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Number of Stores | 8 | 9 | 9 | 10 | 10 | 10 | 10 |
| **Store-Level Revenue and Expenses (Avg Per Store)** | | | | | | | |
| Food and Beverage Revenue | $2,361,212 | $2,090,586 | $2,406,405 | $2,223,687 | $2,419,329 | $2,653,342 | $2,837,906 |
| **Direct Expenses** | | | | | | | |
| Food | $472,176 | $424,671 | $495,351 | $465,325 | $513,280 | $571,594 | $620,984 |
| Beverage | $142,160 | $127,740 | $148,310 | $139,242 | $154,120 | $171,817 | $186,134 |
| Tableware | $46,829 | $42,356 | $50,051 | $46,707 | $51,429 | $57,496 | $62,218 |
| Server Labor | $354,070 | $318,582 | $372,297 | $349,287 | $384,717 | $428,566 | $465,631 |
| Food Preparation Labor | $235,714 | $212,925 | $247,845 | $232,440 | $257,218 | $286,265 | $310,090 |
| Bus Boy Labor | $118,125 | $105,980 | $124,254 | $116,319 | $128,072 | $142,502 | $155,451 |
| Total Direct Expenses | $1,369,073 | $1,231,654 | $1,438,109 | $1,349,321 | $1,488,837 | $1,658,199 | $1,800,459 |
| Gross Profits | $992,139 | $858,932 | $968,297 | $874,365 | $930,486 | $995,143 | $1,037,447 |
| **Operating Expenses** | | | | | | | |
| Management Labor | $82,951 | $73,937 | $86,918 | $81,050 | $90,318 | $99,795 | $108,342 |
| Insurance | $23,990 | $21,087 | $24,765 | $22,896 | $25,800 | $28,886 | $30,817 |
| Marketing | $58,891 | $53,009 | $62,207 | $58,202 | $63,998 | $71,249 | $77,729 |
| Computers and Systems | $23,978 | $21,187 | $24,654 | $23,280 | $25,719 | $29,045 | $31,324 |
| Rent | $47,322 | $42,355 | $49,291 | $46,303 | $50,868 | $56,992 | $61,832 |
| Utilities | $11,788 | $10,248 | $12,869 | $11,343 | $12,524 | $14,721 | $15,585 |
| Office Supplies | $4,541 | $4,726 | $4,954 | $4,426 | $5,087 | $5,809 | $6,294 |
| Total Operating Expenses | $253,457 | $226,549 | $265,658 | $247,500 | $274,309 | $306,497 | $331,924 |
| Operating Income | $738,682 | $632,383 | $702,639 | $626,865 | $656,176 | $688,645 | $705,523 |
| **Additional Parent-Level Expenses (Total)** | | | | | | | |
| Legal | $16,314 | $25,084 | $17,777 | $27,630 | $10,465 | $10,377 | $10,706 |
| Executive Compensation | $179,918 | $164,743 | $166,980 | $169,741 | $172,353 | $174,832 | $177,509 |
| Headquarters Rent | $29,582 | $30,568 | $30,791 | $30,983 | $31,705 | $32,570 | $33,236 |
| Utilities | $1,640 | $1,698 | $1,635 | $2,463 | $1,806 | $2,646 | $2,070 |
| Office Supplies | $1,618 | $1,764 | $1,746 | $2,347 | $1,881 | $2,439 | $2,670 |
| Total Additional Parent-Level Expenses | $290,650 | $224,662 | $220,657 | $233,697 | $219,282 | $222,624 | $226,017 |
| **Net Profit (All Stores and Parent)** | $5,678,810 | $5,466,784 | $6,108,093 | $6,034,954 | $6,342,482 | $6,663,826 | $6,829,210 |

Analysis of cost line items could involve steps such as discussions with management, review of the accounting records and system, or review of supporting documentation of line items (for example, supply agreements). For example, the expert may evaluate whether the accounting system shows regular charges, such as rent and salaries, or inconsistent costs, such as legal fees, or both, which may be driven by specific events, but may also be predictable. There may be patterns such as in businesses with seasonality. These patterns may be observable when looking at monthly data instead of annual data, or even by looking at particular cost entries, such as on the general ledger or in account transaction detail.

The following is an X-Y scatterplot of food costs against revenue, as well as a calculation of food expenses as a percent of revenue, for the years 2010–2016.

46    © 2020 Association of International Certified Professional Accountants

USA-016101

# Figure 7.2. Total Company Food Expense Compared to Total Food and Beverage Revenue

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Food | $3,777,407 | $3,822,040 | $4,458,162 | $4,653,255 | $5,132,803 | $5,715,936 | $6,209,342 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Food as Percent of Revenue | 20.0% | 20.3% | 20.6% | 20.9% | 21.2% | 21.5% | 21.9% |

Food Expense

Revenue

As can be seen in the table and the chart, there is a strong correlation between food expense and revenue. Given that the entity at issue is a restaurant, the finding that food costs rise as revenues rise is consistent with what would be expected.

High correlation between costs and revenue is common in some line items, and particularly costs of goods sold. But other cost line items, such as operating expenses, frequently show less correlation to revenue. For example, the relationship between revenue and executive compensation expense is less clear when analyzed on a percent-of-revenue basis and in an X-Y scatterplot.

© 2020 Association of International Certified Professional Accountants

USA-016102

## Figure 7.3. Executive Compensation Expense Compared to Total Food and Beverage Revenue

| · · · · · | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Exec. Comp. as Percent of Rev. | 7.6% | 7.9% | 6.9% | 7.6% | 7.1% | 6.6% | 6.3% |

Executive Compensation Expense

Revenue

Courts have recognized that the specific analysis necessary in the evaluation of incremental expenses will depend on the facts and circumstances of the business and dispute. [fn 4] Issues that are routinely encountered when performing an evaluation of specific line items include the following:

- Incomplete or missing monthly data (making a monthly trend analysis not possible).

- A business may have limited operational history.

- Limitations on data for comparable entities, resulting in the questioning of those entities' comparability and relevance.

In these types of situations, other tools may be of use. For example, in some situations the lost revenue may be from an existing business that had an impairment as a result of the disputed event (such that there may be a history of sales and costs at a level similar to the but-for world), whereas in other situations the lost revenue may be from a new business or new line of business (so the but-for world would not be similar to the historical period). In these situations, historical cost data will be less available or potentially less relevant (for example, if the comparable entity costs are different, such as a Franchisee store in a more expensive location than Franchisee's other stores or in a location that has a higher labor cost, or possibly the ability to charge higher prices, such as in an airport). In addition, the historical period may not be representative of the damage period, such as when labor or input costs per unit have risen, like the cost of eggs or if the minimum wage rises (using the American Kitchen example).

## Statistical Analysis

---

[fn 4]  See, for example, *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642 (Neb. 2008) (Finding salary and benefits costs need not be deducted as part of the lost profits calculation in which plaintiff had personnel available to service business obtained in breach of a noncompete agreement).

© 2020 Association of International Certified Professional Accountants

USA-016103

Another tool that may be used in evaluating the relationship between costs and revenue is statistical analysis of the relationship between costs and revenue. *Regression* is a specific type of statistical analysis, quantifying the relationship between two variables (for example, food expense and revenue). It is typically performed by using a software package such as Microsoft Excel, SAS, Stata, or SPSS. In a regression, there is a dependent variable (for example, food expense) and one or more independent or explanatory variables. A regression with multiple independent or explanatory variables is referred to as a *multiple regression*. The following is a regression output from Microsoft Excel for a single-variable regression of executive compensation expenses regressed against revenue (executive compensation expenses as explained by revenue).

**Figure 7.4. Selected Regression Output: Exec. Comp. Expense Regressed Against Total Food and Beverage Revenue**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |

| | |
|---|---|
| Beta (Slope) of Revenue Variable | 0.04 |
| Intercept | 808,811.68 |
| R-squared | 0.82 |
| T-score of Revenue Variable | 4.79 |

Per the preceding table and the data in the regression, for every $1 increase in revenue, all else equal, there is a $0.04 increase in executive compensation expense. The intercept value of $808,811.68 means that there would be executive compensation expense of $808,811.68 with no revenue, based on the data in the regression. The t-score of the revenue variable provides an indication of the strength of the explanatory power of revenue as an indicator of executive compensation expense (a higher t-score means that the data show a stronger relationship between the variables). The R-squared value of 0.82 indicates that a high portion of the variation in executive compensation expense is explained by changes in revenue. [5]

In consideration of the regression output, the beta value of 0.04 is not unreasonable because it indicates that with higher revenue, there is more executive compensation expense (but not much), all else equal. Likewise, the t-score and R-squared value suggest that it may be appropriate to treat executive compensation expense as having some variable component. But the intercept value suggests that there is also a fixed component of the expense. When a cost has both fixed and variable components, it is often referred to as a *semi-variable expense* (also called *semi-incremental*). Or, there can be costs that are step-variable, such as when a business can absorb more revenue with its current office or warehouse, but at a certain point another or a larger location is needed.

The preceding regression has only one independent or explanatory variable: revenue. However, it is likely that there are other factors that affect executive compensation. For example, suppose that the franchise company hired a CFO in 2013. By adding a variable to the regression to address this fundamental change, the regression better explains the data, as seen in the following regression output.

---

[5]  R-squared values range from 0 to 1, where values close to 1 indicate that the regression explains much of the variation in the dependent variable, and an R-squared value close to 0 indicates that the regression explains very little of the variation in the dependent variable.

© 2020 Association of International Certified Professional Accountants                    49

USA-016104

**Figure 7.5. Selected Regression Output: Exec. Comp. Expense Regressed Against Revenue and CFO Presence**

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| CFO In Place | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |

| | |
|---|---|
| Beta (Slope) of Revenue Variable | 0.01 |
| Beta (Slope) of CFO Variable | 190,044.28 |
| Intercept | 1,221,390.45 |
| R-squared | 0.99 |
| T-score of Revenue Variable | 4.16 |
| T-score of CFO Variable | 9.05 |

As can be seen in the preceding figure, the amount that executive compensation expense increases with a change in revenue is now lower (seen with a beta of 0.01, as compared to 0.04 in the single-variable regression), and the addition of a CFO is seen to increase annual executive compensation by $190,044.28, as seen by the beta on the CFO variable. Also relevant is that the regression with two explanatory variables accounts for a higher portion of the variability in executive compensation expense, as seen by the R-squared of 0.99, as compared to the other regression's R-squared of 0.82. In other words, this regression does a better job in explaining variations in executive compensation expense, and this expense is not as strongly influenced by changes in revenue as was indicated in the first regression. Finally, the t-scores of the two variables (4.16 for revenue and 9.05 for CFO) show that the CFO variable has a stronger statistical relationship to changes in executive compensation than do changes in revenue.

Courts have, in some situations, looked favorably on the use of regression as a method to evaluate whether costs are incremental or variable, or fixed. [fn 6] Of course, simply finding correlation between cost increases and revenue increases, and assuming that those increases are a result of increases in revenue, may be misleading. As in the preceding restaurant and CFO example, it may be that revenue has increased at the same time as a new executive was hired, and that costs would have been higher, regardless of revenue. Or, it may be that the hiring decision was as a result of expansion, which would support treating at least some of that expense as incremental.

As a result, it is important to identify any confounding events that could lead to an improper conclusion related to the relationship between revenues and costs and to perform reasonableness checks when leveraging statistics-based approaches to estimate incremental costs.

## Company-Specific Factual Investigation

As described previously, a company-specific and cost-specific analysis is often helpful in analysis of incremental expenses. This also frequently applies when performing a statistical analysis such as in the preceding example. For example, it may also be appropriate to look at total expenses, or groups of expenses, and the relationship with total revenue. For example, the following is a table with total parent-level expenses compared to revenue.

---

[fn 6]  See, for example, *Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813 (D. Minn. 1994), *aff'd mem.*, 60 F.3d 839 (Fed. Cir. 1995).

50          © 2020 Association of International Certified Professional Accountants

USA-016105

**Figure 7.6. Total Parent-Level Expenses Compared to Total Food and Beverage Revenue**



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Parent-Level Expenses | $230,650 | $224,662 | $220,657 | $233,697 | $219,282 | $222,624 | $226,017 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Parent-Level Exp. as a % of Rev. | 1.2% | 1.2% | 1.0% | 1.1% | 0.9% | 0.8% | 0.8% |

There does not appear to be much, if any, correlation between parent-level expenses and store revenue. However, if there is a relationship between parent-level expenses and store revenue, it would likely be better seen in an analysis of the individual cost line items. For example, it is possible that individual cost line items, such as legal expenses, would rise with the addition of new stores. In fact, this is supported by the data.

**Figure 7.7. Legal Expenses, Stores Open at Year-End, and New Stores by Year**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Legal Expenses | $16,314 | $25,084 | $17,777 | $27,630 | $10,465 | $10,377 | $10,706 |
| Stores Open at Year End | 8 | 9 | 9 | 10 | 10 | 10 | 10 |
| New Stores | 0 | 1 | 0 | 1 | 0 | 0 | 0 |

Legal fees are higher in years in which new stores are launched. Whether this is simply spurious correlation, or it is an incremental cost related to the addition of a store can be investigated by, for example, reviewing the invoices for legal fees or possibly speaking with management (or asking questions in a deposition). It is also possible that certain legal fees may be covered by insurance. Again, these are issues that likely call for investigation by the practitioner.

The question in a dispute context of which costs are incremental inherently depends on the issue in question in the dispute and the particular facts of the case at hand. In the American Kitchen example, the practitioner evaluated the issue of profits lost from the inability to add a restaurant location. In this context, construction costs would likely be incremental. However, if the dispute pertained to the hours that the location was able to be open (for example, a store is forced to close at 8 p.m., and the owner believes he or she is entitled to keep it open until 10 p.m.), construction costs likely would not be incremental. Neither would marketing expense likely be incremental in a dispute about adding hours during which the restaurant could remain open. In contrast, if there was a disputed event that caused all of Franchisee's restaurants chain to close (for example, revocation by Franchisor of all franchise rights), then many more costs could become incremental, potentially including all executive compensation, as an example.

© 2020 Association of International Certified Professional Accountants

51

USA-016106

The following is a table that summarizes how cost sample line items may be incremental or fixed, depending on the scope of the analysis or dispute.

The analysis of incremental expenses is far from straightforward, and it does not lend itself well to a checklist, given the variety of issues and considerations in play. As a result, the categorization and characterizations in the following table are examples of possible characterizations. As has been described at length, the treatment of costs as incremental or fixed requires judgment and analysis, with conclusions, depending on the facts and circumstances at issue in the case.

**Figure 7.8. Possible Categorization of Costs**

|  | Store Closed 8-10pm on Weekdays | Single Store Not Able to Be Opened | All Franchisee Stores Closed |
|---|---|---|---|
| Food and Beverage | Incremental | Incremental | Incremental |
| Server Labor | Incremental | Incremental | Incremental |
| Food Preparation Labor | Incremental | Incremental | Incremental |
| Retaurant Management Labor | Incremental | Incremental | Incremental |
| Insurance | Semi-Incremental or Fixed | Semi-Incremental | Incremental |
| Marketing | Fixed | Semi-Incremental | Incremental |
| Computers and Systems | Fixed | Semi-Incremental | Incremental |
| Restaurant Rent | Semi-Incremental or Fixed | Incremental | Semi-Incremental or Fixed |
| Restaurant Utilities | Semi-Incremental or Fixed | Incremental | Incremental |
| Construction Costs | Fixed | Incremental | Fixed |
| Parent Legal Expenses | Fixed | Fixed | Incremental |
| Parent Executive Compensation | Semi-Incremental or Fixed | Semi-Incremental or Fixed | Incremental |
| Headquarters Rent | Fixed | Fixed | Incremental |

Certain cost line items invite differences of opinion on how these costs should be treated. Examples include overhead, corporate allocations, leases, and management fees. The common thread between these costs is that they are often large cost categories with the detailed costs not well described, or the costs may relate to amounts paid to related parties, which may be subject to discretion. As described previously, practitioners may consider whether the credibility of the damage calculation could be improved by a more detailed examination of these costs.

Other issues that may call for specific attention include the following:

- *Technological changes.* Cost structures can change with new technology, and the historical costs as a percent of revenue may not hold true across many years in a lost profits calculation.

- *Industry issues.* Often, an industry is in a state of change, such that the historical data do not provide a good basis for forecasting future costs (for example, increased regulatory expenses, labor union agreements, and health care reimbursement rates).

- *Economic and legislative issues.* Often, broader economic issues may change, such as taxes, health care, or wages, which may alter a projection of costs.

© 2020 Association of International Certified Professional Accountants

USA-016107

# Chapter 8

## *Prejudgment Interest*

### Overview

*Prejudgment interest* is an interest-based award that is sometimes made to compensate an injured party for the lost opportunity to use and make money on amounts, including lost profits, that would have been received prior to the judgment date "but for" the wrongful acts. In contrast, post-judgment interest compensates for the use of the money from the judgment date to the date on which the judgment is paid. This chapter primarily addresses prejudgment interest. There is a brief section at the end of this chapter on post-judgment interest. Given that post-judgment interest is almost always provided to a plaintiff, and expert testimony is rarely needed for these calculations, experts often make and provide calculations of prejudgment interest, as well as provide information relevant to such an award.

Prejudgment interest awards are made as part of the effort to "make a plaintiff whole."[fn 1] The U.S. Supreme Court opinion in the intellectual property case *General Motors v. Devex* illustrates the broader concept that prejudgment interest "merely serves to make the patent owner whole because his damages consist not only of the value of the royalty payments but also the foregone use of the money between the time of infringement and the date of the judgment."[fn 2] An award of prejudgment interest can also incentivize defendants to avoid delay in the litigation process.[fn 3]

Although awarding prejudgment interest may, in an economic sense, be required to make a plaintiff whole, the determination and calculation of prejudgment interest can be affected by case facts and legal issues, including the following:

- What a plaintiff would have done with the monies in question

- What a defendant has done with the monies in question

- Delays in the litigation process (especially if caused by the defendant's actions)

- Interest terms contained in a contract between the parties

- Whether the amounts in question were known and quantifiable (and as of when)

- Whether there was a good-faith dispute or, alternatively, abusive conduct by one or more of the parties[fn 4]

---

[fn 1]   *General Motors Corp. v. Devex Corp.*, 461 U.S. 655–56 U.S. 648 (1982).

[fn 2]   See footnote 1.

[fn 3]   *In re Pago Pago Aircrash of Jan. 30, 1974*, 525 F. Supp. 1007 (C.D. Cal. 1981).

[fn 4]   This is sometimes referred to as the *closeness of the dispute. Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–34 (2d Cir. 1992); *St. Louis & O'Fallon Ry. Co. v. United States*, 279 U.S. 461, 478, 483, 49 S.Ct. 384, 385, 387, 73 L.Ed. 798 (1929).

© 2020 Association of International Certified Professional Accountants

USA-016108

- Interest rates and the investment environment during the relevant time period

- Case law in the case's jurisdiction or venue (which may affect interest rate limits or methodologies used)

- Compounding of interest

Courts have approved several measures and considered a wide variety of issues in determining and calculating prejudgment interest. As referenced previously, frequently, the jurisdiction or venue of a dispute (for example, state vs. federal court), as well as the causes of action (for example, torts vs. breach of contract claims), will define parameters for a prejudgment interest calculation.

## Prejudgment Interest and Lost Profits Calculations Under Federal and State Law

Prejudgment interest can be awarded, at the discretion of the court, in federal matters. This aligns with consideration of the foregone opportunity to use the damages amount, from the time of loss to the time of judgment.

However, prejudgment interest is not always available — particularly in cases tried in state courts. For example, in many states, damages must be liquidated to avail prejudgment interest. Liquidated damages are amounts known by the parties or capable of being calculated without the assistance of experts. [fn 5]

For example, under California Civil Code Section 3287, prejudgment interest is due on "damages certain."

> 3287. (a) A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt.

In this context, a dispute over whether a specified amount is or is not owed by defendant to plaintiff would be a sum certain. In contrast, if a defendant owes a percentage of future lost profits, and there is a projection needed to estimate future lost profits, those would not qualify as liquidated damages (a sum certain). For example, in *Watson Bowman Acme Corp. v. RGW Construction, Inc.*, [fn 6] the California Court of Appeal found that when the parties in the litigation disputed the amount that was owed, that showed the amount to be uncertain, which rendered prejudgment interest unavailable in a breach of contract matter.

As a result, given that a lost profits calculation frequently involves a calculation of lost revenue or profits, or both, based on a comparison of a but-for world and the actual or mitigating world, and those worlds are often based at least in part on projections, lost profits calculations frequently do not qualify as liquidated damages, which leaves prejudgment interest unrecoverable in some lost profits calculations.

---

[fn 5] Liquidated damages "can be ascertained by mere computation, and when the damages are complete at a particular time and can be determined as of such time with fixed rules of evidence and known standards of value." *Roper Corp. v. Reisz*, 718 F.2d 1004, 1007–1008 (11th Cir. 1983).

[fn 6] *Watson Bowman Acme Corp. v. RGW Construction, Inc.*, 2016 Cal. App. LEXIS 659 (Cal. App. 5th Dist. Aug. 9, 2016).

© 2020 Association of International Certified Professional Accountants

USA-016109

That said, some states evaluate prejudgment interest as a tool to be considered as a question of equity, which allows latitude in determining the availability of prejudgment interest.

For example, under Title 4, Chapter 304 of the Texas Finance Code (and Texas Common law), when prejudgment interest is awarded in a case involving a contract that provides for a specific rate of interest, it accrues at the lesser of the rate specified in the contract or 18% simple interest.[7] Prejudgment interest in cases that do not have a contract with an interest rate specified accrue interest at a rate set monthly by the Texas Consumer Credit Commissioner.[8] However, the availability of prejudgment interest under Texas law may be limited by factors such as the date on which the defendant received notice of the claim, as well as settlement offers.[9]

Prejudgment interest is more often available for breach of contract causes of action than tort causes of action, which is consistent with the theme of awarding prejudgment interest when an alleged wrongdoer has reason to know of the alleged wrongdoing and, in some instances, the amount owed (for example, after a complaint has been filed) — even if this mechanism does not necessarily make a plaintiff whole.

## Sample Calculations of Prejudgment Interest

Simple interest is calculated as follows:

$$\text{Interest} = \text{Damages Amount} \times \text{Rate} \times \text{Time}$$

Total prejudgment interest is the sum of the individual years' prejudgment interest.[10] The calculation that follows uses the mid-year (mid-period) convention, which assumes that the damages amount (in this case, lost profits) is equally distributed within the time period. For example, the first period, from 3/1/16 to 12/31/16, has a mid-period date of 7/31/16. In addition, there is no prejudgment interest on future damages, which is appropriate when using the ex post approach.

**Figure 8.1. Prejudgment Interest Using Simple Interest**

---

[7] Eighteen percent is the post-judgment interest rate, as defined in Texas Finance Code Section 304.002, which is also applied to prejudgment interest under Texas common law. *See Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002).

[8] Texas Finance Code Section 304.003 and *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002).

[9] Texas Finance Code Sections 304.104, 304.105.

[10] Prejudgment interest can also be calculated using smaller time periods, such as months or quarters, which may be appropriate when there is reason to believe that the damages are not evenly distributed within the time period.

© 2020 Association of International Certified Professional Accountants    55

USA-016110

| | Lost Profits | Mid-Period Date | Judgment Date | Years of PJI | PJI Rate | PJI Factor | PJI ($) |
|---|---|---|---|---|---|---|---|
| 3/1/16 - 12/31/16 | $500,000 | 7/31/2016 | 12/31/2018 | 2.4 | 10.0% | 24.0% | $120,000 |
| 2017 | $733,333 | 7/2/2017 | 12/31/2018 | 1.5 | 10.0% | 15.0% | $110,000 |
| 2018 | $806,667 | 7/2/2018 | 12/31/2018 | 0.5 | 10.0% | 5.0% | $40,333 |
| 2019 | $887,333 | 7/2/2019 | 12/31/2018 | | | | |
| 2020 | $976,067 | 7/2/2020 | 12/31/2018 | | | | |
| 1/1/21 - 2/28/21 | $268,418 | 1/30/2021 | 12/31/2018 | | | | |
| Total | $4,171,818 | | | | | | $270,333 |

Alternatively, prejudgment interest using an annual compounding method is calculated as follows:

$$\text{Interest} = \text{Damages Amount} \times ([1 + \text{Rate}]^{\text{Number of Years}} - 1)$$

The following is a calculation of compound interest (annual compounding), using similar inputs to those from the preceding simple interest calculation.

