UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| TYLER GRENIER, Individually, and JENNA GRENIER, Individually and as Next Friend of J.A.G., a minor,<br><br>             Plaintiffs<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | CIV. NO. 22-00396 LEK-KJM |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

### I. INTRODUCTION

A non-jury trial was conducted from December 2, 2024 to December 12, 2024 in this tort action brought pursuant the Federal Tort Claims Act ("FTCA"), Title 28 United States Code Sections 1346 and 2671 to 2680. The claims in this case are made on behalf of Plaintiffs Mr. Tyler Grenier, individually ("Mr. Grenier"), and Mrs. Jenna Grenier, individually ("Mrs. Grenier") and as next friend of J.A.G., a minor ("J.A.G."), (collectively "Plaintiffs") against Defendant United States of America ("Defendant"). These claims allege that Defendant's employees committed medical negligence that caused the severe physical injuries suffered by J.A.G. and Mrs. Grenier, the resulting serious cognitive injuries to J.A.G. as result of his physical injuries, and Plaintiffs' ensuing

emotional distress. The parties filed post-trial briefing, which
the Court has reviewed and carefully considered in addition to
the extensive evidentiary record and trial testimony. [Dkt.
nos. 310, 320, 321.]

By a preponderance of the evidence, the Court finds
and concludes that Plaintiffs have not carried their burden of
proof that Defendant is liable under the FTCA and with the
application of Hawai`i law. See 28 U.S.C. § 1346(b)(1)
(directing that liability is determined "in accordance with the
law of the place where the act or omission occurred"). In its
consideration of Plaintiffs' claims, it is clear to the Court
that J.A.G. suffered serious injuries after his birth and that,
as a result, Plaintiffs have suffered and continue to suffer
greatly. J.A.G. has profound intellectual and physical
challenges. The Court is sympathetic to Plaintiffs but is
nevertheless bound to uphold the legal requirements that
Plaintiffs must demonstrate by a preponderance of the evidence
that medical negligence occurred (that is, that the medical
services received by Mrs. Grenier and J.A.G. fell below the
standard of medical care) and that medical negligence was a
substantial cause of J.A.G. and Mrs. Grenier's injuries. This
decision does not diminish the tragedy suffered by Plaintiffs,
and the formidable challenges that J.A.G. and his family have
faced and will continue to face.

The Court, having considered the pleadings filed and
the testimony given at trial, including the witnesses'
declarations and deposition testimony; having judged the
credibility of the witnesses; having examined the exhibits
admitted into evidence; and having considered the arguments and
representations of counsel, issues the following findings of
fact and conclusions of law, and finds in favor of Defendant as
to all of Plaintiffs' claims. Any finding of fact that should
more properly be deemed a conclusion of law and any conclusion
of law that should more properly be deemed a finding of fact
shall be so construed.

## II. **FINDINGS OF FACT**

This lawsuit is a medical malpractice action filed by
Plaintiffs, which alleges medical negligence at Tripler Army
Medical Center ("Tripler") related to the medical care by
Defendant's employees for prenatal care and labor of
Mrs. Grenier, and the birth of J.A.G. See Complaint, filed
8/29/22 (dkt. no. 1). There are seven legal claims: a medical
negligence claim by Mrs. Grenier; a medical negligence claim by
J.A.G.; a negligent infliction of emotional distress ("NIED")
claim by Mrs. Grenier; an NIED claim by Mr. Grenier; a loss of
filial consortium claim by Mrs. Grenier; a loss of filial

3

consortium claim by Mr. Grenier; and a loss of spousal

consortium claim by Mr. Grenier. [Id.]


A.    **The Parties and the Treating Physicians**

1.    Mrs. Grenier is married to Mr. Grenier. During the

period relevant to this case, Mr. Grenier was a United States

Marine stationed at the Kaneohe Marine Corps Base, and

Mrs. Grenier received her medical care through the military as

Mr. Grenier's dependent. See Joint Stipulation on Undisputed

Facts, filed 11/29/24 (dkt. no. 276) ("Stipulated Facts"), at

¶ 1.a.

2.    On December 1, 2020, Mrs. Grenier's pregnancy with her

first child was confirmed. Mrs. Grenier was twenty-one years old

at the time, and she was at approximately six weeks gestation.

[Id. at ¶ 2.]

3.    Mrs. Grenier has type 1 diabetes and requires insulin.

[Id. at ¶ 1.b.]

4.    Because of the increased risks associated with

diabetes, Tripler referred Mrs. Grenier to its maternal-fetal-

medicine ("MFM") department[1] and its endocrinology department.

---

[1] Maternal-fetal medicine is a subspecialty of obstetrics
and gynecology. See Declaration of Nader Zane Rabie, M.D., filed
11/19/24 (dkt. no. 225) ("Rabie Decl.") at ¶ 1. MFM specialists
are also referred to as perinatologists. See Transcript of Non-
Jury Trial (Day 1), held on 12/2/24, filed 1/22/25 (dkt.
(....continued)

[Stipulated Facts at ¶ 1.c.] Prior to that point, Mrs. Grenier's diabetes was poorly controlled. See id. at ¶ 1.b.

a.    Tripler's endocrinology team worked with Mrs. Grenier to help her manage her diabetes. [Rabie Decl. at ¶ 10.]

b.    Mrs. Grenier's endocrinology records were incorporated into her prenatal records, which the MFM team reviewed as part of the management of Mrs. Grenier's care. [Id.]

5.    One of the physicians in Tripler's MFM department who saw Mrs. Grenier was Colonel Nader Zane Rabie, M.D. ("Dr. Rabie"), who was the Chief of Maternal-Fetal Medicine. See Stipulated Facts at ¶ 1.c; Rabie Decl. at ¶ 4.

a.    Dr. Rabie is board certified in obstetrics and gynecology and maternal-fetal medicine. [Rabie Decl. at ¶ 1.]

---

no. 312) ("Day 1 Trans."), at 76 (testimony by Adam Levy, M.D.). An MFM specialist manages complicated pregnancies by, *inter alia*, performing imaging tests and other procedures, [Rabie Decl. at ¶ 5,] and is trained to read the ultrasounds to try to identify any potential signs of disorders. See Defendant's Counter Deposition Designations of Colonel Nader Zane Rabie, M.D. ("Def.'s Rabie Depo. Designation"), filed 11/18/24 (dkt. no. 219), Exh. 1 (transcript of Zoom Deposition of Nader Zane Rabie, M.D. taken 3/10/23) ("Rabie Depo. Trans.") at 6. Exhibit 1 to Defendant's Rabie Deposition Designation reflects both Plaintiffs' designations and Defendant's. See Def.'s Rabie Depo. Designation at 3-4. MFM specialists are also trained to treat conditions and monitor issues that an obstetrician/gynecologist does not, including thyroid disease, cardiac disease, hypertension, and fetal growth abnormalities. [Day 1 Trans. at 110 (Dr. Levy's testimony).]

   b.   Dr. Rabie was found qualified to testify as a
percipient expert witness in the areas of obstetrics and
gynecology and in the subspecialty of maternal-fetal medicine.
See Transcript of Non-Jury Trial (Day 3), held on 12/4/24, filed
1/22/25 (dkt. no. 314) ("Day 3 Trans."), at 85-87.

   c.   Dr. Rabie took the lead in Mrs. Grenier's
prenatal care. The other doctors who Mrs. Grenier saw during her
pregnancy said they would report to Dr. Rabie. See Day 1 Trans.
at 39 (Mr. Grenier's testimony).

   d.   During Mrs. Grenier's pregnancy, there were three
MFM physicians at Tripler. Their usual practice is to
collaborate and share responsibilities for all of their
patients. [Rabie Decl. at ¶ 9.]

   6.   Asha Mada, who was a fourth-year resident at Tripler
at the time, managed part of Mrs. Grenier's induction of labor
and Mrs. Grenier's delivery, under the supervision of attending
physician Justin Pilgrim, D.O. See Declaration of Asha Mada,
D.O., filed 11/19/24 (dkt. no. 226) ("Mada Decl."), at ¶¶ 2, 6;
Declaration of Justin Pilgrim, D.O., filed 11/19/24 (dkt.
no. 227) ("Pilgrim Decl."), at ¶ 6.

   a.   Dr. Mada completed her residency at Tripler and
graduated in 2022. At the time of trial, Dr. Mada was completing
a three-year MFM fellowship at Madigan Army Medical Center in
Washington. [Mada Decl. at ¶¶ 1-2.]

6

b.    Dr. Mada was found qualified testify as a
percipient expert witness in the areas of obstetrics and
gynecology. See Transcript of Non-Jury Trial (Day 4), held on
12/6/24, filed 1/22/25 (dkt. no. 315) ("Day 4 Trans."), at 9-12.

c.    Dr. Pilgrim is board certified in obstetrics and
gynecology. [Pilgrim Decl. at ¶ 1.] Dr. Pilgrim is also a
reproductive endocrinologist. [Id. at ¶ 7.]

d.    During the relevant period, Dr. Pilgrim was the
Clinic Chief in Tripler's OBGYN Department. [Id. at ¶ 5.]

e.    Dr. Pilgrim was found qualified to testify as a
percipient expert witness in the areas of obstetrics and
gynecology. See Day 4 Trans. at 59.

7.    J.A.G. was born at 5:58 a.m. on July 7, 2021.
[Stipulated Facts at ¶ 22.f.]

8.    During the relevant period, Joshua Brock, M.D., was
one of five physicians on Tripler's neonatal team, and the team
collectively cared for J.A.G. See Declaration of Lee Joshua
Brock, M.D., filed 11/19/24 (dkt. no. 228) ("Brock Decl."), at
¶ 7.

a.    Dr. Brock is a pediatrician and is board
certified in neonatology.[2] [Id. at ¶ 1.]

_____

[2] "Neonatology is a specialized branch of medicine that
focuses on the care of newborn infants, particularly those who
are ill or premature. Neonatologists work closely with
                                              (....continued)

b.   During the relevant period, Dr. Brock was the
Chief of Neonatology of Tripler's Neonatal Intensive Care Unit
("NICU"). [Id. at ¶ 4.]

c.   Dr. Brock was found qualified testify as a
percipient expert witness in neonatology. See Day 4 Trans. at
98.


B.   **Mrs. Grenier's Prenatal Care**

9.   Mrs. Grenier had numerous appointments at Tripler to
monitor her pregnancy and conditions related to her pregnancy.
See Declaration of Jenna Grenier, filed 11/18/24 (dkt. no. 208)
("Mrs. Grenier Decl."), at ¶¶ 3-20. Mrs. Grenier also had
numerous telephonic and virtual appointments during her
pregnancy to address the management of her diabetes. See id. at
¶ 1.d.

10.  Mrs. Grenier's diabetes increased her risk of
complications during her pregnancy. [Stipulated Facts at ¶ 1.b.]

a.   The potential complications included:
"miscarriage (pregnancy loss < 20 weeks), birth defects,
preeclampsia (high blood pressure), macrosomia (larger than

_____

obstetricians to ensure a smooth transition from prenatal to
postnatal care." [Brock Decl. at ¶ 6.]

expected fetal growth),[3] stillbirth (pregnancy loss > 20 weeks), preterm delivery (delivery before 37 weeks' gestation), cesarean section, and Neonatal Intensive Care Unit (NICU) admission." [Rabie Decl. at ¶ 8.]

  b.   During surgery, patients with type 1 diabetes may also experience poor wound healing and increased risk of infection. [Day 3 Trans. at 127 (Dr. Rabie's testimony).]

11.  From research that she conducted after learning she was pregnant, Mrs. Grenier knew that she had a higher likelihood of having a large baby. [Mrs. Grenier Decl. at ¶¶ 8-9.] The size of the baby was Plaintiffs' biggest concern. [Id. at ¶ 9.]