**Figure 8.2. Prejudgment Interest Using Annual Compounding**

| | Lost Profits | Mid-Period Date | Judgment Date | Years of PJI | PJI Rate | PJI Factor | PJI ($) |
|---|---|---|---|---|---|---|---|
| 3/1/16 - 12/31/16 | $500,000 | 7/31/2016 | 12/31/2018 | 2.4 | 10.0% | 25.7% | $128,510 |
| 2017 | $733,333 | 7/2/2017 | 12/31/2018 | 1.5 | 10.0% | 15.4% | $112,706 |
| 2018 | $806,667 | 7/2/2018 | 12/31/2018 | 0.5 | 10.0% | 4.9% | $39,372 |
| 2019 | $887,333 | 7/2/2019 | 12/31/2018 | | | | |
| 2020 | $976,067 | 7/2/2020 | 12/31/2018 | | | | |
| 1/1/21 - 2/28/21 | $268,418 | 1/30/2021 | 12/31/2018 | | | | |
| Total | $4,171,818 | | | | | | $280,589 |

Courts have accepted and made calculations using annual compounding, quarterly compounding, monthly compounding, daily compounding, or even continuous compounding. [fn 11]

## Prejudgment Interest Period

Although federal law frequently allows for prejudgment interest to accrue from the date of harm to the judgment date, state court cases may have prejudgment interest begin to accrue (when permitted) from dates, such as the date of notice of an amount due (for example, filing of a complaint or a demand letter).

In an effort to "make a plaintiff whole," including the use of money from the date on which it would have been earned or received and the judgment date, courts frequently award prejudgment interest as a

---

[fn 11] Quarterly compounding: *U.S. Philips Corp. v. KXD Technology, Inc.*, 2007 WL 4984150, at *2 (C.D.Cal. 2007). Annual compounding: *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 137 (D.N.J. 2007). Daily compounding: *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

© 2020 Association of International Certified Professional Accountants

USA-016111

matter of equity, with it beginning to accrue from the date on which the monies would have been received by the plaintiff in the but-for world. However, it is common for experts to employ simplistic assumptions regarding the timing of income streams and cash flows, such as the mid-year or mid-period convention, which assumes that the damages amounts would have been equally distributed during the period (for example, quarter or year). This assumption normally does not take into account any lag between when revenue is earned, when it would be reflected on an income statement, and when the cash would be collected. This approach also does not take into account when cash may be received as a prepayment on sales recorded at a later date.

## Prejudgment Interest Rates in Federal and State Courts

Federal courts have accepted and used rates such as the statutorily defined rates, the prime rate, corporate bond rates, corporate borrowing rates, rates of return that plaintiffs have earned on their investments, and rates provided in contracts. [fn 12]

Similarly, matters in state court can be subject to rates and structures that can vary by the nature of the dispute (for example, breach of contract vs. tort) as well as by venue.

Matters in federal court frequently use the applicable state court prejudgment interest construct. For example, when the case is in federal court because of diversity, state law defines the availability and measurement of prejudgment and post-judgment interest. [fn 13] In contrast, federal law on prejudgment and post-judgment interest applies if it is a federal matter.

Typically, a federal statute (for example, the Patent Act or the Lanham Act) and its progeny define if and what type of prejudgment interest may be available or what is relevant to such a determination. For example, in *Kansas v. Colorado* (533 U.S. 1 (2001)), a case going back approximately 50 years, the state of Kansas sought $9 million in damages plus $53 million in prejudgment interest. In its ruling, the U.S. Supreme Court explained that counsel and experts have latitude in arguing how much prejudgment interest should be paid to make a plaintiff whole.

In this situation, practitioners can assist the court in identifying factors relevant to the selection of the prejudgment interest rate. Such considerations may include whether a plaintiff has debt that could have been repaid, the plaintiff's history of paying off debt with available funds, whether the plaintiff had to take out a loan because of the lack of available funds, or if the defendant has borrowings that it would have had to take out to have paid the damages amounts at an earlier date.

## Considerations in Selecting a Prejudgment Interest Rate

Courts have considered several factors in determining the appropriate rate to use in a prejudgment interest calculation. Depending on the case venue, prejudgment interest rates could be any of the following:

- A risk-free rate

- The defendant's cost of unsecured borrowing

---

[fn 12] *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777, at *7–8 (W.D. Wash. 2007).

[fn 13] *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); www.cacb.uscourts.gov/post-judgment-interest-rates.

© 2020 Association of International Certified Professional Accountants

USA-016112

- The plaintiff's cost of unsecured borrowing

- The plaintiff's cost of capital or cost of equity

- The prime rate in effect

- A statutory rate set by the court or a statute specified by a governing body

The following is information on some of the more common rates used.

## Risk-Free Rate

A risk-free rate (for example, Treasury rates) compensates a plaintiff for the passage of time but does not account for risk associated with the cash flow or income stream. Use of a risk-free rate is often a result of considerations such as the following:

- A plaintiff may have delayed the proceedings. [fn 14]

- There has been no proof of a plaintiff borrowing monies, when those loans would have been paid off or unnecessary were the damages amounts to have been received earlier by the plaintiff. [fn 15]

- Post-judgment interest applies a risk-free rate ("a rate equal to the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of the judgment." [fn 16]) [fn 17]

Although courts frequently use the one-year Treasury bill rate when awarding prejudgment interest using a risk-free rate, it may be appropriate to match rates from different Treasury securities, of different maturities, to align with the timing of different cash flows or income streams in a lost profits calculation.

## Defendant's Cost of Unsecured Borrowing

In some situations, courts have awarded prejudgment interest at the defendant's cost of unsecured borrowing based on the idea that the defendant has effectively borrowed the money from the plaintiff for the time between when the damages were lost and the time of the judgment. [fn 18] Use of this rate accounts for risks inherent in the defendant's business, including default and bankruptcy risk. It is helpful to seek out and analyze the defendant's borrowing history when analyzing this rate for use in a prejudgment interest award.

---

[fn 14] *Enzo Biochem, Inc. v. Applera Corp.*, No. 3:04cv929 (JBA), 2014 U.S. Dist. LEXIS 372 (D. Conn. Jan. 3, 2014).

[fn 15] *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997). *Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100, 1107–1108 (N.D. Cal. 2013).

[fn 16] *Judiciary and Judicial Procedure, U.S. Code* (USC) 28, Section 1961.

[fn 17] *Monsanto Co. v. Slusser*, No. 4:10 CV 75 DDN, 2013 U.S. Dist. LEXIS 45386 (E.D. Mo. Mar. 29, 2013).

[fn 18] *ABT Sys., LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2014 U.S. Dist. LEXIS 77136 (E.D. Mo. June 6, 2014); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1394–95 (N.D. Ill. 1993).

© 2020 Association of International Certified Professional Accountants

USA-016113

## Plaintiff's Cost of Borrowing or Return on Investment

When a plaintiff has borrowed money (particularly if it exceeds the amount of the damages award), courts have awarded prejudgment interest using the plaintiff's cost of borrowing, and particularly unsecured borrowing, if there is evidence of such borrowings. This is because, as described previously, the defendant has effectively benefited from an unsecured loan during the period in question. In addition, it is likely that, in some instances, a plaintiff would have paid off its borrowing at its highest rate of interest if the monies in question were available earlier. [fn 19]

As the court wrote in *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F.Supp. 2d 128, 133 (D.N.J. 2007), "... in order to make [the plaintiff] whole, the Court must determine whether it would have used the money to invest, or to avoid borrowing, determine the percentage yield that [the plaintiff] either would have earned, or avoided paying, and then charge that rate to the [defendant] as prejudgment interest."

## Plaintiff's Cost of Capital or Cost of Equity

The plaintiff's cost of capital (or cost of equity) has been argued as appropriate for the award of prejudgment interest on the theory that a plaintiff has been deprived of monies it would have had available to invest in the company, and the best evidence of the expected return on investment in a company is its cost of capital. This can be compelling when a plaintiff has raised debt and equity financing, providing evidence of capital markets' views of the returns required on an investment in the plaintiff company. The cost of capital and cost of equity in the context of discount rates are addressed in greater detail in the AICPA practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*.

## The Prime Rate and Other Rates

The prime rate (an index rate at which commercial banks make loans) has frequently been used in awards of prejudgment interest, frequently as a representation of a lending rate for companies (for example, the plaintiff or defendant). In addition, on occasion, federal courts have used rates such as the composite bond rate, commercial paper rates, and state law prejudgment interest rates.

# The Role of the Practitioner

Sometimes, a plaintiff is required to make an election or provide notice that the plaintiff seeks prejudgment interest, whereas in other situations, prejudgment interest is available by statute under certain conditions or per the court's discretion.

Normally, damage calculations prepared before or during a trial (for example, in an expert report) do not allow for the practitioner to make the calculation with knowledge of the exact judgment date. In this context, practitioners frequently make estimates of the judgment date or calculate prejudgment interest through the report date, with an expectation of updating the calculation, including at the court's request at trial.

As such, an expert may choose in the report and disclosure of opinions stage to identify that prejudgment interest is sought, identify which interest rate or structure the expert believes is appropriate (and

---

[fn 19] *K-TEC v. Vita-Mix*, 765 F. Supp. 2d 1304, 1316 (D. Utah 2011). *Stryker Corp. v. Zimmer Inc.*, No. 1:10-CV-1223, 2013 U.S. Dist. LEXIS 171817 (W.D. Mich. Aug. 7, 2013).

© 2020 Association of International Certified Professional Accountants

USA-016114

why), or perform calculations. Additionally, in some instances, the expert will determine and present the daily interest that accrues on the damage amount calculated.

## Post-Judgment Interest

As described previously, in contrast to prejudgment interest, post-judgment interest is almost always awarded.

The U.S. Supreme Court explained that the "purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." [fn 20]

Post-judgment interest in federal matters generally uses the one-year Treasury bill rate, compounded annually. [fn 21]

## Ex Ante and Ex Post Calculations

Ex ante damages calculations (including ex ante lost profits calculations) discount damages from all periods back to the date of the damaging event (for example, the breach of contract) and then apply prejudgment interest to bring that total damages amount forward to the date of trial. In contrast, an ex post damages calculation (for example, an ex post lost profits calculation) does not discount damages from periods prior to the damages calculation (past damages) but does discount future damages back to the date of the calculation (for example, the trial date). Prejudgment interest in an ex post damages calculation, then, only applies to past damages.

This issue and these approaches are addressed in detail in the practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*. The following is a graphic from that practice aid showing how in an ex ante calculation damages from a future period are discounted back to the time of the damages event and then brought forward with prejudgment interest. The graphic shows that when the discount rate exceeds the prejudgment interest rate, it results in a smaller award to a plaintiff when using an ex ante approach compared to an ex post approach.

**Figure 8.3. Ex Ante Discounting and Prejudgment Interest**

---

[fn 20] *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990).

[fn 21] *Judiciary and Judicial Procedure, U.S. Code* (USC) 28, Section 1961; *Crimes and Criminal Procedure U.S. Code* 18, Section 3612(f)(2); and *Public Buildings, Property, and Works, U.S. Code* 40, Section 3116.

60                      © 2020 Association of International Certified Professional Accountants

USA-016115



An ex ante damages calculation's lower damages figure represents the idea that damages from the past are not treated as amounts certain, but with some risk as of the date of the damages event (for example, a breach of contract), whereas an ex post damages calculation treats past damages as amounts known or certain, with the benefit from the use of information known and learned since the damages event. Case facts, venue, and law are important considerations because they may provide insight on whether an ex post or ex ante damages calculation is proper.

© 2020 Association of International Certified Professional Accountants

USA-016116

# Chapter 9

## *Discount Rates*

## Overview

As a general matter, *lost profits damages* are amounts that a wronged party (usually a plaintiff) has lost as a result of one or more wrongful acts. The harmed party may have already experienced such lost profits as of the time the lost profits calculation is made, may be anticipated to occur in the future, or both. As a result, future lost profits (that is, profits that were expected to be earned after the date of the making of a lost profits calculation, but in light of the wrongful act, are not expected to be earned) are often part of a lost profits calculation, as explained in previous chapters. However, in an award of future lost profits damages, the harmed party typically receives a monetary award that is deemed due as of a judgment date, when that judgment date precedes the date or dates on which the profits in question would have been earned and cash received. Because the award recipient is due this money before the profits would have been earned in the but-for world, two economic justifications are typically cited as the basis to discount future profits to their present value, as of the judgment date.

1. The plaintiff can invest the lost profits damages award received, and in that process, can expect to receive income (for example, interest income) on the damages award invested — particularly the future lost profits component. In the but-for world, the plaintiff would not have had this opportunity to invest because it would not yet have the amounts to invest.

2. As of the judgment date, the value of the expected future income stream (that is, the but-for income stream, less the actual or mitigating income stream) is less than the future value amounts that are expected, unless adjusting for the time value of money and possibly risk.

By way of example, if a business would have earned $1 million in the next year in the but-for world but is now expected to earn $0, then the undiscounted lost profit damages of the business would be $1 million (that is, $1 million of profits but-for the wrongful act, less $0 actual profits).

Although practitioners and courts generally agree that discounting of lost profits is appropriate, the rate at which the lost profits should be discounted is a frequent subject of disagreement. These disagreements often relate to the two alternative justifications cited previously for discounting future lost profits to present value, which may be argued to justify different discount rates.

Per the first justification, the objective is to identify the discount rate that, when applied to the undiscounted lost profits, accounts for the opportunity an injured party must invest the damages awarded in order to achieve the future value of the lost profits. As would be expected, this discount rate would logically align with the rate at which the injured party can invest. Some argue that this should be a risk-free rate, even if the profits in question had risk associated with them. [fn 1] Others suggest that the discount

---

[fn 1] In fact, as a general matter, damages in personal injury matters (for example, lost personal earnings) are frequently discounted at a risk-free rate, even when this is risk associated with the injured party's lost future income. Courts have frequently cited two seminal cases in support of this approach. Per *Chesapeake & Ohio Railway Company v. Kelly*, 241 U.S. 485 (1916): "[W]hen future payments or other pecuniary benefits are to be anticipated, the verdict should be made on the basis of their present value only" (p. 491), and the rate to be used should be based on "the best and safest investment" (p. 490). Per *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523

© 2020 Association of International Certified Professional Accountants

USA-016117

rate should reflect the anticipated returns that the injured party could derive from an investment of the award in an asset with a similar risk profile to the future profits, even if the injured party is effectively forced into a reinvestment to replace the lost future income stream. These arguments often come down to the question of who (that is, the plaintiff or the defendant) should bear the risks associated with obtaining the future lost profits.

Alternatively, under the second justification for discounting of future lost profits, proponents assess the discount rate based on the market value of the income stream in question by estimating a market-based discount rate, rather than a discount rate appropriate to or for a specific injured party or available investment opportunity. In this context, parties frequently disagree on how to estimate a discount rate and how to account for risk in a lost profits damages calculation. For example, many practitioners choose to use a market-based discount rate when calculating lost profits for reasons such as those described previously. Others use a risk-free rate with a model that the practitioner opines has already accounted for "risk" in the development of the income or cash flow streams to be discounted. A variation on this argument is that conduct specific to the defendant's wrongdoing accounts for much or all the incremental risk, above a risk-free rate, of achieving the future lost profits.

It is important to have a clear picture of what "risk" represents in this context. For example, the right to $100 if a coin toss comes up heads, and $0 if the coin toss comes up tails, has an expected value of $50, given that there is a 50% chance of a $100 outcome and a 50% chance of a $0 outcome. In this circumstance, there is a probability of occurrence of 50%, which is incorporated into the expected value.

Probability of occurrence, however, is different from the risk that is part of capital markets' required rate of return for riskier expected future income streams. This risk has long been observed in the return on investment that capital markets expect from companies that have a wide range of possible outcomes. The relationship between variability around an expected income value and the income that investors demand has great empirical support in capital markets behavior.

For example, capital market transactions show that a 100% chance of receiving $50 is generally worth more to investors than a 50% chance of $100 because of investors' aversion to variability — even though the expected value of each of these investments is $50.

In this context, a market-based discount rate will normally be higher, for example, for an income stream to be earned by a business in a riskier industry compared to another in a less risky industry. That will apply even if the income stream in question has been reduced to an expected value (accounting for risk of occurrence). However, given that there are multiple justifications for discounting future income (including lost profits), parties may argue for a variety of discount rates, as appropriate, for the particular income stream in question.

For additional details on discounting future damages to present value, see the practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations.*

---

(1983): "Once it is assumed that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default. (p. 537), using "the appropriate discount rate, reflecting the safest available investment" (pp. 537–538).

© 2020 Association of International Certified Professional Accountants

63

USA-016118

# Chapter 10

## *Taxes*

## Overview

As a general matter and as discussed previously, a lost profits damages calculation financially attempts to put an injured party into the position in which that party would have been absent the alleged harmful act (assuming liability) or, when that exact position is not possible, a position that is equally well off. For example, if as a result of the alleged wrongful acts, a business has been forced to forgo a stream of cash flows from a period prior to trial and into the future, a lost profits calculation is often made to provide the business the present value of the lost past and future income. This is done because it is impossible to go back in time and provide the business the lost income as of the time when it would have been earned and the cash flow streams received. One complication related to this difference arises in the case of future lost profits, when the company will no longer earn or receive these incomes or cash flow streams. Assuming the injured party successfully litigates its case, the past and future lost profits (assuming both are awarded) would typically be paid in a lump sum as of the judgment date instead of over the period of time during which they would have been received. By changing the timing of when profits would be received, the injured party will pay taxes on the lump-sum award in one period instead of paying the taxes over time as would have been the case had the profits been earned over multiple periods.

Taxes are often ignored in a lost profits calculation because a plaintiff who receives a judgment will have to pay income taxes on that judgment, and the profits lost would have been taxed had they been earned by the plaintiff in the but-for world. In theory, this seemingly comports with the typical goal of awarding lost profits damages — to make the injured party whole. Of course, theory and reality do not always perfectly align, and it may be appropriate in a properly constructed lost profits calculation for practitioners to consider tax effects in the effort to ensure that the injured party receives an award that places the party in an economic position that is no better or worse than would have been experienced but-for the wrongful act.

## "In Lieu of" and "Origin of the Claim"

In a typical litigation, whether the plaintiff is awarded damages by the court or agrees to and receives a settlement, the tax treatment of the plaintiff's money received is evaluated under the *Raytheon* "in lieu of" rule. Conversely, a payment of money by the defendant to the plaintiff is analyzed under the *Gilmore* "origin of the claim" doctrine. [fn 1]

## *Raytheon* and the "In Lieu of" Test

When analyzing the appropriate tax treatment for the plaintiff, the question is "In lieu of what were the damages awarded?" In the *Raytheon* dispute, Raytheon, as plaintiff, settled its antitrust suit against Radio Corporation of America (RCA). Raytheon excluded from income $350,000 of the total $410,000 set-

---

[fn 1]   Although the tax treatment by a defendant of amounts it pays related to a litigation is not directly relevant to the plaintiff's tax treatment, this issue is discussed herein to see the other side of the payment.

© 2020 Association of International Certified Professional Accountants

USA-016119

tlement amount as a nontaxable return of capital. The IRS Commissioner disagreed and determined that the $350,000 was taxable income.

Raytheon lost its case at trial and thereafter appealed. On appeal (*Raytheon Production Corporation v. Commissioner*, 144 F.2d 110 (1st Cir. 1944)), the First Circuit wrote that "recoveries which represent a reimbursement for lost profits are income." Typically, profits would be taxable income, so by deduction, proceeds of litigation to replace lost profits are also taxable. In other words, lost profits damages (or settlements received as compensation in the context of a lawsuit) are received "in lieu of" profits that would have been taxable.

Raytheon argued that the illegal conduct of RCA destroyed its business, and the lawsuit sought not to recover lost profits but, rather, the lost business and goodwill value. A return of lost business value represents a return of capital, which is not taxable. The First Circuit opinion explained that even if the settlement was a return of capital, at least some of which could be taxable as a conversion of property into cash, creates a gain to the extent that monies received exceed the cost or basis of the business or goodwill. In the Raytheon matter, there was no evidence of the basis of the business or goodwill, so the entire total of the amount Raytheon had excluded from income was taxable, albeit as a capital gain.

## Gilmore's "Origin of the Claim" Test for Damages or Settlements Paid

The corollary to the "in lieu of" test (for recipients of damages or settlements), applying to the payor of damages or settlements (including fees), is the "origin of the claim" test, first seen in *United States v. Gilmore*, 372 U.S. 39 (1963). In the underlying dispute, a marital dissolution, Gilmore's wife claimed that Gilmore's interests in three companies were community property, with which Gilmore disagreed. Gilmore prevailed but spent approximately $40,000 defending against the wife's claim. Thereafter, he deducted the litigation expenses as ordinary and necessary expenses incurred for the conservation of property held for the production of income (formerly 26 U.S.C. § 23(a)(2) and currently Code Section 212). The IRS found Gilmore's expenditures to be "personal" or to pertain to "family" and, therefore, not deductible.

The U.S. Supreme Court agreed with the IRS and determined that litigation costs are deductible only if the claim arises in connection with the taxpayer's profit-seeking activities. Deductibility depends on "the origin and nature of the claims." Here, Gilmore's legal expenses did not become deductible just because they were incurred to relieve him of a liability. Were that to be the case, costs incurred to defend almost any claim would be deductible by a taxpayer as the defense was made to clear liens on an income-producing property that the taxpayer owned. Instead, the legal claim must arise in connection with the business or profit-seeking activity at issue. In Gilmore, he was defending against claims originating from his personal divorce, not on a claim against the profit-generating business. The fact that the claim would affect his income-producing property (for example, if he had to liquidate an interest to pay the wife) was irrelevant. The origin of the claim doctrine evaluates the tax consequence of a damages or settlement payout and fees incurred based on the origin and character of the claim with respect to which the expense was incurred.

## Timing of Profits Lost Versus Damages Received

Even when the "in lieu of" test matches the nature of the lost income with the tax treatment of the damages award or settlement, there can be differences in effective tax rates, which will call for taxes to be explicitly addressed in a damages calculation. For example, this can occur when an injured party is paid a judgment in a time period that has different tax rates than were or would have been in effect when the lost profits would have been earned. This might occur when tax rates have changed from one year to an-

USA-016120

other. This might also occur, for example, if the income in question would have been taxed at a lower rate over a period of many years but will now be received in one year, such that some of the income will be taxed in a higher tax bracket.

The following is an example that demonstrates how a recipient of a damages award can suffer if an award is taxable as a lump sum in one year, instead of receiving the income spread out over several years, which would have allowed for the income to be taxed at a lower effective rate in a lower bracket. The example also shows the impact of a change in tax rates, which creates a disparity between the rates that would have applied when income would have been received compared to when the damages award is received.

**Figure 10.1. Example of Effect of Timing of Damages Compared to Damages Award Receipt**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|
| Present Value of Lost Profits, Including PJI | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $700,000 |
| Plaintiff's Effective Tax Rate on Damages in That Year | 35% | 35% | 35% | 25% | 25% | 25% | 25% | |
| Present Value of Lost Profits, Including PJI, Post-Tax | $65,000 | $65,000 | $65,000 | $75,000 | $75,000 | $75,000 | $75,000 | $495,000 |
| Plaintiff's Effective Tax Rate on Lump Sum Damages Award | | | 40% | 30% | | | | |
| Post-Tax Proceeds to Plaintiff from Lump Sum Damages Award | | | $420,000 | $490,000 | | | | |

As shown in the example, the plaintiff would have received $495,000 in after-tax profits over the years in question, but with a lump-sum damages award in 2017, the plaintiff would have received only $420,000 after taxes. If the award had been received in 2018, the proceeds would have been $490,000 because of the drop in the effective tax rate in the hypothetical but still not enough to offset the negative impact of having to recognize all the income in one year as compared to spreading it out over time.