12.  Mrs. Grenier had weekly weight checks because the Tripler doctors agreed that Mrs. Grenier should be monitored regularly during her pregnancy, and one of the main things that they were monitoring was the weight of the baby. See Day 1 Trans. at 40 (Mr. Grenier's testimony).

---

[3] Suspected macrosomia is indicated when a fetus is estimated to be more than 4,000 grams, and actual macrosomia can only be established when the baby is weighed after delivery. [Day 3 Trans. at 90-91 (Dr. Rabie's testimony).] Suspected macrosomia is a common occurrence in the practice of obstetrics. See Transcript of Non-Jury Trial (Day 5), held on 12/9/24, filed 1/22/25 (dkt. no. 316) ("Day 5 Trans."), at 50 (testimony of Cole D. Greves, M.D.).

13.   The medical witnesses agree that, if the estimated
fetal weight ("EFW") is 4,500 grams or more,[4] and the pregnant
patient has diabetes, a cesarean section is recommended and
should be discussed with the patient.[5] See, e.g., Mada Decl. at
¶ 14; Declaration of Adam Levy, M.D., filed 11/12/24 (dkt.
no. 190) ("Levy Decl."), at ¶¶ 22-23;[6] Declaration of Cole D.
Greves, M.D., filed 11/19/24 (dkt. no. 229) ("Greves Decl."), at
¶ 12;[7] Day 3 Trans. at 97-98 (Dr. Rabie's testimony).

a.   The 4,500 gram EFW standard is indicated in
American College of Obstetrics and Gynecology ("ACOG") Practice
Bulletin 216. [Rabie Decl. at ¶ 23.] In the practice of
obstetrics and gynecology, ACOG is widely considered to
establish the national standards of care. See Greves Decl. at
¶ 7.

---

[4] "EFW is a calculated value performed by the software [on
the ultrasound machine's computer] and is reported as both a
weight (in grams) and a percentile." [Rabie Decl. at ¶ 14.] It
measures the estimate weight of the fetus at the time the mother
is admitted for delivery. [Id. at ¶ 19.]

[5] For a patient who does not have diabetes, the threshold is
an EFW of 5,000 grams. [Rabie Depo. Trans. at 33.]

[6] Dr. Levy is one of Plaintiffs' retained expert witnesses.
See Levy Decl. at ¶ 4. He was found qualified to give expert
testimony in the areas of general obstetrics and labor and
delivery. [Day 1 Trans. at 73.]

[7] Dr. Greves is one of Defendant's retained expert
witnesses. See Greves Decl. at ¶ 7. He was found qualified to
give expert testimony in perinatology. [Day 5 Trans. at 16.]

      b.    The ACOG standard is measured in grams, not percentiles. [Rabie Decl. at ¶ 24.]

14.    Even when the factors of a 4,500-gram EFW and a pregnant patient who has type 1 diabetes are present, these factors do not necessarily require the performance of a cesarean section. [Day 3 Trans. at 97 (Dr. Rabie's testimony).]

15.    **Ultrasound Appointments** – Tripler provided the appropriate number of ultrasounds, at the appropriate stages in Mrs. Grenier's pregnancy, to gather significant information. [Greves Decl. at ¶ 10.] The parties focused upon five ultrasounds taken during Mrs. Grenier's pregnancy.[8]

      a.    **16 weeks gestation** (February 11, 2021):

| | | |
|---|---|---|
| head circumference | 128.7 mm | 7th percentile |
| abdominal circumference | 108.6 mm | 6th percentile |
| femur length | 19.4 mm | 25th percentile |
| EFW | 152 gm | |

[Stipulated Facts at ¶ 6.]

      b.    A cesarean section is a commonly performed surgery, but, in any patient, it has significant risks to the mother and to the fetus. The fetus may be cut when the incision is made to open the uterus; there is more bleeding in a cesarean

---

[8] In addition to the ultrasounds described below, ultrasounds were taken on December 16, 2020, January 21, 2021, and April 19, 2021. See Trial Exhibit ("Tr. Exh.") J-2 at USA-000270 (page of 7/4/21 OB Triage Clinic note by Dr. Rabie). Trial Exhibit J-2 is Mrs. Grenier's Tripler prenatal records.

section than in a vaginal delivery; there is potential damage to
other organs; and a cesarean section impacts the mother's future
pregnancies. See Day 3 Trans. at 127-28 (Dr. Rabie's testimony).

        c.    **Twenty weeks and two days** (March 11, 2021):

```
head circumference        176.8 mm       36th percentile
abdominal circumference   149.0 mm       40th percentile
femur length               32.6 mm       36th percentile
EFW                       336    gm
```

Stipulated Facts at ¶ 7; see also Rabie Decl. at ¶ 17; Tr.

Exh. J-2 at USA-000469 to 476.

        d.    **Twenty-eight weeks** (May 10, 2021):

```
head circumference        273.4 mm       47th percentile
abdominal circumference   276.6 mm       98th percentile
femur length               54.4 mm       32nd percentile
EFW                      1,569 gm         75th percentile
```

[Stipulated Facts at ¶ 11.] With the EFW in the seventy-fifth

percentile, the fetus was not projected to be large for

gestational age ("LGA").[9] [Stipulated Facts at ¶ 12.]

        1)    During the May 10, 2021 appointment,

Mrs. Grenier expressed concerns about the results of the growth

scan, the acceleration of fetal growth, and the increase in her

insulin requirements. [Stipulated Facts at ¶ 11; Rabie Decl. at

¶ 18.]

_____

        [9] LGA "implies that the estimated fetal weight is above the
90th percentile for that gestational age." [Greves Decl. at
¶ 15.] A fetus can be large for gestational age but not meet the
criteria for a scheduled cesarean section. [Id.]

2)    The increase in Mrs. Grenier's insulin requirements was normal, and insulin requirements often double during pregnancy. [Rabie Decl. at ¶ 18.]

3)    Mrs. Grenier was advised that, even if her diabetes was well controlled, she was still at risk of complications, including macrosomia. [Stipulated Facts at ¶ 11.]

4)    Beginning with the May 10, 2021 ultrasound, J.A.G.'s ultrasounds showed accelerated fetal growth, which met one of the definitions of suspected macrosomia.[10] See Day 3 Trans. at 91-92 (Dr. Rabie's testimony).

e.    **Thirty-four weeks and one day** (June 15, 2021):

| | | |
|---|---|---|
| head circumference | 326.9 mm | 87th percentile |
| abdominal circumference | 359.4 mm | >99th percentile |
| femur length | 63.6 mm | 12th percentile |
| EFW | 3,176 gm | 91st percentile |

[Stipulated Facts at ¶ 13.] J.A.G.'s growth was noted as a concern. An EFW of more than 4,500 grams would be an indication that a cesarean section was necessary, and Mrs. Grenier was at risk of meeting that criteria. [Id.]

1)    During the June 15, 2021 appointment, Mrs. Grenier was told that the plan was still to deliver the baby at thirty-nine weeks, but that delivery would be done sooner if warranted. [Rabie Decl. at ¶ 19.]

---

[10] Ultimately, J.A.G. was macrosomic because he weighed 4,600 grams at birth. See Day 3 Trans. at 91 (Dr. Rabie's testimony).

13

2)    The June 15 ultrasound demonstrated a growth trajectory which indicated suspected macrosomia. [Day 3 Trans. at 114 (Dr. Rabie's testimony).]

3)    Because the June 15 ultrasound indicated that the EFW was above the ninetieth percentile, the fetus was considered to be large for gestational age. [Day 5 Trans. at 22 (Dr. Greves's testimony).]

f.    **Thirty-six weeks and three days** (July 2, 2021):

| | | |
|---|---|---|
| head circumference | 337.8 mm | 77th percentile |
| abdominal circumference | 390.2 mm | >99th percentile |
| femur length | 69.1 mm | 23rd percentile |
| EFW | 4,013 gm | 98th percentile |

[Stipulated Facts at ¶ 19.] Following this visit, Mrs. Grenier was scheduled for induction on July 8, 2021, and the Tripler providers noted that shoulder precautions should be taken during the delivery. [Id.]

1)    On July 2, 2021, Mrs. Grenier was seen by Donald Gloeb, M.D., an MFM specialist. [Day 3 Trans. at 123-24 (Dr. Rabie's testimony); Rabie Decl. at ¶ 22.]

2)    Because the July 2 visit was the first time that Mrs. Grenier showed evidence of gestational hypertension, *i.e.*, high blood pressure due to pregnancy, her delivery was rescheduled from thirty-nine weeks to thirty-seven weeks, and her induction was scheduled for July 8, 2021. Rabie Decl. at

¶¶ 22, 26; see also Tr. Exh. J-2 at USA-000274 to USA-000279
(7/2/21 Ante Partum Diagnostic Center note by Dr. Gloeb).

       3)   During a July 4, 2021 visit, Dr. Rabie
counseled Mrs. Grenier regarding induction of labor at thirty-
seven weeks because of the gestational hypertension diagnosis,
and Mrs. Grenier agreed. [Stipulated Facts at ¶ 20; Rabie Decl.
at ¶ 26.] The induction was rescheduled for July 6, 2021. [Tr.
Exh. J-2 at USA-00270 (page from Dr. Rabie's 7/4/21 OB Triage
Clinic note).]

       4)   At the time of the July 4 visit,
Mrs. Grenier was experiencing such severe labial swelling that
she had difficulty sitting and crossing her legs. Dr. Rabie
suspected this was caused by the gestational hypertension, but
he did not believe it warranted a cesarean section. [Rabie Decl.
at ¶ 27.] Dr. Rabie noted Mrs. Grenier's labial swelling for the
labor and delivery doctors' consideration as her labor
progressed. See id.; Mada Decl. at ¶ 8; Pilgrim Decl. at ¶ 7.

       5)   Although the labial swelling was very
painful and uncomfortable for Mrs. Grenier, it was not something
that was life-threatening to either Mrs. Grenier or J.A.G., nor
did it have a negative impact on Mrs. Grenier's health. [Rabie
Depo. Trans. at 16.]

   16.  When a patient does not have a future ultrasound
scheduled, Dr. Rabie estimates the fetus will grow at a rate of

15

two to three hundred grams per week. [Rabie Decl. at ¶ 20.] This
is the typical growth rate for a fetus during the third
trimester. [Day 3 Trans. at 129 (Dr. Rabie's testimony).]

    a.  Mrs. Grenier's last ultrasound was four days
before induction and five days before delivery. [Rabie Decl. at
¶ 20.] Using the high end of the typical growth rate - 300 grams
per week - and the 4,013 EFW from the last ultrasound, Dr. Rabie
did not expect the EFW at the time of delivery to be 4,500 grams
or more. See id. In other words, even considering the
accelerated fetal growth, after the last ultrasound, J.A.G. was
expected to be growing at approximately 300 grams per week, and
Dr. Rabie estimated that J.A.G. would be 4,300 grams at
delivery. [Day 3 Trans. at 129-30.]

    b.  Dr. Rabie expected that the EFW would exceed
4,500 at **thirty-nine weeks**, Mrs. Grenier's originally estimated
delivery date. [Rabie Decl. at ¶ 20.]

    c.  Based on when Mrs. Grenier was induced, she did
not meet the ACOG 4,500-gram EFW standard for cesarean section
consideration. [Id. at ¶ 23.]

17. J.A.G.'s growth was consistent with what obstetricians
expect to see in the pregnancy of a mother who has diabetes.
[Day 3 Trans. at 111 (Dr. Rabie's testimony).]

16

18.  **Other Relevant Tripler visits**

a.   At her May 27, 2021 prenatal visit, Mrs. Grenier expressed concerns about fetal growth. [Stipulated Facts at ¶ 12.]

b.   After a hospital admission following a June 27, 2021 visit to the Tripler OB Triage Clinic, Mrs. Grenier requested that her baby be weighed because she thought the baby was too big. See Stipulated Facts at ¶ 18.