## Discount Rates and Taxes

Another possible exception to the general rule of taxes being a nonissue pertains to the discount rate that has been used to discount future damages. For example, consider the following scenario:

Plaintiff lost a single income stream that is forecasted to be $1 million and would have been received in five years.

© 2020 Association of International Certified Professional Accountants

USA-016121

**Figure 10.2. Taxes on Growth During Discounting Period**

| | | |
|---|---|---|
| Judgment Date | 1/1/2019 | |
| Date of Expected Receipt | 1/1/2024 | |
| Future Years After Judgment Date of Future Receipt | 5 | |
| Discount Rate | 15% | |
| Expected Future Payment Amount | $1,000,000 | |
| Tax Rate | 45% | |
| After-Tax Amount in But-For World | $450,000 | |
| Present Value Factor | 0.4972 | $1/(1+0.15)^5$ |
| Amount Paid at Judgment Date | $497,177 | $1,000,000 x 0.4972 |
| Taxes on Judgment | $223,730 | |
| After-Tax Judgment | $273,447 | |
| Reinvestment Rate | 15% | |
| Amount That Judgment Date Will Grow to as of Date of Expected Receipt | $550,000 | $273,447 x $(1+0.15)^5$ |
| Income Earned From Judgment Date to Date of Expected Receipt | $276,553 | $550,000 - $273,447 |
| Ordinary Income Tax Rate | 45% | |
| Taxes on Income Earned on Judgment | $124,449 | $276,553 x 45% |
| Post-Tax Income on Judgment | $152,104 | $276,553 - $124,449 |
| Amount That Plaintiff Will Have After Paying Income Taxes on Income | $425,551 | $273,447 + $152,104 |
| Amount That Plaintiff Is Worse Off Due to Failure to Consider Taxes on Interest/Growth of Judgment | $124,449 | $550,000 - $425,551 |

As shown in the preceding table, when a plaintiff will pay taxes on the income gained from investing the judgment or settlement received (for example, at an ordinary income rate if the damages are in lieu of ordinary income), a plaintiff will be worse off if an after-tax discount rate is not used. Moreover, the tax rates paid by investors who make up the transactions that are the basis on which discount rates are estimated may also need to be considered, insomuch as they define what investors expect as income in compensation for an investment. These data are frequently used to estimate market-based discount rates.

© 2020 Association of International Certified Professional Accountants

USA-016122

# Chapter 11

## *Mitigation*

### Overview

A plaintiff has a duty to mitigate its damages. *Mitigation* is an action taken by a plaintiff to lessen or avoid loss from a wrongful act. The "mitigation-of-damages doctrine" is defined in *Black's Law Dictionary* as

> The principle requiring a plaintiff, after an injury or breach of contract, to make reasonable efforts to alleviate the effects of the injury or breach. If the defendant can show that the plaintiff failed to mitigate damages, the plaintiff's recovery may be reduced. [fn 1]

Mitigation may also be referenced in some jurisdictions as the "avoidable consequences doctrine" or the "avoidability of damages theory." The concept is a legal principle: A plaintiff has an obligation to mitigate its damages and should take "reasonable, non-burdensome steps to avoid its loss." [fn 2]

Mitigation efforts may be "negative" when the plaintiff discontinues operations as the means of minimizing its loss, or "affirmative" when the plaintiff's mitigation is through replacements, repairs, or discounts. [fn 3]

A defendant that argues that a plaintiff has failed to mitigate damages may attempt to show how the plaintiff could have avoided damages in a reasonable manner without undue risk but did not do so. The defendant generally has the duty to show that reasonable mitigation possibilities existed but were not acted upon. The court's application of the mitigation doctrine may "consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." [fn 4] Courts have found that mitigation does not extend to arrangements that would expose the plaintiff to undue risk. [fn 5] Courts have also found that a failure to mitigate does not necessarily bar recovery of damages but, rather, affects the amount of damages recoverable. [fn 6]

---

[fn 1]  Bryan A. Garner, *Black's Law Dictionary*, Ninth Edition (2009), West Publishing Co., Thomas Reuters, United States of America, p. 1093.

[fn 2]  *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002).

[fn 3]  *Lost Profits Damages* "Mitigation of Damages in the Lost Profits Calculation," by Scott M. Bouchner and Richard A. Pollack, p. 347.

[fn 4]  *Lost Profits Damages* "Mitigation of Damages in the Lost Profits Calculation," by Scott M. Bouchner and Richard A. Pollack, p. 497.

[fn 5]  See footnote 4.

[fn 6]  *Meineke Car Care Centers, Inc. v. RLB Holdings, LLC, Joe H. Bajjani, Michelle G. Bajjani, a/k/a Michelle Bajjani*, U.S. Ct. of App, Fourth Circuit, No. 09-2030 (April 14, 2011).

© 2020 Association of International Certified Professional Accountants

USA-016123

As a general matter, for the mitigation doctrine to be applied, the defendant must plead mitigation as an affirmative defense [fn 7] and successfully demonstrate that the plaintiff could have reduced damages by mitigation efforts. Alternatively, the plaintiff may respond that mitigation was not reasonably possible because of costs, logistics, or other issues.

## Cases With a Reduction in Lost Profit Damages for Failure to Mitigate

*Cypress Engine Accessories, LLC v. HDMS Ltd.* [fn 8] addressed engine parts purchased by Cypress that it alleged were defective. Pursuant to an agreement between the parties, HDMS credited Cypress for the faulty parts, which were returned to HDMS. In a counterclaim, HDMS claimed that Cypress was wrongfully sold competing parts, with damages calculated as the difference between HDMS's retail price (less a restocking fee) and the wholesale price of those parts. Cypress argued that HDMS failed to mitigate its damages because it did not resell the parts in the retail market. The court found that if HDMS had resold the returned engine parts at retail value, it would not have lost money (that is, HDMS could have mitigated its losses by the resale of engine parts at retail value).

*Cambridge Plating Co., Inc. v. Napco, Inc.* [fn 9] found error in an award of over $3 million in compensatory damages because Cambridge Plating failed to mitigate its damages. A dispute over a defective machine part could have been remedied by the purchase and installation of a new part. Cambridge Plating did not install the new part until 15 months after it knew of the defect, and the installation took one day. Although the district court recognized that Cambridge Plating failed to mitigate its damages, the court did not adjust the damage award. The appellate court vacated and remanded the district court's award because of Cambridge Plating's failure to mitigate.

## Cases With Offsets in Lost Profit Damages for Mitigation

*C & O Motors, Inc. v. General Motors Corporation* [fn 10] addressed mitigation as an offset to lost profits damages claimed by C & O Motors, Inc. (C & O). General Motors (GM) decided to phase out its Oldsmobile line of vehicles, from 2001–2004. GM had recently entered into a five-year dealer agreement with C & O to provide Oldsmobile vehicles for sale at C & O's dealership. When GM informed C & O of the phaseout of Oldsmobile vehicles, C & O purchased rights to a Nissan dealership. The Nissan dealership was profitable and offset the lost profits that C & O claimed against GM. C & O sued GM for damages, including the costs associated with acquiring the Nissan franchise. The district court found that

---

[fn 7] Failure to mitigate damages is generally an affirmative defense. For example, see the following cases, applying Fifth Circuit law, *E.E.O.C. v. Serv. Temps Inc.*, 679 F.3d 323, 334 n.30 (5th Cir. 2012); *Branch Banking & Trust Co. v. Lexiam Enters., LLC*, No. 3:15-CV-2928-M, 2016 U.S. Dist. LEXIS 147305, at *8 (N.D. Tex. Oct. 24, 2016). "The failure to plead an affirmative defense generally results in waiver of that defense." *Garrison Realty, L.P. v. Fouse Architecture & Interiors, P.C.*, 546 Fed. App'x 458, 465 (5th Cir. 2013); see also Fed. R. Civ. P. 8(c). "A court may excuse the failure to plead an affirmative defense, however, if the opposing party is not prejudiced." *Id.* (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) for the proposition that "the purpose of the pleading requirement in Rule 8(c) is to give the opposing party notice and an opportunity to argue why the defense is inappropriate.").

[fn 8] *Cypress Engine Accessories, LC v HDMS Ltd.*, USDC So. District of Texas, C. A. No. H-15-2227 (October 6, 2017).

[fn 9] *Cambridge Plating Co., Inc. v Napco, Inc.*, U.S. Ct. Appeals, 1st Cir. Nos. 95-1781, 95-1782 (June 3, 1996).

[fn 10] *C & O Motors, Inc. v. General Motors Corporation*, U.S. Ct. Appeals, 4th Cir. No 08-1157 (April 1, 2009).

© 2020 Association of International Certified Professional Accountants

USA-016124

because C & O suffered no actual loss, it had no breach of contract loss against GM, even though the dealer agreement between GM and C & O was breached.

The appellate court agreed that C & O had no breach of contract loss against GM and noted "a plaintiff in a contract action is only entitled to be put in the same economic position that it would have been in had the contract not been breached. See *Ohio Valley Builders' Supply Co. v. Wetzel Constr. Co.*, 151 S.E. 1, 4 (W. Va. 1929); 22 Am. Jur. 2d Damages § 28 (2003) ("The sole object of compensatory damages is to make the injured party whole for losses actually suffered; the plaintiff cannot be made more than whole, make a profit, or receive more than one recovery for the same harm. . . . The plaintiff is not entitled to a windfall, and the law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken."). [fn 11]

## Cases Showing Exceptions to the Mitigation-of-Damages Doctrine

The mitigation-of-damages doctrine is not applicable to all damage calculations, as illustrated in the following two cases.

*Ai Ping Lu v. Ravinder S. Grewal, et al.* [fn 12] was appealed by the plaintiff after the trial court found that the plaintiff mitigated all damages that resulted from a breach of contract. The respondents entered into a 10-year lease for a gas station on a property that was acquired by Ms. Lu. Although the lease did not expire until June 30, 2003, no rent was paid after September of 2000. Ms. Lu discovered that the premises were vandalized and vacated, and she and her husband made necessary repairs and operated the business. The respondents were sued for breach of the lease and argued that unpaid rent amounts should be offset under the mitigation doctrine. The respondents argued that the plaintiff fully mitigated damages with profits that were earned during the time of the respondent's breach. The trial court found that the plaintiffs suffered no damages because the mitigation profits (profits from running the business) exceeded the amount of damages owed by the respondents. The court of appeal reversed, finding that the fair market rental value was the appropriate mitigation measure to offset rents owed under a breach of contract claim for lost rents.

*Fiberlok, Inc. v. LMS Enterprises, Inc.* [fn 13] involved the supply and milling of resin by LMS for Fiberlok. Fiberlok entered into a supply contract agreement for LMS to supply Fiberlok with resin. LMS could not procure the necessary resin from a third party, Dow Chemical Company, and the absence of a reliable source of resin caused a breach of the contract between LMS and Fiberlok. LMS filed a counterclaim against Fiberlok for lost profits. The district court awarded LMS, through its counterclaim, lost profits of $460,000, based on an assumption that LMS could have purchased resin in the market and fulfilled the contract with Fiberlok. On appeal, Fiberlok argued that LMS should have continued to purchase resin for sale to other distributors. The appellate court, however, found that LMS was forced to shut down its business as a result of Fiberlok's failure to perform. Therefore, the court excused LMS from the duty to further mitigate.

## Cases Addressing Mitigating Revenues Versus Additional Revenues

---

[fn 11] See footnote 10.

[fn 12] *Ai Ping Lu. v. Ravinder S. Grewal, et al.*, 130 Cal. App.4th 790, 132 Cal Rptr.2d 406 (2003).

[fn 13] *Fiberlok, Inc. v. LMS Enterprises, Inc.*, 976 F. 2d 958, U.S. Ct. of Appeals, 5th Cir. (November 10, 1992).

    © 2020 Association of International Certified Professional Accountants

USA-016125

*Penncro Associates Inc. v. Sprint Spectrum* addressed whether amounts earned by Penncro were mitigating revenues or unrelated revenues, after a breach of contract by Sprint. The district court found that Penncro avoided over $7 million in losses by taking on work for AT&T and American Water; however, Penncro argued on appeal that it could have handled the new jobs and the work for Sprint. The appeals court evaluated whether Penncro was a "lost volume seller," explaining that "[a] lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, without resource or capacity constraints." Because the district court found that Penncro had the capacity to perform additional work only because of the breach of the Sprint contract (freeing up capacity), the appellate court found that Penncro was not a lost volume seller. The appeals court concluded that the Penncro work for AT&T and American Water provided mitigating revenues and not additional revenues; therefore, the amounts were proper offsets to the damages awarded to Penncro.

Conversely, *Collins Entertainment v. Coats* involved a broken six-year lease agreement for video poker machines. [fn 15] The successor entity to Coats claimed Collins's damages failed to consider the opportunity to re-lease the video poker machines. Collins countered that it held a sufficient number of machines to service the Coats contract as well as any subsequent contracts. To resolve this dispute, this court also looked to the lost volume seller doctrine. [fn 16] The court concluded Collins may have mitigating sales, but it still would have had sufficient inventory to fulfill both the lost sales and the mitigating sales. Thus, the court concluded any subsequent transactions did not qualify as a substitute or mitigation of lost sales.

## Application of the Mitigation-of-Damages Doctrine

A practitioner who is calculating lost profits should generally investigate and understand (such as by discussing this issue with counsel) if the mitigation-of-damages doctrine is applicable to the matter. If so, mitigation offsets are applied to projected losses. However, if the plaintiff incurs reasonable expenses in an effort to mitigate damages, the mitigation expenses may be recoverable as damages of the plaintiff, even if the mitigation efforts are unsuccessful.

The expert should also consider mitigation as a factor in the determination of the loss period. That is, the loss period may end when the plaintiff reasonably should have offset or mitigated any damage amounts. For example, lost profits for income-producing assets should generally end after the reasonable life of the income-producing asset.

## Limitations to the Plaintiff's Ability to Mitigate

The plaintiff's ability to mitigate is dependent upon several factors, which may include the following:

- *Plaintiff's financial ability to mitigate.* Mitigation of damages may not be possible if the plaintiff is financially unable to effectuate the mitigating activity.

- *The cost to mitigate as compared to the economic damages suffered by the plaintiff.* If the cost to mitigate is greater than the economic damage suffered as a result of the defendant's breach, it

---

[fn 14] *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155-56 (10th Cir. 2007).

[fn 15] *Collins Entertainment v. Coats and Coats*, 368 S.C. 410 (S.C. 2006).

[fn 16] Citing the Restatement (Second) of Contracts § 347 (1981).

© 2020 Association of International Certified Professional Accountants

USA-016126

may not be possible or reasonable for the plaintiff to mitigate the damages in the contemplated way.

- *Technical barriers to mitigation.* The plaintiff's ability to mitigate may be affected by technology constraints or opportunities.

- *Market barriers to mitigation.* The plaintiff's marketing capabilities, taking into account its reputation, product quality, and product features, may be affected by the defendant's conduct and affect the plaintiff's ability to mitigate damages.

- *Supply-oriented barriers to mitigation.* The defendant's breach may also have affected the plaintiff's ability to obtain goods and services from its suppliers necessary for production to mitigate the plaintiff's losses.

- *Timing issues affecting the mitigation of damages.* The plaintiff's knowledge of the event causing economic harm and the time required to implement a mitigation strategy may also affect mitigation.

## Suggestions for Practitioners in Evaluating Mitigation in Lost Profits Claims

As described previously, practitioners should generally consider the mitigation efforts, if any, taken or made by the plaintiff to lessen its damages, which may affect available remedies to the plaintiff. The practitioner may describe attempts by the plaintiff to mitigate its losses to evaluate whether the plaintiff has reasonably mitigated or attempted to mitigate its losses. Alternatively, the practitioner may illustrate why the plaintiff's losses should be adjusted for mitigation factors.

The practitioner may also assist counsel by suggesting deposition questions that relate to mitigation issues. For example, lost profits in one division of a company may be offset by increased profits in another division of a company, such as other American Kitchen locations having higher sales and profits as a result of a failure to open an 11th location. The practitioner may recommend deposition questions and other information relevant to these profits for support and analysis of a mitigating activity by the plaintiff. These might include internal discussions and consideration of mitigation efforts.

Finally, the practitioner may provide an analysis of affirmative mitigation opportunities to the plaintiff, when the opportunities were not implemented. For example, the practitioner may illustrate repair or replacement costs that the plaintiff may have undertaken to minimize loss amounts. The practitioner may also illustrate that the plaintiff did not attempt to market or discount its excess product after an alleged breach to minimize loss amounts.

© 2020 Association of International Certified Professional Accountants

USA-016127

# Appendix A

## Case Opinions

*Snac Lite, LLC v. Nuts 'N More*, LLC, 2016 WL 6778268, No. 14-cv-01695

*Syngenta Crop Protection, LLC v. Willowood, LLC, et al.*, Civ No. 1:15-cv-00274 (M.D.N.C.)

*Nebula Glass Int'l., Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006)

*Hadley v. Baxendale*, 156 Eng. Rep. 145 (Ex. 1854)

*Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243 (Ind. App. 2010)

*Biren v. Equality Emergency Med. Grp.*, 102 Cal. App. 4th 125 (2002)

*Emerald Investments Limited Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612 (7th Cir. 2008)

*Braun Elevator Co. v. Thyseenkrupp Elevator Corp.* (W.D. Wis. 2005) 379 F. Supp. 2d 993

*O2 Micro Intern. Ltd. v. Monolithic Power Systems*, 399 F. Supp. 2d 1064

*Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620 (Tex. App. 2010)

*Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642 (Neb. 2008)

*Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813 (D. Minn. 1994), *aff'd mem.*, 60 F.3d 839 (Fed. Cir. 1995)

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1982)

*In re Pago Pago Aircrash of Jan. 30, 1974*, 525 F. Supp. 1007 (C.D. Cal. 1981)

*Watson Bowman Acme Corp. v. RGW Construction, Inc.*, 2016 Cal. App. LEXIS 659 (Cal. App. 5th Dist. Aug. 9, 2016)

*Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831 (2d Cir. 1992)

*St. Louis & O'Fallon Ry. Co. v. United States*, 279 U.S. 461 49 S.Ct. 384 73 L.Ed. 798 (1929)

*Redfield v. Bartels*, 139 U.S. 694 11 S.Ct. 683 35 L.Ed. 310 (1891)

*Roper Corp. v. Reisz*, 718 F.2d 1004 (11th Cir. 1983)

*Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494 (5th Cir. 2002)

*U.S. Philips Corp. v. KXD Technology, Inc.*, 2007 WL 4984150 (C.D.Cal. 2007)

*Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128 (D.N.J. 2007)

© 2020 Association of International Certified Professional Accountants

USA-016128

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991)

*Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777 (W.D. Wash. 2007)

*Kansas v. Colorado*, 533 U.S. 1 (2001)

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)

*Enzo Biochem, Inc. v. Applera Corp.*, No. 3:04cv929 (JBA), 2014 U.S. Dist. LEXIS 372 (D. Conn. Jan. 3, 2014)

*Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997)

*Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100 (N.D. Cal. 2013)

*Monsanto Co. v. Slusser*, No. 4:10 CV 75 DDN, 2013 U.S. Dist. LEXIS 45386 (E.D. Mo. Mar. 29, 2013)

*ABT Sys., LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2014 U.S. Dist. LEXIS 77136 (E.D. Mo. June 6, 2014)

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354 (N.D. Ill. 1993)

*K-TEC v. Vita-Mix*, 765 F. Supp. 2d 1304 (D. Utah 2011)

*Stryker Corp. v. Zimmer Inc.*, No. 1:10-CV-1223, 2013 U.S. Dist. LEXIS 171817 (W.D. Mich. Aug. 7, 2013)

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)

*Raytheon Production Corporation v. Commissioner*, 144 F.2d 110 (1st Cir. 1944)

*United States v. Gilmore*, 372 U.S. 39 (1963)

*Koby v United States*, 53 Fed. Cl. 493, 496-97 (2002)

*Meineke Car Care Centers, Inc. v. RLB Holdings, LLC, Joe H. Bajjani, Michelle G. Bajjani, a/k/a Michelle Bajjani*, U.S. Ct. of App, Fourth Circuit, No. 09-2030 (April 14, 2011)

*Cypress Engine Accessories, LC v HDMS Ltd.*, USDC So. District of Texas, C. A. No. H-15-2227 (October 6, 2017)

*Cambridge Plating Co., Inc. v. Napco, Inc.*, U.S. Ct. Appeals, 1st Cir. Nos. 95-1781, 95-1782 (June 3, 1996)

*Ohio Valley Builders' Supply Co. v. Wetzel Constr. Co.*, 151 S.E. 1 (W. Va. 1929); 22 Am. Jur. 2d Damages § 28 (2003)

*C & O Motors, Inc. v. General Motors Corporation*, U.S. Ct. Appeals, 4th Cir. No 08-1157 (April 1, 2009)

74                      © 2020 Association of International Certified Professional Accountants

USA-016129

*Ai Ping Lu. v. Ravinder S. Grewal, et al.*, 1 so Cal. App.4th 790, 132 Cal Rptr.2d 406 (2003 (June 28, 2001)

*Fiberlok, Inc. v. LMS Enterprises, Inc.*, 976 F. 2d 958, U.S. Ct. of Appeals, 5th Cir. (November 10, 1992)

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007)

*Collins Entertainment v. Coats and Coats*, 368 S.C. 410 (S.C. 2006)

*Chesapeake & Ohio Railway Company v. Kelly*, 241 U.S. 485 (1916)

*Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983)

*Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993)

*In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614 (D. Nev. 1998)

*Haskell Co. v. Georgia Pacific Corp.*, 684 So.2d 297, 298 (Fla. Ct. App. 1996)

© 2020 Association of International Certified Professional Accountants

USA-016130



**AICPA & CIMA**

*Worldwide leaders in public and management accounting*

**Forensic & Valuation Services Practice Aid**

# Measuring Damages
# Involving Individuals

USA-016131

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 375 of 432
PageID.8383

© 2020 Association of International Certified Professional Accountants. All rights reserved.

For information about the procedure for requesting permission to make copies of any part of this work, please email copy-right-permission@aicpa-cima.com with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA 220 Leigh Farm Road, Durham, NC 27707-8110

USA-016132

## Notice to Readers

This publication is designed to provide illustrative information for the subject matter covered. It does not establish standards or preferred practices. The material was prepared by the AICPA staff and volunteers and has not been considered or acted upon by AICPA senior technical committees or the AICPA Board of Directors and does not represent an official opinion or position of the AICPA. It is provided with the understanding that the AICPA staff and the publisher are not engaged in rendering any legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought. The AICPA staff and this publisher make no representations, warranties, or guarantees about, and assumes no responsibility for, the content or application of the material contained herein and expressly disclaim all liability for any damages arising out of the use of, reference to, or reliance on such material.

This practice aid supersedes AICPA Forensic and Valuation Services (FVS) Practice Aid 98-2, *Calculation of Damages From Personal Injury, Wrongful Death, and Employment Discrimination*.

Since the development of this practice aid, the AICPA Code of Professional Conduct (AICPA code) has updated the definition of *client* to be defined as both engaging entity (typically engaging attorney or attorney's firm) and subject entity (typically attorney's client). Effective December 31, 2017, the term *client* is defined as "[a]ny person or entity, other than the member's employer that engages a member or member's firm to perform professional services (engaging entity) and also, a person or entity with respect to which a member or member's firm performs professional services (subject entity). When the engaging entity and the subject entity are different, while there is only one engagement, they are separate clients." (ET sec. 0.400.07) [fn 1]

For purposes of this practice aid "attorney," "litigant's attorney," and "counsel's client" are all considered *client* as defined by the AICPA code.

## Update as of January 1, 2020

The AICPA's Forensic and Valuation Services Executive Committee issued Statement on Standards for Forensic Services (SSFS) No. 1 (FS sec.100) [fn 2] to protect the public interest by preserving and enhancing the quality of practice of a member performing forensic services. Effective for engagements accepted on or after January 1, 2020, SSFS No. 1 establishes standards for a member providing services to a client as part of litigation and investigation engagements. The term litigation as used in SSFS No. 1 and throughout this practice aid is not limited to formal litigation but is inclusive of disputes and all forms of alternative dispute resolution, unless otherwise stated. [fn 3]

---

[fn 1]   All ET sections can be found in AICPA *Professional Standards*.