1)   This request was not granted because conducting an ultrasound twelve days after Mrs. Grenier's last ultrasound was not appropriate, and Mrs. Grenier had an ultrasound scheduled a few days after this request, *i.e.*, the July 2, 2021 ultrasound. See Day 3 Trans. at 108 (Dr. Rabie's testimony).

2)   Mrs. Grenier believed that Tripler did not perform weight checks of the fetus often enough during the third trimester of her pregnancy. [Mrs. Grenier Decl. at ¶ 13.]

19.  Mrs. Grenier and Mr. Grenier attempted to measure the fetus every week based on Mrs. Grenier's weight, and they believed the fetus was gaining at least a pound a week. [Id. at ¶ 12.]

20.  There is no direct way to measure a fetus's weight prior to delivery. The EFW is an estimate and varies from actual birth weight. See Rabie Decl. at ¶ 25; see also Mada Decl. at

17

¶ 14 (similar testimony regarding the accuracy of ultrasound estimates at increasing fetal weights).

a.    Although ultrasound estimates have recognized rates of error, when the obstetrician makes a decision that is based upon the estimated fetal weight, the obstetrician uses the estimate itself as the best estimate. See Day 5 Trans. at 76-77 (Dr. Greves's testimony).

21.    Plaintiffs expressed their concern about the baby's size, and they inquired about the possibility of a cesarean section. Mrs. Grenier felt that the Tripler staff dismissed Plaintiffs' concerns and told Plaintiffs to focus on what they could control. See Mrs. Grenier Decl. at ¶ 16 (citing Tr. Exh. J-2 at USA-000379 to USA-000386 (Dr. Rabie's 5/10/21 note), USA-000347 to USA-000351 (5/27/21 note by physician Brian T. Pierce), USA-000304 to USA-000311 (Dr. Rabie's 6/15/21 note), USA-001459 to USA-001460 (Physician's Note (Dyspnea), signed by Samantha M. Carson, M.D., on 6/28/21); see also Declaration of Tyler Grenier, filed 11/12/24 (dkt. no. 196) ("Mr. Grenier Decl."), at ¶ 10 (citing the same exhibits); see also Day 3 Trans. at 57 (Mrs. Grenier's testimony).

22.    At the time of Mrs. Grenier's admission to Tripler, it was not appropriate to perform a cesarean section simply based on maternal request and with no medical reason, but professional guidelines now recommend that physicians allow cesarean sections

simply if requested. <u>See</u> Rabie Decl. at ¶ 21; <u>see also</u> Day 5
Trans. at 40 (Dr. Greves's testimony).

    23.  The ACOG guidance states that, because there is no
precise method to predict macrosomia and because of the absence
of randomized clinical trials, planned cesarean sections for
suspected macrosomia when the EFW is below the 4,500 gram
threshold for patients with diabetes and the 5,000 gram
threshold for other patients are controversial. Mada Decl. at
¶ 14; <u>see also</u> Greves Decl. at ¶ 12.


**C.    <u>Labor and Delivery</u>**

    24.  Mrs. Grenier went to Tripler on July 6, 2021 for her
scheduled induction. <u>See</u> Stipulated Facts at ¶ 21. Dr. Rabie was
the attending physician on duty when Mrs. Grenier arrived.
[Rabie Decl. at ¶ 28; Tr. Exh. J-3[11] at USA-001123 to 1130 (OB
Nurse Admit Assessment, dated 7/6/21).] However, because
Dr. Rabie's shift ended, Dr. Rabie was not involved in
Mrs. Grenier's labor and delivery. [Rabie Decl. at ¶ 32.]

    25.  Mrs. Grenier told Dr. Rabie she thought the baby was
too big, and Plaintiffs expressly stated that they wanted to
have a cesarean section. [Mrs. Grenier Decl. at ¶ 18.]

---

    [11] Trial Exhibit J-3 is Tripler's induction and labor
records for Mrs. Grenier.

26.  After Mrs. Grenier's admission, Dr. Rabie counseled her about the risks and benefits of induction of labor compared to a cesarean section. Dr. Rabie recommended induction of labor, and Mrs. Grenier agreed. [Rabie Decl. at ¶ 28.]

27.  Mrs. Grenier signed a form giving informed consent for a vaginal delivery. The three-page document informed Mrs. Grenier of the risks, benefits, and alternatives to the induction of labor. The alternatives included an operative vaginal delivery using forceps or a vacuum and a cesarean section. See Stipulated Facts at ¶ 21.a; Rabie Decl. at ¶ 28. All patients who are admitted to Tripler's Labor and Delivery department for a vaginal delivery are informed about the risks of the procedure, and they consent to an operative birth as an alternative. See Mada Decl. at ¶ 17.

28.  The informed consent document for a scheduled cesarean section is different document than the document that Mrs. Grenier signed. [Rabie Decl. at ¶ 28.]

29.  While Mrs. Grenier acknowledged that the form was explained to her, she stated that the specific risks for each alternative were not explained to her. [Day 3 Trans. at 35.]

30.  After her admission, Mrs. Grenier requested an ultrasound to measure the estimated fetal weight, but no ultrasound was done. [Id. at 59.] It is not the standard of care to perform an ultrasound every four days. See Day 1 Trans. at 90

20

(Dr. Levy's testimony); Day 5 Trans. at 80 (Dr. Greves's
testimony).

31.  Mrs. Grenier began pushing at 2:51 a.m. on July 7,
2021. [Stipulated Facts at ¶ 22.a.] Mrs. Grenier had been in
labor for twelve hours before she started pushing. [Day 4 Trans.
at 13 (Dr. Mada's testimony).]

32.  Dr. Mada's July 6, 2021 shift started at 6:00 p.m.
[Mada Decl. at ¶ 6.]

a.  During the relevant period, when a shift change
occurred at Tripler, there was an informal handoff and a formal
handoff of each patient's care. Id. at ¶ 7; see also Pilgrim
Decl. at ¶ 7 (referring to this process as the "sign off").

b.  During the handoff, Dr. Rabie and Dr. Mada
discussed the EFW and the fact that they estimated that the baby
would have a higher than usual birth weight. See Day 4 Trans. at
34-35 (Dr. Mada's testimony). Dr. Mada discussed that
expectation with Mrs. Grenier. [Id. at 35.]

c.  Also during the handoff, Dr. Rabie and
Dr. Pilgrim discussed the EFW from Mrs. Grenier's July 2, 2021
ultrasound. Dr. Pilgrim was aware that J.A.G. was estimated to
be in the ninety-eighth percentile based on EFW and abdominal
circumference. [Id. at 63 (Dr. Pilgrim's testimony).]

d.  Dr. Pilgrim was aware that Mrs. Grenier had
expressed concerns about delivering a large baby. See

21

Defendant's Counter Deposition Designations of Justin Pilgrim,
D.O. ("Def.'s Pilgrim Depo. Designation"), filed 11/18/24 (dkt.
no. 217), Exh. 1 (transcript of Deposition of Justin Pilgrim,
D.O., taken 3/27/23) ("Pilgrim Depo. Trans.") at 19.[12]

33.  By the time Dr. Mada's shift started, Mrs. Grenier
already had her epidural, and her labor was progressing as
anticipated. [Mada Decl. at ¶ 6.] Mrs. Grenier completed the
first stage of labor without any complications. [Day 4 Trans. at
45 (Dr. Mada's testimony).]

34.  Dr. Mada's understanding was that Mrs. Grenier's
induction of labor prompted by preeclampsia, and that
Mrs. Grenier had notable medical history of type 1 diabetes and
labial swelling. Mada Decl. at ¶ 8; see also Pilgrim Decl. at
¶ 7 (stating that, during the sign off, Dr. Pilgrim learned
about Mrs. Grenier's history of diabetes and labia edema).
Mrs. Grenier's labial swelling was not clinically relevant to
her delivery because the size of Mrs. Grenier's labia and her
swelling did not affect the birthing process. They did not
compress the birth canal or otherwise affect her labor. Mada
Decl. at ¶ 9; accord Pilgrim Decl. at ¶ 7; Declaration of Dwight

---

[12] Exhibit 1 to Defendant's Pilgrim Deposition Designation
reflects both Plaintiffs' designations and Defendant's. See
Def.'s Pilgrim Depo. Designation at 3.

Rouse, M.D., filed 11/19/24 (dkt. no. 230) ("Rouse Decl."), at
¶ 21.[13]

35.  Dr. Mada reviewed Mrs. Grenier's most recent
ultrasound and the admission note. Dr. Mada was aware that
J.A.G. was estimated to weigh over 4,000 grams and that
accelerated fetal growth was suspected. [Day 4 Trans. at 17-18.]

36.  Based on the review of Mrs. Grenier's July 2, 2021
ultrasound report, which also showed the EFW from all of
Mrs. Grenier's ultrasounds, Dr. Pilgrim knew that J.A.G.'s
growth was accelerated. [Pilgrim Decl. at pg. 4, ¶ 7;[14] Tr.
Exh. J-2 at USA-000276 (Fetal Growth Overview section of
Dr. Gloeb's 7/2/21 Ante Partum Diagnostic Center note).]

37.  Before she started pushing, Mrs. Grenier told Dr. Mada
that she wanted to have a cesarean section. [Day 3 Trans. at
41.] Dr. Mada disputes that this occurred. [Day 4 Trans. at 28-
29.]

38.  After pushing for approximately two hours,
Mrs. Grenier's epidural was not working as well and she was
exhausted. [Mada Decl. at ¶ 10.]

---

[13] Dr. Rouse is one of Defendant's retained expert
witnesses. He was found qualified to give expert testimony in
obstetrics, gynecology, and maternal-fetal medicine. [Day 5
Trans. at 85.]

[14] The Pilgrim Declaration has two sets of paragraphs
numbered six through eight. See Pilgrim Decl. at pgs. 3-5.

39. Dr. Mada assessed Mrs. Grenier's pushing efforts at
4:57 a.m. <u>See</u> Stipulated Facts at ¶¶ 22.b., 22.b.i

    a.  Dr. Mada and Mrs. Grenier discussed fetal size as
a possible explanation for the lack of decent, but their
discussion focused upon Mrs. Grenier's exhaustion and
controlling her pain level. [Mada Decl. at ¶ 11.]

    b.  At this point, Dr. Mada had concerns about the
lack of fetal decent, but Dr. Mada wanted to evaluate
Mrs. Grenier's pushing efforts herself before making a strong or
firm recommendation. [<u>Id.</u>] A cesarean section was not
recommended to Mrs. Grenier during her labor with J.A.G. [Tr.
Exh. J-18 (Def. United States of America's Response to Pltfs.'
First Request for Admissions to Def., dated 4/4/23) at No. 11.]

    c.  Dr. Mada documented in the medical records that
she discussed the risk of vaginal lacerations, the risks and
benefits of an operative birth, and the risks and benefits of a
cesarean section. Dr. Mada told Mrs. Grenier that a cesarean
section was a reasonable option, but Mrs. Grenier chose to
continue pushing. [Stipulated Facts at ¶ 22.b.iii.] Mrs. Grenier
told Dr. Mada that she wanted to continue to push because, after
the pain control improved, her pushing efforts would be more
effective. [Mada Decl. at ¶ 11.]

40. Mrs. Grenier pushed with Dr. Mada for approximately
forty-five minutes after Mrs. Grenier's epidural was re-dosed.

[Mada Decl. at ¶ 13.] At that point, Dr. Mada was concerned because: the fetal heart rate was faster than normal; the fetal heart rate tracing indicated possible fetal acidosis; and Dr. Mada did not expect a prompt delivery because of the lack of significant fetal descent. [Id.]