[fn 2]   All FS sections can be found in AICPA *Professional Standards*.

[fn 3]   See SSFS No. 1, paragraph 1.

© 2020, Association of International Certified Professional Accountants                3

USA-016133

# Acknowledgments

The principal author of this practice aid is Holly Sharp, CPA, CFE, CFF.

In addition, members of the 2012–2013 AICPA Forensic and Litigation Services Committee, FVS Executive Committee, and Forensic and Litigation Services Damages Task Force provided information and advice to the author and AICPA staff for this practice aid.

## AICPA Staff

Barbara Andrews
*Director, Forensic, Technology and Management Consulting Services*
FVS Section

Christine N. Cutti-Fox
*Senior Manager, Forensic Services*
FVS Section

© 2020, Association of International Certified Professional Accountants

4

USA-016134

## Contents

Chapter 1 Scope of This Practice Aid ........................................................................................... 8

Overview ..................................................................................................................................... 8

Useful Skills for the Forensic Practitioner .............................................................................. 8

Chapter 2 AICPA Professional Standards and AICPA Guidance ........................................ 10

Statement on Standards for Forensic Services No. 1 and AICPA Code of Professional Conduct ................... 10

AICPA Publications .................................................................................................................. 10

Chapter 3 Overview of the Law of Damages Involving Individuals .................................... 12

Types of Damages ..................................................................................................................... 12

Reasonable Certainty ............................................................................................................... 13

Mitigation .................................................................................................................................. 13

Collateral Source Rule ............................................................................................................. 14

Jurisdictional Issues ................................................................................................................. 14

Chapter 4 The Forensic Practitioner's Role in Measuring Damages Involving Individuals ........... 17

Types of Engagements .............................................................................................................. 17

Engagement Scope and Engagement Considerations .......................................................... 17

Information Subject to Discovery [fn 4] .................................................................................. 18

Chapter 5 Calculation of Losses Involving Individuals ......................................................... 19

Overview ................................................................................................................................... 19

Lost Earnings and Lost Income .............................................................................................. 20

Establishing the Earnings Base .............................................................................................. 20

Two Sample Cases for Damages Involving Individuals [fn 5] ............................................. 20

Case 1 (a Straightforward Calculation) ............................................................................. 21

Case 2 (More Complicated) ................................................................................................. 21

Earning Capacity ...................................................................................................................... 22

Coordination With Other Experts to Establish the Earnings Base ................................... 22

© 2020, Association of International Certified Professional Accountants

USA-016135

Age-Earnings Profile ........................................................................................................ 23

Lost Income From Other Sources ..................................................................................... 24

Fringe Benefits ................................................................................................................... 24

Fringe Benefits — Lost Retirement Benefits .................................................................... 26

Household Services ............................................................................................................. 26

Medical and Rehabilitation Expenses ............................................................................... 27

Past Losses and Future Losses .......................................................................................... 28

Work Life Expectancy ....................................................................................................... 28

Life Expectancy ................................................................................................................. 29

Other Loss Measurement Periods ..................................................................................... 30

Measurement Date for Work Life and Life Expectancy .................................................. 31

Personal Consumption and Personal Maintenance .......................................................... 31

Growth Rate ....................................................................................................................... 32

Earnings Growth Factors ................................................................................................... 33

Other Growth Factors ........................................................................................................ 34

Consideration of Income Taxes ......................................................................................... 34

Discounting Losses to Present Value ................................................................................ 34

Use of Scenarios ................................................................................................................ 35

Chapter 6 Presenting Findings ............................................................................................... 36

Report Preparation or Other Disclosures .......................................................................... 36

Demonstrative Exhibits ...................................................................................................... 36

Testimony ............................................................................................................................ 36

Deposition Testimony ................................................................................................... 37

Trial Testimony ............................................................................................................. 37

Testifying Traps .................................................................................................................. 37

Chapter 7 Selected Court Cases [fn 1] ................................................................................... 38

6          © 2020, Association of International Certified Professional Accountants

USA-016136

Appendix A Bibliography .................................................................................................................. 41

   AICPA Publications ...................................................................................................................... 41

   Other Publications ........................................................................................................................ 41

   Household Production Studies ...................................................................................................... 41

   Work Life Studies ........................................................................................................................ 41

Appendix B Information That May Assist in Calculation of Personal Damages ................................. 43

   Exhibit B-1 — Information That May Be Obtained for Personal Injury Cases ............................... 44

   Exhibit B-2 — Information That May Be Obtained for Wrongful Death Cases ............................... 44

   Exhibit B-3 — Information That May Be Obtained for Employment Discrimination Cases ............ 45

© 2020, Association of International Certified Professional Accountants

USA-016137

# Chapter 1

## Scope of This Practice Aid

### Overview

Damages are succinctly defined in *Black's Law Dictionary* as

> [m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury.[fn 1]

Damages involving individuals include damages from personal injury (such as an auto accident, premise liability, product liability, or medical malpractice), wrongful death, and lost employment that may be awarded in a lawsuit or other dispute resolution matters.

This practice aid provides an overview of the calculation of damages involving individuals with losses from personal injury, wrongful death, employment termination, and employment discrimination cases. Consideration should be given to local requirements, state laws, and other jurisdictional issues that may differ from the general guidance contained in the practice aid.

This practice aid discusses the types of engagements, the engagement scope and acceptance considerations, the types of damages, the general approaches to damage estimation, and various specific damage calculations used in lawsuits and disputes involving individuals. This practice aid does not set standards for the performance of such engagements or other litigation services.

Practitioners provide a variety of litigation, dispute resolution, and forensic accounting services. The forensic practitioner may assist in matters that involve a pending or potential formal legal or regulatory proceeding before a "trier of fact" (for example, a judge, jury, arbitrator, mediator, or special master) in connection with the resolution of a dispute between two or more parties. Litigation services are a type of consulting service which may be provided by a practitioner acting as a *consultant* (non-testifying expert) or as an *expert witness* (testifying expert). The practitioner may also serve as a *fact witness*. The services provided by the practitioner may include fact-finding (such as assistance in the discovery and analysis of data), damage calculations, document management, preparation of demonstrative exhibits, expert testimony, and other professional services.

### Useful Skills for the Forensic Practitioner

Useful skills for the forensic practitioner in this technical area include familiarity with economic, auditing, and taxation concepts. A practitioner performing damage calculations involving individuals generally analyzes financial statements and income tax returns to determine a base to measure lost earnings. Knowledge of individual income taxation is also helpful when taxes must be considered in calculations. Analysis of other relevant data, such as surveys, studies, and economic data, may be used to establish the base to measure lost earnings and other losses. Time-value-of-money concepts are used to calculate prejudgment interest and to discount future amounts to present value. Familiarity with statistics and sampling may be helpful in the analysis of data and evaluation of the reliability of independent surveys

---

[fn 1]  *Black's Law Dictionary*, 8th ed. (2004), p. 416.

© 2020, Association of International Certified Professional Accountants

USA-016138

and studies. Computer skills will assist the practitioner in calculation of damages involving individuals; spreadsheet software is commonly used to perform the calculations. The Internet provides many useful information sources for formulating the elements of the damage calculation; however, the forensic practitioner should ensure that data obtained from online sources is fact-based and reliable before using as part of the damages calculations. Courts have precluded some testimony by experts using Internet materials. [fn 2]

Credentials are typically useful to establish skills, education, training, and experience. In addition to the CPA credential, the Certified in Financial Forensics (CFF®) credential is an AICPA credential for practitioners who specialize in forensic accounting. The CFF encompasses fundamental and specialized forensic accounting skills that practitioners apply in a variety of service areas, including the following:

- Bankruptcy and insolvency

- Electronic data analysis

- Family law

- Valuations

- Fraud prevention, detection, and response

- Financial statement misrepresentation

- Economic damages calculations

---

[fn 2] Use caution with websites to ensure that the source is reliable. Websites such as Wikipedia may be edited by anyone with Internet access, and the site warns users against using its contents for research purposes. Courts have found Wikipedia to be an unreliable source of information in *Bing Shun Li v. Holder*, 400 F. App's 854, 858 (5th Cir. 2010), and *Campbell v. Secretary of Health and Human Services*, 69 Fed. Cl. 775, 781 (Fed. Cl. 2006). See also *Loussier v. Universal Music Group, Inc.*, 2002-2447, 2005 U.S. Dist. LEXIS 37545 (S.D.N.Y. 2005), precluding an expert from testifying about Internet materials.

© 2020, Association of International Certified Professional Accountants

USA-016139

# Chapter 2

## *AICPA Professional Standards and AICPA Guidance*

### Statement on Standards for Forensic Services No. 1 and AICPA Code of Professional Conduct

The Statement on Standards for Forensic Services (SSFS) No. 1 [fn 1] and the AICPA Code of Professional Conduct apply to damage calculations involving individuals. SSFS No. 1 provides a definition of forensic services, which include both investigation and litigation services. Damage calculations relating to actual or potential claims by individuals generally fit within this definition. SSFS No. 1 generally prohibits contingent fee arrangements, the use of agreed-upon procedures engagements under AT-C section 215, and the expression of opinions regarding the ultimate conclusion of fraud. SSFS No. 1 reiterates that the general standards of the professional apply to forensic services. Both SSFS No. 1 and the "General Standards Rule" of the AICPA Code of Professional Conduct (ET sec. 1.300) require integrity, objectivity, professional competence, due professional care, planning and supervision, and sufficient relevant data. [fn 2] Similarly, both SSFS No. 1 and the "Compliance With Standards Rule" of the AICPA Code of Professional Conduct (ET sec. 2.310) establish standards for client interest, understanding with client, and communication with client. [fn 3] Specifically, practitioners must communicate

1. conflicts of interest that may occur pursuant to the "Integrity and Objectivity Rule" (ET sec. 1.100.001 and 2.100.001) [fn 4]

2. significant reservations concerning the scope or benefits of the engagement, and

3. significant engagement findings or events.

### AICPA Publications

Various AICPA publications discuss relevant topics such as applicable professional standards, conflicts of interest, communication considerations for consulting engagements, and engagement letters.

A conflict of interest [fn 5] may occur if a significant relationship could be viewed by any party to the dispute as impairing the practitioner's objectivity in the performance of a professional service. Before ac-

---

[fn 1] Statement on Standards for Forensic Services (SSFS) No. 1, *Consulting Services: Definitions and Standards* (FS sec. 100).

All FS sections can be found in AICPA *Professional Standards.*

[fn 2] Former Rule 201, *General Standards* (ET sec. 201 par. .01) and paragraphs .06–.07 of SSFS No. 1. All ET sections can be found in AICPA *Professional Standards.*

[fn 3] Former Rule 202, *Compliance With Standards* (ET sec. 202 par. .01) and paragraph .08 of SSFS No. 1.

[fn 4] Former Rule 102, *Integrity and Objectivity* (ET sec. 2.100.001) and paragraph .08 of SSFS No. 1.

10          © 2020, Association of International Certified Professional Accountants

USA-016140

cepting a litigation engagement, the practitioner generally discloses to the engaging attorney and party to the litigation any situations which may be viewed as conflicts of interest.

---

[fn 5] ET section 2.100.001 states, "In the performance of any professional service, a member ... shall be free of conflicts of interest." SSFS No. 1 reiterates the requirement to communicate with the client regarding conflicts of interest and directs practitioners to the "Conflicts of Interest for Members in Public Practice" interpretation (ET sec. 1.110.010) under the "Integrity and Objectivity Rule" for guidance about the identification, evaluation, disclosures, and consent relating to conflicts of interest.

© 2020, Association of International Certified Professional Accountants                11

USA-016141

# Chapter 3

## *Overview of the Law of Damages Involving Individuals*

### Types of Damages

Although many types of damages can arise from an alleged loss or injury, the law does not permit recovery in every case or for each element of damages. Rules of causation have been developed to ensure a sufficient connection between the alleged event and the resulting damages. Recoverable damages generally flow naturally from the event in a direct and continuous sequence. Damages deemed too remote to have been reasonably expected are typically not recoverable.

The role of the forensic practitioner in calculating damages involving individuals often relates to economic losses, or "special damages." Special damages include loss of earnings, fringe benefits, and other income, as well as increased costs resulting from the incident, such as medical expenses and property damages. Special damages may include past losses and future losses. Past losses are measured from the date of the wrongful act, injury, or death to the date of trial or other reference date. Future losses are measured after the date of trial or other reference date and are discounted to present value using an appropriate discount rate.

Most courts have found that damages do not need to be calculated with mathematical precision (to the exact penny), but must not be speculative or remote. [fn 1] That is, damages should be calculated with reasonable certainty. Because damages are generally recognized to be remedial rather than retributive, the goal is to restore the person to the pre-injury status by calculating a monetary sum sufficient to compensate for the injury. The exception to this rule is punitive or exemplary damages, which are awarded to punish the wrongdoer and deter others from similar behavior.

Other types of damages in disputes involving individuals may include "general damages," such as pain and suffering, or "punitive or exemplary damages." General damages include physical or mental impairment and past, present, and future physical pain and suffering. General damages are presumed to have resulted from the nature of the injury, but typically cannot be precisely calculated. Therefore, practitioners would typically not assist with a calculation of the amount of general damages. The practitioner may assist with a calculation of amounts related to general damages, such as prejudgment interest. [fn 2]

Hedonic damages relate to the loss of enjoyment of life and have been held by some jurisdictions as damages in addition to pain and suffering. In this area, a loss calculation attempts to quantify the diminished enjoyment of life caused by the injury. There is considerable debate regarding the calculation of loss of enjoyment of life with no national consensus regarding the application to damages involving in-

---

[fn 1] *Black's Law Dictionary*, 8th ed. (2004), p. 419. "Speculative Damages: Damages that are so uncertain that they will not be awarded. Also termed remote damages."

[fn 2] The rules for calculation of prejudgment interest vary, depending on the jurisdiction. For additional discussion of prejudgment interest calculation, see *Litigation Services Handbook, The Role of the Financial Expert*, 5th ed., Chapter 15 by Jeffrey M. Colon, Michael S. Knoll.

12    © 2020, Association of International Certified Professional Accountants

USA-016142

dividuals.[fn 3] The majority of jurisdictions allow Hedonic damages.[fn 4] The practitioner should be aware of the applicable jurisprudence before rendering an opinion in this area.

## Reasonable Certainty

The reasonable certainty principle is addressed in many cases [fn 5] and is generally found to be met when damages have been calculated using assumptions that are not speculative; however, the calculated damages may be an approximation. References to reasonable certainty in court cases include the following:

- "Certainty as to the amount [of damages] goes no further than to require a basis for a reasoned conclusion." [fn 6]

- "... the fact of economic loss damages must be proven with reasonable certainty but the amount of the damages need only be proved by a reasonable estimate." [fn 7]

- "The claimant must establish the fact of damages with reasonable certainty, but it is not always possible to establish the amount of damages with the same degree of certainty." [fn 8]

To increase the likelihood that the forensic practitioner's opinion will be considered reasonably certain and accepted by the trier of fact, the practitioner should exercise due care in the development of opinions and seek sufficient relevant data to support his or her opinions.

## Mitigation

The plaintiff in a personal injury, employment termination, or employment discrimination case is expected to mitigate losses by making reasonable efforts to offset losses when possible. The hiring attorney will generally be the source for case-specific considerations regarding mitigation factors. Other experts, such as vocational rehabilitation experts, may provide mitigation factors. An offset will generally apply for amounts the plaintiff earned, will earn, or could have earned during the loss period.

---

[fn 3] For example, see "The Misapplication of the Hedonic Damages Concept to Wrongful Death and Personal Injury Litigation," by Thomas Harvilesky, *Journal of Forensic Economics*, Vol. 6, No. 3, Summer, 1993, pp. 93–98; "The Flawed Hedonic Damages Measure of Compensation for Wrongful Death and Personal Injury," by W. Kip Viscusi, *Journal of Forensic Economics*, Vol. 20, No. 2, 2007, pp. 113-135; and "Hedonic Damages—One More Time: A Symposium," by Peter Marks and Thomas R. Ireland, *Journal of Forensic Economics*, Vol. 20, No. 2, 2007, pp. 103-112.

[fn 4] For example, see *James Bailey et al. v. Nyloncraft, Inc.*, USDC for the Eastern District of Michigan, So. Division, Case No. 11-14199, decided August 28, 2012.

[fn 5] Robert L. Dunn, *Recovery of Damages for Lost Profits*, pp. 16-24 (6th ed. 2005), pp. 16-31 (SUPPLEMENT March 2013, pp. 4-9).

[fn 6] *Palmer v. Connecticut Railway & Lighting Co.*, 311 U.S. 544, 561 (1941).

[fn 7] *Hill v. Republic of Iraq*, 328 F.3d 680 (D.C. Cir. 2003).

[fn 8] *Ameristar Jet Charter, Inc. v. Dodson International Parts, Inc., supra*, 155 S.W3d at 55.

© 2020, Association of International Certified Professional Accountants

13

USA-016143

## Collateral Source Rule

Amounts deemed to be from collateral sources are generally not considered mitigating earnings and not offset against past and future losses. The collateral source rule provides

> ... if an injured party receives compensation from a source independent of the tortfeasor, the payments should not be deducted from the damages that the tortfeasor must pay. [fn 9]

The collateral source rule applies in cases involving individuals when compensation is replaced by an independent source (such as disability or social security insurance) or medical expenses are reimbursed by an independent source (such as an employer or health insurance company). The individual may be reimbursed for certain losses, but the reimbursement is not subtracted when the reimbursement is from a collateral source.

## Jurisdictional Issues

The forensic practitioner engaged to calculate damages in litigation and other disputes should understand the applicable jurisdictional issues, including discovery requirements. The practitioner may discuss the applicable discovery rules with hiring counsel to understand what may be produced to the opposing party or parties. Production rules regarding draft reports, emails between the expert and hiring counsel, and notes prepared by the expert are examples of discovery issues that the practitioner should understand when engaged to perform damage calculations.

Rules 702 and 703 of the Federal Rules of Evidence and Rule 26 of the Federal Rules of Civil Procedure will apply to practitioners performing calculations in matters subject to the rules of federal court.

> Rule 702. *Testimony by Experts: If scientific, technical, or other specialized knowledge will assist the Trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

> Rule 703. *Bases of Opinion Testimony by Experts: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts of data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effort.*

The Federal Rules of Civil Procedure cover discovery issues that apply to expert testimony in federal district courts and subject to the federal rules.

---

[fn 9] *Black's Law Dictionary*, 8th Ed. pp. 279-280.

    © 2020, Association of International Certified Professional Accountants

USA-016144

The Federal Rules of Civil Procedure have been amended to protect the "drafts of any report or disclosure" required of an expert by the federal rules. Effective December 1, 2010, the draft reports or disclosures of an expert to the retaining attorney are protected from discovery for cases subject to the federal rules. Communications, in any form, between the attorney and an expert may also be protected from discovery in cases subject to the federal rules. Review of the expert report by the client, or communications between the expert and the client, may not be protected and may be discoverable in cases subject to the federal rules. Communications between the attorney and the expert related to the expert's compensation, facts, data, and assumptions that the attorney provided to the expert for consideration in forming an opinion, and assumptions that the attorney provided and the expert relied upon may be discoverable in cases subject to the federal rules.

Rule 26 of the Federal Rules of Civil Procedure [fn 10] establishes the duty of disclosure of expert testimony. The expert opinion should be accompanied by a written report prepared and signed by the witness. The following written disclosures are required by Federal Rule 26:

- A complete statement of all opinions the witness will express and the basis and reasons for them

- The facts or data considered by the witness in forming them

- Any exhibits that will be used to summarize or support them

- The witness's qualifications, including a list of all publications authored in the previous 10 years

- A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition

- A statement of the compensation to be paid for the study and testimony in the case

Written reports may also be requested or required in other jurisdictions or by the client; different discovery requirements and rules may apply for jurisdictions not subject to the federal rules.

The United States Supreme Court in the seminal case of *Daubert v. Merrell Dow Pharmaceutical, Inc.*, [fn 11] identified four factors to consider in determining the admissibility of scientific evidence:

- Whether the theory or technique can be or has been tested

- Whether the theory or technique has been subjected to peer review and publication

- Whether there is a high known or potential rate of error with respect to the theory or technique, and whether there are standards controlling the technique's operation

- Whether the theory or technique enjoys general acceptance within the relevant scientific community

---

[fn 10] https://www.law.cornell.edu/rules/frcp/rule_26 .

[fn 11] *Daubert v. Merrell Dow Pharmaceutical, Inc.* (509 U.S. 579 [1993]), http://caselaw.lp.findlaw.com/scripts/getcase.pl?court=us&vol=509&invol=579.

© 2020, Association of International Certified Professional Accountants

USA-016145

The ruling in *Daubert* established a new standard for the admissibility of scientific testimony in federal cases because it replaced the "generally accepted" standard established in the earlier *Frye v. United States* [fn 12] decision. Many states have adopted the *Daubert* standards for expert testimony, and numerous courts have excluded testimony related to damages involving individuals for failure to meet the *Daubert* standards. [fn 13]

---

[fn 12] http://daubertontheweb.com/frye_opinion.htm.

[fn 13] An extensive listing of cases with *Daubert* challenges related to damages involving individuals may be found at http://daubertontheweb.com/accountants.htm and www.umsl.edu/~irelandt/Decisions%20of%20Interest.htm.

16                    © 2020, Association of International Certified Professional Accountants

USA-016146

# Chapter 4

## *The Forensic Practitioner's Role in Measuring Damages Involving Individuals*

### Types of Engagements

The practitioner may be retained as a *consultant* to advise the hiring party on technical issues, damage models, and alternative methods of calculation and presentation of damages involving individuals for purposes of settlement negotiations, among other reasons. The consultant's work, unlike that of the expert witness, may be shielded from discovery through the attorney work-product privilege. The consultant is not a testifying expert and is often not identified to the opposing parties. However, the consulting expert may subsequently become a testifying expert.

The forensic practitioner's function when retained as a testifying expert is to assist the trier of fact in understanding the evidence or to determine a fact in issue. The practitioner expresses his or her own opinion with objectivity and integrity, not necessarily the opinion of the client(s). The practitioner is an advocate for his or her unbiased opinion, but is not an advocate for the client.

The forensic practitioner may also be retained for rebuttal of the testimony of another expert witness. In this capacity, the practitioner may express opinions as to whether the statements of opposing experts are inaccurate, misleading, or otherwise not true. [fn 1]

### Engagement Scope and Engagement Considerations

The forensic practitioner first determines if any conflicts of interest could preclude him or her from accepting the engagement. Documents and data obtained for conflict clearance generally include the lawsuit (petition or complaint), names of the parties to the litigation or proceeding, and the names and firms of the counsel for the plaintiff(s) and defendant(s). An overview of the issues, the extent of work necessary to perform the engagement, and critical dates such as the report due date and the trial date are usually obtained prior to accepting the engagement so that the practitioner can evaluate engagement with respect to the AICPA professional standards. [fn 2]

Before undertaking a damages engagement involving individuals, the forensic practitioner ascertains the needs of the client. This in turn assists the practitioner with evaluation of whether his or her ability and experience meet the requirements of the engagement. The practitioner identifies the nature of the services to be provided, which may include fact finding (such as assistance in the discovery and analysis of data), damage calculations, document management, preparation of demonstrative evidence, testimony, or other professional services. The practitioner ascertains that the reporting and timing requirements of the engagement are not problematic. The practitioner also resolves issues that may be viewed as potential conflicts of interest, and then determines the staffing requirements and the ability to undertake the potential client's assignment.

---

[fn 1]  *Rebutting evidence* as defined in *Black's Law Dictionary*, 8th ed., (2004), p. 599: "Evidence given to explain, repel, counteract, or disprove facts given in evidence by the adverse party."

[fn 2]  See chapter 2, "AICPA Professional Standards and AICPA Guidance."