41. Mrs. Grenier pushed with Dr. Mada until 5:48 a.m., when Dr. Mada called Dr. Pilgrim to assess Mrs. Grenier's progress. See Stipulated Facts at ¶¶ 22.b.iv, 22.c.i. At this point, Mrs. Grenier had been pushing for a total of approximately three hours.

a.    When Dr. Pilgrim came to Mrs. Grenier's bedside, the fetal station was as at +1.[15] Dr. Mada opined that an operative delivery was feasible, and Dr. Pilgrim agreed with Dr. Mada's assessment. See Stipulated Facts at ¶ 22.c.i; see also Tr. Exh. J-3 at USA-001119 (Dr. Mada's notes reflecting the discussion between Drs. Mada and Pilgrim and Mrs. Grenier regarding her labor options).

1)    A midforceps delivery, which occurs when the fetus is at 0 to +1 station, has increased risks, as compared to

---

[15] Fetal station measures "the relationship of the fetal scalp to the ischial spine. It's a part of the pelvis that gives us an idea of how deep into the pelvis the fetal head is." [Day 1 Trans. at 128 (Dr. Levy's testimony).]

a low outlet forceps delivery.[16] See Day 4 Trans. at 32

(Dr. Mada's testimony); see also Levy Decl. at ¶ 40.

      b.   During this conversation with Drs. Mada and

Pilgrim, Mrs. Grenier reported that she was exhausted.

[Stipulated Facts at ¶ 22.c.i.]

      c.   Dr. Mada explained to Mrs. Grenier that the

delivery should be expedited in light of the recent fetal heart

rate tracing results. [Mada Decl. at ¶ 13.]

      d.   Dr. Mada advised Mrs. Grenier about the risks and

benefits of a cesarean section, and Dr. Mada advised her about

the alternatives and the risks and benefits of the alternatives.

[Id.]

      e.   With fetal decent to +2 station, there was

increased risk associated with a cesarean section because, the

lower the fetal head is during the cesarean section, the higher

the risk that a hysterectomy will be necessary. [Day 4 Trans. at

47 (Dr. Mada's testimony).]

      1)   After two hours of pushing and descent down

the birth canal, there is a greater risk of complications during

a cesarean section compared to the risks of a cesarean section

under other circumstances, in part because the fetus has to be

---

[16] In a low forceps delivery, the fetus is at +2 or greater
station. If the fetus is at +5 station, it is considered an
outlet forceps delivery. An outlet forceps delivery has the
least amount of risk. [Levy Decl. at ¶ 40.]

pushed back up the birth canal before the cesarean section.
[Defendant's Counter Deposition Designations of Colonel Caela
Miller, M.D., filed 11/18/24 (dkt. no. 216) ("Def.'s Miller
Depo. Designation"), Exh. 1 (Transcript of Zoom Deposition of
Colonel Caela Miller, held on 2/29/24 ("Miller Depo. Trans."))
at 22-23.[17]]

　　　　　　　2)　Cesarean delivery of a large fetus in the
second stage of labor can be very difficult and result in
serious trauma to the fetus, such as a skull fracture. [Rouse
Decl. at ¶ 11.]

　　　　　f.　When discussing the available options with
Mrs. Grenier, Dr. Mada was aware that of the suspected
macrosomia, see Day 4 Trans. at 30, and that the fetus's
estimated abdominal circumference was greater than the ninety-
ninth percentile, based on Mrs. Grenier's last ultrasound, see
id. at 34.

　　　　　g.　By the time Dr. Mada and Dr. Pilgrim had the
discussion about options with Mrs. Grenier, she had been in
labor for a total of fourteen hours, had been pushing for two

---

[17] Exhibit 1 to Defendant's Miller Deposition Designation
reflects both Plaintiffs' designations and Defendant's. See
Def.'s Miller Depo. Designation at 3-4. Colonel Caela Miller,
M.D. is an obstetrician and gynecologist, and Dr. Miller was the
department chief of the labor and delivery section at Tripler
during the period relevant to this case. [Miller Depo. Trans. at
8, 10.]

hours, and had reported maternal exhaustion. [Day 4 Trans. at 29-30.]

       h.   Dr. Mada and Mrs. Grenier discussed the risks, benefits, and alternatives of a forceps delivery. Mrs. Grenier said she understood and agreed to the procedure. [Stipulated Facts at ¶ 22.c.i.]

       i.   Dr. Mada elected to perform an operative delivery with forceps. [Mada Decl. at ¶ 20.]

42.  Dr. Mada could not perform a cesarean section without Mrs. Grenier's consent. [Day 4 Trans. at 47.]

43.  Dr. Mada admitted that some parts the note that she wrote to document Mrs. Grenier's delivery were incorrect. [Id. at 25.]

44.  Mrs. Grenier does not remember much of the discussions with doctors before the forceps delivery because she was exhausted and medicated. She does not recall being told about forceps being used and the risks. [Mrs. Grenier Decl. at ¶ 20.]

45.  After their conversation with Dr. Mada, Plaintiffs asked one more time about the possibility of doing a cesarean section. Dr. Mada reiterated that she did not think a cesarean section was a good idea, and she advised them to proceed with a forceps delivery. [Id. at 45.]

46.  Plaintiffs ultimately accepted Dr. Mada's recommendation of a forceps delivery. See id.; Mr. Grenier Decl. at ¶ 14.

47.  Once the decision was made to perform an operative vaginal birth, preparations were made for the delivery. Mrs. Grenier continued to push during this time. [Mada Decl. at ¶ 19.]

48.  Dr. Mada performed the forceps delivery under Dr. Pilgrim's supervision. [Id.] Dr. Pilgrim applied perineal pressure. [Pilgrim Decl. at ¶ 13.]

49.  It was confirmed that the Simpson's forceps were free from defects and that the blades were able to articulate with ease. The blades were lubricated with iodine. The tip of the left blade was gently introduced into Mrs. Grenier's vagina, followed by the right blade. Mrs. Grenier's labia were manually retracted to facilitate the placement of the forceps. After the biparietal application, the two blades were articulated with ease. [Stipulated Facts at ¶ 22.c.v.]

50.  Mrs. Grenier's labia were retracted to allow for better visualization, but the labia were not a concern during the delivery. See Mada Decl. at ¶ 24; see also Pilgrim Decl. at ¶ 13; Rouse Decl. at ¶ 21 (both similar to Dr. Mada's testimony).

29

51.    During Mrs. Grenier's next contraction, gentle traction was applied in coordination with her pushing effort. The fetal station advanced with these efforts, and the total traction time was three minutes with two contractions. The forceps handles were gradually elevated when the occiput[18] was delivered. [Stipulated Facts at ¶ 22.c.vi.]

52.    J.A.G.'s head was delivered, with the assistance of a Ritgen's maneuver, at 5:56 a.m., and the forceps were disarticulated at that time. [Id. at ¶ 22.d.]

53.    Delivery of J.A.G.'s head was uneventful and straightforward. [Mada Decl. at ¶ 20.]

54.    Shoulder dystocia was called at 5:57 a.m. [Stipulated Facts at ¶ 22.e.]

55.    Mrs. Grenier was placed in the McRoberts position suprapubic pressure continued downward traction was applied to the fetal head. After these maneuvers were unsuccessful, the left posterior arm was delivered which relieved shoulder dystocia. [Id.]

56.    The delivery of the shoulders took an estimated forty-five seconds. [Mada Decl. at ¶ 21; Tr. Exh. J-3 at USA-001117 to USA-001123 (OB Multidisciplinary Delivery Summary, signed by

---

[18] "Occiput" refers to the back of the head. See Brock Decl. at ¶ 13.

Touria R. Burk, R.N.; and Karaline A. Schmitz, R.N.; on 7/7/21
and by Dr. Pilgrim on 7/8/21).]

57.  Delivery was complete at 5:58 a.m. [Stipulated Facts
at ¶ 22.f.] J.A.G. weighed 4,680 grams – *i.e.*, ten pounds and
five ounces – which placed him in the top one percent of birth
weights. See id. at ¶ 23; see also Tr. Exh. J-5 at USA-002086 to
USA-002088 (Newborn Nurse Admission note, stored by Ekaterini
Nofal, R.N. on 7/7/21).

58.  After Dr. Mada delivered the placenta, ensured that
Mrs. Grenier was hemodynamically stable, identified
Mrs. Grenier's perineal laceration, and obtained Mrs. Grenier's
consent for the surgical repair, Dr. Mada went to the warmer to
see J.A.G. [Mada Decl. at ¶ 25.]

59.  Dr. Mada did not perform a full examination of J.A.G.,
but did not see any lacerations or bruising on his face, head,
or body, nor any severe injuries. [Id.] J.A.G. was not showing
signs of any encephalopathy[19] or hypoxic ischemic injury
(meaning that he had sufficient oxygen). [Id.]

60.  After J.A.G. was transferred to the warmer,
Dr. Pilgrim observed typical marks on J.A.G.'s face where the
forceps were placed, but the marks were neither unusual nor

---

[19] Encephalopathy means, in general, that the brain is not
functioning appropriately. See Transcript of Non-Jury Trial
(Day 2), held on 12/3/24, filed 1/22/25 (dkt. no. 313) ("Day 2
Trans."), at 8 (Dr. Deputy's testimony).

concerning. [Pilgrim Decl. at ¶ 16.] He did not see any feces on J.A.G.'s face. Dr. Pilgrim was close enough to see if someone wiped fecal matter off of J.A.G.'s face, but Dr. Pilgrim did not see anyone do so. [Day 4 Trans. at 89-90.]

61.  The photographs that are Exhibit J-9, GRENIER003646 and GRENIER003647 reflect how Dr. Mada and Dr. Pilgrim remember J.A.G. looked immediately after birth. [Mada Decl. at ¶ 26; Pilgrim Decl. at ¶ 17.]

a.  GRENIER003646 and GRENIER003647 show the typical bruising seen on babies after vaginal deliveries, without any lacerations. [Mada Decl. at ¶ 26.]

b.  There are no lacerations, *i.e.* open cuts, and only the typical bruising/surface minor abrasions seen during vaginal deliveries are seen in the photographs. [Pilgrim Decl. at ¶ 17.]

c.  An indention and minor abrasion where the forceps were placed can be seen in Trial Exhibit J-9, GRENIER003644, but these are typical and were not a cause for concern. [Pilgrim Decl. at ¶ 17.]

1)  GRENIER003644 shows one area that could be described a laceration, but that area is not where the forceps blades were placed. [Day 4 Trans. at 84 (Dr. Pilgrim's testimony).]

      2)    GRENIER003644 shows a bruise on J.A.G.'s cheek from the forceps. [Id.] It also shows bruising on J.A.G.'s ear, but it was hard to say whether that bruise was from the forceps "because sometimes the blood underneath the skin may travel to a gravity-dependent area and make the bruise appear larger." [Id.] In a forceps delivery, the forceps are not placed on the face, on the ears, or above the ears. [Day 5 Trans. at 95 (Dr. Rouse's testimony).]

      3)    The open wound seen in GRENIER003644 was not evident when J.A.G. was in the labor and delivery room. [Day 4 Trans. at 84 (Dr. Pilgrim's testimony).]

62. Most of the photographs in Exhibit J-9 do not reflect J.A.G.'s appearance immediately after he was born. [Mada Decl. at ¶ 26.] The necrosis on J.A.G.'s skin developed after the delivery. [Pilgrim Decl. at ¶ 17.] The necrosis in the back of J.A.G.'s neck developed after J.A.G. was septic. [Day 4 Trans. at 121 (Dr. Brock's testimony).]