© 2020, Association of International Certified Professional Accountants    17

USA-016147

The forensic practitioner should understand the fee arrangement and determine if the engaging attorney or the engaging attorney's client will be responsible for payment of the services. The fee structure and terms of payment are generally agreed to before work begins. The practitioner may obtain a retainer upon acceptance of the engagement and may apply this amount against outstanding invoices or the final bill. SSFS No. 1 generally prohibits contingent fee arrangements for engagements to provide expert witness services.

The understanding among the forensic practitioner, the hiring attorney(s) and other parties may be either oral or written. [fn 3] Written understanding of the engagement terms may be in the form of an engagement letter issued by the practitioner to the hiring party or parties. Alternatively, the hiring party or parties may issue a retention letter to the practitioner explaining the engagement terms. Multiple defendants in litigation proceedings may join together and engage the same economic expert, or may each hire independent economic experts. The practitioner that is engaged by multiple defendants should be aware of the fee arrangements between the hiring parties and understand how the parties prefer to be billed for the services rendered. Enrollment of new counsel in proceedings may alter the terms of understanding in the engagement letter or retention agreement. The practitioner should consider whether to revise the documentation of understanding of the engagement when there is enrollment of new counsel.

## Information Subject to Discovery [fn 4]

All information that the forensic practitioner receives and compiles in formulating opinions may be subject to discovery. The practitioner should be aware of jurisdictional issues related to discovery of work and communications with hiring counsel because draft reports, emails, and other documents of communications with hiring counsel may or may not be discoverable. [fn 5]

In each engagement, the forensic practitioner may wish to discuss with the hiring attorney what notes and writings should or should not be made. The practitioner should comply with subpoena requests and coordinate subpoena production with hiring counsel. If there is an objection by the hiring attorney regarding subpoena production, it may be necessary for the practitioner or the practitioner's firm to engage an attorney for advice.

---

[fn 3]   Statement on Standards for Forensic Services No. 1, paragraph .08.

[fn 4]   See appendix B, "Information That May Assist in Calculation of Personal Damages."

[fn 5]   Rule 26 of Federal Rules of Civil Procedure was revised in 2010 to provide work product protection for draft expert reports and most attorney-expert communications. (However, attorney-expert communications that relate to expert compensation, factors or data given to the expert that the expert considered, and assumptions that the expert relied upon are considered discoverable under the new rules.)

18            © 2020, Association of International Certified Professional Accountants

USA-016148

# Chapter 5

## *Calculation of Losses Involving Individuals*

### Overview

The forensic practitioner who is hired to calculate economic damages involving individuals determines monetary amounts that would have been realized "but for" the damage incident, and then applies reductions for amounts actually realized or received. A further reduction may apply for amounts that would have been received had the claimant mitigated damages, depending on the facts of the case. A reduction for personal consumption (the amount of an individual's expenses that do not benefit other family members) generally applies in cases involving wrongful death and may apply in other damages cases involving damages to individuals. Not all jurisdictions allow a reduction for personal consumption, [fn 1] and some jurisdictions provide deductions for personal maintenance (an individual's basic living expenses) instead of personal consumption. [fn 2] Income taxes may or may not be required to be considered, depending on the rules of the jurisdiction.

The loss period is generally the claimant's work life expectancy, or life expectancy, [fn 3] or other time period, depending on the injury and the loss. [fn 4] The loss is projected over this period, with appropriate growth factors applied, and shown as past losses (to date of trial or other reference date) and future losses (from date of trial or other reference date to the end of the loss period). Future amounts are discounted to present value dollar amounts based on appropriate discount factors. A prejudgment interest rate may be applied to past losses. The jurisdiction of the case determines how prejudgment interest is calculated and the applicable legal rate of interest.

The forensic practitioner may work with other experts in calculating damages involving individuals. Vocational rehabilitation experts, medical experts, and life care planners are examples of other experts in cases involving damages to individuals. The practitioner may be provided with reports of these experts for consideration in performing the damage calculations. Hiring counsel generally coordinates the role of the practitioner with other experts.

---

[fn 1] For example, Kentucky and West Virginia state courts do not allow deductions for self-consumption in wrongful death lost earning calculations.

[fn 2] For example, Pennsylvania and Tennessee provide for deduction of the personal maintenance of the individual; personal maintenance is the amount one spends to maintain a condition of well-being, but there are differences in amounts included in each state.

[fn 3] Medical costs expected to be incurred over the claimant's lifetime are an example of a loss that may be projected over life expectancy.

[fn 4] In cases involving employment termination and employment discrimination, the loss period may be much shorter than work-life expectancy because the loss period may be governed by the jurisdiction and influenced by such factors as the claimant's expected job tenure based on his or her prior work history, the average time in position in most recent employment, or the expected convergence of mitigating earnings.

USA-016149

## Lost Earnings and Lost Income

Quantification of the losses involving individuals requires evaluation of what the individual was earning or could have earned, as well as evaluation of what the individual is expected to earn, or could earn over the time period the individual would have worked. "But-for" earnings are earnings that would have been realized absent the event and may be referred to as *unimpaired* earnings. Actual earnings, expected future earnings, or both may be referred to as *impaired* earnings. Lost earnings are segregated into past lost earnings and future lost earnings.

## Establishing the Earnings Base

The earnings base is generally the starting point of the lost earnings calculation. The earnings base may then be used to project future values. The earnings base is generally stated as an annual amount that purports to represent the earnings that a person is capable of making as of the date of injury, accident, or other incident. Past employment history may be sufficient to establish a base; however, the calculation becomes more arduous for individuals who have not entered the workforce, recently entered the workforce, been on hiatus from the workforce, or planned to change their vocation. The claimant that is a new entrant to employment may not have specific actual earnings to use in modeling expected future earnings. Similarly, a claimant who changed careers immediately prior to the loss event may require additional research regarding potential compensation and benefits. The industry outlook and expected promotions may also affect the earnings model and require additional research.

Other issues in calculating lost earnings may arise for individuals with seasonal employment or whose earnings include overtime, individuals who are self-employed, and individuals with inadequate documentation of historical earnings. The earnings of individuals with seasonal employment or overtime may be modeled on a weekly or monthly basis instead of an annual basis to account for fluctuations. The self-employed individual may require additional analysis of historical operations and industry conditions to develop an appropriate earnings base to project lost earnings. Individuals may have inadequate documentation of past earnings history, income may not have been sufficient to require filing income tax returns, or the individual may have neglected to file income tax returns. The facts and circumstances of the particular case will determine how the practitioner should address inadequate documentation of past earnings history.

Once established, the earnings base provides the basis for growth of amounts that are segregated into past losses and future losses. Future losses are discounted to present value to provide loss as of trial date or other applicable reference date. Past losses are summed and added to discounted future losses to provide the amount of total economic losses.

## Two Sample Cases for Damages Involving Individuals [fn 5]

Case 1 illustrates a simple calculation, and case 2 illustrates a more complicated calculation. Neither case is intended to support any preferred method to perform the loss calculation; these sample cases merely illustrate factors to consider when performing damage calculations involving individuals.

---

[fn 5] The two sample cases are for illustrative purposes only.

20     © 2020, Association of International Certified Professional Accountants

USA-016150

## Case 1 (a Straightforward Calculation)

Bill Walker was 40 years old when he was injured in an accident. He is no longer able to perform any type of work and is not expected to recover. Mr. Walker testifies in his deposition that he planned to work until age 62 with no breaks other than annual vacations and holidays. He also testifies that he had no plans to change jobs or change employers for the rest of his work life. The work life tables you consult reflect a remaining work life of 22 years for a male with Mr. Walker's level of education. You are provided with Mr. Walker's income tax returns for the past 5 years along with W-2 forms from his employer. Bill's salary had increased 2 percent above the rate of inflation each year and he had worked for the same employer, Jones Corporation, since graduation from college. Jones Corporation provided Mr. Walker with health insurance, but provided no other fringe benefits. In this situation, the practitioner will likely need to answer questions such as the following:

- Is it appropriate to use Mr. Walker's annual wage in the year before the accident as the earnings base?

- What growth rate should you use to project earnings over work life?

- What work life should you select?

- Should you subtract any replacement earnings for Mr. Walker's remaining work life?

## Case 2 (More Complicated)

Alex Ford was 40 years old when he was injured in an accident. Reports from two vocational experts conflict. Report one states that Mr. Ford may return to work in three years with several different employment scenarios. Report two states Mr. Ford was totally disabled and cannot return to work. Mr. Ford worked for numerous employers during the previous five years but was not employed at the time of the accident. Mr. Ford testifies in his deposition that he also earned income from his lawn-care business that he failed to report on his tax return because he was paid in cash. Mr. Ford also testifies in his deposition that he was taking night courses at the local trade school so that he could become an electrician and "earn a lot more money." He also testifies that he expected to double or triple the amount of money he was making in the lawn-care business. In this situation, the practitioner will likely need to answer questions such as the following:

- Which employment do you use for the wage base?

- What growth rate do you use to project earnings over work life?

- How do you account for the lawn-care business?

- What consideration do you give to the new career Mr. Ford was preparing for?

Forensic practitioners practicing in this area of damages may encounter situations with complexities similar to these cases. The answers to similar questions will frequently depend upon the facts and circumstances of the matter and may result in the inclusion of some, all, or none of the income projection desired by the plaintiff.

© 2020, Association of International Certified Professional Accountants

21

USA-016151

**Earning Capacity**

Earning capacity attempts to measure potential earnings and is based upon earnings that an individual could earn, considering the individual's education, training, and experience, whether or not the individual is ever engaged in such employment. [fn 6]

Earning capacity represents what a person could have been capable of earning "but for" the injury of incident. Earning capacity also encompasses work skills that may be acquired; however, the mere desire of attaining particular employment with no other evidence may be considered speculative. [fn 7]

> **Example 1.** Deborah is a 38-year-old high school science teacher with a Ph.D. in biology. She earns $36,000 per year teaching school, but could earn twice that amount ($72,000) working as a research biologist for a pharmaceutical company. Rather than use her actual earnings of $36,000 per year, many jurisdictions would allow her to recover losses based on her earnings capacity of $72,000 per year. However, without sufficient evidence that the research biologist job was attainable by Deborah, use of $72,000 instead of $36,000 as the base to calculate lost earnings may be considered speculative and not a reasonably certain estimate of her loss.

> **Example 2.** Burt was killed in an automobile accident and his heirs file a wrongful death action. Burt was in his final year of medical school, but his employment history only reflects jobs paying slightly above minimum wage. Most jurisdictions would allow a scenario showing lost earnings that are based on the amount Burt could have earned as a doctor.

> **Example 3.** Mary was employed as a waitress when she was injured and totally disabled in an automobile accident. She had considered going to nursing school, but at the time of the accident had not applied to any nursing schools and lacked the education to qualify for admission to nursing school. Most jurisdictions would consider this to be a speculative claim and not evidence of her earnings capacity.

## Coordination With Other Experts to Establish the Earnings Base

Vocational rehabilitation experts may be utilized to provide data regarding employment alternatives. The hiring attorney generally coordinates this. A vocational rehabilitation expert may provide information regarding the vocational potential of the injured worker with details of what jobs the injured worker could perform and a labor market survey regarding what jobs are available with applicable salary ranges in the local labor market. The vocational rehabilitation expert may also provide an analysis of the current status of medical and vocational issues with suggested dates that the injured worker may return to work. The practitioner may rely on the report and testimony of the vocational rehabilitation expert in establishing the earnings an injured worker will earn over the remaining work life. That is, when possible, the practitioner should analyze the report and testimony of any other expert he or she has relied upon. The practitioner should be alert to any potential inconsistencies when relying on other experts to establish elements of the loss calculation.

---

[fn 6]   *Black's Law Dictionary*, 8th ed. (2004), p. 547: "[a] person's ability or power to earn money, given the person's talent, skills training and experience."

[fn 7]   For example, see *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3rd Cir. 1983), and *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567-69 (D.C. Cir. 1993).

22          © 2020, Association of International Certified Professional Accountants

USA-016152

## Age-Earnings Profile

The age-earnings profile considers the effect of age on earnings. Studies show that earnings generally increase at greater rates for younger individuals and that earnings growth reaches a peak and may decline for older individuals. The following chart, which shows the average weekly earnings across all industries and occupations by age groups using data from the Current Population Survey, [8] illustrates this trend:



- Studies of age-earnings profiles include the following:"Accounting for Age-Earnings Profiles in Net Discount Rates," by Eric Christensen, *Journal of Forensic Economics*, vol. 12, no. 3, 1999.

- "Age-Earnings Profiles Estimates: Do they Change over Time?" by Stephan F. Gohmann, Myra J. McCrickard, and Frank Slesnick, *Journal of Forensic Economics*, vol. 11, no. 3, 1998, pp. 173–188.

- "The Relationship between Age, Earnings and the Net Discount Rate Revisited," by Charles W. deSeve, *Journal of Forensic Economics*, vol. 5, no. 1, Winter 1991, pp. 67–70.

---

[8] Bureau of Labor Statistics (BLS), "Usual Weekly Earnings of Wage and Salary Workers First Quarter 2013," News Release, April 18, 2013, www.bls.gov/news.release/pdf/wkyeng.pdf.

© 2020, Association of International Certified Professional Accountants

23

USA-016153

- "Empirical Age-Earnings Profiles," by K. M. Murphy and F. Welch, *Journal of Labor Economics*, vol. 8, no. 21, 1990, pp. 202–29.

- "Estimates of Earnings Growth Rates Based on Earnings Profiles," by R. F. Gilbert, *Journal of Legal Economics*, vol. 4, no. 2, 1994, pp. 1–19.

- "Income Distribution Issues Viewed in a Lifetime Income Perspective," by Milton Moss, National Bureau of Economic Research. www.roiw.org/1978/119.pdf.

## Lost Income From Other Sources

An individual's income from other sources, such as rental properties, interest, dividends, or royalties, may be examined to determine if it was affected by the loss event. Similarly, the loss event may cause the individual to incur additional expenses that would not have been incurred but for the loss event.

> **Example 1.** Before the loss event, the claimant performed management and repair services for rental properties owned, but is unable to perform these services after the event. The cost of hiring an outside maintenance or management company may represent an increased expense and may be a monetary loss to the claimant.

> **Example 2.** Before the injury, the claimant earned royalty income from a textbook that required periodic updating in order to be marketable. The cost to hire another person to perform this service would represent an increase expense and may be a monetary loss to the claimant.

## Fringe Benefits

Lost fringe benefits may also represent an element of loss. Typical fringe benefits may include the following:

- Employer contributions to stock option, profit sharing, and retirement plans

- Employer contributions for health, life, and disability insurance premiums

- Expense account allowances that reimburse living expenses [fn 9]

- Paid time not worked for vacations, holidays, and sick leave [fn 10]

- Educational assistance

- Section 125 (cafeteria) plans

---

[fn 9]  For example, an offshore worker may receive an allowance for living away from home as additional compensation.

[fn 10]  These items are typically included in the salary component, but accumulated unpaid amounts may be an additional element of loss for damages involving individuals.

24          © 2020, Association of International Certified Professional Accountants

USA-016154

- Child care assistance

- Employer contributions for Social Security, workers' compensation, and unemployment insurance. [fn 11]

Fringe benefit information may be obtained directly from the employer of the injured party. A union member's fringe benefits may be obtained from the union contract. National studies are also available from the Department of Labor [fn 12] and the U. S. Chamber of Commerce. [fn 13]

Working-condition fringe benefits lost as a result of personal injury, wrongful death, or employment termination are generally valued as of injury or incident date and projected over the period of loss. The period of loss may be the work life expectancy, front-pay period, or may end when alternative employment is obtained. Some fringe benefits are provided during retirement, thus extending the loss period through life expectancy. [fn 14]

Once the value of the benefit and the period of loss are determined, the lost benefit is quantified by applying growth and discount factors. The lost benefit may be based upon the cost to the employer, the value to the employee (replacement cost), or based upon an amount obtained from national studies. Lost fringe benefits may be computed as a percentage of compensation in the base year with future growth equal to the same growth rate that is applied to the salary. [fn 15] is growth rate is then applied uniformly to each year in which wages were lost. This method, however, may result in errors and should be carefully considered. The following examples illustrate errors that may result when lost fringe benefits are computed as a percentage of annual lost earnings:

> **Example 1.** The claimant obtains new employment, but at a reduced level of compensation. The new employment provides the same number of days for vacations, holidays, and sick leave. This fringe benefit has been replaced; however, the percentage method of establishing lost fringe benefits may provide a loss and overstate the total loss.

> **Example 2.** Employer contributions for Social Security provide insurance for old age, survivors, disability, and health. The portion allocated to health insurance may not represent a lost fringe benefit because once a person qualifies for Social Security, he or she receives the health insurance benefit regardless of the dollar amount contributed on his or her behalf. The percentage method of establishing lost fringe benefits may provide a loss and overstate the total loss.

---

[fn 11] Note that the lost fringe benefit, if any, for employer contributions for Social Security is not equal to the contribution by the employer. The lost fringe benefit, if any, may be measured by comparing the claimant's expected Social Security benefit before and after the loss event, but this element of damage may not be recoverable. The U.S. Supreme Court has ruled in several cases that Social Security benefits should not be included in projections of damages related to lost earnings. (See chapter 7, "Selected Court Cases.")

[fn 12] Department of Labor, "Monthly Labor Review."

[fn 13] U. S. Chamber of Commerce, "Employee Benefits."

[fn 14] Health insurance coverage provided after retirement as part of a retirement package is an example of a fringe benefit that is extended beyond work life.

[fn 15] The application of a percentage to determine lost fringe benefits should be evaluated for reasonableness. The rate of earnings growth may not be the same rate of growth in fringe benefits.

© 2020, Association of International Certified Professional Accountants

25

USA-016155

Alternatively, lost fringe benefits may be computed as a specific dollar amount in the year of injury or incident with growth factors applied separately over each year of work life expectancy or life expectancy, depending on the benefit provision. This method may also result in error when the fringe benefit would not have been lost over the entire work life expectancy or life expectancy.

> **Example 3.** Connie's employer provided her medical care coverage before her personal injury. The value of this benefit was $1,500 per year. She obtains new employment, but at a reduced level of compensation. The new employment also provides medical care coverage. Connie may have lost earnings, but the fringe benefit has been replaced.

## Fringe Benefits — Lost Retirement Benefits

Lost retirement benefits relate to employment fringe benefits of employer-funded retirement plan contributions. The employer contribution may be to a defined contribution or a defined benefit retirement plan. [fn 16]

The loss of contributions to defined contribution retirement accounts may include two elements of loss. The annual employer contribution that would have been made for the employee's benefit is lost; an additional loss may include the amounts these contributions would have earned.

Defined benefit retirement plans typically provide payments based on average compensation and the number of years worked for the employer. A shortened work life may result in a lower defined benefit retirement payment because the number of years worked is an element of the defined benefit compensation calculation. Calculation of the loss will compare the benefit to be provided with the benefit that would have been provided from retirement through life expectancy. Employee contributions that would have been made during work life reduce this lost benefit.

## Household Services

Household services that can no longer be performed due to personal injury may represent another component of personal damages. Examples of household services include home maintenance and repairs, managing finances, child care, housekeeping, cooking, and shopping.

Household services may be lost for the past and future loss periods, and may extend beyond the work life of the injured party. Measurement of the loss is typically based on the replacement cost to employ someone to perform the services the injured party can no longer perform. The actual amounts spent during the past economic loss period are combined with the amounts expected to be expended over the future economic loss period to determine the loss of household services due to the injury.

Studies have been performed that measure the value of household services. Information from these studies may be used to estimate the value of household services lost but for the injury. [fn 17] Some courts have disallowed claims for household services because there was no proof that any household services were

---

[fn 16] The employer also contributes to Social Security; however, employer contributions into Social Security do not necessarily correlate with future payments.

[fn 17] "The Dollar Value of a Day," published by ExpectancyData (www.expectancydata.com), provides estimates of time spent on various household tasks. See also *Determining Economic Damages*, by Gerald D. Martin, Chapter 6, Rev. 24, 8/12.

© 2020, Association of International Certified Professional Accountants

USA-016156

performed. [fn 18] Before including damages for such household services, the practitioner should ensure the services were previously provided by the injured party.

## Medical and Rehabilitation Expenses

Medical and rehabilitation costs related to the injury may be an element of the loss calculation. The past medical and past rehabilitation costs are generally based on actual costs incurred and should be supported by invoices or other corroborative documentation. Expected future medical and rehabilitation costs may be computed using reports and other data provided by medical and rehabilitation experts. [fn 19]

- The following may be considered in computing future medical costs: The nature of the injury and the expected duration

- The effect, if any, of the injury to the individual's life expectancy

- Past medical and rehabilitation costs (as an indicator of future costs)

- Testimony or reports by medical or rehabilitation experts

- A growth rate developed specifically for medical costs, which may be different from the growth rate applied to earnings

The report of the vocational rehabilitation expert may include information regarding costs for retraining expenses or additional education to enable an injured party (who is unable to return to his or her previous job) to obtain new employment. Records of actual amounts spent by the injured party for such expenses may also be available.

- Medical life care plans provide reports of expected future medical costs and are prepared by experts in this field. The practitioner may use information in the medical life care plan to project the future value of medical costs using the medical consumer price index or other studies of historical and future medical costs. Issues to consider when using a medical life care report include the following: Would the costs listed in the report have been incurred regardless of the injury or incident (for example, routine checkups or drugs prescribed for issues not related to the injury or incident)? Costs unrelated to the incident are not typically recoverable.

- Are the future medical costs described in the life care report as possible or probable? Possible future medical costs may not be recoverable.

---

[fn 18] For example, see *Tivoli v. United States* (S.D.N.Y. 1997), and *Hernandez v. M/V. Rajaan*, 841 F.2d 582 (5th Cir. 1988).

[fn 19] Such experts may include medical and vocational rehabilitation experts.

© 2020, Association of International Certified Professional Accountants

USA-016157

## Past Losses and Future Losses

The claimant's losses should be calculated as of a certain point in time, usually the trial date. [20] Losses sustained from the date of injury to the trial date are referred to as *past losses*. Losses sustained from the trial date through the loss period are referred to as *future losses*. The loss period may extend through the claimant's expected work life or life expectancy, depending on the type of loss that is sustained. [21] Past losses are distinguished from future losses because past losses are not discounted or increased to present dollar amounts. Past losses are generally computed through the trial date, and then prejudgment interest may be added to reflect the value plus interest as of the trial date. [22] Additional adjustments to past losses are generally not necessary. Future losses are computed through the remainder of the loss period, which may consist of the work life expectancy, life expectancy, or other time period and then discounted back to the trial date, based on the appropriate discount rate.

## Work Life Expectancy

Work life expectancy represents the number of years the claimant would have worked but for the loss event. This number is generally taken from tables provided by or based upon data of the Bureau of Labor Statistics (BLS). The BLS work life tables vary according to age, ethnic background, gender, and education level. [23] The BLS data is based upon statistical studies of years that individuals spend in the workforce. The U.S. Department of Labor developed work life tables based upon BLS data, but its most recent tables rely upon data from 1979 to 1980.

More recent data has been used by economists to compile tables using the BLS methodology. Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger have provided the most recent tables using the BLS methodology [24] (Skoog, Ciecka, and Krueger work life tables). [25] The Skoog, Ciecka, and Krueger work life tables are based on the population survey for years 2005–2009 and provide work life expectancies for eight levels of education, with variations for workers who are inactive, part time, or full time in the workforce.

---

[20] The losses may be calculated as of the date of the report or other reference date instead of the date of the trial if the date of the trial is uncertain.

[21] The loss period will not necessarily extend throughout the work life expectancy or life expectancy, and the particular facts of the case will determine the loss period. For example, a claimant may find employment to replace or partially replace amounts lost, and replacement amounts may in some instances exceed amounts lost.

[22] The applicability of judicial interest and the applicable rate or rates will vary by jurisdiction.

[23] U.S. Department of Labor, BLS, "Worklife Estimates: Effects of Race and Education," Bulletin 2254 (Feb. 1986). These tables are based on data from 1979–80, and there are presently no plans by the Department of Labor to update them.

[24] "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points and Bootstrap Standard Errors" by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger, *Journal of Forensic Economics* 22(2), 2011, pp. 165-229.

[25] The 2006 Krueger, Skoog, and Ciecka work life tables are available at http://fac.comtech.depaul.edu/jciecka/12-KRUEGER-SKOOG-CIECKA%20GALLEY.pdf.