63. "*E. coli* is a highly invasive strain of bacteria that has long been known to be one of the two most common causes of systemic infection in newborn infants." [Declaration of Thomas

Wiswell, filed 11/19/24 (dkt. no. 231) ("Wiswell Decl."), at

¶ 20.[20]]

> Infections with *E. coli* have high rates of
> mortality and morbidity including multisystem
> organ failure and substantial long-term
> neurological problems. Additionally, E. coli
> infections are a recognized cause of purpura
> fulminans which is associated with coagulation
> abnormalities leading to thrombi (clots) that
> occlude blood vessels. Infection-associated
> purpura fulminans is manifested by purple spots
> and patches on the skin, shock (hypotension),
> disseminated intravascular circulation
> ("DIC"),[21] and circulatory failure leading to
> multiorgan dysfunction. . . .

[Id. at ¶ 21.] However, although the development of purpura

fulminans is known complication, they do not develop in all

cases of *E. coli* infection; less than one or two percent of

babies who experience *E. coli* sepsis develop purpura fulminans.

[Day 6 Trans. at 57 (Dr. Wiswell's testimony).]

         a.   When an infant develops *E. coli* sepsis within the

first seventy-two hours of life, it is likely to be "a vertical

transmission from the mom to the baby." See Pilgrim Depo. Trans.

at 25; see also Greves Decl. at ¶ 30.

---

         [20] Thomas Wiswell, M.D., is one of Defendant's retained
expert witnesses. See Wiswell Decl. at ¶ 6. He was found
qualified to give expert testimony in the area of neonatology.
[Transcript of Non-Jury Trial (Day 6), held on 12/10/24, filed
1/22/25 (dkt. no. 317) ("Day 6 Trans."), at 11-12.]

         [21] DIC affects the blood's ability to clot. [Stipulated
Facts at ¶ 28.]

b.    An *E. coli* infection can occur whether the baby
was delivered through a nonoperative vaginal delivery, a forceps
delivery, or a cesarean section. [Day 6 Trans. at 45
(Dr. Wiswell's testimony).] *E. coli* infection in babies common,
but a septic or systemic *E. coli* infection occurs approximately
two or three times per one thousand births. [Id. at 46-47.]

c.    There are many ways that bacteria can be
transferred to a person, which suggest that the transfer of the
*E. coli* bacteria can occur at any time any time, through various
means. [Greves Decl. at ¶ 30.]

d.    When bacteria is transferred from mother to baby,
the most likely causes are through the baby's respiratory tract,
gastrointestinal tract, or mucous membranes. [Day 6 Trans at 16
(Dr. Wiswell's testimony).] Infection through skin injury is
very unusual, especially for infections that develop during a
baby's first three days of life. [Id. at 17.]

64.   The profound sepsis that J.A.G. had could have caused
the necrosis, skin breakdown, and poor healing that is seen in
photographs of J.A.G. taken while he was in the NICU. [Pilgrim
Depo. Trans. at 24.]

65.   The source of J.A.G.'s *E. coli* infection is unknown.
[Day 4 Trans. at 115-16 (Dr. Brock's testimony).]

35

D.   **Mrs. Grenier's Perineal Laceration**

66.   After delivery, Mrs. Grenier was diagnosed as having a fourth-degree perineal laceration. She agreed to the recommendation of an immediate repair and was taken to the operating room. [Stipulated Facts at ¶ 22.g.]

67.   A fourth-degree perineal laceration extends from the vagina to the rectal mucosa and exposes the fetus to blood and fecal matter. [Day 4 Trans. at 17 (Dr. Mada's testimony).]

68.   Lacerations are a known risk of all vaginal deliveries. Pilgrim Decl. at ¶ 18; see also Rouse Decl. at ¶ 22.

69.   Before Mrs. Grenier was taken to the operating room, the risks of the repair procedure were discussed with Mrs. Grenier. [Day 4 Trans. at 52 (Dr. Mada's testimony).]

70.   Allen A. Mehr, D.O., performed the laceration repair. Dr. Mada assisted and prepared the notes. [Mada Decl. at ¶ 28; Tr. Exh. J-4 at USA-001057 to USA-001059 (Operative Report, signed by Dr. Mada on 7/7/21 and by Dr. Mehr on 7/8/21).]

71.   After Mrs. Grenier's repair procedure, her prognosis was guarded because of her diabetes. [Day 4 Trans. at 54 (Dr. Mada's testimony).]

72.   Even after the repair, Mrs. Grenier was unable to sit for more than a few minutes at a time because of the fourth-degree laceration. See Mrs. Grenier Decl. at ¶ 25.

73.  Mrs. Grenier's first repair failed, and she required multiple surgeries. [Id. at ¶ 44.]

**E.    J.A.G.'s Postnatal Care**

74.  Within five minutes after birth, J.A.G. needed respiratory support and was transported to the NICU. [Stipulated Facts at ¶ 23.]

75.  J.A.G. also had moderate caput,[22] which is very common in babies who are delivered vaginally. [Brock Decl. at ¶ 11.]

76.  J.A.G.'s neurological examinations were normal, and there was no indication of encephalopathy. See Stipulated Facts at ¶ 24; see also Brock Decl. at ¶ 14. J.A.G. appeared neurologically healthy when he was admitted to the NICU, and there was no evidence of a brain injury. See Brock Decl. at ¶ 14; Wiswell Decl. at ¶ 15; Declaration of Stephen Deputy, M.D., filed 11/12/24 (dkt. no. 194) ("Deputy Decl."), at ¶ 8.[23]

77.  Mrs. Grenier did not see J.A.G. until after the surgery to repair her perineal laceration. When she saw him, he

---

[22] Caput is swelling under the skin on the head. [Brock Decl. at ¶ 11.]

[23] Stephen Deputy, M.D., is one of Plaintiffs' retained expert witnesses. See Deputy Decl. at ¶ 3. He was found qualified to give expert testimony in the areas of pediatric neurology. [Day 2 Trans. at 6.]

looked swollen, and she observed severe lacerations on his face. See Mrs. Grenier Decl. at ¶ 24.

78.   When Mr. Grenier cut J.A.G.'s umbilical cord, he could see lacerations on J.A.G.'s face that were from the forceps used during delivery. [Mr. Grenier Decl. at ¶ 16; Day 1 Trans. at 46.]

a.   Mr. Grenier saw lacerations on J.A.G. that were particularly visible a few minutes J.A.G.'s birth because of his coloring and swelling around the areas where the forceps left impressions. [Day 1 Trans. at 46.]

b.   Mr. Grenier identified one laceration under J.A.G.'s chin and one on the back of J.A.G.'s head in a photograph that was taken during the cutting of the umbilical cord. However, Mr. Grenier testified that the lacerations are not as clearly visible in the photograph as they were in person. See id.; Tr. Exh. J-9 at GRENIER003647.

79.   Mr. Grenier described the lacerations on J.A.G.'s head as open, bleeding areas in J.A.G's skin where the forceps were. However, he admitted the skin breakage was not visible in the photograph he was shown from USA-018233 of Trial Exhibit D-11. [Day 1 Trans. at 50.] For Mr. Grenier, the lacerations were visible in the photographs in USA-18235 and USA-18236 of Exhibit D-11. [Id. at 62.]

38

80.  Dr. Brock began his July 7, 2021 shift at 7:00 a.m.
Dr. William Sherman was on-duty during the prior shift, and
Dr. Brock accepted J.A.G.'s case from Dr. Sherman. [Brock Decl.
¶ 8.]

81.  Dr. Sherman informed Dr. Brock that J.A.G. was in the
NICU, and Dr. Sherman gave Dr. Brock a description of J.A.G. and
J.A.G.'s background, as well as J.A.G.'s immediately apparent
concerns – hypoglycemia and respiratory distress. [Brock Decl.
at ¶ 8.] Both concerns were resolved. [Id. at ¶¶ 9-10.]

82.  At 7:04 a.m. on July 7, 2021, a nurse noted that
J.A.G. had: bruising on his face and scalp; abrasions on his
left check, one measuring 0.5 centimeter and the other measuring
1.0 centimeter; and an abrasion on his right occiput measuring
1.0 centimeter. [Id. at ¶ 12 (citing Tr. Exh. J-5 at USA-002717
(page 1 of 4 of Annotations: 0600 7 Jul 2021 – 0600 8 Jul
2021)).]

83.  Neither J.A.G.'s scalp nor his face was lacerated or
cut when J.A.G. entered Dr. Brock's care. [Brock Decl. at ¶ 13.]
When nurses examined J.A.G. upon his admission to the NICU,
small abrasions were noted on J.A.G.'s left cheek and on the
back of his head. [Id. (citing Tr. Exh. J-5 at USA-002717).]

84.  At 12:30 p.m. on July 7, 2021, J.A.G. was described as
"a well appearing, non-dysmorphic infant in no acute distress,
large for age. That the head had: head/facial bruising and

39

abrasions due to the traumatic birth, moderate caput with no
cephalohematoma or subgaleal and the exam comments were: 'most
notable for facial/scalp trauma from birth, no concerns for
encephalopathy.'" Stipulated Facts at ¶ 25; see also Tr.
Exh. J-5 at USA-002072 (Admission Physical Exam note, dated
7/7/21 at 12:30 p.m. by Brandon L. Fong, M.D.). Dr. Fong's note
also states that J.A.G.'s abdomen was "[s]oft, non-distended,
without masses or hepatosplenomegaly."[24] [Tr. Exh. J-5 at
USA-002072.]

85.  At 12:57 p.m., a nurse noted that J.A.G. had a scalp
abrasion, and a Tripler nursing record stated J.A.G.'s head had
caput succedaneum, forceps marks, molding, bruising, and a
laceration. Stipulated Facts at ¶ 26; see also Tr. Exh. J-5 USA-
002087 (Nursing Admission Physical Assessment section of Newborn
Nurse Admission note, dated 7/7/21).

a.  Dr. Brock was J.A.G.'s treating neonatologist,
and the only treatment that was provided for J.A.G.'s injuries
related to the use of forceps during delivery was the
application of bacitracin on the forceps abrasions. See Day 4
Trans. at 127. The forceps delivery itself did not require any
additional treatment by the neonatal team. [Id. at 128.]

---

[24] Hepatosplenomegaly is "swelling of the liver and spleen."
[Brock Decl. at ¶ 15.]

40

86.  At 7:30 p.m. on July 7, 2021, a nurse noted bruising on J.A.G.'s extremities, buttocks, back, and left shoulder. This was the first time that injuries to that extent were noted. See Brock Decl. at ¶ 16.

87.  On July 8, 2021 at 2:25 p.m., J.A.G.'s head had significant bruising, abrasions, and swelling. Within twenty-four hours, new bruises became visible on his lower extremities. The daily physical exam noted, *inter alia*, that J.A.G. appeared to be in pain while lying in bed and he had a high-pitched cry. Dr. Brock noted J.A.G. had was moderate caput, but no crepitus of the skull. [Stipulated Facts at ¶ 27.a.]

88.  Dr. Brock first noted that J.A.G. appeared to be in pain at approximately 12:00 p.m. on July 8. J.A.G.'s abdomen was noted to be distended and J.A.G. had an elevated temperature. Because Dr. Brock was concerned about the possibility of infection, he ordered blood cultures and started J.A.G. on antibiotics. [Brock Decl. at ¶ 17.] To determine if there was a non-infectious reason for J.A.G.'s discomfort, computerized tomography ("CT") scans of J.A.G.'s head and J.A.G.'s chest, abdomen, and pelvis were ordered. Id.; see also Tr. Exh. J-5 at USA-002091 to USA-002095 (NICU Physician Progress Note, signed on 7/8/21, by Dr. Fong at 4:03 p.m. and Dr. Brock at 5:06 p.m.). The head CT scan was ordered because of the possibility of a skull fracture during delivery. A head CT scan is more accurate

than a physical exam for the identification of head trauma.
[Brock Decl. at ¶ 18.]