    © 2020, Association of International Certified Professional Accountants

USA-016158

These Skoog, Ciecka, and Krueger work tables do not vary with occupation but instead represent the average time a person is expected to be in the labor force, regardless of occupation. These work life tables represent the number of years that men and women are expected to be in the workforce, but not which specific years will be spent working. [fn 26]

Some calculate work life by assigning probabilities for work life expectancy, probabilities for life expectancy, probabilities for employment, and calculate damages based on these probabilities. This is called the "LPE Method" (life, participation, and employment) with "L" for the probability an individual will be alive in any given year; "P" for the probability the individual, if alive, will be a participant in the labor market in any given year; and "E" for the probability the individual will be employed, if alive and a labor participant, in any given year. A life table is used to calculate "L," and employment statistics are used to calculate "P" and "E." [fn 27]

### Work Life Expectancy for Special Circumstances or Specific Occupations

Consideration may be given to the occupation of the individual and particular circumstances with respect to that occupation. An individual's personal situation may also be evaluated to determine if modification should be made to the work life expectancy determined from the work life tables.

The practitioner should exercise caution if using a work life assumption that is arbitrary, not relied upon by peers, and not supported by a reliable statistical table. Testimonies and calculations based on work life tables for special circumstances (such as disability) [fn 28] or specific occupations (such as oil field workers) [fn 29] have been limited or excluded by some courts.

## Life Expectancy

Life expectancy represents the statistically based number of years the injured party would have lived, but for the loss event. This number is generally determined from reference to tables prepared by the Vital Statistics Division of the National Center for Health Statistics, [fn 30] and these tables vary according to age, ethnic background, [fn 31] and gender. The life expectancy tables show the average number of years of

---

[fn 26] The work life tables are based on average life expectancy, and this assumes that the individual would be expected to live an average life span. Modification of the work life expectancy may be considered for persons who would not be expected to live an average life span.

[fn 27] See "Worklife and LPE," by Michael L. Brookshire and George A. Barnett (2009), published in *Determining Economic Damages*, by Gerald D. Martin, Rev. 24, August 2012, pp. 12-41 to 12/51. See also "Why Markov Process Worklife Expectancy Tables are Usually Superior to the LPE Method," by Thomas R. Ireland, *Journal of Legal Economics* 16(2): pp. 95-110.

[fn 28] For example, see *Phillips v. Industrial Machine*, 257 Neb. 265; 597 N.W.2d 377 (1999).

[fn 29] For example, see *Marcel v. Placid Oil Company*, 11 F. 3d 563 (5th Cir. 1994).

[fn 30] "National Center for Health Statistics, Vital Statistics of the United States," Department of Health and Human Services, www.cdc.gov/nchs.

[fn 31] Tables for all males and all females are provided along with tables for males and females classified as White, Black, Hispanic, non-Hispanic white, and non-Hispanic black.

© 2020, Association of International Certified Professional Accountants

USA-016159

life remaining for persons who have attained a given age and the probability of dying from year 0 to 100 and 100 and over. The tables are updated annually. [fn 32]

Lost earnings may be measured over the work life of the claimant or injured party or a shorter time period, but other elements of loss may extend over the life expectancy. Medical expenses are an example of costs that may extend over life expectancy. Lost retirement benefits are also an element of loss that may be measured over life expectancy if the retirement benefits would have been paid over the lifetime of the claimant or injured party.

Consideration should be given to life expectancy both before and after the injury is sustained. The injury may cause a shortened life expectancy; estimates of a shortened life expectancy by other experts would be necessary to perform calculations using a shortened life expectancy.

The spouse's life expectancy may be relevant when measuring damages that include the spouse. For example, calculation of the value of lost household services may require consideration of the spouse's life expectancy.

> **Example.** The injured party alleges cooking meals for the spouse can no longer be performed. The injured party has a life expectancy of 25 years at the injury date, but the spouse has a life expectancy of 12 years at the injury date; the loss attributed to cooking meals for the spouse would end no later than 12 years from the injury date.

## Other Loss Measurement Periods

It may be appropriate to use a period other than work life or life expectancy in measuring damages involving individuals. The particular facts of the case will dictate if this is appropriate and the practitioner should ensure that any other period selected to measure loss will not be considered arbitrary and, therefore, not reliable.

Employment discrimination and wrongful termination cases may consider losses over a specific time period before trial (back pay) and after trial (front pay) with hiring counsel providing the time period to consider. The U.S. Equal Employment Opportunity Commission provides the following description of front pay: [fn 33]

> Front pay is an equitable remedy, an element of the "make whole" relief available to victims of employment discrimination. "Make whole" relief includes all actions necessary to make a victim of discrimination whole for the discrimination suffered, by placing the individual as near as possible in the situation he or she would have occupied if the wrong had not been committed.

> A distinction is to be made between front pay, which is an equitable remedy, and the loss of future earning capacity, which is in the nature of compensatory damages.

---

[fn 32] The United States Life Tables, 2008, National Vital Statistic Reports, Volume 61, Number 3 (published in September 2012), may be accessed at www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf.

[fn 33] www.eeoc.gov/federal/digest/xi-7-4.cfm.

30        © 2020, Association of International Certified Professional Accountants

USA-016160

## Measurement Date for Work Life and Life Expectancy

Measurement of work life at the date of the injury [34] or loss event is supported in several case opinions, [35] however, some practitioners use the trial date to measure work life expectancy. When the trial date is within a few years of the injury or loss event date, there will not be much difference in the results. However, the further the trial date extends from the injury or loss event date, the greater the difference. For example, a 50 year old male with some college education has a remaining work life of 13.29 years, using data from the Skoog, Ciecka, Krueger work life tables. If the trial date does not occur for 7 more years and trial date is used to measure work life, the same individual will have a work life of 15.65 years, using data from the Skoog, Ciecka, Krueger work life tables (8.65 years at age 57 plus the 7 years that have elapsed from injury or loss event date to the trial date.)

## Personal Consumption and Personal Maintenance

Personal consumption or personal maintenance may be considered in calculations involving wrongful death. The monetary amount that would have been used by, or on behalf of the decedent, and which does not benefit other family members may provide a reduction to be taken into consideration in calculation damages in wrongful death cases. This calculation does not apply to all jurisdictions.

Personal consumption is the amount a person spends on or on behalf of one's self and, as a result, would not be available to one's survivors. Personal consumption may also be considered in cases other than wrongful death when personal expenses of the individual are reduced or compensated, as a result of the injury. [36]

Examples of personal consumption include amounts spent on food, clothing, medical expenses, entertainment, and vacations to the extent these amounts are allocable only to the decedent. Families often share these items; therefore, an allocation may be made to establish the amount attributable only to the decedent. Personal maintenance is generally a narrower provision that includes only the amounts required to maintain an individual in healthy condition.

The past annual amounts spent on, or on behalf of, the claimant provide strong evidence for the personal consumption expenses. Many families, however, do not maintain documentation related to the amount of family income used exclusively for each family member; therefore, figures are often based on studies of the average consumption of individuals. Certain government studies provide the average percentages

---

[34] *Pfeifer v. Jones & Laughlin Steel Corporation*, 678 F.2d 453 at 34 (1982). "Damages resulting from the impairment of earning capacity and the probable loss of earnings must be measured on the basis of life expectancy at the time of injury." See http://openjurist.org/678/f2d/453/no-81-1928.

[35] See "Date of Injury or Date of Trial: A Comment on Work Life Expectancy Calculations," by Jules A. Townsend, *Litigation Economics Digest*, Summer 1997, pp. 169–171. http://nafe.net/assets/files/resources/ler_articles/l2_2_8.pdf. See also *Osburn v. Anchor Laboratories*, 834 F.2d 425 (5th Cir. 1987); *Crador v. Louisiana Department of Highways*, 625 F.2d 1227 (5th Cir. 1980); and *Charles H. Tompkins Company v. Louis*, 566 A.2d 1074 (D.C. 1989).

[36] For example, an injured party requires lifetime care in a nursing home due to an injury. Personal expenses, such as food and living expenses, will be provided by a nursing home, and these expenses have been compensated in the medical expense calculation. A personal consumption adjustment may be made to the lost earnings to reflect the compensation of the food and living expense included as part of medical expenses.

© 2020, Association of International Certified Professional Accountants

USA-016161

and dollar amounts of household income consumed by each family member. [fn 37] Studies have also been performed that provide percentages of household income consumed by each family member.

The study performed by Earl Cheit, *Injury and Recovery in the Course of Employment* (1961), was the first study which was widely accepted in determining the percentage of personal consumption. Other studies have expanded the Cheit study, such as those by Michael R. Ruble, Robert T. Patton, and David M. Nelson. [fn 38] Such studies show the percentage of income consumed by a male or female by income level, based upon family size. [fn 39]

An analysis of the components of personal consumption should be performed to ensure no items representing savings are included in personal consumption, no items are included that are compensated for elsewhere, and the treatment of income tax is indicated. A deduction for personal consumption or personal maintenance may apply to other elements of loss, such as fringe benefits or household services. When a reduction is made for consumption or maintenance, consider the effect on the calculation of all elements of monetary loss.

Jurisdictional issues should be considered before calculating personal consumption or personal maintenance reductions to damage calculations. A personal consumption or personal maintenance reduction will generally apply in federal wrongful death cases, but you should discuss the personal consumption or personal maintenance application with counsel before making this assumption. For example, a case may be tried in federal court, but foreign or state law may be applicable. The foreign or state law may govern the consideration of consumption or maintenance. Some states allow no reduction for consumption or maintenance, and some states allow reduction for only the amount that would have been necessary to maintain the deceased individual in healthy condition (maintenance) rather than reduction for the amount the individual would have personally consumed.

Deductions for consumption may extend beyond work life; however, some states limit deductions to the work life expectancy period. Some states do not have sufficient case law to clearly establish if a reduction should be applied or how the reduction is to be determined. Counsel should be consulted for guidance in these instances.

## Growth Rate

A rate of growth is generally applied to the base elements of the loss claim to calculate the loss over the loss period. The rate of growth may be established by analysis of current economic data, reference to historical information of the injured party, employer or industry data, and national and international statistics.

The consumer price index (CPI) [fn 40] represents the rate of change in prices. The yearly change in the CPI represents the annual rate of price inflation and provides inflation and growth in wage and price in-

---

[fn 37] BLS, "Revised Equivalence Scale."

[fn 38] "Patton-Nelson Personal Consumption Tables 2005-06," *Journal of Forensic Economics* 20, no. 3(2009): 217–25.

[fn 39] See also Kurt V. Krueger, *Journal of Forensic Economics* 22, no. 2: 143–163, for a study of the personal consumption of single persons.

[fn 40] The BLS publishes detailed reports of the consumer price index (CPI), and the data is available on its website, www.bls.gov/cpi.

            © 2020, Association of International Certified Professional Accountants

USA-016162

formation. Inflation is generally considered when determining and applying growth and discount rates used to calculate the present value of lost earnings of an individual. When calculating the present value of future lost earnings, growth and discount rates can be applied either in "nominal" terms (inclusive of an inflation factor) or in "real" terms (excluding inflation), provided the treatment of inflation is consistent between the discount and growth rates. Past lost earnings are not discounted or adjusted for the time value of money. Certain jurisdictions, however, dictate statutory prejudgment interest rates that are applied to losses incurred before trial.

## Earnings Growth Factors

Earnings growth factors (which may be positive or negative) are used to project earnings into the future. Earnings growth may be projected at the level of expected inflation, or may include projections for merit or productivity increases.

Growth rates that do not include the effects of inflation are referred to as "real" rates and growth rates that include the effects of inflation are referred to as "nominal" rates. The formulas to calculate the real and nominal rates are as follows: [fn 41]

$$\text{Real Rate of Growth} = [(1 + \text{Nominal})/(1 + \text{Inflation})] - 1$$

$$\text{Nominal Rate of Growth} + [(1 + \text{Real}) \times (1 + \text{Inflation})] - 1$$

Specific information on the industry in which the claimant was working, or would have been working, may provide information on the future outlook and expected future growth of wages and benefits. Past earnings growth may also be analyzed to determine any trend for future growth of wages and benefits.

The employment cost index (ECI) [fn 42] attempts to measure the total change in wages and compensation throughout the workforce. The ECI measures changes in compensation costs, which include wages, salaries, and employer costs for employee benefits. The BLS reports useful data regarding the ECI. For example, a BLS report in December 2012 [fn 43] stated:

> Compensation costs for private industry workers increased 1.9 percent over the year. In December 2011 the increase was 2.2 percent. Wages and salaries increased 1.7 percent for the current 12-month period, essentially unchanged from the 12-month period ending December 2011, which was 1.6 percent. The increase in the cost of benefits was 2.2 percent for the 12-month period ending December 2012, down from the December 2011 increase of 3.6 percent. Employer costs for health benefits increased 2.8 percent over the year. In December 2011 the increase was 3.5 percent.

Government publications such as *Employment and Earnings*, published monthly by the Department of Labor, provide historical wage and earnings information. The *Economic Report of the President* is pub-

---

[fn 41] *Stocks, Bonds, Bills and Inflations: Valuation Edition 2012 Yearbook* (Chicago: Ibbotson Associates).

[fn 42] www.bls.gov/news.release/eci.toc.htm.

[fn 43] www.bls.gov/news.release/eci.nr0.htm.

© 2020, Association of International Certified Professional Accountants

USA-016163

lished annually and may also provide growth information. The *U.S. Industry & Trade Outlook* is published annually by the Department of Commerce and provides information on U.S. industries.

## Other Growth Factors

Different rates may be used to grow the various components of a claim. Growth rates should generally be supported by empirical data. Medical expenses, for example, may be projected into the future based on the medical care cost index (published by the Department of Labor), [fn 44] whereas household services may be projected into the future based on the CPI. The specific facts of the case will be the guide in selecting the factors to use in establishing growth.

## Consideration of Income Taxes

The jurisdiction governs the treatment of taxes in calculating damages, and counsel may be consulted to determine if calculations should be adjusted for income taxes. The U.S. Supreme Court addressed this issue in 1980 in *Norfolk & Western Railway Co. v. Liepelt* [fn 45] and held that lost earnings in a wrongful death action should be estimated on an after-tax basis. Some jurisdictions allow damages to be presented without regard to taxes because there may be an offsetting effect. This is based on the argument that a tax adjustment on income that would have been earned is offset by the tax adjustment on the award. The income tax attributable to lost income is deducted; however, the damage award is increased by the allocable income tax.

The taxation of damage awards varies. Compensatory damages arising from the tort claims of personal injury or wrongful death are excluded from income taxation under Section 104(a)(2) of the Internal Revenue Code. Punitive damages may be excluded from income taxation when awarded in a civil action that is a wrongful-death action, provided applicable state law specifies that only punitive damages may be awarded in such an action. The Small Business Job Protection Act of 1996 clarifies that damages awarded that do not result from personal physical injury will not be excluded from income taxation and, therefore, will be taxable. The law further clarifies that emotional distress shall not be treated as a physical injury or physical sickness.

## Discounting Losses to Present Value

The base elements of the loss claim, as adjusted to reflect growth over the loss period, are discounted to present value to provide the lump sum representing the future loss. Generally, the discount rate represents the rate at which the claimant or the survivors can invest the lump sum with no risk of loss. Courts have referred to this as the rate from the "best and safest investments." [fn 46] Interest-bearing U. S. government securities may be selected for this purpose. U.S. government bills have a term of one year or less (short-term securities), U.S. government notes have terms from 1 year to 10 years (intermediate-term securities), and U.S. government bonds have maturities from 10 years to 30 years (long-term secu-

---

[fn 44] Medical care price changes are measured by the BLS as one of the eight major groups in the CPI. Medical care is classified into medical care commodities (medicinal drugs and medical equipment and supplies) and medical care services (professional services, hospital and related services, and health insurance).

[fn 45] 444 U.S. 490 (1980).

[fn 46] *Chesapeake & Ohio R. Co. v. Kelly*, (241 U.S. 485 [1916]), and *Jones & Laughlin Steel Corp. v. Pfeifer*, (462 U.S. 523 [1983]).

© 2020, Association of International Certified Professional Accountants

USA-016164

rities). The period of loss may be used as the basis for to select the security term, although some may use short-term securities regardless of the period of loss. [fn 47]

Some state jurisdictions provide that the rate of growth equals the discount rate and, therefore, fully offset each other. This is known as the "Alaska method" or total offset method, and the base losses are summed over the loss period to provide the total loss. Most jurisdictions do not allow the total offset method and this method will not apply in federal cases, because the U.S. Supreme Court has held that the Alaska method will be accepted only if the evidence supports that the rate of growth does in fact equal the rate of discount. [fn 48]

Some jurisdictions allow a "partial offset rate" or a "net discount rate" to discount future amounts to present value. This method provides that historically, the discount rate has exceeded the growth rate by a set percentage, and therefore this net figure is applied to determine the loss.

Some elements of compensation are subject to higher risk than other forms of compensation. For example, stock options or other incentive-based compensation may be less certain to be received by an employee when compared with a set salary. Accordingly, the loss of such compensation in, for example, an employment discrimination case may be discounted to reflect this additional risk.

## Use of Scenarios

It may be appropriate to provide more than one scenario when calculating damages to individuals to illustrative alternative considerations to the numerous potential inputs to the damage model. For example, one scenario may be based on the plaintiff receiving future employment promotions and another scenario may be based on the plaintiff receiving future employment raises in compensation, but no future promotions.

Scenarios with alternative calculations should be based upon reasonable assumptions. [fn 49]

---

[fn 47] Federal Reserve Statistical Release provides yields on U.S. government securities and may be accessed at www.federalreserve.gov/releases/h15/current.

[fn 48] *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983).

[fn 49] For example, see *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir 1993), where the court found all four earnings loss scenarios speculative and excluded the testimony. http://openjurist.org/999/f2d/549/joy-v-bell-helicopter-textron-inc-allison-gas-turbine-division-of-general-motors-corp. See also *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230 (5th Cir, 1986), for an example of excluded testimony because of unreasonable assumptions. http://openjurist.org/795/f2d/1230. Also see *Heath Wallace, D.D.S., LLC et al. v. Kalniz, Choksey Dental-Ralston, Inc. et al.*, Court of Appeals of Ohio, Sixth Appellate District, Wood County, 2013 Ohio 2944; 2013 Ohio App. LEXIS 2987 (2013).

© 2020, Association of International Certified Professional Accountants

35

USA-016165

# Chapter 6

## *Presenting Findings*

## Report Preparation or Other Disclosures

The forensic practitioner should be aware of any required due dates related to the litigation, including the report due date. The practitioner's findings will frequently be presented in a written report; however, a written report should not automatically be issued unless requested and authorized by the hiring attorney. A written report is required for matters subject to the Federal Rules of Civil Procedure, but is not required in all jurisdictions. The practitioner may want to discuss preliminary findings with hiring counsel before providing a draft or final report.

The hiring attorney may request that the forensic practitioner critique the report of someone hired by the opposing party. The critique may be a part of the practitioner's report of findings, or it may be issued as a separate report. The critique may address the methodology employed, the assumptions made, and the calculations of the person hired by the opposing party.

## Demonstrative Exhibits

The forensic practitioner may wish to provide demonstrative exhibits with the report to illustrate calculations. Demonstrative exhibits include charts, graphs, and summary tables. Hiring counsel may request that demonstrative exhibits be included in the report to ensure that these exhibits may be used in trial. Exhibits usually may be created after the report due date if the exhibits illustrate information in the report. The practitioner should be aware of any production deadlines for exhibits to be used in trial so that there is sufficient time to prepare exhibits with hiring counsel.

## Testimony

Generally, once the forensic practitioner has submitted findings, the opposing party will request the opportunity to take the practitioner's deposition. Leading up to the deposition, the opposing party may request access to some or all of the practitioner's files associated with the practitioner's calculations and findings. The practitioner should consult with the hiring attorney to understand the obligations to produce such files.

The forensic practitioner should be prepared to discuss and disclose all cases in which deposition or trial testimony was given over the past four years, as required under Rule 26 of the Federal Rules of Civil Procedure or similar state rules. A record of such cases should be maintained for required disclosure purposes. The practitioner may be asked to provide the name of the case, the court, and the attorney(s) in the case. The practitioner may also be asked to disclose the areas of expertise recognized and accepted in each case.

The opposing attorney may use testimony that the forensic practitioner has given in other cases to illustrate inconsistent positions taken. Any testimony that the practitioner provides in deposition or trial may be discovered by the opposing counsel. The opposing attorney may use publications or other materials authored by the practitioner or other members of the practitioner's firm to attempt to illustrate that the practitioner has not followed a methodology that either the practitioner or someone in the practitioner's firm has endorsed.

 © 2020, Association of International Certified Professional Accountants

USA-016166

**Deposition Testimony**

Preparation for deposition testimony requires careful study of calculations and the materials relied upon to perform calculations. It may be helpful for the practitioner to consider relevant deposition testimony and relevant reports prior to the practitioner's deposition.

The following provides examples of deposition questions that may be asked about calculations and the methodology employed:

- What are the relevant AICPA professional standards that apply to the calculation damages involving individuals?

- Did you apply these standards in this case?

- What are the authoritative textbooks in the determination of damages involving individuals?

- What assumptions did you make in formulating your opinion in this case?

- Are all assumptions and projections reasonable in comparison to the actual facts in this case?

- How did you verify your projection of losses?

**Trial Testimony**

The forensic practitioner will usually explain the elements of calculations in direct testimony by answering questions from the hiring attorney. It is usually helpful for the practitioner to use charts and graphs to explain testimony. The opposing attorney will cross examine testimony and attempt to show deficiencies in the calculations to the trier of fact. The hiring attorney may ask additional questions, redirect examination, after cross examination to clarify issues that may have been raised in cross examination. The practitioner also may be asked to provide rebuttal testimony in a trial to dispute the testimony of another trial expert.

The trier of fact may not be familiar with income tax and financial statement terms that are commonly used by accountants such as *Form 1040*, *C Corp*, and *amounts incurred*. The forensic practitioner should provide trial testimony in language that nonaccountants should understand.

# Testifying Traps

Testifying traps include opining in areas beyond expertise, refusal to admit an obvious mistake, arguing with opposing counsel in an unprofessional manner, and advocating beyond opinions. The forensic practitioner should study his or her own deposition testimony prior to trial and consider whether opinions that will be offered at trial differ from answers provided in deposition testimony. The practitioner should not take offense to the questions asked by the opposing attorney and should answer in a professional and courteous manner. If the opposing attorney refers to a document that the practitioner has not studied, the practitioner should ask for the opportunity to read and consider the document. The practitioner should not let the opposing attorney mischaracterize deposition testimony by taking something out of context. The practitioner should not let his or her objectivity and integrity be compromised, and the practitioner should always tell the truth.

© 2020, Association of International Certified Professional Accountants

USA-016167

# Chapter 7

## *Selected Court Cases*[fn 1]

### *Daubert*

The United States Supreme Court ruled in the seminal case of *Daubert v. Merrell Dow Pharmaceutical, Inc.* (509 U.S. 579 [1993]) that four factors should be considered in determining the admissibility of scientific evidence:

- Whether the theory or technique can be or has been tested

- Whether the theory or technique has been subjected to peer review and publication

- Whether there is a high known or potential rate of error with respect to the theory or technique, and whether there are standards controlling the technique's operations

- Whether the theory or technique enjoys generally acceptance within the relevant scientific community

Subsequent court cases raised the issue of applicability of the *Daubert* rules to all expert testimony and this was resolved in *Kumho Tire Co. v. Carmichael* (526 U.S. 137 [1999]). The Supreme Court applied its holding in *Daubert* to all expert testimony and required that such testimony be relevant and reliable before it is admitted.

The following cases provide examples of cases in which testimony was excluded or limited because the courts found that unusual or unacceptable methodology was used:

*Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993). A forensic practitioner calculated and testified to the value of partnerships by taking only their past but not their future cash flows into account. Appellate decision cited *Daubert* and held that this methodology was not typically used by experts in the field and therefore was unreliable.

*Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F. 3d 1139 (7th Cir. 1998). Appeals Court ruled that the district court did not abuse its discretion in applying the *Daubert* factors to exclude the expert report of the valuation and economic damages expert. Target relied upon a report prepared by an accountant and business appraiser from an international accounting firm. ADVO argued the report was "based upon utterly implausible assumptions and unreliable methodology." The district court found that "no reasonable inference of lost profits could be drawn" from the report's assumptions and excluded the report under the *Daubert* factors.

*Terrell v. Childers*, 920 F. Supp 854, 862 (ND Ill. 1996). An expert based opinions solely on personal experience and what that practitioner would have done in a given situation. It was held

---

[fn 1]  The source for many of the selected court cases is "Legal Decisions of Interest to Forensic Economists," by Thomas Ireland, Ph.D. See www.umsl.edu/~irelandt/.

          © 2020, Association of International Certified Professional Accountants

USA-016168

that testimony relating to an investment adviser's performance must compare the adviser's performance to the industry standard and not to a "this is what I would have done" standard.

*Marcel v. Placid Oil*, 11 F 3d. 563 (5th Cir. 1994). Exclusion of work life expectancy test based on a study that failed to compare work life with national averages or work life in other occupations.

*Hopper v. M/V UBC Singapore*, 2010 U.S. Dist. LEXIS 70716 (S.D. Tex. 2010). Testimony of economist was excluded because the earnings used to project lost earnings was not supported by payroll data, all applicable taxes were not deducted, and personal consumption deduction not properly calculated.

*Heath Wallace, D.D.S., LLC et al v. Kalniz, Choksey Dental-Ralston, Inc. et al*, 2013 Ohio 2944; 2013 Ohio App. LEXIS 2987 (2013). Assumptions were speculative and unreliable.

Additional sample cases with issues involving the calculation of damages follow.

### Lost Earnings and Lost Income

*Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483 (MS Supreme Court 9/23/10). Projections of earning are required to be based upon sufficient facts or data.

*Pollard v. E. I. Du Pont De Nemours & Company*, 532 U.S. 843; 121 S. Ct. 1946 (2001). Frontpay defined for wrongful termination cases.

### Fringe Benefits

The following cases did not allow lost Social Security benefits as an element of damages related to lost earnings:

*Flemming v. Nestor* (363 U.S. 603 [1960]).

*Richardson v. Belcher* (404 U.S. 78 [1971]).

### Household Services

*Sea-Land Services, Inc. v. Gaudet*, (414 U.S. 573 [1974]). Household services may be considered.

*Tivoli v. United States*, 1997 U.S.Dist Lexis 23356 (S.D.N.Y. [1997]). No proof that household serves were utilized.

### Work Life

*Marcel v. Placid Oil Company*, 11 F.3d 563 (5th Cir. [1994]). Study of work life expectancies of oil field workers not reliable.

*Kenneth Gumbs and Yvonne Gumbs v. International Harvester, Inc.*, 718 F.2d 88 (3rd Cir. 1983). Estimate of future loss was not accompanied by evidence that plaintiff could be expected to work beyond age 65.

© 2020, Association of International Certified Professional Accountants

USA-016169

**Personal Consumption**

*Hopper v. M/V UBC Singapore*, 2010 U.S. Dist. LEXIS 70716 (S.D. Tex. [2010]). Testimony excluded in part because personal consumption was not based on analysis of amount expected to be consumed over extended period of years.

## Consideration of Income Taxes

*Norfolk & Western Railway Co. v. Liepelt*, (444 U.S. 490 [1990]). Taxes should be considered and subtracted from projections of lost earnings in wrongful death actions, with some exceptions.

*United States v. Cleveland Indians Baseball Company* (532 U.S. 200 [2001]). Back pay should be subject to Social Security and Medicare tax.

*Madore v. Ingram Tank Ships*, 732 F.2d 475 (5th Cir. [1982]). Social Security taxes properly subtracted from projections of lost earnings.

The following cases held that negative tax consequences in wrongful termination cases may be considered:

*O'Neill v. Sears, Roebuck and Company*, 108 F. Supp. 443 (E.D. Pa. [2000]).

*Eshelman v. Agere Systems, Inc.*, 2009 U.S. App. LEXIS 1947 (3rd Cir. [2009]).

The following cases rejected consideration of negative tax consequences:

*Shovlin v. Timemed Labeling Sys., Inc.*, 1997 U.S. Dist. LEXIS 2350; 1997 WL 10253 (E.D. Pa. [1997]).

*Tomaso v. The Boeing Company*, 2007 U.S. Dist LEXIS 70001 (E.D. Pa. [2007]).

## Discounting Losses to Present Value

Losses should be discounted to present value using "the best and safest investments."

*Chesapeake & Ohio R. Co. v. Kelly*, (241 U.S. 485 [1916]).

*Jones & Laughlin Steel Corp. v. Pfeifer*, (462 U.S. 523 [1983]).

*Monessen Southwestern Railway Co. v. Morgan*, (486 U.S. 330 [1988]).

© 2020, Association of International Certified Professional Accountants

USA-016170

# Appendix A

## *Bibliography*

### AICPA Publications

AICPA Code of Professional Conduct (AICPA, *Professional Standards*)

AICPA Statement on Standards for Forensic Services No. 1, *Forensic Services: Definitions and Standards* (FS sec. 100)

### Other Publications

Brinig, Brian P., et al., *PPC's Guide to Litigation Support Services*, 17th ed., 2012, Chapter 5, "Damage Studies Involving Individuals," pp. 5-1 to 5-75.

Federal Rules of Civil Procedure, Rule 26.

Federal Rules of Evidence, Rules 702 and 703.

Garner, Bryan A. Editor in Chief, *Black's Law Dictionary*, 8th ed., 2004.

*Journal of Forensic Economics*, National Association of Forensic Economics.

*Journal of Legal Economics*, American Academy of Economic and Financial Experts.

Martin, Gerald D. *Determining Economic Damages*, Rev. 24, August 2012.

Weil, Roman L, Daniel G. Lentz, David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert*, 5th ed., 2012.

### Household Production Studies

The Dollar Value of a Day, www.expectancydata.com.

### Work Life Studies

"The Markov Process of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger, *Journal of Forensic Economics*, 22(2), 2011, pp. 165–229.

"Worklife in a Markov Model with Full-time and Part-time Activity," by Kurt V. Krueger, Gary R. Skoog, and James E. Ciecka, *Journal of Forensic Economics*, 19(1), 2001, pp. 61–82.

"The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," by Gary R. Skoog and James E. Ciecka, *Journal of Legal Economics*, 11(1), Spring Summer 2001, pp. 23–7.

© 2020, Association of International Certified Professional Accountants

USA-016171

"A Markov Process Model of Work-Life Expectancies by Educational Attainment Based on Labor Force Activity in 1997–98," by James Ciecka, Thomas Donley, and Jerry Goldman, *Journal of Legal Economics*, 10(3), Winter 2000-01, pp. 1–21.

"A Markov Process Model of Work-Life Expectancies for Ages 66–75 Based on Labor Force Activity in 1997–98," by James Ciecka, Thomas Donley, and Jerry Goldman, *Journal of Legal Economics*, 10(2), Fall 2000, pp. 27–36.

Bureau of Labor Statistics Worklife Estimates Method, Worklife Estimates: Effects of Race and Education, Bulletin 2254.

42          © 2020, Association of International Certified Professional Accountants

USA-016172

# Appendix B

## *Information That May Assist in Calculation of Personal Damages*

> *Note:* This list is not exhaustive. The actual information relevant to the case will depend on the specific facts and circumstances.

The following is generally obtained for any personal damages engagement:

- Name of claimant

- Date of birth, race, and sex

- Date of injury, death, or incident

- Educational level of claimant

- Professional licenses or certifications held by claimant

- Marital status of claimant

- Spouse's name and date of birth

- Children's names and dates of birth

- Income tax returns

- Forms W-2 and 1099

- Personal employment records

- Medical records

- Vocational report

- Report of independent medical examiner

- Depositions

- The lawsuit complaint or petition; pleadings

- Report of opposing expert

Additional information, records, and documents which may be obtained are detailed in exhibits B-1, B-2, and B-3.

© 2020, Association of International Certified Professional Accountants      43

USA-016173

# Exhibit B-1 — Information That May Be Obtained for Personal Injury Cases

### Employment Information
Job position at time of injury
Employer's name and address
Employer-paid fringe benefits

### Medical Information
Medical history of injured party
Medical treatment as a result of the injury
Continuing medical consequences of the injury
Medical expenses incurred to date
Medical expenses expected to be incurred in the future

### Fringe Benefit Information
Health insurance benefits prior to injury
Retirement benefits prior to injury
Vacation, holiday, and sick leave policy of employer

### Post-Injury Employment
Actual or expected date of return to employment
Actual or expected job upon return to employment
Actual or expected wages upon return to employment

### Personal Information
Amount of time from work missed or expected to be missed as a result of injury
Expected retirement age prior to injury
Expected retirement age after injury
Description of housework and chores performed prior to injury
Hours spent per week on housework and chores prior to injury
Description of housework and chores performed after injury
Hours spent per week on housework and chores after injury
Child-care information, including ages of children and time spent in care and training

# Exhibit B-2 — Information That May Be Obtained for Wrongful Death Cases

### General Information
Educational level of parents and siblings, if decedent was a minor
Work experience of parents and siblings, if decedent was a minor

### Employment Information
Most recent employer of decedent and dates of employment
Job position held as of date of death
Job promotions anticipated with expected compensation
Employer's name and address
Employer-paid fringe benefits

### Medical Information
Medical history of deceased

 © 2020, Association of International Certified Professional Accountants

USA-016174

Medical treatment as a result of the incident. (Details may apply if death was not immediate and medical expenses were incurred.)

**Fringe Benefit Information**
Health insurance benefits prior to injury
Retirement benefits prior to injury
Vacation, holiday, and sick leave policy of employer

**Personal Information**
Expected retirement age of decedent
Description of housework and chores performed prior to death
Hours spent per week on housework and chores prior to death
Child-care information, including ages of children and time spent in care and training

## Exhibit B-3 — Information That May Be Obtained for Employment Discrimination Cases

**Employment Information**
Job position at time of termination or incident
Employer's name and address
Employer-paid fringe benefits
Promotions and pay raises anticipated by injured party
Date of return to employment
Description of employment after incident, including name of employer, date of employment, job title, and job description
Wages of employment after incident
Union contract

**Medical Information**
Medical history of injured party prior to termination or incident
Medical treatment as a result of termination or incident
Continuing medical consequences of the injury
Medical expenses incurred to date
Medical expenses expected to be incurred in the future
(Psychiatric and psychological medical expenses may apply to cases involving employment discrimination.)

**Fringe Benefit Information**
Health insurance benefits prior to injury
Retirement benefits prior to injury
Vacation, holiday, and sick leave policy of employer

**Post-Injury Employment**
Actual or expected date of return to employment
Actual or expected job upon return to employment
Actual or expected wages upon return to employment

**Personal Information**
Amount of time from work missed or expected to be missed as a result of injury
Expected retirement age prior to injury
Expected retirement age after injury

© 2020, Association of International Certified Professional Accountants                    45

USA-016175




IES NCES National Center for Education Statistics    ≡ MENU                    Search    Go

🔲 **FAST FACTS**

## Tuition costs of colleges and universities

**Question:**

What are the trends in the cost of college education?

**Response:**

The total cost of attending a postsecondary institution includes the sum of published tuition and required fees;[1] books and supplies; and the average cost for room, board, and other expenses for each institution. In academic year 2021–22, the average total cost of attendance for first-time, full-time undergraduate students[2] differed by control of institution (public,[3] private nonprofit, or private for-profit) and level of institution (4-year or 2-year). In addition, the average total cost of attendance varied by student living arrangement. A student could live on campus; off campus with family; or off campus but not with family. For example, in 2021–22, the average total cost of attendance for first-time, full-time undergraduate students living on campus at 4-year institutions was higher at private nonprofit institutions ($55,800) than at private for-profit institutions ($32,900) and public institutions ($26,000).[4]

**Figure 2. Average tuition and fees of degree-granting institutions for first-time, full-time undergraduate students, by level and control of institution: Academic years 2010–11 and 2021–22**

Modify figure

Bar  |  Table

[In constant 2021–22 dollars]

| @Model.FigureTemplate.HorizontalLabel | | 2021–22 |
|---|---|---|
| 4-year institutions | | |
| Public | | $9,678 |
| Private nonprofit | | $38,768 |
| Private for-profit | | $17,825 |
| 2-year institutions | | |
| Public | | $3,970 |
| Private nonprofit | | $17,735 |
| Private for-profit | | $15,637 |

☐ 2010–11    ☐ 2021–22

NOTE: Data are for the 50 states and the District of Columbia. Tuition and fees at public institutions are the lower of either in-district or in-state tuition and fees. Excludes students who previously attended another postsecondary institution or who began their studies on a part-time basis. Degree-granting institutions grant associate's or higher degrees and participate in Title IV federal financial aid programs. Data are weighted by the number of students at the institution who were awarded Title IV aid. Title IV aid includes grant aid, work-study aid, and loan aid. Constant dollars are based on the Consumer Price Index, prepared by the Bureau of Labor Statistics, U.S. Department of Labor, adjusted to an academic-year basis. Although rounded numbers are displayed, the figures are based on unrounded data.

SOURCE: U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2011 and Winter 2021–22, Student Financial Aid component; and Fall 2010 and Fall 2021, Institutional Characteristics component. See *Digest of Education Statistics 2022*, table 330.40.

Average tuition and fees[5] were higher in academic year 2021–22 than in 2010–11 for first-time, full-time undergraduate students at public and private nonprofit 4-year institutions (in constant 2021–22 dollars).[6] In contrast, for private for-profit 4-year institutions, average tuition and fees were lower in 2021–22 than in 2010–11. Specifically, average tuition and fees in 2021–22 were

- $9,700 for public institutions, which was 6 percent higher than $9,100 in 2010–11;
- $17,800 for private for-profit institutions, which was 8 percent lower than $19,400 in 2010–11; and
- $38,800 for private nonprofit institutions, which was 14 percent higher than $34,000 in 2010–11.

Similarly, at 2-year institutions, average tuition and fees were higher in 2021–22 than in 2010–11 for public and private nonprofit institutions and lower in 2021–22 than in 2010–11 for private for-profit institutions. Specifically, average tuition and fees 2021–22 were

USA-016176

Case 1:22-cv-00396-LEK-KJM    Document 235    Filed 11/19/24    Page 420 of 432
PageID.8428

IES NCES National Center for Education Statistics    ☰ MENU

- $17,700 for private nonprofit institutions, which was 1 percent higher than $17,600 in 2010–11.

[1] For public institutions, this is the lower of in-district or in-state published tuition and required fees.

[2] Includes only students who are seeking a degree or certificate.

[3] Data for public institutions only include students who paid the in-district or in-state tuition and fees.

[4] Data in this Fast Fact represent the 50 states and the District of Columbia.

[5] Average tuition and fees presented in this Fast Fact are calculated differently from those presented in Loans for Undergraduate Students. Tuition and fees in this Fast Fact are based on reporting for first-time, full-time students, rather than all full-time students.

[6] All dollar amounts in this Fast Fact are expressed in constant 2021–22 dollars. Constant dollars are based on the Consumer Price Index, prepared by the Bureau of Labor Statistics, U.S. Department of Labor, adjusted to an academic-year basis.

**SOURCE:** National Center for Education Statistics. (2023). Price of Attending an Undergraduate Institution. *Condition of Education.* U.S. Department of Education, Institute of Education Sciences. Retrieved August 4, 2023, from https://nces.ed.gov/programs/coe/indicator/cua.

Numbers in figure titles reflect original numeration from source Condition of Education indicators.

## Related Tables and Figures:  (Listed by Release Date)

- 2023, Digest of Education Statistics 2022, Table 330.10. Average undergraduate tuition, fees, room, and board rates charged for full-time students in degree-granting postsecondary institutions, by level and control of institution: Selected academic years, 1963–64 through 2021–22

- 2023, Digest of Education Statistics 2022, Table 330.40. Avg total cost of attendance for first-time, full-time undergraduate students in degree-granting postsec institutions, by ctrl & lvl of institution, living arrangement, & component of student costs: Selected academic yrs, 2010–11 through 2021–22

- 2023, The Condition of Education 2023: Loans for Undergraduate Students and Debt for Bachelor's Degree Recipients

- 2023, The Condition of Education 2023: Postsecondary Institution Revenues

- 2022, Digest of Education Statistics 2021, Table 330.20. Average undergraduate tuition, fees, room, and board charges for full-time students in degree-granting postsecondary institutions, by control and level of institution and state or jurisdiction: 2019–20 and 2020–21

- 2022, Digest of Education Statistics 2021, Table 330.30. Average undergraduate tuition, fees, room, and board charges for full-time students in degree-granting postsecondary institutions, by percentile of charges and control and level of institution: Selected years, 2000–01 through 2020–21

- 2022, Digest of Education Statistics 2021, Table 330.50. Average and percentiles of graduate tuition and required fees in degree-granting postsecondary institutions, by control of institution: 1989–90 through 2020–21

## Other Resources:  (Listed by Release Date)

- 2023, 2019–20 National Postsecondary Student Aid Study (NPSAS:20): First Look at Student Financial Aid Estimates for 2019–20

- 2023, Integrated Postsecondary Education Data System (IPEDS): IPEDS is a system of surveys designed to collect data from all primary providers of postsecondary education.

- 2023, IPEDS College Navigator

- 2023, National Postsecondary Student Aid Study (NPSAS) examines the characteristics of students in postsecondary education, with special focus on how they finance their education.

- 2022, 2017–18 National Postsecondary Student Aid Study, Administrative Collection (NPSAS:18-AC): First Look at Student Financial Aid Estimates for 2017–18

- 2022, College Affordability Views and College Enrollment

- 2021, Postsecondary Institutions and Cost of Attendance in 2020-21; Degrees and Other Awards Conferred: 2019-20, and 12-Month Enrollment: 2019-20

- 2019, Student Financing of Undergraduate Education in 2015–16: Income, Tuition, and Total Price

- 2018, What High Schoolers and Their Parents Know About Public 4-Year Tuition and Fees in Their State

IES NCES National Center for Education Statistics

Explore the Institute of Education Sciences          IES Policies and Standards          Additional Resources

USA-016177

Case 1:22-cv-00396-LEK-KJM   Document 235   Filed 11/19/24   Page 421 of 432
PageID.8429

IES NCES National Center for Education Statistics  ≡ MENU

Publications

Data

Funding

News

NCES

Home

About

Programs

Publications

Data

Data Training

School Search

News

Kids' Zone

NCSER

Peer Review Process

Privacy and Security Policies

Public Access Policy

Contact Us

U.S. Department of Education

USA-016178

*Journal of Forensic Economics* 29(1), 2020, pp. 131-141
© 2020 by the National Association of Forensic Economics

# Update of Educational Attainment Model for a Minor Child: Round 18 of NLSY (1997)

Lawrence M. Spizman and John Kane[*]

## Abstract

This paper updates the ordered probit educational attainment model by Kane, Spizman and Donelson (2013) using round 18 of the National Longitudinal Survey of Youth (1997).

## I. Introduction

The ordered probit educational attainment model was first published in the *Journal of Forensic Economics* in 1992 (Spizman and Kane (SK), 1992). Since that time Kane and Spizman (KS) have updated the model two times (KS, 2001 and Kane, Spizman, and Donelson (KSD), 2013). Other researchers have also utilized the ordered probit technique developed by SK (1992),[1] demonstrating the robustness of the original SK paper. The most recent update of this model was in 2013 by KSD using round 14 of the 1997 National Longitudinal Survey of Youth (NLSY97).

The ordered probit provides a technique that models the choices individuals have in selecting alternative educational levels. Upon estimating the model, the probabilities of a minor child achieving different educational levels can be estimated using family background characteristics.

## II. Why an Update?

Round 18 of the NLSY97 adds eight additional years of data to the KSD paper. In 1997 a new cohort of youth born between the years of 1980 and 1984 was tracked. This cohort was between 12 and 17 years old as of December 31, 1996. The 18th follow-up would have the participants being between the ages of 32 and 37 (all were born between January 1, 1980 and December 31, 1984). Eight additional years will bring most participants in the NLSY97 sample to their highest level of educational attainment and will provide more accurate estimates of the probability of alternative levels of educational attainment than was possible with the earlier cohort.

---

[*]Lawrence Spizman, Professor Emeritus Economics, State University of New York at Oswego and Principal, Spizman Economics Associates, LLC, Oswego, NY. John Kane, Professor of Economics, State University of New York at Oswego, Oswego NY.

[1]See Gill and Foley (1996), KS (2001), Jepsen and Jepsen (2001), Bruce and Anderson (2005), Kane, Spizman, Rodgers, and Gaskins (2010) and KSD (2013).

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016179

132                    JOURNAL OF FORENSIC ECONOMICS

The model estimated in the current paper follows the practice used in KSD of including the base-year family income-to-poverty ratio as an independent variable.[2] When this information is available, it provides a better measure of human capital stock of household head(s), allowing improved estimation of the probabilities of alternative levels of educational attainment. The base-year family income-to-poverty ratio eliminates the need to convert current incomes into 1997 dollars (the value in which base-year incomes were reported in the NLSY97). Although this is a much easier measure to estimate if tax returns are available, practitioners doing child cases often confront the situation where tax returns are not available for a multitude of reasons. Thus, we continue to estimate the model with and without the base-year family income-to-poverty ratio.

### III. The Model: Estimating the Probability of Obtaining Different Educational Levels

The ordered probit educational attainment model, originally developed in SK (1992) and KS (2001), provides a method of estimating the probabilities of alternative levels of educational attainment of a minor child based on the characteristics of the household in which the child is raised.

The importance of household characteristics on how educational attainment explains earnings differences in the population has been extensively examined. Willis (1973) and Becker (1983) developed early theoretical explanations for discrepancies in parental investments in child quality. Scarr and Weinberg (1978) used regression analysis to examine the impact of family background on intellectual attainment. Willis (1987) shows the best predictors of adult achievement or failure are family background and characteristics. Manski and Wise (1983) showed the importance of family background variables in explaining alternative educational choices. Castro and Coen-Pirani (2016) examined the evolution of educational attainment. Cameron and Heckman (1998), Haveman and Wolfe (1995), Rosenzweig and Wolpin (1993) and many other studies have documented the effects of family background characteristics on the educational attainment of a child.

The impact of parental characteristics and environmental factors on the quality of a child were also examined by Schultz (1974), Leibowitz (1974), De

---

[2]The income-to-poverty ratio is the family income divided by the poverty level for the prior year. Poverty levels for the 48 contiguous states and the District of Columbia depend on the number of persons in the household. In 2020, for example, the poverty levels were \$12,760 for a one-person household, \$17,240 for a two-person household, \$21,720 for a three-person household, \$26,200 for a four-person household, \$30,680 for a five-person household, \$35,160 for a six-person household, \$39,640 for a seven-person household, \$44,120 for an eight-person household, and for more than eight people add \$4,480 for each additional person, (Federal Register/Vol. 85, No. 12/ Friday, January 17, 2020 Notices). Family income as defined by the Census Bureau's measures of poverty includes earnings, unemployment compensation, workers' compensation, Social Security, Supplemental Security Income, public assistance, veterans' payments, survivors benefits, pension or retirement income, interest, dividends, rents, royalties, income from estates, trusts, educational assistance, alimony, child support, assistance from outside the household, and other miscellaneous sources. It is before taxes and does not include non-cash benefits such as food stamps and housing subsidies, as well as excluding capital gains or losses (see https://aspe.hhs.gov/poverty-guidelines). For practical purposes it would be line 22 (total income) from the parents' Federal 1040 Individual Income Tax Returns.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016180

Tray (1974) and Speiser (1988). Teachman (1987) was an earlier adapter for using the National Longitudinal Study of the High School Class of 1992 in examining the impact of family on educational attainment. He also suggests that over time an individual's educational career may change. This factor is important in doing this follow up study as the original sample ages and completes their educations. Wilson (2001) discussed how background characteristics and circumstances affect returns to education.