89.  J.A.G.'s head CT scan showed "a right-sided
cephalohematoma,[25] a hyperdensity near the tentorium indicative
of a small subdural hematoma," but "there was no significant
bony trauma or intracranial bleed." Stipulated Facts at
¶ 27.b.i; see also Tr. Exh. J-5 at USA 002095 to USA 002096
(Radiology Results, CT, head w/o contrast, taken 7/8/21); Day 4
Trans. at 126-27 (Dr. Brock's testimony that there was no skull
fracture visible in the initial head CT scan, nor in any
subsequent imaging studies at Tripler).

    a.  Neither the cephalohematoma nor the subdural
hematoma was remarkable as both often occur without consequence
in normal deliveries. [Brock Decl. at ¶ 18.]

90.  The CT scan of J.A.G.'s chest/abdomen/pelvis "revealed
R subcapsular Grade II-III liver laceration of posterior hepatic
lobe, bilateral adrenal hemorrhage and poor perfusion of right
kidney." Stipulated Facts at ¶ 27.b.ii; see also Tr. Exh. J-5 at
USA-002096 to USA-002097 (Radiology Results, CT, chest/abd/pel
w/IV only, taken 7/8/21).

91.  Grade III liver lacerations are uncommon. [Day 4
Trans. at 114 (Dr. Brock's testimony).]

---

[25] A cephalohematoma is "a small area of fluid outside the
skull." [Pilgrim Decl. at ¶ 18.]

92.  Liver laceration is not a known risk of either operative or nonoperative vaginal delivery. In a forceps delivery, the blades are placed on the fetus's head, not near the liver. Further, liver laceration is not related to shoulder dystocia. [Mada Decl. at ¶ 33.]

93.  Although liver lacerations are associated with large-for-gestational-age babies, there is no significant causation. [Day 4 Trans. at 115 (Dr. Brock's testimony).] Although more common in large-for-gestational-age babies, the cause of liver lacerations is unknown. [Id.] J.A.G.'s liver laceration healed completely. [Brock Decl. at ¶ 19.]

94.  At 5:30 p.m. on July 8, 2021, it was noted that J.A.G. had "moderate caput, soft fontanelles, no facial dysmorphism, forceps marks, and ecchymosis to bilateral cheeks." [Stipulated Facts at ¶ 27.c.]

95.  During the evening of July 8, 2021, J.A.G.'s lab results indicated the presence of gram negative rods, which were later identified at *E. coli*. [Brock Decl. at ¶ 20 (citing Tr. Exh. J-5 at USA-002043 (part of 7/10/21 Pediatric Infectious Disease note by Milissa U. Jones)).]

96.  J.A.G. quickly started to decompensate on July 9, 2021, and Tripler physicians suspected J.A.G. had DIC. Stipulated Facts at ¶ 28; see also Brock Decl. at ¶ 21.

97.   J.A.G. was also suspected to have hypotension and an adrenal hemorrhage. [Brock Decl. at ¶ 21.]

98.   Dr. Brock concluded that J.A.G. was in septic shock and experiencing multiple organ failure. Id.; see also Tr. Exh. J-5 at USA-002096, USA-006286 to USA-006291.

99.   Injuries from strokes or infarcts in J.A.G.'s brain were noted in his July 26, 2021 magnetic resonance imaging ("MRI") test, but it is not clear whether those were caused by the DIC or another cause, such as the massive hypotension J.A.G. had from the evening of July 9 to the afternoon of July 10. [Day 4 Trans. at 117 (Dr. Brock's testimony).]

        a.   An infarction is

        dead brain tissue due to lack of delivery of
        oxygen and glucose, and it can be arterial if
        there is a blood clot that's preventing blood
        from reaching an area to the brain. We call that
        an ischemic stroke. Or it can be venous if there
        is back pressure because the blood that's being
        delivered to a part of the brain has nowhere to
        go and more and more blood continues to come in
        through the arterial side.

[Day 2 Trans. at 34 (Dr. Deputy's testimony).]

        b.   J.A.G. suffered multiple venous infarctions that resulted in hemorrhages and permanent injury to J.A.G.'s brain tissue. [Id.]

        c.   J.A.G. suffered thromboses, not a stroke, and these later led to the hemorrhagic infarcts. [Day 6 Trans. at 43-44 (Dr. Wiswell's testimony).]

44

    d.   J.A.G. did not suffer the thromboses at birth because there is no evidence of the condition in J.A.G.'s July 8, 2021 CT scan. The first indications of the thromboses appeared in J.A.G.'s head ultrasound, which was taken when J.A.G. was five-days-old. [Id. at 43.]

100. By July 9, 2021, the Tripler staff were starting to see purpura fulminans across J.A.G.'s body. [Brock Decl. at ¶ 22.]

101. Purpura fulminans

> is related to sepsis where blood clots in the small arteries skin [sic] leave a purple patch. This color change is often then followed up by the death of the tissue, called necrosis, that is no longer getting blood flow. While rare, purpura fulminans has been associated with *E. coli* sepsis, and DIC. In this case it appears that in areas with small vessel trauma (bruises) there was increased clotting and loss of blood flow to those bruised tissues. Of note, purpura fulminans is frequently associated with limb or digit amputation because the clotting can lead to death of entire digits or limbs.

Id.

102. J.A.G.'s purpura fulminans were part of the sepsis sequelae. [Day 4 Trans. at 120.]

103. GRENIER003659 shows an area under J.A.G.'s ear that was flat, and red or purple, with what appears to be a blister. This wound was related to J.A.G.'s sepsis and purpura fulminans, but there was no way to determine if the wound was related to the use of forceps during delivery. See id. at 122.

104. The neonatal team obtained consults regarding infectious disease, surgery, hematology, and cardiology. [Id.]

105. By July 10, 2021, J.A.G. was in septic shock and was suffering from an *E. coli* infection, DIC, an acute kidney injury, diffuse anasarca, abdominal compartment syndrome, and purpura fulminans. [Stipulated Facts at ¶ 29.]

106. As of July 12, 2021, J.A.G. was still in critical condition, but he had improvement in his blood pressure and the amount of swelling. In addition, his abdomen compartment syndrome had resolved. [Brock Decl. at ¶ 26.]

107. Because J.A.G.'s *E. coli* infection was no longer life-threatening, the Tripler physicians began to address other consequences of J.A.G.'s *E. coli*-related DIC, including the patches of necrotic skin. [Id.]

108. On July 12, 2021, a head ultrasound showed that J.A.G. had "echogenic material in the lateral ventricles consistent with intraventricular hemorrhages." [Stipulated Facts at ¶ 30.]

109. Over the next several days, J.A.G. showed continued improvement, and the neonatal team's primary focus turned to addressing J.A.G.'s skin necrosis. [Brock Decl. 27.]

110. Although J.A.G.'s skin healed in some areas that were not as severely injured healed, other areas dead tissue had to be removed in order for healing to occur. The most notable areas

where this occurred were on J.A.G.'s neck and back of his head.
[Id.]

111. The skin on J.A.G.'s neck had broken down
significantly, and by July 19, 2021, it had full thickness
yellow eschar formation. [Stipulated Facts at ¶¶ 33-34.]

112. A skin graft was discussed. [Brock Decl. at ¶ 28.]

113. Another head ultrasound was taken on July 20, 2021,
and it "revealed echogenic material within the lateral
ventricles of J.A.G.'s brain, as well as a slight increase in
the prominence of the focal and confluent regions of
hyperechogenicity in the supratentorial brain parenchyma
bilaterally." [Stipulated Facts at ¶ 35.]

114. A July 26, 2021 brain MRI "revealed subacute
hemorrhages in the posterior cerebral hemispheres with thrombus
in J.A.G.'s straight sinus and bilateral transverse sinuses" and
"[a] right parietal cephalohematoma demonstrated evolution
consistent with pus or infection." [Id. at ¶ 36.] These "were
consistent with a prior venous infarct due to thrombus in dural
venous sinuses." Id.; see also Tr. Exh. J-5 at USA-002287 to
USA-002288 (Radiology Results for 7/26/21 brain MRI with and
without GAD).

115. On August 5, 2021, Dr. Brock noted that J.A.G. was at
risk of neurodevelopmental sequelae. [Day 4 Trans. at 124.]

47

116. J.A.G. underwent another head CT scan on August 6, 2021. [Stipulated Facts at ¶ 37.]

117. On August 16, 2021, approximately seven weeks after his birth, J.A.G. was transferred from Tripler to Balboa Navel Medical Center in San Diego, California, and approximately a week after that, he was transferred to the Shriners Burn Center in Texas. See id. at ¶ 38; Mrs. Grenier Decl. at ¶ 45; Mr. Grenier Decl. at ¶¶ 27-28; see also Brock Decl. at ¶ 28.

118. In October 2021, J.A.G. was transferred back to Tripler, and later released home. [Mr. Grenier Decl. at ¶ 29.]

**F.    Mrs. Grenier's Post-Delivery Interactions with Tripler**

119. Mrs. Grenier had a postnatal visit with Dr. Mada on July 16, 2021. [Stipulated Facts at ¶ 32.] Mrs. Grenier was accompanied by her mother, Angie Ciraco. [Id.; Declaration of Angie Ciraco, filed 11/12/24 (dkt. no. 191) ("Ciraco Decl."), at ¶ 1.]

120. Mrs. Grenier questioned why her medical records indicated that she refused a cesarean section. Mrs. Grenier stated that she wanted a cesarean section throughout her pregnancy, and therefore she would not have refused one. [Stipulated Facts at ¶ 32.a.]

G.    **Professional Standards and Expert Testimony**

   121. **Treatment and Care Prior to Induction of Labor**

      a.    There is no standard of care for obstetricians
that requires the creation of a fetus's growth curve. See Day 5
Trans. at 78-79 (Dr. Greves's testimony).

      b.    Accuracy in predicting macrosomia is poor. [Day 1
Trans. at 81-82 (Dr. Levy's testimony).]

      c.    Based on the June 15 ultrasound and the July 2
ultrasound, which showed an increased EFW of 837 grams in 17
days, *i.e.* at an approximate rate of 49.2 grams per day,
J.A.G.'s estimated fetal weight on Mrs. Grenier's date of
admission would have been just under 4,250 grams. [Day 5 Trans.
at 30-32 (Dr. Greves's testimony).]

         1)    It would not have been appropriate to assume
that that the fetus would gain more than fifty grams a day after
the July 2 ultrasound because the rate of growth indicated in
the July 2 ultrasound was likely caused by Mrs. Grenier's blood
sugar control and, towards the end of her pregnancy, that factor
was not as much of a concern because Mrs. Grenier's blood sugar
control improved as her pregnancy progressed. [Id. at 111-12
(Dr. Rouse's testimony).]

      d.    Even considering the fetus's growth trend as seen
in Mrs. Grenier's ultrasounds, the fetus's estimated weight on
the date of induction was below the 4,500-gram threshold for a

planned cesarean section. See Greves Decl. at ¶¶ 18-19. It would
not have been reasonable to assume that the fetus would grow
more than 480 grams in the four days between Mrs. Grenier's last
ultrasound and the date of her induction. Id. at ¶ 24; accord
Rouse Decl. at ¶ 6.

    e.    Although the Tripler doctors' predictions of
J.A.G.'s birth weight were ultimately below his actual birth
weight, that is not proof that the standard of care was breached
because these are estimates of fetal weight that doctors use to
make reasonable inferences. [Day 5 Trans. at 120-21 (Dr. Rouse's
testimony).]

    **122. <u>Performance of the Forceps Delivery</u>**

    a.    Tripler's Standard Operating Procedure for Labor
and Delivery - Operative Vaginal Deliveries (Forceps/Vacuum
Extractor), dated November 2, 2021 ("Operative Delivery SOP") is
consistent with ACOG guidance and, if the Operative Delivery SOP
is followed, the standard of care is satisfied. Rouse Decl. at
¶ 12; see also Tr. Exh. D-2 (Operative Delivery SOP).