McLanahan and Sandefur (1994) found children growing up with both biological parents had better outcomes than children in single parent families or families with stepparents. Deleire and Kalil (2002) also reached this conclusion. These results were also shown by Ginther and Pollak (2003). They showed that children growing up in traditional families (children who were biological children of both parents) showed better educational outcomes than children growing up in single-parent or blended families.

Menning (2002) found that having an absent parent who was involved with the child on an interpersonal level and who provided financial contribution to the child increased the probability that the child would complete high school and attend college. Using Canadian data, Bruce and Anderson (2005) found that those children (both male and female) living with both parents were less likely to drop out of high school and more likely to complete university that those children who lived with only one parent.

Duncan, Morris, and Rodriguez (2011) suggested that family income has a positive impact on the eventual school achievement of preschool children. Gould, Simhon and Weinberg (2020), showed that parents spending more time with their children developed a stronger parent-child correlation in education than those parents who spend less time with their children.

The impact of family size on educational attainment was examined by Black, Devereuxz and Salvanes (2005) and Booth and Kee (2009). Religions' impact on education were examined by Lehrer (2004).

The ordered probit model developed by SK (1992) was one of the first empirical studies that examined the impact of family background characteristics on educational attainment. This latest version of SK adds eight more years of data using round 18 of the NLSY97. These years generally will include the highest level of educational attainment of the cohort, providing more accurate estimates of the probability of alternative levels of educational attainment for future use of the ordered probit estimation technique.

The ordered probit model differs from other studies based on binary choices which would include whether or not a student completes high school, attends college, or receives a graduate degree by providing estimates of the probability of multiple levels of educational attainment instead of a simple binary choice.

The model for the ordered probit specification is $Z_i = X_i\beta + \mu_i$. The unobservable variable $Z_i$ is a continuous random variable that depends on the observed factors, $X_i$, and an unobserved error term $\mu_i$. Family background and demographic variables that influence $Z_i$ are represented by the vector $X_i$. There is assumed to be a relationship between the level of $Z_i$ and the level of educational attainment that is selected by each individual. Individuals with

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

134                     JOURNAL OF FORENSIC ECONOMICS

higher levels of $Z_i$ select higher levels of educational attainment while individuals with lower values of $Z_i$ select lower levels of educational attainment. Because $Z_i$ is unobservable, an indicator variable (a discrete random variable representing the highest level of educational attainment) is used to show the actual educational level for each individual in the sample. The error term in this equation, $\mu_i$ is a standard normal random variable that is independent and identically distributed across individuals $i$. It is assumed that individual $i$ acquires:

Less than a High School Diploma or a GED if $Z_i \leq \theta_1$,
GED if $\theta_1 < Z_i \leq \theta_2$
High School Diploma if $\theta_2 < Z_i \leq \theta_3$,
Associate's Degree if $\theta_3 < Z_i \leq \theta_4$,
Bachelor's Degree if $\theta_4 < Z_i \leq \theta_5$,
Master's Degree if $\theta_5 < Z_i \leq \theta_6$,
Ph.D Degree if $\theta_6 < Z_i \leq \theta_7$, and
MD, JD, or DDS Degree if $Z_i > \theta_7$.[3,4]

The parameters of this model are estimated using a maximum likelihood estimator. The ordered probit estimated coefficients are then used to determine the probability of the minor child obtaining each different educational level as his or her highest level of educational attainment.

Table 1 describes how to calculate the probability of reaching each different level of educational attainment. After estimating earnings for each educational level, these values are weighted by the probability of obtaining each alternative educational level. Adding these together would provide the estimated lost earnings of the minor child. The Supplementary Data section for this paper provides the Excel spreadsheets to estimate the probabilities of each educational level. The practitioner can then simply insert the value 1 for those demographic characteristics that are appropriate to the specific case (and the income-to-poverty ratio when available).

## IV. Data

Table 2 describes the variables and the sample means of these variables used in the estimation.[5]

---

[3]See KSD (2013) for a more complete discussion of the specification of the model.

[4]While a PhD degree is a higher academic rank than an MD, JD, and DDS degree, these professional degrees are placed higher in this ordering on the grounds that medical schools, dental schools, and at least some law schools are more selective than are most PhD programs. Further, graduates of professional programs generally receive higher salaries and more social status than is received by PhDs.

[5]Since minority groups are oversampled in the NLSY97, estimated population means are presented in this table using sample weights from the base year survey. The ordered probit equation was estimate using an unweighted procedure. The use of a weighted ordered probit estimator would induce hetorskedasticity and could be justified only if the ordered probit equation would have different parameters in different subsamples of the population. If this were the case, the estimation of a single equation would be inappropriate.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016182

Table 1

Probabilities of Alternative Levels of Educational Attainment

| Outcome | Probability |
|---------|-------------|
| Less than High School Diploma | $\Phi(\hat{\theta}_1 - \hat{Z})$ |
| GED | $\Phi(\hat{\theta}_2 - \hat{Z}) - \Phi(\hat{\theta}_1 - \hat{Z})$ |
| High School Diploma | $\Phi(\hat{\theta}_3 - \hat{Z}) - \Phi(\hat{\theta}_2 - \hat{Z})$ |
| Associate's Degree | $\Phi(\hat{\theta}_4 - \hat{Z}) - \Phi(\hat{\theta}_3 - \hat{Z})$ |
| BA or BS Degree | $\Phi(\hat{\theta}_5 - \hat{Z}) - \Phi(\hat{\theta}_4 - \hat{Z})$ |
| Master's Degree | $\Phi(\hat{\theta}_6 - \hat{Z}) - \Phi(\hat{\theta}_5 - \hat{Z})$ |
| PhD Degree | $\Phi(\hat{\theta}_7 - \hat{Z}) - \Phi(\hat{\theta}_6 - \hat{Z})$ |
| Professional Degree (DDS, JD, MD) | $1 - \Phi(\hat{\theta}_7 - \hat{Z})$ |

Note: $\Phi(\ )$ denotes the cumulative distribution function of a standard normal random variable.

Table 3 compares the mean levels of educational attainment of this current study to the mean years of education in the KSD (2013) study. As this table indicated, the eight additional years of data results in a general upward shift in completed educational attainment.

Note, for example, that the percent of males with less than a high school diploma declined from 9.18% in 2013 to 8.01% in 2020. For both males and females, the proportion of the population with a high school diploma as their highest level of education declined while the proportion of people with Associate's, Master's, PhD, and Professional Degrees increased.

## V. Empirical Results

Table 4 contains the estimated coefficients for the ordered probit model.[6] In all models, predicted educational attainment for the child is predicted to be higher for children that have higher levels of education for the mother or father, have both biological parents present in the household, have a later age at first birth for the mother, or have religions that fall into the "Other" category (which includes a variety of religions including Muslim, Buddhist, Hindu, Shinto, Taoist, Spiritualist, and many more categories). These results also indicate that the base-year family income-to-poverty ratio is also highly significant in predicting the probability of alternative levels of educational level.

Being Hispanic has no significant effect on educational attainment in this model (controlling for the other variables). There is a gender difference in the effect of the Black variable on educational attainment. *Ceteris paribus*, Black females have significantly higher levels of educational attainment than do white or Hispanic females. Black males have significantly lower predicted levels of educational attainment in Model II, but this effect is not significant in

---

[6]No $R^2$ is reported for this model because there really is no good measure of $R^2$ in an ordered probit model and other qualitative response models. Note that what is predicted by the model is the probability of each level of educational attainment for an individual, not the level of an observable random variable.

Downloaded from http://meridian.allenpress.com/rfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016183

136                    JOURNAL OF FORENSIC ECONOMICS

Table 2
Description of Data and Sample Means

| Variable | Description | Sample Means | | | |
|---|---|---|---|---|---|
| | | Model I | | Model II | |
| | | Males | Females | Males | Females |
| (A) Highest Level of Educational attainment | | | | | |
| Less than High School | = 1 if the respondent does not report a HS Diploma or GED | 0.0801 | 0.0701 | 0.0835 | 0.0668 |
| GED | = 1 if the respondent reports a GED | 0.1092 | 0.0783 | 0.1058 | 0.0766 |
| High School Diploma | = 1 if the respondent reports a HS Diploma | 0.4376 | 0.3538 | 0.4361 | 0.3532 |
| Associate's Degree | = 1 if the respondent reports an AA or AS Degree | 0.0903 | 0.0994 | 0.0829 | 0.1017 |
| Bachelor's Degree | = 1 if the respondent reports a BA or BS Degree | 0.1948 | 0.2597 | 0.1999 | 0.2607 |
| Master's Degree | =1 if the respondent reports a Master's Degree | 0.0672 | 0.1079 | 0.0685 | 0.1092 |
| PhD Degree | = 1 if the respondent reports a PhD Degree | 0.0065 | 0.0080 | 0.0071 | 0.0091 |
| Professional Degree | = 1 if the respondent reports a PhD, JD, MD, or DDS Degree | 0.0142 | 0.0229 | 0.0162 | 0.0228 |
| (B) Demographic Variables | | | | | |
| Hispanic | = 1 if the respondent reports a primary racial/ethnic identification as Hispanic or Latino | 0.1133 | 0.1026 | 0.1143 | 0.1044 |
| Black | = 1 if the respondent reports a primary racial/ethic identity as Black | 0.1092 | 0.1170 | 0.1132 | 0.1204 |
| Urban | = 1 if the respondent reports living in the central city in a Metropolitan Statistical Area | 0.2178 | 0.2387 | 0.2224 | 0.2433 |
| Rural | = 1 if the respondent reports living in a rural area | 0.2942 | 0.2947 | 0.2881 | 0.2879 |
| (C) Parent's Education | | | | | |
| Mother's years of schooling | = number of years of schooling for mother | 13.0926 | 13.1086 | 13.1379 | 13.1248 |
| Father's years of schooling | = number of years of schooling for father | 13.0644 | 13.0753 | 13.1120 | 13.1141 |
| Both biological parents | = 1 if both biological parents were present in the household when the respondent was 12 years old | 0.5850 | 0.5599 | 0.5936 | 0.5650 |
| Mother's age at 1st birth | = the age of the mother at the birth of her first biological child | 23.5234 | 23.5439 | 23.5535 | 23.5795 |
| (D) Religion raised | | | | | |
| Baptist | = 1 if the respondent reports being raised as a Baptist | 0.1932 | 0.2167 | 0.1936 | 0.2145 |
| Protestant | = 1 if the respondent reports being raised as a non-Baptist Protestant | 0.3734 | 0.3959 | 0.3789 | 0.3933 |

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016184

Table 2 (continued)

| Variable | Description | Sample Means | | | |
|---|---|---|---|---|---|
| | | Model I | | Model II | |
| | | Males | Females | Males | Females |
| Catholic | = 1 if the respondent reports being raised as a Roman Catholic | 0.3634 | 0.3085 | 0.3567 | 0.3138 |
| Jewish | = 1 if the respondent reports being raised in a Jewish religion | 0.0140 | 0.0110 | 0.0156 | 0.0120 |
| Other (non-agnostic and non-atheist) | = 1 if the respondent reports an alternative religion | 0.0410 | 0.0545 | 0.0420 | 0.0544 |
| (E) Other household variables | | | | | |
| Number of siblings | = number of siblings reported in 1997 | 3.8463 | 3.8535 | 3.8376 | 3.8721 |
| Income-to-poverty ratio | = gross household income / poverty level income | 3.4037 | 3.4178 | - | - |

Table 3
Highest Educational Attainment

| Educational Level | Male | | Female | |
|---|---|---|---|---|
| | KSD (2013) | SK (2020) | KSD (2013) | SK (2020) |
| Less than High School Diploma | 0.0918 | 0.0801 | 0.0943 | 0.0701 |
| GED | 0.1020 | 0.1092 | 0.0992 | 0.0783 |
| High School Diploma | 0.4813 | 0.4376 | 0.4801 | 0.3538 |
| Associate's Degree | 0.0744 | 0.0903 | 0.0681 | 0.0994 |
| Bachelor's Degree | 0.2058 | 0.1948 | 0.2120 | 0.2597 |
| Master's Degree | 0.0365 | 0.0672 | 0.0368 | 0.1079 |
| PhD Degree | 0.0016 | 0.0065 | 0.0015 | 0.0080 |
| Professional Degree | 0.0067 | 0.0142 | 0.0082 | 0.0229 |

Model 1.[7] We suspect that the differential effect by gender is at least partly due to a higher rate of return received by Black females as a result of their higher average lifetime Labor Force Participation Rates (LFPR). In 2018, for example, Black women had the highest LFPR (62.4%) followed by Hispanic women (59.4%). White women have the lowest (57.6%). The situation for males is reversed: Hispanic males have the highest LFPR (80.2%) while Black males have the lowest (68%). Racial and gender differences in the employment-population ratio (the proportion of the population that is employed) follow the same pattern as the LFPR (although the employment-population ration has less variation by race).[8]

---

[7]While a few of the other variables are not statistically significant in all equations, the estimates are still consistent estimators of the model parameters. We include them in the estimates and use them in predicting probabilities because these are still the best estimates of the effects of these variables.

[8]See: https://www.bls.gov/opub/reports/race-and-ethnicity/2018/home.htm

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

138                    **JOURNAL OF FORENSIC ECONOMICS**

Table 4
Ordered Probit Equation

|  | Model I | | Model II | |
|---|---|---|---|---|
|  | Males | Females | Males | Females |
|  | Coefficient | Coefficient | Coefficient | Coefficient |
| Variable | (*t*-ratio) | (*t*-ratio) | (*t*-ratio) | (*t*-ratio) |
| Demographic Variables |  |  |  |  |
| Hispanic | 0.0324 | -.0092 | 0.0271 | 0.0071 |
|  | (0.48) | (-0.13) | (0.44) | (0.11) |
| Black | -0.0748 | 0.2674 | -0.1056 | 0.2564 |
|  | (-1.11) | (4.03)*** | (-1.73)* | (4.28)*** |
| Urban | -0.0676 | -0.0043 | -0.0601 | -0.0030 |
|  | (-1.29) | (-0.08) | (-1.26) | (-0.06) |
| Rural | -0.0054 | 0.1284 | -0.0053 | 0.1083 |
|  | (-0.10) | (2.39)** | (-0.11) | (2.18)** |
| Parent's Education |  |  |  |  |
| Mother's years of schooling | 0.0742 | 0.0722 | 0.0828 | 0.0785 |
|  | (7.35)*** | (7.22)*** | (9.00)*** | (8.60)*** |
| Father's years of schooling | 0.0799 | 0.0569 | 0.0808 | 0.0642 |
|  | (8.81)*** | (6.29)*** | (9.91)*** | (7.75)*** |
| Both biological parents | 0.3703 | 0.3853 | 0.3759 | 0.4091 |
|  | (7.99)*** | (8.34)*** | (8.96)*** | (9.78)*** |
| Mother's age at 1st birth | 0.0184 | 0.0264 | 0.0218 | 0.0276 |
|  | (3.66)*** | (5.18)*** | (4.77)*** | (6.00)*** |
| Religion raised |  |  |  |  |
| Baptist | 0.1893 | 0.3724 | 0.1948 | 0.3235 |
|  | (0.99) | (1.84)* | (1.07) | (1.67)* |
| Catholic | 0.2961 | 0.5857 | 0.2400 | 0.5381 |
|  | (1.57) | (2.92)*** | (1.33) | (2.79)*** |
| Jewish | 0.3647 | 0.6966 | 0.3514 | 0.7500 |
|  | (1.36) | (2.33)** | (1.43) | (2.74)*** |
| Other (non-agnostic and non-atheist) | 0.5428 | 0.5962 | 0.4405 | 0.5737 |
|  | (2.52)** | (2.72)*** | (2.17)** | (2.74)*** |
| Protestant | 0.2560 | 0.4570 | 0.1898 | 0.4230 |
|  | (1.36) | (2.29)** | (1.06) | (2.21)** |
| Other household variables |  |  |  |  |
| Number of siblings | -0.0009 | 0.0018 | -0.0046 | -0.0009 |
|  | (-0.13) | (0.26) | (-0.68) | (-0.14) |
| Income-to-poverty ratio | 0.0305 | 0.0425 | - | - |
|  | (3.46)*** | (4.58)*** |  |  |
| Thresholds |  |  |  |  |
| $\theta_1$ | 1.3857 | 1.5374 | 1.4619 | 1.5537 |
| $\theta_2$ | 2.0045 | 2.0374 | 2.0583 | 2.0464 |
| $\theta_3$ | 3.3908 | 3.2557 | 3.4333 | 3.2676 |
| $\theta_4$ | 3.6876 | 3.5503 | 3.7043 | 3.5654 |
| $\theta_5$ | 4.6137 | 4.4670 | 4.6291 | 4.4704 |
| $\theta_6$ | 5.3606 | 5.3096 | 5.3639 | 5.3212 |
| $\theta_7$ | 5.5154 | 5.4542 | 5.5233 | 5.4899 |
| N | 2576 | 2463 | 3059 | 2928 |
| $\chi^2$ | 715.33*** | 583.39*** | 825.57*** | 658.50*** |

Note: *t*-statistics are in parentheses.
*Significant at the 0.1 level with *t* value >1.645.
**Significant at the 0.05 level with *t* value >1.960.
***Significant at the 0.01 level with *t* value >2.580.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016186

The results in Table 4 are remarkably consistent with KSD (2013). They do, however, provide higher levels of predicted educational attainment than would have occurred under the KSD model.

## VII. Conclusion

Utilizing round 18 of the National Longitudinal Survey of Youth provides estimates that are consistent with KSD (2013) estimations from round 14. Eight additional years of data provide more reliable estimates of educational attainment for the NLSY cohorts who were in the process of completing their education which is especially true for those individuals in graduate or professional school during round 14. The current estimates will make the lifetime income stream based on estimates of round 18 more precise.

Adding what will most likely be the final years of education to the cohort is a significant addition to the literature of estimating educational attainment and hence income, since round 18 essentially captures most educational attainments of the sample which will be used to estimate earnings. Eight additional years will bring most participants in the NLSY97 sample to their highest level of educational attainment. This will allow for more accurate estimates of the probability of alternative levels of educational attainment than was possible with the earlier cohort.

Round 18 estimates show the importance of higher levels of education for the mother or father and the positive impact of having both biological parents present in the household as important predictors of educational attainment. Additionally, the older the mother is when her first child is born and certain religions have a positive impact on the educational achievements of the child. Future research can explore the impact of removing demographic variables such as race and religion from the model.

## References

Becker, Gary S. 1983. *A Treatise on the Family,* Cambridge, MA: Harvard University Press.

Black, Sandra, Paul J. Devereux, Kjell Salvanes. 2005. "The More the Merrier? The Effect of Family Size and Birth Order on Children's Education." *The Quarterly Journal of Economics*, 120(2): 669–700.

Booth, Alison and Hiau Joo Kee. 2009. "Birth Order Matters: The Effect of Family Size and Birth Order on Educational Attainment." *Journal of Population Economics*, 22: 367–397.

Bruce, Christopher, and Carmen Anderson. 2005. "The Impact of Family Background on Education Attainment in Canada." *Journal of Forensic Economics*, 18(2-3): 125–137.

Cameron, S. V., and J. J. Heckman. 1998. "Life Cycle Schooling and Dynamic Selection Bias: Models and Evidence for Five Cohorts of American Males." *Journal of Political Economy*, 106 (2): 262–333.

Castro, R., and D. Coen-Pirani. 2016. "Explaining the Evolution of Educational Attainment in the United States." *American Economic Journal: Macroeconomics*, 8(3): 77–112.

The Chronicle of Higher Education. 2019. Almanac of Higher Education.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016187

140                    JOURNAL OF FORENSIC ECONOMICS

Deleire. T. and A. Kalil. 2003. "Good Things Come in Threes: Single-Parent Multigenerational Family Structure and Adolescent Adjustment." *Demography*, 39(2): 393–413.

De Tray, D. N. 1974. "Child Quality and the Demand for Children." in T. W. Schultz, ed, *Economics of the Family*, 91-116.

Duncan, G.J., P. A. Morris, and C. Rodrigues, 2011. "Does money really matter: Estimating impacts of family income on young children's achievement with data from random-assignment experiments." *Developmental Psychology*, 47(5): 1263–1279.

Gill, Andrew M., and Jack Foley. 1996. "Predicting Educational Attainment for a Minor Child Some Further Evidence." *Journal of Forensic Economics*, 9(2): 101–112.

Ginter, D. and R. Pollak. 2003. "Does Family Structure Affect Children's Educational Outcome?" October, *NBER Working Paper*. 9628.

Gould Eric D, Avi Simhon and Bruce A. Weinberg. 2020. "Does Parental Quality Matter? Evidence on the Transmission of Human Capital Using Variation in Parental Influence from Death, Divorce, and Family Size." *Journal of Labor Economics*, 38(2): 569–610.

Haveman, R. and B. Wolfe. 1995. "The Determinants of Children's Attainments: A Review of Methods and Findings." *The Journal of Economic Literature*, 33 (4): 1829–1878.

Jepsen, Christopher A., and Lisa K. Jepsen. 2001. "Re-examining the Effects of Parental Characteristics on Educational Attainment for a Minor Child." *Journal of Forensic Economics*, 14(2): 141–154.

Kane, John, and Lawrence Spizman. 2001. "An Update of the Educational Attainment Model for a Minor Child." *Journal of Forensic Economics*, 14(2): 155–166.

Kane, John, Lawrence Spizman, James Rodgers, and Rick Gaskin. 2010. "The Effect of the Loss of a Parent on the Future Earnings of a Minor Child." Symposium Paper, *Eastern Economic Journal*, 36: 370–390.

Kane, John, Lawrence Spizman, and Don Donelson. 2013. "Educational Attainment Model for a Minor Child: The Next Generation." *Journal of Forensic Economics*, 24(2): 175–190.

Lehrer, Evelyn. 2004. "Religion as a Determinant of Economic and Demographic Behavior in the United States." *Population and Development Review*, 30(4): 707–726.

Leibowitz, A. 1974. "Home Investment in Children." in *Economics of the Family*. ed. T.W. Schultz. 432-452.

Manski, Charles F. and David A. Wise. 1983. *College Choice in America*. Cambridge. MA: Harvard University Press.

McLanahan, S and G. Sandefur. 1994. *Growing Up with a Single Parent: What Hurts, What Helps*. Cambridge, MA: Harvard University Press.

Menning. C. 2002. "Absent Parents Are More Than Money, The Joint Effect of Activities and Financial Support on Youth's Educational Attainment." *Journal of Family Issues*, 23(5): 648–671.

Rosenzweig, M. R. and K. I. Wolpin. 1993. "Intergenerational Support and the Life-Cycle Incomes of Young Men and their Parents: Human Capital Investments, Coresidence and Intergenerational Financial Transfers." *Journal of Labor Economics*, 11 (1): 84–112.

Scarr Sandra, and Richard Weinberg. 1978. "The Influence of Gamily Background on Intellectual Attainment." *American Sociological Review*, 43(5): 674–692.

Schultz, T.W. 1974. *Economics of the Family*. Chicago, IL: NBER, University of Chicago Press.

Speiser, Stuart. 1988. *Recovery for Wrongful Death and Injury, Economic Handbook*. 3rd. *Ed.*, Rochester, NY: The Lawyers' Co-operative Publishing Company.

Spizman, Lawrence, and John Kane. 1992. "Loss of Future Income in the Case of Personal Injury of a Child: Parental Influence on a Child's Future Earnings." *Journal of Forensic Economics*, 5(2): 159–168.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016188

Teachman, Jay D. 1987. "Family Background, Educational Resources, and Educational Attainment." *American Sociological Review*, 52(4): 548–577.

Willis, Robert J. 1973. "A New Approach to the Economic Theory of Fertility Behavior." *Journal of Political Economy*, 81(2): 14–64.

Willis, Robert J. 1987. "What Have we Learned from the Economics of the Family?" *American Economic Review*, 2(77): 68–81.

Wilson, Kathy. 2001. "The Determinants of Educational Attainment: Modeling and Estimating the Human Capital Model of Education Production Functions." *Southern Economic Journal*, 67(3): 518–551.

Downloaded from http://meridian.allenpress.com/jfe/article-pdf/29/1/131/3051590/i0898-5510-29-1-131.pdf by Mexico, William Partin on 24 May 2022

USA-016189