        1)    Although the Operative Delivery SOP is dated
after J.A.G.'s birth, it describes the procedures that
Dr. Pilgrim and his team were following before the Operative
Delivery SOP was formally adopted. [Pilgrim Decl. at ¶ 12.]

        2)    Dr. Mada and Dr. Pilgrim followed the
Operative Delivery SOP at the time of Mrs. Grenier's labor and

delivery, and they met the applicable standard of care when they performed her forceps delivery. [Rouse Decl. at ¶ 12.]

b.    The fact that the forceps articulated with ease and the fact that the delivery of the head was completed with two contractions within three minutes supports that Mrs. Grenier's forceps delivery met the standard of care. [Id. at ¶¶ 17-18.]

1)    The forceps blades do not articulate easily if they were improperly placed. [Day 5 Trans. at 128 (Dr. Greves's testimony).]

2)    If one of the forceps blades had been placed on the fetus's forehead, and the other had been placed on the fetus's cheek, either the blades would not have articulated or, if the blades did articulate, the baby would not have come out. [Id.]

3)    In light of the size of the fetus, the speed of the delivery of the head indicates that the forceps blades were properly placed. [Id. at 128-29.]

c.    J.A.G. had an Apgar score of five one minute after birth and a score of eight five minutes after birth. These scores and the markings that he had at birth are typical for a healthy baby after a forceps delivery. They do not indicate that he suffered a brain injury caused by the use of forceps. Greves

51

Decl. at ¶ 28; accord Rouse Decl. at ¶ 19; Wiswell Decl. at
¶¶ 15-16.

d.    CT brain imaging conducted one day after J.A.G.'s
birth did not show any damage to his brain tissue, but a
July 12, 2021 ultrasound and subsequent MRI results show the
damage that developed thereafter. [Wiswell Decl. at ¶¶ 25-26
(citing Tr. Exh. J-5 at USA-002139 to USA-002140 (Radiology
Results for 7/12/21 head ultrasound)).]

e.    It is likely that J.A.G.'s liver laceration
occurred at some point during the birth process. [Day 6 Trans.
at 48 (Dr. Wiswell's testimony).]

f.    A liver laceration is not a known risk or
complication of forceps delivery. The forceps blades are not
placed near the liver, and the liver would not be lacerated when
the blades move through the vaginal canal. [Rouse Decl. at
¶ 24.] The forceps delivery was not the cause of J.A.G.'s liver
laceration. Id.; see also Day 6 Trans. at 29 (Dr. Wiswell's
testimony).

**123.** ***E. Coli*-Related Complications**

a.    J.A.G.'s subgaleal hemorrhage was not caused by
the forceps delivery, as evidenced by the lack of physical
evidence of such injury seen during physical examinations and
imaging performed during the first weeks of J.A.G.'s life.
[Wiswell Decl. at ¶ 17.] Rather, the complex subgaleal fluid

collection that was due to an area of necrosis and infection from the *E. coli* and the purpura fulminans. [Id.] Those areas of J.A.G.'s brain developed necrosis and died, which resulted in permanent loss of brain tissue and lower brain circumference.[26] The expected result of the loss of brain issue was some neurological or developmental delay. [Day 6 Trans. at 44-45.]

      b.    The same injuries from the purpura fulminans and DIC that affected J.A.G.'s skin also affected his brain. [Day 2 Trans. at 37 (Dr. Deputy's testimony).]

      c.    The first mention of full thickness skin lacerations appears on July 15, 2021. [Wiswell Decl. at ¶ 13 (quoting Tr. Exh. J-5 at USA-002179 (Radiology Results for 7/15/21 NICU chest, abdomen, AP)).]

      d.    The purpura fulminans that were caused by J.A.G.'s *E. coli* infection may have been mistaken by some witnesses for bruises that occurred during the forceps delivery because purpura fulminans can look like bruises. See Wiswell Decl. at ¶ 10.

      e.    Photographs of J.A.G. identified in Trial Exhibit J-9 show the slow development of J.A.G.'s injuries resulting from the *E. Coli* infection. [Wiswell Decl. at ¶ 24

---

[26] The dead brain tissue was reabsorbed by macrophages, leaving behind water-filled cysts, rather than dead brain tissue. [Day 2 Trans. at 36 (Dr. Deputy's testimony).]

(discussing GRENIER003655, GRENIER003656, USA-002262,

GRENIER000150).]

      f.   The necrotic areas on J.A.G.'s head were not

caused by forceps damage and could not have been predicted nor

prevented. [Id. at ¶ 13.]

      g.   There is no correlation between J.A.G.'s large

size or his liver laceration and the complications of his

E. coli infection. [Day 6 Trans. at 58 (Dr. Wiswell's

testimony).]

      **124. <u>Mrs. Grenier's Laceration Repair</u>**

      a.   Vaginal birth of a baby of any size could cause a

fourth-degree perineal laceration. [Day 5 Trans. at 109

(Dr. Rouse's testimony).]

      b.   Further, breakdowns of perineal laceration

repairs are not uncommon, and that fact that a repair breaks

down is not necessarily an indication that the procedure was

performed incorrectly. [Rouse Decl. at ¶ 23.]

      c.   Mrs. Grenier's diabetes increased the risk for

complications of infection and wound healing, and the

description in the medical record of Mrs. Grenier's laceration

repair meets the standard of care. [Id. (citing Tr. Exh. J-4 at

USA-001058 to USA-001059 (note regarding Mrs. Grenier's 7/7/21

fourth-degree laceration repair)).]

### III. CONCLUSIONS OF LAW

**A.    Jurisdiction** – Because Plaintiffs bring this action
pursuant to the Federal Tort Claims Act ("FTCA"), [Complaint at
¶ 2,] this Court has jurisdiction over the instant action
pursuant to Title 28 United States Code Section 1346(b)(1).


**B.    Burden of Proof**

1.    As to each of their claims, Plaintiffs have the burden
to prove the claim and the amount of damages. See Tourgeman v.
Nelson & Kennard, 900 F.3d 1105, 1109 (9th Cir. 2018) ("It is
one of the most basic propositions of law that the plaintiff
bears the burden of proving his case, including the amount of
damages.'" (ellipsis, citations, and internal quotation marks
omitted)).

2.    The FTCA "allows a plaintiff to bring certain state-
law tort suits against the Federal Government." Brownback v.
King, 592 U.S. 209, 210-11 (2021) (citing 28 U.S.C. § 2674;
§ 1346(b)).

3.    The Court applies Hawai`i state substantive law and
federal procedural law to evaluate Plaintiffs' claims against
the United States. See Taylor v. United States, 821 F.2d 1428,
1430, 1432 (9th Cir. 1987); see also 28 U.S.C. §§ 1346, 2674.
Hawai`i law applies because the alleged acts and omissions that
form the basis of Plaintiffs' claims occurred in Hawai`i. See

§ 1346(b) (permitting "civil actions on claims against the
United States, for money damages, . . . for . . . personal
injury or death caused by the negligent or wrongful act or
omission of any employee of the Government while acting within
the scope of his office or employment, under circumstances where
the United States, if a private person, would be liable to the
claimant in accordance with **the law of the place where the act
or omission occurred**" (emphasis added)). Therefore, Hawai`i law
regarding the applicable burden of proof applies to the parties'
claims.

4.    "[T]he preponderance of the evidence standard is
defined as proof which leads the trier of fact to find that 'the
existence of the contested fact is more probable than its
nonexistence.'" <u>Luat v. Cacho</u>, 92 Hawai`i 330, 343, 991 P.2d
840, 853 (Ct. App. 1999) (quoting <u>Masaki v. Gen. Motors Corp.</u>,
71 Haw. 1, 14, 780 P.2d 566 574 (1989)).

5.    "[T]he plaintiff in a medical malpractice case based
on negligent treatment has the burden of establishing a duty
owed by the defendant to the plaintiff, a breach of that duty,
and a causal relationship between the breach and the injury
suffered." <u>Bernard v. Char</u>, 79 Hawai`i 371, 377, 903 P.2d 676,
682 (Ct. App.) (citing 4 F. Lane, *Lane Medical Litigation Guide*
§ 40.14, at 54 (1993)), *aff'd,* 79 Hawai`i 362, 903 P.2d 667
(1995).

6.    Because the fact finder generally lacks specialized knowledge, technical training and background to determine the standard of care, "[i]t is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony." Craft v. Peebles, 78 Hawai`i 287, 298, 893 P.2d 138, 149 (1995) (citation omitted).

7.    In a medical malpractice case, a plaintiff must establish proximate or contributory causation through expert medical testimony. Barbee v. Queen's Med. Ctr., 119 Hawai`i 136, 158, 194 P.3d 1098, 1120 (Ct. App. 2008), *as corrected* (Nov. 5, 2008) (some citations omitted) (citing Devine v. Queen's Medical Center, 59 Haw. 50, 52, 574 P.2d 1352, 1353 (1978); Craft v. Peebles, 78 Hawai`i 287, 305, 893 P.2d 138, 156 (1995)).

8.    The expert opinion must be based on reasonable medical probability that there is a causal nexus between the physician's treatment and the patient's injury. Craft, 78 Hawai`i at 305, 893 P.2d at 156.

9.    Hawai`i statutory law requires physicians to inform patients of the "recognized alternative treatments or procedures, including the option of not providing these treatments or procedures[,]" the "recognized material risks of serious complications or mortality associated with" those

57

procedures, and the "recognized benefits of the recognized
alternative treatments or procedures." Haw. Rev. Stat. § 671-
3(b)(4)-(6). An element of an informed consent claim is that a
physician is required to inform the patient of **possible**
alternative treatments or procedures. Ray v. Kapiolani Med.
Specialists, 125 Hawai`i 253, 266, 259 P.3d 569, 582 (2011)
(citations omitted).

10.  An informed consent action for failure to inform
properly of alternative treatments requires a plaintiff to prove
a prudent person in the plaintiff's position would have made a
different decision if the person had been adequately informed by
the physician. Id. at 266, 259 P.3d at 582.

11.  A defendant owes a duty of care to those foreseeably
endangered by the conduct. Pulawa v. GTE Hawaiian Tel, 112
Hawai`i 3, 12, 143 P.3d 1205, 1214 (2006) (citations omitted).
"The test of foreseeability 'is whether there is some
probability of harm sufficiently serious that a reasonable and
prudent person would take precautions to avoid it.'" Id. at 12,
143 P.3d at 1214 (citation omitted). That an injury is merely
possible is not sufficient. Id. at 12, 143 P.3d at 1214.

12.  A plaintiff is required to prove that the defendant's
conduct was the legal cause of injuries as an element of a
negligence action. Mitchell v. Branch, 45 Haw. 128, 132, 363
P.2d 969, 973 (1961) (adopting the RESTATEMENT (FIRST) OF TORTS § 431

(Am. Law Inst. 1934) definition of legal cause). Hawai`i law applies the Mitchell test to determine whether the defendant's conduct was a legal cause of a plaintiff's injuries, which requires a determination of whether the defendant's conduct is a substantial factor in bringing about the harm, and there is no rule of law relieving liability for the harm. O'Grady v. State, 140 Hawai`i 36, 44, 398 P.3d 625, 633 (2017), *as amended* (June 22, 2017) (citation omitted).

## C.    **Whether Plaintiffs Proved a Breach of the Standard of Care**

13.    The Court concludes that Plaintiffs did not prove by a preponderance of the evidence that Defendant's employees provided negligent medical treatment in Mrs. Grenier's prenatal care, labor, or delivery of J.A.G., and that Plaintiffs did not prove by a preponderance of the evidence that negligent medical treatment in the prenatal care, labor, or delivery of J.A.G. was the legal cause of his injuries nor the legal cause of the *E. coli* infection that resulted in life-threatening illnesses and injuries for J.A.G.

14.    The decision not to perform an ultrasound after Mrs. Grenier requested one on June 27, 2021 was not a breach of the standard of care because she had an ultrasound on June 15, 2021, and she had one scheduled for July 2, 2021. See Day 3 Trans. at 108 (Dr. Rabie's testimony).

59

15.   The failure to prepare a growth curve chart was not below the standard of care because no standard requires a doctor to create one during a patient's pregnancy, and a growth curve chart is generated by the ultrasound machine for reference during the performance of an ultrasound. See Day 5 Trans. at 78-79 (Dr. Greves's testimony); Day 3 Trans. at 105-06 (Dr. Rabie's testimony).

16.   The failure to schedule Mrs. Grenier for a planned cesarean section was not below the standard of care because the last ultrasound reading, although indicating suspected macrosomia, did not indicate that a planned cesarean section was warranted based on the ACOG standards that constitute the applicable standard of care. See Greves Decl. at ¶¶ 7, 18-19; Rouse Decl. at ¶ 6. The Court concludes that there is insufficient evidence that the standard of care for early induction of labor was breached based on Dr. Greves's expert opinion testimony that the accepted standard of care was met because Mrs. Grenier's labor was induced early based on gestational hypertension and, when that decision was made, the Tripler physicians considered the estimated fetal weight at Mrs. Grenier's last ultrasound on July 2, 2021, which was four days before she was admitted for induction of labor on July 6, 2021 and five days before delivery on July 7, 2021. See Greves Decl. at ¶ 21. The Court concludes that while possible, it was

60

not reasonably foreseeable prior to delivery on July 7, 2021
that J.A.G. would be more than 4,500 grams at delivery. See,
e.g., id. at ¶¶ 18-19, 24; Rouse Decl. at ¶ 6.

17.  The failure to do an ultrasound when Mrs. Grenier was
admitted for induction on July 6, 2021 was not below the
standard of care. See Day 1 Trans. at 90 (Dr. Levy's testimony);
Day 5 Trans. at 80 (Dr. Greves's testimony).

18.  The decision not to perform a cesarean section after
Mrs. Grenier pushed for approximately three hours was not a
breach of the standard of care because performing a cesarean
section at that stage of labor had increased risks of
complications. See Day 4 Trans. at 47 (Dr. Mada's testimony);
Miller Depo. Trans. at 22-23; Rouse Decl. at ¶ 11.

19.  The Court concludes that there is insufficient
evidence that the standard of care was breached because
Defendant's employees used forceps to deliver J.A.G.'s head
during the operative delivery based on Dr. Rouse's opinion that
neither bruises nor abrasions are considered exceptional after
vaginal births. See Rouse Decl. at ¶ 11; see also Day 6 Trans.
at 26, 49 (Dr. Wiswell's testimony). Further, the Court
concludes that there is insufficient evidence that the forceps
delivery, including the resulting bruising, is a substantial
factor in causing the E. coli infection suffered by J.A.G. or

his significant injuries. See, e.g., Day 6 Trans. at 66
(Dr. Wiswell's testimony).

20.   The Court concludes that there is insufficient
evidence that the standard of care was breached because shoulder
dystocia occurred during delivery because it is a known risk
within the standard of care for both operative and cesarean
section deliveries. See Day 3 Trans. at 125-26 (Dr. Rabie's
testimony); Day 4 Trans. at 38-39 (Dr. Mada's testimony). The
Court also concludes that there is insufficient evidence that
the shoulder dystocia was a substantial factor in causing the E.
coli infection suffered by J.A.G. or his significant injuries.
Further, the Court concludes that there is evidence that the
shoulder dystocia resolved without causing injury to J.A.G. See
Rouse Decl. at ¶ 11; Day 5 Trans. at 109 (Dr. Rouse's testimony
that the lack of movement in J.A.G.'s arm for one day after his
birth was "a transient injury" and was "not a severe brachial
plexus injury").

21.   The nurse's note on July 7, 2021 stating that J.A.G.
had a laceration on his face and head is not credible in light
of the photographic evidence taken contemporaneously with her
note, and Dr. Brock's testimony about his recollection upon
seeing J.A.G. in the NICU on July 8, 2021. Compare Tr. Exh. J-5
at USA-002087 (Nursing Admission Physical Assessment section of
7/7/21 Newborn Nurse Admission note), with Tr. Exh. J-9 at

GRENIER003647 (photograph of Mr. Grenier cutting the umbilical cord after J.A.G.'s birth); and Wiswell Decl. at ¶ 12 (stating GRENIER003647 does not show any lacerations on J.A.G.'s face), and Brock Decl. at ¶ 13 (stating he "did not see any lacerations or cuts on J.A.G. when [J.A.G.] first entered [his] care"). Thus, the physical evidence supports a conclusion that the use of forceps during delivery was not a legal cause of the skin breakdown or laceration noted on July 10, 2021. See Tr. Exh. J-5 at USA-002749 (titled "Annotations: 0600 10 Jul 2021 – 0600 11 Jul 2021") at 0800 10 Jul 2021 – Skin Integrity note by Katharine D. Bundy, R.N. (noting "facial laceration on left cheek").

22.   The physical evidence supports a finding that J.A.G. did not sustain a fractured skull from labor or delivery, or any other reason.

a.   A head CT scan was ordered on July 8, 2021 to evaluate J.A.G. for possible fracture or hemorrhage. See Tr. Exh. J-5 at USA-002094 (Assessment and Plan section of NICU Physician Progress Note dated 7/8/21). However, the report of the CT scan did not identify any skull fracture. See id. at USA-002095 to USA-002096 (Radiology Results for CT, head w/o contrast, taken on 7/8/21); see also Day 2 Trans. at 8 (Dr. Deputy acknowledged that the report of the 7/8/21 CT scan did not indicate bony trauma).

63

b.    Further, Dr. Deputy admitted that neither the August 6, 2021 CT scan nor any other radiology report that he was aware of reflected that J.A.G. had a skull fracture. [Day 2 Trans. at 9, 14.]

c.    Only one series of physician's notes in the medical record supports Plaintiffs' position that J.A.G. suffered a skull fracture. See Day 5 Trans. at 104-05 (citing Tr. Exh. J-5 at USA-002391). USA-002391 states that J.A.G.'s "skull integrity [was] intact [with a left] occipital facture." [Tr. Exh. J-5 at USA-002391 (first page of the Physician's Note (Post-Operative Assessment), signed by resident Paige M. Owens-Kurtz, D.O., on 8/6/21).] Another note for the August 6, 2021 procedure lists "skull fracture" within the Indication section and the Preoperative Diagnosis section. [Tr. Exh. J-5 at USA-002392 to USA-002393 (Physician's Note (Neurosurgery Surgical Operative Report), signed by Teresa R. Gonzalez, P.A., on 8/7/21).]

d.    Neither the neurosurgeon nor the plastic surgeon who performed the August 6, 2021 procedure noted that J.A.G. had a skull fracture, [Day 6 at 38-39,] even though "[a] skull fracture would be obvious" during the operation, [id. at 41].

e.    If J.A.G. had suffered a skull fracture that was physically observed by one of J.A.G.'s doctors, it would have been evident in the radiographic imaging that J.A.G. underwent.

64

<u>See</u> Day 5 Trans. at 105 (Dr. Rouse's testimony); Wiswell Decl.
at ¶ 14; Day 6 Trans. at 65-66 (Dr. Wiswell's testimony); Tr.
Exh. J-6 at USA-008726 (Disc 6 of 16, including images from
J.A.G.'s 8/6/21 head CT scan).

    23.  No expert medical testimony established that medical
care below the standard of care caused J.A.G.'s liver
laceration. The Court concludes that the liver laceration did
not occur as a result of professional malpractice. <u>Cf.</u> Mada
Decl. at ¶ 33; Day 4 Trans. at 115 (Dr. Brock's testimony);
Rouse Decl. at ¶ 24; Day 6 Trans. at 29 (Dr. Wiswell's
testimony).

    24.  The Court concludes that there is insufficient
evidence that the standard of case was breached because of the
severe lacerations sustained by Mrs. Grenier that were caused
during the operative delivery of J.A.G. based on the physical
evidence of the physical size of J.A.G. and Dr. Rouse's opinion
that a fourth-degree laceration can occur, without a breach in
the standard of care, during either a forceps delivery or a
nonoperative vaginal delivery. <u>See</u> Rouse Decl. at ¶ 22; <u>see also</u>
Day 5 Trans. at 109. Further, the Court concludes that there is
insufficient evidence that the surgical repair of Mrs. Grenier's
fourth-degree perineal laceration breached the standard of care
because there is no expert medical opinion testimony

establishing that the requisite standard of care was not
provided.

25.    To the extent that Plaintiffs contend that an informed
consent claim is included in their medical negligence claim, the
Court concludes that the evidence supports a finding that
Mrs. Grenier was informed of alternative treatments or
procedures for the induction of labor for which she was
admitted, specifically that of cesarean delivery and forceps
delivery, and of the recognized risks, serious complications or
mortality associated with induction of labor and the
alternatives. See Stipulated Facts at ¶ 21.a; Tr. Exh. J-3 at
USA-010668 to USA-010673 (Informed Consent for Performance of
Procedure and Request for Anesthesia, singed by Mrs. Grenier on
7/6/21). Further, the informed consent document that
Mrs. Grenier signed upon her admission acknowledged that her
doctor may use forceps during the vaginal delivery. See Tr.
Exh. J-3 at USA-010668. Because use of forceps during the
vaginal delivery was a response to the situation that arose
during delivery, and Mrs. Grenier acknowledged the possibility
of an operative delivery at admission, no additional informed
consent was required. The Court therefore concludes that Tripler
complied with Hawai`i informed consent law. See, e.g., Rouse
Decl. at ¶ 10.

66

D.    **Plaintiffs' Claims**

26.  Because Plaintiffs failed to establish any breach of
the applicable standards of care, Plaintiffs' medical negligence
claims fail.

27.  Further, because an NIED claim requires the plaintiff
to prove that the defendant engaged in negligent conduct, and
Plaintiffs have failed to prove negligence, Plaintiffs' NIED
claims also fail. See Spriestersbach v. Hawai`i, 723 F. Supp. 3d
955, 972 (D. Hawai`i 2024) (quoting the elements of an NIED
claim listed in Ricks v. Matayoshi, CIV. NO. 16-00044 HG-KSC,
2017 WL 1025170, at *11 (D. Hawai`i Mar. 16, 2017), *aff'd sub
nom.* Ricks v. Dep't of Educ., 752 F. App'x 518 (9th Cir. 2019)).

28.  Mrs. Grenier's and Mr. Grenier's loss of filial
consortium claims and Mr. Grenier's loss of spousal consortium
claim are derivative claims based upon Plaintiffs' negligence
claims, and therefore the loss of consortium claims "are not
independent causes of action in and of themselves." See HELG
Admin. Servs., LLC v. Dep't of Health, 154 Hawai`i 228, 231 n.5,
549 P.3d 313, 316 n.5 (2024) (citation omitted). Because
Plaintiffs' negligence claims fail, the loss of consortium
claims also fail.

29.  The Court therefore concludes that Defendant is
entitled to judgment as to all of Plaintiffs' claims.

## IV. <u>ORDER REGARDING FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall be entered immediately in favor of Defendant as to all of Plaintiffs' claims in the Complaint filed on August 29, 2022.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, June 16, 2025.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

<u>TYLER GRENIER, ETC., ET AL. VS. UNITED STATES OF AMERICA; WO CV 22-00396 LEK-KJM; FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER</u>

68